**FEE PAID**

MICHELLE RITTER, in pro per
269 S. Beverly Dr. #1315
Beverly Hills, CA 92102
Tel.: (510)-828-7772
Email: ritter_legal@outlook.com
*Plaintiff Pro Se*

FILED

2026 APR 24  PM 12: 24

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF.
LOS ANGELES

BY _____

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE RITTER,<br><br>              Plaintiff,<br><br>      v.<br><br>ERIC SCHMIDT; HILLSPIRE, LLC; GLASER WEIL FINK HOWARD JORDAN & SHAPIRO LLP; CRAIG H. MARCUS, AN INDIVIDUAL; WELLS FARGO BANK, N.A.; KNOX NETWORKS, INC., DBA KNOVA FINANCE; NATALYA THAKUR, AN INDIVIDUAL; KPMG LLP; GOOGLE LLC; MATTHEW HILTZIK, AN INDIVIDUAL; HILTZIK STRATEGIES, LLC, A NEW YORK LIMITED LIABILITY COMPANY; RULTA OÜ, AN ESTONIAN ENTITY; AND DOES 1 THROUGH 50, INCLUSIVE,<br><br>              Defendants. | Case No.: **2:26-CV-04382-JGB-Ex**<br><br>**COMPLAINT FOR:**<br><br>1. Violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030);<br>2. Violation of the Stored Communications Act (18 U.S.C. §§ 2701, 2707);<br>3. Violation of the Federal Wiretap Act (18 U.S.C. §§ 2511, 2520);<br>4. Declaratory Relief Regarding Non-Formation and Non-Assent to Purported March 17, 2022 Audem Arbitration Agreement and Related Gateway Arbitrability Issues (28 U.S.C. §§ 2201–2202; 9 U.S.C. § 4);<br>5. Prospective Declaratory Judgment Under the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act (9 U.S.C. §§ 401–402; 28 U.S.C. §§ 2201–2202);<br>6. Rescission, Cancellation of Instruments, and Declaratory Invalidity of December 4, 2024 Settlement Agreement and December 17, 2024 Amendment (Cal. Civ. Code §§ 1567, 1568, 1572, 1575, 1668, 1689, 3412);<br>7. Common-Law Fraud and Negligent Misrepresentation (Account-Closure Misrepresentation and Account-Control Transfer — Against Wells Fargo Bank, N.A.);<br>8. Aiding and Abetting Breach of Fiduciary Duty and Aiding and Abetting Fraud (Operational, Non-Advocacy Conduct — Against Glaser |

COMPLAINT

Weil Fink Howard Jordan & Shapiro LLP and Craig H. Marcus);

9. Declaratory Relief that Section 3(a)(i), 3(a)(iv), Schedule D, and Section 1 of the Amendment Are Void and Unenforceable as Against Public Policy (Cal. Civ. Code §§ 1668, 1670.11; Cal. Code Civ. Proc. §§ 1001, 1002; 9 U.S.C. §§ 401–402);

10. Violation of the Bane Act — Interference with Constitutional and Statutory Rights by Threats, Intimidation, and Coercion (Cal. Civ. Code § 52.1) — Against Craig H. Marcus, individually;

11. Abuse of Process (California Common Law);

12. Defamation, False Light, Commercial Disparagement, and Intentional Interference with Prospective Economic Advantage (Cal. Civ. Code §§ 45, 46; common law);

13. Declaratory Relief and Vacatur Regarding the April 20, 2026 AAA Interim Arbitration Award — Jurisdictional Overreach, Evident Partiality, and Constitutional Infirmity (9 U.S.C. §§ 10, 402(b); 28 U.S.C. §§ 2201–2202; U.S. Const. amends. I, V, XIV); and

14. Violation of the Digital Millennium Copyright Act — Knowing Material Misrepresentation in Takedown Notices (17 U.S.C. § 512(f)) — Against Google LLC.

15. Violation of California Labor Code §§ 1102.5, 970, and 218 — Whistleblower Retaliation, Misrepresentation to Induce Service, and Unpaid Compensation.

**DEMAND FOR JURY TRIAL**

2
COMPLAINT

Plaintiff Michelle Ritter ("Plaintiff" or "Ritter") alleges on personal knowledge as to herself and her own acts, and on information and belief as to all other matters. Exhibits referenced in the following will be provided in the forthcoming filing.

## PREFATORY STATEMENT

1.     In August 2024, Eric Schmidt — former Chief Executive Officer and Chairman of Google and Alphabet, Inc. — told a classroom of students at Stanford's business school, on camera, that the rule for a Silicon Valley entrepreneur is straightforward: "Steal all the content… If it took off, you'd hire a whole bunch of lawyers to go clean the mess up… And do not quote me."[1] He then asked that the video of the talk be taken down.

2.     This case is what that rule looks like when it is applied to a woman — during the very months, and to date, Schmidt was speaking those words.

---

[1] Remarks of Eric Schmidt, former CEO and Chairman of Google and Alphabet, Inc., at Stanford University (ECON 295 / CS 323, "The Age of AI," interview with Prof. Erik Brynjolfsson) (Aug. 13, 2024). The video of the talk was posted to the Stanford Online YouTube channel and subsequently removed at Mr. Schmidt's request; a transcript of the full conversation remains publicly available. *See* Alex Heath, *Ex-Google CEO Says Successful AI Startups Can Steal IP and Hire Lawyers to "Clean Up the Mess,"* The Verge (Aug. 14, 2024), https://www.theverge.com/2024/8/14/24220658/google-eric-schmidt-stanford-talk-ai-startups-openai.

3. In June 2024, Schmidt initiated a first AAA arbitration against Plaintiff Michelle Ritter and her parents; that same month, unauthorized enterprise-device-management infrastructure carrying Schmidt's family-office domain name was operative on Michelle's personal MacBook Air, and a litigation hold was issued across the Ritter-affiliated corporate domains for which CGNET Systems International was the managed-service provider. In July 2024, Glaser Weil partner Craig H. Marcus — now named as a Defendant in this action — was informing SPM employees that Michelle had "abandoned" SPM while Schmidt and Hillspire paid those same employees to resign and absorbed more than ten of them into Schmidt-family-office roles. In August 2024, at the Stanford talk quoted above, Schmidt — on camera, to a roomful of students — said "if it took off, you'd hire a whole bunch of lawyers to go clean the mess up . . . and do not quote me." By December 2024, each of Michelle's five companies had been transferred, wound down, or renamed into vehicles controlled by Schmidt and Hillspire, LLC. The $14 million Michelle was to be paid for the five-company transfer has never been paid (Interim Award pp. 20–22).

4. Plaintiff Michelle Ritter is a Columbia Law School and Columbia Business School JD/MBA and the founder or co-founder of five companies: Steel Perlot Management, LLC (SPM); Steel Perlot Investments, LLC (SPI); StarX Networks, Inc.; Audem Management, LLC; and Knox Networks, Inc. dba Knova

Finance. From 2020 through 2024 she built and led those companies. She represents herself in this action.

5.   Michelle is also a sexual-assault survivor, a whistleblower who has written to Members of Congress about the enterprise described in this Complaint (Ex. 64), and a published advocate for working women silenced by private arbitration after reporting sexual misconduct. Congress, in the 2022 Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, and the California Legislature, in the 2022 Silenced No More Act and Code of Civil Procedure §§ 1001–1002, have already recognized that the use of pre-dispute arbitration and sworn-recantation provisions to silence sexual-misconduct reporting is a recurring, legislatively-addressed, public harm. Michelle brings this action to vindicate her own rights and — for the other survivors, whistleblowers, and workers to whom the same playbook is applied — to establish that those statutes, and the First, Fifth, and Fourteenth Amendments, mean what they say.

6.   Between April and December 2024, after Michelle reported sexual harassment, retaliation, and coercion by Schmidt to her counsel and in an April 2024 mediation, each of her five companies was transferred into, wound down into, or renamed as an entity controlled by Schmidt and his family office, Hillspire, LLC. The only stated consideration — $14 million under a December 4, 2024 Settlement Agreement — has never been paid to Michelle. The arbitrator has

now found that the $14 million was "discharged" (Interim Award pp. 20–22): Schmidt's admission, on the record, that Michelle received nothing for her 51% interest in SPM and her interests in SPI.

7. The conduct that produced the April 20, 2026 Interim Arbitration Award is, at its core, federal conduct that no arbitrator had jurisdiction to adjudicate. Enterprise-device-management infrastructure carrying Schmidt's family-office domain name — *hillspire.jamfcloud.com* — was installed on Michelle's personal MacBook Air without her authorization, capturing privileged attorney-client communications and in-transit electronic traffic, in violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030), the Stored Communications Act (18 U.S.C. §§ 2701, 2707), and the Federal Wiretap Act (18 U.S.C. §§ 2511, 2520). On April 16, 2026 — one day before the AAA prove-up hearing — a mass-DMCA vendor submitted seventeen takedown notices to Google targeting Michelle's First-Amendment-protected writing (Ex. 70), in violation of 17 U.S.C. § 512(f) (DMCA misrepresentation). The Ending Forced Arbitration Act, 9 U.S.C. § 402(b), expressly commits the applicability of pre-dispute arbitration to a *court* — not an arbitrator — when the underlying dispute relates to sexual harassment or sexual assault. Each of these statutes applies to claims and conduct that Article III courts alone may adjudicate.

8.    On April 20, 2026, and against that federal backdrop, a private arbitrator — paid directly by Schmidt at her own hourly rate estimate, with an additional $28,000 invoiced to Schmidt the day after her ruling (Ex. 62) — ordered Michelle to pay Schmidt $10,744,999. More than three-quarters of that sum, $8,080,138, is earmarked in the Award itself as a "12-month" paid-media budget to "repair Schmidt's reputation" (Interim Award p. 37). The arbitrator reached that conclusion after precluding Michelle — a pro se respondent who could not afford the arbitrator's own fees and who had lost successive counsel during the proceeding — from presenting *any* evidence under AAA Commercial Rule R-60. Arbitrator Beth M. Andrus (Ret.) is not named as a Defendant; the doctrine of arbitral immunity, *Corey v. New York Stock Exchange*, 691 F.2d 1205 (6th Cir. 1982), forecloses such claims. Plaintiff's challenge is to the Award itself under 9 U.S.C. § 10 and to the Defendants who procured it.

9.    The outcome this Complaint asks the Court to reverse is internally contradictory on its face. Michelle has been ordered to pay more than ten million dollars to the man who took her five companies, and that man took those companies for no payment. The Settlement Agreement promised Michelle $14 million for her corporate interests; Schmidt's own counsel have admitted, in the arbitration record itself, that the $14 million was never going to be paid. The sworn declaration Schmidt's counsel continues to demand Michelle sign — stating that

all contact with Schmidt was "entirely consensual and never coerced or compelled" — is a declaration Schmidt and his counsel have known to be disputed since Michelle's April 2024 mediation disclosures, and that Michelle has refused for twenty-four months to execute under oath because it is untrue. And the arbitrator has now ruled, as a matter of fact, that Michelle's sexual-harassment and sexual-assault reports are false — on one-sided evidence, in a proceeding from which Michelle was precluded from offering any evidence of her own, on a question no party ever pleaded to her, and that Congress reserved to this Court under 9 U.S.C. § 402(b).

10. The illogic is the evidence. A legitimate settlement does not condition release on a sworn recantation that opposing counsel know is untrue; does not demand economic transfer without payment of consideration; and does not build a paid-media budget into its remedy to erase a federal whistleblower's speech. Each component of the architecture serves a coercion function, not a settlement function. The purpose of the Schedule D recantation is to convert a true report into a retracted one. The purpose of the $14 million non-payment is to retain coercive leverage over a founder who has already transferred everything she had. The purpose of the $8,080,138 paid-media budget is to fund the suppression of what Michelle has published about Schmidt. The ultimate result, according to Eric Schmidt's statement, is to force the Plaintiff into bankruptcy, which is

further supported by statements from his personal friends. Together, they comprise what Congress, the California Legislature, and California courts have already declared unlawful.

11. This Complaint asks this Court to do what only this Court can do: vacate the April 20, 2026 Interim Award under 9 U.S.C. § 10 and the First, Fifth, and Fourteenth Amendments; declare void the recantation and gag provisions Congress and California have already made unenforceable; restore to Michelle what was taken under those provisions; enjoin the ongoing federal cyber-intrusion, wiretap, stored-communications, and DMCA-misrepresentation conduct pleaded in Counts I–III and XIV; and refuse to permit Eric Schmidt, Hillspire, Glaser Weil, Hiltzik Strategies, and a privately-paid arbitrator to convert their private adjudication into a court-enforceable instrument for silencing a woman's lawful speech.

12. Every date, every dollar figure, every quotation, and every pattern allegation in this Complaint is tethered to an exhibit. The case can be read in the documents.

## **INTRODUCTION**

13. *Nature of the action.* This is a federal action to vacate a private arbitral award procured through a coordinated silencing enterprise, and to enjoin, remedy, and hold accountable the enterprise's continuing violations of federal cyber-

intrusion, wiretap, stored-communications, DMCA, EFAA, and constitutional law. The enterprise is organized through Defendants Eric Schmidt, Hillspire, LLC, Glaser Weil Fink Howard Jordan & Shapiro LLP ("Glaser Weil"), and Glaser Weil partner Craig H. Marcus, and is operationalized through captive professional-service actors — KPMG LLP, Wells Fargo Bank, N.A., Knox Networks, Inc. / Knova Finance, Natalya Thakur, the American Arbitration Association administrators, and Google LLC. Its purpose is the absorption of woman-founded technology companies and the silencing of women who report on Schmidt-aligned sexual misconduct. Its most recent product is the April 20, 2026 AAA Interim Arbitration Award imposing $10,744,999 in damages on Plaintiff, of which $8,080,138 is an earmarked budget for a public-relations campaign to displace Plaintiff's First-Amendment-protected speech from search results. The enterprise, its documented pattern, and its current operations are set out in Part IV.0. The per-defendant and per-act allegations are set out in Parts IV.A–IV.M. The Reves operation-or-management, Boyle association-in-fact, wire-fraud, and H.J. Inc. continuity facts pleaded herein support the present counts and are expressly preserved for future amendment to a civil RICO count per Part VII.

14. *What this Complaint does and does not seek.* This Complaint does not ask this Court to adjudicate the historical truth of Plaintiff's 2024 private sexual-assault

report. It does not seek merits review of any parallel state-court or arbitral dispute. It does ask this Court to do four things this Court, alone, may do: (a) vacate the April 20, 2026 Interim Award under 9 U.S.C. § 10 and the First, Fifth, and Fourteenth Amendments; (b) enforce Congress's express command in 9 U.S.C. § 402(b) that the applicability of the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act is a question for a court, not an arbitrator; (c) remedy the federal cyber-intrusion, wiretap, stored-communications, and DMCA violations pleaded in Counts I–III and XIV; and (d) declare void under federal and California law the contractual instruments procured to silence a rape reporter. Plaintiff pleads the state-law rescission, aiding-and-abetting, Bane Act, abuse-of-process, and defamation counts under supplemental jurisdiction as direct consequences of the same nucleus of operative fact.

15. *Federal subject-matter jurisdiction — post-Badgerow.* This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because the action arises under (i) the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (Count I); (ii) the Stored Communications Act, 18 U.S.C. §§ 2701 and 2707 (Count II); (iii) the Federal Wiretap Act, 18 U.S.C. §§ 2511 and 2520 (Count III); (iv) the Digital Millennium Copyright Act's misrepresentation provision, 17 U.S.C. § 512(f) (Count XIV); (v) the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, 9 U.S.C. §§ 401–402, which by its express terms commits the

applicability determination to a court (Count V); and (vi) the First, Fifth, and Fourteenth Amendments as pleaded in the vacatur count (Count XIII). Consistent with *Badgerow v. Walters*, 596 U.S. 1 (2022), Plaintiff does not rely on 9 U.S.C. §§ 9, 10, or 11 as independent jurisdictional predicates. Count XIII rests on the federal-question jurisdiction supplied by EFAA, the First, Fifth, and Fourteenth Amendments, and the concurrent anchors of Counts I–III, V, and XIV under the *Vaden v. Discover Bank*, 556 U.S. 49 (2009), look-through framework. Count IV (non-formation of the March 17, 2022 Audem instrument) is pleaded under the *Vaden* look-through anchored on the same federal claims; consistent with *Granite Rock Co. v. International Brotherhood of Teamsters*, 561 U.S. 287 (2010), and *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967), formation is for this Court. Supplemental jurisdiction under 28 U.S.C. § 1367(a) covers Counts VI, VII, VIII, IX, X, XI, and XII. Declaratory authority is invoked under 28 U.S.C. §§ 2201–2202. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the conduct giving rise to the claims occurred in this District, including the December 17, 2024 on-site procurement at Plaintiff's California residence, the possession-and-lock-change pressure on California real property, direction of settlement communications into California, cyber injuries suffered by a California resident, and Wells Fargo account conduct directed at a California account-holder.

16. *Fourteen questions, one operative architecture.* The fourteen questions presented arise from a single common nucleus of operative fact — the Hillspire-and-Glaser-Weil-controlled operational architecture built around Plaintiff from 2020 through 2026 and the April 20, 2026 Interim Award by which the enterprise procured through a private adjudicator what a public court could not constitutionally have given it:

a. **Vacatur of the Interim Award.** Whether the April 20, 2026 Interim Award must be vacated under 9 U.S.C. § 10(a)(2), (3), and (4), the EFAA (9 U.S.C. § 402(b)), and the First, Fifth, and Fourteenth Amendments where (1) the arbitrator was compensated directly by the accused at her own rate-estimate and invoiced the prevailing party an additional $28,000 for "completion of this matter"; (2) the arbitrator precluded the pro se accuser from presenting any evidence; (3) the arbitrator adjudicated the truth of the accuser's EFAA-protected sexual-assault report; (4) the arbitrator awarded $8,080,138 to fund a paid-media campaign to suppress the accuser's First-Amendment-protected speech; and (5) the arbitrator drew an adverse inference from the pro se accuser's exercise of her Fifth-Amendment privilege in a quasi-criminal posture. [Count XIII]

b. **CFAA.** Whether Defendants accessed Plaintiff's computers, workspaces, DocuSign environments, and managed laptop without authorization or in excess of authorization in violation of 18 U.S.C. § 1030. [Count I]

c. **SCA.** Whether Defendants obtained, altered, or prevented Plaintiff's authorized access to stored electronic communications in violation of 18 U.S.C. §§ 2701 and 2707. [Count II]

d. **Wiretap.** Whether Defendants intercepted Plaintiff's in-transit electronic communications — including real-time screen contents, keystrokes, and attorney-client privileged communications — through JAMF and TeamViewer pathways pointed to hillspire.jamfcloud.com in violation of 18 U.S.C. §§ 2511 and 2520. [Count III]

e. **DMCA misrepresentation.** Whether DMCA notices directed at Plaintiff-authored content contain material knowing misrepresentations actionable under 17 U.S.C. § 512(f) and Lenz v. Universal Music Corp., 815 F.3d 1145 (9th Cir. 2016). [Count XIV]

f. **EFAA applicability.** Whether Plaintiff's sexual-assault-related claims are not subject to any pre-dispute arbitration agreement or class-action-waiver under 9 U.S.C. §§ 401–402, an issue Congress has expressly committed to a court by § 402(b). [Count V]

14
COMPLAINT

g. **Audem non-formation.** Whether Plaintiff ever formed the purported March 17, 2022 Audem Services Agreement now invoked against her as the jurisdictional predicate for an earlier AAA arbitration and as the source of a disputed intellectual-property clause. [Count IV]

h. **Declaratory invalidity of gag and recantation provisions.** Whether Sections 3(a)(i), 3(a)(iv), Schedule D, and Section 1 of the Amendment are void and unenforceable under Cal. Civ. Code §§ 1668 and 1670.11, Cal. Code Civ. Proc. §§ 1001 and 1002, the Silenced No More Act, and EFAA. [Count IX]

i. **Rescission.** Whether the December 4, 2024 Settlement Agreement and the December 17, 2024 Amendment are subject to rescission, cancellation, and declaratory invalidity on fraud, duress, undue influence, and failure-of-consideration grounds independent of the assault merits. [Count VI]

j. **Wells Fargo.** Whether Wells Fargo intentionally misrepresented closure of three identified Plaintiff accounts while retaining at least one ($946,706.69 SPM-savings -6449) under a Hillspire-aligned successor re-titling. [Count VII]

k. **Aiding and abetting — Glaser Weil and Marcus.** Whether Glaser Weil and Marcus, acting as operational business managers rather than as advocates, knowingly assisted Schmidt-side actual fraud through conduct

falling within the California Code of Civil Procedure § 340.6 actual-fraud carve-out and outside the litigation privilege. [Count VIII]

l. **Bane Act — Marcus individually.** Whether Marcus's December 17, 2024 on-site statements at Plaintiff's California residence ("sued into oblivion" / "sheriffs will be called") and follow-on coercion interfered with Plaintiff's constitutional and statutory rights in violation of Cal. Civ. Code § 52.1. [Count X]

m. **Abuse of process.** Whether Defendants' use of the purported March 17, 2022 Audem Agreement as the jurisdictional predicate for AAA Case 01-24-0005-8902, and their deployment of the AAA forum in Case 01-25-0000-2191 as a silencing vehicle, constitute abuse of process. [Count XI]

n. **Defamation, false light, trade libel, and IIPEA.** Whether Defendants' coordinated public-relations attacks, the planned republication of the arbitrator's defamation findings through the $8,080,138 Rose-directed paid-media campaign, the existing platform-level suppression on Google and X, and the Knox/Thakur commercial-disparagement conduct are actionable. [Count XII]

17. *Parties in overview; full party allegations at Part II.* Named defendants are Eric Schmidt, Hillspire LLC, Glaser Weil Fink Howard Jordan & Shapiro LLP, Craig H. Marcus (individually), Wells Fargo Bank, N.A., Knox Networks, Inc. dba

Knova Finance, Natalya Thakur (individually), KPMG LLP, Google LLC, and Does 1–50. Glaser Weil and Marcus are named for operational, non-advocacy conduct within the actual-fraud carve-out of Cal. Code Civ. Proc. § 340.6(a) and the operational-business-manager carve-out to Cal. Civ. Code § 47(b) recognized in *Kolar v. Donahue, McIntosh & Hammerton*, 145 Cal. App. 4th 1532 (2006), and *Rickley v. Goodfriend*, 212 Cal. App. 4th 1136 (2013). Plaintiff does not sue any Defendant for statements made to a tribunal or for privileged advocacy within the meaning of Cal. Civ. Code § 47(b) and *Rusheen v. Cohen*, 37 Cal. 4th 1048 (2006). The American Arbitration Association is identified as a non-defendant actor in Part II and is the subject of extensive factual allegations in Parts IV.0, IV.K, and IV.L, but is not named as a defendant in this Complaint on account of the arbitral-immunity doctrine articulated in *Corey v. New York Stock Exchange*, 691 F.2d 1205 (6th Cir. 1982), and its progeny; AAA's administrative conduct supports the § 10(a)(2) evident-partiality vacatur ground in Count XIII. Persons and entities referenced for context, percipient-witness status, or preservation-notice purposes — including Jillian Harris, Maria Seferian, Mandy Quach, Debra Smith, CGNET, Eric Rose, Matthew Hiltzik, Kelt 6 Strategies, and Alphabet Inc.— are identified in Part II.

## PARTIES

**FIGURE 1 — Entity Map**
*Hillspire hub, control arms, and Plaintiff's dotted-line interfaces*



Figure 1 — Entity Map. Hillspire hub, controlled entities, professional-service arms, and Plaintiff's dotted-line interfaces. Non-hub ellipses and rectangles do not themselves imply defendant status; see Part II (Parties) for the list of named defendants.

18. Plaintiff Michelle Ritter is an individual residing in the Central District of California. At the time of the events pleaded herein, Ritter was a dual JD/MBA candidate at Columbia Law School and Columbia Business School. In May 2020, as a Columbia graduate student and before she met Defendant Schmidt,

Ritter founded StarX Networks, Inc. ("StarX") through Wilson Sonsini Goodrich & Rosati, P.C., as a Delaware corporation developing consumer-facing technology products. Between 2020 and 2024, Ritter served as founder and Chief Executive Officer of StarX; served as founder, Chief Executive Officer, and principal of Audem Management, LLC ("Audem"); served as a Managing Director of Steel Perlot Management, LLC ("SPM"), the investment-management vehicle co-created with Defendant Schmidt in 2021; and served as a board member or principal of other Schmidt-adjacent entities, including Knox Networks, Inc. dba Knova Finance ("Knox"), where, under Certificate CS-02, she holds a 19,500,000 out of 24,000,000-share Common Stock position. Ritter is the author of the January 29, 2026 op-ed "The Predator's Playground" (Ex. 63) and the February 10, 2026 Whistleblower Letter to Members of Congress (Ex. 64).

19. Defendant Eric Schmidt is an individual who, directly and through Hillspire, the Steel Perlot Entities, Orion-related entities, and agents, directed or benefited from the conduct alleged herein. Eric Schmidt is the former CEO and Chairman of Google LLC and then Alphabet; he is intimately knowledgeable in digital security, data transfer, and data manipulation across digital-based systems. He has a net worth of over $50 billion; he now demands that Ritter pay, in part, for

his $8M+ PR campaign. He previously served as Chairman of Steel Perlot Management LLC and as Chairman of Knox Networks Inc dba Knova Finance.

20. Defendant Hillspire, LLC is Eric Schmidt's integrated management company and the practical hub through which Schmidt-side financial, tax, accounting, legal, information-technology, property, banking, and operational affairs were directed, coordinated, administered, or funded during the relevant period.

21. Defendant Glaser Weil Fink Howard Jordan & Shapiro LLP ("Glaser Weil") is a California limited liability partnership with its principal place of business in Los Angeles, California. Glaser Weil is named as a defendant in Count VIII only, and solely for operational, non-advocacy conduct alleged in Parts IV.A, IV.F, IV.I, and IV.J, including (a) its partners' assumption of governance and operating roles within Steel Perlot Management, LLC and affiliated Steel Perlot Entities from April 2024 forward, as alleged in Part IV.A and confirmed by the July 15, 2024 SPM internal memorandum identifying "our Hillspire counterparts and SPM finance — who are de facto managers" (Ex. 32); (b) its partners' on-site, non-courtroom participation in the procurement of the December 17, 2024 Amendment at Plaintiff's California residence, as alleged in Part IV.F; (c) its direction of a 2024 witness-development campaign directed at former Steel Perlot employees in which severance and release payments were used as leverage to obtain statements adverse to Plaintiff, as alleged in Part IV.I and supported by

the September 25, 2025 declaration of Elijah Reinhardt (Ex. 1) and the April 9, 2026 declaration of Bruce Pixley (Ex. 2); and (d) its post-litigation refusal, by Marcus, to honor Plaintiff's September 11, 2025 records-preservation notice and to withdraw under California Rules of Professional Conduct Rule 3.7 despite having himself submitted testimonial declarations in the underlying arbitration (Exs. 33–34). Glaser Weil is not named for any statement made to a tribunal, in pleadings, in privileged negotiations, or in any other act within the protection of California Civil Code section 47(b) or Rusheen v. Cohen, 37 Cal. 4th 1048 (2006).

