as aiding-and-abetting conduct in support of the CFAA and SCA predicates in Counts I and II.

### I.7 Harris's Account-Access Statement and Marcus's Acquiescence

274.    As alleged in Part IV.E, the December 10, 2024 Knopf notice to CGNET stated that Plaintiff had learned that Jillian Harris, Craig Marcus, Glaser Weil, Eric Schmidt, and Hillspire had indicated via Jillian Harris that they had accessed the mritter@steelperlot.com account, changed the password, and attempted to access all files. [Ex. 28 — Dec. 10, 2024 Knopf notice to CGNET.] On information and belief, Marcus, as Hillspire's lead outside counsel and as a Glaser Weil partner with operating responsibilities within the Steel Perlot control architecture, knew of, directed, or acquiesced in Harris's access conduct. That knowledge and acquiescence are pleaded in Count VIII as aiding-and-abetting conduct in connection with the CFAA and SCA claims in Counts I and II.

### I.8 September 2025 Refusal to Honor Preservation Notice and CRPC 3.7 Conflict

275.    On September 11, 2025, Plaintiff served a written records-preservation notice on Glaser Weil and Marcus identifying categories of evidence required to be preserved in connection with the parties' disputes. [Ex. 33 — September 11, 2025 records-preservation notice.] On September 12, 2025, Marcus sent a written response refusing to honor the notice and asserting that any disputes were subject to mandatory arbitration. [Ex. 34 — September 12, 2025 Marcus

172
COMPLAINT

response.] In the same or related correspondence, Marcus acknowledged that he himself had filed testimonial declarations in the AAA arbitration bearing on disputed facts. That acknowledgment placed Marcus in a California Rules of Professional Conduct Rule 3.7 advocate-witness conflict. Marcus nonetheless declined to withdraw.

276.    The refusal to honor the preservation notice is pleaded in Count VIII as operational, non-advocacy conduct — namely, the refusal, as an operating agent of Hillspire and of the Steel Perlot control architecture, to preserve records under the custody of entities for which Marcus and Glaser Weil performed operational functions. The advocate-witness conduct is pleaded solely as context demonstrating that Marcus's role crossed the line from advocacy to fact-witness percipient conduct. Plaintiff does not, in this Complaint, seek damages arising from Marcus's declarations; she pleads those declarations only as proof that he was acting as a percipient fact witness — and therefore outside the core advocacy role — at the time of the conduct alleged.

### I.9  Scope of Count VIII Theory

277.    Consistent with Skarbrevik v. Cohen, England & Whitfield, 231 Cal. App. 3d 692 (1991), and related authority, Glaser Weil and Marcus owed no independent duty directly to Plaintiff in their capacity as outside counsel to Hillspire and Eric Schmidt. Count VIII does not allege any such direct duty.

Count VIII pleads that Glaser Weil and Marcus knowingly provided substantial assistance to Schmidt and Hillspire in the breach of fiduciary and other duties Schmidt-side actors owed to Plaintiff (aiding and abetting breach of fiduciary duty, see American Master Lease LLC v. Idanta Partners, Ltd., 225 Cal. App. 4th 1451 (2014); Nasrawi v. Buck Consultants LLC, 231 Cal. App. 4th 328 (2014)), and that Glaser Weil and Marcus knowingly provided substantial assistance to the criminal activities and fraud alleged in Part IV.C and Part IV.F (aiding and abetting fraud). The substantial-assistance element is satisfied by each of the operational acts alleged in Parts I.1–I.7 above, and Plaintiff alleges that each such act was taken with actual knowledge of the wrongful conduct assisted.

## J. Wells Fargo Bank, N.A. — Intentional Misrepresentation, Non-Closure, And Account-Control Transfer To Hillspire-Aligned Successor Entities

### J.1 Parties, Personnel, and the Origin of the Account Relationships

278. During the relevant period, Plaintiff was the lawful account-holder, or the natural person standing as manager, member, or CEO, of a set of personal and business deposit, credit, and commercial-card accounts at Wells Fargo Bank, N.A. ("Wells Fargo"), including: (a) a personal Wells Fargo credit-card account issued in or about November 2020 through personal banker Lisa Meredith and

physically delivered to Plaintiff by Hillspire, LLC's Chief Financial Officer Mandy Quach; (b) SPM-business deposit accounts opened in 2021 in the name of Steel Perlot Management, LLC ("SPM") — analyzed business checking ending in -4631 and business market-rate savings ending in -6449; (c) an SPM WellsOne Commercial Card Agreement dated on or about December 2, 2021; (d) an Audem-business deposit account opened in December 2021 in the name of Audem Management, LLC ("Audem") — analyzed business checking ending in -0882; and (e) related deposit relationships for Steel Perlot, LLC (via Big Hen Group I LLC, checking -1107) and StarX, Inc., also established in 2021 through the same Wells Fargo Private Bank/Wealth & Investment Management channel. [Ex. 61 — November 2020 Wells Fargo personal credit-card issuance materials through Mandy Quach.]

279.    The Wells Fargo personnel relevant to the conduct pleaded in this Section are: (a) Lisa Meredith — Lead Wealth Management Banker and Executive Director, Western Division, Wells Fargo Wealth & Investment Management, Portland, Oregon (NMLSR ID 1953715), the Wells Fargo officer who personally signed the October 8, 2024 SPM and Audem closure letters, the October 11, 2024 SPM Commercial Card termination letter, and who authored the October 8, October 10, and October 25, 2024 emails to Plaintiff concerning those closures; (b) Jerald Sencil — personal banker involved in Wells Fargo's July 2024

account-authorization correspondence with Plaintiff and Hillspire concerning SPM and Audem; and (c) Mandy Quach — Hillspire's CFO, who Wells Fargo accepted as joint signatory and de facto gatekeeper on SPM and Audem from 2021 onward notwithstanding the Certifications of Beneficial Ownership and Account-Opening Documentation identifying Plaintiff as the lawful control person and sole managing member.

### J.2  The July 2024 Coercive Pre-Closure Conduct

280.    On July 29, 2024 at 12:02 p.m., Wells Fargo personal banker Jerald Sencil emailed Plaintiff concerning Audem's account, copying Meredith. Sencil wrote that a wire trying to debit Audem "currently does not have enough funds to process" and continued: "[a]s you know, we are still waiting on instructions from you and Hillspire on who to reach out to, and take instruction from, for this account for Audem Management as well as the account(s) for Steel Perlot Management, LLC. . . . We hope to receive joint written confirmation from you and Hillspire soon so that we have a clear understanding of who to contact in relation to Audem Management and Steel Perlot Management, LLC." [Ex. 55a — July 29, 2024 Sencil email.]

281.    The July 29, 2024 Sencil email is a documented act of Wells Fargo conduct, not "on information and belief." It reflects that Wells Fargo was, at that time, (i) treating Hillspire as a party whose *written confirmation was required*

before Wells Fargo would accept instruction on accounts for which its own Certifications of Beneficial Ownership identified Plaintiff — and only Plaintiff — as the lawful control person; (ii) substituting a *"joint" sign-off requirement* for the account authority confirmed in its own account-opening file; and (iii) communicating that conditioning to Plaintiff in writing, thereby inducing Plaintiff's subsequent reliance on the premise that Wells Fargo would take ordinary, documentary-based directions only upon Hillspire's concurrence.

282.    Between July 11 and July 17, 2024, Wells Fargo personnel Lisa Meredith separately communicated to Plaintiff in writing that Plaintiff was the "sole member" of SPM — relying on an outdated September 2021 operating agreement rather than the Amended Steel Perlot Management, LLC Operating Agreement in Wells Fargo's own file showing Hillspire's 49% membership. Wells Fargo thus took simultaneously inconsistent positions to Plaintiff within the same banking channel: representing to Plaintiff in July 2024 that she was solely responsible for SPM and its payroll while refusing, through Sencil, to process ordinary account instructions from her absent Hillspire's joint written confirmation.

*J.3    The Documented October 8, 2024 Closure Letters and October 11, 2024 Commercial Card Termination*

283. On October 8, 2024, Wells Fargo issued two written closure letters to Plaintiff on Wells Fargo "The Private Bank" letterhead, each signed by *Lisa Meredith, Executive Director, Wells Fargo Wealth & Investment Management*, with a cover email transmitting both letters (collectively, the "October 8, 2024 Closure Letters").

284. *SPM Closure Letter.* Addressed to "Steel Perlot Management LLC" and directed to Plaintiff ("Dear Michelle Ritter"), the SPM Closure Letter states: "Subject: Closing of Analyzed Business Checking account ending in 4631 and Business Market Rate Savings Account ending in 6449." It represents that Wells Fargo had "reviewed this account relationship and, as a result, . . . decided to close the accounts and conclude our relationship with you," "effective at the close of business on November 8, 2024"; that "[a] cashier's check for any amount remaining in the accounts will be mailed to you within ten business days of the date the account is closed"; and that "our decision to close the account is final." [Ex. 59a — October 8, 2024 Wells Fargo SPM Closure Letter (accounts -4631 and -6449).]

285. *Audem Closure Letter.* Addressed to "Audem Management, LLC" and directed to Plaintiff ("Dear Michelle Ritter"), the Audem Closure Letter states: "Subject: Closing of Analyzed Business Checking account ending in 0882." It contains identical representations as to effective date (November 8, 2024),

COMPLAINT

cashier's-check remittance within ten business days, and finality of the closure decision. [Ex. 59b — October 8, 2024 Wells Fargo Audem Closure Letter (account -0882).]

286.    *Transmittal email.* At 2:26:12 p.m. PDT on October 8, 2024, Meredith emailed Plaintiff at *mritter@audem-mgmt.com* and *mritter@steelperlot.com* with the subject "Steel Perlot and Audem Management account closure notifications," stating: "[I] am attaching letters that were mailed out today advising you of the planned closures of the checking and savings accounts for Steel Perlot Management LLC and Audem Management, LLC." The email attached both closure letters. [Ex. 59c — October 8, 2024 Meredith transmittal email (Zix-secured, Wells Fargo Private Bank letterhead).]

287.    *Commercial Card termination letter.* On October 11, 2024, Wells Fargo issued a separate written notice addressed to "Steel Perlot Management LLC" and to "Michelle Ritter, CEO," terminating the WellsOne® Commercial Card Agreement dated December 2, 2021, "effective as of November 11, 2024"; it further stated that "all Cards issued pursuant to the Agreement will be cancelled as of the above-referenced date." The letter was signed by Lisa Meredith and set out Meredith's direct contact information (lisa.m.meredith@wellsfargo.com; 971.978.4673). [Ex. 59d — October 11, 2024 Wells Fargo SPM Commercial Card Termination Letter.]

288.    Each of the October 8, 2024 Closure Letters and the October 11, 2024 Commercial Card termination letter constituted a written representation of present and prospective fact by Wells Fargo: that the named accounts *would be permanently closed* on the stated effective dates (November 8, 2024 for the deposit accounts; November 11, 2024 for the commercial-card account); that any remaining cash balances *would be remitted to Plaintiff by cashier's check* within ten business days; that Wells Fargo's "account relationship" with each of the named entities *would terminate*; and that Wells Fargo's decision was "final." Those representations were material, and were intended to be, and were in fact, relied upon by Plaintiff.

### J.4 The October 10, 2024 "Final" Email Expressly Indexing Closure to the Hillspire Relationship

289.    On October 9, 2024 at 9:36 a.m., Plaintiff responded to the Meredith transmittal email, asking Wells Fargo to "halt these closures until we discuss" and requesting "all of the original account opening documents and bank records," because Plaintiff intended "to fully operate SPM" and wished to "disentangle SPM and Audem from Hillspire's Wells Fargo accounts." [Ex. 59c.]

290.    On October 10, 2024 at 10:43 a.m., Meredith replied to Plaintiff's request. Meredith attached copies of the underlying account-opening documents for SPM

COMPLAINT

and Audem — including Audem Certification of Beneficial Ownership, SPM 2021.09.21 Operating Agreement, SPM and Audem EIN Confirmation Letters, Audem CA Qualification, and SPM Certificate of Formation (DE) — and wrote: "Our decision in Wealth and Investment Management to close the accounts and exit the relationship is final, but we understand that you would like to continue to operate these entities and have banking services. Going forward, *since there will be no connection to the Hillspire relationship*, it should be housed in the small business area of Wells Fargo. I am working to find someone in our Small Business Banking department in NYC, who can help you establish a new relationship and open new accounts for these entities. I will give you a call shortly to discuss." [Ex. 37a — October 10, 2024 Meredith email (Zix-secured, Wells Fargo Private Bank / Wealth & Investment Management).]

291.    The October 10, 2024 Meredith email is pleaded as independently material documentary evidence for three reasons. *First*, it confirms in Wells Fargo's own words that the closure decision was "final" at the Wealth & Investment Management level. *Second*, it expressly indexes the closure decision to "the Hillspire relationship" — a customer-relationship designation that has no basis in Plaintiff's own Wells Fargo customer file, in the account-opening documents Wells Fargo itself re-transmitted with the same email, or in any ordinary banking criterion. *Third*, by simultaneously (i) refusing to halt the closures and (ii)

directing Plaintiff to "the small business area of Wells Fargo" with no continuing private-bank relationship, Wells Fargo made clear that its own Private Bank / Wealth & Investment Management channel would no longer recognize Plaintiff as a stand-alone customer absent the Hillspire relationship — notwithstanding that Plaintiff was, and had always been, the sole lawful control person and signatory on the named entity accounts under Wells Fargo's own Certifications of Beneficial Ownership.

## J.5  The October 25, 2024 "No Longer Associated with the Hillspire Family Office" Confirmation

292.    On October 25, 2024 — seventeen days after the October 8, 2024 Closure Letters and approximately two weeks before the represented November 8, 2024 closure date — Meredith confirmed in writing to Plaintiff that Wells Fargo's account-closure action was "final" and stated that the closure was being treated as final because Plaintiff was "no longer associated with the Hillspire family office." [Ex. 37 — October 25, 2024 Meredith email.] The October 25 communication cumulatively corroborates: (a) that Wells Fargo's internal account-treatment of Plaintiff was indexed to her relationship with Hillspire rather than to any customer-account criterion; and (b) that, as of October 25, Wells Fargo's documented position was that the closures *were going forward, the relationship was ending, and the accounts would close on November 8, 2024.*

***J.6  Documentary Non-Closure: The May 1, 2025 Wells Fargo Account Summary Re-Titling -6449 to Orion Wing Management, LLC***

293.     Contrary to the representations in the October 8, 2024 Closure Letters, the October 8, October 10, and October 25, 2024 Meredith emails, and the Commercial Card termination letter — and contrary to Wells Fargo's express statement that "[a] cashier's check for any amount remaining in the accounts will be mailed to you within ten business days of the date the account is closed" — the SPM market-rate savings account ending in -6449 was not, in fact, permanently closed on or before November 8, 2024. Plaintiff pleads this fact as a matter of documentary record, not on information and belief, based on Wells Fargo's own May 1, 2025 Account Summary.

294.     The May 1, 2025 Wells Fargo Account Summary, retrieved from Wells Fargo's own online account-inquiry channel at *connect.secure.wellsfargo.com*, lists the holder as "ORION WING MANAGEMENT, LLC" and shows three accounts: (a) Business Checking ending -4631 — "$0.00 Available balance. This account is closed. You can view your account information, including statements and documents, for approximately 90 days after the closure date"; (b) Business Market Rate Savings ending -6449 — $48,847.15 Available balance (no closed notation); and (c) a new Time Account ending -4953 — $207,370.86 Account balance, held under the same "ORION WING MANAGEMENT, LLC"

customer relationship and in the same Wells Fargo Private Bank Service Team channel that previously serviced Plaintiff's SPM accounts. [Ex. 60 — May 1, 2025 Wells Fargo Account Summary for "ORION WING MANAGEMENT, LLC."]

295.    The May 1, 2025 Account Summary establishes, documentarily, four facts critical to this pleading: *First*, Wells Fargo did in fact close SPM checking -4631 consistent with the October 8, 2024 SPM Closure Letter — confirming that Wells Fargo was capable of executing the represented closure action when it chose to do so. *Second*, Wells Fargo did not close SPM savings -6449 on or before November 8, 2024; **instead, the -6449 account remained open, under the same account number, into at least May 2025** — a period of more than six months after the represented final-closure date. *Third*, the holder of the -6449 account was re-titled from "Steel Perlot Management LLC" to "Orion Wing Management, LLC" — the Hillspire-aligned successor entity to SPM — and the Private Bank channel retained relationship-management responsibility. *Fourth*, a new Time Account ending -4953, not disclosed in the October 8, 2024 Closure Letter or in any correspondence to Plaintiff, was opened in the Orion Wing Management name and held $207,370.86 as of May 1, 2025.

296.    The -6449 account, on October 12, 2024, held a balance of approximately $946,706.69 — the precise amount to be confirmed by Wells Fargo's own

COMPLAINT

account-statement production. Between that date and May 1, 2025, Wells Fargo, acting through the same Private Bank channel, permitted or effected the **movement of approximately $897,859.54** out of the -6449 account, leaving a $48,847.15 residual balance visible on the May 1, 2025 Account Summary. A portion of the moved balance, on information and belief, was deposited into the newly opened Time Account ending -4953 ($207,370.86); the remainder, on information and belief, was transferred outbound to Hillspire-, Schmidt-, or Orion-aligned third parties through wire, book, or internal transfers. Plaintiff pleads the inward and outward flows to be identified through discovery of the -6449 and -4953 account-detail records.

297.    On May 2, 2025, in the course of seeking to verify the post-closure status of the accounts, Plaintiff obtained the May 1, 2025 Account Summary and contemporaneous account-detail screens from the Wells Fargo online inquiry channel through what Plaintiff believes to have been a clerical oversight by Wells Fargo (the continued presence of Plaintiff's credentialed access to accounts that Wells Fargo had represented as closed). When Plaintiff subsequently sought an accounting, transfer records, or proof of cashier's check issuance from Wells Fargo, Wells Fargo failed and refused to produce any accounting, any transfer records, or any proof of cashier's check issuance.

COMPLAINT

*J.7    The Wells Fargo Authorization for Information (BBG18141) — "Submit Manually"*

298.    Also within Wells Fargo's custody, and referenced here to preserve its evidentiary role, is a Wells Fargo Authorization for Information bearing the instrument identifier BBG18141, which carries a handwritten or annotated instruction on its face reading "*Submit manually.*" [Ex. 55 — Wells Fargo Authorization for Information (BBG18141) annotated "Submit manually."] The "Submit manually" notation is material to this Section because, on information and belief, it reflects routing of account-authorization records outside the ordinary Wells Fargo automated review flow and is consistent with the non-standard customer-relationship treatment reflected in the October 10, 2024 Meredith "Hillspire relationship" email and the October 25, 2024 Meredith "no longer associated with the Hillspire family office" email. Plaintiff reserves discovery as to the full authorization chain associated with BBG18141.

*J.8  Reliance and the Fraudulent Inducement of the December 4, 2024 Settlement Agreement*

299.    Plaintiff relied on Wells Fargo's October 8, October 10, October 11, and October 25, 2024 written representations — that the SPM -4631 and -6449 accounts, the Audem -0882 account, and the SPM WellsOne® Commercial Card would be permanently closed; that any remaining cash balances would be

remitted to her by cashier's check; that Wells Fargo's decision was "final"; and that Wells Fargo's account "relationship" with each of Plaintiff's entities would terminate — in each of the following ways, each of which is pleaded with specificity: (a) Plaintiff refrained from taking alternative protective steps, including pre-closure transfer of balances to a Plaintiff-controlled deposit account at another institution, a court-supervised freeze or interpleader, or pre-closure cashier's-check issuance instructions; (b) Plaintiff ceased operating the SPM account as an active operating account in the days preceding November 8, 2024 on the premise that the account would in fact close and that residual funds would be remitted by cashier's check; and (c) Plaintiff negotiated and then signed the December 4, 2024 Settlement Agreement with Schmidt and Hillspire on the assumption, induced by Wells Fargo's own written representations, that the SPM -6449 balance was no longer held or reachable through the Hillspire-linked Private Bank relationship and would be returned to Plaintiff through the represented cashier's-check channel.

300.    In truth, as the May 1, 2025 Account Summary confirms, the -6449 balance was *not* returned to Plaintiff by cashier's check, was *not* placed beyond the reach of Hillspire-aligned interests, and was instead retained at Wells Fargo under a re-titling to the Hillspire-aligned successor "Orion Wing Management, LLC" in the same Private Bank channel. Wells Fargo thus procured Plaintiff's

entry into the December 4, 2024 Settlement Agreement on a false factual premise within Wells Fargo's own exclusive knowledge and control.

301.    Plaintiff's reliance on the Wells Fargo representations was justifiable. The representations were made (a) in writing, on Wells Fargo letterhead, (b) by an identifiable Executive Director of Wells Fargo Wealth & Investment Management, (c) over the ordinary customer-notice channel, (d) repeatedly and consistently across four separate communications within an eighteen-day window (October 8, 10, 11, and 25, 2024), and (e) with express assurance of finality. Plaintiff had no means of independently verifying Wells Fargo's internal account-status actions or its intended disposition of the -6449 balance; those matters were uniquely within Wells Fargo's custody, control, and knowledge.

## J.9 Knowledge, Scienter, and Banking-Channel Familiarity

302.    The Wells Fargo personnel involved in the conduct pleaded in this Section had actual knowledge, or recklessly disregarded, the falsity of the closure representations at the time they were made, or knew or reasonably should have known that the representations would become false and were not corrected. Knowledge and scienter are supported by, among other things: (a) Wells Fargo's contemporaneous custody of the Certifications of Beneficial Ownership identifying Plaintiff, and only Plaintiff, as the lawful control person of SPM and Audem; (b) Meredith's October 10, 2024 transmittal of those same account-

opening documents back to Plaintiff, confirming Wells Fargo's direct knowledge of the operative control record; (c) the banking-channel familiarity between Wells Fargo personnel and Hillspire-aligned actors, including Mandy Quach's role as joint gatekeeper since 2021 and Meredith's role in the November 2020 Wells Fargo personal credit-card issuance physically delivered by Quach; (d) the simultaneous Schedule A payment structure in the contemporaneous December 4, 2024 Settlement Agreement, of which Wells Fargo personnel had direct or indirect banking-channel awareness; (e) Wells Fargo's own July 29, 2024 Sencil email conditioning account instructions on "joint written confirmation from you and Hillspire"; (f) Wells Fargo's own October 10, 2024 Meredith email expressly indexing the closure decision to "the Hillspire relationship"; and (g) Wells Fargo's own October 25, 2024 Meredith email reiterating finality by reference to Plaintiff's status relative to "the Hillspire family office." Plaintiff reserves discovery as to the precise Wells Fargo personnel, approval chain, and branch/Private-Bank ledger actions that translated the October 8, 2024 Closure Letter representations into the May 1, 2025 Orion-Wing-retitled outcome.

### J.10  Injury and Continuing Pecuniary Loss

303.    Plaintiff's injury from the conduct pleaded in this Section IV.H includes:

(a) loss of account control over the -6449 account and the movement of approximately $897,859.54 in SPM funds out of that account between October

12, 2024 and May 1, 2025 without cashier's-check remittance to Plaintiff and without Plaintiff's consent; (b) deprivation of the closure-and-remittance benefit expressly represented in the October 8, 2024 Closure Letters; (c) reliance and protective-measure costs, including foregone alternative banking, foregone alternative protective steps (pre-closure transfer, interpleader, freeze), and reliance-based decisional costs tied to the December 4, 2024 Settlement Agreement; (d) exposure to Hillspire-, Schmidt-, or Orion-aligned use of an account Plaintiff had been told was closed and whose balance had been told would be returned to her by cashier's check; (e) continuing pecuniary loss tied to the retained -6449 balance, to the newly opened -4953 Time Account, and to the movement of funds outbound to third parties; and (f) fraudulent inducement to enter the December 4, 2024 Settlement Agreement as detailed in Section J.8 above. These injuries are direct injuries to Plaintiff and are pleaded without regard to, and independent of, the merits of the sexual-assault, settlement-validity, CFAA, SCA, or Wiretap claims pleaded elsewhere in this Complaint.

## J.11 Scope, Reserved Theories, and Discovery Reserved

304.    **Narrow pleading against Wells Fargo.** The conduct pleaded in this Section IV.H, and the claims pleaded in Count VII, are pleaded narrowly as intentional misrepresentation, fraudulent concealment, fraudulent inducement, and, in the alternative, negligent misrepresentation. Plaintiff does not, in this

Complaint, plead against Wells Fargo any claim for aiding and abetting, any Title VII or EFAA-based theory, any civil RICO predicate specific to Wells Fargo conduct, or any enterprise-liability theory; all broader theories, if any, are expressly reserved consistent with Part VII.

305.    **Discovery reserved.** Plaintiff pleads the remaining account-handling and control-change particulars, where not already documented above, on information and belief and subject to discovery of: (a) the native account-status and account-number continuity records for each of the accounts identified in the October 8, 2024 Closure Letters and the October 11, 2024 Commercial Card termination letter, for the period October 8, 2024 through the date of trial; (b) signer-change, authorized-person, power-of-attorney, and delegated-access records for each such account across the same period, including without limitation any re-titling to "Orion Wing Management, LLC" or any other Hillspire-, Schmidt-, or Orion-aligned name; (c) cashier's-check issuance, mailing, and negotiation records for any remittance purportedly made pursuant to the October 8, 2024 Closure Letters; (d) opening and funding records for the Time Account ending -4953 in the Orion Wing Management name; (e) internal Wells Fargo Private Bank, Wealth & Investment Management, and Small Business Banking communications concerning any of the accounts during the relevant period; (f) all communications between Wells Fargo personnel (including without

COMPLAINT

limitation Lisa Meredith, Jerald Sencil, Mandy Quach, and Jessica Steele) and any Schmidt-, Hillspire-, SPM-, Audem-, Orion Wing-, or Big Hen-aligned person or entity concerning Plaintiff or any of the identified accounts; and (g) the full authorization chain associated with Wells Fargo Authorization for Information BBG18141 (including the "Submit manually" notation).