22. Defendant Craig H. Marcus is an individual and a partner at Glaser Weil. Marcus is named as a defendant in Count VIII only, and solely for operational, non-advocacy conduct alleged in Parts IV.A, IV.F, IV.I, and IV.J. The conduct pleaded against Marcus includes, without limitation: (a) his April 2024 assumption, together with Glaser Weil partner Jillian Harris, of governance and operating roles within Steel Perlot Management, LLC and affiliated Steel Perlot Entities at Hillspire's direction (Ex. 1, Reinhardt Decl. ¶¶ 20–34); (b) his on-site presence and statements at Plaintiff's California residence on December 17, 2024 during the coercive procurement of the Amendment (Part IV.F); (c) his direction or participation in the 2024 witness-development activity described in Part IV.I; (d) his September 12, 2025 written refusal to honor Plaintiff's records-

preservation notice and his refusal to withdraw under California Rules of Professional Conduct Rule 3.7 despite having himself filed testimonial declarations in the AAA arbitration (Ex. 34); and (e) his December 23, 2024 written communication placing pressure on Plaintiff regarding dismissal of a domestic-violence restraining order filing in direct connection with settlement performance (Ex. 35). Marcus is not sued for advocacy, pleadings, or tribunal statements. Plaintiff invokes the operational-conduct / business-manager carve-out to the litigation privilege recognized in Kolar v. Donahue, McIntosh & Hammerton, 145 Cal. App. 4th 1532 (2006), and Rickley v. Goodfriend, 212 Cal. App. 4th 1136 (2013), together with the crime-fraud limitation on the attorney-client privilege under California Evidence Code section 956.

23. Defendant Wells Fargo Bank, N.A. is a national banking association with its main office in South Dakota, doing business in California and throughout the United States. Wells Fargo is named solely for the narrow banking-channel conduct alleged at Part IV.H and Count VII, including the October 12, 2024 written representation that three identified Plaintiff accounts would be permanently closed on or before November 8, 2024 with cashier's-check remittance, the allegation that at least one such account was not closed and its control was transferred to Schmidt- or Hillspire-aligned actors without Plaintiff's consent, and related account-document misrepresentations. Wells Fargo

22
COMPLAINT

personnel referenced by name in this Complaint include Lisa Meredith (personal banker relevant to the November 2020 Wells Fargo personal credit-card issuance and the December 2021 Audem banking set-up; Meredith, on October 25, 2024, confirmed in writing that the account-closure action was "final" because Plaintiff was "no longer associated with the Hillspire family office") and Jerald Sencil (personal banker relevant to account-authorization conduct),.

24. Defendant Knox Networks, Inc. ("Knox") is a Delaware corporation incorporated on January 26, 2021, now operating or doing business under the name "Knova Finance" or through a successor or affiliated entity. Plaintiff served as Chief Executive Officer and as a founding director of Knox from March 15, 2021 (Action of Incorporator) until her removal on or about April 24, 2024, contemporaneous with the April 2024 Glaser Weil governance transition alleged in Part IV.A. Plaintiff holds 24,000,000 shares of Knox Common Stock issued under Certificate CS-02 (June 21, 2021) and reflected on Knox's own books and records as of both 12/31/2022 and 3/31/2024 (see Part IV.D.2). Eric Schmidt and current Alphabet, Inc. director R. Martin Chavez served as Knox directors during Plaintiff's tenure. Knox is named in Count XII (Defamation, False Light, Commercial Disparagement, and Intentional Interference with Prospective Economic Advantage) and, as appropriate, in any future civil RICO count (reserved per Part VIII). Plaintiff's employment-law, Delaware § 220

23
COMPLAINT

statutory-inspection, fiduciary-duty, and workplace-harassment claims arising from her Knox work are expressly reserved per Part VII. Plaintiff worked at Knox solely for equity compensation, which has been discriminatorily and retaliatorily withheld.

25. Defendant Natalya Thakur is an individual, a Knox officer (Chief Operating Officer at the time of Certificate CS-02's June 21, 2021 issuance) and a Knox common stockholder (holder of 5,600,000 shares across Certificates CS-03 and CS-04). On or about April 24, 2025, Thakur participated in the Schmidt-aligned Knox repurchase / call-back / claw-back notice directed at Plaintiff's 24,000,000-share Common Stock position (Part IV.D.5). In April and May 2025, Thakur, together with Knox/Knova Finance, demanded that Plaintiff execute an 8- to 9-page agreement barring Plaintiff from (i) contacting any other Knox stockholder, (ii) pursuing litigation based on information Knox would otherwise be required to provide, and (iii) exercising Delaware statutory shareholder rights (Part IV.D.6). In 2022 and 2023, Thakur, in coordination with Hillspire, redirected StarX Networks, Inc. tax documents — causing them to be withheld from Plaintiff, Knox's 100% StarX-owner stockholder-CEO (Part IV.D.7). Thakur has further participated in defamatory statements and communications concerning Plaintiff made to industry, investor, employer, and media audiences after Plaintiff's 2024 sexual-assault report. Thakur is named in Count XII, and

her conduct is preserved for amendment to any future civil RICO count per Part VII.

26. Defendant KPMG LLP ("KPMG") is a Delaware limited liability partnership that served as the public-accounting firm for Steel Perlot Management, LLC, for Schmidt-aligned Orion Wing Management, LLC, and, on information and belief, for Hillspire-aligned taxpayers during the relevant period. KPMG's conduct is preserved as pattern and predicate-act evidence for any future civil RICO count per Part VIII based on its alleged role in the tax-and-books conduct pleaded in Part IV.C, including the April 9, 2024 Tahiliani–Coit internal characterization of Plaintiff as "our investor" (Ex. 7), the preparation of SPM 2023 and 2024 returns under Schmidt-side control (Ex. 9), and the post-settlement Orion Wing Wind-Down Ledger reconciliations reflected in Ex. 36. KPMG is also named in Count XII (Commercial Disparagement) for its alleged participation in attributing tax and financial exposure to Plaintiff inconsistent with the economic benefit flows.

27. Defendant Google LLC ("Google") is a Delaware limited liability company with its principal place of business in Mountain View, California, and is a wholly-owned subsidiary of Alphabet Inc. Defendant Eric Schmidt is the former Chief Executive Officer and former Executive Chairman of Google and Alphabet. Google is named as a defendant on Counts I (CFAA), II (SCA), III (Federal Wiretap Act), XII (Defamation / False Light / Trade Libel / Intentional

Interference), XIII (Vacatur — injunctive relief against further Google-facilitated suppression of First-Amendment-protected speech), and XIV (DMCA Misrepresentation), based on (i) Google's operation of the Google Workspace tenants pleaded in Counts I and II and the server-side data-handling pleaded in Part IV.E; (ii) Google's control of the search-indexing and DMCA-processing architecture pleaded in Part IV.J.5; and (iii) Google's channel relationship with the Schmidt-directed Hillspire family office and with Glaser Weil as counsel. Plaintiff pleads her claims against Google narrowly and specifically and does not plead vicarious liability for Schmidt's personal conduct. Plaintiff reserves claims against Alphabet Inc. and against X Corp., Meta Platforms, Inc., LinkedIn Corporation, and Substack Inc. consistent with Part VII.

28. Defendant Matthew Hiltzik is, on information and belief, a public-relations executive and principal of Defendant Hiltzik Strategies, LLC, with a principal place of business in New York, New York. At all times relevant to this Complaint, Hiltzik has acted as a paid reputation-management agent of Defendants Schmidt and Hillspire, coordinating the narrative-positioning, reporter-response, and press-placement components of the silencing campaign described in Parts IV.A, IV.F, IV.K, and IV.L. Hiltzik's California-directed contacts include (i) his ongoing retention by California-resident Schmidt and California-headquartered Hillspire; (ii) his sustained interstate communications

directed into California over three years; and (iii) his participation in the California-governed Schedule D, Settlement Agreement, and AAA architecture, all of which are centered in and directed at California. Personal jurisdiction lies under *Calder v. Jones*, 465 U.S. 783 (1984), *Walden v. Fiore*, 571 U.S. 277 (2014), and *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064 (9th Cir. 2017). Hiltzik is named on Counts VIII, X, XI, XII, and XIII, with DMCA liability under Count XIV reserved to the extent supported by discovery.

29. Defendant Hiltzik Strategies, LLC is, on information and belief, a New York limited liability company with a principal place of business in New York, New York, and is the firm through which Defendant Hiltzik provides reputation-management services to Schmidt and Hillspire. Hiltzik Strategies is named on the same Counts as Hiltzik individually, on a joint-and-several basis. Personal jurisdiction lies on the bases described in the foregoing paragraph.

30. Defendant Rulta OÜ is, on information and belief, an Estonian limited-liability entity (*osaühing*) engaged in mass-DMCA takedown-notice submission services. On April 16, 2026 — one day before the April 17, 2026 AAA prove-up hearing — Rulta OÜ submitted a mass-DMCA notice purportedly on behalf of "camille yuki," targeting seventeen URLs across unrelated domains (Lumen Database record 83213332; Ex. 70). Plaintiff alleges, on information and belief, that Rulta OÜ knowingly submitted false or materially misrepresented takedown

notices in violation of 17 U.S.C. § 512(f), coordinated with one or more other Defendants. Rulta OÜ is named on Count XIV (DMCA Misrepresentation). Personal jurisdiction lies under the effects-test principles articulated in *Calder* and its progeny: Rulta OÜ's conduct was expressly aimed at California-directed Google search and platform results and at a California-resident target.

31. Defendants Does 1 through 50 are presently unknown persons or entities responsible for specific acts of unauthorized access, credential retention, workspace administration, direct procurement of the December 2024 Settlement Agreement and Amendment, direction or participation in the 2024 witness-development campaign alleged in Part IV.I, Wells Fargo account-handling or account-control-transfer conduct, AAA administrative conduct, KPMG tax-and-books conduct, or Knox/Knova Finance claw-back and defamation conduct. Plaintiff will seek leave to amend when particularized facts as to their conduct are confirmed.

32. Doe Defendants 1–50. Plaintiff sues Defendants Does 1 through 50, inclusive, by such fictitious names because their true identities are presently unknown. Plaintiff will amend this Complaint to allege their true identities when ascertained. For pleading convenience, Plaintiff categorizes the Doe Defendants as follows: (a) Does 1–10 are information-technology operators, system administrators, and enterprise-credential custodians aligned with Hillspire,

COMPLAINT

CGNET, or Schmidt-controlled entities who participated in the CFAA, SCA, and Wiretap Act conduct pleaded in Parts IV.A, IV.E, and IV.F; (b) Does 11–20 are attorneys, paralegals, and support personnel at or aligned with Glaser Weil Fink Howard Jordan & Shapiro LLP (other than Defendant Craig H. Marcus) who engaged in operational, non-advocacy conduct within the business-manager carve-out of Cal. Code Civ. Proc. § 340.6(a); (c) Does 21–30 are principals, officers, or employees of Hiltzik Strategies, LLC, Kelt 6 Strategies, or other public-relations, search-engine-optimization, or DMCA-submission vendors (including persons working with or for Defendant Rulta OÜ) who participated in the Count XII and Count XIV conduct; (d) Does 31–40 are officers, employees, or agents of Knox Networks, Inc. / Knova Finance or KPMG LLP who participated in the Count XII commercial-disparagement or aiding-and-abetting conduct; and (e) Does 41–50 are additional individuals or entities identified through discovery. Plaintiff will amend to substitute true names and specific allegations upon identification.

33. *Non-defendant actors identified for context, preservation, and proof-source value.* Plaintiff identifies the following persons and entities as non-defendant actors who are presently not sued in this filing but whose conduct is referenced in this Complaint for context, percipient-witness status, custodial role, or proof-source value; and who are expressly placed on litigation-hold notice, in this

Complaint, of their obligation to preserve all documents, communications, files, devices, accounts, credentials, and other materials in their possession, custody, or control relating to Plaintiff, to the entities alleged herein, to the AAA proceeding, and to the conduct alleged herein: (a) Alphabet Inc. and Google LLC ("Google/Alphabet"), as the provider of the Google Workspace tenants pleaded in Counts I and II and as the employer during the relevant period of Defendant Schmidt's prior role; (b) Jillian Harris (Glaser Weil partner, conduct pleaded in Parts IV.A, IV.E, IV.F, IV.I) — reserved for individual naming in amendment; (c) Maria Seferian (Audem formation counsel), Mandy Quach (Wells Fargo personal banker, Audem banking set-up), Debra Smith (Schmidt-aligned on-site agent December 17, 2024), CGNET and its personnel including Ricardo Uribe and "Georg" (technology/DocuSign administrators), TriNet (payroll-services vendor for SPM/Audem), Kelt 6 Strategies (on information and belief, a Schmidt-aligned public-relations or strategic-communications firm), Matthew Hiltzik (on information and belief, a Schmidt-aligned public-relations actor, referenced in the Interim Award's "WSJ-related" damages component), Lisa Meredith (Wells Fargo personnel who confirmed the October 12, 2024 closure as "final" because Plaintiff was "no longer associated with the Hillspire family office," Ex. 37), Jerald Sencil (Wells Fargo personal banker), KPMG personnel including Sunil Tahiliani, Eric Rose (on information and belief, the public-

relations principal identified by the arbitrator as the recipient of the $8,080,138 "reputational-harm mitigation" budget), Fried, Frank, Harris, Shriver & Jacobson LLP (legal-services vendor referenced in the Wind-Down Ledger, Ex. 36). The American Arbitration Association ("AAA") is a New York not-for-profit corporation that administers commercial, consumer, and employment arbitration proceedings through regional offices, including the Los Angeles office that administered Hillspire, LLC; Orion Wing, LLC fka Steel Perlot v. Ritter, AAA Case No. 01-25-0000-2191.

34. All additional claims and parties, including any individual claims against Ms. Harris, are reserved consistent with Part VII.

## JURISDICTION AND VENUE

35. *Federal-question jurisdiction under 28 U.S.C. § 1331.* This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Counts I, II, III, V, XIII, and XIV arise under the laws of the United States: the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (Count I); the Stored Communications Act, 18 U.S.C. §§ 2701 and 2707 (Count II); the Federal Wiretap Act, 18 U.S.C. §§ 2511 and 2520 (Count III); the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, 9 U.S.C. §§ 401–402, which by the express terms of § 402(b) commits the determination of EFAA applicability to a court rather than an arbitrator and thereby confers a federal-question right of judicial determination

that supports federal-question jurisdiction for the prospective declaratory relief sought in Count V; federal constitutional questions under the First, Fifth, and Fourteenth Amendments as pleaded in Count XIII. Count IV (non-formation under 9 U.S.C. § 4) is pleaded under the Vaden v. Discover Bank, 556 U.S. 49 (2009), "look-through" framework applicable to 9 U.S.C. § 4: the non-formation issue in Count IV is tied to the same nucleus of operative fact as Counts I, II, III, and V, and the controversy between the parties that would exist absent the purported arbitration agreement is one over which this Court would have federal-question jurisdiction on the basis of those federal claims.

36. *Post-Badgerow statement.* Consistent with *Badgerow v. Walters*, 596 U.S. 1 (2022), Plaintiff acknowledges that 9 U.S.C. §§ 9, 10, and 11 do not themselves supply federal subject-matter jurisdiction for petitions to confirm, vacate, or modify an arbitration award. Count XIII rests on federal-question jurisdiction under 28 U.S.C. § 1331 because it adjudicates (i) the applicability of EFAA, 9 U.S.C. §§ 401–402, which Congress has committed to a court by § 402(b); (ii) Plaintiff's First-, Fifth-, and Fourteenth-Amendment rights as pleaded in Part IV.K; and (iii) the § 10(a) vacatur grounds come before the Court through the concurrent federal-question anchors in Counts I, II, III, V, and XV under Vaden look-through principles.

37. *Non-arbitrable federal anchors.* Four non-arbitrable federal anchors make this case properly federal: (a) unauthorized-access and retained-access conduct under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (Count I); (b) facility-access and stored-communications conduct under the Stored Communications Act, 18 U.S.C. §§ 2701 and 2707 (Count II); (c) in-transit interception conduct under the Federal Wiretap Act, 18 U.S.C. §§ 2511 and 2520 (Count III); and (d) the prospective determination, committed to this Court by 9 U.S.C. § 402(b), that Plaintiff's sexual-assault-related claims are not subject to any pre-dispute arbitration agreement or class-waiver under the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, 9 U.S.C. §§ 401–402 (Count V). The contract-formation issue in Count IV is tied to these federal anchors under the Vaden look-through framework applicable to 9 U.S.C. § 4 only. The rescission and declaratory-invalidity claim in Count VI is pleaded as a state-law claim under supplemental jurisdiction and is anchored in fraud-in-the-inducement and failure of consideration independent of the merits of any assault allegation. Count VII adds a narrow banking-channel state-law claim (Wells Fargo account-closure misrepresentation and account-control transfer) invoked here under supplemental jurisdiction. Count VIII, against Glaser Weil and Marcus, is a state-law aiding-and-abetting claim anchored in actual-fraud conduct falling within the fraud-exception carve-out to California Code of Civil

Procedure section 340.6(a), and is pleaded under supplemental jurisdiction. Counts IX (Anti-Silencing Declaratory), X (Bane Act), XI (Abuse of Process), and XII (Defamation) are pleaded under supplemental jurisdiction. Tax-attribution conduct is pleaded in this Complaint as material fact supporting Counts VI (¶ G falsity, duress and undue influence, and failure of consideration) and XIV only; any independent federal or state tax-related cause of action is reserved consistent with Part VII.

38. This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 with respect to the declaratory requests in Counts IV, V, IX, and XIII as set forth in the Prayer for Relief.

39. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Counts VI (rescission/cancellation), VII (Wells Fargo), VIII (aiding and abetting), IX (declaratory invalidity of gag provisions, on state-law grounds), X (Bane Act), XI (abuse of process), and XII (defamation), because each arises from the same nucleus of operative fact as the federal claims: the Hillspire-controlled integrated operational architecture (books, banking, technology, workspaces, and counsel) that (i) caused and facilitated the CFAA/SCA/Wiretap injuries pleaded in Counts I, II, and III, (ii) predicated the ¶ G concealment and on-site procurement conduct underlying Counts VI and X, (iii) drove the Wells Fargo account-handling conduct indexed to Hillspire status as alleged in Part IV.H, and (iv) was assisted

by the operational, non-advocacy acts of Glaser Weil and Marcus alleged in Part IV.I.

40. Plaintiff further represents that Count VIII is not duplicative of any claim pending in *Ritter v. Schmidt*, Los Angeles Superior Court Case No. 25STCV26114 (currently stayed). The LASC action does not name Glaser Weil or Marcus as defendants, and does not plead federal CFAA, SCA, or Wiretap claims against Schmidt or Hillspire. Plaintiff will comply with any first-to-file, related-case, or case-management direction of this Court, and will make prompt disclosure of the LASC action in the parties' Rule 26(f) submissions and in any Local Rule 83-1.4.1 related-case notice.

41. Supplemental jurisdiction is appropriate, and abstention is not. The federal claims in Counts I, II, III, V, XIII, and XIV raise federal cyber-intrusion, wiretap, EFAA-applicability, constitutional, and RICO questions that cannot be resolved in the AAA forum and that were not fully available in the state-court posture as to the parties currently before this Court. The parallel proceedings are not "substantially similar" within the meaning of the federal abstention doctrines because (i) the AAA forum cannot adjudicate the federal statutory claims in Counts I, II, III, and XIV, cannot adjudicate EFAA applicability (which 9 U.S.C. § 402(b) commits to a court), and cannot adjudicate the non-formation issue in Count IV that is reserved to a court, and (ii) the LASC action does not include

the Count VIII defendants or the federal claims. Plaintiff does not seek merits supervision of the AAA; she seeks adjudication of federal statutory claims and narrow California claims directly tied to the same operative facts.

42. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this District, including the December 17, 2024 in-person procurement event at Plaintiff's California residence, possession and lock-change pressure connected to California real property, direction of settlement communications into California, cyber-related injuries suffered by Plaintiff in California, and Wells Fargo account conduct directed at a California account-holder.

43. Defendants purposefully directed conduct toward California and this District, including settlement procurement at Plaintiff's California residence, property-possession pressure, communications with California counsel or California-based actors, control of accounts, records, property, and workspaces used by a California resident, and Wells Fargo banking-channel conduct concerning accounts held by a California resident.

44. An actual and concrete controversy exists for purposes of 28 U.S.C. §§ 2201–2202. Defendants have invoked, referenced, or reserved rights under a purported March 17, 2022 Audem agreement that Plaintiff denies forming, and Defendants claim rights and benefits under the December 4, 2024 Settlement Agreement and

December 17, 2024 Amendment, both of which Plaintiff disputes in validity and enforceability. The American Arbitration Association issued the April 20, 2026 Interim Award that Count XIII seeks to vacate. Wells Fargo has, and has exercised, the administrative authority over the identified accounts on which Count VII depends.

45. *Article III standing.* Plaintiff has Article III standing under *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), and *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014). Plaintiff has suffered concrete, particularized, and actual-or-imminent injuries-in-fact including (i) a $10,744,999 monetary obligation presently enforceable against her; (ii) ongoing search-platform de-indexing of her First-Amendment-protected speech (Exs. 67–70); (iii) a scheduled $8,080,138 paid-media campaign to further suppress her speech; (iv) present and continuing CFAA, SCA, and Wiretap Act intrusions on her personal device (Ex. 2, Pixley Decl.); (v) chilling effect on her continuing Petition-Clause communications with Members of Congress; and (vi) conversion of her personal property and interference with her California real-property possession. Each injury is fairly traceable to the conduct pleaded in Parts IV.0 through IV.M and is redressable by vacatur, declaratory, injunctive, and monetary relief within this Court's Article III authority. Plaintiff further has prospective First-Amendment standing under *Driehaus* because Defendants have credibly threatened and

scheduled additional enforcement of the gag, recantation, and non-disparagement provisions pleaded in Count IX, and have scheduled execution of the Rose-directed $8,080,138 PR campaign pleaded in Part IV.0.3 and Count XII.

46. *Federal-question anchors for Count XIII under Vaden.* Jurisdiction over Count XIII (vacatur) is supplied, post-*Badgerow v. Walters*, 596 U.S. 1 (2022), by (a) the independent federal question presented by EFAA applicability under 9 U.S.C. § 402(b), which Congress has expressly committed to a court, not an arbitrator; (b) the First-Amendment question presented by an arbitral order awarding $8,080,138 in prospective speech-suppression funding against a rape reporter and whistleblower; (c) the Fifth-Amendment question presented by the adverse inference drawn against a pro se respondent from her exercise of the privilege against self-incrimination in a quasi-criminal defamation posture; (d) the Fourteenth-Amendment and state-action-entanglement questions presented by a state-compelled FAA and California Arbitration Act forum operating under public-court enforcement authority; and (e) the *Vaden v. Discover Bank*, 556 U.S. 49 (2009), look-through anchors supplied by Counts I (CFAA, 18 U.S.C. § 1030), II (SCA, 18 U.S.C. §§ 2701, 2707), III (Federal Wiretap Act, 18 U.S.C. §§ 2511, 2520), V (EFAA, 9 U.S.C. §§ 401–402), and XIV (DMCA, 17 U.S.C. § 512(f)), each of which arises independently under federal statute and is not

derivative of any contract. Count IV (Audem non-formation) is likewise pleaded under a *Vaden* look-through anchored on those same federal claims; consistent with *Granite Rock Co. v. International Brotherhood of Teamsters*, 561 U.S. 287 (2010), and *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967), formation is for this Court.

47. *No preclusion: anticipatory res judicata and Rooker-Feldman hedge.* The California state-court order compelling arbitration in *Case No. 25STCV26114* adjudicated only gateway arbitrability, not the merits of any federal claim; under Cal. Evid. Code § 452(d) and *Sosinsky v. Grant*, 6 Cal. App. 4th 1548 (1992), and *Herrera v. Deutsche Bank Nat. Trust Co.*, 196 Cal. App. 4th 1366 (2011), a court order is judicially noticeable for its existence, not for the truth of contested factual recitals. The April 20, 2026 AAA Interim Award did not adjudicate Counts I, II, III, VI, VII, VIII, or XIV on the merits, did not reach the non-SPM tenants pleaded in Parts IV.E and IV.L, and cannot preclude claims on which the respondent was, by the arbitrator's March 13, 2026 R-60 order, "precluded from presenting any evidence in her defense." *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 480–82 (1982), requires a full and fair litigation opportunity before preclusion attaches; none existed here. *Rooker-Feldman* does not apply: the state LASC order is interlocutory (arbitration compelled, merits stayed) and Plaintiff does not ask this Court to review, reverse, or modify that order. This

Court is asked instead to adjudicate independent federal claims and to vacate a private arbitral award under 9 U.S.C. § 10 — neither of which triggers *Rooker-Feldman*. See *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280 (2005).

## FACTUAL ALLEGATIONS

### A.   The Machine — Enterprise Identity, Documented Pattern, And Current Operations

48. This Section IV.0 identifies the silencing enterprise Plaintiff alleges is the subject of this action. Its purpose is to frame for the Court, before the chronological narrative begins at Part IV.A, what Plaintiff is suing over and whom. The particularized per-defendant and per-act allegations follow at Parts IV.A through IV.M. The Reves v. Ernst & Young, 507 U.S. 170 (1993), operation-or-management facts; the Boyle v. United States, 556 U.S. 938 (2009), association-in-fact enterprise facts; the H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989), continuity-and-pattern facts; and the particularized wire-fraud predicates under 18 U.S.C. § 1343 pleaded in this Section and throughout Parts IV.C, IV.D, IV.I, IV.K, IV.L, and IV.H are pleaded in support of the counts set forth in this Complaint and are expressly preserved for future amendment to a civil RICO count under 18 U.S.C. §§ 1961–1968 per Part VII.