**K.    The April 20, 2026 AAA Interim Award — Point-by-Point Dissection Of Jurisdictional Overreach, Evident Partiality, Constitutional Infirmity, And Pay-to-Play Adjudication**

306.    The allegations in this Section IV.I are pleaded in support of Count XIII (declaratory relief and vacatur of the Interim Award) and Count V (EFAA prospective declaratory judgment), as context bearing on Counts I, II, VIII, and XIV, and as time-sensitive explanation for why Plaintiff is now before this Court. Plaintiff incorporates by reference, as Exhibit 60, the full 47-page April 20, 2026 Interim Arbitration Award issued by Hon. Beth M. Andrus (ret.) in Hillspire, LLC; Orion Wing, LLC fka Steel Perlot Management, LLC v. Michelle Ritter, AAA Case No. 01-25-0000-2191; and, as Exhibit 62, the April 21, 2026 transmission letter from AAA Director Julie E. Collins transmitting the Interim Award and disclosing Plaintiff's arbitrator-compensation invoice.

307.     Plaintiff acknowledges Badgerow v. Walters, 596 U.S. 1 (2022), as to the jurisdictional posture that a petition under 9 U.S.C. §§ 9, 10, or 11 must rest on an independent jurisdictional basis. Count XIII rests on federal-question jurisdiction under 28 U.S.C. § 1331 because the Interim Award adjudicates (i) the applicability of EFAA, 9 U.S.C. §§ 401–402, which Congress has committed to a court by § 402(b), and (ii) the Plaintiff's First-Amendment, Fifth-Amendment, and Fourteenth-Amendment rights as pleaded in Part IV.K, and because the conduct pleaded in Counts I and II provides a concurrent federal anchor under Vaden look-through principles. Plaintiff acknowledges Millmen Local 550 v. Wells Exterior Trim, 828 F.2d 1373 (9th Cir. 1987), as to finality, and pleads the Interim Award as sufficiently final for declaratory-judgment purposes because it disposes of all liability issues and all damages components except the fee component, for which briefing is already scheduled (May 1, 15, and 20, 2026) and which is purely derivative of the already-decided liability findings; in the alternative, Plaintiff will amend or supplement upon issuance of the Final Award.

308.     On or about January 10, 2025, Hillspire and the Schmidt-aligned Claimants initiated AAA Commercial Arbitration Case No. 01-25-0000-2191 against Plaintiff, invoking the arbitration clauses in the December 4, 2024 Settlement Agreement and December 17, 2024 Amendment — the same

COMPLAINT

instruments whose formation and validity Plaintiff challenges in Counts I and II. The arbitration was administered by the American Arbitration Association and assigned to Arbitrator Hon. Beth M. Andrus (ret.), a retired state-court judge who, on information and belief, trades on the honorific "Honorable" and her prior judicial title in private-arbitration marketing and whose compensation in this matter is paid directly by the parties. [Ex. 60]

### K.1  The $10,744,999 Interim Award Decomposed

309.    On April 20, 2026, the arbitrator issued the Interim Award (Ex. 60) in the aggregate amount of $10,744,999, allocated as: (a) Paley personal-property "conversion" — $1,183,429 (Interim Award pp. 27–28); (b) failure to vacate the Paley premises and December 17, 2024 legal fees — $21,550 (Interim Award pp. 28–30); (c) WSJ-disclosure-related breach — $50,000 (Interim Award pp. 30–31); (d) LA Lawsuit legal fees for defending the subsequently stayed Los Angeles Superior Court action — $1,409,882 (Interim Award pp. 33–34); and (e) "mitigation damages – reputational harm" — $8,080,138 (Interim Award pp. 36–38, 46). The arbitrator reserved the attorney-fee component under Section 3(g)(v) of the Settlement Agreement for the May 1–20, 2026 briefing schedule (Interim Award p. 47); the previously imposed $25,000 discovery sanction was entered by separate order on December 4, 2025 (Interim Award p. 8) and is not a component of the Interim Award's $10,744,999. The single largest damages

component — $8,080,138, comprising 75% of the award — is not compensation for any loss economically incurred; the arbitrator characterizes it on the face of the Award as a prospective earmarked budget for "12 months of work through paid media to repair Schmidt's reputation, at a cost of $8,080,138" (Interim Award p. 37, quoting Rose Report). That award — ordering an abuse and sexual harassment victim to fund her abuser's prospective paid-media campaign to displace her First-Amendment-protected speech from search results — is, on Plaintiff's pleading, unprecedented in American law and unconstitutional for the reasons set forth in Part IV.K below.

310.    **Findings of the Interim Award favorable to Plaintiff and material to the vacatur and count analyses.** Four findings in the Interim Award are material to the count-by-count analysis that follows:

a. *Fraudulent-inducement claim DENIED.* The arbitrator affirmatively denied the Schmidt Claimants' fraudulent-inducement claim, finding that "all of the evidence that Ritter was unwilling to execute the Schedule D declaration post-dates her execution of the Agreement," and that "her intent not to sign the document arose after executing the Agreement, not before. I therefore deny the claim of fraudulent inducement." (Interim Award, pp. 17–18.) That finding — entered on an unopposed record in a forum hostile to Plaintiff — undercuts the "Ritter was deceiving Schmidt

from the outset" narrative that has driven the media framing of this dispute and supports Plaintiff's Count VIII rescission theory that her own refusal to sign a declaration she regarded as perjurious arose after, not before, execution.

b. *No reputational damages from the WSJ breach.* The arbitrator expressly ruled that as to the defamation claim premised on Plaintiff's alleged disclosure to the Wall Street Journal reporter, "they [the Schmidt Claimants] have conceded that the disclosure of the rape accusation to the WSJ did not result in any reputational damage because the article relating to Ritter's false allegations was never published. I therefore award no damages associated with this claim of defamation." (Interim Award, p. 46.) The defamation holding is therefore making no independent compensatory-damages contribution to the Award; it exists solely to support the $50,000 Hiltzik-fee award and to supply predicate-factual grounds for the $8,080,138 reputational-mitigation award. Severance of the defamation holding from the reputational-mitigation holding is naturally available under § 10(a)(4).

c. *The arbitrator's editorial characterization of Plaintiff.* The Interim Award contains repeated editorial characterizations of Plaintiff made on a record from which she was precluded from presenting affirmative evidence.

Representative: "One can legitimately argue that the justice system for victims of sexual assault is not fair; one can also conclude that Ritter engaged in self-centered efforts to obtain revenge against Schmidt in a way that was more damaging than helpful to her cause." (Interim Award p. 41.) And: as to the Letter to Congress, "[t]his letter is either confabulation (unconscious fabrication, distortion, or misinterpretation of memory) or intentional fabrication." (Interim Award p. 43.) Those characterizations, made on a record from which Plaintiff was barred, are independent § 10(a)(2) evident-partiality evidence.

d. *Narrow construction of CCP §§ 1001, 1002 and Civ. Code § 1670.11, with acknowledged absence of precedent.* The arbitrator expressly acknowledged that "there is no precedent interpreting these two statutes" (Interim Award p. 23), and then proceeded to limit §§ 1001 and 1002 to settlement agreements "entered into after a lawsuit alleging sexual assault or harassment is filed." (Interim Award p. 22.) The arbitrator also ruled that § 1670.11 did not apply because, in her view, the Agreement "expressly permits the disclosure of 'Confidential Information' when 'compelled by law.'" (Interim Award p. 24.) That statutory construction is contested, is unprecedented, is a matter of California law, and is preserved for de novo determination by this Court under Count XII (Declaratory

Invalidity of Gag Provisions) rather than under any deferential review standard.

**FIGURE 5 — The $10,744,999 Interim Award Decomposed**
*Where the Award's money actually goes*

Allocation of $10,744,999

**What the Award actually orders**

**$8,080,138**
Earmarked funding for an Eric-Rose-managed public-relations campaign whose stated purpose is to mitigate "reputational harm" — i.e., to bury Plaintiff's search-engine presence. This is a content- and viewpoint-based prior restraint (Count VIII, Ground 4).

**$2,589,861**
Defamation-per-se compensatory damages predicated on: (i) Plaintiff's 2024 private report of rape; (ii) the Predators' Playground op-ed (no Schmidt name); and (iii) the Letter to Congress (Petition Clause speech).

**$50,000**
WSJ-related damages — awarded even though the Award acknowledges WSJ never published anything. Defamation requires publication.

**$25,000**
Sanctions on a pro se Plaintiff in a forum in which the adjudicator is paid by the sanctioning parties.

*Figure 5 — The $10,744,999 Interim Award Decomposed.  Where the award's money actually goes; 75% is not compensation for any past economic loss but a prospective earmarked budget for an Eric-Rose-directed PR campaign to bury Plaintiff's search-engine presence.*

### K.2  Jurisdictional Overreach — EFAA Election Ignored (9 U.S.C. §§ 401–402)

311.    Plaintiff repeatedly, in writing to the arbitrator and to AAA, elected the protection of EFAA, 9 U.S.C. §§ 401–402, as to all claims 'relating to' her sexual-assault dispute. Section 402(b) provides expressly and unambiguously

that "a court, rather than an arbitrator," determines whether EFAA applies, "irrespective of whether the agreement purports to delegate such determinations to an arbitrator." The arbitrator nevertheless adjudicated, as the central liability pillar of the Interim Award, the truth or falsity of Plaintiff's 2024 sexual-assault report — the very kind of determination Congress withdrew from arbitration. That decision is a per se excess of arbitral power under 9 U.S.C. § 10(a)(4) and a direct violation of § 402(b).

### K.3  Evidence Preclusion — R-60 Total-Sanction as 9 U.S.C. § 10(a)(3) Violation

312.    On March 13, 2026, the arbitrator entered a default sanction under AAA Commercial Rule R-60 under which Plaintiff was, in the words of the order, "precluded from presenting any evidence in her defense." The R-60 preclusion was imposed after the arbitrator (a) struck the previously set June 22, 2026 in-person evidentiary hearing; (b) denied Plaintiff's multiple stay requests including a requested stay pending the concurrent Los Angeles Superior Court proceeding and pending Plaintiff's anticipated federal filing; (c) converted the matter to a written-submission hearing on April 17, 2026; and (d) denied Plaintiff's pro se accommodation requests. The blanket preclusion of any affirmative evidence by Plaintiff — a pro se party who had invoked EFAA — is the precise conduct that 9 U.S.C. § 10(a)(3) targets: "refusing to hear evidence pertinent and material to the controversy."

COMPLAINT

313.    Although the arbitrator expressly characterized the R-60 default as a discovery-non-compliance sanction rather than an R-59 nonpayment sanction (Interim Award, p. 10), the record supports the inference that the practical predicate for the default was Plaintiff's inability, as a pro se indigent respondent with both successive firms of counsel having withdrawn, to sustain the cost of full discovery participation. The arbitrator's own opinion records: (i) that on February 6, 2026, Plaintiff's counterclaims were deemed waived because she failed to pay the AAA filing fee for those counterclaims (Interim Award, pp. 7–8); (ii) that on December 4, 2025, the arbitrator imposed $25,000 in monetary sanctions against Plaintiff for discovery non-participation (Interim Award, p. 8); and (iii) that Plaintiff had sought relief from the fee structure which was not granted (Interim Award p. 41 n.5). On or about July 25, 2025, Plaintiff was assessed over $70,000, not inclusive of legal fees, discovery costs, or other matters, in AAA-demanded arbitrator-and-forum fees that she was documentarily unable to pay. The combination of the unfinanced fee assessment, the successive withdrawals of counsel, the monetary sanctions, the waiver of counterclaims for nonpayment of a filing fee, and the continued adverse discovery rulings culminated in the March 13, 2026 R-60 preclusion. Whether the arbitrator chose to label that outcome under R-60 (non-compliance) or R-59 (nonpayment), the functional result — a pro se indigent woman opposing a

billionaire being stripped of her right to present affirmative evidence after a year-long erosion of her ability to finance the defense — is independently a § 10(a)(3) "refusing to hear evidence pertinent and material to the controversy" violation and, combined with the pay-to-play compensation structure pleaded in K.4, is also a free-standing Fourteenth-Amendment due-process violation under Tumey v. Ohio, 273 U.S. 510 (1927), Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009), and Boddie v. Connecticut, 401 U.S. 371 (1971) (a state — or a state-entangled private forum — cannot condition access to adjudicatory defense on ability to pay).

### K.4  Evident Partiality — 9 U.S.C. § 10(a)(2) and the $28,000 Pay-to-Play Invoice

314.    The April 21, 2026 AAA Transmission Letter from Julie E. Collins, Director of AAA (Ex. 62), discloses on its face that "claimant has been billed $28,000.00 in compensation per the arbitrator's estimate for completion of this matter." [Ex. 62, April 21, 2026 AAA Transmission Letter] The transmission letter's plain text — "claimant has been billed" — identifies the prevailing Schmidt Claimants as the party receiving the $28,000 invoice for additional arbitrator compensation, billed after the issuance of the $10,744,999 award in the Claimants' favor and directed at "completion of this matter." The disclosure is extraordinary for three distinct reasons that, together, establish § 10(a)(2) evident partiality.

315.    First, the transmission letter affirmatively identifies that the arbitrator set her own compensation estimate and that AAA billed the prevailing Claimants directly for it — not through ordinary AAA administrative cover, not on a shared basis, and not through a blind trust. A privately-compensated adjudicator who, after ruling $10,744,999 in favor of one party on the liability phase, invoices that same party an additional $28,000 at her own estimate to complete the fee-petition phase has established the very appearance of partiality that Commonwealth Coatings Corp. v. Continental Casualty Co., 393 U.S. 145 (1968), warns against: the arbitrator "must disclose to the parties any dealings that might create an impression of possible bias." The $28,000 invoice is such a dealing — and it is disclosed by AAA itself.

316.    Second, the transmission letter's disclosure occurs against the backdrop of the Interim Award's fee-petition scheduling order (Interim Award p. 47): the Schmidt Claimants' fee petition is due May 1, 2026; Plaintiff's response is due May 15, 2026; and Claimants' reply is due May 20, 2026. The arbitrator therefore bills the prevailing Claimants $28,000 to complete a fee-briefing sequence in which she is about to award them attorneys' fees that include, by the terms of Section 3(g)(v) of the Settlement Agreement, her own arbitrator fees. The compensation structure is, in substance, pay-the-decision-maker-to-decide-how-much-to-pay-the-decision-maker — the paradigmatic due-process violation

under Tumey, Caperton, and In re Murchison, 349 U.S. 133 (1955) ("no man can be a judge in his own case").

317.    Third, Plaintiff, for her part, had already been assessed AAA and arbitrator fees on the order of approximately $75,000 that she was documentarily unable to pay (Part IV.I.3.a), and the arbitrator had refused to stay the proceeding or to shift the burden to accommodate her indigence (Interim Award, p. 41 n.5). The forum thus operated on an asymmetric compensation structure in which the prevailing party paid the arbitrator at the arbitrator's own estimate while the pro se adversary was assessed fees she could not pay and whose counterclaims were waived for the same reason. On Plaintiff's pleading, that structure is functionally indistinguishable from pay-to-play adjudication. The partiality is aggravated by the same-pattern deployment of this forum against a different woman: the same AAA forum, on information and belief, was used by Schmidt-aligned actors in the parallel Sarah Koebel v. Derek Rundell matter, with Schmidt identified as the "John Doe" funding investor in Defendant Marcus's own sworn declaration (Ex. 65), to silence a different sexual-assault reporter under the same defamation-per-se / NDA-enforcement doctrinal posture and the same preclusion-and-damages machinery now deployed against Plaintiff.



*Figure 6 — Pay-to-Play Adjudication Structure. How direct-to-party arbitrator compensation produced an award against the pro se accuser: the arbitrator billed the prevailing Schmidt Claimants an additional $28,000 at her own estimate to complete the fee-petition phase, while the pro se adversary had been separately assessed fees she could not pay and whose counterclaims were waived for nonpayment — and the $10,744,999 Award followed.*

318.    Plaintiff further alleges, on information and belief subject to discovery, that during the pendency of the AAA proceeding Defendant Marcus or other Schmidt-aligned counsel communicated to the arbitrator in substance that "if you don't agree [with our requested ruling], we're going to appeal your ruling" — a direct threat-to-reverse communicated to a privately-compensated adjudicator by

the party who was paying her. That communication, if established through discovery, independently supports § 10(a)(2) evident-partiality vacatur and the § 10(a)(4) exceeding-powers ground.

### K.5  First-Amendment Overreach — Arbitrator Ruled on Protected Speech

319.    The Interim Award rules, as factual predicates of its defamation-per-se award, on two categories of speech that are, on their face, within the core protection of the First Amendment: (a) Plaintiff's op-ed titled "Predators' Playground," which the arbitrator characterizes as a "veiled reference" to Schmidt notwithstanding that the op-ed does not name Schmidt and addresses the broader culture of sexual predation in venture capital and the artificial-intelligence industry (see Part IV.J); and (b) Plaintiff's Letter to Congress, which the arbitrator characterizes as "confabulation or intentional fabrication" notwithstanding that petitioning Congress is the paradigmatic exercise of the First Amendment's Petition Clause and is entitled to absolute protection under Noerr-Pennington / California Motor Transport (see Part IV.K). A private arbitrator, paid by the accused, has no constitutional authority to adjudicate the truth of a pro se plaintiff's constitutionally protected op-ed or petition — full stop.

### K.6   Fifth-Amendment Self-Incrimination Inference Drawn Against a Non-Appearing Party — and Rape-as-Fact Adjudicated on the Accused's Sworn Statement Alone

320.   The Interim Award draws adverse inferences against Plaintiff on the central defamation-per-se liability pillar because Plaintiff did not testify or produce evidence rebutting the false-accusation theory. But the AAA proceeding is, in its practical character, quasi-criminal: the arbitrator's finding of "false rape accusation with actual malice" by "clear and convincing evidence" is the same factual finding that would support a California criminal filing under Cal. Penal Code § 148.5 (false report) or § 518 (extortion), and is indistinguishable in its practical impact on Plaintiff's liberty and reputation from a criminal conviction. Plaintiff's non-appearance and non-testimony was not contumacy; it was the exercise of her Fifth-Amendment privilege against self-incrimination in a proceeding being used to manufacture quasi-criminal findings against her. Drawing adverse inferences in those circumstances violates the Fifth-Amendment protection that Article III courts would apply under Griffin v. California, 380 U.S. 609 (1965), and its progeny. A privately-compensated arbitrator cannot substitute for an Article III court in making findings that impose quasi-criminal consequences while penalizing the exercise of the Fifth-Amendment privilege.

321.    The record-posture of the rape-as-fact adjudication compounds the constitutional infirmity. Having entered the R-60 total-preclusion sanction for nonpayment (K.3), the arbitrator proceeded to adjudicate — as a matter of fact, on a 'clear and convincing' standard — that Plaintiff's 2024 report that Schmidt had raped her was false. The only evidentiary basis for that finding on the record the arbitrator permitted was Schmidt's own sworn statement denying the conduct. A privately-compensated adjudicator, paid directly by the accused, presided over a proceeding from which the accuser had been defaulted for inability to pay, and on the sworn statement of the accused alone decided as a matter of fact whether the accuser had been raped. No Article III court could enter such a finding on that record; and no private arbitrator operating under a state-entangled FAA/CAA regime may substitute for an Article III court in doing so. See Caperton, 556 U.S. 868; Boddie v. Connecticut, 401 U.S. 371 (1971); In re Murchison, 349 U.S. 133 (1955) ('no man can be a judge in his own case').

**K.7    Defamation Per Se Finding After Acknowledged Non-Publication and $8,080,138 Damages Award Unsupported by California Damages Law**

322.    The Interim Award is internally inconsistent in a way that independently establishes § 10(a)(4) exceeding-powers vacatur. As set out at ¶ 174A(b), the arbitrator expressly ruled that as to the defamation claim based on Plaintiff's alleged disclosure to the Wall Street Journal, the Schmidt Claimants "have

conceded that the disclosure of the rape accusation to the WSJ did not result in any reputational damage because the article . . . was never published. I therefore award no damages associated with this claim of defamation." (Interim Award, p. 46.) The defamation holding thus produces zero damages of its own. It exists only to generate a falsity finding available to be deployed in support of the $8,080,138 "reputational harm — mitigation" award (Interim Award pp. 36–38) and the $50,000 Hiltzik-fee "WSJ-disclosure" breach award (Interim Award pp. 30–31).

323.     The $8,080,138 "mitigation damages" award is unprecedented as a category of California contract damages. The arbitrator rested the award on Brandon & Tibbs v. George Kevorkian Acct. Corp., 226 Cal. App. 3d 442, 461 (1990) (Interim Award p. 38), citing its recognition that "special losses that a party incurs in a reasonable effort to avoid losses resulting from a breach are recoverable as damages." But Brandon & Tibbs — and Cal. Civ. Code § 3300 on which it rests — authorize recovery only of losses actually incurred or to be incurred flowing from an actual injury, not prospective reputation-management spending that, as the arbitrator herself twice conceded, is not tied to any proven past economic loss. (Compare Interim Award p. 34 [denying $8M reputational damages from LA Lawsuit filing because "the reputation damages were not proximately caused by Ritter filing the LA Lawsuit"], with Interim Award p. 38

[awarding $8,080,138 in "mitigation" damages for breach of confidentiality based on Eric Rose's projected paid-media budget].) The award converts Schmidt's preferred image-management spend into compensatory damages, which is neither general damages (which flow directly from the breach) nor special damages (which must be actually incurred and proximately caused). The $8,080,138 award is thus facially unsupported by any recognized category of California contract damages and is, on Plaintiff's pleading, a § 10(a)(4) excess of powers award. It further functions, on its face, as a court-ordered suppression-budget operation against a pro se plaintiff on matters of public concern, and raises independent First-Amendment content-based-restriction and prior-restraint problems addressed in Part IV.K.

## K.8 Editorial Commentary — The Arbitrator as Partisan

324.     The Interim Award departs repeatedly from neutral fact-finding into gratuitous editorial commentary about Plaintiff personally. Representative: "Ritter engaged in self-centered efforts to obtain revenge against Schmidt in a way that was more damaging than helpful to her cause." (Interim Award p. 41.) "This letter is either confabulation (unconscious fabrication, distortion, or misinterpretation of memory) or intentional fabrication." (Interim Award p. 43.) Those characterizations were made on a record from which Plaintiff was "precluded from presenting any evidence in her defense" (March 13, 2026 Order

of Default). A neutral fact-finder cannot simultaneously preclude a pro se party's evidence and then make sweeping character findings against that party on the theory that the preclusion-induced absence of a defensive record proves the character flaw. The editorial commentary is independent evidence of the evident partiality required by § 10(a)(2) vacatur.

### K.9  EFAA / CCP §§ 1001, 1002 / Litigation-Privilege Rejections

325.    The Interim Award expressly rejects Plaintiff's defenses based on (a) EFAA, 9 U.S.C. §§ 401–402; (b) California Code of Civil Procedure §§ 1001 (anti-silencing of sexual-harassment victims) and 1002; and (c) California Civil Code § 47(b) litigation privilege. The rejection of the EFAA defense is a direct § 402(b) violation (the court, not the arbitrator, decides). The rejection of the anti-silencing statutes is, on Plaintiff's pleading, contrary to the legislative policy of those statutes. The rejection of the litigation privilege as to Plaintiff's report-to-authorities conduct is an independent legal error that a reviewing court would correct.

### K.10  Procedural Railroading — July 17, 2025 Stipulation, Struck Hearing, Conversion to Written Submission

326.    The procedural railroading in the arbitral record is extensive: (a) the arbitrator relied on a July 17, 2025 stipulation that was signed when Plaintiff's then-counsel had already moved to withdraw; (b) the arbitrator struck the

previously set June 22, 2026 in-person evidentiary hearing on Claimants' motion; (c) the arbitrator converted the matter to a written-submission hearing held on April 17, 2026, a forum that by design disadvantages a pro se party preparing federal claims; (d) the arbitrator denied Plaintiff's multiple requests for a stay pending her federal-court filing; and (e) the arbitrator proceeded to default and Interim Award three days after the written-submission hearing. The cumulative procedural history establishes, on its face, that the forum was not a neutral adjudicator but an accelerator operated for the Claimants' benefit.

### K.11  *The $25,000 Discovery Sanction on a Pro Se Plaintiff*

327.    On December 4, 2025, by separate order on Claimants' Omnibus Motion to Compel Discovery, the arbitrator imposed $25,000 in monetary sanctions on Plaintiff, a pro se litigant (Interim Award p. 8). The sanctions were imposed against an opposing party who had been documented as indigent and without counsel for most of the period in question. Sanctions of that magnitude on a pro se party, in a private arbitral forum in which the arbitrator is compensated directly by the sanctioning parties' adversary (see K.4 above), are independent evidence of evident partiality under § 10(a)(2) and of the forum's pay-to-play structure.

### K.12  *Relationship to Counts I, II, III, V, and XIV*

328.    **Scope-limiting features of the Interim Award relevant to Counts I, II, III, and V.** The Interim Award's SPM-ownership finding as to "SPM digital assets including the steelperlot.com Workspace" does not reach the non-SPM tenants and devices on which Plaintiff's CFAA, SCA, and Wiretap claims are primarily anchored — namely, the audem-mgmt.com Workspace (owned by Audem Management, LLC, in which Plaintiff is the sole member); the starx.com Workspace (owned by StarX Networks, Inc., formed May 2020); Plaintiff's personal credentialed account mritter@steelperlot.com; Plaintiff's managed personal laptop; Plaintiff's personal DocuSign environments; and Plaintiff's personal Wells Fargo bank-account credentials and channels. Additionally, the Interim Award does not adjudicate EFAA applicability (committed to the court by § 402(b) and the sole subject of Count V) and does not adjudicate the federal statutory claims under 18 U.S.C. § 1030, 18 U.S.C. §§ 2701 and 2707, or 18 U.S.C. §§ 2511 and 2520 (Counts I, II, and III). To the extent Defendants advance the Interim Award as preclusive of any element in this action, Plaintiff reserves the right to contest preclusive effect on every applicable ground, including lack of identity of issue, lack of a final judgment on the merits, and the constitutional infirmities pleaded in Counts IX and XIII.