49. The Enterprise: Four actors operate at the center of the enterprise:

a. *Eric Schmidt.* Former Chief Executive Officer and Executive Chairman of Google LLC and Alphabet Inc.; net worth in excess of $50 billion; principal of the Schmidt family office Hillspire, LLC; former Chairman of Steel Perlot Management, LLC and of Knox Networks, Inc. dba Knova Finance. Schmidt is intimately knowledgeable in digital-security, data-transfer, and data-manipulation architecture.

b. *Hillspire, LLC.* Schmidt's integrated management company and the operational hub through which Schmidt-side legal, accounting, tax, banking, information-technology, property, and settlement actions have been coordinated during the relevant period. Hillspire controls the JAMF mobile-device-management service at *hillspire.jamfcloud.com*, the CGNET administrator-credential chain across the *steelperlot.com*, *starx.com*, and *audem-mgmt.com* Google Workspaces, and the Hillspire-administered DocuSign environments used to transmit, store, and attempt to authenticate contested instruments including the purported March 17, 2022 Audem Services Agreement and the December 4, 2024 Settlement Agreement.

c. *Glaser Weil Fink Howard Jordan & Shapiro LLP* and *Craig H. Marcus.* A Los Angeles-based law firm and its partner, who act as Schmidt's outside counsel and, since March 2024, as operational managers of Steel

Perlot Management, LLC and affiliated Steel Perlot Entities at Hillspire's direction. The operational character of that role is acknowledged contemporaneously by Plaintiff herself in the July 15, 2024 internal memorandum addressed in part to "counsel (cc'ed) and those — including our Hillspire counterparts and SPM finance — who are *de facto* managers" (Ex. 32), and by former Steel Perlot Management employee Elijah Reinhardt in his September 25, 2025 declaration (Ex. 1). Glaser Weil partner Jillian Harris operates alongside Marcus; her individual liability is reserved for amendment per Part VII.

d. *The AAA administrative machinery — named as non-defendant actor only.* The American Arbitration Association is the dispute-resolution institution whose administration — through its Los Angeles office, its case administrator Ms. Julie E. Collins, and its retained arbitrator the Honorable Beth M. Andrus (ret.) — permitted the April 20, 2026 Interim Award to issue under the pay-to-play compensation structure disclosed on the face of the April 21, 2026 Transmission Letter (Ex. 62). The AAA is identified here as an enterprise component and as a non-defendant actor for preservation and proof purposes; it is not named as a defendant in this Complaint in view of the arbitral-immunity doctrine articulated in *Corey v. New York Stock Exchange*, 691 F.2d 1205 (6th Cir. 1982), *Olson v.*

*NASD*, 85 F.3d 381 (8th Cir. 1996), and *Cort v. Am. Arb. Ass'n*, 795 F. Supp. 970 (N.D. Cal. 1992). AAA's administrative conduct — including the pay-to-play compensation structure, the direct-party-invoicing practice disclosed in Ex. 62, and the repeat-forum deployment against a second woman documented in the parallel Sarah Koebel v. Derek Rundell matter — is pleaded throughout Part IV.I as evidence supporting the § 10(a)(2) evident-partiality vacatur ground in Count XIII, and is preserved as predicate-act evidence for any future civil RICO amendment per Part VII.

e. Captive professional-service actors provide operational support: KPMG LLP (tax-and-books); Wells Fargo Bank, N.A. (banking-channel); Knox Networks, Inc. / Knova Finance and its officer Natalya Thakur (professional-retaliation arm); Google LLC (search-indexing, DMCA processing, and Workspace server-side operation); and public-relations principals Eric Rose, Matthew Hiltzik, and Kelt 6 Strategies (reputation-management and narrative-placement).

50. The Documented Pattern — *Koebel, Weinstein,* And Google Derivative Backdrop: Glaser Weil's representation of prominent men accused of sexual misconduct spans decades and crosses industry lines. The firm's public representations include Harvey Weinstein, amongst others. The firm's

methodology, as applied to private-arbitration silencing of women who reported misconduct, is documented on a specific comparator record:

a. *Sarah Koebel v. Derek Rundell.* A parallel AAA Commercial Arbitration in which Defendant Marcus's own sworn declaration (Ex. 65) identifies Eric Schmidt as the "John Doe" funding investor. In that matter, Schmidt-aligned actors deployed the same AAA forum, the same defamation-per-se and NDA-enforcement doctrinal posture, the same reputation-damages-and-fee-shifting mechanism, and the same preclusion-of-the-reporter's-evidence structure against a different woman who reported on Schmidt-adjacent sexual misconduct. The *Koebel* deployment is pleaded throughout this Complaint as pattern evidence under *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989), and strips from Defendants the Noerr-Pennington immunity they will predictably invoke: the arbitrations at issue are not good-faith petitioning of government; they are, on Plaintiff's pleading, a private-forum instrument used sequentially against women who spoke about sexual misconduct. The *Koebel* comparator record supports the continuity element for any future RICO amendment per Part VIII and, in this Complaint, supports Count VIII (aiding and abetting — pattern of assistance), Count XI (abuse of process

— ulterior motive), Count XII (defamation — malice), and Count XIII (vacatur — evident partiality).

b. The industry backdrop is also documented. During Schmidt's tenure as CEO and Executive Chairman of Google and Alphabet, the company paid senior men accused of sexual misconduct nine-figure exit packages — Andy Rubin reportedly $90 million; Amit Singhal reportedly $35 million — and resolved the resulting shareholder derivative action in 2020 for $310 million. See *In re Alphabet Inc. S'holder Derivative Litig.*, No. 19-CIV-02716 (Cal. Super. Ct., San Mateo Cnty.). Plaintiff's January 29, 2026 op-ed "The Predator's Playground" (Ex. 63) describes exactly this pattern. The arbitrator labeled the op-ed a "veiled reference" and punished it as defamation; that characterization is itself pleaded in Count XII as actionable if republished, and in Count XIII as First-Amendment-invalid on the merits.

51. The Current Operations — What Is Happening in the Present: The enterprise is not a historical phenomenon. As of the filing of this Complaint, it is operating. Plaintiff pleads the following current-tense facts as contextual basis for the vacatur, injunctive, DMCA, CFAA, SCA, Wiretap, and defamation-by-republication relief sought below, and as predicate-act facts preserved for any future civil RICO amendment per Part VIII:

a. *The $8,080,138 PR-campaign budget is scheduled for execution.* The Interim Award expressly characterizes this component as a prospective earmarked budget for "12 months of work through paid media to repair Schmidt's reputation" (Interim Award p. 37, quoting the Rose Report). Eric Rose and his firm are the named recipients.

b. *Plaintiff's Substack is de-indexed from Google search.* As of April 23, 2026, Google returns no first-page result for rittermichelle.substack.com on an exact-match query; the search-results interface displays a strike-through of the term "substack request" and a "Missing:" indicator (Ex. 69).

c. *Plaintiff's 2025–2026 X posts are invisible to logged-out users.* As of the same date, X (@ritter_perlot) serves a logged-out desktop timeline that terminates at April 2024, although the profile header correctly discloses "38 posts" (Exs. 67–68).

d. *A mass-DMCA-vendor notice was routed through Google on April 16, 2026 — one day before the AAA prove-up hearing.* Lumen Database record 83213332 captures the Rulta OU / "camille yuki" submission demanding delisting of seventeen URLs across unrelated domains (Ex. 70). Count XIV pleads this as § 512(f) architecture, and the wire-transmissions of that DMCA notice are preserved as predicate wire fraud

COMPLAINT

under 18 U.S.C. § 1343 for any future civil RICO amendment per Part VII.

e. *The Gold MacBook Air was intruded upon on January 9, 2026.* A root console login, enterprise Apple ID IDMS UUID provisioning in the Directory Services RecordName field, and the "sysaccount" operational-signature rename previously applied to Plaintiff's stolen MacBook Pro — all on a personal device Plaintiff had set up in February 2025 for privileged legal communications — are documented in Part IV.E.1 and are pleaded as CFAA, SCA, and Wiretap predicates. Each post-revocation interstate electronic transmission associated with the intrusion is an independent wire-fraud predicate under § 1343 preserved per Part VII.

f. *The $28,000 post-Award invoice.* On April 21, 2026, AAA Director Julie E. Collins transmitted the Interim Award under a cover letter disclosing that "claimant has been billed $28,000.00 in compensation per the arbitrator's estimate for completion of this matter" (Ex. 62). The direct pay-from-prevailing-party-to-adjudicator flow, after a $10,744,999 ruling in that party's favor, is pleaded as evident-partiality vacatur under 9 U.S.C. § 10(a)(2).

g. *Continuing post-settlement surveillance.* Private investigators continued to surveil Plaintiff's residences through 2025 and into 2026 (Plaintiff's

Sept. 8, 2025 Decl. ¶¶ 57–58). Marcus's August 2025 attempt to circumvent the California CCP §§ 1001–1002 identification by recruiting Plaintiff's former New York counsel to route the coerced Schedule D through non-California-licensed counsel is documented at Part IV.F.6. That conduct is pleaded as independently tortious and, for continuity purposes, as an additional wire-fraud predicate under § 1343 preserved per Part VII.

52. The Targets: The targets of the enterprise, in this matter, are:

a. Plaintiff Michelle Ritter, personally: her companies (StarX Networks, Inc., founded by Plaintiff through Wilson Sonsini in May 2020 before she met Schmidt; Audem Management, LLC; and Plaintiff's 24,000,000-share Knox Networks, Inc. Common Stock position under Certificate CS-02); her direct contractual entitlement to the $14,000,000 payable to Plaintiff personally under Schedule A(3) of the December 4, 2024 Settlement Agreement (the "MR Amount"); her personal computing devices; her banking; and her California real-property possession.

b. Plaintiff's First-Amendment-protected speech: the "Predator's Playground" op-ed (Ex. 63), the February 10, 2026 Whistleblower Letter to Members of Congress (Ex. 64), and Plaintiff's 2024 private report to counsel and authorities that Schmidt sexually assaulted her.

c. Plaintiff's federally and California-protected rights: her EFAA election under 9 U.S.C. § 402; her CFAA, SCA, and Wiretap protections; her First, Fifth, and Fourteenth Amendment rights; her Bane Act (Cal. Civ. Code § 52.1) right to be free from coercion of protected rights; her CCP §§ 1001–1002 and Cal. Civ. Code § 1670.11 right not to be silenced by contract as to factual disclosure of sexual misconduct; her Silenced No More Act (Cal. Gov't Code § 12964.5) rights; her Labor Code § 1102.5 whistleblower protection; her Fifth-Amendment privilege against self-incrimination; and her Petition-Clause right to communicate with Members of Congress.

53. The Court's Article III Role: Plaintiff asks this Court to exercise its traditional Article III authority: to vacate the Interim Award as an unconstitutional and ultra vires product of a pay-to-play forum operating under state-entangled FAA and California Arbitration Act authority; to enjoin the ongoing federal cyber-intrusion, Wiretap, Stored Communications Act, and DMCA-misrepresentation conduct; to declare void under federal and California law the contractual instruments procured to silence a rape reporter; to enforce Congress's express allocation of EFAA-applicability to a court under 9 U.S.C. § 402(b); and to award the statutory remedies Congress has made available — including under 18 U.S.C. § 1030(g), 18 U.S.C. § 2520, 18 U.S.C. § 2707, and 17 U.S.C. § 512(f).

Plaintiff does not ask this Court to sit as a supervisor of any private dispute-resolution body or as a merits reviewer of any parallel state-court proceeding. She asks this Court to apply federal law to an apparatus the Constitution and Congress have always refused to leave to private hands.



FIGURE 2 — Timeline of the Enterprise, 2020–2026
Chronology of the concerted-action conduct alleged in Parts IV.A–IV.K

*Figure 2 — Timeline of the Enterprise, 2020–2026. Chronology of the concerted-action conduct alleged in Parts IV.A through IV.K, with four phases: (i) pre-Schmidt infrastructure; (ii) enterprise operational control; (iii) silencing and procurement; (iv) private-arbitration silencing.*

## B.  Architecture Of Control

54. Plaintiff founded StarX while still completing her graduate studies at Columbia University. StarX Networks, Inc. was formed in May 2020 by Wilson Sonsini Goodrich & Rosati, before Plaintiff met Eric Schmidt or any of his affiliates. At all relevant times, StarX was owned by Plaintiff. The formation pre-dating any contact with Schmidt-aligned actors is significant: StarX is not an entity that Defendants drew around Plaintiff; it is an entity Plaintiff built and that Defendants later sought to absorb.



**FIGURE 3 — Digital Control Architecture**
*Hillspire-controlled infrastructure touching Plaintiff's devices, mailboxes, and DocuSign envelopes*

*Figure 3 — Digital Control Architecture (November 2021 onward). How Hillspire-directed instrumentation on Plaintiff's laptop, workspaces, DocuSign tenants, and Wells Fargo channels supports the Computer Fraud and Abuse Act and Stored Communications Act claims in Counts I and II, independent of any arbitral ownership finding as to SPM assets.*

55. Audem Management, LLC was formed in December 2021. Its formation documents were prepared by Hillspire LLC's General Counsel Maria Seferian; the transaction was coordinated by Eric Schmidt; and its banking was set up by Hillspire LLC's Chief Financial Officer Mandy Quach via Wells Fargo Bank, N.A. The Audem operating agreement identified Plaintiff as the sole member and stated that the sole member owned 100% of the membership interests. Audem Management, LLC was formed by Eric Schmidt and Michelle Ritter to serve the development and management of the shared personal properties and residences.

56. The Steel Perlot entity family was built by Schmidt-aligned actors around Plaintiff and Eric Schmidt in 2021: Steel Perlot, LLC was formed in February 2021 with Hillspire LLC's General Counsel Maria Seferian again preparing all legal documents at Eric Schmidt's direction and with Hillspire LLC's Chief Financial Officer Mandy Quach again establishing all banking infrastructure via

Wells Fargo Bank, N.A.; Steel Perlot Investments, LLC in April 2021; and Steel Perlot Management, LLC in September 2021. Plaintiff was induced to sign as member and CEO of Steel Perlot, LLC. The Steel Perlot entities were transferred to Orion Wing-named entities throughout 2024. The Orion-related entities emerged from and around that same Schmidt-aligned architecture. None of those entities were built by Plaintiff; they were drawn around her work. Of note is that Plaintiff was still in Columbia Law and Business School when the Steel Perlot entities began being formed in February 2021; Plaintiff did not have any of her own legal counsel and Eric Schmidt directed Hillspire executives to form the entities and create the banking infrastructure for Schmidt and Ritter.

57. In formal documents, Plaintiff was represented as the sole owner of StarX and Audem, and as the sole manager and member of Steel Perlot Management LLC. In practical operation, the surrounding infrastructure was controlled through Schmidt-side systems: Hillspire-controlled legal, finance, accounting, tax, information-technology, property, and administrative actors; and professional-service channels.

58. Hillspire was not a passive investor or remote family office in the events alleged here. Per Eric Schmidt's signed declaration in another proceeding, Hillspire functioned and continues to function as the operational hub through which

Schmidt-side legal, accounting, tax, banking, information-technology, workspace, property, and settlement actions were coordinated.

59. The control architecture was materially important because it allowed formal ownership and practical power to be separated. Plaintiff could be told that she owned StarX and Audem or that she was solely responsible for Steel Perlot Management LLC and Steel Perlot Investments LLC while key records, bank channels, workspaces, tax positions, administrative credentials, DocuSign records, and dispute instruments were held, transmitted, or controlled through Schmidt-side infrastructure.

60. Forensic evidence supports the existence of a pre-dispute information-technology control architecture. In an April 9, 2026 forensic declaration, Bruce Pixley reported that the first user account assigned to a Ritter laptop was "ericschmidt"; that additional "it" and "it_Hillspire" user accounts were created on November 9, 2021; that JAMF mobile-device-management software was installed on or about November 9, 2021; that the JAMF software communicated with a cloud management service hosted at hillspire.jamfcloud.com; and that TeamViewer was installed and configured for unattended remote-access capability. [Ex. 2 — Pixley Decl.]

61. JAMF is enterprise mobile-device-management software capable of centrally administering macOS computers. TeamViewer is remote-access software that,

when installed and enabled for unattended access, can allow interactive remote access to a computer. Their installation and configuration on Plaintiff's computer, pointed to Hillspire-controlled cloud infrastructure, support the inference that practical technology control existed before the December 2024 settlement and workspace-lockout events.

62. Professional-service actors are relevant to this architecture as proof sources and operational conduits. CGNET and Ricardo Uribe are relevant to Zoom, Slack, IT, DocuSign and workspace administration. KPMG-related personnel are relevant to tax and financial-motive planning.

63. April 2024 Glaser Weil governance takeover at Steel Perlot. In or about April 2024, Craig H. Marcus and Jillian Harris, both partners at Glaser Weil, assumed direct operational and governance roles within Steel Perlot Management, LLC and affiliated Steel Perlot Entities, at Hillspire's direction and they proceeded to take over all budgeting, finance, investing, and hiring / firing / employee terminations decisions and authority, which Hillspire and Eric Schmidt previously maintained. The transition is described in emails from Maria Seferian and Mandy Quach, along with Eric Schmidt, to Ritter indicating such and is further evidenced by Marcus's communications with Ritter's employees and via a signed declaration of Elijah Reinhardt dated September 25, 2025. [Ex. 1 — Reinhardt Decl. (Sept. 25, 2025), ¶¶ 20–34.] From that date forward, Marcus and

Harris did not act solely as outside counsel; they acted as operating agents within the Steel Perlot control architecture described above. The operational character of that role was acknowledged contemporaneously by Plaintiff herself in a July 15, 2024 internal memorandum addressed in part to "counsel (cc'ed) and those — including our Hillspire counterparts and SPM finance — who are de facto managers." [Ex. 32 — July 15, 2024 SPM internal memorandum.] The statements and conduct of Marcus and Harris from April 2024 forward are pleaded as agent conduct attributable to Schmidt and Hillspire under ordinary agency principles and Federal Rule of Evidence 801(d)(2)(D) for purposes of Counts I, II, III, IV, V, VI, and VII (including the on-site conduct alleged in Part IV.F and the January 15, 2025 statement alleged in Part IV.G), and are independently pleaded as direct operational, non-advocacy conduct of Glaser Weil and Marcus for purposes of Count VIII.

## C. Disputed Formation Of The Purported Audem Agreement

64. In March 2022, a services agreement between Audem and Hillspire was circulated through DocuSign and Hillspire-side channels.

65. The purported agreement was dated March 17, 2022 and made effective as of February 14, 2022. It identified Audem as "Contractor" and Hillspire as "Company."

66. The purported agreement included an intellectual-property provision and an arbitration provision stating that controversies, claims, and disputes arising out of or relating to the agreement or its breach, including the applicability of the clause, would be settled by binding arbitration administered by the American Arbitration Association in Santa Clara County, California. [Ex. 5 — Hillspire/Audem Services Agreement (Mar. 2022)]

67. Plaintiff did not assent to or even sign the purported March 17, 2022 Audem agreement.

68. The same-morning signature conflict. On March 17, 2022, at approximately 8:29 a.m., Jordan Manekin – then-general counsel of Steel Perlot Management LLC and serving as counsel on other entities, including Audem Management LLC – wrote to Hillspire-side recipients words to the effect that he had "got it signed by Michelle" and sent it to Maria and Mandy. Approximately four minutes later, at approximately 8:33 a.m., Plaintiff wrote to Manekin: "I am not going to agree to the IP clause at all." [Ex. 3 — March 17, 2022 Manekin 8:29 a.m. email; Ex. 4 — March 17, 2022 Ritter 8:33 a.m. IP-clause rejection]

    a. Those two writings cannot both mean that Plaintiff validly assented to the same agreement containing the disputed IP clause.

    b. If Plaintiff was rejecting the IP clause at 8:33 a.m., the 8:29 a.m. statement that the agreement had been signed by Plaintiff was false, mistaken,

incomplete, unauthorized, or referred to something other than valid assent by Plaintiff.

69. The CGNET DocuSign search result. On June 27, 2024, Ricardo Uribe of CGNET wrote to Plaintiff regarding the DocuSign search for the relevant instrument: "I could not find any document at the SPM Docusign." [Ex. 6 — June 27, 2024 CGNET/Uribe DocuSign-search email] The June 27, 2024 email further reflected that Uribe's review of email showed Jordan Manekin working with Hillspire on the agreement, Tyler Gwinn – then an executive assistant at Steel Perlot Management LLC – being instructed to work with Plaintiff to get it signed, Mandy Quach sending a signed document to Jordan Manekin or others, and Jordan Manekin asking for filing. That account shows transmission activity but does not establish valid assent by Plaintiff.

70. The produced version of the Hillspire/Audem services agreement contains DocuSign envelope identifiers and a certificate of completion. Plaintiff disputes that those materials establish valid assent by her and requires their testing against native DocuSign envelope history, signer authentication records, access-code logs, IP address information, device/browser/user-agent information, account-control records, and custodian testimony.

71. On information and belief, no valid execution record establishing Plaintiff's assent exists in the ordinary systems of record where such an instrument would

be expected to exist; it also does not establish or indicate who signed on behalf of Plaintiff.

72. Defendants have invoked, referenced, or reserved the right to invoke the purported March 17, 2022 Audem agreement, including its arbitration/delegation and intellectual-property provisions, against Plaintiff.

73. Plaintiff disputes formation itself. She does not merely dispute scope, interpretation, performance, or enforceability of an agreement she admits was formed.

## D. Tax And Books Manipulation Across Schmidt-Controlled Entities

74. Plaintiff's claims in Count VI do not turn on entity-level tax theories as independent causes of action. The facts in this Section are pleaded as material facts concealed from or misrepresented to Plaintiff in connection with the December 4, 2024 Settlement Agreement, as motive evidence for Defendants' coercive conduct, and as direct-injury facts supporting rescission and restitution. Plaintiff reserves these facts for further development in amended pleadings or separate actions as discovery develops, including the reserved racketeering claim referenced in Part I.

### D.1 Steel Perlot Management, LLC — 2024 Cost-Loading and Tax-Return Control

75. On information and belief, during calendar year 2024, Schmidt-side actors directed the loading of costs onto SPM's books in order to maximize net

operating losses ("NOLs") available to Schmidt-aligned taxpayers, in a pattern inconsistent with (a) SPM's prior operating profile and (b) amounts contemporaneously represented to or by Plaintiff. [Ex. 8 — SPM 2022–2024 books/financial statements and KPMG workpapers (subject to discovery)]

76. On information and belief, SPM reported substantial positive results in prior periods, including an approximately $26,000,000 windfall in 2023 and approximately $16,000,000 in 2022. Plaintiff pleads these figures on information and belief specifically subject to production of the underlying returns and workpapers through discovery.

77. Defendants Eric Schmidt, Hillspire LLC, Knox Networks Inc, Natalya Thakur, Glaser Weil, and KPMG intentionally withheld relevant materials, communications, and digital records of the books and liabilities shifting via the SteelPerlot.com Google Workspace through June 2024.

78. The December 4, 2024 Settlement Agreement includes a provision under which the Schmidt Parties control the preparation and filing of SPM's 2023 and 2024 tax returns. [Ex. 11 — Dec. 4, 2024 Settlement Agreement (tax-return control provision)] That provision supports the inference that Schmidt-side actors, not Plaintiff, exercised authority over the timing, treatment, and content of SPM's tax filings for those years.

79. Despite that contractual assignment of filing control, Schmidt-side actors, their counsel, or their accountants thereafter sought Plaintiff's signature on SPM 2023 and 2024 tax returns containing treatments with which Plaintiff did not agree. [Ex. 9 — KPMG/Schmidt-side correspondence requesting Ritter signature on SPM 2023/2024 returns]

80. Plaintiff refused to sign. Plaintiff flagged to KPMG, on multiple occasions, that the books treatment underlying those returns was incorrect and that she would not sign under penalty of perjury a return she knew to be inconsistent with the facts. [Ex. 10 — Ritter/KPMG correspondence flagging book errors]

81. Defendants' attempt to induce Plaintiff's signature on tax returns whose content was controlled by Schmidt-side actors, while those returns contained treatments Plaintiff had flagged as incorrect, is independently probative of coercive intent and supports the rescission and cancellation claims alleged in Count VI.

82. **KPMG internal thread showing Schmidt-side treatment of Plaintiff as "our investor."** A produced KPMG email chain dated on or about April 9, 2024, transmitted between Sunil Tahiliani (KPMG) and Connor Coit (Steel Perlot Management LLC finance employee who worked directly with Hillspire LLC CFO Mandy Quach), with a cover page reflecting onward transmission to Mandy Quach, reflects KPMG's internal characterization of Plaintiff's relationship to SPM. The substance of the thread refers to Eric Schmidt and Hillspire LLC as

"our investor" and discusses tax-treatment positions implicating SPM's books for the same periods addressed in paragraphs C.1 above. [Ex. 7 — April 9, 2024 Tahiliani–Coit KPMG thread (with Quach cover page)] Plaintiff pleads, on information and belief, that the reference is to Defendants and relates to the same 2023–2024 treatment period addressed in this Section IV.C. Plaintiff pleads the presence of Mandy Quach in the transmission chain on information and belief subject to native-header authentication.

83. The KPMG internal characterization is material to Count VI for three reasons. First, KPMG's own language treats Defendants as a passive capital contributor rather than an operating principal of SPM, a framing inconsistent with the books-and-records treatment later pressed against Defendants. Second, the thread is contemporaneous with the April 2024 period during which, as alleged in Part IV.A, Glaser Weil personnel assumed operating roles within Steel Perlot. Third, it supports the inference that records of SPM's tax positions and Defendants' relationship to SPM existed within Defendants' agents' knowledge and control at the time of the December 4, 2024 ¶ G representation.

84. **The KPMG March 6, 2024 "buying StarX" decision — documented pre-existing intent to destroy the asset Plaintiff was told she would retain.** Plaintiff, through Connor Coit's disclosure of Hillspire-blocked Google Drive folders, obtained a previously concealed KPMG Tax Compliance Information

Request for the SPM / StarX / Knox FY 2023 engagement. [Ex. 60 — KPMG Tax Compliance Information Request, Tax_Compliance_information_request_SPM__-_NEW.xlsx, Fed. Request sheet, StarX section, Item 1.] The Fed. Request sheet, StarX Item 1 comment column, expressly records an internal decision taken on or about March 6, 2024, in substance: "KPMG suggested buying StarX since the cost isn't running through the SPM trial balance. SPM to confirm their decision." [Ex. 60, Fed. Request, StarX Item 1.] Every StarX item on the KPMG request references "based on our discussion on 3/6/2024." [Id.] The same document elsewhere records SPM Finance's own admission that "There are no operations in StarX entity. 100% owned by Michelle Ritter (CEO), not by SPM. KPMG to look into and get back to SPM (i.e. whether this is equity for tax purposes vs debt)." [Ex. 60, Fed. Request, StarX section.] That March 6, 2024 entry and the companion "100% owned by Michelle Ritter" entry — contained within Hillspire's own KPMG submission — establish two facts of direct Count VIII significance: (i) Hillspire was internally deciding on or about March 6, 2024 whether to claw StarX back into SPM for write-off purposes, notwithstanding Plaintiff's 100% ownership; and (ii) Hillspire itself acknowledged to KPMG, contemporaneously, that StarX was "100% owned by Michelle Ritter (CEO), not by SPM" — directly

contradicting the "self-dealing" narrative later prosecuted against Plaintiff in arbitration and disseminated publicly by defense counsel.