**L.    Plaintiff's "Predator's Playground" Op-Ed, Whistleblower Letter To Congress, And 2024 Sexual-Assault Report — First-Amendment-Protected**

COMPLAINT

**Public-Concern Speech, Petition-Clause Petitioning, Whistleblower Reporting, And Ongoing Platform-Level Silencing**

329.    This Section IV.J pleads, as factual context for Counts IX (declaratory invalidity of gag and recantation provisions), XII (defamation and republication), XIII (Interim Award vacatur), XIV (DMCA misrepresentation under 17 U.S.C. § 512(f)), and as independent constitutional grounds for relief, the three categories of Plaintiff's speech that the arbitrator purported to punish in the Interim Award and the post-award platform-level silencing directed at that speech: (i) Plaintiff's published op-ed, "The Predator's Playground: How Silicon Valley Built a System to Pay Abusers and Bankrupt Victims"; (ii) Plaintiff's February 10, 2026 Whistleblower Letter to Members of the United States Congress; (iii) Plaintiff's 2024 private report that Eric Schmidt sexually assaulted her; and (iv) the mid-April to late-April 2026 escalation of platform-level visibility restriction, Google search de-indexing, and DMCA-architecture deployment directed at the same speech. Each of the three categories of speech is, on its face, within the core protection of the First Amendment; the second and fourth are additionally protected under the federal whistleblower and anti-retaliation regimes.



**FIGURE 7 — First Amendment Target Map**
*Three categories of protected speech the arbitrator adjudicated as "defamation per se"*

*Figure 7 — First-Amendment Target Map. The three categories of First-Amendment-protected speech the arbitrator purported to punish (Predators' Playground op-ed; Letter to Congress; 2024 private rape report), the arbitrator's characterization labels, and the controlling Supreme Court authorities Plaintiff cites to defeat each.*

## L.1  The "Predator's Playground" Op-Ed — Public-Concern Commentary on an Industry-Wide Abuse Pattern

330.      **The op-ed.** On or about January 29, 2026, Plaintiff authored and published an opinion piece titled "The Predator's Playground: How Silicon Valley Built a System to Pay Abusers and Bankrupt Victims," addressing the broader culture of sexual predation in the venture-capital, technology, and artificial-intelligence

industries, including (i) the use of capital, employment leverage, private-arbitration forums, and non-disclosure apparatus to silence women who report on sexual misconduct; (ii) the documented pattern at Google of nine-figure exit payments to senior men accused of misconduct (Andy Rubin, reportedly $90 million; Amit Singhal, reportedly $35 million), followed by a $310 million 2020 shareholder-derivative settlement; and (iii) the structural role of the American Arbitration Association as a repeat-corporate-customer forum that, by Plaintiff's view, operates as a "pay-to-play" adjudicator against individual reporters. [Ex. 63 — "The Predator's Playground" op-ed (Jan. 23, 2026).] The op-ed does not name Eric Schmidt, does not describe any specific encounter between Schmidt and Plaintiff, and does not attribute any specific act to Schmidt. It is, in form and content, the kind of cultural and industry-critical commentary for which the First Amendment provides the broadest constitutional protection. See *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964); *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990); *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (speech on matter of public concern is "at the heart of the First Amendment's protection" and "occupies the highest rung of the hierarchy of First Amendment values").

331.    **The op-ed's thesis has been proven, in real time, on the record of the very proceeding in which the arbitrator purported to punish it.** The central thesis of the op-ed — that wealthy men and their institutional enablers in the

COMPLAINT

technology industry use capital, arbitration, economic coercion, and reputation-assassination to silence women who report on sexual misconduct — was validated in real time by the very proceeding Defendants were then conducting against Plaintiff, and by Defendants' own documented conduct: (i) the arbitrator's $8,080,138 "mitigation damages" component is an earmarked prospective budget for "12 months of work through paid media to repair Schmidt's reputation" (Interim Award, p. 37) — i.e., a court-funded narrative-assassination campaign directed at a rape reporter, precisely the mechanism the op-ed identified; (ii) the $28,000 post-decision arbitrator-compensation invoice disclosed in the April 21, 2026 AAA Transmission Letter (Ex. 62) is precisely the "pay-to-play" compensation structure the op-ed identified; (iii) Glaser Weil LLP — counsel for Schmidt — is the same firm the op-ed identified as a repeat representative of high-powered men accused of sexual misconduct (including Harvey Weinstein and Charlie Walk); (iv) the conduct of Knox Networks, Inc. and Natalya Thakur — terminating Plaintiff's professional standing, retracting her equity, and circulating adverse characterizations of her — is precisely the economic-entanglement silencing mechanism the op-ed described; and (v) the collective conduct of Schmidt, Hillspire, and Glaser Weil — the seizure of StarX and Audem (Parts IV.A–IV.C), the Schedule D recantation apparatus (Part IV.F), the AAA coercion (Part IV.I), the property-conversion theory (Interim Award

pp. 27–28), and the reputation-mitigation remedy (Interim Award pp. 36–38) — constitutes a live-case demonstration of the op-ed's thesis. The op-ed therefore is not refutable on the record of this proceeding; it has been proven by the very conduct that Defendants and the arbitrator now seek to punish it for describing.

332.    **The arbitrator's "veiled reference" finding is unconstitutional on its face.** The Interim Award treats the "Predator's Playground" op-ed as a "veiled reference" to Schmidt (Interim Award pp. 40–41) and uses that characterization as part of the predicate for both the defamation-per-se liability theory and the $8,080,138 PR-campaign remedy. A privately-compensated arbitrator, ruling on a pro se party precluded from presenting evidence, cannot constitutionally convert non-named industry commentary into actionable defamation by labeling it "veiled." The constitutional rule the "veiled reference" theory tries to circumvent — *Rosenblatt v. Baer*, 383 U.S. 75 (1966), and its requirement that a defamation plaintiff be specifically identifiable to a reasonable reader from the speech itself — precludes the arbitrator's ruling as a matter of constitutional law.

333.    **The arbitrator's additional finding that Plaintiff was "not … for the benefit of victims at large" and engaged in "self-centered efforts to obtain revenge" is a viewpoint-based ad hominem attack on public-concern speech.** Beyond the "veiled reference" finding, the arbitrator made an additional,

independent, and more sweeping viewpoint-based finding that the op-ed was not bona fide public-concern speech at all. In the arbitrator's own words:

*"Ritter chose to use a very public forum to manipulate this system for her own personal benefit — not for the benefit of victims at large. And she did so, knowing that she had contractually agreed not to turn her personal situation into headline news. ...* **One can legitimately argue that the justice system for victims of sexual assault is not fair; one can also conclude that Ritter engaged in self-centered efforts to obtain revenge against Schmidt in a way that was more damaging than helpful to her cause.***" (Interim Award, p. 41.)*

334.    That passage is a textbook example of a privately-paid adjudicator adjudicating the *motive* behind a published work of public-concern commentary. First, the finding that Plaintiff did not speak "for the benefit of victims at large" but for "her own personal benefit" is a pure viewpoint-based judgment concerning the worthiness of Plaintiff's speech, which the First Amendment forbids a state-entangled adjudicator to make. *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992); *Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819 (1995). Second, the finding is not supported by any evidence; Plaintiff had been R-60-precluded from presenting any. An adjudicator cannot know the speaker's state of mind without evidence, and none was recited in the Award. Third, the ad*

*hominem characterizations — "self-centered," "revenge," "more damaging than helpful" — are precisely the delegitimizing adjudicator labels the First Amendment bars a government-connected adjudicator from using to punish speech on a matter of public concern. See* Snyder v. Phelps\*, 562 U.S. at 452. Fourth, the arbitrator's characterization is demonstrably false on the record of this proceeding: Plaintiff has, by writing the op-ed, speaking publicly, filing her LASC complaint, writing to Congress, and bringing this federal action, concretely advanced the interests of survivors and whistleblowers in exactly the class of cases Congress had in mind when it enacted the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act (EFAA), 9 U.S.C. §§ 401–402. The arbitrator's contrary finding — that Plaintiff was, in effect, a bad advocate for sexual-assault victims — is a viewpoint judgment that the Constitution commits to public discourse and to Congress, not to a privately-paid arbitrator.

**L.2  *The February 10, 2026 Whistleblower Letter to Congress — Petition-Clause Speech Grounded in Firsthand Forensic Experience***

335.    **The Letter was, in form and substance, a whistleblower communication to Congress.** On February 10, 2026, Plaintiff transmitted and published a "Letter to the Honorable Members of the United States Congress, including the United States Senate and House of Representatives." [Ex. 64 —

Plaintiff's February 10, 2026 Letter to Congress.] The Letter is, on its face and by express caption, a "Request for Congressional Oversight" into four subjects of plain federal and national importance: (i) "Epstein Files" and related integrity risks to federal investigations; (ii) "Evidence Integrity" across digital platforms; (iii) "Whistleblower Suppression via Arbitration"; and (iv) "Google's Data Alteration and Risks to Federal Investigations Involving Google-Hosted Records." (Ex. 64, p. 1.) The Letter expressly asks Congress to "initiate oversight and inquiry into these matters before further compromise of federal investigations, victims' rights, and the integrity of digital evidentiary systems occurs," and offers "technical evidence, sworn testimony, and full cooperation to assist Congress." (Ex. 64, p. 3.) On any fair reading that is whistleblower speech — an individual with firsthand knowledge of conduct she believes to be unlawful or institutionally dangerous, reporting that conduct to the federal legislative branch and offering cooperation with federal oversight.

336.    **The Letter was grounded in Plaintiff's firsthand experience of digital deletion, data alteration, DocuSign fraud, and intellectual-property theft — not in speculation.** Each principal allegation in the Letter is predicated on Plaintiff's direct, firsthand experience of institutional conduct particularized elsewhere in this Complaint. It is not, as the Interim Award characterizes it, abstract or imagined:

COMPLAINT

337. **Server-side data alteration of Google-hosted records.** As pleaded in Parts IV.A, IV.D, and IV.E, Plaintiff personally experienced the server-side seizure, lockout, password-change, and alteration of communications, documents, and administrator-controlled artifacts within the steelperlot.com Google Workspace and associated Google environments after authorization to access those systems was revoked. The specific technical indicators — including the retained JAMF and TeamViewer control pathways pointed to hillspire.jamfcloud.com, CGNET-administrator credential retention across steelperlot.com, starx.com, and audem-mgmt.com, and post-revocation password and session control — are described in the April 9, 2026 Declaration of Bruce Pixley (Ex. 2). Those indicators are the same class of institutional-operator backdoor capabilities that the Letter described to Congress. When the Letter refers to "Google's internal logging architecture [being] intentionally limited, materially constraining post-hoc forensic auditing and shielding institutional exposure for evidentiary manipulation" (Ex. 64, p. 2), it is describing conditions Plaintiff documented in her own records.

338. **DocuSign fraud used to attempt to coerce a false sworn declaration.** As pleaded in Parts IV.B and IV.F, Plaintiff personally experienced the use of the DocuSign tenant (to which Hillspire-side actors had retained administrator access) (i) to circulate the purported March 17, 2022 Audem Services Agreement

that Plaintiff never assented to and never signed, but that was later invoked as a jurisdictional predicate against her; and (ii) to structure the December 4, 2024 Settlement Agreement with an attached Schedule D recantation declaration whose delivery was conditioned on the final tranche of Plaintiff's own promised settlement payments. The Schedule D mechanism is the precise "declaration restricting disclosure" the Letter identified to Congress as a coercive instrument — in Plaintiff's case, a DocuSign-delivered instrument designed to extract a sworn recantation of Plaintiff's 2024 sexual-assault report in exchange for her own promised money (see Part IV.F and Count IX).

339.    **Intellectual-property theft through the Google Workspace environment.** As pleaded in Parts IV.E.2 and IV.I, in or about April 2025, StarX Networks, Inc. intellectual property residing within the steelperlot.com Google Workspace environment was transmitted to an OpenAI employee. That transmission is a documentary, non-speculative theft of a reporter-whistleblower's proprietary work product effected through the same Google infrastructure the Letter asked Congress to examine.

340.    **Anomalies in the DOJ's Epstein-file productions that matched anomalies Plaintiff had observed in her own records.** The Letter's principal technical allegation is that "the same technical trace indicators of Google server-side data alteration that [Plaintiff] documented in [her] own litigation against

COMPLAINT

Eric Schmidt and Google appear to be consistent with anomalies in … portions of the DOJ's Epstein-related email records" (Ex. 64, p. 1). That allegation rests on Plaintiff's own binary-level forensic review of her own records — including unexpected hashmark patterns, byte-order-mark anomalies, PDF incremental-save sequences at intervals (13 seconds apart) consistent with automated scripting rather than with human editing, and DocuSign PKCS7-signed byte-range inconsistencies — and her comparison of those indicators to anomalies observable in publicly-released DOJ Epstein-file materials. The underlying forensic methodology is documented in the Pixley Declaration (Ex. 2) and in the FEA8 forensic record. The Letter's supplemental observation — that one of Schmidt's documented aliases, "Eric Ross," appeared in December 2025 DOJ releases but appeared much less often in late-January 2026 DOJ releases after being flagged to Schmidt and Google (Ex. 64, p. 1 n.1) — is a reporting observation about the public record, not a fabrication.

341. **Server-side spoliation concerns are not novel — they parallel concerns previously raised in related sexual-abuse litigation.** Plaintiff's concerns about server-side evidence spoliation in sexual-abuse-adjacent litigation are consistent with concerns previously raised in *Giuffre v. Maxwell*, in which questions regarding spoliation and server-side manipulation of digital records were squarely raised in the course of that sexual-abuse litigation. The

Letter's central premise — that digital records hosted on a single dominant institutional operator's infrastructure can be altered in ways that defeat chain-of-custody and post-hoc forensic auditing — is supported by an existing litigation and academic record concerning exactly that class of integrity risk.

342.    **Speaking on behalf of sexual-assault victims and whistleblowers, not only herself.** The Letter is expressly framed not as a personal grievance but as a plea for oversight benefiting "whistleblower actions, sexual assault and harassment investigations, and federal matters of national importance" (Ex. 64, p. 1), and as a warning that "the evidence or digital records that Congress is viewing may have been subject to alteration prior to presentation, previewed illegally by some of Epstein's co-conspirators and clients, and prepared such that some well-placed individuals will likely be held unaccountable" (Ex. 64, p. 2). That is a petition in the interest of victims at large — directly contrary to the arbitrator's characterization that Plaintiff spoke only for "her own personal benefit — not for the benefit of victims at large" (Interim Award, p. 41).

343.    **Absolute Petition-Clause and Noerr-Pennington protection.** Petitioning Congress is "the paradigmatic exercise" of the First Amendment's Petition Clause. *BE&K Constr. Co. v. NLRB, 536 U.S. 516, 525 (2002). Such petitioning is entitled to absolute immunity from private-law punishment under California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510*

*(1972), and* Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.\*, 365 U.S. 127 (1961). No "sham" exception applies because (i) Plaintiff is not a repeat petitioner at all — she is the defaulted respondent in the AAA matter; (ii) the Letter does not seek any adjudicatory outcome against Schmidt or any private party but rather legislative oversight of a national institutional question; and (iii) the Letter's substantive claims are supported by the forensic record pleaded above, by parallel litigation, and by the public enforcement record concerning Google's data-handling practices.

344.     **Independently protected as whistleblower speech.** The Letter is additionally protected as a whistleblower communication to Congress. It identifies Plaintiff as a person with firsthand knowledge of conduct she believes to implicate federal investigations, corporate governance, tax compliance, and the integrity of digital evidentiary systems (Ex. 64, pp. 1–2). It communicates that information to Members of Congress and offers cooperation with federal oversight. That is whistleblower speech within the meaning of the federal whistleblower-anti-retaliation framework, including without limitation 18 U.S.C. § 1513(e) (retaliation against informants), 18 U.S.C. § 1514A (Sarbanes-Oxley whistleblower protection) to the extent applicable to a subject employer and its affiliates, and 15 U.S.C. § 78u-6 (Dodd-Frank whistleblower protection) to the extent applicable. Adjudicating and punishing such speech through a

COMPLAINT

private-law defamation-per-se finding at the suit of the alleged wrongdoer is the exact mischief those federal regimes were enacted to prevent.

345. **The arbitrator's "confabulation or intentional fabrication" finding is impermissible adjudication of whistleblower-petition content.** The Interim Award characterizes the Letter to Congress as "confabulation (unconscious fabrication, distortion, or misinterpretation of memory) or intentional fabrication" (Interim Award, p. 43), and at the April 17, 2026 oral hearing, the arbitrator, on Plaintiff's recollection subject to confirmation from the hearing record, characterized the Letter's allegations concerning Google's server-side data-alteration and administrative-backdoor capabilities as "fantastical" and, in words or substance, as describing a "magical backdoor." [Ex. 66 — April 17, 2026 AAA Oral-Hearing record.] Each of those characterizations is independently a per se violation of the First Amendment as applied through the Fourteenth Amendment and a per se excess of arbitral power under 9 U.S.C. § 10(a)(4):

346. **Evidence-preclusion posture.** The characterizations were made on a record from which, as of the March 13, 2026 R-60 Order, Plaintiff had been "precluded from presenting any evidence in her defense." The arbitrator could not, and did not, examine any forensic evidence corroborating the Letter's allegations because she had ordered that no such evidence could be presented.

Finding the Letter "confabulation" or "fantastical" on a no-evidence record is a textbook failure of adjudicative judgment on the record. *Morgan v. United States*, 298 U.S. 468, 481 (1936); *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

347. **Improper assignment of motive and adjudication of the speaker's state of mind.** "Confabulation" is a psychiatric term of art connoting an unconscious mental process. "Intentional fabrication" is, in context, a quasi-criminal accusation. To characterize speech as one or the other, an adjudicator must make a finding about the speaker's state of mind. The arbitrator had no evidentiary basis to know Plaintiff's state of mind — Plaintiff had been barred from presenting any evidence, including any evidence bearing on her own understanding of her allegations — and the Award recites none. Assigning motive to a pro se petitioner on a no-evidence record, against the absolute Petition-Clause protection, (i) violates the First Amendment when directed at public-concern or petition speech, see *Milkovich*, 497 U.S. at 19–20; (ii) reflects evident partiality under 9 U.S.C. § 10(a)(2); and (iii) exceeds the arbitrator's powers under 9 U.S.C. § 10(a)(4).

348. **One-sided prove-up, exploited by Claimants to mislead the tribunal.** The arbitrator's adverse characterizations emerged from a one-sided "prove-up" hearing at which Plaintiff could present no evidence, Schmidt/Hillspire/Glaser Weil witnesses submitted seven unchallenged declarations and 74 exhibits

227
COMPLAINT

(Interim Award p. 9), and the arbitrator credited every Schmidt-side declaration and treated the cumulative weight of unchallenged declarations as proof of the falsity of Plaintiff's Letter. On Plaintiff's pleading, Schmidt, Hillspire, and Glaser Weil intentionally exploited the one-sided prove-up to make statements the Plaintiff was structurally barred from rebutting; the arbitrator's default posture of giving weight to every Schmidt-side declaration converted that structural asymmetry into the Award's fact-findings. *Armstrong*, 380 U.S. at 552.

349.    **"Fantastical" and "magical backdoor" as viewpoint labels.** Describing a whistleblower's allegations concerning Google-scale server-side data-alteration capabilities as "fantastical" or a "magical backdoor" — without examining the forensic evidence, and over the First Amendment's categorical protection for petition speech — is precisely the kind of delegitimizing viewpoint label that *Rosenberger*, 515 U.S. 819, and *R.A.V.*, 505 U.S. 377, forbid a state-entangled adjudicator from deploying against protected speech. The substance of Plaintiff's "backdoor" allegation is corroborated by the enterprise-class JAMF and TeamViewer management pathways on Plaintiff's personal laptop pointed to hillspire.jamfcloud.com (Ex. 2), by the CGNET administrator-credential retention, and by the public enforcement record concerning Google's data-handling practices, including the $1.4 billion Texas privacy settlement (2025)

and the €2.95 billion EU antitrust fine (2025). The "magical backdoor" is neither magical nor fantastical; it is documented.

### L.3  Plaintiff's 2024 Private Sexual-Assault and Sexual Harassment Report

350.    As alleged throughout this Complaint, in 2024 Plaintiff privately reported that Eric Schmidt had sexually assaulted her. That report was made within the categories of speech most strongly protected by the First Amendment: reporting of alleged criminal conduct to those equipped to respond, and reporting of workplace sexual misconduct. The federal statutory scheme reflects the same protection: EFAA, 9 U.S.C. §§ 401–402, withdraws such reports from pre-dispute arbitration at the reporter's election; and California Code of Civil Procedure §§ 1001–1002 and California Civil Code § 1670.11 prohibit pre-dispute or settlement provisions that silence factual disclosures concerning sexual-misconduct reports or that prevent testimony under legal process. Adjudication of that report as "defamation per se" by a privately-paid arbitrator, on a record from which the reporter had been R-60 precluded from presenting evidence, is a content-based private-law punishment of constitutionally and statutorily protected speech.

### L.4  Use of Sections L.1 through L.3

351.    The three categories of speech addressed in Sections L.1 through L.3 (the op-ed, the Whistleblower Letter to Congress, and the 2024 private sexual-assault

report) are pleaded as: (i) evidence of the arbitrator's jurisdictional overreach in Count XIII; (ii) affirmative constitutional grounds for vacatur under the federal-question anchor in Count XIII, supporting Grounds 1 (EFAA), 4 (First Amendment), and 5 (Fifth Amendment) as pleaded in Part IV.K; (iii) non-actionable conduct, as a matter of constitutional law, for purposes of the defamation-per-se, aiding-and-abetting, operational-fraud, and anti-silencing theories in Counts VI, VIII, IX, X, and XII; (iv) identified defamatory characterizations by the arbitrator herself — including the "self-centered efforts to obtain revenge," "not … for the benefit of victims at large," "confabulation or intentional fabrication," and "fantastical / magical backdoor" characterizations — that Defendants intend to re-publish through the $8,080,138 Eric Rose paid-media campaign and that are accordingly actionable against Schmidt, Hillspire, Glaser Weil, and their agents as planned republication in Count XII; (v) evidence of Defendants' and the arbitrator's assignment of motive to Plaintiff without any evidentiary basis, supporting the evident-partiality vacatur ground in Count XIII and the state-of-mind-fabrication element of the defamation claim in Count XII; and (vi) evidence of the First-Amendment-protected, Petition-Clause-protected, and whistleblower-protected nature of the speech for which Defendants seek, through the PR-campaign-funding award, to punish Plaintiff.

*L.5    Post-Award Escalation — Platform Shadow-Banning, Google Search De-Indexing, and DMCA-Based Silencing as Continuing First-Amendment and Whistleblower-Retaliation Injuries*

352.    **The Interim Award was not the terminal act of silencing; it initiated an escalating, platform-level, extra-adjudicatory silencing campaign.** The $8,080,138 "reputation-mitigation" award directed at Plaintiff's First-Amendment-protected speech (Interim Award pp. 36–38) did not stand alone. On information and belief, in the days immediately preceding and immediately following the April 17, 2026 AAA prove-up hearing and the April 20, 2026 issuance of the Interim Award, Plaintiff's constitutionally protected speech — and particularly the Predator's Playground op-ed, the Whistleblower Letter to Congress, and the ongoing reporting concerning Schmidt, Google, and AAA-forum weaponization — has been systematically suppressed on platforms where Schmidt, Hillspire, and Google exercise control, direct influence, or established channel relationships. That suppression has taken at least three concrete forms, each pleaded as continuing First-Amendment, CFAA, SCA, and common-law retaliation injury.

353.    **X (formerly Twitter) platform-level visibility restriction of Plaintiff's 2025–2026 posts.** As of April 23, 2026, Plaintiff's verified X account @ritter_perlot contains thirty-eight (38) posts, including Plaintiff's February 13,

2026 post regarding retaliation for her speech, her February 10, 2026 post publishing the Whistleblower Letter to Congress (1,600+ impressions), her January 29, 2026 post publishing "The Predator's Playground" with link to rittermichelle.substack.com (856 impressions), and a series of January–February 2026 posts concerning arbitration, Google, and the Epstein-related data-integrity issues pleaded in Section L.2. [Ex. 67 — X profile screenshots (iPhone, logged-in, Apr. 23, 2026).] When the same profile URL (x.com/ritter_perlot) is accessed from a desktop browser in a logged-out posture, X serves a dramatically different timeline: the platform correctly discloses the post-count of "38 posts" in the header but returns as "most recent" a chronology that terminates at April 2024, with 2025 and 2026 posts entirely absent from the public view. [Ex. 68 — X profile screenshots (desktop, logged-out, Apr. 23, 2026).] That differential is not explainable by pagination, rate-limiting, or logged-out default truncation; it is a platform-level visibility restriction selectively applied to Plaintiff's 2025–2026 content, which is also the Schmidt-critical, Google-critical, and AAA-critical content that Defendants and the arbitrator identified as the object of the $8,080,138 paid-media suppression remedy.

354.    **Google search-result suppression of rittermichelle.substack.com.** As of April 23, 2026, a Google search from a desktop browser for the exact-match string "michelle ritter substack urgent request to congress epstein substack" does

not return rittermichelle.substack.com in the first-page results. The Google results interface displays a strike-through of the term "substack request" and a "Missing:" indicator, confirming that Google's own relevance engine treats a direct query that includes "substack" as one that cannot be satisfied by the obviously on-point rittermichelle.substack.com domain. [Ex. 69 — Google search-results screenshots (Apr. 23, 2026).] The LinkedIn re-publication of the Letter to Congress surfaces; the original, author-controlled Substack publication does not. The result is systematic: Plaintiff's substantive speech is de-indexed from the public-facing record of the internet, while third-party repostings that do not link to Plaintiff's underlying work remain. That asymmetric suppression is the exact "bury Plaintiff's search-engine presence" outcome that the Rose Report and the Interim Award characterized as the intended work product of the $8,080,138 paid-media award (Interim Award pp. 36–38).

355.    **DMCA-architecture abuse — Rulta OU / "camille yuki" notice of April 16, 2026 and the mechanism it exemplifies.** On April 16, 2026 — the day before the AAA prove-up hearing that generated the Interim Award — Google received and processed a DMCA notice, captured in Lumen Database record number 83213332, submitted by Rulta OU (an Estonia-based mass-DMCA-filing vendor) on behalf of "camille yuki," identifying "onlyfans.com" as the "original URL" and demanding delisting of seventeen (17) URLs across

unrelated adult-content aggregator domains. [Ex. 70 — Lumen Database DMCA Notice #83213332 (April 16, 2026).] Plaintiff alleges on information and belief, specifically subject to development through discovery of Google's DMCA-processing logs, that (i) Google's present-day DMCA-compliance architecture is a mass-ingestion, minimal-review pipeline in which Rulta OU-style notices — identifying a single "original" URL, naming a minimally-authenticated rights-holder, and requesting blanket delisting of large numbers of unrelated destination URLs — are acted upon without meaningful verification of either the identity of the complainant or the relationship between the claimed "original" URL and the targeted destinations; (ii) that same mass-ingestion architecture is, on information and belief, the mechanism through which Plaintiff's Schmidt-critical, Google-critical, and AAA-critical speech (including content on rittermichelle.substack.com, LinkedIn, and Instagram) has been de-indexed from Google's public search results as pleaded above; and (iii) the Rulta OU / "camille yuki" notice is pleaded here not as a direct takedown of Plaintiff's content but as an exemplar of the architecture that, on Plaintiff's pleading, Google operates as a private-censorship pipeline accessible to any party willing to route notices through a DMCA-compliance vendor.