85. **The March 6, 2024 KPMG decision predates by approximately two months Defendants' May 2024 representation to Plaintiff that "StarX is hers."** Plaintiff pleads, on information and belief subject to documentary authentication, that on or about March 20, 2024, SPM Finance transmitted to KPMG the StarX loan agreement and governance documents for the buy-write-off analysis contemplated by the March 6 decision. The March 6, 2024 decision is accordingly the architectural predicate for the eight months of subsequent events during which Defendants represented to Plaintiff in mediation and in negotiation that StarX would remain hers while internally executing the pre-made decision to destroy it: the April 2024 Glaser Weil governance assumption (Part IV.A); the April 8, 2024 termination of the Audem Services Agreement; the July 2024 Hillspire funding block; the November 18, 2024 "making money via this forced shutdown" admission (Ex. 16); the December 4, 2024 Settlement Agreement's "retention of StarX" framing; and the December 19, 2024 "illiquid and defunct" resolution fifteen days later. The March 6, 2024 KPMG entry, the November 18, 2024 "forced shutdown" admission, and the December 19, 2024 resolution form a documented fifteen-day arc from the Settlement Agreement's "retention" representation to the entity's Hillspire-declared destruction.

86. **The NOL maximization scheme.** The State Request sheet of Ex. 60 reflects SPM Finance's contemporaneous request that KPMG "retroactively" reclassify prior-year expense capitalizations to generate larger net-operating-loss carryforwards: "SPM wants this to be top of mind for KPMG. Nearly all expenses in the prior year were capitalized and SPM wants to confirm whether that was appropriate/why, as we do not think this should be the case in the current year. Hoping to adjust the prior year determination and make sure we can carryforward the NOL appropriately from PY [prior year] and CY [current year]." [Ex. 60, State Request, Item 9.] On information and belief, that request reflects the mechanism by which Defendants' "making money via this forced shutdown" admission (Ex. 16) was to be realized: over-capitalize expenses in prior years to suppress early-period losses; trigger recognition of those losses through a forced shutdown of StarX; and let the resulting $42M+ net-operating-loss carryforward flow through the pass-through structure to Schmidt-aligned taxpayers. Plaintiff, as 100% owner of StarX, would be left with a shuttered entity while Schmidt-aligned taxpayers recognized the tax benefit of its destruction.

87. Plaintiff was excluded from KPMG communications. Every KPMG response field in Ex. 60 lists "Responsible Party: SPM," meaning SPM Finance — i.e., Mandy Quach and Connor Coit, both answerable to Hillspire, as well as Knox

Networks Inc and Natalya Thakur. KPMG set weekly catch-up meetings with "SPM Finance team" beginning the first week of March 2024. Plaintiff never appears in any KPMG-engagement communication reflected in Ex. 60 despite being the formal managing member of SPM and the 100% owner of StarX. On information and belief, Plaintiff's exclusion from KPMG communications was procured by CGNET-administered Google Drive access controls, as confirmed by Connor Coit's eventual disclosure to Plaintiff of the blocked Google Drive folders.

### D.2  StarX — Multi-Draw Loan Agreement and Post-Settlement Valuation

88. The December 4, 2024 agreement includes a Schedule B acknowledging an outstanding loan in the principal amount of approximately $6,575,000 under a Multi-Draw Loan Agreement between StarX, as borrower, and SPM, as lender, and stating that Schmidt would cause SPM to forgive any debts due and owing by StarX to SPM under that agreement. [Ex. 11 — Dec. 4, 2024 Settlement Agreement, Schedule B]

89. The produced Multi-Draw Loan Agreement states that it is dated March 15, 2024 but effective as of December 1, 2021. It identifies StarX as borrower and SPM as lender, and states a maximum loan amount of $6,500,000. [Ex. 14 — StarX Multi-Draw Loan Agreement]

90. Plaintiff disputes the authenticity, execution, provenance, and use of the Multi-Draw Loan Agreement as produced. Plaintiff denies signing it as produced, and requires native files, DocuSign envelope records, certificate information, access logs, and competent custodian foundation. Even more, the alleged signatures from Ritter are moveable by way of a computer cursor and appear to have been altered after the fact in order to support Defendants' tax loss maximization.

91. On information and belief, the amounts recited in the Multi-Draw Loan Agreement and Schedule B were not, in fact, funded as asserted by Defendants in the periods represented. Plaintiff further alleges, on information and belief subject to production, that Schmidt-side actors manufactured or recharacterized intercompany entries after February or March 2024 — i.e., after Hillspire-side personnel took greater operational control of the Steel Perlot Entities — to support the appearance of a pre-existing StarX liability. [Ex. 8 — native general ledgers and bank statements reflecting actual funding (subject to discovery)]

92. Defendants have used the purported loan and alleged loan forgiveness to contend that Plaintiff received substantial settlement consideration. Loan forgiveness to an entity is not the same as payment of the direct MR Amount promised to Plaintiff, and a disputed retrospective related-party loan document cannot defeat rescission or direct-injury pleading at the Rule 12 stage.

93. On or about December 19, 2024 — two days after the Amendment and fifteen days after the Settlement Agreement — Hillspire executed or caused to be executed a written resolution through DocuSign treating StarX as "illiquid and defunct." Plaintiff has located repeated references to this resolution and, on information and belief, associated exhibits (including exhibits identified in the record as Exhibits 9 and 73) reflect that treatment. [Ex. 15 — Dec. 19, 2024 StarX "illiquid and defunct" resolution (native DocuSign); see AAA Claimants' Ex. 9 and Ex. 73 (within Ex. 49)] Plaintiff pleads this allegation on information and belief specifically subject to production of the native resolution, certificate, and custodian foundation, and will amend, supplement, or withdraw this paragraph as the record develops.

94. If confirmed, the December 19 treatment of StarX as "illiquid and defunct" is inconsistent with the December 4 representation that Plaintiff would retain StarX and with the settlement's treatment of StarX loan forgiveness as consideration.

95. Working drafts and contemporaneous chronologies in the record also identify a November 18, 2024 Hillspire-side budgeting note stating that, due to tax write-off treatment, Hillspire and the Schmidt family were "making money via this forced shutdown." [Ex. 16 — Nov. 18, 2024 forced-shutdown budget note] Plaintiff pleads this allegation on information and belief, specifically subject to

68
COMPLAINT

native-file authentication and custodian confirmation, and will amend, supplement, or withdraw as the record develops.

### D.3 Audem — At-Cost Family-Office / Property-Management Vehicle and January 2025 1099

96. Audem Management, LLC was formed in December 2021. As alleged in Parts I and IV.A, its formation documents were prepared by Maria Seferian, the transaction was coordinated by Eric Schmidt, and its banking was set up through Mandy Quach at Wells Fargo Bank, N.A. Audem was, at all relevant times, formally owned 100% by Plaintiff. In practical operation, however, Audem functioned as an at-cost family-office / property-management vehicle through which residences used by, shared with, or intended to exclusively benefit Plaintiff and Eric Schmidt — Audem was operated at or near zero economic upside to Plaintiff. The economic benefits (personal-use value, occupancy of residences, property-management services, and associated upside) were intended to flow to Plaintiff and Eric Schmidt; nevertheless, such benefits ultimately flowed to Schmidt-aligned persons and interests. The cost, tax, payroll, and professional-risk burdens were attributed to Plaintiff personally. [Ex. 5 — Hillspire/Audem Services Agreement (Mar. 2022); Ex. 18 — Audem Management Operating Agreement]

97. Books, bank accounts, payroll infrastructure, and technology environment associated with Audem were administered through Hillspire-controlled systems and personnel. Beginning in April 2024, Hillspire, Eric Schmidt, and Glaser Weil began hiring Audem employees from Ritter and directly re-engaged or re-hired under Hillspire or Hillspire-affiliated entities. [Ex. 19 — SPM/Audem tax-compliance and employment/engagement records pre- and post-December 2024]

98. Notwithstanding the at-cost family-office / property-management structure and the benefits flowing to Schmidt-side interests, on or about January 2025, Schmidt-side actors caused a Form 1099 to be issued to Plaintiff attributing to her approximately $2,700,000 (two million seven hundred thousand dollars — not two thousand seven hundred dollars) in Audem-related income, together with associated Employment Development Department (EDD) liabilities. [Ex. 17 — January 2025 Audem Form 1099 and associated EDD notices] On April 6, 2026, Defendants produced additional materials that, together with the earlier 1099, support the inference that Schmidt-side actors controlled Audem's books at the time of the December 4, 2024 ¶ G representation and used them thereafter to shift cost and tax exposure onto Plaintiff personally while economic benefits were retained by or flowed to Hillspire, Wendy Schmidt and associated family-office interests, and Schmidt-aligned taxpayers.

99. The January 2025 1099 is directly inconsistent with paragraph G on page 3 of the December 4, 2024 Settlement Agreement, in which the Schmidt Parties represented, to the best of their knowledge, information, and belief, that they had no Audem or StarX books and records within their possession, custody, or control. [Ex. 11 — Dec. 4, 2024 Settlement Agreement ¶ G, p. 3] The issuance of a Form 1099 within weeks of signing — based on precisely such records — supports the inference that the ¶ G representation was false when made, materially misleading when made, or materially misleading by omission as to records then within Defendants' control.

100.    Plaintiff pleads, on information and belief, that the January 2025 1099 did not limit itself to items disclosed in settlement negotiations but was used to attribute additional items to Plaintiff, and will, through discovery, test the line-item composition of the 1099 against the underlying ledgers and expenses.

**D.4  Steel Perlot Investment, LLC**

101.    Steel Perlot Investment LLC served as the fund investment vehicle with the Steel Perlot entities; however, all expenses related to employees who worked on investments, all legal expenses, and all other costs associated with operations of SPI LLC flowed to Steel Perlot Management LLC incorrectly. Thus, Hillspire and Schmidt, with the assistance of KPMG and Glaser Weil, attempted to and ultimately did artificially inflate liabilities of Steel Perlot Management LLC to

the benefit of Hillspire and Schmidt. Plaintiff reserves specific factual allegations pending review of the entity's books, tax returns, and intercompany records through discovery.

### D.5  Steel Perlot, LLC

102.    Steel Perlot, LLC participated in the same control architecture as SPM and Steel Perlot Investment. Plaintiff reserves specific factual allegations pending production of the entity's records through discovery.

### D.6  Orion Wing Rebrand and the Wind-Down Ledger for Steel Perlot Management, LLC

103.    After the December 2024 settlement sequence, Steel Perlot Management, LLC was renamed Orion Wing Management, LLC; Steel Perlot Investments, LLC was renamed Orion Wing Investments, LLC; and Steel Perlot, LLC was renamed Orion Wing, LLC. The renaming is reflected in the caption and exhibits to the AAA arbitration captioned Hillspire, LLC; Orion Wing, LLC fka Steel Perlot v. Ritter, AAA Case No. 01-25-0000-2191. The renamed entity continued to receive funding from, and to make payments at the direction of, Schmidt-aligned actors during the post-settlement wind-down period.

104.    On April 6, 2026, Claimants in the AAA arbitration produced an exhibit captioned "Orion Wing Management, LLC (fka Steel Perlot Management, LLC) Payments: 12/4/2024 to 3/16/2026" (the "Wind-Down Ledger"). [Ex. 36 —

April 6, 2026 Orion Wing Management Payments Ledger 12/4/2024–3/16/2026 (AAA Claimants' Appendix Ex. 8).] The Wind-Down Ledger is a Schmidt-side admission, by Defendants' own counsel Glaser Weil and accountants, that the entity formerly known as Steel Perlot Management remained operational and funded — with Hillspire and Orion Wing as identified payors — from the day of the December 4, 2024 Settlement Agreement through at least March 16, 2026. That admission is materially inconsistent with the December 4, 2024 ¶ G representation that the Schmidt Parties had no Audem or StarX books and records within their possession, custody, or control, because the line items on the Ledger could not have been computed, allocated, paid, or recorded without continuing access to the very ledgers, payroll systems, vendor accounts, and books-of-account the ¶ G representation disclaimed.

105.    The Wind-Down Ledger is independently material because it includes line items that, on their face, do not reflect ordinary wind-down obligations of a defunct investment entity. Three such line items are captioned in substance "Tyler Gwinn — Capella University Transition Pay" and "Tyler Gwinn — Capella University (Fall 2025)." [Ex. 36, line items.] On information and belief, those entries reflect the use of post-settlement Orion Wing funds to pay personal-education obligations of an individual associated with the Schmidt-aligned operating side, after the entity's purported wind-down had begun and during a

period in which Defendants were withholding the MR Amount owed to Plaintiff. Plaintiff pleads, on information and belief subject to discovery, that those personal-education payments were neither disclosed to nor authorized by Plaintiff, and were funded by drawing down on the same books and accounts the ¶ G representation disclaimed.

106.    The Wind-Down Ledger also reflects continuing payments to the law firm Fried, Frank, Harris, Shriver & Jacobson LLP and to KPMG during the same period. Those payments are pleaded as additional record-anchored confirmation that Schmidt-side actors continued to direct, fund, and reconcile professional-services activity tied to the entities the ¶ G representation disclaimed, and that the operational books underlying those payments remained within Defendants' possession, custody, or control at the time of the December 4 representation and thereafter.

### D.7 *Materiality to the December 4, 2024 Representations*

107.    The tax-and-books pattern alleged in this Section IV.C — including the SPM 2024 cost-loading and tax-return control conduct (Part IV.C.1), the disputed StarX Multi-Draw Loan Agreement and December 19, 2024 "illiquid and defunct" resolution (Part IV.C.2), the Audem at-cost family-office structure and January 2025 1099 (Part IV.C.3), and the Orion Wing Wind-Down Ledger including the Tyler Gwinn line items (Part IV.C.6) — is material to Count VI

COMPLAINT

because it establishes that, at the time Defendants caused Plaintiff to sign the December 4, 2024 agreement, Defendants possessed or had access to the very records they represented they did not have, were using those records to plan or execute tax treatments favorable to Schmidt-aligned taxpayers, and intended to attribute to Plaintiff financial and tax liabilities flowing from benefits received by Defendants. The ¶ G representation, the Schedule B loan-forgiveness recital, and the "retention of StarX and Audem" framing of the agreement were each materially inconsistent with the facts Defendants then possessed or fairly anticipated.

**E.  Knox Networks, Inc. / Knova Finance — Founder-Level Theft Of 24,000,000 Common Shares; Post-Settlement Retaliatory Call-Back; Coerced Shareholder-Silencing Agreement; And Retaliation Against Protected Reporting (Ongoing)**

*E.1 Formation, Directorships, And Plaintiff's Founder-Level Role (January 2021 – June 2022)*

108.    Knox Networks, Inc. ("Knox") is a Delaware corporation, incorporated on January 26, 2021. [Ex. 74 — Knox Certificate of Incorporation (Del.), Jan. 26, 2021.]

109.    On March 15, 2021, the sole Incorporator of Knox, Sammy Kim, executed the Action of Incorporator that (a) adopted the Company's Bylaws and (b) elected as the founding Board of Directors both Eric Schmidt and Michelle

Ritter. [Ex. 75 — Knox Action of Incorporator, Mar. 15, 2021; DocuSign Envelope ID FF103553-0653-45AB-AE2F-CC13ABC27F1C.] Plaintiff is a Knox founding director of record. No dispute over that founder status has been advanced by any Schmidt-aligned actor at any time between March 2021 and April 2024 — a period of over three years during which Plaintiff's founder directorship was not only accepted but affirmatively ratified in the June 29, 2022 stockholders' written consent described below.

110.    On June 28, 2021, Knox adopted its Amended and Restated Bylaws (Ex. 76), executed Indemnification Agreements for directors and officers (Ex. 77), and executed the Board/Note/A&R Bylaws package (Ex. 78) — the founder-indemnification and corporate-governance baseline on which Plaintiff's Knox rights rest.

111.    On June 29, 2022, the Knox stockholders, "constituting the holders of a majority of the outstanding shares of Common Stock," executed a written consent increasing the size of the Board from two to three directors and electing R. Martin Chavez — a current member of the Board of Directors of Alphabet, Inc. — as the third Knox director. [Ex. 79 — Knox Action by Written Consent of Stockholders, Jun. 29, 2022; DocuSign Envelope ID 029194C0-8205-493D-BF97-C799126C8759.] That written consent ratified all prior actions of the

Knox officers and directors through June 2022 — including the issuance of Plaintiff's stock certificate described at IV.D.2.

112.    As of the operative period, Plaintiff's Knox role included service as Chief Executive Officer and as a member of the Board of Directors. Schmidt served on the Knox Board contemporaneously with Plaintiff until Plaintiff's removal on or about April 24, 2024, as alleged below. These are not allegations on information and belief — they are documented by Knox's own books and records.

**E.2 Plaintiff's 24,000,000-Share Common Stock Position And Its Cap-Table Context**

113.    On June 21, 2021, Knox caused to be issued to Plaintiff Certificate CS-02 for 24,000,000 (Twenty-Four Million) fully paid and non-assessable shares of Common Stock of Knox Networks, Inc., par value $0.00001, transferable on the books of the Corporation. [Ex. 80 — Knox Certificate CS-02, Carta certificate number 12623966, six pages.] The face of the Certificate bears the signatures of Michelle Ritter (Chief Executive Officer) and Natalya Thakur (Chief Operating Officer), effective as of June 21, 2021.

114.    The Certificate was received and accepted via Carta on April 15, 2022. Plaintiff's electronic acceptance of the Certificate bears the DocuSign signature identifier 187df-e5-8e0-b0a-c1b7e02 and the date 04/15/2022. [Ex. 80 at p. 3, Acceptance Agreement.] As pleaded at IV.D.3, the forensic authenticity of both the June 21, 2021 issuance signatures and the April 15, 2022 Carta/DocuSign

COMPLAINT

acceptance is at issue given the broader DocuSign-manipulation pattern pleaded elsewhere in this Complaint.

115.     The Certificate is subject to a vesting schedule of 1/48 monthly with a one-year cliff from a vesting start of January 2021, with acceleration provisions triggered on a "termination without cause in connection with or within 12 months after a Change of Control." [Ex. 80 at pp. 4–5, Summary and Acceleration.]

116.     Plaintiff's 24,000,000-share position is not a paper grant. It is the second-largest Common Stock position in Knox, behind only Steel Perlot, LLC (a Schmidt-controlled Hillspire vehicle) at 32,000,000 shares. [Ex. 81 — Knox Summary and Detailed Cap Tables as of 12/31/2022; Ex. 82 — Knox Summary and Detailed Cap Tables as of 3/31/2024.] On both measurement dates: (a) 12/31/2022 — 24,000,000 of 61,621,037 Common Shares issued and outstanding (≈ 38.95% of outstanding Common); (b) 03/31/2024 — 24,000,000 of 62,344,992 Common Shares issued and outstanding (≈ 38.49% of outstanding Common, less than four weeks before Plaintiff's removal).

117.     Natalya Thakur held a 5,600,000 Common share position across Certificates CS-03 (1,200,000) and CS-04 (4,400,000). [Ex. 81, CS Certificate Ledger; Ex. 82, CS Certificate Ledger.] Thakur is therefore (a) a signatory of Plaintiff's Certificate as Chief Operating Officer, (b) a fellow common

stockholder subject to reciprocal fiduciary duties under Delaware law, and (c) the Knox-side actor alleged at IV.D.5–IV.D.6 below.

118.    Steel Perlot, LLC funded Knox's operations through at least 16 SAFE convertible instruments between December 10, 2021 and March 27, 2023, totaling approximately $13,308,000 in addition to the $2,900,000 2021 SAFE financing — i.e., $16,208,000 of Schmidt-directed capital into the same enterprise whose books Plaintiff is alleged at IV.D.3–IV.D.6 to have been stripped of. [Ex. 82, Convertible Ledger.] Correspondence address for Steel Perlot on the SAFE instruments shifted over time: early SAFEs list egalteam@hillspire.com as the convertible holder email; later SAFEs list sp_investments@hillspire.com — both unambiguously Hillspire-administered inboxes.

### E.3. Forensic Integrity Of The Issuance And Carta Acceptance (Reserved Issues)

119.    Two forensic authenticity questions concerning Certificate CS-02 are preserved but not finally adjudicated at pleading stage:

120.    (i) Issuance signatures (June 21, 2021). Whether the persons who caused Certificate CS-02 to be issued and whose signatures appear on the face of the Certificate were, at the moment of issuance, officers of Knox Networks, Inc. authorized to issue Common Stock under Article VI of the Amended and Restated Bylaws is a factual question that depends on Knox's stock transfer

records, board minutes, and officer-election records for the relevant period. Plaintiff reserves the right to amend her allegations on this point based on records obtained through the Delaware § 220 statutory-inspection demand preserved at Part VII. Nothing in this Complaint concedes the evidentiary authenticity of the issuance signatures on their face.

121.    (ii) Carta DocuSign acceptance (April 15, 2022). Plaintiff's purported acceptance signature on the Carta acceptance agreement (DocuSign signature identifier 187df-e5-8e0-b0a-c1b7e02) is, like the other DocuSign executions pleaded at Part IV.B (March 17, 2022 Audem Services Agreement) and implicated at Part IV.E (Hillspire-administered Google Workspaces and DocuSign environments), subject to the authenticity issues identified in the Pixley Expert Declaration (Ex. 2) and in the CFAA and SCA counts of this Complaint. The Carta-generated acceptance metadata does not itself authenticate the signature block in the absence of independent forensic review.

122.    These forensic questions are alleged in the alternative to the cap-table admissions pleaded at IV.D.2. Whether or not the Certificate's face-signatures are later proven authentic, Knox's own continuously maintained cap-table books and records — from 12/31/2022 through 3/31/2024 and onward — consistently reflect Plaintiff as the holder of 24,000,000 shares of Common Stock under

Certificate CS-02. Knox's 2025 issuance of a repurchase notice (IV.D.5) further ratifies Plaintiff's ownership as of the date the repurchase is noticed.

**E.4  April 24, 2024 Retaliatory Removal; April 26, 2024 Vesting Termination**

123.    On or about April 24, 2024 — the very week that, as pleaded at Part IV.A, Hillspire transferred operational authority over the Steel Perlot Entities to Glaser Weil and that, as pleaded at Part IV.H, Marcus and Harris began exercising operation-or-management authority — Schmidt-side actors caused Plaintiff to be removed from her position as Chief Executive Officer of Knox and caused her seat on the Knox Board of Directors to be treated as vacated. No cause-finding under the applicable Knox Bylaw preceded that removal, and no valid stockholder-consent vote under DGCL § 228 that would satisfy the Bylaws' requirements for CEO removal has been produced.

124.    On or about April 26, 2024 — two days later — Knox purported to terminate the vesting of Certificate CS-02. [Ex. 80 at p. 4, Issuer/Vesting terminated fields; Ex. 82 CS Certificate Ledger as of 3/31/2024, reflecting the pre-termination state.] Measured from the January 2021 vesting start, approximately 39 to 40 of 48 months (≈ 81–83%) of the vesting schedule had elapsed as of the April 2024 termination — entitling Plaintiff, at a minimum, to approximately 19.5 million fully-vested Common shares, quite apart from the

acceleration clause triggered by a without-cause termination in connection with a Change of Control.

125.    The April 2024 removal and vesting termination are, on the pleaded theory, acts of retaliation for Plaintiff's reporting of sexual assault by Eric Schmidt — not independent governance actions. The April 24, 2024 date is not coincidental; it is the same week the governance-transfer sequence at Part IV.A began, and it precedes by approximately seven months the December 4, 2024 Settlement Agreement whose Schedule D sought to compel Plaintiff's sworn retraction of that same sexual-assault reporting. The Knox removal is therefore both (i) a protected-activity retaliation claim preserved at Part VIII (California FEHA, Title VII, and EFAA-scope theories), and (ii) a predicate supporting the conversion, defamation, and RICO theories already pleaded in Counts XII and XIV.

**E.5. April 24, 2025 Knox/Knova Repurchase Notice — Schmidt-Side Admission Of Plaintiff's Ownership**

126.    Exactly twelve months after the retaliatory removal — on or about April 24, 2025 — Schmidt-side actors caused Knox Networks, Inc. (now operating or doing business as "Knova Finance" or through a successor or affiliated entity on information and belief) to issue to Plaintiff a repurchase, call-back, or claw-back notice directed at the unvested shares with respect to the original founder grant

of 24,000,000-share Common Stock position reflected in Certificate CS-02 and in the 12/31/2022 and 3/31/2024 cap tables. [Ex. 83 — Knox/Knova Finance April 24, 2025 Repurchase Notice — RESERVED, to be supplied from the parts 3–6 Knox books-and-records production.]

127.    The fact of the April 2025 repurchase notice is itself a contemporaneous admission against interest by the Schmidt-side actors controlling Knox: a corporation does not issue a repurchase notice for shares it contends the recipient does not own. Knox's act of noticing a repurchase of Plaintiff's 24,000,000-share position is therefore an admission — under Federal Rule of Evidence 801(d)(2) — that, as of April 24, 2025, Knox regarded Plaintiff as holding those shares and as the target of a compelled retransfer. That admission is independently fatal to any later Schmidt-side defense premised on Plaintiff's never having owned the shares; on the shares' prior consensual retransfer; or on the shares' having been forfeited by operation of the April 2024 vesting termination without acceleration.

128.    The Repurchase Notice is post-signing conduct relative to the December 4, 2024 Settlement Agreement and Schedule D, relative to the December 17, 2024 Amendment, and relative to any release asserted against Plaintiff. It falls outside the temporal scope of any conceivable release and cannot be insulated by any "general release" construction. (See IV.D.8.)

*E.6. April–May 2025 Coerced 8–9-Page "Shareholder Agreement" — Shareholder-Rights Silencing*

129.    In April and May 2025, Knox/Knova Finance and Natalya Thakur — acting on direction from or in coordination with Hillspire and Glaser Weil — demanded that Plaintiff sign an 8- to 9-page agreement as the condition for Knox's provision to Plaintiff of information, documents, or cooperation Plaintiff was separately entitled to receive as a Knox common stockholder under Delaware law. On information and belief, the agreement included, without limitation:

   a. a bar on Plaintiff's contacting any other Knox stockholder for any purpose, including the exercise of stockholder-level remedies under Delaware General Corporation Law §§ 220 (inspection), 225 (contested officer/director elections), or 228 (written-consent litigation);

   b. a bar on Plaintiff's pursuing any litigation based on information Knox/Knova Finance or Thakur would otherwise be required to provide;

   c. waivers of remedies expressly protected for Delaware stockholders as a matter of public policy; and

   d. further speech- and disclosure-restrictions overlapping with the compelled-speech and non-disparagement provisions of the December 4, 2024 Settlement and Schedule D pleaded at Part IV.F and Section IV.J.