356.    **The timing supports the inference of concerted conduct.** Each of the three silencing mechanisms pleaded above — X visibility restriction, Google

234
COMPLAINT

search de-indexing, and DMCA-architecture deployment — escalated in the immediate pre-award and post-award window (mid-April through April 23, 2026). The Rulta OU DMCA notice is dated April 16, 2026, one day before the April 17, 2026 AAA oral hearing at which the arbitrator called Plaintiff's Google-backdoor allegations "fantastical." The Interim Award issued four days later (April 20, 2026) contains the $8,080,138 prospective PR-campaign remedy whose purpose is expressly to "repair Schmidt's reputation" through paid media (Interim Award p. 37, quoting Rose Report). The three are pleaded as coordinate mechanisms of the same suppression enterprise, with the Award providing the financial and decretal backing for platform-level actions that Google, X, and affiliated vendors took or are taking in the same temporal window.

357.    **These platform-level acts are independent continuing violations; they are not litigation steps.** The suppression described in this Section L.5 is not the lawful execution of any adjudicated judgment. No court or arbitrator has ordered X to hide Plaintiff's 2025–2026 posts; no court or arbitrator has ordered Google to de-index rittermichelle.substack.com; no court or arbitrator has ordered a DMCA takedown of any of Plaintiff's writings. These acts are extra-adjudicatory platform-level silencing, executed by private institutional actors with whom Defendants Schmidt, Hillspire, and the Enterprise have established business, investor, director, affiliate, or channel relationships. They are therefore

separately actionable as (a) continuing First-Amendment injury supporting vacatur Ground 4 in Count XIII and informing the injunctive relief sought in the Prayer; (b) continuing defamation, false-light, trade-libel, and tortious-interference injury in Count XII, both as evidence of Defendants' intent and capability to effectuate the $8,080,138 Rose-budgeted paid-media campaign and as actual concrete disparagement injury during the pendency of this action; (c) continuing CFAA, SCA, and Wiretap injury in Counts I, II, and III to the extent the X, Google, and DMCA-architecture suppression involves access to, alteration of, or interference with Plaintiff's authored content on platforms on which Plaintiff is the authenticated account-holder and authorized speaker; (d) predicate conduct for a new DMCA-misrepresentation claim under 17 U.S.C. § 512(f) as pleaded in Count XIV, to the extent that DMCA notices directed at Plaintiff's content contain material knowing misrepresentations actionable under *Lenz v. Universal Music Corp.*, 815 F.3d 1145 (9th Cir. 2016); and (e) pattern evidence supporting the Enterprise and continuity elements of any future civil RICO count (reserved per Part VIII).

358.    **Standalone significance: Google as an integrated instrument, not a neutral platform.** Defendant Schmidt is the former Chief Executive Officer and former Executive Chairman of Google and Alphabet. His family office (Hillspire) is staffed by and in continuous contact with Google-related personnel,

as pleaded in Parts IV.A and IV.E. The Letter to Congress (Ex. 64) is directed at the Google-hosted data-integrity problem specifically because Google is the dominant repository of communications, evidence, and corporate records relevant to federal investigations, sexual-misconduct accountability, and public discourse. When the platform that is the subject of the whistleblower speech is also the platform on which that speech is suppressed, the First-Amendment injury is not incidental — it is the central injury. The suppression pleaded in this Section L.5 is the empirical confirmation, during the pendency of the arbitration and of this Complaint, of the whistleblower thesis the arbitrator labeled "fantastical" (Interim Award p. 43).

359.    **Preservation demand.** All Defendants, and all persons and entities acting in concert with them — including without limitation Alphabet Inc. / Google LLC, X Corp., Substack Inc., LinkedIn Corporation / Microsoft Corporation, Meta Platforms, Inc. (Instagram, Threads, Facebook), Rulta OU, and "camille yuki" (a name treated here as an identifier pending confirmation of any underlying natural-person claimant) — are hereby placed on formal preservation notice as to all records, communications, logs, content-moderation decisions, visibility-restriction determinations, DMCA submissions, DMCA determinations, ex parte communications with Schmidt-aligned actors, and all

internal policy documents relating to Plaintiff's accounts and content on their respective platforms, from January 1, 2024 through the conclusion of this action.

## L.6  The HILTZIK PR Apparatus — Three Years Of Directed Narrative Harm

360.    **Retention, scope, and continuity.** On information and belief, in or about 2022, Defendant Hillspire retained Defendants Matthew Hiltzik and Hiltzik Strategies, LLC, to manage Defendant Eric Schmidt's public-narrative exposure in relation to Plaintiff. The retention has continued without interruption through the filing of this Complaint. The scope of the retention, as understood by Plaintiff on information and belief, includes: (a) monitoring all press inquiries concerning Schmidt, Plaintiff, SPM, StarX, Knox, and the Schedule D / Settlement / Amendment architecture pleaded in Part IV.F; (b) coordinating reporter responses on behalf of Schmidt and Hillspire; (c) seeding, shaping, and amplifying media and social-media narratives about Plaintiff; and (d) participating in the broader Glaser-Weil-directed silencing and economic-extortion strategy pleaded throughout Parts IV.A, IV.F, IV.H, IV.I, IV.K, and IV.L.

361.    **The January 9, 2025 WSJ-inquiry episode.** On or about January 9, 2025, Hiltzik received a *Wall Street Journal* reporter inquiry concerning Plaintiff's sexual-assault and sexual-harassment allegations. (Interim Award pp.

15, 30.) On information and belief, Hiltzik thereafter coordinated with Glaser Weil, Hillspire, and Schmidt to supply the WSJ reporter with a non-public "scorned mistress" framing of Plaintiff's allegations, which framing was (a) false and defamatory of Plaintiff; (b) made with actual malice within the meaning of *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), because Hiltzik knew or recklessly disregarded that Plaintiff had made a genuine sexual-assault report to counsel and to authorities; and (c) used as the predicate for the $50,000 "WSJ-disclosure" contractual-breach component of the April 20, 2026 Interim Award (Interim Award pp. 30–31). The $50,000 component is itself a publicly-disclosed, formal admission by Schmidt that Hiltzik's PR conduct was operational to Schmidt's enforcement strategy against Plaintiff and is pleaded as documentary evidence of Hiltzik's paid-agent relationship with Schmidt and Hillspire.

362.    **Continuing narrative work, 2022–2025.** Hiltzik's engagement predated and continued after the January 2025 episode. On information and belief, Hiltzik-directed or Hiltzik-coordinated media placements, social-media activity, and reporter-contact events occurred repeatedly during the 2022–2025 period and targeted Plaintiff's California-based business, professional, and personal relationships, including but not limited to (a) discussions with journalists covering Schmidt and Hillspire; (b) strategic outreach to outlets likely to cover

Plaintiff's StarX, Audem, and SPM roles; and (c) coordination with Schmidt-aligned public-relations actors including Eric Rose and Kelt 6 Strategies. Full particularization of dates, outlets, reporters, specific statements, and internal Hiltzik-Hillspire communications is reserved pending targeted discovery of Hiltzik Strategies records, reporter-contact logs, Hillspire-Hiltzik communications, and Rule 26(a)(1) disclosures.

363.    **The $8,080,138 prospective paid-media campaign.** The Interim Award's $8,080,138 prospective reputation-mitigation budget (Interim Award p. 37, quoting the Rose Report: "12 months of work through paid media to repair Schmidt's reputation") is, on information and belief, a campaign in which Hiltzik and Hiltzik Strategies are expected recipients, sub-contractors, or coordinating principals. The injunctive relief sought in Part VII expressly enjoins Hiltzik's prospective participation in that campaign, because Hiltzik's three-year antecedent narrative work laid the foundation the $8,080,138 budget is scheduled to amplify. Each planned media placement under that budget is an independent act of republication for which Hiltzik will be strictly liable under Restatement (Second) of Torts § 578, and each is accomplished with actual malice because the underlying arbitral findings were procured from a tribunal that had precluded Plaintiff from presenting evidence under AAA Commercial Rule R-60.

364.    **Economic-extortion architecture.** Hiltzik's continuing availability as a press-placement channel was part of the coercion architecture by which Schmidt-side actors procured Plaintiff's December 4, 2024 Settlement Agreement, Schedule D declaration, and December 17, 2024 Amendment. On information and belief, Schmidt-side counsel and principals, in negotiations with Plaintiff and Plaintiff's successive counsel, referred to, implied, or relied upon the existence of Hiltzik's ongoing reputation-management operation and the attendant risk that Plaintiff's public reputation would be further damaged absent her signature on the silencing instruments pleaded in Part IV.F. That conduct is pleaded as (a) aiding and abetting fraud and fraudulent inducement under Count VIII; (b) abuse of process under Count XI; (c) Bane Act coercion under Count X; and (d) defamation-adjacent intentional interference with prospective economic advantage under Count XII.

**M.  Constitutional Foundations — First, Fifth, And Fourteenth Amendments; State-Action Entanglement; Digital-Era Private-Censorship Doctrine; Right To Receive Information; DMCA As Private-Censorship Instrument**

365.    This Section IV.K pleads the constitutional foundations that anchor Count XIII    (Declaratory    Relief    and    Vacatur)    and    Count    XIV    (DMCA

Misrepresentation), and that inform the equitable defenses and relief across Counts I, II, III, V, VIII, IX, XII, , and XIV.

### M.1  First Amendment — Content and Viewpoint Punishment of Protected Speech

366.    The Interim Award purports to impose $10,744,999 in damages, of which $8,080,138 is an earmarked budget for a public-relations campaign to suppress Plaintiff's search-engine presence, on speech consisting of: (i) an industry-critical op-ed that did not name Defendant Schmidt (Part IV.J.1); (ii) a whistleblower petition to Members of Congress concerning retaliatory silencing and Google-hosted data-integrity risks (Part IV.J.2); and (iii) Plaintiff's 2024 private report that Schmidt had sexually assaulted and harassed her (Part IV.J.3). All three categories are within the core protection of the First Amendment. See *New York Times v. Sullivan*, 376 U.S. 254 (1964); *BE&K Constr. Co. v. NLRB, 536 U.S. 516 (2002);* Snyder v. Phelps, *562 U.S. 443 (2011). The Award's imposition of PR-campaign damages to counter-speak the Plaintiff into invisibility is a content-based and viewpoint-based punishment on its face. See* R.A.V. v. City of St. Paul, *505 U.S. 377 (1992);* Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995).

367.    **Viewpoint-based ad hominem findings.** The Award's independent findings that Plaintiff was "not … for the benefit of victims at large" and engaged in "self-centered efforts to obtain revenge" (Interim Award p. 41), and that her

Letter to Congress was "confabulation … or intentional fabrication" (Interim Award p. 43) " fantastical" or a "magical backdoor" (Apr. 17, 2026 hearing), are viewpoint-based judgments concerning the worthiness and motive of Plaintiff's speech. The First Amendment forbids a state-entangled adjudicator from issuing such judgments as grounds for monetary penalty or injunctive remedy.

**M.2   Fifth Amendment — Adverse Inference Against Exercise of the Privilege in Quasi-Criminal Proceeding**

368.    As pleaded in Part IV.I.6, the arbitrator drew adverse inferences against Plaintiff on the defamation-per-se liability pillar because Plaintiff did not testify or produce evidence contesting the false-accusation theory. The Interim Award's "clear and convincing" defamation-per-se finding is quasi-criminal in character — it mirrors the elements and burden of proof for Cal. Penal Code § 148.5 (false report) and Cal. Penal Code § 518 (extortion), and has been publicly characterized, and will on Plaintiff's pleading be used, as a de facto finding of criminal-level wrongdoing against Plaintiff. Drawing adverse inferences from silence in such a proceeding violates the Fifth-Amendment rule of *Griffin v. California*, 380 U.S. 609 (1965), applied through the Fourteenth Amendment. That an arbitrator, rather than a court, drew the inference does not cure the constitutional infirmity; it aggravates it, because the arbitrator is operating under

color of a state-enforced (California Arbitration Act / California Code of Civil Procedure) and federally-supervised (FAA) regime.

### M.3  Fourteenth Amendment — Due Process and Pay-to-Play Adjudication

369.    A fundamental requirement of due process is a neutral decisionmaker. See *Tumey v. Ohio*, 273 U.S. 510 (1927); *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009); *In re Murchison*, 349 U.S. 133 (1955). An adjudicator who is compensated directly by one party at her own rate-estimate, while ruling on the evidence-preclusion, liability, and damages of the other party (a pro se plaintiff), violates the core due-process neutrality requirement. The $28,000 invoice disclosed in the April 21, 2026 AAA Transmission Letter (Ex. 62) is facially sufficient to establish the due-process defect.

370.    **Poverty-bar default.** The due-process violation is independently established by the nonpayment-driven R-60 default: a pro se woman was stripped of her entire defensive record for inability to pay AAA-demanded forum fees that the accused had already paid, in a proceeding resulting in $10,744,999 in damages against her. See *Boddie v. Connecticut*, 401 U.S. 371 (1971) (due-process prohibition on poverty-based denial of adjudicatory access).

### M.4  State-Action Entanglement — Shelley, Lugar, Edmonson

371.    Defendants may argue that private arbitration is "private" conduct to which the Constitution does not apply. Plaintiff pleads three independent state-

action theories that defeat that defense: (a) the Interim Award is enforceable only through judicial confirmation under 9 U.S.C. § 9 and analogous California Code of Civil Procedure provisions, and any judicial confirmation constitutes state action on the terms of the Award itself (*Shelley v. Kraemer*, 334 U.S. 1 (1948)); (b) the arbitrator is selected through, and her awards processed through, a pervasive state-law scheme (the California Arbitration Act and the Federal Arbitration Act) that confers quasi-judicial authority on a private actor (*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982)); and (c) the private actor exercises a power "traditionally the exclusive prerogative of the State" — the binding adjudication of disputes concerning alleged defamation — sufficient to invoke the state-action doctrine under *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974), and *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991). Each theory independently supports the application of the First, Fifth, and Fourteenth Amendments to the conduct alleged in Part IV.I.

### M.5  Digital-Era State Action — Platform Suppression Operating Under Federal Safe-Harbor Immunity and Arbitral Decretal Backing

372.    The shadow-banning, search-engine de-indexing, and DMCA-based suppression pleaded in Part IV.J.5 implicates a state-action framework distinct from and additional to the Shelley / Lugar line. This framework rests on three doctrinal sources:

373. **Halleck distinguished — platforms acting under government-created immunity and in concert with decretal remedies.** *Manhattan Community Access Corp. v. Halleck*, 587 U.S. 802 (2019), holds that private platforms are not per se state actors merely because they are open to the public. Halleck is distinguishable where (i) the platform operates a private-censorship instrument created and immunized by Congress (the DMCA safe harbor, 17 U.S.C. § 512), and (ii) the platform acts in concert with or in anticipation of a decretal remedy (the $8,080,138 Interim Award) whose confirmation under 9 U.S.C. § 9 and California Code of Civil Procedure § 1285 would itself be state action. The *Halleck* limit was never intended to immunize the hybrid public-private suppression architecture operating here.

374. **Jawboning and coercion of private intermediaries.** *National Rifle Ass'n v. Vullo*, 602 U.S. 175 (2024), reaffirmed that government coercion of a private intermediary to suppress disfavored speech violates the First Amendment even when the coercion operates through private-party action. The analogue here is doubled: (a) the arbitrator, operating under state-entangled authority, has decreed a $8,080,138 remedy earmarked for suppression of Plaintiff's speech through paid-media counter-speech; and (b) the same arbitral finding, together with direct communications from Schmidt-aligned parties to Google, X, and DMCA vendors, pressures those intermediaries to effectuate the suppression. See also

COMPLAINT

*Bantam Books v. Sullivan*, 372 U.S. 58 (1963) (informal government pressure on private intermediaries to suppress protected speech is state action).

375.    **Platform speech vs. conduit suppression.** *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), recognizes that platform content-moderation is expressive activity protected by the First Amendment. That recognition does not shield suppression where the platform is acting as a conduit for a government-entangled suppression directive, where the platform is acting in concert with a decretal remedy, or where the platform's moderation is itself the product of bad-faith DMCA submissions procured by the party whose speech-adverse decree is being effectuated. *Moody* accordingly sets the terrain on which Plaintiff's L.5 theory operates; it does not foreclose it.

### M.6 The Public's First-Amendment Right to Receive Whistleblower Information

376.    The First Amendment protects not only the speaker but also the listener. When a decretal remedy and coordinated platform-level suppression combine to remove Plaintiff's whistleblower speech from the searchable record of the internet, the injury is not Plaintiff's alone — it is the public's. See *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (right to receive information is "fundamental to our free society"); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390 (1969) ("It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount."); *Lamont v. Postmaster General*, 381 U.S.

301 (1965); *Board of Education v. Pico*, 457 U.S. 853, 867 (1982) (viewpoint-motivated removal of material from library shelves violates the First Amendment right to receive).

377.    The audience Plaintiff addressed in the Whistleblower Letter to Congress is Congress itself and the American public concerned with the integrity of federal investigations, sexual-misconduct accountability, and digital-evidence preservation. Platform-level suppression of that speech during the pendency of ongoing federal inquiries into Epstein-related records and Google-hosted data handling is an injury to an audience the First Amendment was written to protect.

## M.7  The DMCA as a Private-Censorship Instrument — 17 U.S.C. § 512(f) and the Lenz Line

378.    Congress created the DMCA notice-and-takedown regime, 17 U.S.C. § 512, as a safe-harbor framework for online intermediaries handling copyright complaints. Section 512(f) provides that "[a]ny person who knowingly materially misrepresents … that material or activity is infringing … shall be liable for any damages … incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by a service provider." The Ninth Circuit in *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1154–55 (9th Cir. 2016), held that a copyright holder must form a subjective good-faith belief that the targeted use is not authorized by fair use before submitting a takedown

COMPLAINT

notice, and that failure to do so is actionable misrepresentation under § 512(f). See also *Online Policy Group v. Diebold, Inc.*, 337 F. Supp. 2d 1195 (N.D. Cal. 2004); *Rossi v. Motion Picture Ass'n of America*, 391 F.3d 1000 (9th Cir. 2004).

379.    **DMCA abuse as content-based suppression of protected speech.** When the DMCA architecture is deployed to suppress commentary, criticism, and whistleblower speech that is obviously not infringing, the architecture functions not as a copyright-enforcement instrument but as a private-censorship instrument. See *Online Policy Group*, 337 F. Supp. 2d at 1204 (DMCA misuse "interferes with the use of [the internet] as a legitimate source of political discourse"). The mass-ingestion, minimal-review architecture pleaded in Part IV.J.5 is precisely the abuse § 512(f) was enacted to deter.

### M.8 Supreme-Court Jurisprudence on Retaliatory Silencing

380.    Plaintiff's claims fit squarely within the line of Supreme Court cases on retaliatory use of private-law remedies and associated doctrines: *NAACP v. Button*, 371 U.S. 415 (1963) (protecting civil-rights petitioning from retaliatory use of private-law remedies); *NAACP v. Alabama*, 357 U.S. 449 (1958) (compelled disclosure chilling associational rights); *Bigelow v. Virginia*, 421 U.S. 809 (1975) (protecting reportorial speech about matters of public concern from private-law punishment); *Bose Corp. v. Consumers Union*, 466 U.S. 485 (1984) (requiring independent appellate review of fact-findings in First-

Amendment cases); *Bartnicki v. Vopper*, 532 U.S. 514 (2001) (First Amendment protects publication of matters of public concern even where the underlying information was obtained unlawfully by a third party); and *Garcetti v. Ceballos*, 547 U.S. 410 (2006), and its workplace-speech progeny. Private-arbitration silencing of a rape reporter through a $10.7-million defamation-per-se ruling, combined with platform-level suppression of her whistleblower speech, is, on Plaintiff's pleading, the kind of private-law instrument the Supreme Court has held unconstitutional when the retaliatory use is established.

381.    **Anticipatory *Noerr-Pennington* rebuttal.** Defendants' deployment of AAA is not protected *Noerr-Pennington* petitioning. Private commercial arbitration is not government petitioning within the meaning of *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), or *United Mine Workers v. Pennington*, 381 U.S. 657 (1965), because arbitrators are not government officials and the FAA's enforcement mechanism does not convert private adjudication into public petitioning. In the alternative, the sham-petitioning exception of *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993), applies: the pattern evidence in *Koebel v. Rundell* (Ex. 65) and the pay-to-play structural evidence in Ex. 62 establish that Defendants' AAA deployment is objectively baseless as applied to its stated dispute-resolution purpose and subjectively intended to silence rather

than to resolve. The *Koebel-Ritter* sequential pattern, repeated against women who reported on Schmidt-aligned sexual misconduct, places this case squarely within the sham exception.

**N.  Present-Tense Injuries And Irreparable Harm — Basis For Injunctive And Provisional Relief**

382.     This Section IV.L consolidates the facts establishing that the injuries pleaded in Parts IV.0 through IV.M are present, continuing, and irreparable, supplying the evidentiary basis for the preliminary-injunction and preservation-order relief sought in Part VI. Plaintiff incorporates each factual allegation above.

383.     **Scheduled speech-suppression campaign.** The April 20, 2026 Interim Award's $8,080,138 component is presently scheduled for execution through Defendant Eric Rose and his firm Kelt 6 Strategies. The Interim Award expressly identifies the sum as "12 months of work through paid media to repair Schmidt's reputation" (Interim Award p. 37, quoting the Rose Report). Once funds are deployed and placements are published, the injury to Plaintiff's reputation and speech environment becomes unringable.

384.     **Ongoing platform-level suppression.** (a) Plaintiff's Substack publication *rittermichelle.substack.com* is de-indexed from Google search results as of April

23, 2026 (Ex. 69, Google SERP capture showing strike-through and "Missing:" indicator on an exact-match query). (b) Plaintiff's 2025–2026 posts on X (@ritter_perlot) are invisible to logged-out users on the same date, although the profile header discloses "38 posts" (Exs. 67–68). (c) A mass-DMCA-vendor notice was routed through Google on April 16, 2026 — one day before the AAA prove-up hearing (Ex. 70, Lumen Database record 83213332). Each of (a), (b), and (c) constitutes present and continuing First-Amendment-relevant injury redressable by injunctive and declaratory relief.

385.     **Ongoing cyber-intrusion.** The January 9, 2026 Gold MacBook Air intrusion — root console login, enterprise Apple-ID IDMS UUID provisioning, and "sysaccount" operational-signature rename — represents current CFAA, SCA, and Wiretap Act injury on a personal device Plaintiff had set up in February 2025 specifically for privileged legal communications (Ex. 2, Pixley Decl.). Absent injunctive relief compelling cessation of JAMF and TeamViewer pathways directed at Plaintiff-owned devices, privileged attorney-client and counsel-preparation communications remain subject to continuing interception.

386.     **Pay-to-play adjudicator compensation in-flight.** The April 21, 2026 Collins Transmission Letter (Ex. 62) discloses that the arbitrator has invoiced the prevailing Schmidt Claimants an additional $28,000 for "completion of this matter" — a direct, post-Award, pay-from-prevailing-party-to-adjudicator

invoice, payable in the days and weeks following the Interim Award. Once paid, that sum becomes a further recoverable injury against Plaintiff and a further emolument flowing from the prevailing party to the decision-maker.

387. **Evidence-preservation urgency.** Several of the digital-forensics anchors (Apple IDMS UUID records tied to specific device Hardware UUIDs, DocuSign PKCS7 signed-byte-range metadata, JAMF command logs, TeamViewer session logs) are subject to provider retention windows measured in weeks, not years. Plaintiff's concurrent preservation letters to Apple, Google, Wells Fargo, JAMF, TeamViewer, and DocuSign are further supported by the preservation orders sought in Part VI.

388. **Chilling effect on continuing Congressional communications.** Plaintiff's February 10, 2026 Whistleblower Letter to Members of Congress (Ex. 64) is a Petition-Clause communication. The April 20, 2026 Interim Award characterizes that Letter as a contractual breach and compounds Plaintiff's exposure for it. Without injunctive relief, Plaintiff is deterred from continued whistleblower communications to Congress and to federal law-enforcement officials. See *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) (pre-enforcement First-Amendment standing where chilling effect is credible).

389. **Continuing post-settlement surveillance.** Private investigators continued to surveil Plaintiff's residences through 2025 and into 2026 (Plaintiff's

Sept. 8, 2025 Decl. ¶¶ 57–58), and Marcus's August 2025 attempt to circumvent Cal. Code Civ. Proc. §§ 1001–1002 by recruiting Plaintiff's former New York counsel to route the coerced Schedule D through non-California-licensed counsel is documented at Part IV.F.6. These facts establish continuing enterprise operation in the present, not merely historical injury.

390.    **Irreparable harm standard is met.** Under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), Plaintiff establishes likely success on the merits of Counts I, II, III, V, IX, and XIII; irreparable harm absent injunctive relief (First-Amendment injuries are per se irreparable under *Elrod v. Burns*, 427 U.S. 347, 373 (1976), and *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)); balance of equities favoring Plaintiff (Defendants are enriched by ongoing suppression; Plaintiff is silenced and financially destroyed); and public interest (enforcing federal statutes and constitutional floors outweighs any private interest in enforcing a pay-to-play arbitral judgment against a sexual abuse and sexual harassment reporter).

## CLAIMS FOR RELIEF

### COUNT I – *Violation of the Computer Fraud and Abuse Act — 18 U.S.C. § 1030*

*Against Schmidt, Hillspire, Google LLC, Matthew Hiltzik (individually, for prospective injunctive relief only), Hiltzik Strategies, LLC (for prospective injunctive relief only), and Does 1–50*

391.    Plaintiff realleges the preceding paragraphs as though fully set forth herein.

392.    This Count is pleaded narrowly as a without-authorization theory based on post-revocation, post-expiration, or never-authorized access. It is not pleaded as an "authorized access used for improper purpose" theory.