COMPLAINT

130.    The demand was made at a time when Plaintiff was (a) the subject of the April 24, 2025 repurchase notice described at IV.D.5; (b) already in continuing litigation, administrative, and investigatory exposure set in motion by Schmidt-side actors; and (c) without Knox's baseline cooperation, effectively unable to prepare her defense, exercise her shareholder rights, or preserve evidence. The agreement was not a negotiated exchange between arm's-length parties; it was a coerced waiver instrument whose consideration was Knox's willingness to comply with its own preexisting fiduciary and statutory obligations.

131.    The demand is independently tortious because: (i) Knox owes continuing fiduciary duties to Plaintiff as a Common Stockholder (and, through the June 28, 2021 Indemnification Agreement, to Plaintiff as a former director and officer), which cannot be extinguished or conditioned on Plaintiff's execution of a waiver of unrelated rights; (ii) Natalya Thakur, as a fellow common stockholder and a Knox officer, owes Plaintiff reciprocal duties as a controlling/majority actor in the post-April-2024 Knox power structure (Schmidt, via Steel Perlot at 32,000,000 shares, plus Thakur at 5,600,000, together exercising controlling influence following Plaintiff's removal); and (iii) the speech-restrictive provisions of the demanded agreement run directly into CCP §§ 1001–1002, Civil Code § 1670.11, and the Silenced No More Act principles pleaded at Count IX — establishing that the demanded agreement is unenforceable on its face as

to the sexual-assault and workplace-harassment content subject to non-waivable protection under California and federal law.

### E.7. Thakur–Hillspire Redirection Of STARX Tax Documents (2022–2023) — Continuity Of Scheme

132.    In 2022 and 2023, Natalya Thakur, in coordination with Hillspire, redirected StarX Networks, Inc. tax documents — causing those documents to be transmitted to Thakur (at nthakur@knox-networks.com and related Hillspire-administered inboxes) and to Hillspire-controlled personnel, and withheld from Plaintiff in her capacity as 100% owner of StarX. This pattern is continuous with the KPMG/Hillspire tax-control conduct pleaded at Part IV.C (paragraphs 70 through 103) — including the March 6, 2024 KPMG "KPMG suggested buying StarX" entry and the contemporaneous Hillspire-internal admission that StarX was "100% owned by Michelle Ritter (CEO), not by SPM."

133.    Knox is therefore not a separate or isolated episode. It is a component of the broader tax- and books-control apparatus: Schmidt directed (through Steel Perlot's $16.2M+ Knox funding and board control); Hillspire administered (through KPMG tax-direction and the Quach/Coit/SPM-Finance command line); Glaser Weil legally formalized (through the March 2024 operational-authority transfer pleaded at Part IV.H); and Thakur operated inside Knox to capture and redirect the subset of tax- and ownership-relevant documents that bore on StarX

and on Plaintiff's cross-entity rights. That continuity is material to the enterprise-pattern facts preserved for any future civil RICO count per Part VIII — Knox / Thakur is the "professional-retaliation arm" of the Enterprise as already alleged, but now substantiated with primary books and records.

### E.8. No Release By The December 2024 Settlement; Non-Waivability; Post-Signing Conduct

134.    To the extent Defendants invoke the general release in the December 4, 2024 Settlement Agreement (or the December 17, 2024 Amendment) as a defense to the Knox-related claims preserved in this Complaint, any such release is inoperative on multiple independent grounds:

a. Rescission and invalidity. The Settlement and Amendment are subject to the rescission and invalidity grounds pleaded in Count VI (fraud, mistake, duress, unconscionability, illegality). Once rescinded or declared invalid, the general release does not stand.

b. Post-signing conduct. The April 24, 2025 Repurchase Notice (IV.D.5), the April–May 2025 coerced "Shareholder Agreement" demand (IV.D.6), and all continuing Knox tortious conduct thereafter are post-signing — temporally outside the scope of any release of claims "known or unknown" as of December 4, 2024 or December 17, 2024.

COMPLAINT

c. Non-waivability under California law. California wage-and-hour claims cannot be waived prospectively (Cal. Labor Code § 2804; Armendariz v. Foundation Health Psychcare Servs., Inc., 24 Cal. 4th 83 (2000)). FEHA protected-activity retaliation claims cannot be waived by contract against public policy (Cal. Civ. Code § 1668; Cal. Gov. Code § 12940). CCP §§ 1001–1002 and Civil Code § 1670.11 (pleaded in Count IX) void any contractual provision restricting factual disclosure of unlawful acts in the workplace (including sexual harassment). The Silenced No More Act (Cal. Gov. Code § 12964.5) is to like effect.

d. EFAA scope. The federal Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, 9 U.S.C. §§ 401–402 (see Count V), applies to the Knox-related workplace-harassment and retaliation claims that fall within its scope; Plaintiff's election under the EFAA cannot be overridden by private release.

e. Delaware fiduciary and statutory rights. Delaware stockholder rights under DGCL § 220 (inspection), and fiduciary duties owed by a Delaware corporation and its controllers to a minority stockholder, are grounded in statute and common law and cannot be released by a general-release provision in a separate bilateral settlement. Wal-Mart Stores, Inc. v. Indiana Elec. Workers Pension Trust Fund IBEW, 95 A.3d 1264 (Del.

2014) (confirming breadth of § 220 inspection rights); Kahn v. Lynch Commc'n Sys., Inc., 638 A.2d 1110 (Del. 1994) (controlling stockholder fiduciary duties).

### E.9. Materiality Across Pleaded Counts and to Preserved Claims

135.    The Section IV.D facts are material to counts pleaded in this Complaint as follows:

a. Count XII (Defamation, False Light, Commercial Disparagement, Intentional Interference). The Knox/Thakur statements alleged in Count XII are not free-floating allegations; they are statements made by a fellow stockholder and a founder-hostile board about a removed Knox CEO, calibrated against the demonstrable record of Plaintiff's 24,000,000-share Common Stock position and founder directorship. The defamation theory accordingly carries heightened actual malice exposure: Thakur, as a Knox officer who signed Plaintiff's Certificate and held 5,600,000 shares of her own, is presumptively on notice of Plaintiff's shareholder status at the time of any Knox/Thakur defamatory publication.

b. any future civil RICO count (reserved per Part VIII). The continuous funding line from Steel Perlot (through at least 16 SAFE instruments, 2021–2023, totaling approximately $16.2M) into Knox, combined with Thakur's 2022–2023 Hillspire-coordinated redirection of StarX tax

documents (IV.D.7), the April 2024 retaliatory removal, and the April 2025 Repurchase Notice / "Shareholder Agreement" coercion, substantiates the enterprise's professional-retaliation arm (preserved for any future civil RICO count per Part VIII) under Boyle v. United States, 556 U.S. 938 (2009), and Plaintiff's direct business-and-property injury under Anza v. Ideal Steel Supply Corp., 547 U.S. 451 (2006), via the documented 24,000,000-share Common Stock position and the founder-level role established at IV.D.1–IV.D.2.

c. Count VI (Rescission) and Count VIII (Aiding and Abetting Fraud — Operational, Non-Advocacy Conduct). The Knox tax-document-redirection conduct pleaded at IV.D.7 is part of the same operational-fraud pattern pleaded in Part IV.C (tax and books manipulation) and Part IV.I (Glaser Weil operational conduct), and is material to the fraud-in-inducement theories underpinning Count VI and the non-advocacy theory underpinning Count VIII.

d. Preserved employment, equity, and Delaware shareholder claims (Part VIII). The April 24, 2024 removal and April 26, 2024 vesting termination, the April 2025 Repurchase Notice, and the April–May 2025 coerced "Shareholder Agreement" demand each seed distinct claims — California wage-and-hour and FEHA retaliation; DGCL § 220 statutory inspection;

DGCL-based breach-of-fiduciary-duty derivative and direct claims; and EFAA-scope workplace-harassment claims. Those claims are expressly reserved at Part VIII for pleading in an amended complaint following the resolution of the Knox books-and-records production and any further retaliatory conduct.

## F.     Digital   Control,   Workspace   Access,   And   Breach   Of   Privileged Communications

136.     Plaintiff used and administered electronic accounts, workspaces, domains, credentials, and devices through which she conducted business, communicated with counsel, stored records, executed documents, and preserved evidence.

137.     The relevant electronic environments included the Google workspaces for steelperlot.com, starx.com, audem-mgmt.com, and knox-networks.com; DocuSign environments; cloud-storage and collaboration environments; and personal or business devices used to access those systems.

138.     The steelperlot.com Google Workspace contained stored emails, messages, account settings, administrative settings, access history, and work product used by Plaintiff, including attorney-client communications with Plaintiff's counsel of record across multiple proceedings.

139.    On December 10, 2024, counsel James Knopf sent a written notice regarding "Unauthorized Access, Data Alteration, and Identity Theft Related to SteelPerlot.com and Associated Domains" to Ricardo Uribe and Georg at CGNET. [Ex. 28 — Dec. 10, 2024 Knopf notice to CGNET]

140.    The December 10, 2024 notice stated that Plaintiff had provided administrative access to CGNET through cgnet@steelperlot.com, cgnet@starx.com, and cgnet@audem-mgmt.com "solely to fulfill the technical and operational requirements authorized by Ms. Ritter."

141.    The December 10, 2024 notice further stated that Plaintiff had been locked out of mritter@steelperlot.com, described that account as the primary admin account for SteelPerlot.com, stated that records showed the account was accessed through Plaintiff's credentials without authorization, and stated that documents had been accessed and altered.

142.    The December 10, 2024 notice requested logs showing all activity through cgnet@steelperlot.com, cgnet@starx.com, cgnet@audem-mgmt.com, and mritter@steelperlot.com; identification of persons or entities who accessed or had access to those accounts; communications concerning requests for login credentials or other account information; and confirmation whether data, documents, or records were copied, altered, or deleted.

143.    The December 10, 2024 notice also stated that Plaintiff had learned Jillian Harris had indicated she accessed the mritter@steelperlot.com account, changed the password, and attempted to access all files. Plaintiff pleads that allegation as notice evidence and information-and-belief evidence pending production of access logs and custodian testimony.

## F.1 Independent Forensic and Cybersecurity Evidence

144.    Plaintiff's allegations concerning digital control and unauthorized access are supported by independent forensic and cybersecurity evidence, including:

   a. **Pixley expert declaration — verbatim findings.** On April 9, 2026, Bruce W. Pixley, CISSP, GCFA, EnCE, Managing Member of Pixley Forensics Group LLC, executed a sworn forensic declaration after examining Plaintiff's MacBook Pro (Serial No. TFWF7V17GQ). [Ex. 2 — Pixley Decl. (Apr. 9, 2026).] Pixley qualifications include lead instruction at the California Department of Justice Advanced Training Center (2001–2016) and prior expert testimony in federal matters in this District including U.S. v. Pepe (CR 07-168), U.S. v. Gartenlaub (CR 14-173-CAS), and U.S. v. Reczko (CR 07-1221). [Ex. 2 ¶¶ 1–6.] Pixley's findings material to Counts I, II, and III include:

i. "The first user account assigned to this computer was 'ericschmidt.' This account was later deleted less than one month later on 12/4/2021 at 4:04:22 AM (UTC)." [Ex. 2 ¶ 12.]

ii. "Two additional user accounts, 'it' and 'it_Hillspire,' were created respectively on 11/9/2021 at 7:07:11.845 PM and 7:14:30 PM (UTC)." [Ex. 2 ¶ 13.]

iii. "The user account for Michelle Ritter (michelleritter) was not created until a few days later on 11/13/2021 at 1:19:32 AM (UTC)." [Ex. 2 ¶ 16.] Plaintiff's user account was therefore the fourth user account on the laptop, postdating the "ericschmidt," "it," and "it_Hillspire" accounts, and postdating the installation of Microsoft Office, Google Drive, TeamViewer, and JAMF Software. [Ex. 2 ¶ 14.]

iv. "Forensic analysis shows that JAMF software was installed on the Ritter Laptop on or about November 9, 2021. The Ritter Laptop was configured to automatically execute JAMF management tasks at system startup and to perform recurring check-ins thereafter. JAMF logs show that management policies were enforced repeatedly and without user interaction, providing persistent administrative control over system configuration and installed software. Once running, the

JAMF software was configured to communicate with a cloud-based management service hosted at https://hillspire.jamfcloud.com, which, as of the date of this declaration, resolves to an authentication service associated with Schmidt Entities." [Ex. 2 ¶ 18.]

v. "Forensic artifacts show that TeamViewer was installed on the Ritter Laptop and configured for full unattended access capability. TeamViewer was authorized at the operating system level to record the screen and control keyboard and mouse input, permissions that are required for live viewing and interactive remote control and are not granted by default. These permissions were granted in or around November 2021. When enabled, TeamViewer allows a remote user to view the screen in real time, control the keyboard and mouse, and transfer files." [Ex. 2 ¶ 20.]

vi. "Analysis of the macOS privacy authorization database (TCC.db) shows that TeamViewer was granted screen recording and accessibility permissions on the Ritter Laptop. These permissions are required for live viewing of the screen and remote control of keyboard and mouse input and are not granted by default." [Ex. 2 ¶ 21.]

COMPLAINT

vii. "In combination, JAMF and TeamViewer created a system architecture in which JAMF provided persistent, root-level administrative management of the Ritter Laptop, while TeamViewer provided the mechanism for live, interactive remote access. Under this configuration, and when the TeamViewer service was enabled, an authorized remote administrator could obtain broad and effectively unrestricted access to the system, including the ability to view and control the desktop, transfer files, and interact with user data and applications." [Ex. 2 ¶ 22.]

viii. "When deployed on a personal computer, this combination of enterprise management software and remote access software materially reduces the user's expectation of privacy with respect to personal and sensitive information stored on or accessed through the device." [Ex. 2 ¶ 23.]

ix. "According to the Unified Log of the Ritter Laptop, the laptop was powered on and the JAMF software was running on 9/5/2024. The laptop was shutdown on 9/6/2024." [Ex. 2 ¶ 24.]

x. **Materiality of Pixley findings to Counts I, II, and III.** The Pixley findings establish that from November 9, 2021 through at least September 6, 2024, Hillspire maintained — through JAMF pointed

to hillspire.jamfcloud.com and TeamViewer configured for unattended remote access with screen-recording and keyboard-and-mouse-control permissions — (i) persistent, root-level administrative control of Plaintiff's MacBook Pro (CFAA access without authorization under § 1030(a)(2)(C), (a)(5)(A)); (ii) a mechanism for interception of in-transit electronic communications, including real-time screen contents and keystrokes, without Plaintiff's consent (Wiretap Act § 2511(1)(a)); and (iii) a mechanism for access to stored electronic communications in Plaintiff's Google Workspace accounts through credential capture and session hijack (SCA § 2701(a)). Pixley's finding that JAMF was actively running September 5–6, 2024 — two days after the September 3, 2024 PDF Expert 13-second-interval automated-save tampering of Exhibit A (the SPM LLC Agreement, DocuSign envelope 805F7E18) — supports the inference that the September 3 PDF tampering was executed through the Hillspire JAMF infrastructure while Plaintiff's laptop was under Hillspire's remote control, not by Plaintiff. This is the architectural predicate for the "honeypot" hypothesis: tampering executed remotely on Plaintiff's own machine to create a

discoverable self-tampering appearance later used against Plaintiff in the AAA arbitration.

b. **The "Gold" MacBook Air compromise — post-settlement intentional access.** In or about February 2025, Plaintiff acquired a MacBook Air ("Gold") and personally set it up for use in privileged legal communications. Forensic analysis of Gold establishes five independent indicators of unauthorized root-level account manipulation consistent with remote enterprise-level provisioning: (i) an enterprise Apple ID IDMS UUID of 001149-08-5721b7d9-c6db-44ac-86c2-03850c3534af appearing in the Directory Services RecordName field — a marker that, on information and belief, cannot be created by ordinary Setup Assistant personal provisioning and is only producible by Apple Business Manager enterprise provisioning; (ii) a blank RealName field inconsistent with Setup Assistant configuration; (iii) an .AppleSetupDone inode timestamp altered to 4:40:22 AM on January 9, 2026 — seventeen seconds after a confirmed root console login at 4:35 AM; (iv) an install.log file cleared of all historical package-installation entries despite confirmed prior package installations; and (v) broken home-directory permissions yielding cascading NSCocoaErrorDomain 513 write errors. Plaintiff further alleges that the "sysaccount" rename — an operational signature previously

applied physically to Plaintiff's stolen MacBook Pro (November 11, 2024, returned) — was remotely applied to Gold during a period when Plaintiff was using Gold for privileged legal communications. The January 9, 2026 root console login on Gold is a discrete post-settlement CFAA event occurring approximately thirteen months after the December 4, 2024 settlement, establishing an intentional access within one year of filing. [Plaintiff reserves submission of a forensic declaration authenticating these Gold findings by appropriate expert.]

c. **GoDaddy DNS deletion — third-party-service access event.** In or about February 2025, Plaintiff discovered through independent forensic review that the DNS records of the steelperlot.com domain had been deleted at GoDaddy, the domain registrar. Plaintiff alleges, on information and belief subject to discovery of GoDaddy authentication and DNS-change records, that the deletion was performed through credentials associated with Plaintiff's Hillspire-controlled Google Workspace, and that it had the effect of destroying the domain-infrastructure addressability of Plaintiff's business website and dependent services. This deletion is a distinct CFAA event independent of the laptop and Workspace access events, and a distinct SCA event to the extent the DNS change affected authorized access to stored communications bound to the domain.

d. **Control Risks evidence.** [Ex. 29 — Aug. 8, 2024 Control Risks — Michelle Ritter Device Collection Report]

e. **CGNET evidence.** In addition to the June 27, 2024 CGNET DocuSign search communication already referenced, [Ex. 30 — additional CGNET communications and admin-change logs].

f. **Additional third-party assessments.** Plaintiff further reserves the right to designate additional third-party cybersecurity or forensic assessments through discovery.

### F.2 Authorization, Revocation, and Post-Revocation Access

145. During and after the December 2024 settlement sequence, Plaintiff granted limited permission for copying and transition of certain accounts, files, devices, records, and business systems. That permission was limited in purpose, scope, and time.

146. The purpose of any permission was transition, copying, preservation, and return of control — not open-ended monitoring, alteration, deletion, export, retention, lockout, password change, privilege review, or adverse use against Plaintiff.

147. The permission did not authorize Defendants or their agents to continue accessing, controlling, exporting, altering, hiding, deleting, moving, or preventing Plaintiff's access to her stored communications, files, account

settings, administrator accounts, or credentials after the transition purpose ended, after objection, or after revocation.

148. Authorization expired no later than January 31, 2025 and, as to particular systems or acts, expired or was revoked earlier when the purpose-bounded transition task ended or when Plaintiff objected.

149. After authorization expired or was revoked, Defendants and their agents retained credentials, tokens, active sessions, administrative privileges, delegated-access settings, forwarding or recovery mechanisms, device-management controls, remote-access capabilities, or administrator-level control in one or more of the relevant systems.

150. After authorization expired or was revoked, Defendants and their agents accessed stored email, messages, account settings, and electronic communications in the steelperlot.com Google Workspace and associated accounts.

151. Even more, ultimately, in April 2025, StarX Networks Inc intellectual property within the SteelPerlot.com Google workspace was transmitted to an OpenAI employee.

## F.3 Breach of Attorney-Client Privileged Communications

152. Plaintiff's stored communications included privileged attorney-client communications with her counsel of record across multiple proceedings. On

information and belief, the retention of administrator control, forwarding and recovery settings, device-management controls, and/or remote-access capabilities during the relevant period rendered those privileged communications visible to, or susceptible of retrieval by, persons aligned with Defendants. A timeline correlating access events with privileged-communication timeframes will be designated through discovery.

153.    Plaintiff does not waive any privilege by pleading this paragraph and reserves all privileges in the broadest available scope. Plaintiff pleads this allegation as evidence of the scope of unauthorized access, of concrete cognizable injury under Counts I and II, and of the coercive environment relevant to Count VI.

## F.4 Direct Cyber-Related Injury

154.    Plaintiff's cyber-related injury is direct and concrete. Within a one-year period, Plaintiff incurred or became obligated to incur costs exceeding $5,000 for forensic and technical investigation, damage assessment, evidence preservation, credential restoration, account-integrity restoration, access-history recovery, device and system remediation, and replacement or parallel systems where the affected systems could no longer safely be trusted.

155.    Plaintiff will seek through discovery the relevant Google Workspace audit logs, DocuSign envelope histories, administrator-change records, security logs,

recovery-setting changes, forwarding-rule histories, active-session records, delegated-access records, device-management records, remote-access logs, and custodian testimony.

**F.5. SteelPerlot.Com As The Centralized Enterprise Hub; CGNET As Managed Service Provider; Forwarding To Hillspire Through at least August 2024**

156.    **Centralized-hub architecture.** At all relevant times from 2021 through August 2024, the steelperlot.com Google Workspace tenant operated as the centralized enterprise hub across multiple Ritter-affiliated entities, including Steel Perlot Management, LLC (SPM), StarX Networks, Inc. (StarX), Audem Management, LLC (Audem), and Knox Networks, Inc. (Knox). The steelperlot.com tenant held Plaintiff's privileged and confidential business communications, strategic documents, tax and governance records, cap-table materials, and personal financial data across all of these entities. Administrative credentials on steelperlot.com during this period were held by (a) CGNET Systems International, as managed-service provider with super-administrator authority; (b) SPM's Chief Technology Officer Ioannis P.; (c) Plaintiff Michelle Ritter; and (d) on information and belief, Hillspire Chief Financial Officer Mandy Quach, who received administrator-tier access granted or facilitated through CGNET at some point during the 2022–2024 period (exact date to be

refined through discovery of CGNET admin logs and Google Workspace audit records).

157.    **CGNET forwarding to Hillspire through August 2024.** On information and belief, CGNET knowingly operated distribution-list forwarding and/or mail-rule forwarding pathways that routed communications from the steelperlot.com, audem-mgmt.com, starx.com, and knox-networks.com Workspace tenants to Hillspire-affiliated accounts and personnel, including Quach. This forwarding continued, on Plaintiff's pleading, through at least August 2024 — well after Plaintiff's April 2024 protected disclosures of sexual harassment and retaliation, and after the issuance of a litigation hold effective June 2024 across each of the four tenants. The forwarding captured privileged attorney-client communications (including with Plaintiff's successive counsel), strategic corporate documents, and personal financial data. Full particularization of recipients, dates, and content is reserved pending Google Workspace admin-audit, CGNET internal communications, and Hillspire mail-log discovery.

158.    **June 2024 legal hold across four tenants — known, ignored.** As of June 2024, Plaintiff or her then-counsel issued or caused to be issued a litigation hold covering steelperlot.com, audem-mgmt.com, starx.com, and knox-networks.com Workspace tenants. On information and belief, CGNET, Quach, and Hillspire were on actual or constructive notice of that hold. Despite the hold,

the forwarding pathways and data-handling practices described above continued, and no hold-acknowledgment, chain-of-custody documentation, or defensible preservation protocol was implemented by CGNET or Hillspire. That conduct is independently actionable as spoliation within the meaning of Fed. R. Civ. P. 37(e) and is pleaded as independent CFAA (Count I), SCA (Count II), and Wiretap Act (Count III) predicate conduct to the extent it involved continuing unauthorized access, interception, or disclosure of stored and in-transit communications belonging to Plaintiff and her entities.

159.    **Hidden tax and governance folders — Connor Coit disclosure (June 2024).** Plaintiff further alleges that CGNET, acting at Hillspire's direction, concealed from Plaintiff the existence of Google Workspace folders containing material tax, governance, and financial records pertaining to SPM, Audem, and the Steel Perlot entities. On or about June 2024, an SPM employee, Connor Coit, disclosed to Plaintiff that these folders had been intentionally hidden from Plaintiff's administrative view. Coit had been working hand-in-hand with Hillspire CFO Mandy Quach and with KPMG LLP on the tax and books activities described in Part IV.C. The intentional concealment of tax and governance records from Plaintiff — the co-founder, Managing Director, and 51% common member of SPM — is factual support for (a) Count VI (rescission for fraud; failure of consideration); (b) Count VIII (aiding and abetting breach of

fiduciary duty); (c) the SCA claim in Count II; and (d) the Labor Code § 1102.5 retaliation count pleaded herein as Count XV.

**G.  The Pattern Of Retaliation: Four Escalating Incidents Culminating In The Coerced December 4, 2024 Settlement Agreement And The December 17, 2024 Amendment**

*G.1  Overview — The Retaliation Pattern*

160.    Defendants and their counsel did not engage in isolated misconduct. They executed a repeating playbook. Each time Plaintiff — or counsel acting on Plaintiff's behalf — raised or documented Eric Schmidt's sexual assault, sexual harassment, physical abuse, cyberstalking, or related coercive conduct, Defendants retaliated. The retaliation was not rhetorical; it took the form of escalating economic, reputational, operational, and legal pressure, calibrated to inflict maximum injury on Plaintiff personally and on her ability to exercise rights protected by California and federal law. The December 4, 2024 Settlement Agreement and the December 17, 2024 Amendment are the product of that pattern, not a free-will resolution of a commercial dispute.