393.    **Computer zones pleaded; primary and alternative theories.** Count III is pleaded, primarily, with respect to Plaintiff-owned and Plaintiff-controlled computer zones as to which Plaintiff is the undisputed account holder and right-to-exclude owner under hiQ Labs: (a) the audem-mgmt.com Google Workspace tenant (Audem Management, LLC, of which Plaintiff is the sole member); (b) the starx.com Google Workspace tenant (StarX, Inc., a company Plaintiff founded in May 2020 through Wilson Sonsini before she met Schmidt or any Schmidt affiliate); (c) the DocuSign environments for SPM, Audem, and StarX in which Plaintiff was the named account holder; and (d) Plaintiff's personal laptop subjected to Hillspire-controlled JAMF and TeamViewer enterprise-management pathways pointed to hillspire.jamfcloud.com, as reported by the April 9, 2026 Pixley Declaration. Count III is also pleaded, alternatively, as to

the mritter@steelperlot.com account, on the ground that Plaintiff was the credentialed administrator and user of that account irrespective of the final tenant-ownership question and that the post-authorization lockout, password change, and attempted all-files access constituted access "without authorization" under Nosal II regardless of tenant-level title. Nothing in the April 20, 2026 AAA Interim Award's SPM digital-assets finding resolves Plaintiff's CFAA rights as to the non-SPM tenants and devices, which were not part of the arbitral submission and are outside the scope of any issue properly adjudicated in that proceeding, as detailed in Part IV.I. To the extent Defendants advance the SPM digital-assets finding as preclusive of any CFAA element pleaded here, Plaintiff reserves the right to contest preclusive effect on every applicable ground, including lack of identity of issue, lack of a final judgment on the merits, and the absence in the arbitral record of any adjudication as to audem-mgmt.com, starx.com, Plaintiff's personal laptop, DocuSign, and Wells Fargo channels.

394.    **Elements of the CFAA claim, matched to the facts pleaded.** The civil CFAA claim pleaded here requires, and Plaintiff alleges, that: (i) Defendants intentionally accessed a "protected computer" under 18 U.S.C. § 1030(e)(2) — satisfied by the steelperlot.com, starx.com, audem-mgmt.com, SPM DocuSign, Audem DocuSign, StarX DocuSign, and managed-laptop systems pleaded at Parts IV.A and IV.E, each used in or affecting interstate commerce; (ii) the

access was "without authorization" within the meaning of Van Buren v. United States, 141 S. Ct. 1648 (2021), hiQ Labs, Inc. v. LinkedIn Corp., 31 F.4th 1180, 1196–97 (9th Cir. 2022) (CFAA directed at unauthorized intrusion into computer owner's protected zone, not at misuse of authorized access), and United States v. Nosal, 844 F.3d 1024 (9th Cir. 2016) ("Nosal II") (holding that once authorization to access a computer system is expressly revoked, subsequent access is "without authorization" within the meaning of § 1030(a)(2)) — satisfied because (a) Plaintiff is the computer owner / account holder / right-to-exclude holder within the meaning of hiQ Labs: Plaintiff is the registered administrator of mritter@steelperlot.com, 100% member of Audem LLC (the audem-mgmt.com tenant), founder and principal of StarX, Inc. (the starx.com tenant), account holder of the identified DocuSign environments, and owner/possessor of the managed laptop; (b) Plaintiff's permission to CGNET, Hillspire-side actors, and their agents was limited to technical transition, copying, preservation, or return-of-control purposes and was either revoked earlier (including by the express December 10, 2024 Knopf notice to CGNET, Ex. 28) or expired no later than January 31, 2025; and (c) the specific post-revocation access events pleaded below — the on-or-about December 10, 2024 lockout of mritter@steelperlot.com, the alleged password change, the alleged attempt to access all files, the retained CGNET tenant-administrator credentials

257
COMPLAINT

across steelperlot.com, starx.com, and audem-mgmt.com after revocation, and the continued JAMF/TeamViewer management pathways pointed to hillspire.jamfcloud.com — all post-date revocation or expiration; no concurrent-authorization defense is available because Plaintiff pleads post-revocation and post-expiration access under Nosal II and unauthorized intrusion into her owned/controlled computer zones under hiQ Labs, not misuse of concurrent permission under Van Buren; and no "enterprise-managed environment" defense is available because Plaintiff pleads that the relevant tenants (audem-mgmt.com, starx.com) are owned or controlled by Plaintiff-side entities, not by Hillspire, and because the mritter@steelperlot.com account, managed laptop, and DocuSign environments were Plaintiff's personal accounts and devices, not employer-issued or employer-owned assets subject to enterprise control; (iii) Defendants thereby "obtained information," altered information, impaired access, or caused damage — satisfied by the post-authorization lockout of mritter@steelperlot.com, password change, attempted file access, retained CGNET tenant-administrator credentials, and retained JAMF/TeamViewer control pathways pointed to Hillspire-controlled cloud infrastructure; and (iv) Plaintiff suffered "loss" of at least $5,000 in any one-year period under 18 U.S.C. § 1030(e)(11) — satisfied by the qualifying incident-response, damage-assessment, restoration, credential-recovery, account-integrity, and replacement-

system costs pleaded below, which are pleaded as response-and-restoration costs and not as general litigation costs.

395.    The computers, workspaces, cloud environments, email accounts, DocuSign environments, and devices alleged herein were "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2) because they were used in or affected interstate or foreign commerce or communication.

396.    Plaintiff had lawful access, use, ownership, administrative, possessory, or control rights in the relevant accounts, workspaces, devices, and credentials.

397.    Any permission Plaintiff granted to CGNET, Hillspire-side actors, counsel, or other agents was limited to technical transition, copying, preservation, or return-of-control purposes. It did not authorize indefinite access, lockout, adverse control, export, alteration, deletion, monitoring, credential retention, password changes, remote access, or prevention of Plaintiff's own access.

398.    Authorization expired no later than January 31, 2025 and, for particular systems or acts, expired or was revoked earlier when the purpose-bounded transition task ended or when Plaintiff objected.

399.    **CFAA event map.** The table below identifies the challenged access events on a system-by-system basis. Each event is pleaded as either "access

259
COMPLAINT

without authorization" or as retained access beyond the period for which authorization was granted, and not as misuse of concurrent authorized access.

| System / Account | Plaintiff's Right | Authorized Purpose | Revocation / Expiration | Challenged Access (after revocation/expiration) |
|---|---|---|---|---|
| mritter@steelperlot.com (Google Workspace primary admin) | Primary administrator / account holder | Personal use; ordinary administration | Authorization never granted to any third party to lock out or change password; lockout began on or before Dec. 10, 2024 | Credential use without authorization; alleged password change and attempt to access all files; lockout Plaintiff's authorized access |
| cgnet@steelperlot.com, cgnet@starx.com, cgnet@audem-mgmt.com | Account owner / tenant administrator | Limited technical/operational administrative access | Purpose-bounded; expired no later than Jan. 31, 2025; revoked earlier on objection | Retention or continued use of administrator access beyond the technical-operational purpose |
| DocuSign environments for SPM / Audem / StarX | Account holder / authorized user | Transition, copy, preservation | Transition-purpose expired; revoked on objection and no later than Jan. 31, 2025 | Retained administrator access; use of DocuSign to transmit or purport to complete instruments adverse to Plaintiff |
| Plaintiff's laptop / managed device (macOS) | User / owner / possessor | None granted to remote-management channel | No authorization granted for JAMF cloud management or TeamViewer unattended access during periods alleged | Presence and operation of enterprise device-management pointed to hillspire.jamfcloud.com; TeamViewer configured for unattended access |

400.    **Defendant-by-defendant attribution.** As to each of the systems listed above, Plaintiff attributes the challenged access as follows, pleading on

information and belief based on the records currently available and subject to development through discovery: (i) as to mritter@steelperlot.com (primary Google Workspace administrator account), Hillspire and its agents exercised operational control over the steelperlot.com tenant and directed or caused the post-authorization lockout, password change, and attempt to access all files; Schmidt, as principal of Hillspire, directed or ratified that conduct; Does 1–50 include the individual administrators and operators who executed the lockout and credential actions; (ii) as to the cgnet@ mailboxes (CGNET tenant-administrator channels across steelperlot.com, starx.com, and audem-mgmt.com), Hillspire retained the business relationship with CGNET after Plaintiff's authorization expired or was revoked and directed or permitted continued administrative access to Plaintiff's environments; Schmidt directed or ratified that retention; Does 1–50 include the individuals who used or maintained the CGNET administrator credentials after revocation; (iii) as to the DocuSign environments for SPM, Audem, and StarX, Hillspire and Schmidt retained administrator-level access to DocuSign environments containing Plaintiff's business records after the transition purpose expired and used those channels to transmit or purport to complete instruments adverse to Plaintiff; Does 1–50 include the individuals who executed DocuSign actions after revocation; and (iv) as to Plaintiff's laptop and managed device, Hillspire operated or caused the operation of JAMF

COMPLAINT

mobile-device-management and TeamViewer unattended-access configurations that communicated with Hillspire-controlled cloud infrastructure (hillspire.jamfcloud.com), as reported in the April 9, 2026 Pixley Declaration [Ex. 2]; Schmidt directed or ratified that architecture; Does 1–50 include the individuals who installed, configured, or operated those controls.

401.    Defendants and their agents thereby obtained information, altered information, impaired access, retained credentials, altered access pathways, or caused damage and loss within the meaning of 18 U.S.C. § 1030.

402.    Plaintiff suffered "loss" under 18 U.S.C. § 1030(e)(11), including reasonable costs of responding to the offense, conducting damage assessment, restoring data, programs, systems, credentials, account integrity, device trust relationships, and information, and consequential costs caused by interruption of service.

403.    Plaintiff's qualifying loss exceeded $5,000 during a one-year period. Those losses are tied to response, damage assessment, restoration, credential-recovery, and replacement-system activity, and are not pleaded as general litigation costs.

404.    Plaintiff seeks compensatory damages, injunctive relief, return and restoration of access, preservation and production of logs, deletion or disabling

of unauthorized access pathways, and all other equitable relief authorized by 18 U.S.C. § 1030(g).

405.    **Social-platform access zones pleaded on information and belief.** In addition to the Google Workspace, DocuSign, and managed-laptop zones pleaded above, Plaintiff pleads, on information and belief subject to particularization through discovery, that Plaintiff's authenticated-account zones on X (@ritter_perlot), LinkedIn, Substack (rittermichelle.substack.com), Instagram, and Threads are "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2), and that Plaintiff possesses the account-holder "right to exclude" identified in *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022). Plaintiff alleges on information and belief that during 2025–2026, persons other than Plaintiff (acting in concert with or at the direction of Schmidt-aligned Defendants, or induced by § 512(f)-infringing DMCA submissions) caused platform-level administrative actions — including visibility restrictions, content-level alterations, and delisting actions — to be effected on Plaintiff's account zones after any authorization for such actions had expired or was revoked. Such post-revocation actions, to the extent they involve alteration, impairment, or restriction of Plaintiff's account-holder control or of the information associated with her authenticated accounts, are pleaded as CFAA violations under the *Nosal II / hiQ Labs* "without authorization" framework. Plaintiff preserves these

allegations as against each Defendant and reserves the right to amend as specific platform-level actions are identified through discovery.

406.    **Post-*Van Buren* framing — Plaintiff pleads a "without authorization" theory.** Under *Van Buren v. United States*, 141 S. Ct. 1648 (2021), the CFAA's "exceeds authorized access" clause is read narrowly and does not extend to information-use policy violations by otherwise authorized users. Plaintiff's theory is ***without authorization*** — the specific events pleaded involve access by persons who had no authorized gateway at all, who retained credentials past revocation or expiration, or whose access was affirmatively refused. Each of the following constitutes independent "without authorization" access falling outside *Van Buren*'s carve-out:

a. (a) Post-revocation access to the *steelperlot.com*, *starx.com*, and *audem-mgmt.com* Google Workspace tenants after Plaintiff's April 2024 credential revocation and removal.

b. (b) Never-authorized enterprise Apple-ID IDMS UUID provisioning in the Directory Services RecordName field of Plaintiff's personal "Gold" MacBook Air on January 9, 2026 (Ex. 2, Pixley Decl.).

c. (c) Post-expiration JAMF mobile-device-management commands routed through hillspire.jamfcloud.com against devices that had ceased to be corporate-issued.

264
COMPLAINT

d. (d) Never-authorized TeamViewer sessions documented in the Pixley Declaration (Ex. 2).

e. (e) Never-authorized access to Plaintiff's personal DocuSign environment in March 2022 and December 2024 used to transmit, store, or attempt to authenticate contested instruments.

f. (f) The "sysaccount" operational-signature rename applied across two of Plaintiff's devices (once physically to the stolen MacBook Pro, once remotely to the Gold MacBook Air) — a signature consistent with enterprise provisioning by an actor with no ownership or administrative right to the personal device.

407.    **CFAA loss threshold — 18 U.S.C. § 1030(c)(4)(A)(i)(I) and § 1030(g).** Plaintiff pleads in good faith that losses aggregated across the one-year period preceding this Complaint exceed the $5,000 statutory threshold of 18 U.S.C. § 1030(c)(4)(A)(i)(I), and materially exceed $25,000 in aggregate, as itemized below (amounts to be refined through discovery):

a. (a) Forensic investigation and expert-response costs, including fees for Michael Pixley and any further retained examiner;

b. (b) Device remediation and replacement costs for compromised devices (MacBook Pro and Gold MacBook Air);

c.  (c) Remediation of breached attorney-client privileged communications, including counsel time for privilege-log reconstruction and claw-back proceedings;

d.  (d) Loss of access to, and loss of use of, business data during compromise windows (2022–2026);

e.  (e) Reasonable cost of responding to the offenses, including preparation and submission of preservation letters, subpoenas, and declarations;

f.  (f) Interruption-of-service costs associated with the enterprise-IDMS UUID provisioning on the Gold MacBook Air on January 9, 2026;

g.  (g) Attorney's fees reasonably incurred as a result of the intrusions, recoverable under 18 U.S.C. § 1030(g) where consistent with *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016).

**COUNT II – *Violation of the Stored Communications Act — 18 U.S.C. §§ 2701 and 2707***

*Against Schmidt, Hillspire, Google LLC, Matthew Hiltzik (individually, for prospective injunctive relief only), Hiltzik Strategies, LLC (for prospective injunctive relief only), and Does 1–50*

408.    Plaintiff realleges the preceding paragraphs as though fully set forth herein.

COMPLAINT

409.    This Count is narrowly limited to unauthorized access to facilities through which electronic communication service is provided, resulting in obtaining, altering, or preventing authorized access to Plaintiff's stored emails, messages, and other electronic communications in electronic storage. It is not pleaded as a general-purpose cloud-files, account-settings, or device-control claim; those facts are relevant to Count III and not to Count IV.

410.    **Facilities pleaded; primary and alternative theories.** Count IV is pleaded, primarily, as to the audem-mgmt.com Google Workspace facility (tenant owned by Audem Management, LLC, of which Plaintiff is the sole member) and the starx.com Google Workspace facility (tenant owned by StarX, Inc., an entity Plaintiff founded before meeting Schmidt), each of which is a "facility through which an electronic communication service is provided" within the meaning of 18 U.S.C. § 2701(a) and stored Plaintiff's electronic communications in "electronic storage" under 18 U.S.C. § 2510(17). Count IV is also pleaded, alternatively, as to the steelperlot.com Google Workspace facility and the mritter@steelperlot.com account, on the ground that Plaintiff was the credentialed user whose authorized access to stored communications was prevented by the December 10, 2024 password change and lockout (Ex. 28), irrespective of the tenant-ownership question. The April 20, 2026 AAA Interim Award did not, and under the parties' submissions could not, adjudicate any

federal SCA question, and its SPM-level ownership finding is not preclusive of Plaintiff's claims as to the audem-mgmt.com or starx.com facilities, nor of her personal-user-access claim as to the steelperlot.com facility. To the extent Defendants advance the Interim Award as preclusive of any SCA element, Plaintiff reserves the right to contest preclusive effect on every applicable ground.

411.    **Elements of the SCA claim, matched to the facts pleaded.** The civil SCA claim pleaded here requires, and Plaintiff alleges, that: (i) Defendants intentionally accessed, without authorization or in excess of any authorization, a "facility through which an electronic communication service is provided" within the meaning of 18 U.S.C. § 2701(a) — satisfied by the steelperlot.com Google Workspace tenant, which provided "electronic communication service" under 18 U.S.C. § 2510(15), and by the post-authorization facility access pleaded at Part IV.E; (ii) by that access Defendants obtained, altered, or prevented authorized access to an "electronic communication . . . while it is in electronic storage in such system" under 18 U.S.C. §§ 2510(17) and 2701(a), consistent with Theofel v. Farey-Jones, 359 F.3d 1066 (9th Cir. 2004) (stored emails held by the provider after delivery remain in protected "electronic storage" for purposes of the SCA), and Clare v. Clare, 982 F.3d 1199 (9th Cir. 2020) (recognizing SCA civil liability for unauthorized access to stored email accounts) — satisfied in three

independently pleaded ways tied to specific events (not mere technical capability): (a) "preventing authorized access" is pleaded as to the on-or-about December 10, 2024 password change and lockout of mritter@steelperlot.com (Ex. 28), which affirmatively excluded Plaintiff from her own stored communications by changing the credential she had used to authenticate to the facility; (b) "obtaining" a stored communication is pleaded as to the alleged attempt to access all files / messages in Plaintiff's Workspace account contemporaneous with the lockout, and as to retention and use of CGNET tenant-administrator credentials for the steelperlot.com tenant after revocation, which permitted review of stored mailbox content; and (c) "altering" is pleaded as to the password change itself (an alteration of the authentication credential that controls access to stored communications) and as to retention of administrator, forwarding, recovery, and delegated-access settings affecting the disposition of stored emails and messages; (iii) Plaintiff was a "subscriber[], user[], or other person aggrieved" under 18 U.S.C. § 2707(a) — satisfied because Plaintiff was the account holder, administrator, and user of the affected mailboxes; and (iv) the access was knowing or intentional — satisfied by the deliberate and targeted character of the post-authorization lockout, password change, and file-access conduct described in Parts IV.A and IV.E, and by the fact that the conduct

269
COMPLAINT

occurred after the express revocation reflected in the December 10, 2024 Knopf notice (Ex. 28).

412.    The steelperlot.com Google Workspace tenant provided electronic communication service within the meaning of 18 U.S.C. § 2510(15) and was a "facility through which an electronic communication service is provided" within the meaning of 18 U.S.C. § 2701(a).

413.    Plaintiff's stored emails, messages, and other electronic communications in that facility were in "electronic storage" within the meaning of 18 U.S.C. § 2510(17).

414.    Plaintiff was a subscriber, user, account holder, and administrator of the accounts containing those stored communications, and was a person aggrieved by the unauthorized access alleged herein.

415.    Defendants and their agents intentionally accessed that facility without authorization, or intentionally exceeded authorization, and as a result obtained, altered, or prevented Plaintiff's authorized access to stored electronic communications. The strongest currently known SCA events include the post-authorization lockout of mritter@steelperlot.com, alleged credential use without authorization, alleged password change, alleged attempt to access all files containing stored communications, and impairment of Plaintiff's authorized access to stored email and messages.

416.    **SCA event map.** The following table summarizes the facility, stored communications, authorization status, and challenged conduct at issue.

| Facility / Service | Communications in Electronic Storage | Authorization Status | Challenged Conduct |
|---|---|---|---|
| steelperlot.com Google Workspace (ECS) | Stored emails and messages in Plaintiff's authorized accounts, including mritter@steelperlot.com | No authorization for third-party access to Plaintiff's stored communications; any transition permission expired no later than Jan. 31, 2025 | Access without authorization; obtaining, altering, or preventing authorized access to stored emails and messages; password change and lockout impairing Plaintiff's authorized access to her stored communications |

417.    **Defendant-by-defendant attribution.** As to the steelperlot.com Google Workspace facility, Plaintiff attributes the challenged SCA conduct as follows, on information and belief and subject to development through discovery: Hillspire operated or caused the operation of the steelperlot.com tenant during the relevant period, directed or caused the post-authorization lockout and password change affecting mritter@steelperlot.com, and directed or caused the retention of administrator, forwarding, recovery, and delegated-access settings that obtained, altered, or prevented Plaintiff's authorized access to stored emails and messages; Schmidt, as principal of Hillspire, directed or ratified that conduct; Does 1–50 include the individual administrators and operators who executed the facility access, password-change, and access-prevention actions. To the extent any accessed material constituted privileged attorney-client

COMPLAINT

communications with Plaintiff's counsel of record, Plaintiff incorporates Part IV.E.3 and reserves all privileges.

418.    Defendants' access was knowing or intentional.

419.    Plaintiff seeks relief under 18 U.S.C. § 2707, including preliminary and permanent equitable relief, declaratory relief, actual damages, statutory damages where available, any profits made by violators as a result of the violation, punitive damages for willful or intentional conduct if proven, and attorneys' fees and costs.

420.    **Additional facilities pleaded on information and belief.** In addition to the Google Workspace facility already pleaded, Plaintiff pleads on information and belief, subject to particularization through discovery, that the X, LinkedIn, Substack, Instagram, and Threads facilities on which Plaintiff's authored content is stored are "facilities through which an electronic communication service is provided" within the meaning of 18 U.S.C. § 2701(a). Plaintiff alleges on information and belief that, during 2025–2026, access was effected to those facilities, with respect to Plaintiff's account zones, for purposes of visibility restriction, delisting, or removal of stored communications, by persons acting in concert with or at the direction of Schmidt-aligned Defendants or induced by § 512(f)-infringing DMCA submissions, and that such access exceeded any

272
COMPLAINT

authorization lawfully granted and was not within the SCA's permissible-conduct framework.

421. **SCA "facility" theory — Google as independent § 2701(a)(1) defendant.** Google operates the electronic-communications facility at issue. Unauthorized access by Schmidt-side actors to Plaintiff's stored Workspace communications at the tenant level constitutes access to Google's facility through which the service is provided, within the meaning of 18 U.S.C. § 2701(a)(1). See *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir. 2002); *Theofel v. Farey-Jones*, 359 F.3d 1066 (9th Cir. 2004). Plaintiff pleads Google's independent liability on the theory that Google, having been placed on notice through the administrator-credential events pleaded in Part IV.E, nevertheless permitted continued Workspace access by non-authorized users and failed to cure the breach once revocation had been requested. Plaintiff pleads Google's SCA liability narrowly and specifically, in addition to and not in displacement of the § 2707 claims against the accessing actors (Schmidt, Hillspire, and Does). Google's § 2707(c) exposure is measured by statutory damages of not less than $1,000 per violation, plus attorney's fees and costs under § 2707(b).

**COUNT III** – *Violation of the Federal Wiretap Act — 18 U.S.C. §§ 2511, 2520*

*Against Schmidt, Hillspire, Google LLC, Matthew Hiltzik (individually, for prospective injunctive relief only), Hiltzik Strategies, LLC (for prospective injunctive relief only), and Does 1–50*

422.    Plaintiff realleges the preceding paragraphs as though fully set forth herein.

423.    **Statutory framework.** The federal Wiretap Act prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication (18 U.S.C. § 2511(1)(a)), and from intentionally using, or endeavoring to use, the contents of any wire, oral, or electronic communication knowing or having reason to know that the information was obtained through such interception (18 U.S.C. § 2511(1)(d)). A person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of the Act may recover statutory damages, actual damages, punitive damages, and reasonable attorneys' fees and costs under 18 U.S.C. § 2520.

424.    **Interception of electronic communications in transit — laptop.** As alleged in Parts IV.A, IV.E, and the Pixley declaration quotations at ¶ 104(e)–(g), Hillspire, acting through JAMF pointed to hillspire.jamfcloud.com and TeamViewer configured for unattended remote access with screen-recording and keyboard-and-mouse-control permissions granted at the operating-system level,

COMPLAINT

possessed the capability and, on information and belief, exercised the capability during the period November 2021 through at least September 6, 2024, to view Plaintiff's screen in real time, capture Plaintiff's keystrokes, and access Plaintiff's electronic communications in transit on Plaintiff's MacBook Pro (Serial No. TFWF7V17GQ). Such real-time screen capture and keystroke capture constitute "intercept[ion] of . . . electronic communication" within the meaning of 18 U.S.C. §§ 2510(4) and 2511(1)(a). See United States v. Ropp, 347 F. Supp. 2d 831 (C.D. Cal. 2004), and Potter v. Havlicek, 2008 WL 2556723 (S.D. Ohio June 23, 2008), on capture of in-transit electronic communications through device-level surveillance.

425. **Interception of confidential communications — Paley home-security system.** On or about May 25, 2021, Hillspire or its agents installed TeamViewer on the Paley property's home-security desktop/computer system, with screen-recording and interactive-control permissions. On information and belief, the TeamViewer installation captured video, audio, or electronic communications of Plaintiff and her family members present at the Paley property during periods of sensitive communication, including periods of active settlement negotiation in 2024. Plaintiff discovered the installation in or about July 2024. The interception of oral and electronic communications at the Paley property, without all-party consent under California Penal Code § 632 and without federal consent under §

COMPLAINT

2511(2)(d), is independently actionable under the Wiretap Act as to the federally cognizable electronic-communication interception.

426. **Interception of attorney-client communications.** Plaintiff's electronic communications with counsel of record across multiple proceedings — including Liner Freedman Taitelman Cooley; Miller Barondess; Baron Samson; Blank Rome; and current counsel in Ritter v. Google et al. — were conducted, in whole or in substantial part, on or through the Hillspire-compromised MacBook Pro and/or through the steelperlot.com Google Workspace administered under Hillspire credentials. On information and belief, the screen-recording and keystroke-capture capabilities established by the TeamViewer configuration captured attorney-client privileged communications in transit during the November 2021 – September 2024 period, without Plaintiff's or her counsel's consent. Defendants' knowledge of Plaintiff's defense strategy, witness identification, and settlement-posture evaluations — reflected in the precision of arbitration timing and discovery selection — supports the inference that intercepted attorney-client communications were used by Defendants and their counsel. Disclosure and use of intercepted attorney-client communications satisfies § 2511(1)(c) and § 2511(1)(d) liability.

427. **Interception of DocuSign transmissions.** On information and belief, the JAMF/TeamViewer architecture captured in-transit DocuSign envelope

COMPLAINT

transmissions, signature events, and associated email traffic on Plaintiff's laptop during the relevant period. This capture supports both the unformed-agreement allegation in Count IV (the capability to execute a DocuSign signature click remotely from Plaintiff's laptop, and to manipulate the apparent-IP-and-device of the signing event) and the Wiretap interception count.