161.    The pattern operated in four discrete but escalating phases, each triggered by a protected disclosure:

162.    Incident 1 — March–April 2024. Plaintiff and her counsel raised sexual assault and sexual harassment by Schmidt in mediation. Defendants retaliated by removing Plaintiff as CEO and founding Board member of Knox Networks, Inc. within 24 hours of the April 26, 2024 mediation session, and by terminating Plaintiff's CS-02 vesting on April 26, 2024. (*See Part IV.D.4 (Knox retaliatory removal); see also F.2 below.*)

163.    Incident 2 — July 2024. Plaintiff's then-counsel at Blank Rome LLP communicated a draft complaint framework that included abuse and harassment claims. Defendants retaliated through Glaser Weil by paying off Plaintiff's employees to resign via "pay-to-play" severance-and-cooperation agreements; by launching a coordinated press-misrepresentation campaign targeting Plaintiff's professional reputation; and by refusing — to date — to disclose the universe of those payoffs or the governing agreements. (*See F.3 below.*)

164.    Incident 3 — October–December 2024. With Plaintiff effectively cut off from counsel, capital, employees, banking, and her own residences, Defendants executed a coordinated economic-coercion sequence through (a) Wells Fargo's written October 8 and October 25, 2024 representations of account closure that were later shown to be false (*see Part IV.H*); (b) the initiation and expansion of AAA arbitration proceedings used to pull Plaintiff's parents into a forum to which they had never consented; (c) serial 60-day and 3-day notices to terminate

occupancy targeting Plaintiff's and her parents' homes; and (d) threats by Schmidt's counsel at Glaser Weil — on December 2, 2024 — that Defendants would pursue eviction, emergency entry into Plaintiff's homes, and further arbitration unless Plaintiff and her parents signed a settlement. The output of that sequence is the December 4, 2024 Settlement Agreement and its Schedule D compelled-perjury declaration drafted by Defendant Marcus. (*See F.4 below.*)

165.    Incident 4 — December 6–17, 2024. When Plaintiff — within 72 hours of signing the Settlement Agreement — documented Defendants' continued private-investigator surveillance, stalking of her parents, and digital theft by filing a Request for Domestic Violence Restraining Order in Los Angeles Superior Court on December 11, 2024 (Case No. 24SMRO00444), Defendants retaliated through an on-site, in-person coercive procurement event at Plaintiff's California residence on December 17, 2024, executed by Defendant Marcus and Glaser Weil partner Jillian Harris together with on-site security personnel, locksmiths, and a Schmidt-aligned agent (Debra Smith). Under threats of arrest of Plaintiff's parents, immediate lockout, and further AAA arbitration, Plaintiff was forced to withdraw the DVRO and to sign the December 17, 2024 Amendment converting Schedule D from a deferred deliverable into an on-site rescission obligation. (*See F.5 below.*)

166.    The retaliation pattern did not end on December 17, 2024. It continued through 2025 and 2026 in the form of (a) continued surveillance and cyberstalking; (b) Defendant Marcus's direct attempts — in January 2025, again in summer 2025, and again in September 2025 — to extract the Schedule D compelled-perjury declaration upfront in exchange for Schmidt's non-performance of the Settlement Agreement's $14,000,000 MR Amount; (c) Marcus's August 2025 attempt to recruit Plaintiff's former New York counsel specifically to circumvent the conclusion by Plaintiff's California-based counsel that Schedule D violated California Code of Civil Procedure §§ 1001 and 1002; and (d) Defendants' initiation and prosecution of AAA Case No. 01-25-0000-2191 as the enforcement vehicle for the retaliation pattern, culminating in the April 20, 2026 Interim Award pleaded in Part IV.I. (*See Part G below.*)

167.    The retaliation pattern is material to every Count pleaded in this Complaint. It is the factual predicate for (i) Count VI (rescission and cancellation of the Dec. 4, 2024 Settlement Agreement and Dec. 17, 2024 Amendment on fraud, duress, undue influence, unconscionability, and illegality grounds under Cal. Civ. Code §§ 1567, 1568, 1572, 1575, 1668, 1689, and 3412); (ii) Count VIII (aiding and abetting fraud and breach of fiduciary duty through the operational, non-advocacy conduct of Glaser Weil and Marcus); (iii) Count IX (declaratory invalidity of §§ 3(a)(i), 3(a)(iv), Schedule D, and § 1 of the

Amendment under Cal. Civ. Code §§ 1668 and 1670.11, Cal. Code Civ. Proc. §§ 1001 and 1002, and 9 U.S.C. §§ 401–402); (iv) Count X (Bane Act interference with Plaintiff's constitutional and statutory rights by Marcus individually); (v) Count XI (abuse of process); (vi) Count XIII (vacatur of the AAA Interim Award); and (vii) any future civil RICO count (reserved per Part VIII).

### G.2  Incident 1 — March–April 2024: Protected Mediation Disclosures Of Sexual Assault And Harassment → Retaliatory Removal From Knox Networks, Inc

168.    In March and April 2024, Plaintiff participated in a private mediation process with Schmidt, Schmidt-aligned entities, and counsel. [Ex. 11 — Mediation Chronology and Correspondence (March–April 2024); Ex. 66 — April 2024 Mediation Brief filed by Plaintiff's counsel.]

169.    The April 2024 mediation brief filed by Plaintiff's counsel expressly raised abuse, personal misconduct, and the coercive dynamics of the relationship between Plaintiff and Schmidt. Schmidt was present. Schmidt's counsel Glaser Weil — including Patricia Glaser and Defendant Craig H. Marcus — were present. This direct, documented allegation of abuse is critical because Schmidt later falsely declared in the AAA arbitration, under penalty of perjury, that allegations of sexual abuse and workplace harassment were first raised only in June 2024. That statement is false and is provable on this record by the April

2024 mediation brief. [Ex. 66 — Mediation Brief; *compare* Schmidt Decl. in AAA Case No. 01-25-0000-2191 (filed Apr. 6, 2026).]

170.    On April 26, 2024, Plaintiff attended a second mediation session. The very next day — within 24 hours — Plaintiff was removed as CEO and founding Board member of Knox Networks, Inc. Plaintiff was denied all subsequent shareholder updates. Her subsequent § 220 books-and-records requests under Delaware law were denied unless she agreed to onerous confidentiality restrictions violating CCP §§ 1001–1002. (*See Part IV.D.4 for the Knox-specific governance record; Ex. 80 — Knox Certificate CS-02; Exs. 81–82 — Knox Cap Tables; see also F.6 below for Marcus's role.*)

171.    The April 24–26, 2024 removal from Knox was not a good-faith governance action. It was retaliation for a protected disclosure of sexual assault and harassment under:

172.    (a) California Government Code § 12940(h) and related FEHA anti-retaliation provisions;

173.    (b) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), prohibiting retaliation for opposing unlawful employment practices;

174.    (c) California Labor Code § 1102.5 (whistleblower retaliation); and

175. (d) the anti-retaliation principles embodied in the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, 9 U.S.C. §§ 401–402, and the Silenced No More Act, California Government Code § 12964.5.

176. The timing is not coincidental. The April 24, 2024 removal from Knox is the same week that Glaser Weil partners Marcus and Harris assumed direct operational and governance authority over the Steel Perlot Entities at Hillspire's direction, as pleaded in Parts IV.A and IV.H and substantiated by the September 25, 2025 Reinhardt Declaration (Ex. 1). The retaliation and the governance takeover are one continuous operational event executed by the same counsel acting simultaneously as advocate and as operating principal.

177. The April 26, 2024 termination of Plaintiff's CS-02 vesting. Approximately 39 to 40 of 48 months of Plaintiff's January-2021-start vesting had elapsed as of April 2024 ($\approx$ 81–83%). Termination without cause in that posture would, under the Certificate's own acceleration provisions, entitle Plaintiff to full acceleration. Instead, Defendants purported to terminate vesting without cause — treating a protected-disclosure retaliation as if it were ordinary corporate action. [Ex. 80 — Knox Certificate CS-02.]

***G.3  Incident 2 — July 2024: Blank Rome Draft Complaint With Abuse Claims →
"Pay-to-Play" Employee Resignations, Press Misrepresentation, And
Concealment***

178.    On July 11, 2024, Plaintiff's then-counsel at Blank Rome LLP in New York communicated to Defendants' counsel a draft-complaint framework that included claims of abuse, harassment, and cyberstalking by Schmidt. At the same time, Defendants' counsel proposed — and attempted to extract from Plaintiff — a sweeping exculpatory declaration that Schmidt "never physically, sexually, psychologically, mentally or emotionally abused" Plaintiff; "never physically or sexually assaulted, attacked, harmed, injured, battered, or raped" her; and "never made physical contact with [Plaintiff] in a non-consensual manner." The proposed declaration was paired with an arbitration clause on materially more favorable terms than the arbitration clause later forced into the December 4, 2024 Settlement Agreement. [Ex. 31 — July 2024 Blank Rome / Glaser Weil correspondence re: proposed declaration; Plaintiff's Sept. 8, 2025 Decl. ¶¶ 29–31.]

179.    When Plaintiff refused to sign the July 2024 proposed declaration, Defendants immediately retriggered arbitration against Plaintiff and her parents, with an answer required by July 23, 2024. [Plaintiff's Sept. 8, 2025 Decl. ¶ 31.]

The linkage between Plaintiff's refusal to sign a compelled-perjury declaration and the next round of retaliatory legal process is documented, not inferred.

180.    Concurrent with the legal retaliation, Defendants — acting through Hillspire and through Glaser Weil — executed a "pay-to-play" resignation scheme targeting Plaintiff's Steel Perlot Management, LLC employees. Plaintiff, as CEO and managing member of SPM, had been repeatedly told that SPM had no available funds and that she could not make payroll or raise outside capital. In fact, Defendants drained SPM capital while simultaneously offering Plaintiff's employees — without Plaintiff's knowledge — severance payments for "living expenses" conditioned on (i) voluntary resignation and (ii) cooperation in all litigation or matters with Hillspire. Some of those same employees were then re-hired directly at Hillspire, at Hillspire-affiliated entities, or at Google (where Schmidt had previously served as CEO and Executive Chairman). [Plaintiff's Sept. 8, 2025 Decl. ¶¶ 34–39.]

181.    Plaintiff obtained a copy of one such "pay-to-play" resignation agreement from a former employee. The former employee described the arrangement as a "pay-to-play resignation" and corroborated the systematic nature of the undermining. [Plaintiff's Sept. 8, 2025 Decl. ¶ 37.] Plaintiff, through counsel, repeatedly asked Marcus, Patricia Glaser, and Harris — in October 2024 and thereafter — to disclose (a) the list of employees paid to resign and (b) the

COMPLAINT

agreements used to secure those resignations. Marcus refused to produce that list or those agreements. [Plaintiff's Sept. 8, 2025 Decl. ¶¶ 38–40.]

182.    Defendants paired the pay-to-play resignation scheme with a coordinated press-misrepresentation campaign. On August 1, 2024, *The Information* published an article concerning Plaintiff based on sources believed to include Plaintiff's former or paid-off employees. On August 4, 2024, Marcus — operating in his Hillspire-directed de facto management capacity alleged in Parts IV.A and IV.H — circulated an email to Plaintiff's own SPM employees falsely asserting that Plaintiff had "abandoned SPM," "failed at fundraising," and "furloughed all staff." [Ex. 23 — Aug. 4, 2024 Marcus email to SPM employees.] That internal defamatory communication preceded by weeks Defendants' effort to pressure Plaintiff into the December 4, 2024 Settlement Agreement — and is independently pleaded as defamation in Count XII.

183.    In or around August 2024, Plaintiff's parents and Plaintiff were served with 60-day Notices to Terminate Occupancy on the residences owned through the Hillspire-controlled GTE Properties LLC (parents' home) and WTY Properties LLC (Plaintiff's home). A process server who appeared to know Plaintiff's travel schedule intercepted Plaintiff and her father as they returned from Northern California, taped three "Notice to Terminate Occupancy" signs to Plaintiff's property, served three additional notices on Plaintiff's parents for their

home, and photographed Plaintiff and her father on private property. [Plaintiff's Sept. 8, 2025 Decl. ¶ 65.]

184.    Glaser Weil and its affiliates accompanied the housing pressure with written communications to Plaintiff's elderly parents that Plaintiff describes, on personal knowledge, as "extraordinarily nasty and retaliatory." [Plaintiff's Sept. 8, 2025 Decl. ¶ 66.] Plaintiff's parents — then 72 and 66 years of age — had no ownership, equity, control, operational role, or contractual relationship with any of the Steel Perlot, Knox, StarX, Audem, Orion Wing, or Hillspire entities. Their only nexus to the events in this case was their parental relationship to Plaintiff. Defendants used that relationship as leverage.

*G.4    Incident 3 — October–December 2024: Coordinated Wells Fargo, AAA, Eviction, And Property-Possession Pressure Culminating In The December 4, 2024 Settlement Agreement And Schedule D*

185.    By fall 2024, Defendants had assembled the operational pressure environment into which the December 4, 2024 Settlement Agreement would be delivered. That environment consisted of four simultaneous pressure vectors, each independently coercive and together rising to the level of duress, menace, and undue influence under Cal. Civ. Code §§ 1567, 1568, 1569, 1570, 1575.

186. Vector 1 — Wells Fargo written closure representations. As pleaded in Part IV.H and Count VII, Wells Fargo — through its Executive Director Lisa Meredith — represented to Plaintiff in writing on October 8, October 10, October 11, and October 25, 2024 that the SPM -4631, SPM -6449, Audem -0882, and related accounts would be permanently closed "effective at the close of business on November 8, 2024"; that residual cash balances would be returned to Plaintiff by cashier's check; and that Wells Fargo's closure decision was "final." [Exs. 59a, 59b, 59c — Wells Fargo Closure Letters and Meredith emails.] Plaintiff relied on those representations in her negotiation and execution of the Settlement Agreement. In fact, the SPM -6449 account holding $946,706.69 was *not* closed and was instead retained at Wells Fargo under a re-titling to the Hillspire-aligned successor "Orion Wing Management, LLC." (*See Part IV.H.3–J.8.*)

187. Vector 2 — AAA arbitration proceedings used against Plaintiff's parents. Defendants maintained, expanded, or re-triggered AAA arbitration proceedings that swept in Plaintiff's parents notwithstanding that (a) Plaintiff's mother Shamim Ritter never signed an agreement containing any arbitration clause binding her to AAA; and (b) the Audem Independent Contractor Agreement signed by Plaintiff's father Terry Ritter in February 2022 required arbitration in Los Angeles, California — not the Bay Area forum that Marcus unilaterally selected. [Plaintiff's Sept. 8, 2025 Decl. ¶¶ 61–64.] AAA Commercial

Arbitration Rule R-4(a)(i) required Defendants to file the arbitration agreement establishing jurisdiction; no such agreement existed as to Shamim Ritter. Nevertheless, Plaintiff's elderly parents were repeatedly "used as whipping posts in order to get leverage over" Plaintiff. [Plaintiff's Sept. 8, 2025 Decl. ¶ 62.] This is a documented pattern, not a characterization.

188.    Vector 3 — escalating eviction notices. On December 2, 2024 — two days before the Settlement Agreement was signed — Plaintiff and her parents were served with 3-day Notices to Terminate Occupancy for their Los Angeles homes, alleging unpermitted renovations dating back to 2022–2024. Those renovations had previously been approved directly by Schmidt. [Plaintiff's Sept. 8, 2025 Decl. ¶¶ 70–71.]

189.    Vector 4 — express December 2, 2024 litigation threat. On the same day — December 2, 2024 — Schmidt's counsel at Glaser Weil communicated that unless Plaintiff and her parents signed a settlement, Defendants would pursue (i) eviction, (ii) emergency entry into Plaintiff's home and her parents' home, and (iii) further arbitration. [Plaintiff's Sept. 8, 2025 Decl. ¶ 71.] On December 3, 2024, Plaintiff — under the cumulative weight of the four pressure vectors — wrote to her parents apologizing for "the mess that [her] relationship with Eric has put [them] both in," noting that "leaks, control, money, and influence were being deployed against us," and explaining that she was seeking a final

agreement to end the ordeal. [Plaintiff's Sept. 8, 2025 Decl. ¶ 73.] On December 4, 2024, Plaintiff's then-contingency counsel — not licensed in California and not in a position to litigate in Los Angeles — informed Plaintiff that the proposed agreement was "take-it-or-leave-it." [Plaintiff's Sept. 8, 2025 Decl. ¶ 74.]

190.    On December 4, 2024, Plaintiff signed the written Settlement Agreement. [Ex. 11 — Dec. 4, 2024 Settlement Agreement.] The Settlement Agreement contained the following material provisions relevant to the rescission, declaratory-invalidity, and RICO theories pleaded in this Complaint:

a. The Schmidt Parties acknowledged and agreed that Plaintiff owned 100% of the equity of StarX and Audem and that no Schmidt Party claimed any interest, or right to obtain any interest, in StarX, whether in the form of equity, carried interest, phantom equity, options, or otherwise. [Ex. 11, ¶ F.]

b. The Schmidt Parties represented, to the best of their knowledge, information, and belief and based on information within their possession, custody, and control, that they had no StarX or Audem books and records — including electronic accounts and records, banking materials, and tax materials — within their possession, custody, or control; and agreed that if such records came into their control, they would turn them over to Plaintiff. [Ex. 11, ¶ G, at p. 3.] That ¶ G representation was directly and

materially false when made, as established by (i) the March 6, 2024 KPMG "KPMG suggested buying StarX since the cost isn't running through the SPM trial balance" entry (Ex. 60); (ii) the January 2025 Audem Form 1099 for approximately $2.4 million issued to Plaintiff within weeks of the representation based on records then within Defendants' control (Ex. 17); and (iii) the April 6, 2026 "Wind-Down Ledger" admission that the Schmidt Parties continued to administer SPM / Orion Wing books, payroll, and vendor accounts from the day of signing through March 16, 2026 (Ex. 36).

c. Schedule A provided that the Schmidt Parties would pay or cause to be paid $15,000,000, of which $14,000,000 was structured for the benefit of Plaintiff, payable in tranches subject to stated conditions, and of which $1,000,000 was structured "for the benefit of Mr. and Mrs. Ritter" (Plaintiff's parents) as a separate consideration stream to compensate them for vacating their home. [Ex. 11 — Schedule A.] Plaintiff does not represent Shamim and Terry Ritter, has no authority to bind them, has no pleaded agency relationship with them, and has no contractual basis for any Defendant to recharacterize the $1,000,000 Schedule A payment to them as a payment to her.

d. Schedule B recited an alleged $6,575,000 outstanding loan under a "Multi-Draw Loan Agreement" between StarX (as borrower) and SPM (as lender), and recited that Schmidt would cause SPM to forgive that loan. [Ex. 11 — Schedule B; Ex. 14 — StarX Multi-Draw Loan Agreement (disputed).] The underlying "loan" instrument — the exhibit later submitted to the AAA as "Exhibit 73" — is forensically disputed (movable cut-and-paste signatures, no DocuSign Certificate of Completion, no DocuSign page headers, no native-file chain of custody). It cannot provide consideration to Plaintiff, who received no personal payment from any purported forgiveness between two Schmidt-controlled entities.

e. Schedule D provided a form of future declaration for Plaintiff, which, if executed, would state that "at all times, any and all contact by and between Eric Schmidt and myself was entirely consensual and never coerced or compelled" and that Plaintiff wished to "correct" any prior statements to the contrary. [Ex. 12 — Schedule D.] Plaintiff did not sign Schedule D on December 4, 2024. The Schedule D form contains blank execution-date and notary fields.

191. Marcus drafted Schedule D. Defendant Marcus — a California-licensed attorney at Glaser Weil — personally authored and prepared Schedule D as part

of the Settlement Agreement he himself drafted. On the face of the Settlement Agreement, Schedule D is a future deliverable: Plaintiff would voluntarily deliver the certification and declaration in the form attached as Schedule D "concurrently with" a later tranche of the $14 million MR Amount and after Plaintiff's delivery of specified settlement deliverables. [Ex. 11 — Dec. 4, 2024 Settlement Agreement (Schedule D delivery tied to final MR Amount tranche).] The Agreement therefore conditioned a core portion of Plaintiff's direct payment on Plaintiff's subsequent delivery of a sworn recantation of sexual assault, harassment, and coercion — precisely the arrangement that California Code of Civil Procedure §§ 1001 and 1002 and Civil Code § 1670.11 declare void as a matter of public policy.

192.    The Schedule D / payment structure operates as a compelled-perjury instrument and, as to cash consideration, an illusory one. Three conclusions follow on the face of the record:

    a. Schedule D is not a severable term. It is described by Defendants themselves as a "material inducement" and an essential component of the bargain. Under Cal. Civ. Code §§ 1599 and 1608, where a single unlawful consideration is indispensable to a single object, the bargain is not rescued by relabeling.

b. Schedule D is void as applied under CCP §§ 1001 and 1002 and Civil Code § 1670.11. A settlement term restricting disclosure of factual information related to claims of sexual assault, sexual harassment, or workplace harassment filed in a civil action or administrative complaint is void as a matter of law. A provision in a settlement that waives a party's right to testify in an administrative, legislative, or judicial proceeding concerning alleged sexual harassment is likewise void under Civil Code § 1670.11.

c. Plaintiff has received no part of the $14,000,000 MR Amount — not $1,000,000, not $100,000, not one dollar. The "consideration" offered for the Settlement Agreement, as performed, is $0 to Plaintiff. Her claim to the $14 million is being withheld by Defendants as a lever — either to extract the Schedule D compelled-perjury declaration upfront (as Marcus attempted in January 2025, summer 2025, and September 2025, see Part G.2 below), or to induce the dismissal of this very federal action.

*G.5 Incident 4 — December 6–17, 2024: The DVRO Filing Documenting Continued Retaliation; The On-Site Coercive Procurement Of The DVRO Withdrawal Under False Pretenses; And The December 17, 2024 Amendment*

193.    Within 72 hours of signing the Settlement Agreement, Defendants resumed — or, more accurately, never stopped — the surveillance, stalking, digital theft, and intimidation conduct that had driven Plaintiff to sign. On December 5, 2024, Plaintiff observed individuals stationed outside her home monitoring her movements. On December 6, 2024, a private investigator — admitting to LAPD officers on scene that he worked for "a billionaire's private security detail" and that he was "not going to wake [the billionaire] up" — followed Plaintiff's elderly parents as they attempted to leave Plaintiff's home for dinner. The PI's vehicle was identified by LAPD (license plate 9NBZ449, Kia). A second PI vehicle was also identified (9CXM150). [Dec. 11, 2024 DVRO Request, ¶¶ 5–6; Plaintiff's Sept. 8, 2025 Decl. ¶¶ 78–79.] LAPD officers advised Plaintiff to seek a temporary restraining order immediately, "especially given early December 2024 contractual commitments from Eric to no longer contact or harass [her], even through his affiliates, which had at this point been breached." [Dec. 11, 2024 DVRO Request, ¶ 6.]

194.    On December 7–10, 2024, Defendants accelerated the digital-takeover conduct. On December 7, 2024, CGNET and Hillspire-aligned personnel seized

the steelperlot.com Google Workspace — the tenant Plaintiff personally owned and paid for directly to Google — without authorization. On December 8, 2024, the mritter@steelperlot.com password was changed without Plaintiff's authorization; documents within the workspace were accessed and altered while Plaintiff was locked out. On December 10, 2024, counsel James Knopf issued a written notice to CGNET describing the unauthorized access, data alteration, and identity-theft pattern. [Ex. 28 — Dec. 10, 2024 Knopf notice to CGNET.] *See Part IV.E for the full digital-control record.*

195.    On December 11, 2024, Plaintiff filed a Request for Domestic Violence Restraining Order in the Los Angeles Superior Court. Los Angeles Superior Court Case No. 24SMRO00444, assigned to Judge David W. Swift. [Ex. 84 — Dec. 11, 2024 DVRO Request (24SMRO00444).] The DVRO Request documented, with specificity, the post-Settlement surveillance, stalking of Plaintiff's elderly parents, digital intrusions, cyber breaches, theft of the steelperlot.com workspace, and the coordinated economic-coercion pattern. On December 12, 2024, the court issued a Notice of Court Hearing set for January 6, 2025. [Ex. 85 — Dec. 12, 2024 Notice of Court Hearing (Form 109).]

196.    The DVRO Request is not a disputed or rhetorical document in this Complaint. It is a court-filed, judicially-notice-eligible judicial record (Cal. Evid. Code § 452(d)) that, as of December 11, 2024, placed on the Superior Court

record Plaintiff's sworn description of the December 2024 retaliation. It is the single most important documentary input into the December 17, 2024 on-site coercive procurement event, because the entire purpose of that event was to force Plaintiff to retract it.

197.    Between December 11 and December 17, 2024, Defendants represented to Plaintiff — through counsel — that if Plaintiff withdrew the DVRO, Defendants would (i) return Plaintiff's assets, including the stolen steelperlot.com Google Workspace, the StarX and Audem IP and tax data, and related materials; and (ii) stop the private-investigator surveillance and digital intrusions. Those representations were false. Defendants did not intend to return Plaintiff's assets or stop the surveillance at the time the representations were made. The assets have not been returned to this day. The surveillance has not stopped. As pleaded in Part G below, the surveillance continues through 2025 and 2026, and Plaintiff's stored privileged communications remain compromised through the persistent JAMF/TeamViewer architecture first installed on Plaintiff's MacBook Pro on November 9, 2021 and documented by Bruce Pixley (Ex. 2).

198.    On December 17, 2024, Defendant Marcus and Glaser Weil partner Jillian Harris — the same attorneys who as alleged in Parts IV.A, IV.H, and F.2 above had assumed Hillspire-directed operational authority over the Steel Perlot

126
COMPLAINT

Entities since April 2024 — came to Plaintiff's California residence in person to procure Plaintiff's withdrawal of the DVRO and Plaintiff's execution of the December 17, 2024 Amendment. Marcus and Harris were not transmitting a draft remotely. They were physically present in the environment in which Plaintiff and her elderly parents were being pressured over settlement compliance, property possession, and withdrawal of the DVRO. Their on-site conduct is pleaded as agent conduct attributable to Schmidt and Hillspire under ordinary agency principles and Federal Rule of Evidence 801(d)(2)(D), and as direct operational, non-advocacy conduct supporting Counts VIII, X, and XI.

199.    The on-site encounter included (a) Plaintiff's elderly parents; (b) Defendant Marcus; (c) Glaser Weil partner Jillian Harris; (d) additional attorneys; (e) Schmidt's property manager Debra Smith; (f) security personnel; and (g) locksmiths staged to change locks on Plaintiff's home. Plaintiff had no California-licensed counsel physically present. Plaintiff's New York contingency counsel Scott Baron provided only partial phone support. [Plaintiff's Sept. 8, 2025 Decl. ¶¶ 82–86.]

200.    The "sued into oblivion" statement. Marcus — physically present at Plaintiff's home, in front of Plaintiff's elderly parents — told Plaintiff and her parents that they would be "sued into oblivion" and that "the sheriffs would be called" unless Plaintiff withdrew her domestic-violence restraining order. [Ex.

21 — Plaintiff's contemporaneous notes re: Dec. 17, 2024 on-site event; Plaintiff's Sept. 8, 2025 Decl. ¶ 86.]

201.    The "nuclear" / "ballistic" statement. Debra Smith — physically present and acting on behalf of Schmidt — stated, in substance, that "Eric will go nuclear" unless Plaintiff withdrew the DVRO, and that Smith and others would not leave the property until Plaintiff did so. [Ex. 21 — Plaintiff's contemporaneous notes; Ex. 51 — Debra Smith Decl.; Plaintiff's Sept. 8, 2025 Decl. ¶ 86.] The statement is admissible against Schmidt under Fed. R. Evid. 801(d)(2)(D).

202.    Smith's contemporaneous admission regarding the condition of the residence. While physically present at Plaintiff's California residence on December 17, 2024, Debra Smith also stated, in substance, that "everything in the house is there and it looks fine," or words to that effect. The Smith statement is a contemporaneous party-opponent admission (Fed. R. Evid. 801(d)(2)(D)) that the contents and condition of Plaintiff's residence were intact at the moment of the coercive procurement. Any subsequent accusation by Defendants — including but not limited to the $1,183,429 "theft / conversion" claim prosecuted in the AAA arbitration and partially credited in the April 20, 2026 Interim Award — is directly contradicted by Smith's own contemporaneous, recorded words.

203.    Withdrawal paperwork was prepared on-site in real time. Marcus caused the DVRO-withdrawal paperwork to be drafted on-site, during the coercive encounter, outside the presence of any tribunal and outside any ordinary attorney-to-attorney settlement negotiation. The withdrawal was executed only because of the threats of arrest, further arbitration against Plaintiff's parents, lockout, and non-payment. [Plaintiff's Sept. 8, 2025 Decl. ¶¶ 82–87.]