428.    **Defendant-by-defendant attribution.** As to each interception vector alleged above, Plaintiff attributes liability as follows: Hillspire operated or caused the operation of the JAMF service at hillspire.jamfcloud.com (Pixley ¶ 18) and of the TeamViewer unattended-access configuration (Pixley ¶¶ 20–22); Schmidt, as principal of Hillspire, directed or ratified that configuration; Does 1–50 include the individual administrators who executed and used the interception capabilities.

429.    **Consent not established.** Plaintiff did not consent to interception. Any consent nominally recited in device-use policies or service agreements cannot extend to continuous real-time screen-recording and keystroke capture in a personal-use device, to capture of attorney-client privileged communications, or to capture conducted after authorization had been revoked as pleaded in Part IV.E.

430.    **Discovery and statute of limitations.** Plaintiff first discovered the specific interception architecture (JAMF + TeamViewer pointed to

hillspire.jamfcloud.com) through the April 9, 2026 Pixley declaration (Ex. 2). The Wiretap Act's two-year limitations period under § 2520(e) begins to run when "the claimant first has a reasonable opportunity to discover the violation." Plaintiff's reasonable opportunity to discover arose no earlier than the Pixley declaration of April 9, 2026. Discrete interception events during the January 9, 2026 Gold MacBook Air compromise period (¶ 104B) are independently within the two-year window.

431.    **Relief.** Plaintiff seeks statutory damages of $10,000 per intercepted communication or such greater amount as the Court deems appropriate under 18 U.S.C. § 2520(c)(2); actual damages; punitive damages for willful and intentional violations; reasonable attorneys' fees and costs under § 2520(b)(3); preliminary and permanent injunctive relief requiring the disabling of any retained interception pathways; and an order requiring disgorgement and preservation of any intercepted communications and all derivatives thereof.

432.    **Four independent in-transit interception modalities under 18 U.S.C. § 2511.** Plaintiff's Wiretap Act claim rests on four independent interception modalities, each targeting electronic communications in transit (not in storage) and each pleaded in compliance with *In re Google Assistant Privacy Litigation*, 457 F. Supp. 3d 797 (N.D. Cal. 2020), and *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020):

a. Real-time screen-content capture through TeamViewer sessions — the contents of Plaintiff's screen were captured while the session was live and the content was being rendered, satisfying the in-transit element.

b. Real-time keystroke capture through an MDM-installed utility deployed via JAMF/hillspire.jamfcloud.com — keystrokes were captured at the moment of entry, before any storage event.

c. In-transit audio and video capture from the IP surveillance cameras on the Paley property and from Hillspire-deployed cameras directed at Plaintiff's California residence — conversations within range of the microphones, and visual communications in the visual field of the cameras, were intercepted as they occurred.

d. In-transit capture of attorney-client privileged communications between Plaintiff and her successive counsel through compromised devices and compromised email environments, with specific reference to the Gold-MacBook-Air privileged environment Plaintiff established in February 2025 and which was intruded upon on January 9, 2026 (Ex. 2).

e. Each modality is independently actionable and each triggers 18 U.S.C. § 2520(c)(2)'s damages: the greater of (i) Plaintiff's actual damages and Defendants' profits, or (ii) $100 per day of violation or $10,000 per

violation, whichever is greater — plus punitive damages, attorney's fees, and costs under § 2520(b).

**COUNT IV – *Declaratory Relief Regarding Non-Formation and Non-Assent to the Purported March 17, 2022 Audem Agreement; Gateway Arbitrability; and Judicial Determination of the Making of the Arbitration Agreement under 9 U.S.C. § 4***

*Against Schmidt, Hillspire, and Does 1–50 to the extent they invoke, claim benefits under, or seek enforcement of the purported Audem agreement*

433.    Plaintiff realleges the preceding paragraphs as though fully set forth herein.

434.    An actual and present controversy exists concerning (a) whether Plaintiff ever assented to, or validly executed, the purported March 17, 2022 Audem agreement; and (b) whether any Defendant may invoke the arbitration, delegation, intellectual-property, fee, confidentiality, or related provisions of that purported instrument against Plaintiff.

435.    Plaintiff disputes formation itself. She does not merely dispute interpretation, scope, breach, or enforceability of an agreement she admits was formed.

436.    Under ordinary contract-formation principles, mutual assent is required. Plaintiff did not assent to the purported March 17, 2022 Audem agreement. The same-morning 8:29 / 8:33 conflict described in Part IV.B, and the CGNET

statement that "I could not find any document at the SPM Docusign," support Plaintiff's allegation that valid assent was never given.

437.    Any DocuSign certificate or PDF purporting to reflect an Audem/Hillspire agreement must be tested against native DocuSign envelope history, certificate of completion data, signer-event logs, authentication method information, access-code method and logs, IP address information, device/browser/user-agent information, account-control records, and custodian testimony.

438.    Because Plaintiff disputes whether the agreement was ever formed as to her, the gateway question is for judicial determination. A delegation clause in a purportedly unformed agreement cannot bootstrap itself into existence. Any argument that the American Arbitration Association's rules (including AAA Commercial Rule R-7) delegate arbitrability presupposes an enforceable agreement containing a delegation provision; that presupposition fails where formation itself is disputed.

439.    The Federal Arbitration Act, 9 U.S.C. § 4, provides that when the making of the arbitration agreement is in issue, the court shall proceed summarily to the trial of that issue, and that a party alleged to be in default in making such agreement is entitled to a jury trial on request.

440.    If any party moves to compel arbitration under 9 U.S.C. § 4 or otherwise seeks to enforce the purported March 17, 2022 Audem agreement against

Plaintiff, Plaintiff demands a jury trial of the making-of-agreement issue and seeks limited expedited discovery on formation only, including production of: (a) the complete native DocuSign envelope history, including signer events, access-code events, and authentication method for every signer, reviewer, and sender; (b) the complete certificate of completion; (c) all IP addresses, device identifiers, and user-agent information associated with any signer, reviewer, or sender; (d) all account-control records for the DocuSign account from which the envelope was sent; (e) CGNET/SPM/Hillspire administrator logs for DocuSign relating to the envelope; (f) email delivery, open, click, and forwarding events related to the envelope; and (g) deposition of the custodian of the DocuSign administrator account and the CGNET administrator who conducted the June 27, 2024 search.

441.    Plaintiff seeks a declaration that (a) Plaintiff did not assent to the purported March 17, 2022 Audem agreement; (b) the purported agreement was never formed as to Plaintiff; and (c) any arbitration, delegation, intellectual-property, fee, confidentiality, or related clause drawn from that purported instrument is unenforceable against Plaintiff.

**COUNT V –** ***Prospective Declaratory Judgment Under the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act That Plaintiff's Sexual-***

***Assault-Related Claims Are Not Arbitrable and That the Applicability of EFAA Is for This Court — 9 U.S.C. §§ 401–402; 28 U.S.C. §§ 2201–2202***

*Against Schmidt, Hillspire, and Does 1–50*

442.    Plaintiff realleges the preceding paragraphs as though fully set forth herein.

443.    **Court-decision anchor — 9 U.S.C. § 402(b).** Count V is brought under the prospective, court-decision anchor of 9 U.S.C. § 402(b), which commits to a court — not an arbitrator — the determination of whether the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, 9 U.S.C. §§ 401–402, applies to any given dispute, "irrespective of whether the party resisting arbitration challenges the arbitration agreement specifically or in conjunction with other terms of the contract containing such agreement, and irrespective of whether the agreement purports to delegate such determinations to an arbitrator." Congress's explicit court-decision reservation creates a federal-question right of judicial determination that supplies federal-question jurisdiction under 28 U.S.C. § 1331 for this Count, consistent with the jurisdictional statement in Part III. Plaintiff seeks only a prospective declaration under 9 U.S.C. § 402 and 28 U.S.C. §§ 2201–2202; the separate federal-question declaratory and constitutional relief directed at the April 20, 2026 AAA Interim Award is set forth in Count XIII.

COMPLAINT

444.    An actual and present controversy exists between Plaintiff, on the one hand, and Schmidt, Hillspire, and Does 1–50, on the other, concerning whether any arbitration clause in the December 4, 2024 Settlement Agreement, the December 17, 2024 Amendment, the purported March 17, 2022 Audem agreement, or any related instrument may be invoked to compel further arbitration of any claim, case, or dispute which relates to Plaintiff's sexual-assault dispute with Schmidt. Defendants have invoked, and on information and belief intend to continue to invoke, those clauses; Plaintiff invokes the protection of 9 U.S.C. § 402 prospectively as to all future claims and proceedings that relate to the sexual-assault dispute.

445.    A "sexual-assault dispute" under 9 U.S.C. § 401(3) means a dispute involving a nonconsensual sexual act or sexual contact, as such terms are defined in 18 U.S.C. § 2246 or similar state or tribal law. The 2024 private report by Plaintiff that Schmidt committed sexual assault against her, and the underlying events to which that report referred, constitute a "sexual-assault dispute" within the meaning of § 401(3). The dispute additionally constitutes a "sexual-harassment dispute" under § 401(4) to the extent it involves nonconsensual sexual conduct, advances, or contact that is sexual or sex-based.

e.    **"Relates to" breadth under § 401(4).** The EFAA applies to any "case which . . . relates to the sexual assault dispute or the sexual harassment

dispute." The word "relates to" is expansive, as interpreted by Hodgin v. Intensive Care Consortium, 666 F. Supp. 3d 1326 (S.D. Fla. 2023), Johnson v. Everyrealm, Inc., 657 F. Supp. 3d 535 (S.D.N.Y. 2023), and Famuyide v. Chipotle Mexican Grill, Inc., 2023 WL 5651915 (D. Minn. Aug. 31, 2023), to cover all claims in a case that shares a common nucleus of operative fact with a sexual-assault or sexual-harassment dispute. On Plaintiff's pleading, the present case "relates to" Plaintiff's 2024 sexual-assault dispute with Schmidt on at least four bases: (a) every count in this Complaint shares a common nucleus of operative fact with Plaintiff's 2024 sexual-assault report and Schmidt's coordinated retaliation against Plaintiff for that report; (b) the instruments Plaintiff seeks to rescind (Counts VI, IX) are the instruments procured in direct response to Plaintiff's 2024 sexual-assault report and were structured to compel her recantation of that report (Schedule D, Amendment § 1); (c) the defamation findings Plaintiff seeks to vacate (Count XIII) expressly adjudicate the truth of Plaintiff's sexual-assault report; and (d) the computer-intrusion findings (Counts I, II, III) predate the sexual-assault dispute but were weaponized after her 2024 report as a retaliatory device. Each basis independently triggers EFAA applicability to the full case.

f. **Continuing post-agreement conduct within the dispute.** Even if "relates to" required the operative conduct to postdate the arbitration agreement, the EFAA applies here because Defendants' sexual-harassment-related conduct continued well past the December 4, 2024 Settlement Agreement. Continuing post-agreement conduct within the "dispute" includes: (i) the January 15, 2025 AAA filing initiating a "defamation per se" case premised on the alleged falsity of Plaintiff's sexual-assault report; (ii) the 2025–2026 witness-development campaign against Plaintiff; (iii) Schmidt's repeated sworn denials of sexual assault and Schmidt's repeated characterizations of Plaintiff's report as false (Interim Award pp. 44–45); (iv) the continued invocation of Schedule D and § 3(a)(iv) against Plaintiff through April 2026; and (v) the April 20, 2026 Interim Award itself, which adjudicates the sexual-assault allegation as false by clear and convincing evidence and imposes an $8,080,138 suppression budget in response. Whether the conduct at issue "accrued" before or after the December 4, 2024 Agreement is, in any event, a question of accrual, not a question of EFAA applicability; the "relates to" test looks to the character of the dispute, not to the accrual date of individual claims. See Famuyide, 2023 WL 5651915, at *4.

COMPLAINT

446.     Section 402 provides that, at the election of the person alleging the conduct, no predispute arbitration agreement or joint-action-waiver shall be valid or enforceable with respect to a case which relates to the sexual-assault dispute. Plaintiff elects, and by this Complaint elects, to invoke § 402. Plaintiff's election covers all present and future claims that relate to the sexual-assault dispute within the meaning of § 401(4), including without limitation: (a) any claim, defense, or theory predicated on the December 17, 2024 Amendment's DVRO-withdrawal and recantation provisions; (b) any claim, defense, or theory predicated on Schedule D's unsigned sexual-consent language; (c) any claim arising from the coercive procurement, compelled-recantation, and witness-development conduct alleged in Parts IV.F, IV.G, and IV.I to the extent such conduct "relates to" the sexual-assault dispute; and (d) every count in this Complaint as an integrated case relating to the sexual-assault dispute.

447.     Plaintiff seeks a prospective declaration that: (a) Plaintiff has validly elected 9 U.S.C. § 402 with respect to the sexual-assault dispute; (b) no arbitration agreement invoked by Defendants is valid or enforceable with respect to any case or future claim which relates to that sexual-assault dispute; (c) the entire present case, being a "case which relates to" the sexual-assault dispute within the meaning of § 401(4), is non-arbitrable under § 402(a); and (d) the determinations set forth in (a), (b), and (c) are committed to this Court rather

than any arbitrator under 9 U.S.C. § 402(b), irrespective of any delegation provision.

448.    **Ninth-Circuit-persuasive and district-court authority applying EFAA broadly.** Multiple persuasive authorities hold that EFAA (9 U.S.C. §§ 401–402) invalidates arbitration agreements as to the entire action where any claim falls within EFAA's scope. Plaintiff relies on:

a. • *Liu v. Miniso Depot CA, Inc.*, 100 Cal. App. 5th 1151 (2024) (California Second District) — EFAA applies to entire case including non-assault claims;

b. • *Kader v. Southern California Medical Center, Inc.*, 99 Cal. App. 5th 214 (2024) (California Second District) — EFAA barred arbitration of all claims in a sexual-harassment case, including retaliation and wage claims;

c. • *Famuyide v. Chipotle Mexican Grill, Inc.*, 2024 WL 509247 (D. Minn. Feb. 9, 2024) — EFAA applies to whole case;

d. • *Turner v. Tesla, Inc.*, 686 F. Supp. 3d 917 (N.D. Cal. 2023) — EFAA bars arbitration of entire employment case where one count is sexual-harassment-related;

e. • *Mera v. SA Hospitality Group, LLC*, 675 F. Supp. 3d 442 (S.D.N.Y. 2023) — EFAA covers all claims in a "case" under § 402(a);

f. • *Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535 (S.D.N.Y. 2023) — case-wide scope of EFAA;

g. • *Jane Doe v. Second Street Corp.*, 105 Cal. App. 5th 522 (2024) — California court confirming EFAA's case-wide scope;

h. • *Mitura v. Finco Services, Inc.*, 712 F. Supp. 3d 442 (S.D.N.Y. 2024) — non-sexual-assault claims properly in federal court alongside EFAA-covered claims.

449.    **Dispute-accrual date and retroactivity.** EFAA applies to any dispute or claim that arises or accrues on or after March 3, 2022. Plaintiff's sexual-assault and sexual-harassment dispute arose when Schmidt engaged in the assault and harassment pleaded in Part IV.F and continued through the retaliation and silencing pleaded through April 2026 — well after EFAA's March 3, 2022 effective date. The pre-dispute character of any arbitration provision invoked by Defendants does not defeat EFAA applicability where the dispute itself accrues after the statute's effective date; this is the plain command of 9 U.S.C. § 402(a). See *Hodgin v. Intensive Care Consortium, Inc.*, 666 F. Supp. 3d 1326 (S.D. Fla. 2023); *Zinsky v. Russin*, 2022 WL 2906371 (W.D. Pa. July 22, 2022). Plaintiff's invocation of EFAA was made in writing in the AAA matter and was refused by the arbitrator — a refusal that, under § 402(b), exceeded her powers and is reviewable by this Court de novo.

450.        **LASC March 2, 2026 gateway ruling does not foreclose EFAA merits adjudication in this Court.** On March 2, 2026, the Los Angeles Superior Court in *Ritter v. Schmidt et al.*, Case No. 25STCV26114 (stayed), granted Defendants' motion to compel arbitration and in doing so rejected Plaintiff's argument that the arbitration agreement in the December 4, 2024 Settlement Agreement is invalid under EFAA, 9 U.S.C. § 402. (Interim Award p. 8; Ex. 25.) That ruling does not preclude federal-court EFAA adjudication for three independent reasons. First, the LASC ruling was interlocutory and addressed only the gateway question of arbitrability; the merits of EFAA applicability to the post-March 3, 2022 accrued sexual-assault-and-harassment dispute pleaded in Parts IV.A, IV.F, and IV.L have not been adjudicated in any forum. Second, preclusion under *Kremer v. Chemical Construction Corp.*, 456 U.S. 461 (1982), requires a full and fair litigation opportunity that did not exist on the truncated briefing schedule for the motion to compel; no discovery was taken and no merits record was developed. Third, and dispositively, 9 U.S.C. § 402(b) expressly commits EFAA applicability to a *court* — not to an arbitrator — but does not commit it to any particular court as exclusive. Congress's allocation-to-court rule ensures that the question is adjudicated in the forum in which it is properly raised and fully litigated; here, in this federal action, where Plaintiff pleads the question as an independent federal claim under § 402 that is not derivative of any contract

and is not subject to the *Badgerow* look-through constraint. Plaintiff further notes that any alleged waiver of EFAA by a pro se respondent through her counsel's July 17, 2025 statement at the AAA preliminary hearing (Interim Award p. 3) would be ineffective under § 402(a): EFAA rights are non-waivable by pre-dispute agreement and, as Plaintiff pleads, non-waivable by the procedural posture of a party then subject to continuing economic duress.

## COUNT VI – *Rescission, Cancellation of Instruments, and Declaratory Invalidity of the December 4, 2024 Settlement Agreement and the December 17, 2024 Amendment*

*Against Schmidt, Hillspire, and Does 1–50*

451.    Plaintiff realleges the preceding paragraphs as though fully set forth herein.

452.    The December 4, 2024 Settlement Agreement and the December 17, 2024 Amendment are void, voidable, subject to rescission, subject to cancellation, or unenforceable against Plaintiff on two independent and mutually reinforcing grounds, each of which alone is sufficient under Count II, as framed in Part IV.F.1: (a) fraudulent inducement and coercion; and (b) failure of consideration. Plaintiff reserves the right to amend to plead additional public-policy grounds (including under Cal. Code Civ. Proc. §§ 1001, 1002, and 1670.11 and EFAA, 9 U.S.C. §§ 401–402) if and when necessary to defeat any assertion of the

challenged instruments as a defense to otherwise non-waivable or EFAA-covered claims.

453.    **Independence from assault merits.** Count II is pleaded on grounds that are independent of the truth or falsity of any underlying sexual-assault allegation. The fraud-in-the-inducement pillar rests on the ¶ G no-records representation on page 3 of the December 4, 2024 Settlement Agreement, on concealment of the Audem, StarX, and SPM books, records, and digital assets whose existence and Schmidt-side access is corroborated by the JAMF/TeamViewer managed-laptop findings in the April 9, 2026 Pixley Declaration (Ex. 2) and by the December 10, 2024 Knopf notice (Ex. 28), and on related inventory-of-digital-assets concealment — none of which depends on adjudication of the assault allegation. The failure-of-consideration pillar rests on withholding of the MR Amount and on the unsigned Schedule D structure, neither of which depends on the assault allegation. The duress and menace pillar rests on the December 17, 2024 on-site "sued into oblivion" and "the sheriffs would be called" statements, the "Eric will go nuclear" statement attributed to Debra Smith, concurrent possession pressure, and real-time recantation-paperwork preparation — each independently actionable on duress, menace, and undue-influence grounds under California Civil Code sections 1567–1570 without reaching the question of whether the domestic-violence filing being pressured for withdrawal was itself well-founded.

454.    Under California Civil Code section 1567, apparent consent is not real or free if obtained through duress, menace, fraud, undue influence, or mistake. Under Civil Code sections 1568, 1572, and 1575, apparent consent obtained by those means is voidable. Under Civil Code section 1689, a party may rescind a contract where consent was obtained through such means or where consideration fails. Under Civil Code section 3412, a written instrument that is void or voidable may be cancelled where leaving it outstanding may cause serious injury.

455.    Plaintiff pleads rescission and cancellation on ordinary consent and equity grounds. Any public-policy overlay (including without limitation California Code of Civil Procedure sections 1001, 1002, and 1670.11, and the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, 9 U.S.C. §§ 401–402) is expressly reserved for a later pleading and is not asserted as an independent ground for relief in this Complaint.

456.    **Fraud and concealment in the December 4 procurement.** Defendants procured the December 4 Settlement Agreement while representing that Plaintiff owned 100% of StarX and Audem, that no Schmidt Party claimed any interest or right to obtain any interest in StarX, and that the Schmidt Parties had no StarX or Audem books and records within their possession, custody, or control. Those representations were material to Plaintiff. They were false or materially misleading when made because, as alleged in Part IV.C, Defendants possessed

or had access to the very records they represented they did not have, were using those records to plan or execute tax treatments favorable to Schmidt-aligned taxpayers, and intended to attribute to Plaintiff financial and tax liabilities flowing from benefits received by Defendants. Within weeks of signing, Defendants issued a 1099 to Plaintiff based on Audem records and attempted to procure Plaintiff's signature on SPM 2023 and 2024 tax returns prepared under Schmidt-side control. These subsequent acts are probative of falsity at the time of signing.

457. **Duress, menace, and undue influence in the December 17 procurement.** The December 17, 2024 Amendment was procured at Plaintiff's California residence under the conditions alleged in Part IV.F, including on-site statements by Hillspire's outside counsel and operating agents Marcus and Harris that Plaintiff and her parents would be "sued into oblivion" and that "the sheriffs would be called" unless Plaintiff withdrew her domestic-violence filing; the statement attributed to Debra Smith that "Eric will go nuclear"; concurrent possession activity; and real-time preparation of withdrawal paperwork. Those statements are pleaded as agent conduct attributable to Schmidt and Hillspire under Federal Rule of Evidence 801(d)(2)(D) and ordinary agency principles. Those conditions, together with the use of Plaintiff's parents' housing and

arbitration exposure as leverage against Plaintiff, establish duress, menace, undue influence, coercion, and lack of clean consent.

458.    **Failure of consideration and sham agreement.** Defendants did not pay Plaintiff the MR Amount promised to her under Schedule A. Defendants' reliance on "loan forgiveness" to an entity (StarX) under the disputed Multi-Draw Loan Agreement does not satisfy the personal consideration promised to Plaintiff and cannot defeat rescission at the pleading stage. As alleged in Parts IV.C and IV.G, Defendants continued to demand additional concessions — including a public statement mirroring the unsigned Schedule D — while withholding the payment owed.

459.    **Tender excused or equitably adjusted.** Any tender obligation is excused, impossible, impracticable, or subject to equitable adjustment because Defendants withheld payment of the MR Amount, dispute the consideration structure, and retained or used the instruments and property-control benefits while Plaintiff challenges procurement and validity.

460.    **Invalidity of every procurement-linked provision.** To the extent Defendants seek to enforce any severable provision of the December 4 Agreement or the December 17 Amendment notwithstanding invalidity of the instruments as a whole, Plaintiff specifically seeks rescission, cancellation, or declaratory invalidity of each of the following provisions on the same grounds

set forth above and, as to any public-policy overlay, under California public policy and EFAA: (a) any arbitration or forum-selection provision; (b) any release or covenant-not-to-sue provision, including any purported general release of unknown claims (including without limitation any reliance on California Civil Code section 1542 or equivalent language) to the extent it would purport to reach future, non-waivable, or EFAA-covered claims; (c) any confidentiality, non-disparagement, anti-disclosure, or information-restriction provision; (d) any "cooperation," scripted-statement, press-statement, public-statement, or recantation provision; (e) any testimony-waiver, non-cooperation-with-authorities, or similar provision; (f) Schedule D and any provision calling for its future execution; (g) any attorney-fee, cost-shifting, or indemnification provision intended to be enforced against Plaintiff with respect to these claims; and (h) any enforcement, specific-performance, or injunctive-relief provision intended to compel recantation or public statements by Plaintiff.

461.    **Schedule D never signed.** Plaintiff did not sign Schedule D. The agreement treated Schedule D as a future deliverable. Defendants may not treat Schedule D as a present sworn admission by Plaintiff.

462.    Plaintiff seeks rescission, cancellation, declaratory invalidity, restitution, restoration of the status quo to the extent possible, return or restoration of records

and access, and all equitable relief necessary to prevent Defendants from enforcing or benefiting from the challenged instruments, in whole or in part.

463. **Total failure of consideration — independent alternative ground for rescission.** Independent of the fraud, duress, coercion, and unconscionability grounds above, Plaintiff alleges that the December 4, 2024 Agreement is subject to rescission for total failure of consideration. The Schmidt Parties' sole bargained-for consideration to Plaintiff for her transfer of SPM and SPI interests was the $14 million Schedule A(3) payment. No portion of that $14 million has ever been paid. The non-payment is confirmed by judicial admission in the April 20, 2026 Interim Award, pages 20–22, which records the arbitrator's finding that the Schmidt Parties' "duty to perform that term of the Agreement" was "discharged" — i.e., no payment was made. Under Cal. Civ. Code §§ 1611 and 1688–1694, and under the authority of *Taliaferro v. Davis*, 216 Cal. App. 2d 398 (1963), and *Crofoot Lumber, Inc. v. Thompson*, 163 Cal. App. 2d 324 (1958), a party's receipt of contract benefits without any payment of the agreed consideration entitles the deprived party to rescission and restitution. Plaintiff seeks rescission of the Agreement, rescission of the Schedule H Assignment of her SPM interest, rescission of any related SPI transfer, restoration of her 51% SPM common-member position, restoration of her SPI interests (including her 20% carry entitlement on the SPI fund's >44% returns on more than $65 million

in assets under management), and restitution of the other property interests she transferred or lost control over in connection with the Agreement.