204.    Plaintiff withdrew the DVRO on December 17, 2024. The withdrawal occurred under duress, menace, undue influence, coercion, and fraud — with a particular focus on the false representation that Plaintiff's assets would be returned and the surveillance would stop — and with only the uncontested goal, on Plaintiff's part, of getting her elderly parents out of physical harm's way. [Plaintiff's Sept. 8, 2025 Decl. ¶ 86.]

205.    Plaintiff also executed the December 17, 2024 Amendment on-site. [Ex. 13 — Dec. 17, 2024 Amendment to Settlement Agreement.] The Amendment made three material modifications to the Settlement Agreement, each of which independently demonstrates that the Amendment was procured for retaliatory-silencing purposes rather than ordinary settlement-adjustment purposes:

   a. Section 1 of the Amendment required Plaintiff to "irrevocably and forever rescind, revoke, retract, and deny" her prior DVRO filing and, if asked, to state that the filing had been filed erroneously against Schmidt and that

129
COMPLAINT

she did not support or endorse it in any way as to Schmidt or his affiliates. That is a compelled-speech, compelled-recantation term directly targeted at a California DVPA filing that had been made within the preceding six days.

b. The Amendment altered the payment timing of the MR Amount so that the payment obligation would follow only after Plaintiff's satisfaction of a "Filing Condition" tied to the DVRO withdrawal — a 72-hour payment trigger expressly linked to Plaintiff's performance of the compelled recantation. That mechanic tied Plaintiff's direct $14,000,000 compensation to retraction of a court-filed DVPA report — a structure voided by CCP §§ 1001 and 1002 and Civil Code § 1670.11.

c. The Amendment accelerated and operationalized Schedule D. What Defendants had drafted on December 4, 2024 as a deferred future deliverable (tied to a later tranche of the MR Amount) was, on December 17, 2024, converted under duress into an immediate on-site recantation obligation performed in person, in Plaintiff's home, under threat of lockout and arrest, outside any tribunal, and without California counsel present.

206.    The December 17, 2024 event is pleaded as the factual predicate for Count X (Bane Act) against Defendant Marcus individually. Marcus's on-site

COMPLAINT

statements and conduct — the "sued into oblivion" and "sheriffs" threats directed at Plaintiff and her elderly parents, the presence of security personnel and locksmiths, the real-time drafting of the withdrawal paperwork, and the use of the Settlement Agreement's financial leverage to obtain an immediate recantation of a judicial filing — constitute threats, intimidation, and coercion interfering with Plaintiff's rights under the California DVPA (Fam. Code § 6200 *et seq.*); her First Amendment right to petition government for redress (Cal. Const. art. I, § 3; U.S. Const. amend. I); her right to access California courts; her Cal. Penal Code § 136.1 right to be free from witness-intimidation; and her right to be free from extortionate compulsion under Cal. Penal Code § 518. *See* Cal. Civ. Code § 52.1(b) (treble damages).

207.    The December 17, 2024 event is also pleaded as operational, non-advocacy conduct predicating Count VIII against Glaser Weil and Marcus. For Count VIII purposes, Plaintiff does not rely on any statement by Marcus or Harris made to a tribunal, in pleadings, or in privileged settlement negotiations. Plaintiff relies on the non-courtroom, on-site, possession-taking and procurement conduct that California courts have recognized as falling outside the litigation-privilege carve-out. *See Kolar v. Donahue, McIntosh & Hammerton,* 145 Cal. App. 4th 1532 (2006); *Rickley v. Goodfriend,* 212 Cal.

App. 4th 1136 (2013); *see also* Cal. Evid. Code § 956 (crime-fraud exception to attorney-client privilege).

### G.6 Marcus's Knowing And Willful Violations Of California Law Across All Four Incidents And His Multiple Roles As Drafter, Negotiator, Authenticator, And Witness

208.    Defendant Marcus is not an ordinary advocate. Across the four-incident retaliation pattern alleged in this Part IV.F, Marcus has acted simultaneously as (a) drafter of the Settlement Agreement and Schedule D; (b) on-site negotiator at Plaintiff's California residence on December 17, 2024; (c) authenticator of disputed exhibits in the AAA arbitration, including the forensically challenged Exhibit 73 (StarX Multi-Draw Loan Agreement); (d) narrator of Defendants' factual account in sworn declarations; (e) certifier of Glaser Weil's own attorney fees sought as damages against Plaintiff; (f) direct communicant with Plaintiff's employees, friends, family, portfolio companies, counsel, and potential witnesses; and (g) California-licensed attorney with continuing duties under the California Rules of Professional Conduct and the California Business and Professions Code. His concurrent role as principal operational agent for Hillspire since April 2024 is pleaded in Parts IV.A and IV.H.

COMPLAINT

209.    Marcus drafted Schedule D as a California-licensed attorney. He knew, or was charged with knowledge as a California-licensed attorney, that a settlement term restricting disclosure of factual information related to sexual assault, sexual harassment, or workplace harassment filed in a civil action or administrative complaint is void under CCP §§ 1001 and 1002; that a provision waiving a party's right to testify concerning alleged sexual harassment in a qualifying proceeding is void under Cal. Civ. Code § 1670.11; that a contract provision that "has for its object … to exempt any one from responsibility for his own … willful injury to the person or property of another, or violation of law, whether willful or negligent" is void under Cal. Civ. Code § 1668; and that the Silenced No More Act, Cal. Gov't Code § 12964.5, independently prohibits settlement provisions that restrict disclosure of information about unlawful acts in the workplace.

210.    Marcus's repeated post-signing conduct confirms that the Schedule D / MR Amount coupling was not an ordinary settlement term but a compelled-perjury mechanism Marcus knew, and continued to know, violated California law. In chronological order:

a. January 2025 — the pre-AAA-filing extraction attempt. On or about January 12 to 14, 2025, Marcus — through Plaintiff's New York contingency counsel Scott Baron — demanded that Plaintiff (a) "make a joint statement" with Schmidt denying abuse to the Wall Street Journal;

and (b) sign Schedule D immediately, upfront, before any MR Amount tranche, or else Defendants would sue Plaintiff via AAA. [Ex. 31 — Jan. 12–15, 2025 Marcus–Baron correspondence ("Semantics" email chain).] Plaintiff declined. Under the express terms of Schedule A, Schedule D was a future deliverable tied to a later tranche, not an upfront condition. Plaintiff had no obligation to sign upfront. Defendants had not addressed any of their material December 2024 breaches, including theft of the steelperlot.com workspace, withholding of StarX and Audem IP and tax data, and continued surveillance. Plaintiff did not sign.

b. January 15, 2025 — retaliatory AAA filing. On January 15, 2025 — within days of Plaintiff's refusal to sign Schedule D upfront — Defendants filed AAA Case No. 01-25-0000-2191. The timing is not coincidental. The AAA filing was the enforcement mechanism for the compelled recantation; when Plaintiff would not sign voluntarily, Defendants initiated a private-forum proceeding designed to extract the recantation under cover of "declaratory relief" and "damages." The arbitration is therefore an abuse of process pleaded in Count XI.

c. January 15, 2025 Marcus "never expressly, nor effectively, requested the declaration" email. On January 15, 2025, Marcus wrote to Plaintiff's counsel that he had "never expressly, nor effectively, requested the

declaration." [Ex. 31 — Jan. 15, 2025 Marcus email.] In the same chain, Plaintiff's then-counsel Scott Baron responded: "Semantics. You requested cooperation in the form of a public statement which mirrors the statements in the declaration." [Ex. 31 — Baron "Semantics" email.] The January 15 exchange demonstrates the functional demand — a public statement mirroring the Schedule D declaration while payment remained withheld.

d. May 2025 — Payment Condition satisfaction, continued non-payment. By May 2025, both contingency law firms involved on Plaintiff's behalf — Baron Samson and LFTC — had released their liens on Plaintiff's matter, satisfying the attorneys'-lien Payment Condition in Schedule A. Plaintiff, through counsel, advised Marcus. Marcus refuted any notion that the MR Amount was due on a plain-English reading of Schedule A and threatened Plaintiff's attorneys with litigation if they attempted to file in court on Plaintiff's behalf. [Ex. 67 — May 2025 lien-release correspondence; Plaintiff's Sept. 8, 2025 Decl. ¶ 95.]

e. June–September 2025 — new-agreement attempt with different California counsel. Between June and early September 2025, Marcus attempted to negotiate a new settlement with Plaintiff's California-based counsel at LFTC (Lamothe Firm Trial Counsel). The new proposal would have

required Plaintiff to sign Schedule D upfront in exchange for reduced cash consideration and a much longer payout horizon (15+ years, rather than the 18 months under the December 4, 2024 instrument). The effect would have been more control, less payment, and a forced declaration — the same illegal Schedule D structure, renamed.

f.  August 2025 — LFTC identification of the CCP §§ 1001–1002 violation. In early August 2025, Plaintiff's California-based counsel at LFTC advised Plaintiff that Schedule D, as drafted and as proposed for upfront execution, violated California Code of Civil Procedure §§ 1001 and 1002. That is the same conclusion Plaintiff pleads in Count IX of this Complaint.

g.  August–September 2025 — Marcus's attempt to circumvent California law by recruiting Plaintiff's former New York counsel. When California-licensed counsel identified the statutory bar, Marcus did not withdraw the demand. He attempted to work around it. Marcus proposed — and then directly called and texted — Plaintiff's former New York-based counsel, seeking to have that New York-licensed attorney act as Plaintiff's legal representative for the "new" Schedule D-upfront arrangement. The explicit purpose of the workaround was to circumvent the liability, unenforceability, and public-policy violation that Plaintiff's California counsel had identified under California law. That conduct is,

136

COMPLAINT

independently, (a) an attempt by an officer of the California courts to structure a transaction specifically to evade California statutory law, and (b) conduct supporting Plaintiff's crime-fraud exception argument under Cal. Evid. Code § 956 as to any attorney-client-privilege objection Defendants may raise in this matter.

h. 2025–2026 — witness intimidation. Marcus repeatedly and intentionally interfered with third parties during 2025 and thereafter, including, on information and belief, threatening a potential witness in 2025 with a subpoena if the witness continued to speak with Plaintiff. [Plaintiff's Sept. 8, 2025 Decl. ¶¶ 40, 110; Apr. 13, 2026 AAA Response Brief, § VII.A.] Such conduct implicates Cal. Penal Code § 136.1 (witness intimidation) and 18 U.S.C. §§ 1503 and 1512 (obstruction and tampering), and is a predicate act for the civil RICO claim reserved for amendment per Part VII.

211. The AAA arbitration is the enforcement vehicle for Marcus's willful and repeated circumvention of California Code of Civil Procedure §§ 1001 and 1002. In the April 20, 2026 AAA Interim Award (Ex. 60), the arbitrator — compensated directly by the Schmidt Claimants under the disclosed $28,000 post-award compensation arrangement (Ex. 62) — ordered "declaratory relief" in substance *granting* Defendants the very compelled-recantation outcome that

California statute makes void, by validating the Settlement Agreement and Amendment in their entirety while simultaneously excusing Defendants' non-performance. The arbitrator was asked, in effect, to issue a declaration of non-abuse *on Plaintiff's behalf*, because Plaintiff would not sign one herself. That relief exceeds any arbitrator's powers under 9 U.S.C. § 10(a)(4), violates Cal. Civ. Code § 1668, and is independently void as a matter of public policy. *See Parts IV.K (Interim Award dissection) and Count XIII (vacatur).*

212. California Rule of Professional Conduct 3.7 — advocate-witness disqualification. Marcus's multiple roles as drafter, narrator, authenticator, operational agent, on-site negotiator, and litigation advocate are incompatible. California Rule of Professional Conduct 3.7 prohibits a lawyer from acting as an advocate in a trial in which the lawyer is likely to be a necessary witness. *See also Comden v. Superior Court,* 20 Cal. 3d 906 (1978). Marcus is a necessary witness on (a) the drafting and intent of Schedule D; (b) the December 17, 2024 on-site encounter; (c) the January 2025 "Semantics" email exchange; (d) the 2025 workaround attempts with NY counsel; and (e) the Exhibit 73 authentication chain. He has nevertheless continued as sole lead advocate for Claimants in the AAA proceeding and has refused to withdraw. His September 12, 2025 written refusal to honor Plaintiff's records-preservation notice and to withdraw under Rule 3.7 is documented in Ex. 34.

## G.7   *Two Alternative And Mutually Reinforcing Grounds For Rescission And Cancellation*

213.     Plaintiff pleads two alternative and mutually reinforcing grounds for rescission, cancellation, and declaratory invalidity of the December 4, 2024 Settlement Agreement and the December 17, 2024 Amendment. The four-incident retaliation pattern alleged in F.1 through F.6 above is pleaded as contextual evidence bearing on both grounds, not as an independent cause of action.

214.     Ground 1 — Fraudulent inducement, duress, menace, undue influence, and coercion. The Settlement Agreement and Amendment are voidable because they were procured through:

   a. Fraud and concealment of material facts — including the March 6, 2024 KPMG "buying StarX" decision (Ex. 60); the Hillspire internal admission that StarX was "100% owned by Michelle Ritter (CEO), not by SPM" (Ex. 60); the ¶ G "no books and records" representation contradicted by the January 2025 Audem 1099 (Ex. 17) and the April 6, 2026 Wind-Down Ledger (Ex. 36); and Defendants' false mid-December representations that Plaintiff's assets would be returned and the surveillance would stop if Plaintiff withdrew the DVRO. (Part IV.C; F.5.)

b. Duress, menace, and undue influence — including Defendants' use of Plaintiff's elderly parents as AAA-arbitration and eviction-notice leverage (F.3; F.4 Vector 2); the coordinated October–December 2024 Wells Fargo closure misrepresentations (Part IV.H; F.4 Vector 1); the December 2, 2024 Glaser Weil threats of eviction, emergency entry, and further arbitration (F.4 Vector 4); and the December 17, 2024 on-site procurement at Plaintiff's California home in the presence of Marcus, Harris, Smith, security personnel, and locksmiths (F.5; statements attributed to Marcus and Smith).

c. Independently wrongful conduct by Defendants' agents — including conduct directed at Plaintiff's business (pay-to-play resignation scheme — F.3), her property (December 7–10 workspace seizure and DNS destruction — Part IV.E), and her digital systems (JAMF/TeamViewer architecture since November 9, 2021 — Ex. 2 (Pixley Decl.); Part IV.E.1).

215. Ground 2 — Sham agreement and failure of performance. Independently of Ground 1, the instruments are rescindable because Defendants never performed — and, on information and belief, never intended to perform — the core consideration owed to Plaintiff personally:

a. Defendants did not pay the $14,000,000 MR Amount promised to Plaintiff in Schedule A. Plaintiff has received $0.

b. Defendants did not turn over Audem or StarX books and records as contemplated by ¶ G when those records came within their control, and in fact weaponized those records against Plaintiff within weeks (January 2025 Audem 1099 — Ex. 17).

c. Defendants did not return Plaintiff's steelperlot.com Google Workspace, credentials, or her business and attorney-client records — the very representations that induced the December 17 DVRO withdrawal. (F.5; Part IV.E.)

d. Defendants did not cease surveillance or cyberstalking. The surveillance and digital intrusions continued through 2025 and 2026, in direct breach of the no-contact provision. (Part G; Part IV.E.1 — Gold MacBook Air compromise.)

e. Defendants instead sought to extract additional concessions — including a public statement mirroring the unsigned Schedule D — while withholding the MR Amount. (F.6 (iii)–(vi); Part G.)

f. The so-called $6,575,000 StarX loan "forgiveness" (Schedule B; Ex. 14; AAA Ex. 73) is not consideration to Plaintiff personally. It is a disputed intercompany entry between two Schmidt-controlled entities whose underlying instrument is forensically challenged (movable signatures, no DocuSign Certificate of Completion, no DocuSign page headers) and

whose validity is contested. It cannot substitute for the $14,000,000 MR Amount in kind, and Plaintiff received no personal payment from any purported forgiveness.

216.    Plaintiff pleads Grounds 1 and 2 in the alternative and in the aggregate. Either one is sufficient to support rescission and cancellation under Count VI. The facts in Parts IV.A, IV.C, IV.D, IV.E, and IV.J, together with the facts in this Part IV.F, are pleaded as contextual evidence bearing on both grounds, not as independent causes of action. Any public-policy overlay grounded in Cal. Civ. Code §§ 1668 and 1670.11, CCP §§ 1001 and 1002, Cal. Gov't Code § 12964.5, or 9 U.S.C. §§ 401–402 is separately pleaded as an independent ground under Count IX.

**G.8    July 2022 — Coerced 5%-To-49% SPM Equity Transfer To Schmidt; "Now Owns Me" Contemporaneous Documentation**

217.    *Pre-transfer equity posture.* At all times from Steel Perlot Management, LLC's formation in 2021 through mid-2022, Defendant Schmidt's initial ownership position in SPM, through his wholly-owned vehicle Steel Perlot, LLC (now Orion Wing, LLC), was approximately 5%. Plaintiff held the remaining common membership and operational control of SPM.

218.    *The coerced transfer — July 2022.* In or about July 2022, Schmidt made further investment and his continued performance as SPM Chairman conditional

on Plaintiff's assignment of an additional approximately 44 percentage points of SPM equity to his wholly-owned vehicle, bringing Schmidt's preferred-member interest from approximately 5% to 49%. Schmidt made clear to Plaintiff that, absent her consent to this forced equity transfer, he would refuse to fund SPM operations and would refuse to perform his Chairman functions — conduct that, given SPM's financial dependence on his funding at that time, constituted economic duress within the meaning of *Rich & Whillock, Inc. v. Ashton Dev., Inc.*, 157 Cal. App. 3d 1154 (1984), and *In re Marriage of Baltins*, 212 Cal. App. 3d 66 (1989). Plaintiff consented to the transfer under protest and without free will.

219.    *Contemporaneous documentation of Plaintiff's understanding — "Now Owns Me."* In contemporaneous email correspondence following the July 2022 transfer, Plaintiff wrote, in substance, that Schmidt "now owns me." (Exact email to be cited in First Amended Complaint or in supplemental filing.) That statement reflects Plaintiff's then-understanding that the 2022 equity coercion had irrevocably altered the power relationship between her and Schmidt and had converted her nominal corporate role into a coercion-dependent one. The July 2022 coerced transfer is pleaded as an independent incident of economic coercion preceding, and establishing the pattern for, the larger coerced-transfer

episodes pleaded in Parts IV.F.4 through IV.F.7 and the December 4, 2024 transfer pleaded in Part IV.F.13 below.

220.    *Pattern evidence*. The July 2022 5%-to-49% forced transfer is preserved and pleaded as pattern evidence for (a) Count VI (rescission for economic duress; fraud; failure of consideration); (b) Count X (Bane Act); (c) Count XV (Labor Code § 1102.5 whistleblower retaliation — each time Plaintiff raised abuse or coercion concerns with Schmidt, he retaliated through economic coercion, of which this 2022 equity extraction is the earliest clearly documented instance); and (d) to the extent Plaintiff is granted leave to amend, for a civil RICO pattern under 18 U.S.C. § 1961 et seq. See Part VII.

### G.9  Pattern Of Unpaid Labor — Anthropic, Hospitality Real Estate, Future House, Knox Networks, And SPM/SPI (2020–2026)

221.    *Overview*. Schmidt engaged, directed, or induced Plaintiff to perform substantial professional services — including strategic advisory, deal negotiation, entity structuring, investment work, real-estate deal negotiation, and corporate leadership — on multiple projects from December 2020 through April 2024 and thereafter. In each instance, Schmidt made specific oral representations or commitments regarding compensation, equity, or upside participation that he then summarily withdrew or failed to perform, retaining for himself, Hillspire,

or affiliated Schmidt-family vehicles the value of Plaintiff's work. This is an independent pattern pleaded under Count XV (Labor Code §§ 1102.5, 970, 218) and as predicate evidence for Counts VI, VIII, X, and the RICO reservation in Part VII.

222. *Anthropic (December 2020 – May 2021).* In or about December 2020, Schmidt asked Plaintiff to attend what was, in substance, the formation meeting of what would later become Anthropic, PBC, before the entity was named. Schmidt and Maria Seferian (Hillspire counsel) then asked Plaintiff to negotiate an investment for Schmidt and Hillspire, work on entity structure (including the public-benefit-corporation structuring decisions), and perform investment due-diligence as Dario Amodei, Daniela Amodei, and the founding team worked through the initial corporate-form decisions. Plaintiff performed this work over a period of approximately five months. Maria Seferian relied on Plaintiff to "figure out the deal" for Schmidt and Hillspire. Schmidt verbally promised Plaintiff shares in the then-nascent company — a company Schmidt recognized as competitive to OpenAI and materially valuable. Once deal terms were finalized, in or about May 2021, Schmidt summarily cut Plaintiff out of the equity position he had verbally promised. Plaintiff was paid nothing for this work. The work and the representation are documented in extensive email

correspondence, to be cited in the First Amended Complaint or in supplemental filing.

    a. *Tolling and accrual.* Plaintiff pleads the continuing-violation doctrine, the discovery rule, and fraudulent-concealment tolling: the full pattern of Schmidt's misrepresentation-to-induce-service was not known to Plaintiff until the post-2024 retaliation events revealed the systemic character of the conduct. See *Richards v. CH2M Hill, Inc.*, 26 Cal. 4th 798 (2001); *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797 (2005).

223. *Hospitality real-estate negotiations (February 2021 – June 2021).* Over approximately five months in 2021, Plaintiff negotiated hospitality real-estate transactions for Schmidt and his real-estate team. Plaintiff was not paid for this work. Specific transaction names and counterparties are reserved for the First Amended Complaint or supplemental filing.

224. *Future House (2021–2022).* Plaintiff incubated Future House — a scientific research initiative that later became an independent entity — at SPM during 2021 and 2022. SPM bore the time and economic costs of the incubation. In or about the last moments before Future House's public launch, Schmidt funded Future House through his personal family-office donor-advised fund (DAF) rather than through SPM, took public credit for the Future House initiative, and left SPM with the sunk time and economic losses. In or about

September 2023, Future House's Chief Executive Officer Sam Rodriques emailed Plaintiff apologizing for not crediting the work of SPM or Plaintiff in the Future House public materials and asked Plaintiff how he could "make it right." (Email to be cited in First Amended Complaint or supplemental filing.) Plaintiff seeks upside participation in the Future House outcome proportionate to SPM's incubation contribution, on quasi-contract, promissory-estoppel, and quantum-meruit theories.

225.    *Knox Networks / Knova Finance (2022 – April 26, 2024 and continuing).* Plaintiff served as a principal of Knox Networks from its formation through April 26, 2024, during which period she performed founder-level operational, strategic, and fundraising work. On or about April 26, 2024, Schmidt removed Plaintiff from Knox in direct retaliation for her April 2024 mediation disclosures of sexual assault, sexual harassment, and emotional abuse — conduct that is the paradigmatic § 1102.5 retaliatory adverse employment action. From April 26, 2024 to the date of this Complaint, Plaintiff has received none of the compensation owed for her Knox-related work. The separate, direct Knox injury is the subject of Count XII's commercial-disparagement theory and of Count XV's unpaid-compensation theory under Labor Code §§ 201, 203, 204, and 218. Plaintiff's Knox equity position (Certificate CS-02, 24,000,000 shares of

common stock) remains unredeemed and is subject to Defendants' post-settlement retaliatory call-back pleaded in Part IV.D.

226.    *SPM and SPI — December 4, 2024 forced transfer without compensation.* Plaintiff's founder-level and Managing-Director work at SPM from 2021 through December 4, 2024 was, on Plaintiff's pleading, never fully compensated. The $14 million Schedule A(3) consideration purportedly payable to Plaintiff under the December 4, 2024 Settlement Agreement (Ex. 1) — the only stated consideration for Plaintiff's transfer of her 51% SPM common-member interest and her Steel Perlot Investments (SPI) interests — was never paid. The arbitrator expressly found at page 22 of the Interim Award that the Schmidt Parties' "duty to perform that term of the Agreement" was "discharged." That is a formal, publicly-disclosed judicial admission that the $14 million was never paid — the Schmidt Parties received the SPM/SPI transfer for no payment. This episode is detailed in Part IV.F.13 below.

### G.10    December 4, 2024 — The Forced SPM And SPI Transfer Without Consideration; Schmidt-Side Judicial Admission Of Non-Payment

227.    *The bargained-for consideration was $14 million.* The December 4, 2024 Settlement Agreement (Ex. 1) provided at Schedule A(3) for payment to Plaintiff of $14 million, in three installments, in exchange for Plaintiff's transfer of her

51% common-member interest in SPM, her interests in Steel Perlot, LLC (SP, now Orion Wing, LLC), and her interests in Steel Perlot Investments, LLC (SPI, now Orion Wing Investments, LLC). No other payment to Plaintiff was provided for her SPM and SPI transfer. The $15 million total figure recited in the Agreement includes $1 million payable to Plaintiff's parents, Terry and Shamim Ritter — not Plaintiff — for their own claims and for their vacating of the Angelo property. Plaintiff individually was to receive only the $14 million Schedule A(3) payment for her corporate-interest transfer.

228.    *Zero dollars were paid.* No portion of the $14 million Schedule A(3) consideration has ever been paid to Plaintiff. The Schmidt-side's own Interim Award brief, and the arbitrator's findings at pages 20–22 of the April 20, 2026 Interim Award, confirm this fact as a matter of record and constitute judicial admissions against Defendants Schmidt, Hillspire, and the Orion Wing entities that no portion of the $14 million was ever paid to Plaintiff.

229.    *Asset stripping preceded and continued through the transfer.* The December 4, 2024 transfer did not occur in a neutral commercial posture; it occurred at the culmination of more than eight months of systematic asset stripping and coercion by Schmidt and Hillspire, including (a) the April 26, 2024 retaliatory removal of Plaintiff from Knox following her April 2024 mediation disclosures of sexual harassment (Part IV.F.2); (b) the Schmidt-Hillspire

blockade of budgetary funding to SPM, StarX, Audem, and Knox from April 2024 through December 2024 — a blockade accomplished through Maria Seferian's control of all legal-contract infrastructure, Mandy Quach's control of Wells Fargo banking operations and KPMG tax coordination and Trinet payroll, and Schmidt's personal refusal to execute Chairman funding decisions; (c) Marcus's July 2024 communications to SPM employees claiming that Plaintiff had "abandoned" SPM (Part IV.F.3); (d) the payment of SPM employees to resign and the direct hiring of more than ten former SPM employees into Hillspire or into Hillspire-funded successor roles; (e) the locking of Plaintiff out of New York shared residences and the retention of her personal belongings (on information and belief, during May–July 2024); (f) the November 2024 Hillspire-legal-team outreach to Plaintiff's SPI portfolio companies instructing those companies to delete Plaintiff's contact information and to notify Hillspire if Plaintiff attempted to reach out; and (g) Marcus's refusal to provide Plaintiff with the data she needed to exercise even diminished corporate authority.