464.    **Constructive trust over Orion Wing Management, Orion Wing, and Orion Wing Investments assets.** Alternatively and cumulatively, Plaintiff seeks imposition of a constructive trust, under Cal. Civ. Code § 2224 and *Meister v. Mensinger*, 230 Cal. App. 4th 381 (2014), over (a) Plaintiff's former 51% common-member interest in SPM, now held by Orion Wing Management, LLC (formerly SPM); (b) Plaintiff's SPI interests and 20% carry entitlement, now held by or attributable to Orion Wing Investments, LLC (formerly Steel Perlot Investments, LLC); and (c) the residual cash, cryptocurrency-token positions, intellectual property, customer relationships, and incubated-initiative upside that were transferred as part of the zero-payment December 4, 2024 transaction. The constructive trust runs against Defendants Schmidt, Hillspire, and their successor entities Orion Wing, LLC, Orion Wing Management, LLC, and Orion Wing Investments, LLC, which Plaintiff reserves the right to add as named Defendants in a First Amended Complaint or through Rule 19 joinder as necessary to accomplish complete relief. See Part VII.

**COUNT VII – *Intentional Misrepresentation, Fraudulent Concealment, Fraudulent Inducement, and Negligent Misrepresentation — Account-Closure Misrepresentation and Account-Control Transfer***

*Against Wells Fargo Bank, N.A.*

465.    Plaintiff realleges the preceding paragraphs as though fully set forth herein. This Count is pleaded under supplemental jurisdiction, 28 U.S.C. § 1367(a), as arising from the same nucleus of operative fact as the federal claims in Counts I, II, and III and the California state-law claims in Counts IV, V, VI, and IX. Plaintiff incorporates by specific reference the factual allegations of Part IV.H in full, including Sections J.1 through J.11.

466.    **Narrow posture and preserved boundaries.** This Count is pleaded narrowly. It is limited to the Wells Fargo banking-channel conduct documented in Part IV.H and anchored in the October 8, 2024 Closure Letters, the October 10, 2024 "final/Hillspire relationship" email, the October 11, 2024 Commercial Card termination letter, the October 25, 2024 "no longer associated with the Hillspire family office" email, and the May 1, 2025 Wells Fargo Account Summary for "Orion Wing Management, LLC" re-titling the -6449 account and opening the -4953 Time Account. This Count is not pleaded as a sex-based harassment, Title VII, EFAA, aiding-and-abetting, civil-RICO, or enterprise-liability theory, and no such theory is asserted against Wells Fargo in this Complaint.

467.    **Rule 9(b) particularity.** Plaintiff pleads the who, what, when, where, and how of the fraud and misrepresentation conduct as required by Federal Rule of

Civil Procedure 9(b) and Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003). **Who**: Wells Fargo Bank, N.A., acting through Lisa Meredith (Executive Director, Wells Fargo Wealth & Investment Management; Lead Wealth Management Banker, Western Division), Jerald Sencil (personal banker), and Mandy Quach (Hillspire CFO whom Wells Fargo accepted as joint signatory/gatekeeper on Plaintiff's entity accounts). **What**: written representations, made on Wells Fargo Private Bank letterhead and in Zix-secured emails, that the SPM accounts ending -4631 and -6449 and the Audem account ending -0882 would be *permanently closed* on November 8, 2024, that the SPM WellsOne® Commercial Card Agreement would terminate on November 11, 2024, that residual cash balances would be remitted to Plaintiff by *cashier's check* within ten business days of closure, and that Wells Fargo's closure decision was "*final*." **When**: October 8, 2024 (SPM and Audem Closure Letters plus Meredith transmittal email at 2:26 p.m. PDT); October 10, 2024 at 10:43 a.m. (Meredith "final"/"Hillspire relationship" email); October 11, 2024 (SPM Commercial Card termination letter); October 25, 2024 (Meredith "no longer associated with the Hillspire family office" email). The non-closure and control-change conduct occurred on and after November 8, 2024 and is confirmed by the May 1, 2025 Account Summary. **Where**: California (directed to Plaintiff in California, as a California resident), through Wells Fargo's ordinary customer-

notice channel and online account-inquiry channel, and through Wells Fargo's Private Bank / Wealth & Investment Management account-administration systems. **How**: by representing as permanently closed (and to be cashier's-checked out) accounts Wells Fargo did not in fact close as to the -6449 SPM savings account; by re-titling the -6449 account to "Orion Wing Management, LLC" and retaining it in the same Private Bank channel notwithstanding the represented closure; by opening a new -4953 Time Account in the Orion Wing Management name for the partial retention of funds previously held as SPM property; by failing to issue any cashier's check to Plaintiff for the residual balance as expressly represented; and by never issuing any written correction to Plaintiff. Further particulars — including the identities of the Wells Fargo personnel who authorized, effected, or ratified the re-titling of -6449 to Orion Wing Management, LLC and the opening and funding of -4953 — are uniquely within Wells Fargo's control and will be identified through targeted discovery.

A.    *Intentional Misrepresentation / Deceit — Cal. Civ. Code §§ 1709, 1710*

468.    California Civil Code section 1709 provides that one who willfully deceives another with intent to induce reliance, and who thereby causes injury, is liable for any damage suffered. Civil Code section 1710 defines deceit to include (1) the suggestion, as a fact, of that which is not true, by one who does

not believe it to be true; (2) the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; (3) the suppression of a fact by one bound to disclose it, or who gives information of other facts likely to mislead for want of communication of that fact; and (4) a promise made without any intention of performing it.

469.    **Representation.** Wells Fargo, through Lisa Meredith and with the authority of the Wells Fargo Wealth & Investment Management channel, made material representations of present and prospective fact to Plaintiff on October 8, 2024 (two letters plus a transmittal email), October 10, 2024, October 11, 2024, and October 25, 2024 — namely, that the named SPM, Audem, and Commercial Card accounts would be permanently closed on the stated effective dates; that any remaining cash balances would be remitted to Plaintiff by cashier's check within ten business days; and that the decision was "final." Each representation was material to Plaintiff's banking posture, to her protective-measure decisions, and to her decision whether to enter into a settlement agreement with Schmidt and Hillspire.

470.    **Falsity.** The representations were false when made, or, at minimum, were made by Wells Fargo without any intention of performance and were allowed to remain uncorrected after the represented November 8, 2024 closure date, because Wells Fargo (a) did not permanently close the SPM -6449 market-rate

savings account, (b) did not remit the residual balance to Plaintiff by cashier's check, and (c) retained the -6449 account in its Private Bank channel under a re-titling to "Orion Wing Management, LLC," as documented by Wells Fargo's own May 1, 2025 Account Summary.

471.    **Scienter / intent to deceive.** Wells Fargo knew the representations were false, recklessly disregarded their truth, made promises without any intention of performance, or had no reasonable ground for believing them to be true. Scienter is supported by the particulars alleged in Section IV.H.9, including Wells Fargo's contemporaneous custody of the Certifications of Beneficial Ownership, the July 29, 2024 Sencil "joint written confirmation from you and Hillspire" email, the October 10, 2024 Meredith "Hillspire relationship" email, the October 25, 2024 Meredith "Hillspire family office" email, and the fact that Wells Fargo carried out the closure it represented as to the SPM checking account -4631 (confirming operational capability) while failing to do so as to the higher-balance SPM savings account -6449. The selective non-closure — closing only the zero-utility checking account while retaining the high-balance savings account in the same Private Bank channel under a Hillspire-aligned name — is itself strong circumstantial evidence of intent.

472.    **Intent to induce reliance.** Wells Fargo made the representations for the specific purpose of inducing Plaintiff to act in reliance — to cease active

COMPLAINT

operation of the accounts pre-closure, to refrain from alternative protective steps, and to understand her residual banking posture vis-à-vis the Hillspire relationship — and knew or foresaw that Plaintiff would rely on written communications of this character transmitted through Wells Fargo's ordinary customer-notice channel by an Executive Director of Wealth & Investment Management.

473.    **Justifiable reliance.** Plaintiff justifiably relied on the representations for the reasons stated in Sections IV.J.8 and the detailed reliance allegations therein. Plaintiff had no means independently to verify Wells Fargo's internal account-status actions, and the facts giving rise to falsity were uniquely within Wells Fargo's custody, control, and knowledge.

474.    **Causation and damage.** Wells Fargo's deceit proximately caused the injuries alleged in Section IV.H.10, including direct loss of control over the -6449 balance, reliance and protective-measure costs, and the fraudulent-inducement consequential damages associated with the December 4, 2024 Settlement Agreement, as further pleaded in Subsection VII.C.

**B.**    *Fraudulent Concealment — Cal. Civ. Code § 1710(3); Deceit By Suppression Of Fact*

475.    Wells Fargo, as the depository and custodian of Plaintiff's named accounts and as the sole source of ledger-level information concerning the status and re-titling of those accounts, was bound to disclose to Plaintiff the material facts that (a) the -6449 account had not in fact been permanently closed; (b) the -6449 account had been re-titled to "Orion Wing Management, LLC" and was being administered in the same Private Bank channel; (c) a new Time Account ending -4953 had been opened in the "Orion Wing Management, LLC" name and funded in part from balances previously held as SPM property; and (d) no cashier's check had been or would be issued to Plaintiff for the residual -6449 balance as expressly represented.

476.    Wells Fargo intentionally failed to disclose these material facts to Plaintiff. Wells Fargo's duty to disclose is established by: (a) the special relationship between a depository bank and its named account-holder under California banking law, see Cal. Com. Code §§ 4102–4103, 4401–4402, and California Financial Code §§ 1450–1462 (ordinary care, good faith, and transparent records); (b) Wells Fargo's express prior representations creating an affirmative duty to correct — having represented closure and cashier's-check remittance in writing, Wells Fargo was under a continuing duty to disclose any

material deviation from those representations; (c) Wells Fargo's exclusive knowledge and control of the account-status, signer-change, and re-titling records; and (d) partial representations — having told Plaintiff on October 10, 2024 that the relationship would end and that she should re-establish banking elsewhere, Wells Fargo was under a duty not to mislead by omission as to the fact that the -6449 account would in fact remain under a different name in the same channel.

477.    Plaintiff, unaware of the concealed facts, would have acted differently had she been informed, including by taking the protective-measure alternatives described in Section IV.H.8. The concealment proximately caused the injuries alleged in Section IV.H.10.

C.    ***Fraudulent Inducement — December 4, 2024 Settlement Agreement***

478.    Plaintiff pleads fraudulent inducement against Wells Fargo in a tort-based reliance-and-causation posture, not as a claim for rescission against Wells Fargo. Wells Fargo is not a party to the December 4, 2024 Settlement Agreement, and Plaintiff does not seek rescission of that Agreement against Wells Fargo. Rescission of the Settlement Agreement is pleaded against Schmidt and Hillspire in Count VI. Against Wells Fargo, Plaintiff pleads fraudulent inducement as a theory of consequential damages: that Wells Fargo's October 2024 written

representations, made with the scienter and intent pleaded in Subsection VII.A, proximately induced Plaintiff to enter into the December 4, 2024 Settlement Agreement on a false factual premise as to her banking posture and as to the disposition of the -6449 balance.

479.    **Nexus.** The October 8, 2024 Closure Letters, the October 10, 2024 "final/Hillspire relationship" email, and the October 25, 2024 "no longer associated with the Hillspire family office" email each preceded the December 4, 2024 Settlement Agreement and each conveyed, in written form, that (a) Plaintiff's SPM and Audem accounts would be closed, (b) residual balances would be remitted to Plaintiff by cashier's check, and (c) the Hillspire-linked Private Bank relationship would terminate. Plaintiff reasonably understood these representations to mean that the $946,706.69 held in the -6449 account on October 12, 2024 would come back to her through the represented cashier's-check channel, and that Hillspire-aligned interests would no longer be positioned through Wells Fargo's Private Bank channel to exercise control over that balance.

480.    **Material effect on settlement terms.** Had Plaintiff known the truth — that Wells Fargo intended to leave the -6449 account open under a re-titling to a Hillspire-aligned successor entity, to open a new Time Account in the same successor's name, to refrain from issuing any cashier's check to Plaintiff, and to

retain all of that activity in the same Private Bank channel — Plaintiff would not have signed the December 4, 2024 Settlement Agreement on the terms she did, and would have pursued alternative protective steps and alternative settlement terms including, without limitation, an express Schedule A carve-out for the -6449 balance, a cashier's-check condition precedent, and an interpleader or court-supervised freeze.

481.    **Causation and damage.** Wells Fargo's representations were a substantial factor in Plaintiff's decision to sign the December 4, 2024 Settlement Agreement on the terms she did. Plaintiff's consequential damages include the differential between the settlement terms she accepted in reliance on Wells Fargo's representations and the terms she would reasonably have insisted upon had she been told the truth; reliance costs including foregone alternative protective steps; and all direct and foreseeable pecuniary harm traceable to the induced settlement entry. Plaintiff pleads these consequential damages subject to Bily v. Arthur Young & Co., 3 Cal. 4th 370 (1992) (scope of liability for intentional tort), and reserves the right to establish their amount at trial.

**D.**    *Negligent Misrepresentation — In The Alternative*

482.    In the alternative, and without waiver of the intentional-misrepresentation and fraudulent-concealment claims pleaded above, Plaintiff pleads negligent misrepresentation.

483.    Wells Fargo owed Plaintiff a duty of reasonable care in its account-closure and customer-notice functions and in its handling of signer-change, authorized-person, power-of-attorney, and delegated-access entries on the identified accounts. That duty is established by the special depositor-bank relationship under California Commercial Code §§ 4102–4103 and 4401–4402, by California Financial Code §§ 1450–1462, and by the Wells Fargo Private Bank Deposit Agreement governing the named accounts.

484.    Wells Fargo breached that duty. Its October 2024 written representations were made, at minimum, without reasonable grounds for believing them to be true with respect to the -6449 account; Wells Fargo permitted, or effected, signer-change, authorized-person, and re-titling entries on the -6449 account without adequate verification of Plaintiff's continuing consent (and without correcting the prior written representations to Plaintiff); and Wells Fargo failed to issue the promised cashier's check.

485.    Plaintiff justifiably relied on Wells Fargo's representations and was harmed as pleaded in Section IV.H.10. Wells Fargo's breach was a substantial factor in causing Plaintiff's harm.

### E.    *Governing Law*

486.    California law applies to this Count under ordinary choice-of-law principles: Plaintiff is a California resident; the representations were directed to Plaintiff in California; reliance occurred in California; and the tortious injury (loss of account control and reliance-based settlement-entry consequential damages) was suffered in California. See Mazza v. Am. Honda Motor Co., 666 F.3d 581, 593–94 (9th Cir. 2012) (governmental-interest analysis). To the extent Wells Fargo asserts that the Wells Fargo Private Bank Deposit Agreement or any other customer-contract instrument designates a different governing law for contract claims, Plaintiff does not assert in this Count any claim sounding in contract, and California law governs the tort claims pleaded here. See Nedlloyd Lines B.V. v. Superior Court, 3 Cal. 4th 459 (1992) (contractual choice-of-law clauses do not displace tort claims except where clearly so provided).

### F.    *Relief Sought On Count VII*

487.    Plaintiff seeks, on Count VII: (a) compensatory damages in an amount to be proven at trial, including but not limited to the converted -6449 balance and

its movement ($897,859.54 as of May 1, 2025, subject to further discovery), prejudgment interest under California Civil Code § 3287 (liquidated) or § 3288 (unliquidated), and all other direct and consequential damages traceable to the representations; (b) fraudulent-inducement consequential damages for Wells Fargo's induction of Plaintiff's entry into the December 4, 2024 Settlement Agreement on a false factual premise as to her banking posture, in an amount to be proven at trial; (c) an accounting of all activity on the accounts ending -4631, -6449, -0882, -1107, and -4953 (and any successor or continuity accounts) from October 8, 2024 through judgment; (d) an order directing Wells Fargo to produce the native account-status, signer-change, authorized-person, power-of-attorney, delegated-access, re-titling, cashier's-check issuance, and internal-communication records for each identified account across the same period; (e) preliminary and permanent injunctive relief prohibiting further Schmidt-, Hillspire-, or Orion-aligned transactional authority over any account continuity-related to the identified accounts pending adjudication; (f) punitive damages under California Civil Code § 3294 upon a showing of malice, oppression, or fraud by clear and convincing evidence; (g) costs of suit and pre-judgment and post-judgment interest; and (h) such other and further relief as the Court deems just and proper.

COMPLAINT

488.    **Right to Financial Privacy Act — 12 U.S.C. §§ 3401–3422.** Plaintiff pleads, in the alternative and as an independent federal theory, that Wells Fargo Bank, N.A.'s disclosures of Plaintiff's personal financial information to third parties affiliated with Hillspire and the Schmidt enterprise — including, on Plaintiff's pleading, disclosures to Hillspire CFO Mandy Quach and to Hillspire-adjacent successor-entity actors in connection with the "orion Wing Management, LLC" re-titling of the -6449 account and the opening of the -4953 Time Account — were made absent Plaintiff's written authorization as required by 12 U.S.C. § 3404, and were not authorized by any of the exceptions in §§ 3403(c)–(d) or § 3413. Plaintiff seeks the statutory remedies of 12 U.S.C. § 3417, including actual damages sustained, $100 statutory damages per violation, punitive damages for willful and intentional violations, costs, and reasonable attorney's fees. Plaintiff further reserves the right to amend to add individual Wells Fargo employee defendants (Lisa Meredith, Jerald Sencil, and Does 1–10 within the category defined in Part II) as personally liable under § 3417 to the extent discovery supports such liability.

489.    **Attorney-fee-lien context and non-payment predicate.** Plaintiff alleges that Defendant Wells Fargo's October 8 and October 25, 2024 account-closure misrepresentations (Part IV.H) caused, in part, the cascading attorney-representation disruptions that later manifested as two attorney-fee liens invoked

against Plaintiff to justify Defendants' non-payment of Plaintiff's Schedule A(3) consideration under the Settlement Agreement. Specifically, on or about September 5, 2025, Baron Samson LLP asserted a $5.7 million attorney's-fee lien against any settlement proceeds payable to Plaintiff, and on or about October 28, 2025, Liner Freedman Taitelman + Cooley LLP asserted a separate $6.0 million attorney's-fee lien. (Interim Award pp. 20–21; Exs. 68, 70.) Defendants subsequently invoked these liens as an affirmative basis for refusing to pay Plaintiff the $14 million Schedule A(3) consideration. The predicate cascade — Wells Fargo's unauthorized account-control transfer, the resulting financial destabilization of Plaintiff's ability to retain and pay counsel, and the ensuing attorney-fee-lien posture — is an independent damages element recoverable under Counts VII and IX, and an independent equitable predicate for the rescission and restitution relief sought in Count VI.

**COUNT VIII –** *Aiding and Abetting Breach of Fiduciary Duty and Aiding and Abetting Fraud — Operational, Non-Advocacy Conduct*

*Against Glaser Weil Fink Howard Jordan & Shapiro LLP and Craig H. Marcus*

490.    Plaintiff realleges the preceding paragraphs as though fully set forth herein. This Count is pleaded under supplemental jurisdiction, 28 U.S.C. § 1367(a), as arising from the same nucleus of operative fact as the federal claims in Counts I and II and the state-law claims in Counts II and V.

491.    This Count is narrowly limited to operational, non-advocacy conduct of Glaser Weil and its partner Craig H. Marcus alleged at Parts IV.A, IV.F, IV.I, and IV.J. Plaintiff does not plead in this Count any cause of action based on any statement made to a tribunal, any pleading filed in any court or arbitral proceeding, or any privileged settlement negotiation. Plaintiff invokes the operational-conduct / business-manager carve-out to California Civil Code section 47(b) recognized in Kolar v. Donahue, McIntosh & Hammerton, 145 Cal. App. 4th 1532 (2006), and Rickley v. Goodfriend, 212 Cal. App. 4th 1136 (2013).

492.    **Rusheen / litigation-privilege boundary.** Plaintiff acknowledges and respects the holding of Rusheen v. Cohen, 37 Cal. 4th 1048 (2006), that privileged communications made in furtherance of litigation, including non-communicative acts necessarily related to the communication, fall within Civil Code section 47(b). The conduct pleaded in this Count is outside that boundary for at least three independent reasons: (a) the challenged acts are operational business conduct of a Hillspire-embedded advisor — taking possession of personnel, books, and workspaces on April 2024 (Part IV.I.1); participating in a December 17, 2024 on-site procurement at a California residence (Part IV.I.3); refusing a September 11–12, 2025 preservation notice (Part IV.I.7); and facilitating the concealment of records addressed in ¶ G on page 3 of the

December 4 Settlement Agreement (Part IV.I.6) — and are not statements to, or acts necessary to, any communication to a tribunal; (b) the challenged acts precede and exist independently of the AAA arbitration filed in 2025 and of the LASC 25STCV26114 state-court action filed later, meaning they cannot be characterized as acts "in furtherance" of litigation that did not yet exist at the time the core acts occurred; and (c) the business-manager carve-out recognized in Kolar and Rickley applies where counsel functions as an operational business manager rather than as an advocate, which Plaintiff pleads here with the specificity of the "de facto managers" characterization in Plaintiff's July 15, 2024 internal memorandum (Ex. 32) and with the dated acts in Part IV.I.

493.    Plaintiff does not in this Count allege that Glaser Weil or Marcus owed any independent fiduciary duty directly to Plaintiff. Consistent with Skarbrevik v. Cohen, England & Whitfield, 231 Cal. App. 3d 692 (1991), Plaintiff pleads only that Glaser Weil and Marcus knowingly assisted breaches by Schmidt-side principals who did owe such duties.

494.    **California Code of Civil Procedure section 340.6 — actual-fraud carve-out.** Plaintiff acknowledges the one-year / four-year limitations framework of California Code of Civil Procedure section 340.6(a) applicable to actions against an attorney for a wrongful act or omission arising in the performance of professional services, other than actual fraud. Count VI is timely

315

COMPLAINT

and otherwise governed by section 340.6(a)'s actual-fraud carve-out for multiple, independently sufficient reasons: (a) the claims in this Count are anchored on actual fraud and aiding-and-abetting of actual fraud within the meaning of section 340.6(a)'s express exclusion, including the ¶ G concealment conduct (no-records representation on page 3 of the December 4, 2024 Settlement Agreement), the December 17, 2024 procurement-by-coercion conduct, the 2024 witness-development campaign in which severance and release payments were used as leverage to obtain adverse statements, and the September 11–12, 2025 preservation-refusal conduct, each pleaded with Rule 9(b) particularity in Parts IV.F, IV.G, IV.I, and herein; (b) Plaintiff's injury from the operational conduct of Glaser Weil and Marcus was not discovered, and could not reasonably have been discovered, until Plaintiff obtained the July 15, 2024 "de facto managers" memorandum (Ex. 32), the September 25, 2025 Reinhardt Declaration (Ex. 1), the April 9, 2026 Pixley Declaration (Ex. 2), and the September 12, 2025 preservation-refusal email (Ex. 34), bringing each event well within one year of filing on the particularized pillars, and within four years on the operational architecture pillar; and (c) independent tolling grounds include continuing wrongful conduct (pleaded through April 2026), fraudulent concealment (pleaded at ¶ G and at Part IV.I.6), and the "actual fraud" carve-out itself, which is unlimited by section 340.6(a) for Count VI's actual-fraud pillars.

495.    **Noerr-Pennington distinguishing.** Plaintiff further acknowledges the Noerr-Pennington doctrine, which immunizes good-faith petitioning of government and participation in litigation. Count VI is outside the Noerr-Pennington boundary on three independent grounds: (a) the operational business acts pleaded in Part IV.I (the April 2024 assumption of governance and operating roles at SPM; the December 17, 2024 on-site procurement at a California residence; the 2024 witness-development campaign; the refusal to honor the records-preservation notice) are not petitioning activity, are not conduct incidental to litigation, and occurred in the ordinary course of business management rather than in a judicial or quasi-judicial forum; (b) the AAA Commercial Arbitration is a private contractual dispute-resolution forum and not a "government" petitioning venue, so conduct directed at AAA outcomes does not qualify for Noerr-Pennington immunity as a matter of first principles; and (c) to the extent any of the challenged conduct could arguably be characterized as incidental to litigation, the "sham litigation" exception applies because the conduct was objectively baseless and was undertaken for the purpose of interfering with Plaintiff's business relationships, concealing predicate facts (¶ G), and procuring instruments by fraud rather than for any sincere adjudicative purpose. Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49 (1993).

496.    **Aiding and abetting breach of fiduciary duty.** Under California law, a defendant who knows that another party's conduct constitutes a breach of fiduciary duty, and who gives substantial assistance or encouragement to the breaching party, is liable as an aider and abettor. American Master Lease LLC v. Idanta Partners, Ltd., 225 Cal. App. 4th 1451, 1475 (2014); Nasrawi v. Buck Consultants LLC, 231 Cal. App. 4th 328, 343–44 (2014). Schmidt-side actors owed Plaintiff, at minimum, duties of good faith and fair dealing in connection with the contractual and operational relationships alleged in Parts IV.A, IV.C, IV.E, IV.F, and IV.G, including duties attaching to the management of entities in which Plaintiff was the formal owner (StarX, Audem) or a principal (SPM/Orion Wing) and to the control of infrastructure (books, payroll, tax systems, technology, banking) on which Plaintiff relied. Glaser Weil and Marcus, through the operational acts alleged at Parts IV.I.1 through IV.I.7, knowingly provided substantial assistance to breaches of those duties, including without limitation the concealment of records addressed in paragraph G on page 3 of the December 4 Settlement Agreement, the misdirection of Audem and SPM/Orion Wing books for tax-attribution purposes (including the Tyler Gwinn Wind-Down Ledger conduct alleged in Part IV.C.6), and the diversion of post-settlement entity operations to Hillspire-controlled channels. These acts occurred outside any tribunal and were operational in character.

318
COMPLAINT

497.    **Aiding and abetting fraud.** Under California law, a person who knows that another is engaged in fraudulent conduct and who provides substantial assistance or encouragement to that conduct is liable for aiding and abetting the fraud. American Master Lease, 225 Cal. App. 4th at 1476. The fraud and concealment alleged in Part IV.C and Part IV.F.1 Ground 1 — including the ¶ G representation of no records, the Audem / StarX framing, and the duress-coercion procurement of the December 17 Amendment — was assisted by Glaser Weil and Marcus's operational acts alleged in Part IV.I. Those acts include, without limitation, the April 2024 assumption of operating roles within Steel Perlot (Part IV.I.1), the 2024 witness-development campaign (Part IV.I.2), the December 17 on-site procurement (Part IV.I.3), the December 23, 2024 DVRO-dismissal pressure communication (Part IV.I.4), and the September 11–12, 2025 refusal to honor the records-preservation notice (Part IV.I.7).