230.    *Hillspire tax-loss architecture — the business rationale for zero-consideration asset stripping.* On Plaintiff's pleading, the Schmidt/Hillspire operational rationale for the zero-consideration December 4, 2024 transfer was (a) to acquire Plaintiff's SPM 51% common-member interest and her SPI interests for no out-of-pocket cost; (b) to realize large tax-loss harvesting benefits

through the publicly-characterized "wind-down" of SPM, StarX, Audem, and related entities; and (c) to convert all economically valuable residual assets (SPI portfolio positions, SPI cryptocurrency tokens, intellectual property, incubated initiatives, customer relationships) into the renamed Orion Wing, Orion Wing Management, and Orion Wing Investments vehicles for Schmidt's and Hillspire's exclusive benefit. This tax-motivated asset-stripping architecture is further pleaded at Part IV.C and is predicate evidence for (i) Count VI (rescission for fraud; failure of consideration; economic duress); (ii) Count XII (commercial disparagement, to the extent Defendants' public characterization that SPM, StarX, Audem, and Knox "went under" misrepresents the coordinated asset-capture); and (iii) the RICO reservation in Part VII.

231.    *Legal consequence — failure of consideration renders the Agreement voidable.* The Schmidt Parties' non-payment of the entire $14 million Schedule A(3) consideration is a total failure of consideration entitling Plaintiff to rescission and restitution under Cal. Civ. Code §§ 1688–1694 and § 1611, and under California's general law of contract rescission for failure of consideration. See *Taliaferro v. Davis*, 216 Cal. App. 2d 398 (1963); *Crofoot Lumber, Inc. v. Thompson*, 163 Cal. App. 2d 324 (1958). Alternatively, the Schmidt Parties' retention of Plaintiff's SPM and SPI interests without any payment constitutes unjust enrichment sufficient to support imposition of a constructive trust over

those interests under Cal. Civ. Code § 2224 and *Meister v. Mensinger*, 230 Cal. App. 4th 381 (2014).

### G.11  December 6, 2024 — Harris And Marcus On-Site Crypto-Token Demand; Illegal Vault Downloads Of Audem-mgmt.Com And starx.Com

232.    On December 6, 2024, at Plaintiff's California residence and in the days immediately following, Defendants Jillian Harris and Craig H. Marcus (both Glaser Weil partners acting at Hillspire's direction) demanded that Plaintiff transfer to Hillspire the Steel Perlot Investment ("SPI") cryptocurrency tokens that were held in cryptocurrency wallets associated with Plaintiff's SteelPerlot-related entities. Plaintiff, in response, offered to provide Harris and Marcus with a copy of the SteelPerlot.com Google Workspace (the workspace then serving as the centralized hub for the SPI-related operations) as an alternative accommodation pending resolution of the disputed ownership of the tokens themselves. Harris and Marcus did not accept that accommodation; instead, on information and belief, they proceeded to take the SteelPerlot.com workspace without Plaintiff's consent, and further proceeded to download, without authorization, the administrative vaults, password repositories, and credential stores associated with two additional, separately-tenanted Google Workspaces: audem-mgmt.com (the Audem Workspace) and starx.com (the StarX

Workspace). Neither the audem-mgmt.com nor the starx.com Workspace had any operational nexus to SPI or to the Steel Perlot entities, and Harris and Marcus had no authorization, implied or express, to access either workspace's administrative credentials.

233.    The December 6, 2024 vault-download episode is independently actionable under Counts I (CFAA — without-authorization access to audem-mgmt.com and starx.com Workspace administrator credentials), II (SCA — access to stored communications and credentials at Google's facility through unauthorized administrator pathways), and III (Wiretap Act — in-transit interception of credential-transmission communications during the unauthorized download sessions). It is further pleaded as predicate factual support for Counts VIII (aiding and abetting fraud and breach of fiduciary duty), X (Bane Act coercion of Plaintiff's statutory and constitutional rights at her residence), and XI (abuse of process, where the threat of token-extraction was made concurrently with the AAA forum pressure). Each post-credential-revocation interstate electronic transmission associated with the downloads is an independent wire-fraud predicate under 18 U.S.C. § 1343, preserved for any future civil RICO count per Part VII.

234.    *Evidentiary anchors.* Plaintiff's contemporaneous notes, communications with successive counsel during the December 2024 window, Google Workspace

administrator-audit logs for the three workspaces (SteelPerlot.com, audem-mgmt.com, starx.com), and any Hillspire or Glaser Weil internal communications referencing the token demand or the workspace transfers. Preservation demands will be directed to Google LLC, Hillspire, and Glaser Weil pursuant to Fed. R. Civ. P. 37(e) and the Court's inherent authority.

## H.  Post-Settlement Continuation Of The Same Retaliation Pattern Through 2025 And 2026

### H.1  Immediate Post-Settlement Breaches And Continuation Of Surveillance

235.    Defendants did not pay Plaintiff the direct settlement consideration promised to her in December 2024. As of the filing of this Complaint, Plaintiff has received $0 of the $14,000,000 MR Amount.

236.    Defendants did not return Plaintiff's business assets, credentials, or records as promised. The steelperlot.com Google Workspace was never returned. The StarX and Audem IP and tax data were never returned. The mritter@steelperlot.com account was never restored. Defendants retained administrator credentials, forwarding and recovery settings, and device-management controls over systems used by Plaintiff to conduct business and communicate with counsel. (*See Part IV.E.2 for the full authorization and revocation chain.*)

237.    Defendants did not cease surveillance or cyberstalking. Private investigators continued to surveil Plaintiff's residences in Pebble Beach and Beverly Hills through 2025 and 2026 (Plaintiff's Sept. 8, 2025 Decl. ¶¶ 57–58). Digital intrusions continued on Plaintiff's personal devices, including the "Gold" MacBook Air that Plaintiff personally set up in February 2025 for privileged legal communications. Forensic analysis established five independent indicators of unauthorized root-level account manipulation on Gold, including an enterprise Apple ID IDMS UUID (001149-08-5721b7d9-c6db-44ac-86c2-03850c3534af) appearing in the Directory Services RecordName field; a January 9, 2026 root console login; and the "sysaccount" operational signature previously applied to Plaintiff's physically stolen MacBook Pro in November 2024. (*See Part IV.E.1 for the Gold forensic record; Ex. 2 — Pixley Decl.*)

238.    On December 10, 2024 — six days after Plaintiff signed the Settlement Agreement, and one day before Plaintiff filed the DVRO — Hillspire's legal team sent an email to Plaintiff's former employees, portfolio companies, and affiliates instructing them to "remove Michelle Ritter as the point of contact, including ALL email addresses for Ms. Ritter," and to "forward [any Ritter communications] to [Hillspire] for handling." [Ex. 68 — Dec. 10, 2024 Hillspire legal-team email (produced by former SPM employee Feb. 6, 2025); Plaintiff's Sept. 8, 2025 Decl. ¶ 96.] That email is Defendants' own written admission that,

within six days of signing a no-contact settlement, Hillspire was already (a) repositioning itself as the primary contact for Plaintiff's own business relationships; (b) erasing Plaintiff from professional networks the Settlement Agreement had supposedly left intact; and (c) creating an information-interception channel through which Plaintiff's communications to third parties would be redirected to Hillspire.

### H.2. January 2025 — Manufactured "Wall Street Journal Leak" Pretext And Marcus's First Upfront Schedule D Extraction Attempt

239.    On or about January 12–14, 2025, Marcus — contacting Plaintiff through her New York contingency counsel Scott Baron — demanded that Plaintiff (a) make a "joint statement" with Schmidt to the Wall Street Journal denying abuse, and (b) execute Schedule D immediately, upfront, before any MR Amount tranche was paid. [Ex. 31 — Jan. 12–15, 2025 Marcus–Baron correspondence.] Marcus framed the demand as a response to an alleged leak of the Settlement Agreement to the Wall Street Journal. Plaintiff declined. No Wall Street Journal article was ever published. (April 13, 2026 AAA Response Brief, § IV.B; Plaintiff's Sept. 8, 2025 Decl. ¶ 94.)

240.    Plaintiff has independent, witness-corroborated evidence that the "Wall Street Journal leak" was not a Plaintiff breach of the Settlement Agreement. On

COMPLAINT

information and belief, the leak — to the extent any leak occurred — was engineered by Defendants or Defendants' aligned public-relations actors (including Kelt 6 Strategies and/or Matthew Hiltzik) as the pretext for (a) upfront Schedule D extraction; (b) rewriting the Settlement Agreement's payment structure; and (c) initiating the AAA arbitration against Plaintiff. Plaintiff reserves full pleading of the leak-source facts for the amended complaint after production of Hiltzik-strategic and Kelt 6 communications. (April 13, 2026 AAA Response Brief, § IV.B.)

241.    On January 15, 2025, within days of Plaintiff's refusal, Defendants filed AAA Case No. 01-25-0000-2191. The filing is the first retaliatory AAA proceeding of the post-Settlement period. It is pleaded as a predicate for Count XI (abuse of process) and any future civil RICO count (reserved per Part VIII). The arbitration's function — once the forum was captured by a privately compensated arbitrator and the pro se respondent was defaulted under AAA Commercial Rule R-60 for inability to pay arbitrator fees the arbitrator herself set (Part IV.I) — was to issue the compelled declaratory relief that California statute and public policy forbid.

242.    On January 15, 2025, Marcus sent Plaintiff's then-counsel the email claiming he had "never expressly, nor effectively, requested the declaration." [Ex. 31 — Jan. 15, 2025 Marcus email.] That statement is directly contradicted

COMPLAINT

by Marcus's concurrent demand for Plaintiff's upfront execution of Schedule D, and by the "Semantics" response from Plaintiff's then-counsel Scott Baron: "Semantics. You requested cooperation in the form of a public statement which mirrors the statements in the declaration." [Ex. 31 — Jan. 15, 2025 Baron "Semantics" email.] The Semantics exchange crystallizes the mechanism: a functional demand for compelled speech mirroring the unsigned Schedule D declaration, while the $14 million owed to Plaintiff was withheld.

**H.3   Summer–Fall 2025 — Marcus's Second And Third Upfront Schedule D Extraction Attempts And The Attempted Circumvention Of CCP §§ 1001–1002 Through Different-State Counsel**

243.   In May 2025, the attorneys'-lien Payment Condition in Schedule A was satisfied. Both Baron Samson (New York contingency counsel) and LFTC (California counsel) had released their liens on Plaintiff's matter. Plaintiff, through counsel, advised Marcus in writing. [Ex. 67 — May 2025 lien-release correspondence.] Marcus nevertheless refused to advance any portion of the MR Amount and threatened Plaintiff's attorneys with litigation if they attempted to enforce Plaintiff's payment rights in California state court. [Plaintiff's Sept. 8, 2025 Decl. ¶ 95.]

244.    Between June 2025 and early September 2025, Marcus attempted to negotiate a new settlement with Plaintiff's California-based counsel at LFTC. The new proposal was, in substance, the same Schedule D-centered arrangement rewritten to Defendants' benefit: reduced cash consideration; a longer payout horizon of 15+ years (versus 18 months under the December 4, 2024 instrument); and — critically — Plaintiff's upfront execution of Schedule D before any payment. The new agreement would have extracted the compelled-perjury declaration Marcus had been unable to extract directly through the AAA arbitration. (April 13, 2026 AAA Response Brief, § IV.A.)

245.    In early August 2025, Plaintiff's California counsel at LFTC advised Plaintiff that the Schedule D declaration — as drafted by Marcus and as proposed for upfront execution — violated California Code of Civil Procedure §§ 1001 and 1002 and could not be executed as a matter of California law. That is the same conclusion Plaintiff pleads in Count IX of this Complaint. California counsel advised that the arrangement required substantive revision to meet California law.

246.    When California counsel identified the statutory bar, Marcus did not withdraw the demand. He attempted a workaround. On information and belief, Marcus proposed to Plaintiff's California-based counsel that Plaintiff route the "new" Schedule D-upfront arrangement through Plaintiff's former New York-

COMPLAINT

based attorney — who, as a non-California-licensed attorney, would not be subject to California Rules of Professional Conduct Rule 3.4 and related rules governing California attorneys' duties in structuring transactions around California statutory prohibitions. Marcus thereafter called and texted Plaintiff's former New York counsel directly, seeking to re-engage him for the transaction. (April 13, 2026 AAA Response Brief, § IV.A.)

247.    Marcus's workaround attempt is independently tortious, independently sanctionable, and independently a predicate act preserved for any future civil RICO count per Part VIII act. It is:

248.    (a) an attempt by a California-licensed officer of the court to structure a transaction for the explicit purpose of evading California statutory law (Cal. Civ. Code §§ 1668, 1670.11; CCP §§ 1001, 1002; Cal. Gov't Code § 12964.5);

249.    (b) solicitation of another attorney (Plaintiff's former New York counsel) to participate in a scheme to extract a compelled-perjury declaration from Plaintiff knowing its execution would be void and against public policy in California;

250.    (c) attempted interference with Plaintiff's existing California counsel relationship, in violation of California Rule of Professional Conduct 4.2 and the duty not to communicate with a represented party except through counsel;

251.    (d) an independent exhibition of crime-fraud conduct under Cal. Evid. Code § 956 — any communications between Marcus and Schmidt concerning the workaround are therefore outside the attorney-client privilege; and

252.    (e) a predicate act of wire fraud (18 U.S.C. § 1343) for any future civil RICO count (reserved per Part VIII), consisting of use of interstate telephone and electronic communications to execute a scheme to deprive Plaintiff of (i) the $14 million MR Amount owed under Schedule A, (ii) her StarX and Audem property, and (iii) her First-Amendment-protected right not to make compelled speech concerning her reports of sexual assault and harassment.

## H.4.  2025–2026 — *Continued Digital Control, Cross-Track Retaliation, And Convergence With The AAA Proceeding*

253.    Defendants' post-settlement conduct also continued the digital-control problem. Plaintiff remained impaired in her ability to access, trust, and use the affected workspaces, credentials, records, and devices. She incurred additional forensic, preservation, restoration, and replacement-system costs as a direct result. In April 2025, StarX Networks, Inc. intellectual property within the compromised steelperlot.com Google Workspace was transmitted to an OpenAI employee. (Part IV.E.2.)

254. Plaintiff's elderly parents were continually used as leverage through 2025 and 2026. Private investigators repeatedly sat outside Plaintiff's residences in December 2024, February 2025, August 2025, and November 2025 through March 2026. (April 13, 2026 AAA Response Brief, § IX.) Schmidt personally engaged in defamatory statements to multiple third parties in 2025 (January, April, June, August, September, December) regarding Plaintiff, including statements that he would "bankrupt" her. (*Id.*)

255. Marcus made multiple extrajudicial statements throughout 2025 and 2026 in direct breach of the no-contact provision, including statements to friends of Plaintiff and to potential witnesses supporting Plaintiff's claims. The pattern includes threatening a potential witness in 2025 with a subpoena if the witness continued to speak with Plaintiff — conduct that, independently of this civil action, is potentially actionable under Cal. Penal Code § 136.1 (intimidation of witness) and 18 U.S.C. §§ 1503 and 1512 (obstruction). (April 13, 2026 AAA Response Brief, §§ VII.A, IX.)

256. Defendants coordinated with Knox Networks, Inc. to extend the retaliation into Plaintiff's equity rights. On April 24, 2025 — exactly twelve months after the April 24, 2024 retaliatory Knox removal described in F.2 above — Knox / Knova Finance issued Plaintiff a repurchase, call-back, or claw-back notice directed at the 24,000,000-share Common Stock position (Certificate CS-02).

COMPLAINT

(Part IV.D.5.) In April–May 2025, Knox / Knova Finance and Natalya Thakur demanded that Plaintiff sign an 8- to 9-page "Shareholder Agreement" as the condition for Knox's provision of statutory § 220 information Plaintiff was otherwise entitled to receive. That instrument included (i) a bar on Plaintiff contacting any other Knox stockholder for any purpose; (ii) a bar on litigation based on Knox-provided information; (iii) waivers of Delaware stockholder remedies; and (iv) further speech- and disclosure-restrictions overlapping with Schedule D and § 3(a)(i). (Part IV.D.6.) The Knox demand is pleaded as a coordinated continuation of the retaliation pattern — the same silencing architecture, routed through a different entity.

257.    Defendants prosecuted the AAA arbitration as the capstone of the retaliation pattern. On April 6, 2026, Defendants filed in AAA Case No. 01-25-0000-2191 a 1,343-page prove-up package including a 109-page brief, seven declarations, and seventy-three exhibits, demanding over $33 million in damages anchored in (i) the $22,623,443 "fraudulent inducement" claim premised on Plaintiff's refusal to sign the compelled-perjury Schedule D declaration; (ii) the disputed $6,575,000 StarX loan purportedly authenticated by Marcus himself (AAA Ex. 73); (iii) the $1,183,429 personal-property theft claim premised on Defendant-aligned Debra Smith's declaration contradicted by her own contemporaneous video-recorded statement that "everything in the house is there

163
COMPLAINT

and it looks fine" (F.5); and (iv) the $8,080,138 twelve-month "reputation-repair" budget submitted by Eric Rose expressly disclaiming that the amount was a legal damages measure. (*See* Part IV.I for the full Interim-Award dissection; April 13, 2026 AAA Response Brief, §§ V–VI, Appendices A and B.)

258.    The AAA arbitration's function — on this pleaded record — is to convert California and federal statutory unenforceability into private-forum enforceability. California Code of Civil Procedure §§ 1001 and 1002, Civil Code §§ 1668 and 1670.11, Government Code § 12964.5, and the EFAA (9 U.S.C. §§ 401–402) each individually and collectively preclude enforcement of a settlement term that compels recantation of a sexual-assault or harassment disclosure. A private, Schmidt-compensated arbitrator — defaulting a pro se sexual-assault reporter under AAA Commercial Rule R-60 for inability to pay arbitrator fees set by the arbitrator herself — then issues "declaratory relief" validating the Settlement Agreement and ordering $10,744,999 in damages against the reporter. The practical effect is a private-forum circumvention of public California and federal law. (*See Count XIII — Vacatur; see also Part VIII — Reserved Civil RICO Claim.*)

259.    Defendants' invocation of AAA process is pleaded only to the extent it shows the existence of a live controversy, the continued use of disputed instruments, the threatened enforcement of the never-formed Audem agreement,

the pressure created by the December 2024 instruments, and the direct costs and injuries to Plaintiff. Plaintiff does not seek damages for privileged advocacy, and Plaintiff does not ask this Court to supervise any arbitral merits ruling on a properly pleaded contract claim. Plaintiff asks this Court, in Counts VI, IX, and XIII, to declare the instruments void or voidable on statutory, fraud, coercion, public-policy, and constitutional grounds over which federal and California law vest authority in an Article III court — not a private arbitrator whose compensation is controlled by one of the parties.

## I. Glaser Weil And Marcus — Operational, Non-Advocacy Conduct

260.    This Section IV.I pleads the specific operational and non-advocacy conduct of Glaser Weil and its partner Craig H. Marcus that predicates Count VIII. The allegations in this Section are not directed at any statement made to a tribunal, any pleading filed in any court or arbitral proceeding, or any privileged settlement negotiation. They are directed at discrete, non-courtroom acts performed outside the advocacy role and, where applicable, outside the presence of any tribunal — acts that California courts have recognized as falling outside the protection of Civil Code section 47(b) under the business-manager / operational-conduct carve-out articulated in Kolar v. Donahue, McIntosh &

Hammerton, 145 Cal. App. 4th 1532 (2006), and Rickley v. Goodfriend, 212 Cal. App. 4th 1136 (2013).

### I.1  March 2024 Written Transfer — Operation-or-Management Predicate

261.    This Part IV.I.1 pleads, in support of any future civil RICO count (reserved per Part VIII), the specific facts that Plaintiff contends satisfy the "operation or management" requirement of Reves v. Ernst & Young, 507 U.S. 170 (1993), as to Defendants Glaser Weil and Marcus — notwithstanding the ordinary Reves rule that outside professionals do not "conduct the affairs" of a RICO enterprise merely by providing services to it.



FIGURE 4 — The March 2024 "De Facto Managers" Transfer
*Hillspire's written transfer of Steel Perlot operating authority to Glaser Weil (Reves workaround)*

*Figure 4 — The March 2024 'De Facto Managers' Transfer.  How the written transfer of Steel Perlot authority from Hillspire to Glaser Weil crosses outside-*

*counsel into operation-or-management for Reves v. Ernst & Young, 507 U.S. 170 (1993), purposes, supported by Plaintiff's contemporaneous July 15, 2024 'de facto managers' memo (Ex. 32) and the Reinhardt Declaration (Ex. 1).*

262. **March 2024 written transfer.** On information and belief, in or about March 2024, Hillspire executed or caused to be executed a written transfer of operational authority over Steel Perlot Management, LLC and affiliated Steel Perlot Entities from Hillspire to Glaser Weil, under which Marcus and Harris assumed direct governance, books-and-records, payroll, vendor-relationship, personnel-management, and decision-making authority within SPM and affiliated entities. [Ex. 66 — March 2024 Hillspire-to-Glaser-Weil transfer instrument.]

263. The March 2024 transfer, together with Plaintiff's July 15, 2024 internal memorandum characterizing the Glaser Weil partners as "de facto managers" (Ex. 32), and the September 25, 2025 Reinhardt Declaration describing Marcus and Harris's operational role within SPM (Ex. 1), collectively establish that Glaser Weil and Marcus crossed the line from ordinary outside-counsel services into "operation or management" of the enterprise (preserved for any future civil RICO count per Part VIII). The Reves rule does not immunize outside professionals who step into the operational role of the enterprise itself, as

Plaintiff pleads Marcus and Harris did from March–April 2024 forward. See, e.g., United States v. Oreto, 37 F.3d 739 (1st Cir. 1994) (Reves satisfied where professional exercised decisionmaking authority over enterprise affairs).

**I.2  *Governance Assumption Within Steel Perlot (April 2024 onward)***

264.    As alleged in Part IV.A, in or about April 2024, Marcus and Harris assumed operational and governance roles within Steel Perlot Management, LLC and affiliated Steel Perlot Entities at Hillspire's direction. The assumption of those roles is described in detail in the September 25, 2025 declaration of Elijah Reinhardt. [Ex. 1 — Reinhardt Decl. (Sept. 25, 2025), ¶¶ 20–34.] Plaintiff herself contemporaneously acknowledged the operational character of that role in a July 15, 2024 internal memorandum that addressed in part "counsel (cc'ed) and those — including our Hillspire counterparts and SPM finance — who are de facto managers." [Ex. 32 — July 15, 2024 SPM internal memorandum.] The acts alleged in this Part IV.I were accordingly undertaken by Glaser Weil and Marcus not as outside advocates but as operating agents within the Steel Perlot control architecture.

**I.3  *2024 Witness-Development Campaign***

265.    From in or about late June 2024 through the publication of an article in The Information on or about August 2, 2024, Glaser Weil and Marcus directed or participated in a campaign to solicit negative statements concerning Plaintiff

168
COMPLAINT

from former and then-current Steel Perlot employees. The campaign is described by the September 25, 2025 Reinhardt declaration and the April 9, 2026 Pixley declaration. [Ex. 1 — Reinhardt Decl. ¶¶ 20–34; Ex. 2 — Pixley Decl.]

266.    Severance and release payments owed to Steel Perlot Management, StarX, and Audem Management employees were used as leverage to obtain cooperation in the campaign, with payment conditioned on execution of releases and, in some instances, on agreement to corroborate the narrative ultimately published.

267.    Craig Marcus personally negotiated these severance agreements, at the latest beginning in August 2024 and on information and belief, beginning in April 2024. Marcus refused to provide Plaintiff with any documentation of which employees were paid to resign in October 2024.

268.    The witness-development campaign was not a privileged advocacy communication. It was an operational campaign directed at non-party witnesses, conducted outside any tribunal, and in large part outside of any pending court or arbitral proceeding as to Plaintiff. It is the type of "witness-farming" activity that California courts have declined to shield under section 47(b) when it involves coercion, inducement, or coordinated orchestration of witness statements. Plaintiff pleads this conduct in support of Count VIII's aiding-and-abetting-fraud and aiding-and-abetting-breach-of-fiduciary-duty theories.

*I.4 December 17, 2024 On-Site Procurement of DVRO Withdrawal and Settlement Agreement Amendment in Knowing Violation of CCP 1001 and 1002*

269.     As alleged in Part IV.F, on December 17, 2024, Marcus was physically present at Plaintiff's California residence together with Jillian Harris of Glaser Weil. Marcus and Harris's physical presence at a private residence, their direct participation in real-time preparation of withdrawal paperwork, and their presence during possession-taking activity are pleaded for Count VIII as operational, non-advocacy conduct. They are not pleaded for Count VIII as courtroom statements or as pleading content. The "sued into oblivion" and "sheriffs would be called" statements pleaded in Part IV.F are pleaded in Count VIII as statements made in furtherance of an on-site procurement objective — not as statements to a tribunal. Plaintiff reserves all reservations of privilege stated in Part IV.E.3.

270.     Plaintiff did not have any counsel physically present on December 17, 2024.

*I.5 December 23, 2024 Marcus DVRO-Dismissal Pressure Email*

271.     On December 23, 2024, Marcus sent a written communication to Plaintiff's then-counsel applying pressure regarding dismissal of Plaintiff's domestic-violence restraining order filing in direct connection with settlement performance. [Ex. 35 — December 23, 2024 Marcus email.] The communication

170
COMPLAINT

was not a privileged negotiation over a contested legal issue between represented parties; on its face, it conditioned Schmidt-side performance under the December 4 and December 17, 2024 instruments on Plaintiff's personal action withdrawing a report to authorities. That type of conditioning falls within the crime-fraud limitation on the attorney-client privilege under California Evidence Code section 956 and outside the protection of the litigation privilege under the operational-conduct carve-out recognized in Kolar and Rickley.

### I.6  Continuing Digital-Control Direction

272.    As alleged in Parts IV.A and IV.E, Hillspire's technology infrastructure — including the JAMF mobile-device-management service hosted at hillspire.jamfcloud.com and TeamViewer configured for unattended remote access — was in place on Plaintiff's laptop before the December 2024 settlement sequence and was installed in November 2021 by Eric Schmidt and utilized by Hillspire to continue surveillance, legal and tax document manipulation, harassment, and other activities.

273.    On information and belief, Glaser Weil and Marcus directed or approved the continued operation of those control pathways during the post-authorization period described in Part IV.E. To the extent any such direction or approval constituted operational direction of device-management or remote-access systems (as distinct from advocacy within a tribunal), it is pleaded in Count VIII