498.    **Knowledge and substantial assistance.** Glaser Weil and Marcus had actual knowledge of the breaches and fraud assisted. Knowledge is supported by (a) Marcus's personal operating role within the Steel Perlot control architecture from April 2024 forward, including his receipt of Plaintiff's own July 15, 2024 internal memorandum characterizing him as within the group of "de facto managers" (Ex. 32); (b) Marcus's personal on-site participation in the December 17, 2024 procurement; (c) Marcus's direct written participation in the post-

procurement pressure reflected in the January 15, 2025 email chain (Ex. 31), the December 23, 2024 DVRO-dismissal pressure email (Ex. 35), and the September 12, 2025 preservation-refusal email (Ex. 34); and (d) Harris's alleged statement concerning access to mritter@steelperlot.com, reflected in the December 10, 2024 Knopf notice (Ex. 28). Substantial assistance is supported by each of the operational acts alleged in Part IV.I.

499.    **Crime-fraud-limited privilege; FRE 801(d)(2)(D) independence.** To the extent any of the conduct alleged in Part IV.I would otherwise be subject to an assertion of attorney-client privilege as to communications between Marcus or Glaser Weil and Hillspire, the crime-fraud exception under California Evidence Code section 956 limits the assertion of privilege to communications that were not in furtherance of the fraud or breach alleged. The operational acts alleged in Part IV.I are, in any event, non-communicative conduct falling outside the privilege. The statements pleaded as agent statements of Schmidt and Hillspire for purposes of Counts I, II, III, IV, V, VI, and VII remain admissible against Schmidt and Hillspire under Federal Rule of Evidence 801(d)(2)(D) independently of any privilege analysis as to Glaser Weil or Marcus.

500.    **Direct injury and causation.** The operational acts alleged in Part IV.I caused or materially contributed to each of the direct injuries alleged in Part IV, including without limitation (a) Plaintiff's compelled surrender of possession

320

COMPLAINT

and the on-site conditions at her California residence on December 17, 2024; (b) Plaintiff's withholding-conditioned exposure to the Schedule D apparatus and to the December 17 Amendment; (c) the continuing non-payment of the $14,000,000 MR Amount; (d) Plaintiff's deprivation of records and her associated investigation, restoration, and replacement-system costs predicated on Counts I and II; and (e) Plaintiff's reliance and reputational costs connected to the 2024 witness-development campaign.

501.    Plaintiff seeks compensatory damages for the injuries identified in Part IV traceable to the operational conduct alleged in Part IV.I, together with punitive damages under California Civil Code section 3294 on a showing of malice, oppression, or fraud; an equitable order requiring Glaser Weil and Marcus to preserve and produce records in their custody, possession, or control relating to the operational acts alleged in Part IV.I; and all other equitable relief necessary to prevent continuation of the operational conduct alleged.

**COUNT IX – *Declaratory Relief that Sections 3(a)(i), 3(a)(iv), Schedule D, and Section 1 of the Amendment Are Void and Unenforceable as Against Public Policy — Cal. Civ. Code §§ 1668, 1670.11; Cal. Code Civ. Proc. §§ 1001, 1002; and 9 U.S.C. §§ 401–402***

*Against Schmidt, Hillspire, and Does 1–50 to the extent they invoke or seek enforcement of the challenged provisions*

502.     Plaintiff realleges the preceding paragraphs as though fully set forth herein. This Count is pleaded under supplemental jurisdiction, 28 U.S.C. § 1367(a), except as to the EFAA grounds (9 U.S.C. §§ 401–402), which are federal-question grounds under 28 U.S.C. § 1331.

503.     **Instruments at issue.** Plaintiff seeks a declaration that the following contractual provisions in the December 4, 2024 Settlement Agreement and the December 17, 2024 Amendment (Exs. 11, 13) are void and unenforceable: (a) Section 3(a)(i) (confidentiality/non-disclosure of "Confidential Information" defined to include "the existence and terms of this Agreement, and any and all information regarding the relationship, interaction, communications, dealings, and activities by and between" the parties); (b) Section 3(a)(iv) (non-disparagement, prohibiting the making of "any unflattering statement," or creating/liking/sharing any post "that could reasonably be inferred as a veiled reference to" the other party); (c) Schedule D (the never-signed declaration reciting that "at all times, any and all contact by and between Eric Schmidt and myself was entirely consensual and never coerced or compelled" and that Plaintiff "wish[ed] to correct any prior statements made to the contrary"); and (d) Section 1 of the Amendment (compelling Plaintiff to "irrevocably and forever rescind, revoke, retract, and deny" the allegations in her December 12, 2024

DVRO petition, including the stalking/surveillance allegations, and to file a retraction).

504.    **Ground 1 — Illegality under Cal. Civ. Code § 1668 (Schedule D compelled-perjury declaration).** California Civil Code § 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." Schedule D, as written, required Plaintiff to swear under penalty of perjury that "any and all contact" between Schmidt and Plaintiff was "entirely consensual and never coerced or compelled." If Plaintiff's underlying allegations that Schmidt sexually assaulted her in 2021 and 2024 are true, then the Schedule D declaration — made under penalty of perjury — would be false, and its execution would constitute the crime of perjury under Cal. Penal Code § 118. A contractual provision conditioning payment of $14 million on Plaintiff's execution of a sworn declaration that, if her underlying allegations were true, would constitute perjury, is a contract whose object is to compel a violation of law within the meaning of § 1668 and to exempt Schmidt from responsibility for "willful injury to the person . . . of another." Schedule D is therefore void and unenforceable as a matter of California public policy, independent of any §§ 1001/1002 or EFAA analysis.

505.    **Ground 2 — Cal. Civ. Code § 1670.11 (right to testify about sexual harassment).** California Civil Code § 1670.11, enacted post-January 1, 2019, voids any contractual provision that waives a party's right to testify "concerning alleged criminal conduct or alleged sexual harassment" when so required or requested by legal process. Section 3(a)(i) of the Settlement Agreement, as written, prohibits Plaintiff from "disclos[ing], discuss[ing], mention[ing], reveal[ing], shar[ing], publish[ing], mak[ing] available, disseminat[ing], communicat[ing], sell[ing], or distribut[ing], directly or indirectly, any Confidential Information," which is defined to include "all confidential, personal, or private information concerning or relating to Mr. Schmidt or Ms. Ritter, including . . . any and all information regarding the relationship, interaction, communications, dealings, and activities by and between [them]." On its face, that provision prohibits Plaintiff from testifying about, including in response to subpoena or administrative request, her alleged sexual assault and harassment by Schmidt, because the conduct is indistinguishable from "information regarding the relationship, interaction, communications, dealings, and activities" between them. Although the arbitrator held (Interim Award p. 24) that a "compelled by law" carve-out in § 3(a)(ii) avoided the § 1670.11 problem, that carve-out does not cure the § 1670.11 defect because the very act of binding Plaintiff to the gag provision has the effect — and, on the pleading, had the

purpose — of deterring voluntary disclosure to law-enforcement and legislative audiences that Plaintiff was not yet "required to attend" but whose attention she was entitled to seek under the First Amendment.

506.    **Ground 3 — Cal. Code Civ. Proc. §§ 1001 and 1002 (anti-silencing statutes).** California Code of Civil Procedure §§ 1001 and 1002 prohibit settlement-agreement provisions that prevent or restrict the disclosure of factual information related to claims of sexual assault, sexual harassment, and felony sex offenses. The arbitrator construed §§ 1001 and 1002 to apply only to "settlement agreements entered into after a lawsuit alleging sexual assault or harassment is filed" (Interim Award p. 22), and expressly acknowledged that "there is no precedent interpreting these two statutes" (Interim Award p. 23). That construction is contested, unprecedented, and subject to de novo review by this Court. On Plaintiff's reading, §§ 1001 and 1002 apply to settlement agreements that resolve "a claim" — i.e., a present, reported dispute — irrespective of whether the claim has been reduced to a filed civil action. Plaintiff had reported sexual assault and harassment through counsel in private mediation well before the December 4, 2024 agreement; § 1001's protection extends to such claims, not only to already-filed civil actions. See Legislative history of AB 820 (2018). The Court should reject the arbitrator's narrow construction and declare

§§ 3(a)(i) and 3(a)(iv) void as to factual information related to Plaintiff's sexual-assault and sexual-harassment claims against Schmidt.

507.    **Ground 4 — EFAA (9 U.S.C. §§ 401–402).** To the extent §§ 3(a)(i) and 3(a)(iv) operate as joint-action waivers or as predispute prohibitions on disclosure of factual information about sexual-assault or sexual-harassment disputes, they are invalid and unenforceable under the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, 9 U.S.C. § 401(1)–(4) and § 402(a). Section 402(b) commits the applicability determination to this Court, irrespective of any delegation clause. Plaintiff elects § 402 protection and seeks the declaration accordingly.

508.    **Amendment § 1 — compelled DVRO retraction.** Section 1 of the December 17, 2024 Amendment compelled Plaintiff, in exchange for payment consideration, to "irrevocably and forever rescind, revoke, retract, and deny" the allegations in her DVRO petition — which included allegations of cyberstalking, surveillance, and harassment by Schmidt — and to file a formal retraction (Interim Award, pp. 13–14). The compelled retraction is void under § 1668 for the same reason as Schedule D: it required Plaintiff to publicly disavow factual allegations that, on her pleading, were true. The compelled retraction also violates California public policy protecting DVPA applicants and Cal. Penal

Code § 136.1 (witness intimidation), and triggers the Bane Act claim in Count X.

509.    **Relief sought.** Plaintiff seeks a declaratory judgment under 28 U.S.C. §§ 2201–2202 that Sections 3(a)(i), 3(a)(iv), Schedule D, and Section 1 of the Amendment are void and unenforceable as against public policy on each of the four independent grounds above; permanent injunctive relief restraining Defendants from asserting those provisions in any forum against Plaintiff or from using them as the predicate for damages; and, to the extent the $8,080,138 "reputational-harm mitigation" award in the Interim Award derives from the validity of the gag provisions, severance of that award together with the $50,000 WSJ-related breach award and the $1,409,882 LA Lawsuit fee award.

510.    **Continuing tort, continuing violation — Schedule D is currently untrue.** Plaintiff pleads, as a predicate to the declaratory invalidity sought in this Count and as cumulative factual support for the EFAA applicability question in Count V and the Labor Code § 1102.5 retaliation pleaded in Count XV, that Defendants' actions since December 6, 2024 through the filing of this Complaint have constituted a continuing extension of coercion, non-consent, and compelled speech by Defendant Eric Schmidt and those acting at his direction, including Defendants Hillspire, LLC, Glaser Weil Fink Howard Jordan & Shapiro LLP, Craig H. Marcus, Knox Networks, Inc., and Natalya Thakur. The sexual

harassment and retaliation that Plaintiff first disclosed in her April 2024 mediation have continued through the April 20, 2026 Interim Award and to the date of this filing. As of the present date, any declaration conforming to Schedule D — stating that all contact between Plaintiff and Schmidt was "entirely consensual and never coerced or compelled" — would be factually untrue, and Schmidt's counsel's continuing demand that Plaintiff execute such a declaration is itself an ongoing act of compelled perjury in violation of Cal. Civ. Code § 1670.11. The continuing character of the violation tolls any applicable limitations period under *Richards v. CH2M Hill, Inc.*, 26 Cal. 4th 798 (2001), and operates as an independent ground for declaratory and injunctive relief.

**COUNT X – *Violation of the Bane Act — Interference with Constitutional and Statutory Rights by Threats, Intimidation, and Coercion — Cal. Civ. Code § 52.1***

*Against Defendant Craig H. Marcus, in his individual capacity*

511.    Plaintiff realleges the preceding paragraphs as though fully set forth herein. This Count is pleaded against Defendant Craig H. Marcus in his individual capacity. It is not pleaded against Glaser Weil on a respondeat superior theory; if the conduct alleged below exceeded the scope of Marcus's advocacy authority (as Plaintiff pleads it did), then it is properly pleaded against Marcus personally under the operational-conduct / business-manager carve-out recognized in Kolar v. Donahue, McIntosh & Hammerton, 145 Cal. App. 4th

1532 (2006), and *Rickley v. Goodfriend*, 212 Cal. App. 4th 1136 (2013), and under the Bane Act's "any person" liability provision in Cal. Civ. Code § 52.1(b).

512.    **Statutory framework.** California Civil Code § 52.1(b) authorizes a civil action by "any individual" against any "person or persons, whether or not acting under color of law," who "interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." Relief includes damages, treble damages under § 52.1(b), civil penalties, injunctive relief, and reasonable attorneys' fees. The "threat, intimidation, or coercion" element is satisfied where the conduct is "independent from the constitutional violation," *Reese v. Sacramento County*, 888 F.3d 1030, 1043 (9th Cir. 2018), or where, as here, the threats and coercion are themselves directed at compelling surrender of a statutory or constitutional right.

513.    **Rights interfered with.** Marcus's conduct on December 17, 2024 and in follow-on communications interfered with Plaintiff's exercise of the following rights secured by California and federal law: (a) Plaintiff's right, as a petitioner under the California Domestic Violence Prevention Act, to prosecute her DVRO petition without being compelled to withdraw it under threats of litigation, law-enforcement summons, and financial annihilation (Cal. Fam. Code §§ 6200 et

329
COMPLAINT

seq.); (b) Plaintiff's constitutional right of access to the courts under the First Amendment's Petition Clause and the Fourteenth Amendment's Due Process Clause, exercised through her DVRO petition; (c) Plaintiff's right to be free from witness-intimidation under Cal. Penal Code § 136.1, which makes it a crime to "knowingly and maliciously prevent or dissuade, or attempt to prevent or dissuade" any "witness or victim" from "attending or giving testimony at any trial, proceeding, or inquiry authorized by law" or from "reporting to any peace officer . . . the victimization" or "assisting in the prosecution or defense of any felony"; (d) Plaintiff's right, under the First Amendment, to make reports of sexual assault to law enforcement and to petition Congress and the executive; and (e) Plaintiff's right to be free from extortion under Cal. Penal Code § 518.

514.    **The December 17, 2024 on-site encounter.** As alleged in Parts IV.F and IV.I.3, on December 17, 2024, Defendant Marcus traveled to Plaintiff's California residence together with Glaser Weil partner Jillian Harris and Schmidt-aligned agent Debra Smith, and was physically present during an eleven-hour encounter that took place outside any courtroom, any tribunal, or any formal settlement-conference venue. During that encounter, Marcus personally told Plaintiff and her parents words to the effect that (i) they would be "sued into oblivion" unless Plaintiff withdrew her DVRO filing; (ii) "sheriffs would be called"; and (iii) (as conveyed through Debra Smith acting in Marcus's

presence and with Marcus's acquiescence) "Eric will go nuclear" unless the DVRO was withdrawn (Part IV.F ¶¶ 131–133). Withdrawal paperwork (the December 17 Amendment) was prepared on-site in real time. Marcus's role in the encounter was not limited to advocacy communication with counsel; it included direct threats communicated in person, at a private residence, to the opposing party and her parents.

515.    **The December 23, 2024 follow-on pressure email.** On December 23, 2024, Marcus sent a written communication to Plaintiff's then-counsel applying further pressure regarding the dismissal of Plaintiff's domestic-violence restraining order filing in direct connection with settlement performance (Ex. 35). The communication is not a privileged negotiation over a contested legal issue between represented parties; on its face, it conditioned Schmidt-side performance under the December 4 and December 17 instruments on Plaintiff's personal action withdrawing a report to authorities — i.e., it conditioned payment on conduct the law criminalizes under Cal. Penal Code § 136.1.

516.    **Conduct outside the litigation privilege — Flatley v. Mauro.** The Bane Act conduct is outside California Civil Code § 47(b) because, under Flatley v. Mauro, 39 Cal. 4th 299 (2006), the litigation privilege does not protect communications that constitute the crime of extortion as a matter of law. Marcus's "sued into oblivion" / "sheriffs will be called" / "nuclear" statements,

conditioned on the withdrawal of a DVRO petition and dismissal of a criminal-adjacent filing in exchange for money and possession, fall within Flatley's first category (threats of litigation combined with threats to publicly accuse the other side of crime "unless the matter can be settled"). The on-site, non-courtroom setting further removes the conduct from any privileged-advocacy boundary recognized by Rusheen v. Cohen, 37 Cal. 4th 1048 (2006), and brings it within the operational-conduct carve-out of Kolar and Rickley. Marcus's on-site conduct was not addressed "to achieve the objects of litigation"; it was addressed to compel surrender of Plaintiff's DVRO petition and her home, two objectives outside the scope of the litigation then pending.

517.    **Injury and relief.** As a direct and proximate result of Marcus's threats, intimidation, and coercion, Plaintiff was compelled to surrender possession of the Paley residence and to execute the December 17, 2024 Amendment; was compelled to file the December 23, 2024 stipulated dismissal of her DVRO petition; and suffered emotional distress and reliance and transaction costs. Plaintiff seeks compensatory damages, treble damages under Cal. Civ. Code § 52.1(b), the civil penalty of $25,000 per violation under Cal. Civ. Code § 52(b)(2) where applicable, punitive damages, and reasonable attorneys' fees and costs under § 52.1(i).

518.     **Continuing coercion through platform-level and decretal silencing.** The "threat, intimidation, or coercion" pleaded in Count X continues through (i) the $8,080,138 decretal remedy directed at Plaintiff's First-Amendment-protected speech (Interim Award pp. 36–38); (ii) the platform-level visibility restriction, Google search de-indexing, and DMCA-architecture deployment pleaded in Part IV.J.5; and (iii) the in terrorem effect of those mechanisms on Plaintiff's exercise of her protected rights to speak, to petition Congress, and to report workplace sexual misconduct. California law recognizes Bane Act liability for ongoing coercion, not only discrete physical or verbal acts; the decretal remedy and the coordinated platform-level suppression are pleaded as continuing coercion within the meaning of Cal. Civ. Code § 52.1. See *Reese v. County of Sacramento*, 888 F.3d 1030 (9th Cir. 2018).

519.     **Specific-intent mapping under *Reese* and *Sandoval*.** Under *Reese v. County of Sacramento*, 888 F.3d 1030 (9th Cir. 2018), and *Sandoval v. County of Sonoma*, 912 F.3d 509 (9th Cir. 2018), Bane Act liability requires the specific intent to interfere with the protected right. Plaintiff pleads specific intent on the following non-exhaustive facts:

a. (a) Marcus's own on-site statements at Plaintiff's California residence on December 17, 2024 ("sued into oblivion," "sheriffs will be called," "Eric will go nuclear") — made in direct response to Plaintiff's invocation of

her First-Amendment and Cal. Code Civ. Proc. §§ 1001–1002 rights not to be silenced by contract as to factual disclosure of sexual misconduct.

b. (b) The Schedule D recantation-declaration demand, drafted and tendered by Schmidt-side counsel on December 17, 2024, and repeated thereafter — a demand that can only be read as intending to procure Plaintiff's recantation of her 2024 sexual-assault report, and thereby to interfere with her First-Amendment, Silenced No More Act (Cal. Gov't Code § 12964.5), and Labor Code § 1102.5 whistleblower rights.

c. (c) The sequencing: each threat-and-demand event immediately followed Plaintiff's exercise of a protected right (oral reporting to counsel, written reporting to Members of Congress, publication of "The Predator's Playground" op-ed).

d. (d) Marcus's August 2025 attempted workaround of Cal. Code Civ. Proc. §§ 1001–1002 by recruiting non-California counsel to route the coerced Schedule D — conduct that, by its own terms, evidences specific intent to circumvent a California statutory protection of Plaintiff's right to disclose factual information about sexual assault (see Part IV.F.6).

e. (e) The protected rights interfered with include: Plaintiff's First-Amendment right to report sexual misconduct; her CCP §§ 1001–1002 and Cal. Civ. Code § 1670.11 right to disclose factual information about

sexual assault; her Silenced No More Act rights under Cal. Gov't Code § 12964.5; her Labor Code § 1102.5 whistleblower protection; her EFAA right under 9 U.S.C. § 402; and her Petition-Clause right to communicate with Members of Congress.

### COUNT XI – *Abuse of Process*

*Against Schmidt, Hillspire, Glaser Weil, Craig H. Marcus (individually), Matthew Hiltzik (individually), Hiltzik Strategies, LLC, and Does 1–50*

520. Plaintiff realleges the preceding paragraphs as though fully set forth herein.

521. **Elements.** The tort of abuse of process under California law requires (a) an ulterior motive by the defendant in using the process, and (b) a willful act in the use of the process not proper in the regular conduct of the proceedings. Brown v. Kennard, 94 Cal. App. 4th 40, 44 (2001); Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc., 42 Cal. 3d 1157, 1168–69 (1986). The tort is distinct from, and is not a substitute for, malicious prosecution: abuse of process targets the perversion of legal process for a purpose it was not designed to serve, not the wrongful initiation of the proceeding itself.

522. **Process abused — AAA Case 01-24-0005-8902 (June 2024).** On June 7, 2024, Defendants Glaser Weil and Marcus, on behalf of Schmidt and Hillspire, filed AAA Commercial Arbitration Demand No. 01-24-0005-8902, naming

COMPLAINT

Plaintiff, her father Terry Ritter, her mother Shamim Ritter, StarX, Audem, and SPM (nominally) as respondents. The jurisdictional predicate for that Demand was the March 17, 2022 Audem Services Agreement pleaded in Count IV as unformed. Shamim Ritter, who had no arbitration agreement with any Defendant, objected in writing to the Demand and to AAA's jurisdiction over her; AAA failed to act on the objection. The use of an unformed instrument as the jurisdictional basis for a multi-respondent arbitration proceeding directed at a sexual-assault reporter and her parents is the paradigmatic "willful act . . . not proper in the regular conduct of the proceedings." On information and belief, the Demand was dismissed without prejudice in or about May 2025.

523.    **Process abused — AAA Case 01-25-0000-2191 (January 2025).** On January 15, 2025, within one week of the Schmidt Claimants' receipt of a WSJ reporter inquiry concerning their dealings with Plaintiff (see Interim Award, pp. 15, 31), Defendants filed the present AAA Commercial Arbitration Demand No. 01-25-0000-2191. That Demand was styled as a defamation and breach-of-contract case but, on Plaintiff's pleading, served purposes unrelated to any sincere adjudicative objective. The Demand's central request — that the arbitrator adjudicate the truth or falsity of Plaintiff's 2024 sexual-assault report as "defamation per se" — sought an arbitral determination on a subject-matter Congress had expressly withdrawn from arbitration under EFAA, 9 U.S.C. §§

COMPLAINT

401–402. The Demand's ultimate damages request — $8,080,138 for prospective paid-media displacement of Plaintiff's First-Amendment-protected speech — sought, in substance, a court-ordered suppression budget, a remedy foreign to California contract and defamation law.

524.    **Process abused — Schedule D as compelled-perjury instrument.** The Schedule D declaration, pleaded in Count IX as void under Cal. Civ. Code § 1668, was prepared by Glaser Weil and Marcus as a non-courtroom instrument whose object was to extract from Plaintiff — in exchange for payment consideration — a sworn declaration that, if her underlying allegations were true, would constitute perjury under Cal. Penal Code § 118. The use of a contractual instrument to compel execution of a prospective sworn statement, drafted by counsel, whose content the drafting counsel had reason to know was false, is abuse of process beyond the ordinary scope of settlement drafting.

525.    **Ulterior motive.** Plaintiff alleges, on information and belief supported by the Sarah Koebel v. Derek Rundell pattern — a parallel AAA Commercial Arbitration proceeding in which Defendant Marcus's own sworn declaration identified Schmidt as the "John Doe" funding investor (Ex. 65), and in which Schmidt-aligned actors deployed the same AAA forum and the same doctrinal apparatus against a different sexual-assault reporter — that Defendants' ulterior motive in deploying each of the three process vectors above was to silence

Plaintiff — to procure through private arbitration what a court could not constitutionally impose: findings that Plaintiff's sexual-assault report was false; a compelled recantation; and a court-ordered suppression campaign.

526.    **Distinguishing Noerr-Pennington.** Defendants will predictably invoke the Noerr-Pennington doctrine as a defense. That defense fails: (a) AAA proceedings are not petitioning of government, they are private contractual dispute-resolution proceedings; (b) even if treated as Noerr-Pennington-eligible, the "sham litigation" exception applies under Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49 (1993), because the proceedings were objectively baseless and were undertaken for the purpose of interfering with Plaintiff's business relationships, concealing predicate facts, and procuring instruments by fraud rather than for any sincere adjudicative purpose; and (c) the pattern-against-a-second-woman evidence established by the Sarah Koebel v. Derek Rundell matter (Ex. 65 — Marcus Decl. identifying Schmidt as the "John Doe" funding investor in a parallel AAA proceeding deployed against a different sexual-assault reporter) is independently dispositive of the sham-litigation exception, Flatley v. Mauro, 39 Cal. 4th 299 (2006).

527.    **Arbitral immunity — why AAA is not a defendant in this action.** The American Arbitration Association is identified in Part II as a non-defendant enterprise actor. AAA is not sued as a Defendant on this Count or any other

Count in this Complaint on account of the arbitral-immunity doctrine articulated in *Corey v. New York Stock Exchange*, 691 F.2d 1205 (6th Cir. 1982), *Olson v. NASD*, 85 F.3d 381 (8th Cir. 1996), and *Cort v. American Arbitration Association*, 795 F. Supp. 970 (N.D. Cal. 1992). Plaintiff pleads the AAA administrative, economic, and pay-to-play conduct described in Parts IV.K and IV.L (including the direct-party compensation structure, the April 21, 2026 Collins Transmission Letter's disclosure of the $28,000 post-Award invoice (Ex. 62), and the R-60 default on non-payment against a documented-indigent pro se respondent) as factual context supporting the § 10(a)(2) evident-partiality vacatur ground in Count XIII, and as pattern evidence preserved for any future civil RICO count per Part VII. None of those factual allegations reaches, or depends upon, the neutral adjudicative decisions of the arbitrator. The abuse-of-process theory pleaded in this Count XI is directed at Defendants' deployment and exploitation of the AAA forum, not at AAA itself. Cf. *Flatley v. Mauro*, 39 Cal. 4th 299 (2006) (sham-litigation exception to privilege).

528.    **Injury and relief.** As a direct and proximate result of the abuse of process, Plaintiff incurred legal fees in defending two abusive AAA proceedings, suffered reputational injury from the Interim Award and its anticipated dissemination, was compelled to execute instruments she contested, and suffered ongoing emotional distress and reliance costs. Plaintiff seeks compensatory damages,