MICHELLE RITTER
269 S. Beverly Dr. #1315
Beverly Hills, CA 90212
Tel.: (510) 828-7772
Email: ritter_legal@outlook.com
*Plaintiff Pro Se*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA – RIVERSIDE**

MICHELLE RITTER,

Plaintiff,

v.

ERIC SCHMIDT; HILLSPIRE, LLC; GLASER WEIL FINK HOWARD JORDAN & SHAPIRO LLP; CRAIG H. MARCUS, AN INDIVIDUAL; WELLS FARGO BANK, N.A.; KNOX NETWORKS, INC., DBA KNOVA FINANCE; NATALYA THAKUR, AN INDIVIDUAL; KPMG LLP; GOOGLE LLC; MATTHEW HILTZIK, AN INDIVIDUAL; HILTZIK STRATEGIES, LLC, A NEW YORK LIMITED LIABILITY COMPANY; RULTA OÜ, AN ESTONIAN ENTITY; AND DOES 1 THROUGH 50, INCLUSIVE,

Defendants.

Case No. 2:26-cv-04382-JGB-Ex

The Honorable Jesus G. Bernal

**FIRST AMENDED COMPLAINT FOR:**

1. Violation of the RICO Act (18 U.S.C. §§ 1961, 1962(c), 1964(c)) by: (a) Wire Fraud (18 U.S.C. §§ 1343, 1349); (b) Mail Fraud (18 U.S.C. §§ 1341, 1349); (c) Financial Institution Fraud (18 U.S.C. § 1344); (d) Extortion (18 U.S.C. § 1951); (e) Obstruction of Justice and Witness Tampering (18 U.S.C. §§ 1512(b), (c)); and (f) Money Laundering (18 U.S.C. §§ 1956, 1957);
2. Violation of the RICO Act (18 U.S.C. §§ 1961, 1962(d), 1964(c));
3. Fraudulent Filing of Information Returns (26 U.S.C. § 7434);
4. Fraud, Fraudulent Concealment, Professional Negligence, and Breach of Fiduciary Duty (Against KPMG LLP);
5. Computer Fraud and Abuse Act (18 U.S.C. § 1030);
6. Stored Communications Act (18 U.S.C. §§ 2701, 2702, 2707);
7. Federal Wiretap Act (18 U.S.C. §§ 2511, 2520);
8. Comprehensive Computer Data Access and Fraud Act (Cal. Penal Code § 502);

9. Misappropriation of Trade Secrets (18 U.S.C. § 1836; Cal. Civ. Code § 3426 et seq.);

10. Intentional Misrepresentation, Fraudulent Concealment, Negligent Misrepresentation, and Negligence — Non-Routine Banking Services (Against Wells Fargo Bank, N.A.);

11. Conversion;

12. Aiding and Abetting Breach of Fiduciary Duty and Fraud;

13. Bane Act (Cal. Civ. Code § 52.1);

14. Abuse of Process;

15. Sexual Harassment in a Business Relationship and Aiding, Inciting, and Conspiring in Its Denial (Cal. Civ. Code §§ 51.9, 52(b));

16. Trafficking Victims Protection Reauthorization Act (18 U.S.C. §§ 1589, 1591, 1595);

17. Whistleblower Retaliation, Misrepresentation to Induce Service, and Unpaid Compensation (Cal. Lab. Code §§ 1102.5, 970, 218);

18. Defamation, Trade Libel, and False Light;

19. Intentional Interference with Contractual Relations and Prospective Economic Advantage;

20. Declaratory Relief — Non-Formation of the Purported Audem Arbitration Agreement (28 U.S.C. § 2201; 9 U.S.C. § 4);

21. Declaratory Relief — Void and Unenforceable Provisions (Cal. Code Civ. Proc. §§ 1001, 1002; Cal. Gov't Code § 12964.5; Cal. Civ. Code §§ 1668, 1670.11);

22. Declaratory Relief — Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act (9 U.S.C. §§ 401–402; 28 U.S.C. § 2201);

23. Constructive Trust, Unjust Enrichment, and Accounting;
24. Unfair Competition (Cal. Bus. & Prof. Code § 17200 et seq.)

**DEMAND FOR JURY TRIAL**

Plaintiff Michelle Ritter ("Ritter" or "Plaintiff"), appearing pro se, alleges as follows. Allegations concerning Plaintiff and her own acts are made on personal knowledge. Allegations concerning Defendants' internal acts, communications among Defendants, and the contents of records within Defendants' exclusive control are made on information and belief after reasonable inquiry, and each such allegation is tethered to a document identified in the Exhibit Index at the end of this Complaint.

## I. NATURE OF THE ACTION

1. This is a fraud case. Its subject is an extensive tax fraud and accounting fraud, the theft of a founder's companies and cash, and the use of digital tools and unauthorized access to cover it up — including the withholding, alteration, and deletion of the digital records that show the extent of the tax fraud and the corporate fraud. Beginning in 2020 and continuing through the month this Complaint is filed, a family office worth tens of billions of dollars, its lawyers, its accountants, its bank, its IT vendor, its payroll company, and the technology company its principal once ran took the companies a graduate student built, booked more than $42,000,000 of tax losses to themselves, booked the liabilities to her, and then reached into her computers, her email, and her privileged communications to rewrite the record of what they had done. The personal conduct — sexual assault and harassment by the man who funded the companies, the surveillance of Ritter and her parents, and the conditioning of payment on a sworn recantation — is being addressed in its own right; it is pleaded here because the same parties enabled it with the same tools, and because it was the enforcement mechanism of the fraud. The fraud does not depend on it.

2. The paper trail begins with $26,800,000. In May 2024, KPMG LLP — engaged by SPM for a single year's returns — proposed to amend SPM's already-filed 2022 partnership return so that $26,800,000 of expenses the prior preparer had capitalized would "flow through as expenses and be carried forward as an NOL." SPM's finance staff told Ritter, SPM's Manager and 51% owner, in writing that this was "a massive tax benefit," that "Michelle will need to amend her 2022 K1," and that KPMG was proceeding "as MR approved." [Ex. 51; Ex. 52] Eight days later, on May 31, 2024, at a meeting with KPMG that Ritter did not attend and was not told of, Hillspire's tax representative instructed KPMG: "All losses will be allocated to hillspire, MR K1 will not be impacted. I want to make sure this is clear and understood." KPMG answered: "we will keep this in mind." In the same meeting Hillspire's Chief Accounting Officer asked whether, if the amendment "might trigger an audit," KPMG was "standing behind us in this position"; KPMG said the position was "more likely than not"; Hillspire's representative put it at "50-70%"; and a second Hillspire representative warned that "where you get to the individual level, it may raise a red flag. Who knows what else is coming down the pipeline this year." [Ex. 53] What was coming down the pipeline was the shutdown. Three weeks earlier Hillspire's Chief Accounting Officer had announced that "Eric has no further funding obligation" and that severances would follow "as part of a broader transition"; one week later Schmidt filed the first arbitration against Ritter and her parents; and by November 18, 2024 Hillspire's own budget analysis recorded that "due to the KPMG tax assessment of 2023 and additional $26M+ 2022 write-off, Hillspire and the Schmidt family — via their pass-through structure — is making money via this forced shutdown." [Ex. 57; Ex. 8] KPMG's fees for that work were paid from SPM's own cash — cash that was 51% Ritter's — and presented to an arbitrator as costs of "winding down" her company. [Ex. 5]

3. The scheme is not historical. It is running. In July and August 2026, Defendant Craig H. Marcus of Glaser Weil transmitted to Ritter the latest California Employment

Development Department tax notices directed at Audem Management, LLC, a company she owns whose books, payroll, and bank accounts have been administered through Hillspire, LLC's systems and personnel since 2022, demanding that she answer for employment-tax liabilities generated under Defendants' control. On April 6, 2026, Eric Schmidt and Hillspire filed with the American Arbitration Association a ledger for Steel Perlot Management, LLC ("SPM") that discloses, in their own hand, that after they took Ritter's 51% of SPM for $14,000,000 they never paid, they spent SPM's own cash on KPMG tax engagements Ritter never authorized, on severance for people Hillspire then re-hired, on a vendor invoice Ritter had already paid, and on a year of live trading-data feeds for a company they told the tribunal they were "winding down." The same filing disclosed for the first time that on December 19, 2024, fifteen days after Ritter signed a settlement negotiated on the express footing that StarX Networks, Inc. remained hers, Hillspire's Senior Legal Director signed a resolution declaring StarX's loan "wholly worthless" and writing it off. In May 2025, Knox Networks, Inc., now Knova Finance Corp., and its officer Natalya Thakur refused to release any share information to the company's founder unless she first agreed never to speak to another stockholder, never to use the information in litigation "including over corporate mismanagement or tax fraud," and to forgo the Delaware stockholder rights the settlement itself had confirmed she kept.

4. Those April 6, 2026 disclosures are why this action exists, and why it exists here. Eighteen days after Schmidt, Hillspire, Glaser Weil, and Marcus filed 1,341 pages in the arbitration — after Ritter's answer had been struck and her evidence precluded — Ritter filed this action on April 24, 2026. The April 6 filing disclosed for the first time the Wind-Down Ledger [Ex. 5]; the December 19, 2024 Written Consent declaring StarX's loan "wholly worthless" [Ex. 6]; Marcus's sworn admission that he communicated directly with Ritter on December 17, 2024 to procure the withdrawal of her restraining-order petition [Ex. 38, App. Ex. 72]; the RSI surveillance invoices and the $8,080,138 reputational-repair budget [Ex. 38]; and the declarations of Quach and

Young describing Hillspire's administration of SPM's accounts and devices [Ex. 38]. Those documents supplied the payment trail, the admissions, and the predicate acts on which Counts One through Four, Eleven, Thirteen, and Twenty-Three rest. Ritter did not choose this forum to escape another; she came to the only forum that can hear these claims. Nine of the twelve Defendants are strangers to the December 4, 2024 Agreement and to the arbitration. The claims arise under federal statutes — the Racketeer Influenced and Corrupt Organizations Act, the Computer Fraud and Abuse Act, the Stored Communications Act, the Wiretap Act, the Defend Trade Secrets Act, 26 U.S.C. § 7434, the Trafficking Victims Protection Act, and 9 U.S.C. § 402 — that no arbitrator has decided and that the Los Angeles Superior Court proceeding, a summary petition by four award creditors to confirm an award under Code of Civil Procedure § 1285, cannot adjudicate. The Santa Clara County action against Google and Alphabet was voluntarily dismissed so that every claim could be heard together here.

5. The result is a tax bill in the wrong name. Through the coordinated acts of KPMG LLP, Wells Fargo Bank, N.A., TriNet Group, Inc., Alphabet Inc., Google LLC, Glaser Weil, Marcus, Knox, and Thakur, tax liabilities generated by and for Knox, Schmidt, Hillspire, Steel Perlot Investments, LLC, and other Schmidt-aligned taxpayers have been booked, reported, and are now being collected against Ritter personally, while the economic benefit of the same activity, including more than $42,000,000 in net-operating-loss write-offs that Hillspire's own budget note described as "making money via this forced shutdown," flowed to Schmidt-side interests. A Form 1099 attributing approximately $2,700,000 of Audem "income" to Ritter, issued weeks after the Schmidt Parties represented in writing that they held no Audem books or records, is one instance. StarX tax documents redirected for two years to Thakur and to Hillspire's Menlo Park address is another. A StarX power of attorney filed with the Idaho Department of Labor through TriNet bearing a copy-pasted "signature" of Ritter and the personal cell-phone number of Hillspire's Chief Accounting Officer is a third.

6. Then the records were changed. To carry out the shift and conceal it, Defendants used sustained, unauthorized access to Ritter's personal devices and to her professional and personal email and digital accounts: a laptop configured with an "ericschmidt" account, Hillspire IT accounts, enterprise device-management software reporting to hillspire.jamfcloud.com, and remote-control software with screen-recording rights, all installed four days before Ritter's own account was created; a DocuSign "signature" on an Audem agreement Ritter rejected in writing four minutes after her general counsel told Hillspire she had signed it; tax and governance folders hidden from the 51% owner's administrative view until her own finance employee, a former KPMG accountant, told her they existed; and, in December 2024, the seizure of three Google Workspace domains she owned and paid for, within twenty-four hours of her granting temporary access so that a copy could be made, followed ten days later by Hillspire's payment of the IT vendor's outstanding invoice.

7. The digital lever served three ends, and each is pleaded with precision. First, it enabled the cover-up of the tax and business fraud: the books, tax-compliance workpapers, and governance records of SPM, SPI, Knox, StarX, and Audem were held in accounts and folders Defendants controlled, hidden from the 51% owner's administrative view, altered after the fact, and — after the December 2024 seizure of the Workspace domains she owned — withheld from her entirely, so that the records reflecting the extent of the tax fraud and the corporate fraud could not be examined, and the theft of StarX's intellectual property, which an OpenAI employee accessed through the seized workspace in April 2025, could proceed. Second, it enabled the surveillance and harassment of Ritter and her parents: device-management and remote-control software on her computers, location tracking through a shared vehicle, and administrator-level access to her email. Third, it enabled the interception of her attorney-client communications, which Defendants read while litigating against her. The digital conduct is the means; the tax and business fraud is the object; the personal harm is the enforcement.

8. Alphabet knew. Since no later than April 26, 2024, when Ritter was removed from every position she held at Knox, a company on whose board Alphabet director R. Martin Chávez sat alongside Schmidt, on the day of the second mediation session and four weeks after her counsel first reported Schmidt's abuse in mediation, Alphabet Inc. has been aware of the retaliation: Chávez signed the removal consent himself. [Ex. 33] Ritter gave Google written notice of unauthorized access to her accounts beginning in June 2024, again on December 10, 2024 after the workspace seizure, to an Alphabet board member in January 2025, by counsel's preservation letter of February 21, 2025, and by counsel's December 5, 2025 letter to Google's Chief Legal Officer. No investigation, cure, or preservation followed. Instead, the seized workspace was migrated to a new tenant, "SchmidtEntity.co," complete with an email account impersonating Ritter, and the engineer who had been paid to resign from her companies in August 2024 was hired by Google that fall. Alphabet is sued for what Alphabet did and failed to do after notice to Alphabet itself; its liability does not depend on Google's, and Google's does not depend on Alphabet's. Wells Fargo, likewise, is sued for its own written representations to its own customer and for its own re-titling of her account to her adversary; its liability does not depend on a finding against Schmidt or Hillspire.

9. Two schemes, one enterprise, one victim. The tax-and-asset scheme and the digital-seizure scheme were carried out by the same participants, against the same person, through the same channels, for the same purpose. The second exists to protect the first. Each was accomplished through interstate wires, the mails, a national bank, and cloud infrastructure, and each generated discrete, dated acts that are pleaded individually in Part V and mapped defendant-by-defendant in Count One.

10. The scheme had a second purpose: silence. Ritter has experienced a repeated and continuing course of quid-pro-quo sexual harassment and retaliation that began in 2021, was reported through counsel in March and April 2024, and has not stopped. Within weeks of the report she was cut off from funding and removed from Knox. Schmidt then commenced an arbitration against her and her elderly parents on the

strength of the agreement she never signed. The December 4, 2024 Settlement Agreement conditioned the $14,000,000 for her 51% of SPM on her "voluntarily" delivering a sworn declaration recanting her report; the $14,000,000 has never been paid. The December 17, 2024 Amendment, procured in an eleven-hour session at her residence by Marcus, Jillian Harris, a Hillspire executive, and private security, conditioned payment to her parents on the withdrawal of her pending domestic-violence restraining-order petition within twenty-four hours. On January 15, 2025 Schmidt filed a new arbitration demand premised on the falsity of her report. Through 2025 and 2026 came a repurchase notice against her founder shares, a gag agreement, investigators outside her residences, a $120,095 social-media surveillance program, contacts with her witnesses, an $8,053 investigator effort to locate and serve her parents, and a private award adjudicating her report false and budgeting $8,080,138 to displace her speech. Each act was a step toward defeating, by private means, the protections Congress and California enacted for people in her position.

11. This Complaint does not ask the Court to adjudicate the historical truth of Ritter's 2024 sexual-assault report, and it does not seek merits review of any arbitral award or state-court ruling. It asks for what the statutes Defendants violated provide: treble damages and fees under 18 U.S.C. § 1964(c); the statutory remedy Congress created for fraudulent information returns; damages and injunctive relief under the Computer Fraud and Abuse Act, the Stored Communications Act, the Wiretap Act, and California's computer-crime and trade-secret statutes; the banking-law remedies available against a bank that went beyond routine services to move a customer's money to her adversary; a declaration that the provisions purchasing her silence are void; a declaration under 9 U.S.C. § 402 that, at her election, no predispute arbitration provision is enforceable against this case; a constructive trust over the assets taken for no consideration; and an order ending Defendants' access to, and alteration of, her records.

12. Every date, dollar figure, and quotation in this Complaint is tethered to an exhibit. The case can be read in the documents.

## II. PARTIES

### A. Plaintiff

13. Plaintiff Michelle Ritter is an individual residing in Los Angeles County, California. She holds a JD and an MBA from Columbia University. In May 2020, as a Columbia graduate student and before she met Defendant Schmidt, Ritter founded StarX Networks, Inc. ("StarX"), a Delaware corporation, through Wilson Sonsini Goodrich & Rosati. Between 2020 and 2024 Ritter served as founder and Chief Executive Officer of StarX; as founder, Chief Executive Officer, and 100% owner of Audem Management, LLC ("Audem"), a Delaware limited liability company formed December 28, 2021; as co-founder, 51% common member, and sole Manager of Steel Perlot Management, LLC ("SPM"), a Delaware limited liability company formed in 2021; and as founding Chief Executive Officer and director of Knox Networks, Inc. ("Knox"), a Delaware corporation incorporated January 26, 2021, in which she holds 24,000,000 shares of Common Stock under Certificate CS-02, of which the December 4, 2024 Settlement Agreement, § 1(j), acknowledges 19,500,000 as vested. Ritter is the author of the January 29, 2026 op-ed "The Predator's Playground" and the February 10, 2026 whistleblower letter to Members of Congress. [Ex. 43]

### B. Defendants

14. **Defendant Eric Schmidt** ("Schmidt") is an individual residing in California. He is the former Chief Executive Officer and Executive Chairman of Google and Alphabet, a person intimately familiar with digital security, data transfer, and the administration of Google Workspace tenants. He controls Hillspire, LLC and, through it, Steel Perlot, LLC (now Orion Wing, LLC), Steel Perlot Investments, LLC (now Orion Wing Investments, LLC), and, since December 4, 2024, SPM (now Orion Wing Management, LLC). He served as Chairman of SPM and of Knox. He directed, funded, and benefited from every act alleged in this Complaint.

15. **Defendant Hillspire, LLC** ("Hillspire") is a Delaware limited liability company with its principal place of business in Menlo Park, California. It is the family office of Eric and Wendy Schmidt and the operational hub through which Schmidt-side legal, accounting, tax, banking, payroll, information-technology, real-estate, and settlement functions were directed. Its personnel who acted in the events alleged include Mandy Quach (Chief Accounting Officer), Maria Seferian (General Counsel), Kelly Young (Chief Information Officer), Debra Smith (Senior Director of Real Estate), Sarah Frayer, and Joon Hur (Senior Legal Director). Hillspire is the sole manager of Orion Wing Management, LLC.

16. **Defendant Glaser Weil Fink Howard Jordan & Shapiro LLP** ("Glaser Weil") is a California limited liability partnership with its principal place of business at 10250 Constellation Boulevard, Los Angeles, California. Glaser Weil is sued for its own operational, non-advocacy conduct: its partners' assumption, from April 2024, of governance and operating authority over SPM and its affiliates, confirmed by SPM's July 15, 2024 internal memorandum describing "our Hillspire counterparts and SPM finance — who are de facto managers"; its direction of the December 2024 seizure of Ritter's Google Workspace domains, confirmed by its partner's written statement that "we are responsible for the CGNet bill … We are simply taking over CGNet now"; its on-site procurement of the December 17, 2024 Amendment at Ritter's residence; its administration of a severance program under which departing employees attested that no one had induced them to leave; and its refusal to honor a records-preservation notice invoking the crime-fraud exception. Glaser Weil billed $1,409,881.94 through October 2025 for the work described in this Complaint and holds a financial stake in its outcome. Glaser Weil is not sued for any statement made to a tribunal in the course of advocacy.

17. **Defendant Craig H. Marcus** ("Marcus") is an individual and a partner of Glaser Weil. Marcus is sued in his individual capacity for conduct in which he acted as a principal, not as an advocate: assuming with Jillian Harris governance and operating

roles within SPM from April 2024; emailing SPM and Audem employees on August 4, 2024 with false statements about Ritter after removing her from the thread; refusing on October 26, 2024 to state a buyout price while the December agreement was being prepared; personally attending, with private security, the December 17, 2024 session at Ritter's residence at which the Amendment and the withdrawal of a pending domestic-violence restraining-order petition were procured; communicating directly with Ritter regarding that withdrawal after obtaining her counsel's acquiescence, a role he admitted in a sworn filing on April 6, 2026; pressuring Ritter in writing on December 23, 2024 and January 13–15, 2025 to deliver the Schedule D recantation "now instead of when Michelle is paid in full"; threatening Ritter's successive counsel; refusing on September 12, 2025 to honor a records-preservation notice; and transmitting the August 2026 Audem tax notices. Marcus submitted sworn declarations in the AAA proceeding on the very facts in which he participated, making himself a necessary witness.

18. **Defendant KPMG LLP** ("KPMG") is a Delaware limited liability partnership with its principal office in New York and offices throughout California. Ritter engaged KPMG, and signed its engagement, for tax year 2023 only, for SPM, Knox, Audem, and StarX. KPMG took all direction on that engagement from Hillspire and "SPM Finance," Mandy Quach and Connor Coit, a former KPMG accountant, and excluded Ritter from every communication. KPMG suggested on March 6, 2024 that SPM "buy" StarX so that its costs would run through SPM's trial balance for write-off; accepted Hillspire's instruction to reclassify prior-year capitalizations to maximize net-operating-loss carryforwards; undertook, outside the scope of its engagement, to amend SPM's 2022 partnership return to generate a $26,800,000 loss, obtained Ritter's approval for that amendment on the representation that her own Schedule K-1 would be amended, and then, at a May 31, 2024 meeting from which Ritter was excluded, accepted Hillspire's instruction that "All losses will be allocated to hillspire, MR K1 will not be impacted"; characterized Schmidt and Hillspire internally as "our investor"; ignored Ritter's repeated written statements that the books had been altered and that

the structure made no sense; represented that it had prepared Audem's returns when it had not; and then accepted, and was paid $71,460 from SPM's own accounts for, tax-year 2024 and 2025 engagements for SPM that Ritter never authorized, including preparation of the returns for the year in which the $2,700,000 Audem 1099 was issued. KPMG entered into a deferred prosecution agreement with the United States Department of Justice in August 2005 admitting its role in fraudulent tax-shelter schemes and paying $456,000,000 in fines, restitution, and penalties. It knew what it was doing.

19. **Defendant Wells Fargo Bank, N.A.** ("Wells Fargo") is a national banking association with its main office in Sioux Falls, South Dakota, doing business throughout California. Wells Fargo held the personal, SPM, Audem, StarX, and Steel Perlot accounts described in Part V through its Private Bank / Wealth & Investment Management channel, the same channel that served Hillspire. Its personnel who acted include Lisa Meredith (Lead Wealth Management Banker and Executive Director, NMLSR ID 1953715) and Jerald Sencil (personal banker). Wells Fargo went beyond routine banking: it treated Hillspire's Chief Accounting Officer as a gatekeeper on accounts whose Certifications of Beneficial Ownership named Ritter alone; told Ritter in July 2024 that she was SPM's "sole member" responsible for its payroll while telling her the same month that it would not act on her instructions without Hillspire's written concurrence; represented in writing four times in October 2024 that SPM's and Audem's accounts would be permanently closed on November 8, 2024 with the balances remitted to Ritter by cashier's check because she was "no longer associated with the Hillspire family office"; and then did not close the SPM savings account holding $946,706.69, re-titled it to Hillspire's successor entity "Orion Wing Management, LLC," opened a new $207,370.86 time account in that name, and permitted $897,859.54 to move out to Schmidt-side interests, all while refusing Ritter any accounting.

20. **Defendant Knox Networks, Inc., dba Knova Finance** ("Knox") is a Delaware corporation now operating as Knova Finance Corp. Ritter co-founded Knox at the request of Schmidt and R. Martin Chávez in late 2020 and served as its Chief Executive Officer and a director until her removal on April 24–26, 2024. Schmidt and Chávez served as Knox directors during her tenure. Knox is sued for the retaliatory removal, the termination of vesting, the April 2025 repurchase notice, the May 2025 gag-agreement demand, the redirection of StarX tax documents through its officer Thakur, and the accounting practices by which its costs were shifted onto SPM.

21. **Defendant Natalya Thakur** ("Thakur") is an individual, Knox's Chief Operating Officer at the time of the June 21, 2021 issuance of Certificate CS-02, a Knox common stockholder, and, after April 2024, a controlling actor in Knox's governance together with Schmidt. Thakur is sued for redirecting StarX's tax documents to herself and to Hillspire beginning no later than 2022 — including StarX's State of Delaware tax notices, which StarX's registered agent addressed to "Natalya Thakur-COO, Knox Networks Inc." at Knox's Palo Alto post-office box [Ex. 58] — for holding herself out to third parties as having authority for StarX, a company in which she held no office and no shares, for enabling documents to be executed in Ritter's name without authorization, for signing the December 4, 2024 Settlement Agreement on Knox's behalf and then, in April and May 2025, executing the repurchase notice and demanding the gag agreement, and for attempting in August 2025 to access Ritter's personal Google Workspace.

22. **Defendant Google LLC** ("Google") is a Delaware limited liability company with its principal place of business in Mountain View, California, and a wholly owned subsidiary of Alphabet Inc. Google operated the Google Workspace tenants and Gmail accounts described in this Complaint under Terms of Service that condition control of a Workspace on ownership of the associated domain. Ritter owned steelperlot.com, starx.com, and audem-mgmt.com and paid the subscriptions personally through the end of 2024. Google is sued for divulging the contents of Ritter's stored communications

to persons not authorized to receive them; for permitting, after repeated written notice, the transfer of tenant control to persons who did not own the domains, the migration of the seized contents to the "SchmidtEntity.co" tenant, the creation of an account impersonating Ritter, and the access of StarX trade secrets by an OpenAI employee; and for failing to preserve. Google employed, from Fall 2024, the former head of engineering for Ritter's companies whom Schmidt-side actors had paid to resign in August 2024. Google's own Terms of Service are its contract; its conduct here was not routine hosting.

**Prior Doe Defendants – Parties Now Named**:

23. **Defendant CGNET Services International, Inc.** ("CGNET") is, on information and belief, a California corporation with its principal place of business in Santa Clara County, California. CGNET was the managed IT-services provider, with super-administrator authority, for the Google Workspace tenants steelperlot.com, starx.com, audem-mgmt.com, and knox-networks.com, and administered SPM's DocuSign, email, Zoom, Slack, and distribution lists. Its personnel include Ricardo Uribe. CGNET held a separate, direct relationship with Hillspire. CGNET blocked Ritter's access to the KPMG tax-compliance folders in her own Workspace in 2024; operated forwarding pathways from Ritter's tenants to Hillspire personnel through August 2024; confirmed in June 2024 that the Audem agreement used against Ritter's parents did not exist in SPM's DocuSign; and, on December 6–7, 2024, within twenty-four hours of receiving temporary elevated access to make a copy, locked Ritter out of steelperlot.com and copied the starx.com and audem-mgmt.com tenants for Hillspire, for which Hillspire paid CGNET's outstanding invoice on December 20, 2024.

24. **Defendant TriNet Group, Inc.** ("TriNet") is a Delaware corporation with its principal place of business in Dublin, California, which, directly and through its professional-employer-organization affiliates, provided payroll, employment-tax, and human-resources services to SPM, Knox, StarX, and Audem from 2021 through 2024 under enrollments set up by Hillspire's Mandy Quach. TriNet is sued for transmitting

to the Idaho Department of Labor and to California authorities, in June 2024, employment-tax filings and a power of attorney for StarX bearing a copy-pasted "signature" of Ritter and listing Quach's personal cell phone as the contact, and for administering payroll, wage reporting, and information returns for Ritter's companies at Hillspire's direction and without Ritter's authorization, thereby generating the employment-tax liabilities now being collected against her.

25. **Defendant Alphabet Inc.** ("Alphabet") is a Delaware corporation with its principal place of business in Mountain View, California, and the parent of Google. R. Martin Chávez has been a member of Alphabet's Board of Directors since July 14, 2022 and was, at the same time, a director of Knox; Chávez asked Ritter, alongside Schmidt, to form Knox in late 2020 and urged her to bring Thakur in as Knox's Chief Operating Officer in June 2021. Alphabet is sued because its director Chávez personally executed, with Schmidt, the April 26, 2024 written consent removing Ritter from every office at Knox four weeks after her report of Schmidt's abuse, so that Alphabet had actual knowledge of the retaliatory removal through its own director's act and of the governance and accounting practices at Knox described in Part V; because Ritter gave notice to an Alphabet board member in January 2025 of the ongoing unauthorized access to her Google accounts; because Alphabet, as the entity that sets and enforces the Workspace and Gmail policies under which the seizure, migration, impersonation, and disclosure occurred, enabled and ratified that conduct after notice; and because Alphabet's former Executive Chairman is the person on whose behalf the conduct was undertaken.

26. **Defendants Does 1 through 50** are persons and entities whose identities are presently unknown, sued by fictitious names. Does 1–10 are information-technology operators and credential custodians aligned with Hillspire, CGNET, or Schmidt-controlled entities who participated in the device, Workspace, and DocuSign conduct pleaded in Part V.D; Does 11–20 are attorneys, paralegals, and staff at or aligned with Glaser Weil (other than Marcus) who engaged in the operational conduct pleaded

herein; Does 21–30 are Wells Fargo, KPMG, or TriNet personnel who participated in the account, tax, and filing conduct pleaded herein; Does 31–40 are Knox or Knova officers, employees, or agents who participated in the repurchase, gag-agreement, or defamation conduct; and Does 41–50 are additional persons identified through discovery, including private investigators and surveillance vendors. Plaintiff will amend to substitute true names.

**C. Non-Party Participants**

27. The following persons participated in the enterprise's affairs and are identified for the Court's understanding; each is placed on notice of the obligation to preserve all documents, communications, devices, and accounts relating to Plaintiff and the entities alleged herein: Mandy Quach (Hillspire Chief Accounting Officer; Wells Fargo joint gatekeeper; TriNet enroller; KPMG counterparty; declarant in the AAA proceeding); Maria Seferian (Hillspire General Counsel; formed Ritter's entities); Kelly Young (Hillspire Chief Information Officer; authority over hillspire.jamfcloud.com; declarant); Debra Smith (Hillspire Senior Director of Real Estate; present December 17, 2024; declarant); Joon Hur (Hillspire Senior Legal Director; signed the December 19, 2024 StarX write-off); Sarah Frayer (Hillspire; originated the Audem DocuSign envelope); Jillian Harris and Patricia Glaser (Glaser Weil partners; conduct pleaded in Part V; individual claims reserved); Jordan Manekin (SPM general counsel who told Hillspire the Audem agreement was "signed by Michelle"); Connor Coit (former KPMG accountant; SPM finance lead; KPMG's counterparty; disclosed the hidden folders); Sunil Tahiliani, Chun Cho, Robert Kierzkowski, and Aum Minyong (KPMG; Cho, Kierzkowski, and Minyong attended the May 31, 2024 meeting on the $26,800,000 amendment); Luke Keel and Megan Lennon (Hillspire; Hillspire's tax representatives at the May 31, 2024 meeting; Keel is the speaker of "All losses will be allocated to hillspire, MR K1 will not be impacted"); Ran Rabinowitch and Mitchell Bajema (SPM finance; attended the May 31, 2024 meeting); Lisa Meredith and Jerald Sencil (Wells Fargo); Ricardo Uribe and "Georg"

(CGNET); Ivan, Hristo, Spassimir, and Alexander Paskov (former SPM personnel paid "transition pay" by Hillspire and thereafter employed by Hillspire); Tyler Gwinn (former SPM employee, resigned February 2023, paid tuition by Hillspire at semester cadence through February 2026); Ioannis P. (former head of engineering, paid to resign August 2024, hired by Google Fall 2024); R. Martin Chávez (Alphabet director; Knox director who signed the April 26, 2024 removal consent); Wendy Schmidt (Hillspire principal); Todd Meister; Eric Rose (Englander Knabe & Allen; $8,080,138 reputational-harm model); RSI and Bullpen Strategy Group (surveillance and media-monitoring vendors); Matthew Hiltzik (public-relations agent); Stephanie Bousley (Sibble) and Ty Schenck, whose roles will be substituted for Doe defendants upon identification; and the American Arbitration Association, which administered AAA Nos. 01-24-0005-8902 and 01-25-0000-2191.

**D. The Entities**

28. Three distinct "Steel Perlot" entities appear in this Complaint and must not be conflated. SPM is Steel Perlot Management, LLC, the operating company Ritter built, in which she held 51% of the common interest and served as sole Manager; it was renamed Orion Wing Management, LLC after December 4, 2024 and is now managed by Hillspire. SP LLC is Steel Perlot, LLC, Schmidt's investment vehicle holding the 49% preferred interest in SPM, renamed Orion Wing, LLC. SP LLC's sole member is Big Hen Group I, LLC ("Big Hen"), whose manager is Hillspire and whose co-manager is Schmidt — the chain recorded in Hillspire's own signature block on the April 26, 2024 Knox consent [Ex. 33] — and Big Hen is the Schmidt entity that receives SPM's Schedule K-1 for the 49% interest and that SPM's finance staff identified in May 2024 as the partner whose K-1 would be amended alongside Ritter's. [Ex. 51; Ex. 52] Hillspire uses SP LLC and Big Hen interchangeably as the holder of that interest; and in 2021 Hillspire's General Counsel, Seferian, had Ritter sign as Chief Executive Officer of, and for, Steel Perlot, LLC — the same entity that Hillspire now presents as Schmidt's vehicle adverse to her. The interchangeable use of those entities is itself part

of the fraud pleaded in Part V and will be further particularized. SPI is Steel Perlot Investments, LLC, the Schmidt-side fund vehicle, renamed Orion Wing Investments, LLC. Knox Networks, Inc. is now Knova Finance Corp. StarX and Audem are, and always were, 100% owned by Ritter, as the Schmidt Parties acknowledged in writing in § 1(g) of the December 4, 2024 Settlement Agreement and as Hillspire's own submission to KPMG recorded: "100% owned by Michelle Ritter (CEO), not by SPM."

## III. JURISDICTION AND VENUE

29. This Court has original subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States: 18 U.S.C. §§ 1962, 1964(c) (RICO); 26 U.S.C. § 7434; 18 U.S.C. § 1030(g); 18 U.S.C. § 2707; 18 U.S.C. § 2520; 18 U.S.C. § 1836; 18 U.S.C. § 1595; 9 U.S.C. §§ 4, 401–402; and 28 U.S.C. §§ 2201–2202. The Court has jurisdiction under 28 U.S.C. § 1337 over the RICO claims. The Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a) because they arise from the same nucleus of operative fact: the same enterprise, the same documents, the same accounts, the same devices, and the same dated acts.

30. This Court has personal jurisdiction over every Defendant. Schmidt, Hillspire, Glaser Weil, Marcus, CGNET, TriNet, Google, and Alphabet reside in or maintain their principal places of business in California. KPMG maintains offices in Los Angeles and performed the engagement at issue for California entities under the direction of California-based Hillspire personnel. Wells Fargo conducts continuous and systematic banking business in California, opened and administered the accounts at issue through personnel serving California customers, and directed the October 2024 correspondence to Ritter in California. Knox and Thakur directed the repurchase notice, the gag-agreement demand, the StarX tax redirection, and the August 2025 access attempt at a California resident and at California-hosted accounts. Personal jurisdiction over all Defendants also lies under 18 U.S.C. § 1965(b) and (d) because the ends of

justice require that all members of a single nationwide enterprise be brought before one court.

31. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred here: Glaser Weil's principal office is in Los Angeles; the December 17, 2024 session occurred at Ritter's residence in Los Angeles County; the AAA proceedings were administered from Los Angeles; the properties from which Ritter and her parents were evicted are in Los Angeles County; Ritter's devices were accessed while located in Los Angeles County; and Ritter suffered the injuries alleged here. Venue is also proper under 18 U.S.C. § 1965(a) as to each Defendant that resides, is found, has an agent, or transacts affairs in this District.

32. This action is not subject to any arbitration agreement, and no claim in it is barred by the December 4, 2024 Agreement. Nine of the twelve named Defendants — KPMG, Wells Fargo, TriNet, CGNET, Google, Alphabet, Glaser Weil, Marcus, and Thakur — are not parties to the Agreement or to any agreement with Ritter containing an arbitration clause. Under *Goldman v. KPMG LLP*, 173 Cal. App. 4th 209 (2009), a nonsignatory may invoke another party's arbitration clause only where the plaintiff's claims against it are "founded in and inextricably intertwined with" the obligations of the agreement containing the clause. The claims here against each nonsignatory arise from that Defendant's own statutory and common-law duties — KPMG's duties as Ritter's engaged accountant, Wells Fargo's duties as her bank, TriNet's as her payroll processor, CGNET's and Google's under the computer-crime statutes, Alphabet's as the party with knowledge and control, Glaser Weil's and Marcus's for operational conduct outside advocacy, and Thakur's as a corporate officer and fellow stockholder — and none depends on the terms of the Agreement. As to Schmidt, Hillspire, and Knox: (i) Counts One through Nineteen are complete without reference to any term of the Agreement — they rest on conduct before December 4, 2024 that the Agreement neither performed nor adjudicated, and on conduct after December 4, 2024 that was not

the performance of any obligation under it — and none was submitted to or decided by the arbitrator, whose Award adjudicated only the Schmidt Parties' claims that Ritter had breached the Agreement; (ii) the Agreement's general release, § 2, by its own terms does not reach "Claims for Fraud or other Intentional and Willful Violation in the making of this Agreement," and the Agreement was made by the fraud, concealment, and duress pleaded in Parts V.C.7 and V.E, so that the release is unenforceable as to every claim here and is the subject of Count Twenty-One; (iii) the arbitration clause, § 3(g), is a predispute arbitration agreement that the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, 9 U.S.C. § 402, renders unenforceable at Ritter's election, a question that § 402(b) commits to this Court and that no court has decided on the merits; and (iv) whether any agreement to arbitrate was ever formed under the March 17, 2022 Audem instrument is a question for this Court under 9 U.S.C. § 4 (Count Twenty). Counts Twenty through Twenty-Two present questions that statute assigns to this Court; Counts Twenty-Three and Twenty-Four seek equitable relief over property taken by the conduct pleaded in the preceding Counts, including property whose transfer the Agreement recited but for which the recited consideration was never paid. The Los Angeles Superior Court proceeding is a petition by four award creditors to confirm the Award under Code of Civil Procedure § 1285 and Ritter's response seeking its vacatur; it does not and cannot adjudicate the claims here, which are against different parties, under different law, for different injuries. Nothing in this Complaint seeks review of the Award or relitigation of the breach-of-contract questions it decided.

## <u>IV. SUMMARY OF CLAIMS BY DEFENDANT</u>

33. For the Court's convenience, the following chart identifies each Defendant and the Counts pleaded against it. Counts are pleaded in full in Part VI.

Eric Schmidt: Counts 1, 2, 3, 5, 6, 7, 8, 9, 11, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24.

Hillspire, LLC: Counts 1, 2, 3, 5, 6, 7, 8, 9, 11, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24.

Glaser Weil: Counts 1, 2, 5, 8, 12, 14, 15, 18, 19, 24.

Craig H. Marcus: Counts 1, 2, 5, 8, 12, 13, 14, 15, 18, 19, 24.

KPMG LLP: Counts 1, 2, 3, 4, 12, 19, 24.

Wells Fargo Bank, N.A.: Counts 1, 2, 10, 11, 12, 15, 24.

Knox Networks, Inc. dba Knova Finance: Counts 1, 2, 3, 11, 15, 17, 18, 19, 21, 22, 23, 24.

Natalya Thakur: Counts 1, 2, 3, 5, 8, 11, 12, 15, 18, 19, 24.

CGNET Services International, Inc.: Counts 1, 2, 5, 6, 7, 8, 9, 11, 12, 19, 24.

TriNet Group, Inc.: Counts 1, 2, 3, 12, 24.

Google LLC: Counts 2, 5, 6, 8, 9, 19, 24.

Alphabet Inc.: Counts 1, 2, 5, 6, 8, 9, 12, 15, 19, 24.

Does 1–50: As pleaded in each Count.

## V. FACTUAL ALLEGATIONS

### A. Origin: The Businesses and the Control Architecture Built Around Them (2020–2022)

34. Ritter met Schmidt in September 2020, while she was a joint JD/MBA candidate at Columbia, through an introduction concerning StarX, the company she had founded four months earlier. Schmidt was thirty-nine years her senior and among the wealthiest people in the world. He offered resources; she had student loans. In November 2020, Schmidt, through Hillspire's Mandy Quach, caused Wells Fargo to issue Ritter a personal credit card, which Quach delivered by hand. [Ex. 17] From that month forward, Ritter's housing, banking, payroll, legal counsel, accountants, IT, and devices were supplied, administered, or controlled by Schmidt-side personnel.

35. In late 2020, at the request of Schmidt and R. Martin Chávez, Ritter co-founded Knox. Chávez urged her to bring Thakur in as Chief Operating Officer in June 2021. Knox was incorporated January 26, 2021; Ritter was its Chief Executive Officer and a director from the Action of Incorporator on March 15, 2021; Schmidt and Chávez sat on its board. On June 21, 2021, Knox issued Ritter Certificate CS-02 for 24,000,000

shares of Common Stock, vesting from January 2021 over forty-eight months, reflected on Knox's own capitalization tables as of December 31, 2022 and March 31, 2024. [Ex. 33] Schmidt, through Steel Perlot, funded Knox with more than $16,000,000, including $13,945,000 recorded as preferred member contributions. [Ex. 7] Ritter worked at Knox for equity only. She was never paid a salary.

36. In 2021, Ritter and Schmidt formed SPM, an investment-management and incubation company, under an Amended and Restated Limited Liability Company Agreement effective September 21, 2021. Ritter held 51% of the common interest and was SPM's sole Manager; SP LLC held a 49% preferred interest. SPM built and housed the shared teams — finance, legal, technology, product, AI, and fund partners — that served SPM, Knox, StarX, and SPI. SPM's spend reached approximately $34,200,000 by February 2024. SPI, the Schmidt-side fund vehicle, invested more than $51,000,000 in early-stage companies with returns of at least 40% by February 2024; its personnel, legal, and diligence costs were expensed through SPM. In July 2022, Ritter was induced to transfer a substantial portion of her SPM economics to Schmidt-side interests, raising SP LLC's position from 5% to 49%, on representations concerning SPI carry and continued funding that were not honored. [Ex. 50]

37. Audem was formed December 28, 2021, with formation documents prepared by Hillspire General Counsel Maria Seferian, banking set up by Quach at Wells Fargo, and payroll enrolled by Quach at TriNet. Audem was 100% owned by Ritter, but it functioned as an at-cost property-management vehicle for residences owned by Schmidt entities and occupied by Ritter, Schmidt, and Ritter's parents, who had moved from the Bay Area to Los Angeles in April 2021 at Schmidt's inducement. The economic benefit of Audem's operations flowed to Schmidt-side interests; the cost, payroll, and tax burden was booked to Ritter.

38. Every function of these companies was placed under Hillspire's control before any dispute existed. Legal: entity formation through Seferian; material agreements drafted by Glaser Weil; SPM's general counsel, Jordan Manekin,

maintained a personal relationship with Schmidt's executive assistant and ultimately took Hillspire's side. Financial: all bank accounts at Wells Fargo, opened by Quach, with Quach accepted by Wells Fargo as joint signatory and gatekeeper notwithstanding Certifications of Beneficial Ownership naming Ritter alone; all payroll at TriNet, enrolled by Quach; monthly budgets requiring Schmidt's personal approval and Quach's funding release. Accounting: KPMG engaged as tax accountant for SPM, Knox, StarX, and Audem, taking direction from "SPM Finance" — Quach and Connor Coit, a former KPMG accountant hired as SPM's finance lead — and not from Ritter. Information technology: CGNET as managed-service provider with super-administrator authority over every Workspace tenant and over SPM's DocuSign, with a separate direct relationship with Hillspire; Hillspire's Chief Information Officer, Kelly Young, overseeing device management through hillspire.jamfcloud.com.

39. Devices. On November 9, 2021, a MacBook Pro (serial TFWF7V17GQ) was set up for Ritter. Forensic examination by Bruce W. Pixley, a certified examiner who has testified in this District, established from a zero-error forensic image that the first user account on the machine was "ericschmidt"; that two further accounts, "it" and "it_Hillspire," were created the same day at 7:07 and 7:14 p.m. UTC; that JAMF enterprise mobile-device-management software and TeamViewer remote-access software were installed the same day; that JAMF was configured to execute management tasks at startup and to report to a cloud service at https://hillspire.jamfcloud.com, which "resolves to an authentication service associated with Schmidt Entities"; that TeamViewer was granted screen-recording and accessibility permissions "required for live viewing of the screen and remote control of keyboard and mouse input" that "are not granted by default"; and that Ritter's own account was not created until November 13, 2021, four days later. [Ex. 1, ¶¶ 11–21] "In combination, JAMF and TeamViewer created a system architecture in which JAMF provided persistent, root-level administrative management of the Ritter Laptop, while TeamViewer provided the mechanism for live, interactive remote access," under which

"an authorized remote administrator could obtain broad and effectively unrestricted access to the system, including the ability to view and control the desktop, transfer files, and interact with user data and applications." [Ex. 1, ¶ 21] TeamViewer had likewise been installed on May 25, 2021 on the computer running the security system at the Paley residence, where Ritter and her family lived; recordings of the family were captured. [Ex. 36] This architecture was operational from November 2021 through at least September 6, 2024, when JAMF was still running on the laptop. [Ex. 1, ¶ 23] Schmidt's April 6, 2026 sworn denial of device access is confined to the period "after I left Google"; it says nothing about 2021 through 2024. [Ex. 38]

**B. The Enterprise**

40. From no later than November 2021 through the present, Schmidt, Hillspire, Glaser Weil, Marcus, KPMG, Wells Fargo, Knox, Thakur, CGNET, TriNet, and Alphabet, together with the non-party participants identified in Part II.C, have constituted an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Hillspire Enterprise" or the "Enterprise"). The Enterprise has a purpose — to capture the economic value of the companies Ritter built, to allocate their tax losses to Schmidt-side taxpayers and their liabilities to Ritter, and to prevent Ritter from exposing or contesting what was done, including by silencing her report of sexual assault and harassment; relationships among those associated with it — a hub (Hillspire) that directed and funded, professional-service spokes (Glaser Weil, KPMG, Wells Fargo, TriNet, CGNET) that executed, a captured portfolio company (Knox, Thakur) that operated from inside, and a platform (Google/Alphabet) that hosted, enabled, and after notice ratified; and longevity sufficient to permit those associates to pursue the Enterprise's purpose, spanning more than four years and continuing.

41. The Enterprise is distinct from each Defendant. Hillspire is a family office; Glaser Weil a law firm; KPMG an accounting firm; Wells Fargo a bank; TriNet a payroll company; CGNET an IT vendor; Knox a portfolio company; Alphabet a public company. None is the Enterprise; each participated in the operation or management of

the Enterprise's affairs through the acts pleaded below, and each was recruited, compensated, and directed for that purpose. The rim connecting the spokes is documentary: Glaser Weil directed CGNET and paid its bill (Part V.D.4); Glaser Weil and Hillspire directed KPMG's engagement and paid it from SPM's accounts (Part V.C.1, C.8); Wells Fargo conditioned Ritter's own accounts on Hillspire's written concurrence and re-titled them to Hillspire's successor (Part V.C.6); TriNet took its instructions from Quach (Part V.C.5); Knox and Thakur executed the repurchase notice and gag demand in coordination with Hillspire and Glaser Weil, and Thakur signed the Settlement Agreement (Part V.C.8); and Alphabet, through a director who sat on Knox's board, knew of the retaliation from its first act and, through Google, hosted the seized data thereafter (Part V.D.6).

42. The Enterprise operated two schemes, both directed at Ritter, through the same participants, channels, and methods. Scheme One, the Tax-and-Asset Fraud, took the value of SPM, SPI, StarX, Knox, and Audem for Schmidt-side interests and booked the losses to Schmidt-side taxpayers and the liabilities to Ritter. Scheme Two, the Digital Seizure and Cover-Up, used unauthorized access to Ritter's devices and accounts to execute documents in her name, to conceal and alter the records of Scheme One, to seize her companies' data and intellectual property, and to surveil her and her family. A third layer, the Coercion Program (Part V.E), enforced both schemes by fear of economic loss, by litigation process, and by conditioning payment on Ritter's silence.

**C. Scheme One — The Tax-and-Asset Fraud**

**1. Three Sets of Books; SPI's Costs Loaded onto SPM; The Investment Advisers Act Motive**

43. SPM kept more than one set of books. Ritter, SPM's Manager and 51% owner, did not learn until late June 2024 — from Connor Coit, who had been KPMG's exclusive counterparty on SPM's tax engagement — that there existed accounting records and tax-compliance workpapers for SPM, StarX, and Knox that had been

maintained outside her view and that CGNET, at Hillspire's direction, had blocked from her administrative access in her own Google Workspace. [Ex. 7; Ex. 1] The records Coit disclosed differed from the books Ritter had been shown. Costs that belonged to SPI — the personnel who worked on SPI's investments, SPI's legal and diligence expenses, and other SPI operating costs — had been booked to SPM. Costs that belonged to Knox and to Schmidt-side incubation groups had been shifted to SPM and, from 2024, to StarX. [Ex. 7; Ex. 9]

44. The loading had a purpose. SPI was Schmidt's investment vehicle; Hillspire, which managed it, could not hold SPI's positions or its operating function on Hillspire's own books without exposure under the Investment Advisers Act of 1940. Running SPI's costs through SPM, an operating company 51% owned by a young founder, kept those costs off the adviser's books and inflated SPM's losses. The inflated SPM losses, through SPM's pass-through structure, flowed as net-operating-loss deductions to SP LLC and, above it, to Hillspire and the Schmidt family. A Hillspire budgeting analysis dated November 18, 2024 states the objective in Hillspire's own words: "in either budget scenario, due to the KPMG tax assessment of 2023 and additional $26M+ 2022 write-off, Hillspire and the Schmidt family — via their pass-through structure — is making money via this forced shutdown." [Ex. 8, row 49] The same analysis records a 2023 SPM write-off of $16,891,194 and a 2022 write-off exceeding $26,000,000: more than $42,000,000 of tax benefit to Schmidt-side taxpayers from the destruction of the companies Ritter built. [Ex. 8, row 41]

45. KPMG designed and executed the mechanism. KPMG's tax-compliance information request for fiscal year 2023, covering SPM, StarX, and Knox — the document CGNET had hidden — records that "SPM Finance" asked KPMG to reclassify prior-year expense capitalizations retroactively: "SPM wants this to be top of mind for KPMG. Nearly all expenses in the prior year were capitalized and SPM wants to confirm whether that was appropriate/why, as we do not think this should be the case in the current year. Hoping to adjust the prior year determination and make

sure we can carryforward the NOL appropriately from PY and CY." [Ex. 7, State Request, Item 9] Over-capitalize in early years; trigger recognition through a forced shutdown; carry the loss forward to Schmidt-side taxpayers. KPMG also undertook to supply a "ball-park estimate for Transfer Pricing benchmark for shared services provided by SPM to both StarX and Knox" [Ex. 7, KPMG Request, Item 12], and the Knox sheet of the same document records $5,382,251.09 of Knox labor capitalized, more than $7,400,000 across entries, $1,006,967.94 of Knox litigation cost, and $13,945,000 of preferred member contributions — Knox's economics maximized at SPM's expense. [Ex. 7, Knox sheet]

46. Every KPMG response field in that document reads "Responsible Party: SPM," meaning Quach and Coit. KPMG set weekly meetings with "SPM Finance team" beginning the first week of March 2024. Ritter — the Manager of SPM, the 100% owner of StarX, and the person who had signed KPMG's engagement — appears nowhere. [Ex. 7] On April 9, 2024, KPMG's Sunil Tahiliani and Coit exchanged a thread, forwarded to Quach, in which KPMG referred to Schmidt and Hillspire as "our investor." [Ex. 10] KPMG's client was Ritter's companies. Its investor was Schmidt.

47. Ritter told KPMG, repeatedly and in writing, that the books had been altered, that the structure being used did not make sense, and that she would not sign returns she knew to be inconsistent with the facts. [Ex. 11] KPMG ignored her and, together with Schmidt-side actors, continued to press for her signature on SPM returns whose content Hillspire controlled. [Ex. 11] KPMG told Ritter it had prepared Audem's returns; it had not. KPMG did not act on the redirection of StarX's tax documents to Thakur (Part V.C.4). It did not act on the shift of SPI's and Knox's costs onto SPM's and StarX's books. It did not act on the fact that the person paying it and instructing it was not its client.

48. On January 18, 2024, seven weeks before the March 6 meeting described next, five SPM-affiliated entities were legally closed on a single day: StarX Ecosystem LLC, Steel Perlot Advisory LLC, Steel Perlot Holdings LLC, Steel Perlot Investment

Funds LLC, and Steel Perlot Swaps Holdings LLC. [Ex. 7, Item 8] The clean-up preceded the takeover.

**2. The $26,800,000 Amendment (May 2024): "All losses will be allocated to hillspire, MR K1 will not be impacted"**

49. SPM was designed and funded as a multi-year operating program. SPM's capital model of November 1, 2022 planned $95,300,000 of capital across fiscal years 2021 through 2023 for 73 full-time and 14 other personnel organized into "Internal Cash Engines," "Inhouse Startups," "Other Initiatives," and "SPM Operations," with external financings scheduled for 2023 — a Knox Series A in April 2023, a StarX seed round in March 2023 — and $61,200,000 of "Incremental Investment Needed." StarX appears in that model as one of SPM's "Inhouse Startups," with $1,500,000 of "Capital Invested": an investment, not a loan. [Ex. 55] Schmidt funded the program through SP LLC in tranches released against periodic funding requests that SPM's finance staff sent to Ritter and to Schmidt personally and that Quach processed. On June 16, 2023, for example, SPM's Ran Rabinowitch wrote to "Michelle and Eric" with headcount (Knox 14, StarX 4, SPM 32), the second-half-of-June payroll for each company ($189,000 Knox; $38,000 StarX; $775,000 SPM), and "$745,627 to close the outstanding balance owed from SPM to Steel Perlot"; Quach responded on June 21, 2023 with Schmidt, at his personal Gmail address, and Hillspire's Seferian, Hur, and Vince Manuel copied. [Ex. 56] Schmidt personally received the payroll-funding requests for the employees of the companies he would later tell Wells Fargo, the arbitrator, and the public were Ritter's sole responsibility.

50. SPM's fiscal-year-2023 book-to-tax reconciliation, prepared for KPMG's engagement, shows a book loss of $(20,580,161) and a taxable loss of $(15,777,531). It adds back, as a permanent difference, $2,036,685 of "Interest" treated as non-deductible — consistent with Schmidt's funding having been carried as a balance "owed from SPM to Steel Perlot" rather than as capital — together with $1,000,000 of "Guaranteed Payments," and it records a $3,388,013 "Written off capitalized labour

cost" against a $(1,604,960) "Section 174 Deduction Capitalized Labour." [Ex. 54] The labor written off was the labor of the teams Ritter built.

51. For fiscal year 2022, SPM's return had been prepared by Deloitte, which "deemed SPM as a start-up and inevitably capitalized all expenses," producing no net operating loss for that year. [Ex. 52] KPMG was engaged for fiscal year 2023 only. In the spring of 2024 — after the March 6, 2024 meeting at which KPMG "suggested buying StarX" (Part V.C.3), and after SPM Finance had told KPMG that the prior-year capitalization should be "top of mind" (Part V.C.1) — KPMG proposed to reopen 2022. On May 23, 2024, at 10:26 a.m., Coit wrote to Ritter under the heading "URGENT REGARDING 2022 TAX RETURNS/AMENDMENTS": "As you are aware, KPMG has been engaged to perform the FY 2023 tax work for SPM and related entities. In FY 2022, Deloitte took a tax position that capitalized all expenses … KPMG does not agree with Deloitte's tax determination in FY 2022 and proposed amending the prior year returns. … KPMG estimates the fees for amending these returns of $40K - $45K fee, and after carving our StarX from SPM in FY 2022, the estimated net operating tax loss (i.e. NOL carryforward) will be approx. $26.8M as a result of changing the prior year tax position. Should we proceed with having KPMG amend the FY 2022 returns, each partner's K1s will also need to be amended (i.e. your K1 along with Big Hen's K1)." [Ex. 51] At 11:29 a.m., answering SPM's in-house counsel's request to "explain to me the significance of the net operating tax loss figure," Coit wrote that "the $26.8M will be intended to be used for" carryforward against future income, "which is a massive tax benefit as you can offset your income to in-turn owe less in taxes. It is a significant tax win and I would recommend proceeding with the amended returns. It appears Michelle has signed off on proceeding with this approach as well." At 3:36 p.m., copying Ritter: "KPMG is beginning their work on the amended 2022 returns (as MR approved). As a result, Michelle will need to amend her 2022 K1, and Big Hen will need to amend their 2022 K1." [Ex. 51]

52. On May 29, 2024, Coit sent Ritter "the addendum provided by KPMG today, which is in line with the fee proposal you approved ($40-$45K)," routed for signature through DocuSign, and reported that "based on my discussion with KPMG earlier today, we need to reach out to Big Hen Group I, LLC to inform them of this change as their 2022 K1's will require an amendment." The draft notice to Big Hen, prepared for Ritter to send as Manager, stated: "KPMG estimates $26.8M of the previously capitalized expenses from a tax perspective can flow through as expenses and be carried forward as an NOL. This is a substantial tax win. However, as a result of this FY 2022 amendment, partners will need to amend their respective FY 2022 K1s. … At this point, the only action needed from Big Hen Group I, LLC is that you confirm you are in agreement and understand the FY 2022 amendment." Ritter forwarded the draft with the request that it be shared "with the appropriate counsel to communicate these revisions expeditiously … given the circumstances and extent to which other matters impact the work and employees." [Ex. 52] Ritter's approval of the amendment — the approval of SPM's Manager, without which SPM's partnership return could not be amended and KPMG's addendum could not be signed — was given on the representations that the amendment was a partnership-level correction whose benefit would flow to both partners through amended K-1s, hers included.

53. Two days later, on May 31, 2024, KPMG met with Hillspire's tax representatives and SPM's finance staff on the "$26.8M amendment to SPM FY2022 Tax Return." Ritter — SPM's Manager, the signatory of KPMG's engagement, and the partner whose K-1 was to be amended — was not invited, did not attend, and was not told that the meeting had occurred. The attendees were Coit, Bajema, and Rabinowitch for SPM Finance; Quach, Luke Keel, and Megan Lennon for Hillspire; and Chun Cho, Robert Kierzkowski, and Aum Minyong for KPMG. The contemporaneous minutes record the following. [Ex. 53]

54. KPMG explained its position and its mechanics. Cho: "No reason to capitalize until trader business began. … When we looked at FY21, EY took a position

that is consistent with the approach we had for FY23. We raised a possibility to amend FY22 returns." KPMG: "Point from national office - safe agreement is contingent on IPO or realized gain. Revenue is contingent on such." KPMG: "National office is more likely than not to sign the return." KPMG: "BBA regime is how you amend partnership returns is through AAR. Notify the IRS, we are making adjustments to partnership returns, attaching schedules to show what changes on 1065. This will be an additional deduction, so you push out to the partners." Keel: "there is no NOL here. We need to pick it up in future years as returns as favorable adjustment. There are a lot of states here. Most of them would require amendments technically."

55. Hillspire explained whose benefit it was. Lennon: "this is our biggest concern. Picking up the adjustment for federal purposes. Our concern is having to amend all of these state returns." Keel: "I am with you that I am not concerned about the federal return. I am concerned our principals would have to file amendment returns to the states. But, it would be beneficial, even from the state side." Keel: "California is important for us and we need to confirm but it should all be beneficial on the CA side as well. Even from a worldwide income perspective for the individuals." Lennon: "Also NOLs, we don't have corporations up the chain and there are partnerships and individuals." Keel: "could impact Hillspire as well. All losses will be allocated to hillspire, MR K1 will not be impacted. I want to make sure this is clear and understood." Cho: "we will keep this in mind." Keel: "from a timing perspective, you probably want to do this as soon as possible so you have the starting point for FY23." Cho: "Correct, need to start ASAP." Keel: "When you send the bullets, is the amount referenced solid for us to think internally how it would impact us going up the chain?" Minyong: "yes, we are comfortable with the amount provided. It is based on the trial balance provided." [Ex. 53]

56. Hillspire and KPMG then discussed the risk of being caught. Quach: "The whole thing about changing the position is based on what was done. … Our position is that the business starts when you provide services per the SAFE agreements. We are

not looking at when you start businesses. The incubation business started." Quach: "if we take the position and file amendment it might trigger an audit. If we get audited, is KPMG standing behind us in this position?" Cho: "We do stand in this position. We are saying this is more likely than not." Keel: "This is by 50-70%. Possibly not trigger a return the way BBA works." Lennon: "where you get to the individual level, it may raise a red flag. Who knows what else is coming down the pipeline this year and would be needed to report." Cho: "you have the right position to make sure this is well documented. We will do the same on our end." The recorded action items were that Quach "asked if SPM Finance can share the list of 2022 SAFEs that was shared with KPMG. She wants to make sure this decision is not based on FY23 SAFE agreements"; that "KPMG can provide authority of their position"; and that "KPMG can summarize the rationale for everyone's records." [Ex. 53]

57. The minutes establish five things. First, the "principals," the "individuals," and the persons "up the chain" for whose "worldwide income" the amendment was engineered were Schmidt and the Schmidt family; the $26,800,000 was being manufactured from SPM's expenses — the salaries and costs of the teams Ritter had built — for their benefit. Second, "All losses will be allocated to hillspire, MR K1 will not be impacted" was the opposite of what Ritter had been told eight days earlier when her approval was obtained: the partner who owned 51% of the company, and whose company's operations had generated the loss, was to receive none of it. Third, KPMG's client was SPM, whose Manager was Ritter; KPMG nonetheless took its instruction on the allocation of SPM's tax attributes between SPM's partners from the adverse partner's family office, agreed to "keep this in mind," and kept the meeting from the Manager. Fourth, the participants knew the position was aggressive — "50-70%," "might trigger an audit," "may raise a red flag," "make sure this is well documented" — and knew that "what else is coming down the pipeline this year" would have to be reported. Fifth, what was coming down the pipeline had already been decided. On May 6, 2024, Quach had written to SPM's finance lead that "Eric has no further funding

obligation," that Schmidt would "fund wages for SPM employees through the end of May pursuant to a recoupable loan to SPM," and that "he might fund severances as part of a broader transition" (Part V.E.2). [Ex. 57] On June 7, 2024, one week after the meeting, Glaser Weil filed the first arbitration against Ritter and her parents (Part V.E.2). And on November 18, 2024, Hillspire's budget analysis recorded the result: "due to the KPMG tax assessment of 2023 and additional $26M+ 2022 write-off, Hillspire and the Schmidt family — via their pass-through structure — is making money via this forced shutdown." [Ex. 8, row 49] The forced shutdown was not a consequence of the tax plan. It was the tax plan.

58. On information and belief, KPMG thereafter prepared and caused to be filed with the Internal Revenue Service, by mail or interstate wire, an administrative adjustment request and amended schedules for SPM's fiscal year 2022 under the Bipartisan Budget Act partnership-audit regime, with corresponding state filings, allocating the resulting adjustments as Hillspire had directed, and prepared SPM's fiscal-year-2023 return on the same footing. Ritter has never been furnished the amended 2022 return, any administrative adjustment request, any statement of adjustments, or any amended Schedule K-1 in her name, and has never been told what allocation was reported for her. KPMG's $40,000–$45,000 fee for the amendment and its fees for the 2023 engagement were paid from SPM's cash; the Wind-Down Ledger Hillspire filed in April 2026 shows KPMG paid $71,460 from SPM's own accounts and $19,497 by SP LLC in 2025 alone, including on November 12, 2025, for work on 2024 and 2025 returns Ritter never authorized (Part V.C.8). [Ex. 5] Ritter's company paid to manufacture a $26,800,000 deduction for the man who was, in the same weeks, shutting it down; Ritter was excluded from the deduction; and the cost of manufacturing it was then presented to an arbitrator as an expense of her company's "transition."

59. The same spring, the record of StarX's funding was rewritten. In SPM's November 2022 capital model, StarX was an SPM "Inhouse Startup" with "Capital Invested." [Ex. 55] By May 2024 the same money was being described within Hillspire

and SPM Finance as "the debt line funding for StarX," and Quach was asking, "In the SPM Feb Financials, where is the amount spent by StarX reflected?" [Ex. 57] The instrument that accomplished the rewriting is the Multi-Draw Loan Agreement "dated as of March 15, 2024" with effect "as of December 1, 2021" described in Part V.C.3 — a 2024 document that reached back to 2021 to convert an investment into a $6,500,000 debt, so that the debt could be declared "wholly worthless" in December 2024 and written off. Coit's own description of the amendment — "after carving our StarX from SPM in FY 2022" — confirms that the treatment of StarX and the $26,800,000 were parts of a single calculation. [Ex. 51]

60. The scheme was not confined to the United States. The May 31, 2024 minutes record Hillspire's concern with the amendment's effect "from a worldwide income perspective for the individuals." [Ex. 53] On information and belief, KPMG, on behalf of Schmidt and Hillspire and under the cover of Glaser Weil's and Marcus's involvement as counsel, extended the same allocation and write-off positions to the non-U.S. tax filings and structures of Schmidt-side individuals and entities; the particulars of those filings are within Defendants' exclusive possession and will be established in discovery.

61. The tax at stake is substantial and identifiable. At the highest federal and California marginal rates, $26,800,000 of ordinary deductions carries a tax value exceeding $13,000,000 on Plaintiff's estimate, before the fiscal-year-2023 loss of $(15,777,531), the fiscal-year-2024 loss, and the $6,575,000 StarX write-off are counted. The taxpayers who received or will receive that value are Big Hen, SP LLC, Hillspire, and the Schmidt-family individuals "up the chain"; the tax years are fiscal years 2022 (as amended), 2023, and 2024; the mechanisms are the administrative-adjustment-request push-out of $26,800,000 of adjustments to those partners on a "trader business" position its own proponents rated at "50-70%," the allocation of SPM's losses away from its 51% Manager contrary to the representation on which her approval was obtained, the retroactive conversion of StarX's capital into a "loan"

written off as "wholly worthless," and the loading of SPI's and Knox's costs onto SPM's and StarX's books. The same conduct has a securities dimension: Hillspire holds itself out as a family office excluded from registration under the Investment Advisers Act of 1940 and 17 C.F.R. § 275.202(a)(11)(G)-1 while providing investment and operating direction to and through entities with a non-family 51% owner, and structuring SPI's positions and costs through SPM to keep them off the adviser's own books (Part V.C.1); Knox purported to terminate the vesting of, and then to repurchase, its founder's shares without the corporate authority its own bylaws and § 1(j) of the Agreement required, and conditioned her stockholder rights on a promise not to litigate over "tax fraud" (Parts V.C.4, V.C.8); and Alphabet permitted a significant stockholder and former Executive Chairman, through his family office, to exercise insider-level influence over accounts on its platform without disclosure (Part V.D.6). These allegations are made with the particularity required for submissions to the Internal Revenue Service under 26 U.S.C. §§ 7434(d) and 7623 and to the Securities and Exchange Commission under 15 U.S.C. § 78u-6, and Ritter reserves every right under those provisions.

**3. March 6, 2024: "KPMG Suggested Buying StarX"; The Fifteen-Day Arc to "Wholly Worthless"**

62. StarX was Ritter's. Hillspire's own submission to KPMG says so: "There are no operations in StarX entity. 100% owned by Michelle Ritter (CEO), not by SPM." [Ex. 7, Fed. Request, StarX] StarX had signed a Memorandum of Understanding with the Fédération Internationale de Football Association (FIFA) dated September 14, 2023 for fan-engagement technologies to be developed by StarX, had produced NBA and NFL draft predictions of better than 98% accuracy, and was in active engagement with the NBA, the Premier League, and leading sports agencies; as late as May 14, 2024, its engineering lead was in discussions with Auth.Inc, a Dubai-based technology company, about working together. [Ex. 42; Ex. 45; Ex. 59] In November 2023, Ritter initiated a formal separation of StarX from Hillspire's control, a separation the

Investment Advisers Act required because Hillspire could not hold StarX securities; the intercompany loan between SPM and StarX was reviewed and documented by Fried, Frank, Harris, Shriver & Jacobson LLP, which SPM paid more than $84,000 in April and May 2024 alone. [Ex. 49]

63. On March 6, 2024, without Ritter's knowledge, KPMG and SPM Finance decided StarX's fate. The KPMG document records, under StarX Item 1: "KPMG suggested buying StarX since the cost isn't running through the SPM trial balance. SPM to confirm their decision." Every StarX item references "based on our discussion on 3/6/2024." [Ex. 7, Fed. Request, StarX Item 1] "Buying StarX" meant clawing the company back into SPM so that its costs could be written off through SPM's trial balance. On March 20, 2024, SPM Finance transmitted the StarX loan agreement and governance documents to KPMG for that analysis. [Ex. 7] In February 2024 and again in May 2024, Schmidt and Hillspire told Ritter that StarX was hers.

64. The instrument for the write-off was a "Multi-Draw Loan Agreement" between SPM and StarX. The version later produced is "dated as of March 15, 2024" with effect "as of December 1, 2021," bears "Michelle Ritter, CEO" on both sides, carries a maximum of $6,500,000, and shows signature images that can be moved with a cursor. [Ex. 6; Ex. 3, Sched. B] Ritter denies signing it as produced. The loan balance "spiked" in April 2024, after Hillspire took operational control of SPM, and by July 12, 2024 Hillspire's own scenario model recorded the StarX loan "past due: –$644,000," Ritter's guaranteed salary "past due: –$252,000," Ritter personally funding $67,000, and the question "August 2024 NY Office Rent: Does payment switch from SPM to StarX?" [Ex. 9, rows 20, 32–34] Liabilities were being moved onto StarX while Ritter was being told StarX was hers.

65. On December 4, 2024, the Settlement Agreement recited in Schedule B that StarX owed SPM $6,575,000 and provided that Schmidt would cause SPM to forgive it; the forgiveness was sold to Ritter as consideration and § 1(g) confirmed that "Ms. Ritter owns 100% of the equity of StarX." [Ex. 3, § 1(g), Sched. B] Fifteen days

later, on December 19, 2024, Hillspire's Senior Legal Director Joon Hur, "in its capacity as the sole manager" of Orion Wing Management, LLC (SPM renamed), executed a Written Consent reciting that on November 24, 2024 — ten days before the Agreement — "the Borrower informed the Company that the Borrower does not have the financial wherewithal and is unable to repay," determining "that the Loan is uncollectible and deemed wholly worthless as of the Effective Date," and directing that "the books and records of the Company shall reflect the forgiveness." [Ex. 6] The "consideration" was a tax write-off. Ritter never made the November 24 statement the Consent attributes to StarX. The Consent was withheld from Ritter until Schmidt filed it with the arbitrator on April 6, 2026. That same month, the seized steelperlot.com Workspace — StarX's records and intellectual property with it — had already been copied by CGNET for Hillspire (Part V.D.4). StarX was destroyed, its loss was harvested, and its assets were taken.

**4. Knox and Thakur: StarX's Tax Documents Redirected; Knox's Costs Shifted; The Founder Removed**

66. Beginning no later than 2022 and continuing through 2023, Thakur, in coordination with Hillspire, caused StarX's tax documents and notices to be redirected to herself at nthakur@knox-networks.com and to Hillspire-administered inboxes, and to be mailed to Hillspire's address in Menlo Park, California — the address of Schmidt, Wendy Schmidt, and Hillspire — and withheld from Ritter, StarX's sole owner. [Ex. 58] Thakur held no office in StarX, no shares in StarX, and no authority for it; she nonetheless held herself out to StarX's registered agent and to taxing authorities as the person responsible for StarX's tax matters, represented to third parties that she had StarX authority, and enabled the execution of documents in Ritter's name that Ritter had not authorized. On April 24, 2023, The Corporation Trust Company, StarX Networks, Inc.'s Delaware registered agent, addressed StarX's "2023 State of Delaware 1st Estimated Tax Notice" to "NATALYA THAKUR-COO, KNOX NETWORKS INC., 555 BRYANT ST PMB 374, PALO ALTO, CA" — Knox's post-

office box, not StarX's owner — showing a tax of $68,066.00, a "Prev. Bal. or Cr." of $174,857.96, and a "Total Bal. Due" of $242,923.96, escalating to $252,605.38 if unpaid by August 1, 2023. [Ex. 58] Ritter, StarX's sole owner and Chief Executive Officer, never received the notice and never saw the accumulated balance until 2024. A registered agent addresses a corporation's tax notices to the contact the corporation's records identify; Thakur's name and Knox's address were in StarX's records because Thakur, with Hillspire, caused them to be entered there. Ritter did not discover the redirection until 2024. Knox's own books, in the same period, capitalized more than $7,400,000 of labor and absorbed shared services from SPM at transfer prices KPMG was asked to benchmark, maximizing Knox's economics at SPM's expense. [Ex. 7]

67. On April 24, 2024 — the week Hillspire transferred operating authority over SPM to Glaser Weil, and four weeks after Ritter's counsel first reported Schmidt's abuse in mediation, on the day of the second mediation session — Ritter was removed as a director of Knox by a Shareholders' Written Consent executed for the majority holder, Steel Perlot, LLC, "By: Big Hen Group I, LLC, Member; By: Hillspire, LLC, Manager; By: Eric Schmidt, Co-Manager," removing her "without cause," and was removed as Chief Executive Officer and "from each and every office" by a Board Written Consent executed by the only two remaining directors, Eric Schmidt and R. Martin Chávez — both consents dated April 26, 2024 and both transmitted in a single DocuSign envelope. [Ex. 33] No cause was stated because none existed; the removal came four weeks after her counsel's report of Schmidt's abuse. On April 26, 2024, Knox purported to terminate the vesting of Certificate CS-02, with approximately 81–83% of the schedule elapsed. [Ex. 33] Chávez, an Alphabet director since July 14, 2022, was one of the two directors who signed the removal. [Ex. 33] The signature block of the shareholder consent also records, in Hillspire's own hand, the chain through which Schmidt holds and controls the 49% of SPM: Steel Perlot, LLC, whose member is Big Hen, whose manager is Hillspire, whose co-manager is Schmidt. [Ex. 33] Schmidt's April 6, 2026 arbitration brief asserted that he did not remove Ritter from Knox in April

2024; the assertion is contradicted by Knox's own vesting-termination record and by the Settlement Agreement, § 1(j), which recites that "on April 26, 2024, Ms. Ritter was removed as a director and officer of Knox." [Ex. 3, § 1(j)]

**5. TriNet: Forged Authority Transmitted to State Agencies**

68. TriNet processed payroll and employment-tax filings for SPM, Knox, StarX, and Audem under enrollments Quach established in 2021, and took its instructions from Quach. In June 2024, after Ritter's abuse report and after Schmidt had cut off funding, TriNet transmitted to the Idaho Department of Labor a StarX power of attorney bearing a "signature" of Ritter that is a copy-pasted image, not a signature Ritter made, and listing as the StarX contact the personal cell-phone number of Mandy Quach. [Ex. 13] On information and belief, TriNet transmitted corresponding filings to California employment-tax authorities in the same period. Ritter did not sign, authorize, or know of these filings. Through them, and through TriNet's continued administration of payroll and information returns for Audem and StarX at Hillspire's direction after Ritter had been cut off from her companies' accounts, TriNet generated the employment-tax liabilities in Ritter's companies' names that Marcus is now transmitting to her for payment. [Ex. 12]

**6. Wells Fargo: The Bank That Moved Ritter's Money to Her Adversary**

69. Wells Fargo held, through its Private Bank / Wealth & Investment Management channel, Ritter's November 2020 personal credit-card account; SPM's analyzed business checking account ending -4631 and business market-rate savings account ending -6449; SPM's WellsOne Commercial Card account (agreement dated December 2, 2021); Audem's analyzed business checking account ending -0882; and related accounts for Steel Perlot, LLC and StarX. [Ex. 17] Wells Fargo's own Certifications of Beneficial Ownership and account-opening documentation identified Ritter, and only Ritter, as the control person and managing member for SPM and Audem. Wells Fargo nonetheless accepted Quach as joint signatory and de facto gatekeeper from 2021 forward. An Authorization for Information in Wells Fargo's file,

instrument BBG18141, carries the handwritten notation "Submit manually," routing account-authorization records outside Wells Fargo's ordinary review. [Ex. 17]

70. July 2024. Between July 11 and 17, 2024, Meredith told Ritter in writing that Ritter was SPM's "sole member," relying on the September 2021 operating agreement rather than the amended agreement in Wells Fargo's own file showing Hillspire's 49% — the premise on which Ritter was told she alone was responsible for SPM's payroll after Schmidt cut off funding. [Ex. 15] On July 29, 2024, Sencil wrote that Wells Fargo was "still waiting on instructions from you and Hillspire on who to reach out to, and take instruction from" for Audem's and SPM's accounts and hoped "to receive joint written confirmation from you and Hillspire." [Ex. 15] In the same month Wells Fargo personnel told Ritter the SPM savings account held approximately nothing. It held $946,706.69. [Ex. 9; Ex. 16] Wells Fargo was simultaneously telling Ritter she was solely responsible for SPM and refusing to act on her instructions without Hillspire's consent.

71. October 2024. On October 8, 2024, Meredith signed and mailed two closure letters on Private Bank letterhead — one to SPM for accounts -4631 and -6449, one to Audem for account -0882 — each stating that Wells Fargo had "decided to close the accounts and conclude our relationship with you" effective at the close of business on November 8, 2024, that "[a] cashier's check for any amount remaining in the accounts will be mailed to you within ten business days of the date the account is closed," and that "our decision to close the account is final"; she emailed both letters to Ritter at 2:26 p.m. the same day. [Ex. 14] On October 9, Ritter asked Wells Fargo to halt the closures and to provide the account-opening documents so that she could "disentangle SPM and Audem from Hillspire's Wells Fargo accounts." On October 10, Meredith transmitted the account-opening documents — confirming Wells Fargo's knowledge that Ritter was the sole control person — and wrote that the decision "to close the accounts and exit the relationship is final," and that "since there will be no connection to the Hillspire relationship, it should be housed in the small business area of Wells

Fargo." [Ex. 14] On October 11, Wells Fargo terminated SPM's commercial-card agreement effective November 11, 2024. On October 25, 2024, Meredith confirmed that the closure was "final" because Ritter was "no longer associated with the Hillspire family office." [Ex. 14] Ritter's own accounts were being closed because she had left the man who assaulted her.

72. November 8, 2024 and after. The SPM savings account -6449 was not closed. No cashier's check was mailed. Wells Fargo's own Account Summary of May 1, 2025, retrieved from its online channel, lists the account holder as "ORION WING MANAGEMENT, LLC" — SPM renamed by Hillspire — and shows account -4631 closed; account -6449 open with $48,847.15; and a new Time Account ending -4953, never disclosed to Ritter, holding $207,370.86, all in the same Private Bank service team that had serviced Ritter. [Ex. 16] Between October 12, 2024 and May 1, 2025, approximately $897,859.54 moved out of -6449, part of it into -4953 and the remainder, on information and belief, to Hillspire-, Schmidt-, or Orion-aligned recipients. [Ex. 16] When Ritter asked for an accounting, transfer records, or proof of a cashier's check, Wells Fargo refused.

73. Wells Fargo's representations were false when made or were made with reckless disregard for whether Wells Fargo would honor them, and Wells Fargo knew Ritter would rely on them: it had her account-opening file in hand when it wrote; it had conditioned her instructions on Hillspire's concurrence; it had indexed her relationship to Hillspire in three separate writings; and it serviced Hillspire in the same channel. Ritter relied. She did not move the balances, seek a freeze, or demand pre-closure remittance, and on December 4, 2024 she signed the Settlement Agreement believing, because her bank had told her so, that SPM's cash was no longer reachable through the Hillspire relationship and would come back to her by check. Instead the bank kept the account open, put Hillspire's name on it, and let the money go to Hillspire. The money then funded Scheme One's cover-up: the "Wind-Down Ledger" filed with the arbitrator records $441,917.45 of payments by "OWM" — SPM's own accounts — including

every dollar paid to KPMG for the unauthorized 2024 and 2025 engagements. [Ex. 5] This was not routine banking. A bank providing routine services does not tell a customer she is the sole owner of an account while requiring her adversary's signature to operate it, does not close a customer's accounts because she is "no longer associated with" another customer, and does not retitle a closed account to that other customer and let the balance out. Wells Fargo's liability for that conduct stands on its own. The representations were Wells Fargo's; the duties — to its customer, under its own account agreements and beneficial-ownership certifications, and under 31 C.F.R. § 1010.230 and 12 C.F.R. Part 21 — were Wells Fargo's; the re-titling, the undisclosed account, and the refusal to account were Wells Fargo's acts. Every claim pleaded against Wells Fargo in this Complaint is complete on those facts without any finding that Schmidt, Hillspire, or any other Defendant is liable for anything, and would survive the dismissal of every other Defendant.

**7. The December 4, 2024 Agreement as the Instrument of the Fraud**

74. The December 4, 2024 Settlement Agreement (the "Agreement") was drafted by Glaser Weil. Its economic core was the transfer of Ritter's 51% of SPM, "free and clear," to SP LLC "and/or its affiliate" — Hillspire — "in consideration for payment to her in the amount set forth on Schedule A," $14,000,000 (the "MR Amount"), payable in installments under Schedule A(3). [Ex. 3, § 1(b), Sched. A, Sched. H] Section 1(r) gave "the Schmidt Parties" control of "the preparation and filing of SPM's 2023 and 2024 tax returns." Section 1(a) obligated Schmidt's affiliates to pay SPM's wind-down costs, defined as amounts due to Ivan Paskov and the vendor expenses "set forth on and subject to Schedule C," and to complete the wind-down within six months. Paragraph G of the Recitals and § 1(g) represented that the Schmidt Parties had "no StarX or Audem books and records, including electronic accounts and records and banking and tax materials, within their possession, custody or control." Section 1(j) confirmed Ritter's 19,500,000 vested Knox shares and her Delaware stockholder rights and bound the Schmidt Parties "not to use Ms. Ritter's removal as the basis to trigger

a buyout or termination." Section 3(b) provided that "concurrently with the final payment set forth in Schedule A(2), Ms. Ritter will voluntarily deliver the certification and declaration in the form attached hereto as Schedule D" — a declaration that all contact with Schmidt had been "entirely consensual." [Ex. 3]

75. Every one of those representations was false or was broken within weeks. The $14,000,000 has never been paid. Section 1(r) was the contractual mechanism by which KPMG, under Hillspire's control, prepared returns for the year of the Audem 1099 and the StarX write-off. Paragraph G was false when made: within weeks Hillspire issued a 1099 to Audem that could only have been prepared from Audem's books, and within fifteen months it filed a 40-line ledger of Audem, StarX, Knox, and SPI payments that could only have been computed from the same records. Schedule C was not followed; the ledger Hillspire filed diverges from it in both directions (Part V.C.8). The Knox covenant was broken in April 2025. The Schedule D "voluntary" recantation, tied to the payment for her 51% of SPM, was the price of her business.

76. The Agreement also contains, at § 2, a general release by which the "Ritter Parties" released the "Schmidt Parties" and their affiliates, members, managers, officers, employees, agents, and assigns from all "Released Claims" arising before the Effective Date, with a waiver of Civil Code § 1542. By its own terms the release "shall not include … any Claims for Fraud or other Intentional and Willful Violation in the making of this Agreement." [Ex. 3, § 2(a)(ii)–(iii)] The Agreement was made by fraud, concealment, and duress. It was induced by the representation in Recital G and § 1(g) that the Schmidt Parties held no Audem or StarX books and records, made while Hillspire's systems held them and weeks before a $2,700,000 Audem Form 1099 was prepared from them; by § 1(g)'s confirmation that Ritter owned 100% of StarX, made while the write-off of StarX's loan was already planned and was executed fifteen days later; by the representation that SPM would be wound down, made while Hillspire's own analysis recorded that it was "making money via this forced shutdown"; by the concealment of the May 31, 2024 instruction that "MR K1 will not be impacted" (Part

V.C.2); by the concealment that Wells Fargo had retained SPM's account and would re-title it to Hillspire's successor (Part V.C.6); and by the concealment of the arrangement with CGNET under which her Workspace domains were seized beginning two days after signature (Part V.D.4). It was signed under duress: in the four weeks before signature her vehicle and laptop were taken, three-day eviction notices were served on her parents, and all funding was withheld (Part V.E.3). And its consideration failed: the $14,000,000 recited for her 51% interest was never paid, and the Schmidt Parties' reciprocal release under § 2(a)(iii)(2) never took effect by its own terms. The release is therefore inapplicable by its terms and voidable at Ritter's election, and she so elects (Count Twenty-One).

**8. After the Agreement: The Write-Off, the 1099, the Unauthorized KPMG Engagements, the Ledger, the Knox Repurchase and Gag, the EDD Notices**

77. December 19, 2024: the StarX write-off (Part V.C.3). [Ex. 6]

78. January 2025: Hillspire caused a Form 1099 to be issued attributing approximately $2,700,000 of Audem-related "income" to Ritter, with associated California Employment Development Department liabilities. [Ex. 12] Audem was an at-cost vehicle whose benefits flowed to Schmidt; the 1099 reported to the Internal Revenue Service payments purportedly made to Ritter that she did not receive as income. It was prepared, on information and belief, with KPMG's participation and issued by or at the direction of Hillspire from the Audem records Hillspire had represented it did not have. The 1099 was willfully false.

79. January 29, July 21, and November 12, 2025: KPMG was paid $19,497 by "OW" (SP LLC) for "Tax Prep," $14,000 by "OWM" (SPM) for "Tax preparation for 2025 Tax Returns," and $57,460 by "OWM" for "Tax Preparation fees for 2023 and 2024 Tax Returns" — $90,957 in total, of which $71,460 came from SPM's own accounts, the entity Ritter was never paid for. [Ex. 5, lines 6, 22, 35] Ritter's only KPMG engagement was for tax year 2023. She never engaged KPMG for 2024 or 2025, never authorized anyone to do so on SPM's behalf while she was its Manager, and

never authorized SPM's cash to be used for it. The $19,497 payment matches no invoice or scope under her engagement. The $14,000 was prepaid before tax year 2025 had ended. The $57,460 paid for the 2024 return — the year Hillspire controlled under § 1(r), the year of the Audem 1099, the year in which SPI's and Knox's costs were loaded onto SPM's books, and the year Ritter had refused to sign. Schedule C to the Agreement had carried KPMG at $9,917 for "2023 taxes." KPMG accepted engagements from persons who were not SPM's Manager, for years its client had not authorized, and prepared and transmitted federal and state returns on that footing. Ritter first learned of the 2024 and 2025 engagements on April 6, 2026, from the ledger Hillspire filed with the arbitrator. [Ex. 5]

80. The Wind-Down Ledger. The exhibit Hillspire filed on April 6, 2026 — "Orion Wing Management, LLC (fka Steel Perlot Management, LLC) — Privileged & Confidential — Payments: 12/4/2024 to 3/16/2026," sponsored by Quach — lists forty payments totaling $1,060,943.78, and the arbitrator recited on that basis that Schmidt "had Hillspire and the Orion Wing entities pay $1,060,943 to resolve SPM debts to third parties and to wind down the entity." [Ex. 5; Ex. 39 at 12] The ledger shows the opposite. Of the total, $441,917.45 was paid by "OWM" — SPM's own cash, the asset never paid for. $344,637.70 went to Alexander, Hristo, Spassimir, and Ivan Paskov as "Transition Pay to former employee," paid by Hillspire, only one of whom is named in § 1(a) and none of whom appears on Schedule C; each thereafter went to work for Hillspire. $63,000 was paid on July 28, 2025 to "MSCI/Barra LLC" against an "original amount" of $126,000 — Schedule C lists "Barra LLC $63,000" and "MSCI $63,000," the same vendor twice, and Ritter had caused SPM to pay Barra in June 2024. $24,736 went in four semester-cadence payments, through February 5, 2026, to "Tyler Gwinn — Capella University Transition Pay" for a person who resigned from SPM in February 2023 and appears on no schedule. $407,234.50 was paid after the six-month wind-down window closed, including $254,600 between July and November 2025 to AlgoSeek, Refinitiv/LSEG, MSCI, ShotQuality, and LinkedIn — the live market-data and

research feeds of SPM's quantitative trading operation. Paying for live trading data a year after the Agreement is not winding an entity down. It is operating it, under a new name, on the intellectual property and data infrastructure Ritter built and was never paid for. The ledger is Hillspire's admission that it depleted SPM's cash, paid its own re-hires, paid a vendor twice, paid for tax work Ritter never authorized, and ran the business, and then told a tribunal it was resolving "SPM debts to third parties."

81. April 24–26, 2025: exactly twelve months after the removal, Knox issued Ritter a "Repurchase Notice" directed at the unvested portion of her Certificate CS-02 shares, in breach of § 1(j). The notice was signed by Thakur as an embedded image, not a DocuSign signer certificate; its embedded metadata gives its title as "The Cloudscaling Group, Inc" and its author as "Natalie Morsette" — a template from a company acquired by Dell EMC in 2014. [Ex. 34] A corporation does not issue a repurchase notice for shares it contends the recipient does not own.

82. April–May 2025: Knox and Thakur, in coordination with Hillspire and Glaser Weil, refused Ritter's request through counsel for basic stockholder information unless she executed an eight- to nine-page agreement barring her from contacting any other Knox stockholder, from pursuing any litigation based on information Knox would otherwise be required to provide — expressly including litigation over corporate mismanagement or tax fraud — and from exercising the Delaware statutory rights § 1(j) had confirmed. [Ex. 34] The "consideration" was Knox's willingness to comply with its own fiduciary and statutory obligations. In August 2025, Thakur attempted to access Ritter's personal Google Workspace. [Ex. 41]

83. August 2026: Marcus transmitted to Ritter the latest EDD tax notices directed at Audem, demanding that she answer for employment-tax liabilities generated by TriNet's and Hillspire's administration of Audem's payroll under Hillspire's control. [Ex. 12] The scheme's most recent act was a demand that its victim pay its bill.

**D. Scheme Two — Digital Seizure, Alteration, and Cover-Up**

**1. The Forged Audem Agreement (March 17, 2022) and Its Use Against Ritter's Parents**

84. On March 17, 2022 at 8:29 a.m., Manekin, SPM's general counsel, emailed Hillspire's Sarah Frayer: "No worries. I got it signed by Michelle and sent to Maria and Mandy." Four minutes later, at 8:33 a.m., Ritter emailed Manekin, forwarding the DocuSign request for the Audem Services Agreement: "I am not going to agree to the IP clause at all." [Ex. 18] Ritter never signed the agreement and never authorized anyone to sign for her. The DocuSign envelope (EF878356) was originated from Hillspire's DocuSign account by Frayer; Quach signed at 12:22 p.m. as "Acting Treasurer-SIF." [Ex. 18] On June 27, 2024, CGNET's Ricardo Uribe, who administered SPM's DocuSign, confirmed: "I could not find any document at the SPM Docusign." [Ex. 18] The "Ritter" signing event registered from Ritter's environment because, as Pixley's examination establishes, from November 2021 a remote operator with Hillspire's JAMF and TeamViewer access could click a signature field on Ritter's own device. [Ex. 1, ¶¶ 19–21] On April 8, 2024, Hillspire used the agreement to send Audem a "Termination of Services Notice." On June 7, 2024, Glaser Weil filed an arbitration demand against Ritter, her mother Shamim Ritter, her father Terry Ritter, Audem, and SPM (AAA No. 01-24-0005-8902), invoking that agreement's arbitration clause; Shamim Ritter had no agreement with anyone, objected in writing repeatedly, and was ignored. [Ex. 19]

**2. Surveillance and Interception Through the Hillspire Device Stack (2021–2024)**

85. From November 2021 through at least September 2024, Ritter's attorney-client communications, legal strategy, financial records, and personal data were accessible in real time to whoever held Hillspire's JAMF credentials, through screen recording and keyboard-and-mouse control. [Ex. 1] On July 27, 2024, Ritter's iPhone was accessed via Safari from the United Kingdom. In July and August 2024 Ritter confirmed TeamViewer and JAMF on the Paley residence systems. On September 3,

2024 at 1:12:56 and 1:13:09 p.m. PDT, thirteen seconds apart, the DocuSign-executed SPM Operating Agreement (envelope 805F7E18) was re-saved twice by PDF Expert in an unsigned incremental-save operation that altered only timestamps — the same day Glaser Weil's side raised the document's authenticity with DocuSign — and JAMF was running on Ritter's laptop on September 5–6, 2024. [Ex. 25; Ex. 1, ¶ 23] The altered document was later transmitted as authentic through AAA WebFile. Ritter did not discover the remote-access architecture until mid-July 2024, after the first arbitration had already been filed on the forged agreement.

**3. CGNET Inside the Tenants (June–August 2024)**

86. CGNET administered the steelperlot.com, starx.com, audem-mgmt.com, and knox-networks.com tenants with super-administrator authority and operated forwarding pathways routing communications from those tenants to Hillspire personnel, including Quach, through at least August 2024 — after Ritter's April 2024 protected disclosures and after a litigation hold issued in June 2024 across all four tenants. [Ex. 2] On June 17, 2024, from the cgnet@starx.com account, CGNET created a new super-administrator account, idfr@starx.com, and changed the password on Ritter's own account, mritter@starx.com; the next day a Linux device with full rights was registered to the new account. On July 4, 2024, an API client with full mail, email-migration, and gmail.insert scopes — the capability to insert messages into a mailbox server-side — was authorized "from" Ritter's account and from her residential IP address, an action Ritter did not take and which is consistent with remote control of her device. [Ex. 45] In June 2024 Coit disclosed that CGNET, at Hillspire's direction, had hidden the KPMG tax-compliance folders from Ritter's administrative view. [Ex. 7] When Ritter discovered these acts in July 2024, she took protective steps — resetting CGNET's credentials, disabling organization-wide auto-forwarding, and engaging Control Risks to collect her devices — and the enterprise's response was to accelerate. [Ex. 36]

**4. The Workspace Seizure (December 6–20, 2024) and the Payment for It**

87. The Agreement itself recognized that the Ritter Parties "control the steelperlot.com site" (§ 1(d)) and required Ritter, within twenty-four hours, to modify steelperlot.com (§ 1(n)) — obligations she could perform only as the Workspace administrator — and confirmed that StarX and Audem were hers and that the Schmidt Parties held none of their records (§ 1(g)). [Ex. 3] On December 6, 2024, through counsel, Ritter "authorized CGNET to provide access to all such information to SPM personnel" and "asked CGNET to provide Hillspire with all such information and records in its possession," and granted CGNET temporary elevated access to steelperlot.com so that a copy could be delivered to the Schmidt Parties. [Ex. 27] She had personally paid the subscriptions since July 2024. The same evening a private investigator sat outside her residence; when police responded, he stated that he worked for "a billionaire's private security detail."

88. Within twenty-four hours, on December 6–7, 2024, CGNET locked Ritter out of mritter@steelperlot.com, the primary administrator account, accessed her account through her own credentials, altered documents, and copied the starx.com and audem-mgmt.com tenants — the records and intellectual property of two companies the Agreement had just confirmed were 100% hers and that were outside any cooperation duty. Access was restored on December 9 and revoked again within an hour. On December 10, 2024 at 7:03 p.m., Harris wrote to Ritter's counsel: "CGNet has been informed that MR keeps reporting suspicious activity and attempting to suspend the google accounts which are controlled through CGNet. Please have her withdraw her requests and reports as they are interfering with our ability to access everything in CGNet. … It is the company's CGNet account and we are responsible for the CGNet bill. MR is not entitled to maintain access to CGNet now that the agreement has been signed. … There was no hack. We are simply taking over CGNet now." [Ex. 28] The same day, Ritter's counsel put CGNET and Google on written notice that the three cgnet@ administrator accounts had been used to lock Ritter out,

that her account had been accessed through her credentials and documents altered, that Harris had "accessed the mritter@steelperlot.com account, changed the password and attempted to access all files," and that all evidence must be preserved; a police report was filed. [Ex. 29]

89. On December 20, 2024, SP LLC paid CGNET $62,688.26 — fifty percent of the $125,376.52 CGNET balance on Schedule C — the first vendor payment on the Wind-Down Ledger. [Ex. 5, line 2] Ten days after Glaser Weil declared itself "responsible for the CGNet bill" and "simply taking over CGNet," the bill was paid at a negotiated discount. CGNET's transfer of administrative control over three domains Ritter owned was procured by, and compensated with, payment of CGNET's receivable.

90. On December 13, 2024, Harris promised that the Workspace would be returned; it was not. On January 16, 2025, Harris wrote to Ritter's counsel that the Workspace "could be returned as of January 13, 2025" — an admission of forty days of unauthorized possession — and when observed the domain's nameservers were gone; in February 2025 Pixley found that the GoDaddy DNS record for steelperlot.com had been deleted by someone with account access. [Ex. 30; Ex. 1] In January 2025 the seized steelperlot.com contents and email were migrated to a new tenant, SchmidtEntity.co, including a newly created account impersonating Ritter, MRitter@SchmidtEntity.co. [Ex. 41] Ritter's counsel notified Glaser Weil in writing on December 31, 2024 and January 19, 2025 of the theft and of the Google breaches. [Ex. 32] On April 6, 2026, Hillspire's Chief Information Officer Kelly Young declared to the arbitrator that Ritter had "obstructed" the transfer of the SPM Google Workspace — the Workspace her own IT vendor had seized under her authority sixteen months earlier. [Ex. 38]

**5. The Intellectual Property Goes Out the Door; The Devices Are Hit Again**

91. In August 2024, Ioannis P., the head of engineering who provided shared technical services to StarX, Knox, and other Ritter-affiliated entities, was paid to resign

by Schmidt-side actors; in Fall 2024 he was hired by Google as a Principal Engineer. In April 2025, Ritter discovered that critical StarX intellectual property and tax data from the former steelperlot.com Workspace, now under SchmidtEntity.co, had been accessed and downloaded by third parties including an OpenAI employee who had previously been in business discussions with StarX; the access was obtained, on information and belief, through the former engineer. [Ex. 41] Ritter reported this to Google. Nothing happened. In August 2025, Thakur attempted to access Ritter's personal Google Workspace. On December 11, 2025 and January 9, 2026, Ritter's new MacBook Air ("Champagne"), set up personally by her in February 2025 and used for privileged legal communications, showed a root console login at 4:35 a.m., an .AppleSetupDone timestamp change seventeen seconds later, an enterprise Apple Business Manager identifier that cannot result from personal setup, a cleared install log, and the same "sysaccount" rename that had been applied to the MacBook Pro Schmidt took from her at Nobu Malibu on November 7, 2024 (Part V.E).

**6. Google and Alphabet: Notice, Control, and Enabling**

92. Google's Terms of Service condition control of a Workspace on ownership and control of the associated domain. [Ex. 40] Ritter owned steelperlot.com, starx.com, and audem-mgmt.com and paid for them. Beginning in June 2024 Ritter notified Google in writing of unauthorized access and data alteration in her business and personal Google accounts; on December 10, 2024, her counsel notified Google of the seizure; in January 2025 she notified an Alphabet board member; on February 21, 2025, her counsel sent Google a formal evidence-preservation letter; and on December 5, 2025, counsel wrote to Google's Chief Legal Officer, Kent Walker, demanding preservation. [Ex. 29; Ex. 32; Ex. 26] Google did not investigate, did not restore the domain owner's control, did not preserve, and instead permitted the migration of the seized tenant to SchmidtEntity.co, the creation of an account in Ritter's name, and the disclosure of her stored communications and StarX's trade secrets to persons not authorized to receive them. Google hired the engineer through whom the trade secrets

were accessed. Ritter sued Google and Alphabet in Santa Clara County Superior Court on September 18, 2025 to recover the Workspace; that action was voluntarily dismissed without prejudice on November 18, 2025 so that these claims could be brought together here. [Ex. 40]

93. Alphabet's knowledge is not derivative of Google's. Chávez, an Alphabet director since July 2022, sat on Knox's board with Schmidt during Ritter's tenure, urged the hiring of Thakur, and was present at meetings and events at which Schmidt's conduct toward Ritter described in Part V.E occurred. He was a Knox director on April 24–26, 2024 when Ritter was removed four weeks after her counsel's abuse report and on the day of the second mediation. From that date Alphabet knew, through a sitting director, that its former Executive Chairman's family office was retaliating against a founder for reporting sexual assault, and that the retaliation ran through Knox's governance and books. From January 2025 Alphabet knew, through its board, that Ritter's Google accounts were being accessed without authorization and that the seized data was being hosted on Google's platform. Alphabet sets and enforces the Workspace and Gmail policies under which the seizure, migration, impersonation, and disclosure occurred. It did nothing, and by doing nothing after notice from its own board it enabled and ratified what followed.

94. Alphabet's liability stands on its own. It rests on Alphabet's own director's conduct and knowledge: Chávez sat on Knox's board at Schmidt's request, urged Thakur's hiring, and personally signed, with Schmidt, the April 26, 2024 Board Written Consent removing Ritter from every office at Knox four weeks after her abuse report [Ex. 33]; on notice given to Alphabet's own board in January 2025 that Ritter's Google accounts were being accessed without authorization and that the seized data was being hosted on Google's platform; on Alphabet's own control, as the parent that sets and enforces the Workspace and Gmail policies under which tenant ownership, account recovery, and migration are decided, over whether the seizure was reversed or ratified; on Alphabet's own decision, after that notice, to do nothing; and on Alphabet's own

relationship with Schmidt — its former Executive Chairman and a significant Alphabet stockholder — whom it permitted, through his family office, to exercise the practical control of a corporate insider over accounts hosted on its platform without any of the disclosure that status would require. None of those facts is Google's. Each Count in which Alphabet is named is pleaded against Alphabet for Alphabet's own acts and omissions, not on any theory of respondeat superior, alter ego, or parental liability for Google, and does not depend on a finding that Google, Hillspire, Schmidt, or any other Defendant is liable. Google's liability, in turn, rests on Google's own Terms of Service, Google's own receipt of notice beginning in June 2024, and Google's own conduct as operator of the tenants, and does not depend on Alphabet's.

**E. The Coercion Program: How the Schemes Were Enforced**

**1. The Report and the Course of Conduct**

95. Ritter's work for Schmidt's companies was never separated from Schmidt's personal demands on her. From 2021, Schmidt conditioned funding, housing, and compensation on the continuation of a personal relationship he controlled; the businesses, the homes, the bank accounts, and the parents' housing were all his to withdraw. Ritter was never paid a salary at Knox; her SPM guaranteed pay was withheld when Schmidt chose; her work at Anthropic-related, hospitality, real-estate, Future House, Knox, and SPM/SPI projects between 2020 and 2026 was uncompensated or compensated only in equity that was later stripped. Schmidt's conduct toward Ritter included sexual assault, which Ritter reported through counsel in a mediation in late March 2024, over Glaser Weil's demand that the subject be excluded. Glaser Weil and Schmidt terminated the mediation immediately. Schmidt's purpose in what followed is not a matter of inference. In September 2025, Emina, a witness residing in the United Kingdom who spoke with Schmidt directly, wrote to Ritter that Schmidt "told me more than once 'I will bankrupt her' as if it was his vengeance for you not submitting to him," and that "everyone around him also knows

that the story he sells about you isn't true." [Ex. 61] This Complaint does not ask the Court to adjudicate that report; it pleads what followed it.

**2. March–August 2024: Funding Cut, Locks Changed, Knox Removal, the First Arbitration, Witnesses Bought**

96. Within weeks of the March 2024 report, all funding to Ritter's companies was blocked. The cutoff was announced by Hillspire's Chief Accounting Officer, not by Schmidt to Ritter: on May 6, 2024, after SPM's finance lead had written to Quach that "I need to know where we stand on the SPM budget and the debt line funding for StarX" and that "per Michelle's first principles, people should always get paid for their work," Quach replied that "Eric's attorney sent multiple communications to Michelle's attorney regarding SPM funding," that "because of that and other reasons Eric has no further funding obligation," that Schmidt was "willing to fund wages for SPM employees through the end of May pursuant to a recoupable loan to SPM," and that "he might fund severances as part of a broader transition." [Ex. 57] The "broader transition" — the shutdown, the severances, the write-offs — was thus fixed by May 6, 2024, three weeks before Hillspire told KPMG that "All losses will be allocated to hillspire" (Part V.C.2) and a month before the first arbitration was filed. On April 8, 2024, Hillspire terminated Audem's services under the forged agreement. On April 15, 2024, Schmidt changed the locks at the New York, Miami, and Aspen properties without notice and withheld Ritter's belongings for approximately five months as negotiating leverage. On April 24–26, 2024, Ritter was removed from Knox (Part V.C.4); at the April 26 mediation Schmidt brought SPM employees and his friend Todd Meister, who spent more than an hour disparaging Ritter until the mediator questioned the statements. In April 2024 Patricia Glaser personally threatened Fried Frank to deter it from assisting Ritter. Also in April 2024, Marcus and Harris assumed governance and operating roles within SPM at Hillspire's direction; SPM's July 15, 2024 internal memorandum describes "our Hillspire counterparts and SPM finance — who are de facto managers." [Ex. 23; Ex. 2, ¶¶ 19–32] On May 20, 2024, Schmidt told Ritter he did not like her

attorneys and that she should cap their fees, and held funding as leverage while the deal terms changed.

97. On June 7, 2024, Glaser Weil filed the first arbitration against Ritter and her parents on the forged Audem agreement (Part V.D.1), applying the Large Complex Commercial Case procedures to two elderly individuals without counsel. [Ex. 19] In July 2024, Wells Fargo delivered the "sole member" and "$0 balance" representations (Part V.C.6). Beginning in July 2024, departing SPM and Audem employees were routed into severance agreements with "H, LLC," a Hillspire-affiliated entity, whose Section 2 required each to "affirm that no individual or entity, associated with the Company or otherwise, has directly or indirectly induced you to end your employment," and whose Section 4 barred any statement "concerning the Company or any member of the Company Group now or in the future"; the attestations were false, the departures were induced, and the recipients — including Ritter's executive assistant and her general counsel — thereafter worked for Hillspire; in October 2024 Hillspire supplied SPM with releases it had obtained from those employees, and on December 10, 2024 Marcus refused Ritter's request, through counsel, to see them. [Ex. 21; Ex. 2; Ex. 47; Ex. 28] The Reinhardt declaration documents that Glaser Weil directed a witness-development campaign in which severance and release payments were used as leverage to obtain statements adverse to Ritter, and that Schmidt-side agents contacted third parties in January 2025 to shape testimony. [Ex. 2] On August 1, 2024, a negative article about Ritter appeared in The Information; on August 4, 2024, Marcus emailed SPM and Audem employees, removing Ritter from the thread, stating that she had "abandoned" SPM, "failed at fundraising," and "furloughed all staff" — each false on SPM's own records. [Ex. 22] On August 7, 2024, a process server who "appeared to know our schedule" served sixty-day notices to terminate occupancy on Ritter and her parents at both Los Angeles homes and photographed them on private property. [Ex. 24] Through the summer and fall, private investigators surveilled Ritter and her parents.

**3. October–December 2024: The Buyout Refused, the Bank Closes the Accounts, the Car Is Taken, the Homes Are Noticed, the Agreement Is Signed**

98. On October 24, 2024, Ritter requested a buyout of Schmidt's 49% of SPM; on October 26, Marcus replied that her email "contains false assertions and is generally denied" and refused to state any price, while Glaser Weil prepared the agreement under which Ritter would instead transfer her 51% for a payment that would never be made. [Ex. 48] Wells Fargo's closure letters followed on October 8–25 (Part V.C.6). On November 7, 2024, Schmidt tracked Ritter's location through the Tesla application on a shared vehicle, arrived at Nobu Malibu in a Maybach while she was at a family lunch, took the car, returned her mother's bag, and kept Ritter's personal laptop, which held evidence of the account breaches and did not, at that time, carry Hillspire's device-management software; Ritter's counsel demanded that Nobu preserve its video the next day, and Ritter filed a police report. [Ex. 26] On November 7, 2024, Glaser Weil's Patricia Glaser communicated with Ritter's New York counsel concerning the taking of the vehicle and the laptop. On November 25, 2024, Harris wrote to Ritter's counsel that SPM's assets would be subject to "wind-down, dissolution, and liquidation" — a representation contradicted by the November 18 budget note ("making money via this forced shutdown") and by the fifteen months of trading-desk operations the Wind-Down Ledger later disclosed. [Ex. 8; Ex. 5] On December 2, 2024, Ritter and her parents were served with three-day notices to terminate occupancy for both Los Angeles homes on a pretext of unpermitted renovations, with a demand for handover under threat of emergency entry. [Ex. 24] On December 3, 2024, Ritter wrote to her parents: "I'm so sorry to both of you. I cannot believe this is the mess that my relationship with Eric has put you both in… We need to get out and I asked for a final agreement."

99. On December 4, 2024, Ritter signed the Agreement (Part V.C.7). In late November 2024, Glaser Weil had changed the deal's terms: its November 20 redline moved the Schedule D trigger from "first" payment to "final" payment and tied it to

the schedule paragraph that then denoted Ritter's own $14,000,000; its November 21–24 renumbering inserted a new $125,000 parent advance, pushed the parents' $875,000 into that paragraph, and moved Ritter's $14,000,000 to a new paragraph without conforming § 3(b) — creating the cross-reference the arbitrator later read to require the recantation upon the parents' payment rather than upon Ritter's. [Ex. 3] Ritter had no counsel with her; her counsel of record was in New Jersey.

**4. December 6–23, 2024: The Seizure, the Restraining Order, the House Visit, the Amendment**

100. On December 5–6, 2024, Harris, copying Marcus, demanded the passcodes and access information for SPI's cryptocurrency account ("we know there is an SPI crypto account that we need the information that will allow us to access it"); Ritter's counsel answered that she held no passcodes and had again authorized CGNET to give Hillspire everything in its custody; that evening the Workspace seizure began (Part V.D.4). [Ex. 27] On December 11, 2024, Ritter filed a petition for a domestic-violence restraining order against Schmidt in the Los Angeles County Superior Court (No. 24SMRO00444), documenting the theft of her assets and the surveillance of her parents. [Ex. 46] The same day, Hillspire's Debra Smith inspected the Paley residence and photographed its contents. On December 13, 2024, Harris promised the Workspace would be returned. On December 17, 2024 — six days after the petition — Marcus and Harris, with additional attorneys, Smith, and private security, came to the residence where Ritter and her parents lived. No counsel for Ritter was present; her father had to rent a car at the last minute. Over approximately eleven hours, Harris drafted and Marcus repeatedly demanded that Ritter sign a stipulation to dismiss the restraining-order petition and an Amendment to the Agreement under which the parents' $875,000 payment was made contingent on Ritter's filing, within twenty-four hours, a form "irremovably and forever" rescinding, revoking, retracting, and denying the petition, with the parents to vacate by noon that day, and under which the Schmidt Parties would "forego" property claims if she complied. [Ex. 4] A video Ritter recorded at 12:21 p.m.

that day shows Marcus inside her home, in the entry hall, while the demand that she withdraw the petition was being pressed. [Ex. 60] Marcus told Ritter's parents they would be evicted and that the Workspace and funds would continue to be withheld. On April 6, 2026, Marcus admitted in a sworn filing that on December 17, 2024 he obtained Ritter's counsel's agreement that Marcus could communicate directly with Ritter to procure the withdrawal. [Ex. 38, App. Ex. 72] Ritter signed under duress. On December 23, 2024, Marcus wrote to Ritter's counsel pressing for the dismissal, and the petition was withdrawn under the Amendment's terms. [Ex. 30] The parents' payment, reduced to $862,500 by a claimed offset, was wired the next day. The $14,000,000 was not.

**5. 2025–2026: "Declaration Now Instead of When Michelle Is Paid in Full"**

101. On January 9, 2025, a Wall Street Journal reporter contacted Schmidt's public-relations advisor with details of the Agreement. Schmidt's side attributed the disclosure to Ritter without evidence and used it as the pretext for the next demand. On January 13–15, 2025, Marcus wrote to Ritter's counsel requiring the Schedule D declaration "now instead of when Michelle is paid in full"; Ritter's counsel replied that this was a "monumental modification" of the Agreement. [Ex. 30; Ex. 31] On January 15, 2025 — forty-two days after the Agreement — Marcus signed and filed a new arbitration demand (AAA No. 01-25-0000-2191) alleging that Ritter had breached by "disparaging and defaming Schmidt, including with false accusations of abuse," by "filing a false application for a temporary restraining order," by "failing to timely relinquish and return property," and by "failing to reasonably cooperate in the transition of SPM" — the last two being the Schmidt Parties' own unperformed obligations inverted against her. [Ex. 20] On June 2, 2025, Marcus wrote to Ritter's contingency counsel accusing them of malicious prosecution and abuse of process for assisting her. In the summer and fall of 2025, Marcus made two further attempts to extract the declaration up front, including through counsel in another state, and in September 2025 the position communicated to Ritter's counsel was "no payment and we arbitrate." On September 9, 2025, AAA demanded $75,000 in deposits from Ritter, then without

funds because her assets had been taken. On September 11, 2025, Ritter served a Notice to Preserve invoking the crime-fraud exception and CCP §§ 1001–1002; on September 12, 2025, Marcus refused to honor it and refused to withdraw as counsel despite being a witness. [Ex. 35; Ex. 44] After Ritter's counsel withdrew on February 11, 2026, Marcus and Glaser attended a conference with the arbitrator on March 4, 2026 without her; an order followed demanding that Ritter surrender her compromised devices for "mirroring" to the parties who had compromised them; on March 13, 2026 all three Glaser Weil partners attended the show-cause hearing; Marcus drafted the default order that struck her answer and precluded her evidence. [Ex. 37] On April 6, 2026, Schmidt's side filed 1,341 pages, including Marcus's own sworn declarations; Ritter was given seven days. The filing sought $8,080,138 to "repair" Schmidt's reputation through twelve months of paid media, computed by a public-affairs consultant who acknowledged the underlying allegations were unadjudicated, and $120,095 for a vendor's real-time monitoring of Ritter's social-media accounts from November 2025, plus $8,053.40 for investigators' efforts to locate and serve her parents. [Ex. 38] The Award that followed on June 4, 2026 adjudicated Ritter's report false without hearing her evidence, awarded the media budget, and awarded the surveillance invoice as "fees." Ritter has sought vacatur of that Award in the Superior Court; this Complaint does not seek review of it. On April 21, May 15, and July 6, 2026, and again in August 2026, Marcus sent the Audem EDD notices. [Ex. 12]

**F. Marcus and Glaser Weil: Parties and Witnesses**

102. Marcus and Glaser Weil are not sued for advocacy. They are sued for the roles they took as principals: managers of SPM from April 2024; the persons who declared themselves "responsible for the CGNet bill" and "taking over CGNet"; the persons physically present at Ritter's residence with private security on December 17, 2024; the administrators of the H, LLC severance program; the transmitters of tax notices; and the persons who refused to preserve evidence of their own conduct. Each of those roles is outside the litigation privilege under the operational-conduct exception

recognized in *Kolar v. Donahue, McIntosh & Hammerton*, 145 Cal. App. 4th 1532 (2006), and *Rickley v. Goodfriend*, 212 Cal. App. 4th 1136 (2013), and outside any privilege under the crime-fraud exception of Evidence Code § 956 and *Flatley v. Mauro*, 39 Cal. 4th 299 (2006). Marcus has submitted sworn declarations in the arbitration on the December 17, 2024 events and on the settlement negotiations in which he was a participant, and Glaser Weil holds a $1,409,881.94 financial stake in the outcome of the conduct at issue. [Ex. 38] Marcus and Harris are necessary witnesses to Counts One, Two, Five, Twelve, Thirteen, Fourteen, and Fifteen. Ritter will move, at the appropriate time, for an order under this Court's inherent authority and Local Rule 83-3.1.2 (incorporating California Rule of Professional Conduct 3.7) disqualifying Glaser Weil and Marcus from representing Schmidt, Hillspire, or Knox in this action.

**G. Injury to Business and Property**

103. Ritter's injuries to business and property, proximately caused by the predicate acts and the schemes pleaded above, include without limitation: (a) her 51% interest in SPM, transferred for $14,000,000 that has never been paid; (b) SPM's cash — the $897,859.54 that left account -6449 and the $441,917.45 of SPM funds spent through "OWM" — the value of which belonged 51% to her; (c) StarX: its FIFA engagement and sports-industry relationships, its intellectual property accessed by OpenAI, its records seized, and the $6,575,000 "forgiveness" that was in truth a write-off harvested by Schmidt-side taxpayers; (d) her 24,000,000 Knox shares, including the unvested portion subjected to the April 2025 repurchase notice and the value of her Delaware stockholder rights; (e) Audem: the approximately $2,700,000 of 1099 "income" attributed to her, the EDD liabilities now being collected, and the value of Audem's operations, at least approximately $5,200,000 in foregone operating margin for 2022–2024 and more than $25,000,000 including goodwill and appreciation; (f) SPI: her share of carry on more than $51,000,000 of investments and a $2,000,000,000 transaction blocked by Seferian in 2024, with direct damages of no less than

$400,000,000; (g) tax liabilities booked to her personally that were generated by and for other taxpayers, and her 51% share of the tax attributes SPM's own operations generated — the $26,800,000 of fiscal-year-2022 adjustments and the fiscal-year-2023 and 2024 losses — diverted to Schmidt-side taxpayers by the allocation Hillspire dictated on May 31, 2024, together with the KPMG fees charged to SPM's cash to accomplish it; (h) the contents of the seized Workspace tenants, including three years of business records; (i) the personal laptop taken November 7, 2024; (j) more than $75,000 of arbitration deposits demanded and legal fees incurred in proceedings commenced on a forged agreement and in the second proceeding; (k) uncompensated labor between 2020 and 2026; and (l) the costs of forensic examination, preservation, and remediation. These are concrete financial losses to Ritter's business and property. They are not personal injuries and they are not derivative of any corporation's claim: the 51% interest, the shares, the 1099, the EDD liabilities, the laptop, the fees, and the labor were hers.

**H. Continuing Conduct, Discovery, and Timeliness**

104. Each scheme is continuing. The most recent acts — the April 6, 2026 filings, the June 4, 2026 Award, the RSI monitoring invoiced through April 2026, and the August 2026 EDD transmittal — occurred within months of this Complaint. Ritter first learned of the existence of the KPMG 2024 and 2025 engagements, of the Paskov and Gwinn payments, of the double payment to Barra, of the trading-data payments, and of the December 19, 2024 StarX write-off on April 6, 2026. She first learned of the hidden books in late June 2024. She was never told of the May 31, 2024 meeting or of the instruction that "MR K1 will not be impacted," and learned of both only after the fact from records not given to her at the time; she has never been furnished the amended 2022 return or any amended K-1. She first learned of the device architecture in July 2024 and of its scope on April 9, 2026. She first learned of the Wells Fargo re-titling on May 2, 2025. She first learned of the OpenAI access in April 2025. Defendants concealed each of these facts through the means alleged, and the periods of limitation

on every claim were tolled by that concealment, by Ritter's reasonable diligence, and, as to 26 U.S.C. § 7434, by the statute's own rule that suit may be brought within the later of six years after the fraudulent return was filed or one year after it would have been discovered by reasonable care.

## VI. CLAIMS FOR RELIEF

## COUNT ONE

### Violation of 18 U.S.C. § 1962(c) — Association-in-Fact Enterprise

### (Against Schmidt, Hillspire, Glaser Weil, Marcus, KPMG, Wells Fargo, Knox, Thakur, CGNET, TriNet, Alphabet, and Does 1–50)

105. Plaintiff realleges and incorporates the allegations of Parts I through V above.

106. Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c). Each Defendant named in this Count is a "person" within the meaning of §§ 1961(3) and 1962(c).

**The RICO Enterprise**

107. At all relevant times the Defendants named in this Count, together with the non-party participants identified in Part II.C, formed and operated the Hillspire Enterprise, an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), as alleged in Part V.B. The Enterprise had a common purpose: to capture the value of SPM, SPI, StarX, Knox, and Audem for Schmidt-side interests, to allocate the tax losses of those companies to Schmidt-side taxpayers and their liabilities to Ritter, and to prevent Ritter from exposing or contesting the scheme, including by silencing her report of sexual assault and harassment. Its participants remained constant across more than four years and shared an ongoing framework — Hillspire's control of the companies' legal, financial, accounting, payroll, and IT functions — for carrying out that purpose. The Enterprise engaged in, and its activities affected, interstate commerce: its participants operated across California, New York, Oregon, Idaho, South

Dakota, and abroad; its instruments were interstate wires, the mails, a national bank, and cloud infrastructure.

108. The Enterprise was structured as follows. Schmidt and Hillspire directed and funded the Enterprise and received its benefits: the companies, the write-offs, and the silence. Glaser Weil and Marcus drafted the instruments, assumed operating control of SPM in April 2024, directed CGNET and paid its bill, administered the H, LLC severance program, procured the Agreement and the Amendment, and transmitted the tax notices, and were paid $1,409,881.94 through October 2025 for it. KPMG designed and executed the tax-loss mechanism, took direction from Hillspire instead of its client, decided StarX's fate on March 6, 2024, and prepared and transmitted returns for years its client never authorized, and was paid from SPM's own accounts. Wells Fargo conditioned Ritter's accounts on Hillspire's concurrence, represented that they would be closed and remitted, and instead retitled them to Hillspire's successor and let the money out. TriNet transmitted forged authority and employment-tax filings to state agencies at Quach's direction. CGNET administered the tenants and DocuSign for Hillspire, hid the books, forwarded the mail, created the super-administrator, seized the domains, and was paid. Knox and Thakur redirected StarX's tax documents, removed the founder, terminated vesting, issued the repurchase notice, and demanded the gag agreement. Alphabet, through a director sitting on Knox's board, knew of the retaliation from its first act and, after notice through its board, enabled and ratified the hosting, migration, impersonation, and disclosure on its platform. Each conducted or participated in the conduct of the Enterprise's affairs, and not merely its own, through the acts alleged; each played a part in directing those affairs within the meaning of *Reves v. Ernst & Young*, 507 U.S. 170 (1993), including, as to the professional-service Defendants, by exercising discretion over the Enterprise's operations that a mere vendor would not exercise: KPMG decided what StarX's fate would be and what SPM's returns would say; Wells Fargo decided whose instructions would be honored and whose name the account would bear; CGNET decided who would hold the

credentials; TriNet decided what would be filed with the State of Idaho in Ritter's name; Glaser Weil decided who managed SPM.

109. The Enterprise is distinct from each Defendant, and each Defendant is distinct from the Enterprise, as alleged in Part V.B. The professional-service Defendants each maintain independent businesses serving other clients; the Enterprise was the combination of those businesses with Hillspire, Knox, and Alphabet in service of a common scheme against a single victim.

**Pattern of Racketeering Activity**

110. Each Defendant named in this Count committed, or caused to be committed, at least two acts of racketeering activity within the meaning of 18 U.S.C. § 1961(1), the last of which occurred within ten years of the first, as set forth below. The acts are related: they share the same purpose (the capture of Ritter's companies and the allocation of their losses and liabilities), the same victim, the same participants, the same methods (control of the victim's own accounts, books, devices, and counsel; execution of documents in her name; conditioning of payment on silence), and the same result. They are continuous: they span from March 2022 (the Audem DocuSign) to August 2026 (the EDD transmittal), and they are the Enterprise's regular way of doing business, with the specific threat of continuing — SPM's returns for 2025 are being prepared; the EDD liabilities are being collected; the Knox shares remain withheld; the Workspace remains seized; the surveillance continues.

111. Wire fraud (18 U.S.C. § 1343) and mail fraud (18 U.S.C. § 1341). Defendants devised and participated in a scheme to defraud Ritter of money and property — her SPM interest, SPM's cash, her 51% share of the tax attributes SPM's operations generated, StarX, her Knox shares, Audem's value, and her tax position — by means of materially false representations and omissions, and transmitted or caused to be transmitted by interstate wire and by mail, in furtherance of the scheme, the following communications, each with the specific intent to defraud:

(a) March 17, 2022: transmission through Hillspire's DocuSign account (Frayer) and by email (Manekin to Frayer, 8:29 a.m.) of the purported Audem Services Agreement bearing a "signature" of Ritter that she did not make [Ex. 18] — Hillspire, Does;

(b) 2022–2023: redirection of StarX tax documents and notices by mail and email to Thakur and to Hillspire's Menlo Park address [Ex. 58] — Thakur, Knox, Hillspire;

(c) February 16–21, March 6, and March 20, 2024: KPMG engagement communications, the NOL-reclassification instruction, the "buying StarX" analysis, and the transmission of StarX's loan and governance documents for write-off analysis, all routed to exclude the client [Ex. 7] — KPMG, Hillspire;

(d) April 9, 2024: the Tahiliani–Coit "our investor" thread forwarded to Quach [Ex. 10] — KPMG, Hillspire;

(e) June 2024: transmission to the Idaho Department of Labor and to California authorities of the StarX power of attorney and employment-tax filings bearing a copy-pasted "signature" and Quach's telephone number [Ex. 13] — TriNet, Hillspire;

(f) June 7, 2024: electronic filing through AAA WebFile of the demand for arbitration premised on the forged Audem agreement [Ex. 19] — Glaser Weil, Schmidt, Hillspire;

(g) July 11–17 and July 29, 2024: the "sole member," "$0 balance," and "joint written confirmation from you and Hillspire" emails [Ex. 15] — Wells Fargo;

(h) July–August 2024: transmission of the H, LLC severance agreements containing the false non-inducement attestation [Ex. 21] — Hillspire, Glaser Weil;

(i) August 4, 2024: Marcus's email to SPM and Audem employees [Ex. 22] — Marcus, Glaser Weil;

(j) September 3, 2024 and thereafter: alteration of the SPM Operating Agreement exhibit on the JAMF-managed device and its transmission through AAA WebFile as authentic [Ex. 25] — Hillspire, Glaser Weil, Does;

(k) October 8, 10, 11, and 25, 2024: the closure letters (mailed) and emails representing that the accounts would be closed, the balances remitted by cashier's check, and the decision "final" [Ex. 14] — Wells Fargo;

(l) November 18, 2024: the "making money via this forced shutdown" budget analysis circulated within Hillspire in furtherance of the scheme [Ex. 8] — Hillspire;

(m) November 25, 2024: Harris's "wind-down, dissolution, and liquidation" email to Ritter's counsel — Glaser Weil;

(n) December 4, 2024: transmission for execution of the Agreement containing the ¶ G "no books and records" representation, the Schedule B loan recital, and the Schedule A payment promise [Ex. 3] — Schmidt, Hillspire, Glaser Weil, Marcus, Knox, Thakur;

(o) December 10, 2024: Harris's "taking over CGNet" email [Ex. 28] — Glaser Weil;

(p) December 13, 2024 and January 16, 2025: Harris's emails promising return of the Workspace and stating it "could be returned as of January 13, 2025" [Ex. 30] — Glaser Weil;

(q) December 19, 2024: transmission through DocuSign of the Written Consent declaring the StarX loan "wholly worthless" [Ex. 6] — Hillspire, Schmidt;

(r) January 2025: transmission to the Internal Revenue Service and to Ritter of the Audem Form 1099 [Ex. 12] — Hillspire, KPMG, Does;

(s) January 13–15, 2025: Marcus's "declaration now instead of when Michelle is paid in full" emails and the electronic filing of the second arbitration demand [Ex. 20; Ex. 30] — Marcus, Glaser Weil, Schmidt, Hillspire;

(t) 2025: electronic filing of SPM's 2024 federal and state returns, and preparation and transmission of 2025 return workpapers, under engagements Ritter never authorized [Ex. 5; Ex. 11] — KPMG, Hillspire;

(u) April 24–26, 2025: transmission through DocuSign of the Knox Repurchase Notice [Ex. 34] — Knox, Thakur, Hillspire;

(v) April–May 2025: transmission of the proposed gag agreement and the refusal of stockholder information [Ex. 34] — Knox, Thakur;

(w) April 6, 2026: electronic filing through AAA WebFile of the Wind-Down Ledger with the representation that it reflected "SPM debts to third parties," of Young's "obstruction" declaration, and of Marcus's declarations [Ex. 5; Ex. 38] — Hillspire, Glaser Weil, Marcus;

(x) April 21, May 15, July 6, and August 2026: Marcus's transmittals of the Audem EDD notices demanding that Ritter answer for liabilities generated under Hillspire's control [Ex. 12] — Marcus, Hillspire.

(y) June 17, 2024 and December 6–7, 2024: CGNET's transmissions creating the idfr@starx.com super-administrator, changing the password on Ritter's account, and transmitting the copied starx.com and audem-mgmt.com tenant contents and control of steelperlot.com to Hillspire by interstate wire, each in furtherance of the scheme [Ex. 45; Ex. 28; Ex. 29] — CGNET, Hillspire;

(z) January 2025: the migration by interstate wire of the seized steelperlot.com tenant contents to the SchmidtEntity.co tenant and the creation of the MRitter@SchmidtEntity.co account, effected through Google's platform with Alphabet's knowledge through its board and after notice [Ex. 41] — Hillspire, Alphabet, Does.

(aa) May 23, 2024 (10:26 a.m., 11:29 a.m., and 3:36 p.m.): the "URGENT REGARDING 2022 TAX RETURNS/AMENDMENTS," "massive tax benefit," and "Michelle will need to amend her 2022 K1, and Big Hen will need to amend their 2022 K1" emails by which Ritter's approval of the $26,800,000 amendment was obtained on the representation that her own K-1 would be amended [Ex. 51] — Hillspire, KPMG (through its counterparty, SPM Finance, acting on KPMG's advice);

(bb) May 29, 2024: transmission through DocuSign of KPMG's $40,000–$45,000 addendum for the 2022 amendment and of the draft notice to Big Hen Group I, LLC, and the May 31, 2024 conference on the "$26.8M amendment to SPM FY2022

Tax Return," conducted by interstate wire and telephone, at which Hillspire instructed KPMG that "All losses will be allocated to hillspire, MR K1 will not be impacted" and KPMG agreed to "keep this in mind," concealed from the Manager whose approval had been obtained eight days earlier on the contrary representation [Ex. 52; Ex. 53] — Hillspire, KPMG;

(cc) 2024: transmission to the Internal Revenue Service and to state taxing authorities, by mail or interstate wire, of the administrative adjustment request, amended schedules, and amended Schedules K-1 for SPM's fiscal year 2022 and of SPM's fiscal-year-2023 return and Schedules K-1, allocating $26,800,000 of adjustments as Hillspire had directed and without furnishing Ritter the statements the Code required (on information and belief as to the dates and contents of the filings, which are in Defendants' exclusive possession) [Ex. 51–54] — KPMG, Hillspire;

(dd) May 1–6, 2024: the "Wire scheduled - SPM to StarX for May-2024 Coverage" thread in which Hillspire's Chief Accounting Officer recharacterized StarX's funding as "the debt line funding for StarX," announced that "Eric has no further funding obligation," and described the coming "recoupable loan to SPM" and "broader transition" [Ex. 57] — Hillspire;

(ee) April 24, 2023: the mailing of StarX Networks, Inc.'s State of Delaware estimated-tax notice to "Natalya Thakur-COO, Knox Networks Inc." at Knox's post-office box, caused by the entry of Thakur's name and Knox's address in StarX's records as StarX's tax contact [Ex. 58] — Thakur, Knox, Hillspire.

112. Financial institution fraud (18 U.S.C. § 1344). Schmidt, Hillspire, and Wells Fargo's personnel executed a scheme to obtain moneys under the custody or control of a federally insured financial institution — the $946,706.69 in SPM account -6449 and the balances in the Audem account — by means of false and fraudulent pretenses and representations: the "sole member" representation, the "joint written confirmation" requirement, the closure and cashier's-check representations, and the re-titling of the account to "Orion Wing Management, LLC" without Ritter's authorization, resulting

in the movement of approximately $897,859.54 to Schmidt-side interests (Part V.C.6). [Ex. 14–16]

113. Extortion (18 U.S.C. § 1951). Schmidt, Hillspire, Glaser Weil, Marcus, Knox, and Thakur obtained, and attempted to obtain, Ritter's property — her 51% interest in SPM, her cooperation in the transfer of SPM's assets and accounts, her Knox shares and stockholder rights, the withdrawal of her restraining-order petition, and the sworn recantation on which her $14,000,000 was conditioned — with her consent induced by the wrongful use of fear of economic loss, including: the cutoff of all funding within weeks of her abuse report; the April 15, 2024 lockouts and five-month withholding of her belongings; the June 7, 2024 arbitration against her parents on a forged agreement; the August 7 and December 2, 2024 eviction notices; the November 7, 2024 taking of her vehicle and laptop; the December 6, 2024 investigator outside her home; the December 17, 2024 on-site session with private security; the conditioning of her parents' payment on withdrawal of the petition within twenty-four hours; the January 2025 demand for the declaration "now instead of when Michelle is paid in full" backed by a new arbitration; the "no payment and we arbitrate" position; the $75,000 deposit ultimatum; the April 2025 repurchase notice; the May 2025 gag agreement; and the RSI surveillance and parent-subpoena hunt. Schmidt stated the object in his own words to a third party: "I will bankrupt her." [Ex. 61] Fear of economic loss suffices under § 1951; the exploitation of that fear to obtain property to which the Defendants had no lawful claim — including the recantation of a report of a crime — is wrongful. [Ex. 3; Ex. 4; Ex. 20; Ex. 24; Ex. 30; Ex. 34; Ex. 38]

114. Obstruction of justice and witness tampering (18 U.S.C. §§ 1512(b), (c)). Hillspire and Glaser Weil, through the H, LLC severance program, knowingly used corrupt persuasion — severance payments conditioned on false attestations of non-inducement and on perpetual silence — with intent to influence, delay, or prevent the testimony of former SPM and Audem employees, including Ritter's executive assistant and general counsel, in official proceedings, including this action, that were foreseeable

when the program was administered and need not have been pending (§ 1512(f)(1)). [Ex. 21; Ex. 2] Schmidt-side agents contacted third-party witnesses in January 2025 to shape their accounts. [Ex. 2] Marcus refused to preserve records subject to the crime-fraud exception after written notice on September 11, 2025, and Hillspire and CGNET deleted the steelperlot.com DNS record and cleared device logs, corruptly concealing records with intent to impair their availability for use in an official proceeding (§ 1512(c)(1)). [Ex. 35; Ex. 1] The RSI program that monitored Ritter's speech in real time and the investigators dispatched to locate her parents were undertaken with intent to intimidate a witness and complainant. [Ex. 38]

115. Money laundering (18 U.S.C. §§ 1956, 1957). Schmidt, Hillspire, Wells Fargo, KPMG, CGNET, and Does knowingly engaged in monetary transactions, each exceeding $10,000 and each through a financial institution affecting interstate commerce, in property derived from the wire fraud, bank fraud, and extortion alleged above — SPM's cash, obtained by the false pretenses at Wells Fargo and by the transfer of Ritter's 51% for no consideration — including: the movement of approximately $897,859.54 out of account -6449 between October 12, 2024 and May 1, 2025, including into the undisclosed -4953 Time Account ($207,370.86); the December 20, 2024 payment of $62,688.26 to CGNET; the payments of $19,497, $14,000, and $57,460 to KPMG; the $88,758.90 to Fried Frank; the $63,000 to MSCI/Barra; the $80,000 to AlgoSeek; the $100,000 to Refinitiv/LSEG; and the remaining "OW" and "OWM" line items on the Wind-Down Ledger. [Ex. 5; Ex. 16] These transactions were designed in whole or in part to conceal the nature, source, ownership, and control of the proceeds — by re-titling the account, by routing SPM's cash through a renamed entity, and by characterizing the payments to a tribunal as "SPM debts to third parties" (§ 1956(a)(1)(B)(i)) — and to promote the carrying on of the scheme, including by paying the IT vendor for the seizure and the accountant for the unauthorized returns (§ 1956(a)(1)(A)(i)).

**Specific Predicate Acts for Each Defendant**

116. Without limiting the foregoing, each Defendant named in this Count committed at least the following predicate acts: Schmidt — (f), (n), (q), (s) (wire fraud); § 1344; § 1951 (each act listed); § 1957 (each "OW"/"OWM" transaction). Hillspire — (a), (b), (c), (d), (e), (f), (h), (j), (l), (n), (q), (r), (t), (u), (w), (x), (y), (z), (aa), (bb), (cc), (dd), (ee) (wire/mail fraud); § 1344; § 1951; § 1512(b), (c); §§ 1956, 1957. Glaser Weil — (f), (h), (i), (j), (m), (n), (o), (p), (s), (w) (wire fraud); § 1951; § 1512(b), (c). Marcus — (i), (n), (s), (w), (x) (wire fraud); § 1951; § 1512(c). KPMG — (c), (d), (r), (t), (aa), (bb), (cc) (wire and mail fraud); § 1957 (receipt of the payments from SPM's accounts). Wells Fargo — (g), (k) (wire and mail fraud); § 1344; §§ 1956, 1957 (the -6449 and -4953 transactions). Knox — (b), (n), (u), (v), (ee) (wire/mail fraud); § 1951. Thakur — (b), (n), (u), (v), (ee) (wire/mail fraud); § 1951. CGNET — (y) (wire fraud); § 1957 (receipt of the December 20, 2024 payment); and the § 1030 conduct pleaded in Count Five, which, though not itself a listed predicate, is the means by which predicates (a), (j), and (y) were accomplished. TriNet — (e) (wire fraud). Alphabet — (z) (wire fraud), with knowledge acquired through its director and through notice to its board; and the § 1512(c) concealment effected through the migration and impersonation on its platform after notice.

**Injury and Causation**

117. Ritter was injured in her business and property by reason of the violations of § 1962(c), as alleged in Part V.G. The injuries flow directly from the predicate acts: the false representations induced the transfer of her SPM interest and her reliance on the closure of her accounts; the extortionate acts induced the Agreement, the Amendment, and the withdrawal; the bank-fraud and laundering transactions removed SPM's cash; the forged and fraudulent transmissions to state agencies and to the IRS generated the liabilities now collected against her; and the repurchase notice and gag demand deprived her of her shares and rights. Ritter is the direct victim and the intended target of each act; no other party stands between the acts and her losses.

118. Under 18 U.S.C. § 1964(c), Ritter is entitled to threefold the damages she has sustained, the costs of suit, and reasonable attorneys' fees, together with equitable relief.

**COUNT TWO**

**Violation of 18 U.S.C. § 1962(d) — Conspiracy to Violate § 1962(c)**

**(Against All Defendants)**

119. Plaintiff realleges and incorporates the allegations of Parts I through V above.

120. Each Defendant knowingly agreed to facilitate a scheme that included the operation or management of the Hillspire Enterprise through a pattern of racketeering activity, and adopted the goal of furthering or facilitating it. The agreement is established by each Defendant's knowing participation in acts that could have no purpose other than the Enterprise's: CGNET locked Ritter out within twenty-four hours of receiving access to make a copy, on Glaser Weil's instruction, and accepted payment ten days later; KPMG accepted engagements for years its client had not authorized from persons who were not the client's Manager, took direction to maximize losses, and was paid from the client's own cash; Wells Fargo closed a customer's accounts because she was "no longer associated with the Hillspire family office" and re-titled them to Hillspire's successor; TriNet transmitted a document to a state agency bearing a pasted signature and its instructing party's telephone number; Knox and Thakur executed a repurchase notice built on a defunct company's template and conditioned statutory rights on silence; Glaser Weil and Marcus billed $1,409,881.94 for a matter in which they were managers, drafters, on-site enforcers, and witnesses; Google, after four written notices and notice to its parent's board, migrated the seized tenant, hosted an account impersonating its customer, employed the engineer through whom her trade secrets were accessed, and preserved nothing; and Alphabet, with knowledge through a sitting director, did nothing. Each Defendant knew the general nature of the conspiracy and that it extended beyond that Defendant's individual role. Google is

named in this Count under *Salinas v. United States*, 522 U.S. 52 (1997), because a conspirator need not itself commit a predicate act; its agreement is evidenced by its conduct after notice.

121. Ritter was injured in her business and property by reason of the overt acts committed in furtherance of the conspiracy, as alleged in Count One and Part V.G, and is entitled to treble damages, costs, and attorneys' fees under 18 U.S.C. § 1964(c).

**COUNT THREE**

**Fraudulent Filing of Information Returns — 26 U.S.C. § 7434**

**(Against Hillspire, Schmidt, KPMG, TriNet, Knox, Thakur, and Does 21–30)**

122. Plaintiff realleges and incorporates the allegations of Parts I through V above.

123. 26 U.S.C. § 7434(a) provides that if any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing. Forms 1099 and employment-tax information returns are "information returns" within 26 U.S.C. § 6724(d)(1).

124. In or about January 2025, Hillspire, at Schmidt's direction and, on information and belief, with KPMG's preparation or participation, willfully filed with the Internal Revenue Service a Form 1099 reporting approximately $2,700,000 of payments purportedly made to Ritter in respect of Audem. [Ex. 12] The return was fraudulent: Audem was an at-cost vehicle whose economic benefit flowed to Schmidt-side interests; the amounts reported were not income received by Ritter; the return was prepared from records the filers had represented, thirty days earlier, that they did not possess; and it was filed to shift to Ritter a tax liability generated by and for others. In June 2024 and thereafter, TriNet, at Hillspire's direction and under a power of attorney bearing a signature Ritter did not make, willfully filed federal employment-tax information returns (including Forms W-2, W-3, 941, and 940) for StarX and Audem reporting wages and payments purportedly made by and to persons in Ritter's

companies' names without her authorization, and transmitted corresponding filings to the Idaho Department of Labor and California authorities. [Ex. 13] Beginning no later than 2022, Thakur and Knox, in coordination with Hillspire, caused federal information returns concerning StarX to be prepared, redirected, and filed without the knowledge of StarX's owner, reporting items in StarX's and Ritter's names. [Ex. 58] In 2025, KPMG prepared and filed SPM's 2024 returns and associated information returns under Hillspire's control, allocating to Ritter items generated by and for Schmidt-side taxpayers. [Ex. 5; Ex. 11] In the alternative, and to the extent the amended fiscal-year-2022 and the fiscal-year-2023 Schedules K-1 issued in Ritter's name reported payments or allocations to her that did not reflect her interest as SPM's 51% member — allocations that Hillspire directed and KPMG implemented on May 31, 2024 without her knowledge (Part V.C.2) — those filings are within this Count. [Ex. 51–54]

125. Each filing was willful: made with knowledge that the person reported as payee had not received the payments as reported, or with reckless disregard of that fact, and for the purpose of shifting tax liability. Ritter has suffered actual damages proximately caused by each fraudulent filing, including tax liabilities assessed and being collected against her, the EDD liabilities transmitted to her in August 2026, professional fees incurred to address them, and injury to her standing with taxing authorities. She is entitled under § 7434(b) to the greater of $5,000 or her actual damages for each fraudulent return, together with costs and reasonable attorneys' fees, and will provide a copy of this Complaint to the Internal Revenue Service as § 7434(d) requires.

## COUNT FOUR

### Fraud, Fraudulent Concealment, Professional Negligence, and Breach of Fiduciary Duty

### (Against KPMG and Does 21–30)

126. Plaintiff realleges and incorporates the allegations of Parts I through V above.

127. Ritter engaged KPMG, and signed its engagement, for tax year 2023, for SPM, Knox, Audem, and StarX. KPMG thereby undertook duties of care, loyalty, candor, and confidentiality to Ritter as its client and to the entities she controlled; a certified public accountant engaged to prepare a client's returns owes that client the duty to prepare them accurately from the client's true books, to disclose material facts bearing on the client's tax position, and to refrain from taking direction adverse to the client from third parties. These duties arise from KPMG's engagement and from the standards of the accounting profession; they do not arise from, and are not intertwined with, the December 4, 2024 Settlement Agreement, to which KPMG is not a party.

128. KPMG breached those duties and defrauded Ritter by: (a) taking all direction on the engagement from Hillspire and "SPM Finance" and excluding the client from every communication; (b) suggesting on March 6, 2024 that SPM "buy" StarX, a company owned by its client, so that its costs could be written off, and analyzing that transaction without disclosing it to the owner; (c) accepting and implementing the instruction to reclassify prior-year capitalizations to maximize loss carryforwards to Schmidt-side taxpayers, and, outside the scope of the engagement, undertaking to amend SPM's fiscal-year-2022 partnership return to generate $26,800,000 of adjustments; (c-1) obtaining Ritter's approval of that amendment, and of its $40,000–$45,000 addendum, through its counterparty's May 23 and May 29, 2024 representations that the amendment was "a massive tax benefit" whose benefit would flow to both partners and that "Michelle will need to amend her 2022 K1"; (c-2) meeting on May 31, 2024 with the adverse partner's family office, without notice to its client's Manager, accepting the instruction that "All losses will be allocated to hillspire, MR K1 will not be impacted," answering "we will keep this in mind," and assuring Hillspire that KPMG would "stand in this position" if the amendment "trigger[ed] an audit"; (c-3) preparing and filing the administrative adjustment request, amended schedules, and Schedules K-1 on that footing without furnishing Ritter the statements required by 26 U.S.C. § 6031(b) and the Bipartisan Budget Act regime, and

without ever disclosing to her what allocation had been reported in her name; (d) preparing returns from books it knew or should have known allocated SPI's and Knox's costs to SPM and StarX; (e) ignoring Ritter's written statements that the books had been altered and the structure made no sense, and pressing her to sign returns whose content Hillspire controlled; (f) representing that it had prepared Audem's returns when it had not; (g) failing to act on the redirection of StarX's tax documents to Thakur; (h) characterizing Schmidt and Hillspire as "our investor"; (i) concealing all of the foregoing, including by permitting its workpapers to be maintained in folders hidden from the client; and (j) after the engagement it had been given ended, accepting engagements for tax years 2024 and 2025 from persons who were not SPM's Manager, preparing and filing returns for the year of the Audem 1099 and the StarX write-off, and accepting $71,460 in payment from SPM's own accounts, all without notice to the client who had engaged it. [Ex. 7; Ex. 10; Ex. 11; Ex. 5]

129. KPMG's concealment was of facts within its exclusive knowledge and which it had a duty to disclose; KPMG intended that Ritter rely on the resulting silence and on its affirmative representations; Ritter did rely, by continuing the engagement, by not retaining independent accountants, by not contesting the allocations, and by entering the Agreement whose § 1(r) placed her returns under Hillspire's control; and she was damaged in the amounts of the tax liabilities attributed to her, her 51% share of the $26,800,000 of adjustments and of the fiscal-year-2023 loss diverted to Schmidt-side taxpayers, the KPMG fees charged to SPM's cash for that diversion, the value of StarX, the value of her SPM interest, and the fees required to remedy KPMG's work. KPMG's conduct was fraudulent, oppressive, and malicious within Civil Code § 3294, warranting punitive damages. Ritter first discovered the 2024 and 2025 engagements on April 6, 2026, the hidden workpapers in June 2024, and the May 31, 2024 instruction that her K-1 "will not be impacted" only after the fact, from records she was not given at the time; each claim is timely under Code of Civil Procedure §§ 338(d) and 339 and the discovery rule.

**COUNT FIVE**

**Computer Fraud and Abuse Act — 18 U.S.C. § 1030**

**(Against CGNET, Schmidt, Hillspire, Google, Alphabet, Glaser Weil, Marcus, Thakur, and Does 1–10)**

130. Plaintiff realleges and incorporates the allegations of Parts I through V above.

131. Ritter's MacBook Pro, her MacBook Air ("Champagne"), her iPhone, the Paley residence systems, and the Google Workspace tenants and accounts steelperlot.com, starx.com, audem-mgmt.com, and mritter@steelperlot.com, mritter@starx.com, and her personal Google account are each a "protected computer" within 18 U.S.C. § 1030(e)(2)(B), used in and affecting interstate commerce and communication.

132. Defendants intentionally accessed those protected computers without authorization, or exceeded authorized access, and thereby obtained information (§ 1030(a)(2)(C)); knowingly and with intent to defraud accessed them and by means of such conduct furthered the intended fraud and obtained things of value (§ 1030(a)(4)); and knowingly caused the transmission of programs, information, codes, and commands and thereby intentionally caused damage without authorization, or intentionally accessed them without authorization and caused damage and loss (§ 1030(a)(5)(A)–(C)); and conspired to do so (§ 1030(b)). The acts include: (a) the installation and operation, from November 9, 2021 through at least September 6, 2024, of JAMF reporting to hillspire.jamfcloud.com and of TeamViewer with screen-recording and remote-control rights on Ritter's laptop, and the remote sessions conducted through them, including the execution of documents and the September 3, 2024 alteration [Ex. 1; Ex. 25] — Schmidt, Hillspire, Does; (b) the May 25, 2021 installation and operation of TeamViewer on the Paley residence systems [Ex. 36] — Schmidt, Hillspire, Does; (c) the July 27, 2024 access to Ritter's iPhone from the United Kingdom — Schmidt, Does; (d) the June 17, 2024 creation of the

idfr@starx.com super-administrator from cgnet@starx.com, the change of the password on Ritter's own starx.com account, the registration of a Linux device with full rights, and the July 4, 2024 authorization of an API client with gmail.insert and email-migration scopes purportedly from Ritter's account [Ex. 45] — CGNET, Hillspire, Does; (e) the concealment of the KPMG folders from Ritter's administrative view [Ex. 7] — CGNET, Hillspire; (f) the December 6–9, 2024 lockout of mritter@steelperlot.com, the access of that account through Ritter's credentials, the alteration of documents within it, the change of its password by Harris, and the copying of the starx.com and audem-mgmt.com tenants, each beyond the limited, temporary access Ritter had granted for the purpose of making a copy and each after that access was revoked [Ex. 28; Ex. 29] — CGNET, Glaser Weil, Marcus, Hillspire, Schmidt, Does; (g) the deletion of the steelperlot.com DNS record at GoDaddy [Ex. 1] — Does, Hillspire; (h) the January 2025 migration of the seized tenant to SchmidtEntity.co and the creation of MRitter@SchmidtEntity.co [Ex. 41] — Hillspire, Google, Does; (i) the August 2025 attempt to access Ritter's personal Google Workspace — Thakur; (j) the December 11, 2025 and January 9, 2026 root-level access to and manipulation of the Champagne MacBook Air — Does, Hillspire; and (k) the taking of Ritter's laptop on November 7, 2024 and the "sysaccount" rename applied to it [Ex. 26] — Schmidt.

133. Google and Alphabet are liable under § 1030(a)(2)(C), (a)(5), and (b) because, after written notice in June 2024, on December 10, 2024, in January 2025, on February 21, 2025, and on December 5, 2025 that the tenants were being accessed and controlled by persons without authorization from the domain owner, they knowingly permitted and effected the continued access, the transfer of tenant control, the migration to SchmidtEntity.co, and the creation of the impersonating account, thereby exceeding the authorization their own Terms of Service conferred and intentionally causing damage to the integrity and availability of Ritter's data; and because they agreed with the other Defendants, by conduct, to that course. Google's liability under this Count rests on Google's own conduct as operator of the tenants after notice to Google;

Alphabet's rests on Alphabet's own conduct after notice to Alphabet's board and on Alphabet's own control of the policies under which the seizure was permitted to stand (Part V.D.6). Neither depends on the other, and neither depends on a finding against any other Defendant.

134. Ritter has suffered "loss" within § 1030(e)(11) exceeding $5,000 in a one-year period, including the cost of responding to the offenses, forensic examination (Pixley; Control Risks; the Champagne addendum), damage assessment, restoration of data and systems, and lost revenue and consequential damages from interruption of service, and "damage" within § 1030(e)(8) to the integrity and availability of her data, satisfying § 1030(c)(4)(A)(i)(I). Ritter is entitled under § 1030(g) to compensatory damages and injunctive and other equitable relief, including an order restoring her control of the tenants and prohibiting further access. This Count is timely: it is brought within two years of the December 2024 seizure, the January 2025 migration, the April 2025 access, the August 2025 attempt, and the January 2026 device manipulation, and within two years of Ritter's April 9, 2026 discovery of the scope of the 2021–2024 device architecture.

## COUNT SIX

### Stored Communications Act — 18 U.S.C. §§ 2701, 2702, 2707

### (Against Google, Alphabet, CGNET, Schmidt, Hillspire, and Does 1–10)

135. Plaintiff realleges and incorporates the allegations of Parts I through V above.

136. Google provides an electronic communication service and a remote computing service to the public. The steelperlot.com, starx.com, and audem-mgmt.com tenants and Ritter's Gmail accounts are facilities through which those services are provided, and the emails, documents, and data stored in them are communications in electronic storage and communications carried or maintained on the service.

137. CGNET, Schmidt, Hillspire, and Does intentionally accessed those facilities without authorization, or exceeded their authorization, and thereby obtained,

altered, and prevented authorized access to communications while in electronic storage, in violation of § 2701(a), through the acts alleged in Count Five, including the June 17, 2024 password change and super-administrator creation, the forwarding of Ritter's tenants' mail to Hillspire personnel through August 2024, the July 4, 2024 gmail.insert authorization, the December 6–9, 2024 lockout and copying, and the January 2025 migration.

138. Google and Alphabet knowingly divulged to persons other than the addressees, intended recipients, or their agents the contents of communications while in electronic storage, and knowingly divulged to third parties the contents of communications carried or maintained on their remote computing service, in violation of § 2702(a)(1) and (a)(2), by transferring control of the tenants and their entire contents — including Ritter's privileged communications, medical records, and StarX's trade secrets — to persons who did not own the domains and were not authorized by the domain owner; by migrating those contents to SchmidtEntity.co; by maintaining an account impersonating Ritter through which her communications were received; and by permitting the April 2025 access by an OpenAI employee. None of the exceptions in § 2702(b) applies: Ritter, the subscriber and the originator and addressee of the communications, did not consent; and no lawful process authorized the disclosure. Alphabet is liable as the entity that, with knowledge through its board, set and enforced the policies under which the divulgence occurred and ratified it after notice. Each of Google and Alphabet is liable under this Count for its own divulgence and its own failure to act after its own notice, independently of the other and of every other Defendant (Part V.D.6).

139. Each violation was knowing and intentional. Ritter is entitled under § 2707(b) and (c) to actual damages and any profits made by the violators, but not less than $1,000 per violation; to punitive damages because the violations were willful; to reasonable attorneys' fees and costs; and to equitable and declaratory relief, including an order restoring her control and enjoining further divulgence. The claim is timely

under § 2707(f), brought within two years of each violation and of Ritter's discovery of it.

**COUNT SEVEN**

**Federal Wiretap Act — 18 U.S.C. §§ 2511, 2520**

**(Against Schmidt, Hillspire, CGNET, and Does 1–10)**

140. Plaintiff realleges and incorporates the allegations of Parts I through V above.

141. Defendants intentionally intercepted, endeavored to intercept, and procured others to intercept Ritter's wire and electronic communications, contemporaneously with their transmission, through: the TeamViewer screen-recording and remote-viewing capability on Ritter's laptop, which captured her communications with counsel and others as she composed and received them, from November 2021 through at least September 2024 [Ex. 1, ¶¶ 19–22]; the TeamViewer installation on the Paley residence systems, which recorded the family's conversations during the 2024 negotiations [Ex. 36]; the forwarding pathways CGNET operated from Ritter's tenants to Hillspire personnel, which acquired her communications in transit [Ex. 2]; and the July 4, 2024 API authorization with full mail scope purportedly from her account [Ex. 45]. Defendants intentionally used and disclosed the contents of the intercepted communications, knowing they were obtained through interception, including to shape the June 2024 and January 2025 arbitration demands and the discovery demands directed at her devices, in violation of § 2511(1)(a), (c), and (d).

142. Ritter is entitled under § 2520 to the greater of actual damages and profits or statutory damages of $100 per day of violation or $10,000, whichever is greater; punitive damages; reasonable attorneys' fees and costs; and preliminary and other equitable and declaratory relief. The claim is timely under § 2520(e), brought within two years of the date on which Ritter first had a reasonable opportunity to discover the violations, which as to the device architecture was no earlier than July 2024 and as to its scope no earlier than April 9, 2026.

**COUNT EIGHT**

**Comprehensive Computer Data Access and Fraud Act — Cal. Penal Code § 502 (Against CGNET, Schmidt, Hillspire, Google, Alphabet, Thakur, Glaser Weil, Marcus, and Does 1–10)**

143. Plaintiff realleges and incorporates the allegations of Parts I through V above.

144. Through the acts alleged in Counts Five through Seven, Defendants knowingly and without permission accessed, altered, damaged, deleted, and used data, computers, computer systems, and computer networks belonging to Ritter in order to devise and execute a scheme to defraud and to wrongfully control and obtain money, property, and data (§ 502(c)(1)); knowingly accessed and without permission took, copied, and made use of her data (§ 502(c)(2)); knowingly and without permission used her computer services (§ 502(c)(3)); knowingly and without permission added, altered, damaged, deleted, and destroyed her data (§ 502(c)(4)); knowingly and without permission disrupted and caused the disruption of computer services to an authorized user (§ 502(c)(5)); knowingly and without permission provided and assisted in providing a means of accessing her computers and systems (§ 502(c)(6)); and knowingly and without permission accessed her computers and systems (§ 502(c)(7)); and, as to Google and Alphabet, knowingly and without the owner's permission transferred and permitted the transfer of control of her tenants and data after notice.

145. Ritter has suffered damage and loss by reason of the violations and is entitled under § 502(e)(1) to compensatory damages and injunctive relief, under § 502(e)(2) to reasonable attorneys' fees, and under § 502(e)(4) to punitive and exemplary damages because the violations were willful and oppressive, fraudulent, and malicious.

## COUNT NINE

**Misappropriation of Trade Secrets — Defend Trade Secrets Act, 18 U.S.C. § 1836, and California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 et seq.**

**(Against Schmidt, Hillspire, CGNET, Google, Alphabet, and Does 1–10)**

146. Plaintiff realleges and incorporates the allegations of Parts I through V above.

147. Ritter, directly and as the 100% owner of StarX, owns trade secrets within 18 U.S.C. § 1839(3) and Civil Code § 3426.1(d), including StarX's predictive models and algorithms for human-capital and sports assets, its marketplace and tradable-asset systems, its points-based consumer-engagement software, its FIFA, NBA, and Premier League engagement materials and data, its investor and partner pipelines, and its financial and tax records, together with SPM's quantitative-trading models, data infrastructure, and investment records in which Ritter held a 51% interest. These derive independent economic value from not being generally known, and Ritter took reasonable measures to keep them secret, including access controls on the Workspace tenants, engagement of a managed-service provider bound to act on her authority, and a litigation hold. They relate to products and services used in and intended for use in interstate and foreign commerce.

148. Defendants misappropriated those trade secrets: CGNET, Hillspire, Schmidt, and Does acquired them by improper means — the December 2024 seizure and copying of the tenants beyond the limited access granted, and the JAMF/TeamViewer access — and used and disclosed them without consent, including by migrating them to SchmidtEntity.co, by operating SPM's trading desk on them after the transfer, and by permitting their access by an OpenAI employee in April 2025; Google and Alphabet, after notice that the tenants had been seized by persons without authority from the domain owner, disclosed and permitted the disclosure and use of the trade secrets by maintaining the SchmidtEntity.co tenant, the impersonating account,

and the access, knowing or having reason to know that the secrets had been acquired by improper means. The misappropriation was willful and malicious.

149. Ritter is entitled under 18 U.S.C. § 1836(b)(3) and Civil Code §§ 3426.2–3426.4 to injunctive relief, actual damages and unjust enrichment or a reasonable royalty, exemplary damages of up to twice the award, and attorneys' fees. The claim is timely, brought within three years of the December 2024 seizure and the April 2025 discovery of the OpenAI access.

## COUNT TEN

### Intentional Misrepresentation, Fraudulent Concealment, Negligent Misrepresentation, and Negligence — Non-Routine Banking Services

### (Against Wells Fargo Bank, N.A. and Does 21–30)

150. Plaintiff realleges and incorporates the allegations of Parts I through V above.

151. Intentional misrepresentation and concealment (Civ. Code §§ 1709, 1710). Wells Fargo, through Meredith and Sencil, represented to Ritter in writing that she was SPM's "sole member" (July 11–17, 2024); that the SPM savings account held approximately nothing (July 2024); that the SPM and Audem accounts would be permanently closed effective November 8, 2024, that any remaining balance would be mailed to her by cashier's check within ten business days, that Wells Fargo's relationship with the entities would end, and that the decision was "final" (October 8, 10, 11, and 25, 2024). [Ex. 14; Ex. 15] Each representation was false when made or Wells Fargo had no reasonable ground to believe it true: the account held $946,706.69; Wells Fargo was at that moment conditioning Ritter's instructions on Hillspire's concurrence; the -6449 account was not closed; no cashier's check was mailed; the account was re-titled to Hillspire's successor and a new account opened in its name. Wells Fargo concealed that the account would be retained, re-titled, and made available to Hillspire, facts within its exclusive knowledge that it had a duty to disclose to the account's control person. Wells Fargo intended Ritter to rely; she did, justifiably, as

alleged in Part V.C.6, including by entering the Agreement on the premise the bank had supplied; and she was damaged in the amount of the balances moved, the value of the lost account control, and her reliance costs. Wells Fargo's conduct was fraudulent, oppressive, and malicious, warranting punitive damages under Civil Code § 3294.

152. Negligent misrepresentation. In the alternative, Wells Fargo made the representations without reasonable ground for believing them true, intending Ritter's reliance, and Ritter relied to her detriment.

153. Negligence — non-routine banking services. Wells Fargo owed Ritter, its customer and the certified control person of the accounts, a duty to exercise reasonable care in the administration of her accounts and, specifically, a duty not to provide non-routine banking assistance to third parties that it knew or had reason to know would be used to deprive its customer of her property. Wells Fargo breached that duty by going far beyond routine banking: accepting an adversary's officer as gatekeeper contrary to its own beneficial-ownership certifications; taking inconsistent positions on ownership within the same month; refusing the customer's instructions; closing the customer's accounts because of her relationship with another customer; routing authorization records "manually" outside ordinary review; retitling a closed account to that other customer's successor; opening an undisclosed account in that name; permitting $897,859.54 to leave; and refusing any accounting. These acts violated Wells Fargo's own account agreements, its know-your-customer and beneficial-ownership obligations under 31 C.F.R. § 1010.230, and its duty under the Bank Secrecy Act and 12 C.F.R. Part 21 to identify and report suspicious activity — here, the transfer of a customer's funds to an entity controlled by the person she had accused of assault, in the same channel that served him. Wells Fargo knew, or was willfully blind to, the fact that its assistance was facilitating the wrongful taking of its customer's property, and it benefited by retaining the Hillspire relationship. Ritter was damaged as alleged.

154. Aiding and abetting conversion. Wells Fargo knew that Hillspire and Schmidt were converting SPM's funds — funds belonging 51% to Ritter and subject

to her sole control under Wells Fargo's own records — and gave substantial assistance by the acts alleged. It is liable for the conversion as an aider and abettor.

155. These claims arise from Wells Fargo's own representations and duties as Ritter's bank. They are not founded in, and are not intertwined with, the December 4, 2024 Settlement Agreement, to which Wells Fargo is a stranger; no obligation of that agreement is necessary to any element of them. *Goldman v. KPMG LLP*, 173 Cal. App. 4th 209 (2009). Nor does any element of them depend on the liability of any other Defendant: the misrepresentations, the duties, the re-titling, the undisclosed account, and the refusal to account are all Wells Fargo's own, and each theory in this Count is complete against Wells Fargo alone.

## COUNT ELEVEN

### Conversion

### (Against Schmidt, Hillspire, Knox, Thakur, CGNET, Wells Fargo, and Does 1–50)

156. Plaintiff realleges and incorporates the allegations of Parts I through V above.

157. Ritter owned or had the right to immediate possession of: (a) her 51% interest in SPM and, through it, her share of SPM's cash, including the $946,706.69 in account -6449; (b) her 24,000,000 Knox shares under Certificate CS-02 and the rights attached to them; (c) the data, documents, communications, and intellectual property stored in the steelperlot.com, starx.com, and audem-mgmt.com tenants and the domains themselves; (d) the personal laptop taken on November 7, 2024; and (e) the personal property removed from the Paley and Angelo residences and withheld between April and October 2024.

158. Defendants intentionally and substantially interfered with that property by taking possession of it, transferring it, preventing Ritter from having access to it, and refusing to return it after demand: Schmidt and Hillspire took the SPM interest for consideration never paid, moved SPM's cash, took the laptop, withheld the belongings,

and hold the seized data; Knox and Thakur issued the repurchase notice and withheld the shares and the information attached to them; CGNET seized and copied the tenants and delivered them to Hillspire; Wells Fargo, as alleged in Count Ten, knowingly assisted the taking of the cash. Ritter did not consent. She has been damaged in the value of the property, and is entitled under Civil Code § 3336 to the value of the property at the time of conversion with interest, to compensation for the time and money expended in pursuit of it, and to punitive damages because the conversion was fraudulent, oppressive, and malicious.

**COUNT TWELVE**

**Aiding and Abetting Breach of Fiduciary Duty and Fraud**

**(Against Glaser Weil, Marcus, KPMG, Wells Fargo, TriNet, CGNET, Thakur, Alphabet, and Does 1–50)**

159. Plaintiff realleges and incorporates the allegations of Parts I through V above.

160. Schmidt, as SPM's 49% preferred member and Chairman and as a Knox director, Hillspire, as SPM's de facto manager from April 2024 and the administrator of Ritter's companies' books and accounts, Thakur, as a Knox officer and controlling stockholder after April 2024, and Knox, as to its stockholder, owed Ritter fiduciary duties of loyalty, care, candor, and good faith under Delaware law and under the SPM Operating Agreement, and breached them by the acts alleged in Part V: loading SPI's and Knox's costs onto SPM; deciding to destroy StarX while telling its owner it was hers; taking the 51% interest for nothing; depleting SPM's cash; issuing the 1099; removing the founder from Knox in retaliation; issuing the repurchase notice; and conditioning stockholder rights on silence. Schmidt and Hillspire also committed the frauds alleged in Part V.C.7 and Counts One and Three.

161. Each Defendant named in this Count had actual knowledge of those breaches and frauds and gave substantial assistance or encouragement to them, by conduct that was not the ordinary provision of professional services: Glaser Weil and

Marcus by assuming management of SPM, drafting and procuring the instruments, directing the seizure and paying for it, administering the severance program, and transmitting the tax notices; KPMG by designing the loss mechanism, deciding StarX's fate, preparing the returns for the unauthorized years, and accepting payment from the client's own cash; Wells Fargo by the non-routine banking conduct alleged in Count Ten; TriNet by transmitting the forged power of attorney and the filings generating the liabilities; CGNET by hiding the books, forwarding the mail, and seizing the tenants; Thakur by redirecting the StarX tax documents and executing the repurchase notice and gag demand; and Alphabet by enabling and ratifying, after knowledge through its director and notice to its board, the platform conduct through which the records were seized and the retaliation carried out. Each is liable jointly and severally for the resulting damages, and for punitive damages under Civil Code § 3294.

## COUNT THIRTEEN

### Violation of the Bane Act — Cal. Civ. Code § 52.1

### (Against Marcus, Schmidt, Hillspire, and Does 11–20, 41–50)

162. Plaintiff realleges and incorporates the allegations of Parts I through V above.

163. Defendants, by threats, intimidation, and coercion, interfered with and attempted to interfere with Ritter's exercise and enjoyment of rights secured by the Constitution and laws of the United States and of California, including her right to petition the courts (U.S. Const. amend. I; Cal. Const. art. I, § 3), her right to seek a domestic-violence restraining order (Fam. Code § 6200 et seq.), her right to be free from retaliation for reporting sexual assault, her right to speak about unlawful conduct (Code Civ. Proc. § 1001; Gov't Code § 12964.5), and her rights of property and quiet enjoyment. The threats, intimidation, and coercion include: the December 2, 2024 three-day notices under threat of emergency entry; the December 6, 2024 investigator outside her home who identified himself as working for "a billionaire's private security detail"; the December 17, 2024 arrival of Marcus, Harris, additional attorneys, Smith,

and private security at the residence, the eleven-hour session with no counsel for Ritter, the threats to her parents of eviction and of continued deprivation of the Workspace and funds, and the demand that she withdraw her restraining-order petition within twenty-four hours as a condition of her parents' payment; and the continued surveillance of Ritter and her parents through 2025 and 2026, including the investigator effort to locate and serve them. [Ex. 4; Ex. 24; Ex. 38] Ritter reasonably believed that if she exercised her rights Defendants would carry out their threats, and Defendants intended their conduct to coerce her. The conduct was not speech alone: it consisted of physical presence with private security at a family residence, service of notices under threat of entry, surveillance, and the deprivation of property and funds, and it was coercion of the kind Penal Code § 518 (extortion) and § 136.1 (dissuading a witness or victim) prohibit, which is outside any litigation privilege. *Flatley v. Mauro*, 39 Cal. 4th 299 (2006).

164. Ritter is entitled under § 52.1(c) and § 52(b) to actual damages, exemplary damages, a civil penalty of $25,000 for each violation, injunctive relief, and attorneys' fees under § 52.1(i).

## COUNT FOURTEEN

### Abuse of Process

### (Against Schmidt, Hillspire, Glaser Weil, Marcus, and Does 11–20)

165. Plaintiff realleges and incorporates the allegations of Parts I through V above.

166. Defendants used legal process for an ulterior purpose for which it was not designed, and committed willful acts in the use of the process not proper in its regular conduct: (a) they invoked arbitral process on June 7, 2024 against Ritter's elderly parents on an agreement Ritter never signed and to which her mother was a stranger, for the purpose of leveraging the parents' exposure to obtain Ritter's business interests and silence; (b) they invoked arbitral process on January 15, 2025 for the purpose of extracting, in advance of payment, the sworn recantation the Agreement tied to

payment, and of adjudicating false a report of sexual assault they had been told in March 2024 could not be made a subject of business negotiation; (c) they used discovery process to demand the surrender for "mirroring" of the very devices they had compromised, so as to obtain Ritter's privileged communications; (d) they used interrogatory and collection process on a $25,000 sanction against a person whose assets they had taken; and (e) they deployed investigators, under color of service of process, to locate and surveil Ritter's parents. [Ex. 19; Ex. 20; Ex. 37; Ex. 38] These acts are not the mere filing or maintenance of a proceeding; they are the misuse of process, after issuance, as a tool of extortion and intimidation, and they are outside the litigation privilege because they are independently criminal. Ritter was damaged by the deposits demanded, the fees incurred, the loss of the ability to defend, and the emotional and financial toll on herself and her parents, and is entitled to compensatory and punitive damages.

## COUNT FIFTEEN

**Sexual Harassment in a Business Relationship (Cal. Civ. Code § 51.9) and Aiding, Inciting, and Conspiring in the Denial of That Right (Cal. Civ. Code § 52(b))**

**(§ 51.9 Against Schmidt; § 52(b) Against Hillspire, Knox, Thakur, Glaser Weil, Marcus, Alphabet, Wells Fargo, and Does 1–50)**

167. Plaintiff realleges and incorporates the allegations of Parts I through V above.

168. Ritter and Schmidt had business, service, and professional relationships within Civil Code § 51.9(a)(1), including the relationship of investor, which the statute expressly names: Schmidt was the investor, funder, Chairman, and 49% member of SPM, of which Ritter was Manager; the funder and Chairman of Knox, of which Ritter was Chief Executive Officer; the counterparty to Audem's services; and the person who controlled the compensation, housing, and funding on which Ritter's work depended. Schmidt made sexual advances and engaged in verbal and physical conduct of a sexual

nature, and in conduct hostile based on sex, that was unwelcome, pervasive, and severe; conditioned funding, compensation, housing, and the continuation of Ritter's businesses on the continuation of that conduct; and, when Ritter reported the conduct through counsel in March 2024, retaliated in every way alleged in Part V.E, culminating in the conditioning of $14,000,000 on a sworn statement that the conduct had been "entirely consensual." Ritter was unable easily to terminate the relationship because Schmidt controlled her companies, her bank accounts, her parents' housing, and her pay. Schmidt's own account of his motive, given to a third party who reported it to Ritter in writing in September 2025, was "I will bankrupt her" — "his vengeance for [her] not submitting to him." [Ex. 61] She has suffered economic loss and personal injury as a result. This is a claim under § 51.9, not under the Fair Employment and Housing Act; Ritter was a founder, manager, and counterparty, not Schmidt's employee.

169. Hillspire, Knox, Thakur, Glaser Weil, Marcus, Alphabet, and Wells Fargo aided, incited, and conspired in the denial of Ritter's right under § 51.9 within the meaning of § 52(b), each with knowledge that Ritter had reported sexual assault and harassment by Schmidt: Hillspire by executing every act of retaliation — the funding cutoff, the lockouts, the Knox removal, the arbitration, the seizure, the eviction notices, the write-off, the 1099 — and by furnishing Smith and security for December 17, 2024; Knox and Thakur by removing Ritter and terminating her vesting within weeks of her report and on the day of the second mediation, by issuing the repurchase notice, and by conditioning her stockholder rights on a promise not to litigate over what had been done to her; Glaser Weil and Marcus by drafting the Schedule D recantation, tying it to payment, procuring the Amendment and the restraining-order withdrawal, demanding the declaration "now instead of when Michelle is paid in full," filing a demand premised on the falsity of her report, and threatening her counsel; Alphabet by its director's own execution, with Schmidt, of the April 26, 2024 consent removing Ritter from every office at Knox, and by knowing, through that director, of the retaliatory

removal from its first act and enabling and ratifying the platform conduct through which the retaliation was carried out; and Wells Fargo by closing Ritter's accounts because she was "no longer associated with the Hillspire family office," refusing her instructions without Hillspire's concurrence, and delivering her money to the person she had accused. Each is liable under § 52(b) for actual damages, exemplary damages, a civil penalty of $25,000, and attorneys' fees.

**COUNT SIXTEEN**

**Trafficking Victims Protection Reauthorization Act — 18 U.S.C. §§ 1589, 1591, 1595**

**(Against Schmidt and Hillspire)**

170. Plaintiff realleges and incorporates the allegations of Parts I through V above.

171. This Count is pleaded separately and severably. It rests on the allegations of Parts I through V and of this Count alone; no other Count depends on it, and it depends on no other Count. Should the Court determine that this Count must be stayed under 18 U.S.C. § 1595(b), severed under Federal Rule of Civil Procedure 21, or dismissed, that determination would leave every other Count, and the relief sought on every other Count, unaffected, and Plaintiff requests that the Court sever or stay this Count alone rather than delay the remainder of this action.

172. Schmidt knowingly obtained Ritter's labor and services — years of uncompensated work at Knox, SPM, SPI, Audem, and other Schmidt projects — by means of serious harm and threats of serious harm, including financial harm, and by means of a scheme, plan, and pattern intended to cause her to believe that if she did not perform the labor she and her parents would suffer serious harm: the loss of housing, funding, banking, and the businesses themselves (§ 1589(a)(2), (4)). Schmidt knowingly recruited, enticed, harbored, provided, obtained, and maintained Ritter, and benefited from participation in a venture that did so, knowing that means of force, fraud, and coercion would be used to cause her to engage in sex acts on account of

which things of value — housing, the November 2020 credit card, funding, and the promise of compensation — were given (§ 1591(a)). Hillspire knowingly benefited, financially and by receiving things of value, from participation in a venture it knew or should have known engaged in those acts, by administering the housing, the credit card, the accounts, and the funding through which the coercion operated (§ 1595(a)). The venture continued after Ritter's report, through the conditioning of payment on recantation and the acts alleged in Part V.E. Ritter is entitled under § 1595(a) to damages and reasonable attorneys' fees. This claim is timely under § 1595(c), brought within ten years of the conduct.

## COUNT SEVENTEEN

**California Labor Code §§ 1102.5, 970, and 218 — Whistleblower Retaliation, Misrepresentation to Induce Service, and Unpaid Compensation**

**(Against Schmidt, Hillspire, and Knox)**

173. Plaintiff realleges and incorporates the allegations of Parts I through V above.

174. § 1102.5. Ritter provided services to Knox as its Chief Executive Officer and to SPM as its Manager under the direction and control of Schmidt and Hillspire, who set her compensation, approved her budgets, and controlled her work. Ritter disclosed to persons with authority over her, to counsel, and to KPMG information she had reasonable cause to believe disclosed violations of state and federal statutes — the alteration of books, the shifting of SPI's and Knox's costs onto SPM and StarX, the tax positions being taken, and Schmidt's sexual assault and harassment — and refused to sign returns she believed to be false. Schmidt, Hillspire, and Knox retaliated by the acts alleged in Parts V.C.3 and V.E: removing her from Knox, terminating her vesting, cutting off her funding and pay, filing arbitration against her and her parents, seizing her data, evicting her, and conditioning her payment on recantation. Ritter is entitled to damages, the civil penalty of § 1102.5(f), and attorneys' fees under § 1102.5(j).

175. § 970. Schmidt and Hillspire induced Ritter to relocate her residence, and her parents' residence, to Los Angeles in 2021, and to devote her services to Knox, SPM, SPI, and Audem, by knowingly false representations concerning the kind, character, and existence of the work, the compensation to be paid — including SPI carry, SPM guaranteed pay, and Knox equity — and the length of time the work would last. Ritter is entitled under § 972 to double damages.

176. §§ 201–204, 218. Ritter's SPM guaranteed compensation for May through July 2024 (at least $252,000) and her earned compensation thereafter were not paid; her Knox equity compensation was withheld. Ritter is entitled to the unpaid amounts, waiting-time penalties under § 203, interest under § 218.6, and attorneys' fees under § 218.5.

## COUNT EIGHTEEN

### Defamation, Trade Libel, and False Light — Cal. Civ. Code §§ 45, 46; Common Law

### (Against Schmidt, Hillspire, Glaser Weil, Marcus, Knox, Thakur, and Does 31–50)

177. Plaintiff realleges and incorporates the allegations of Parts I through V above.

178. Defendants published to third parties, outside any judicial or quasi-judicial proceeding, false statements of fact concerning Ritter and her businesses, including: (a) Marcus's August 4, 2024 email to SPM and Audem employees stating that Ritter had "abandoned" SPM, "failed at fundraising," and "furloughed all staff" [Ex. 22]; (b) the statements, made to employees, investors, industry participants, and the press from July 2024 through 2026, that Ritter had "unilaterally implemented a self-dealing $6.5 million loan" between SPM and StarX "without Schmidt's knowledge," that SPM "could not pay its own expenses," and that Ritter had "misappropriated SPM resources" — statements Hillspire's own submission to KPMG ("100% owned by Michelle Ritter (CEO), not by SPM") and Fried Frank's review of the structure show to be false [Ex.

7; Ex. 49]; (c) statements by Knox and Thakur to industry, investor, and employer audiences after April 2024 that Ritter had been removed for cause and had no continuing interest in Knox; (d) statements by Marcus in August 2025 to third parties that Ritter was "conspiring against Eric"; and (e) statements to The Information and other media, coordinated with the August 4, 2024 email, that Ritter was a "scorned" former partner whose business claims were pretextual. Each statement was false, was made with knowledge of its falsity or reckless disregard for the truth, was not privileged, and tended directly to injure Ritter in her profession and business by imputing dishonesty, incompetence, and misconduct (§ 46(3)), constituting libel and slander per se, and disparaged the quality of StarX's and SPM's businesses, causing specific pecuniary loss including the loss of the FIFA engagement and of fundraising. The statements also placed Ritter in a false light highly offensive to a reasonable person. Ritter is entitled to general, special, and punitive damages. Statements within one year of this Complaint are timely on their face; earlier statements are timely under the discovery rule and because their republication continued within the year.

## COUNT NINETEEN

### Intentional Interference with Contractual Relations and Prospective Economic Advantage

### (Against Schmidt, Hillspire, Glaser Weil, Marcus, KPMG, CGNET, Google, Alphabet, Knox, Thakur, and Does 1–50)

179. Plaintiff realleges and incorporates the allegations of Parts I through V above.

180. Ritter and StarX had valid contracts and economic relationships with a probability of future economic benefit, including StarX's September 2023 FIFA engagement agreement, its relationships with the NBA, the Premier League, and sports agencies, its investor pipeline, SPM's prospective $2,000,000,000 transaction, Ritter's fundraising for the buyout of Schmidt's SPM interest, and Ritter's relationships with successive counsel. [Ex. 42] Defendants knew of those relationships and intentionally

disrupted them by independently wrongful acts — the acts alleged in Counts One, Five, Nine, and Eighteen, including the March 6, 2024 decision to destroy StarX, the seizure of its records and intellectual property, the disclosure of its trade secrets, the defamatory "self-dealing" narrative, the threats to counsel, the blocking of the SPM transaction, and the paid resignation of the engineer on whom StarX's technology depended. KPMG's participation was its design of and advice toward the StarX shutdown; CGNET's was the seizure; Google's and Alphabet's was the hosting of the seized data, the impersonating account, and the hiring of the engineer after notice; Knox's and Thakur's was the redirection of StarX's tax documents and the false statements to industry. The relationships were disrupted: FIFA's engagement was lost; investors withdrew; counsel withdrew; the transaction did not close. Ritter is entitled to compensatory and punitive damages.

## COUNT TWENTY

**Declaratory Relief — Non-Formation of the Purported Audem Arbitration Agreement and Judicial Determination Under 9 U.S.C. § 4**

**(Against Schmidt and Hillspire)**

181. Plaintiff realleges and incorporates the allegations of Parts I through V above.

182. An actual controversy exists concerning whether Ritter, Audem, or Ritter's parents ever assented to the purported March 17, 2022 Audem Services Agreement and its arbitration clause. Ritter did not sign it; she rejected it in writing four minutes after her general counsel told Hillspire it was signed; it does not exist in SPM's DocuSign; its "signature" was generated through Hillspire's DocuSign account during a period in which Hillspire held remote control of Ritter's device; and Ritter's mother is not a party to any agreement with any Defendant. [Ex. 18; Ex. 1] Schmidt and Hillspire have invoked the agreement to terminate Audem's services and to commence arbitration against Ritter, Audem, and her parents, and have reserved the right to do so again. Under 9 U.S.C. § 4 and *Granite Rock Co. v. Teamsters*, 561 U.S. 287 (2010), the

making of an arbitration agreement is for the court. Ritter is entitled to a declaration that no arbitration agreement was formed between any Ritter Party and any Schmidt Party under the purported Audem Services Agreement, that the instrument is void, and that no proceeding may be compelled or maintained under it.

## COUNT TWENTY-ONE

**Declaratory Relief — Sections 3(a), 3(b), and Schedule D of the Agreement, Section 1 of the Amendment, and the Knox Gag Agreement Are Void and Unenforceable; the Section 2 Release Does Not Reach the Claims in This Action (Against Schmidt, Hillspire, and Knox)**

183. Plaintiff realleges and incorporates the allegations of Parts I through V above.

184. An actual controversy exists concerning the enforceability of: § 3(b) and Schedule D of the Agreement, which condition payment on Ritter's sworn statement that all contact with Schmidt was "entirely consensual"; § 3(a) of the Agreement, which prohibits Ritter from disclosing information concerning sexual assault and harassment; § 1 of the December 17, 2024 Amendment, which conditioned payment to Ritter's parents on her rescinding and denying a pending domestic-violence restraining-order petition; and the April–May 2025 Knox agreement conditioning stockholder rights on a promise not to litigate over tax fraud or mismanagement and not to speak to other stockholders. Defendants contend those provisions are enforceable and have prosecuted arbitration on the theory that Ritter breached them. An actual controversy also exists concerning whether the general release in § 2 of the Agreement reaches any claim in this action; Defendants contend that it does.

185. Each provision is void and unenforceable. Code of Civil Procedure § 1001 voids any provision in a settlement agreement that prevents or restricts the disclosure of factual information related to sexual assault, sexual harassment, or discrimination; § 1002 voids any provision that prevents the disclosure of information concerning such conduct and prohibits conditioning settlement on it; Government Code § 12964.5

makes it unlawful to require, in exchange for a benefit, a release or non-disparagement agreement denying the right to disclose unlawful acts; Civil Code § 1670.11 voids any provision that waives a party's right to testify concerning criminal conduct or sexual harassment; and Civil Code § 1668 voids contracts exempting anyone from responsibility for his own fraud or willful injury. A provision purchasing a sworn recantation of a crime report, a provision conditioning an elderly couple's payment on their daughter's withdrawal of a restraining-order petition, and a provision conditioning a stockholder's statutory rights on silence about tax fraud are each against public policy independently of those statutes. Ritter is entitled to a declaration that the provisions are void, that no obligation, breach, or damages may be predicated on them, and that Ritter is free to disclose the facts they purport to restrict.

186. The § 2 release does not reach the claims in this action, for three independent reasons. First, by its own terms it excludes "any Claims for Fraud or other Intentional and Willful Violation in the making of this Agreement," and the Agreement was made by the fraud and concealment pleaded in Part V.C.7 — the Recital G and § 1(g) representations, the StarX write-off already in motion, the "wind-down" representation contradicted by Hillspire's own "making money via this forced shutdown" analysis, and the concealment of the May 31, 2024 K-1 instruction, of Wells Fargo's retention of SPM's account, and of the arrangement under which her Workspace domains were seized two days later. Second, a release procured by fraud, concealment, duress, or undue influence is voidable at the election of the party defrauded, Civil Code §§ 1567, 1568, 1569, 1572, 1573, 1575, and 1689(b)(1); a contract cannot exempt a party from responsibility for his own fraud or willful injury, Civil Code § 1668; and a waiver of Civil Code § 1542 does not extend to claims whose existence the releasee concealed from the releasor. Ritter elects to avoid the release as to every claim in this Complaint. Third, the release's consideration failed: the $14,000,000 recited for Ritter's 51% interest was never paid, and the Schmidt Parties' reciprocal release under § 2(a)(iii)(2) never became effective by its own terms. Ritter

is entitled to a declaration that § 2 of the Agreement does not bar, release, or discharge any claim pleaded in this Complaint.

## COUNT TWENTY-TWO

### Declaratory Relief — Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, 9 U.S.C. §§ 401–402

### (Against Schmidt, Hillspire, and Knox)

187. Plaintiff realleges and incorporates the allegations of Parts I through V above.

188. An actual controversy exists concerning whether § 3(g) of the Agreement — a predispute arbitration agreement within 9 U.S.C. § 401(1) as applied to disputes that had not arisen when it was signed — may be enforced against the claims in this action. This action relates to a sexual harassment dispute and a sexual assault dispute within § 401(3)–(4): the course of conduct alleged in Parts V.E and Count Fifteen, which began before December 4, 2024, was reported in March 2024, and has continued through each act alleged after that date — the seizure, the write-off, the January 2025 demand premised on the falsity of Ritter's report, the repurchase notice, the gag agreement, the surveillance, and the Award — each of which reaccrued the dispute. Section 402(a) renders such an agreement invalid and unenforceable at the election of the person alleging the conduct, and Ritter so elects. Section 402(b) provides that the applicability of the Act "shall be determined under Federal law" and "by a court, rather than an arbitrator, irrespective of whether the party resisting arbitration challenges the arbitration agreement specifically or in conjunction with other provisions" and "irrespective of any contractual language to the contrary." No court has determined the Act's applicability to the post-December 4, 2024 dispute on the merits. Ritter is entitled to a declaration that, at her election, § 3(g) of the Agreement and any other predispute arbitration provision invoked by Schmidt, Hillspire, or Knox is invalid and unenforceable with respect to this case, and that the claims herein shall proceed in this Court. This Count seeks no review or vacatur of any arbitral award.

## COUNT TWENTY-THREE

**Constructive Trust, Unjust Enrichment, and Accounting**

**(Against Schmidt, Hillspire, Knox, and Does 1–50)**

189. Plaintiff realleges and incorporates the allegations of Parts I through V above.

190. Schmidt and Hillspire hold, directly or through SP LLC (Orion Wing, LLC), Orion Wing Management, LLC, and Orion Wing Investments, LLC, property wrongfully obtained from Ritter: the 51% interest in SPM transferred for $14,000,000 never paid; SPM's cash, including the $897,859.54 removed from account -6449 and the $441,917.45 spent through "OWM"; StarX's records and intellectual property; the tax benefits of more than $42,000,000 in write-offs generated from the losses of Ritter's companies, including the $26,800,000 of fiscal-year-2022 adjustments that Hillspire directed be allocated entirely to itself on May 31, 2024 and the fiscal-year-2023 loss of $(15,777,531); and the personal property taken from her. Knox holds the unvested shares subjected to the repurchase notice and the value of the rights withheld. Each was obtained by fraud, duress, undue influence, breach of fiduciary duty, and the violation of the statutes alleged above, and each Defendant would be unjustly enriched by retaining it. Under Civil Code §§ 2223 and 2224, Ritter is entitled to a decree that Defendants hold that property, and its proceeds and profits, in constructive trust for her; to restitution; and, because the accounts and books through which the property passed are in Defendants' exclusive control and the amounts cannot be determined without discovery, to an accounting of all SPM, Orion Wing, StarX, Audem, and Knox funds and property received, held, or disbursed by Defendants since March 1, 2024, and of the allocation, reporting, and use by Big Hen, SP LLC, Hillspire, Schmidt, and any other Schmidt-side taxpayer of every tax attribute derived from SPM's fiscal-year-2022 amendment and its fiscal-year-2023 and fiscal-year-2024 returns.

**COUNT TWENTY-FOUR**

**Unfair Competition — Cal. Bus. & Prof. Code § 17200 et seq.**

**(Against All Defendants)**

191. Plaintiff realleges and incorporates the allegations of Parts I through V above.

192. Defendants' acts constitute unlawful, unfair, and fraudulent business acts and practices within § 17200. They are unlawful because they violate the statutes alleged in Counts One through Twenty-Two, including 18 U.S.C. §§ 1030, 1343, 1344, 1951, 1962, 2511, and 2701–2702; 26 U.S.C. § 7434; Penal Code §§ 470, 502, 518, and 136.1; Code of Civil Procedure §§ 1001–1002; Government Code § 12964.5; Civil Code §§ 51.9, 52.1, 1668, and 1670.11; and Labor Code §§ 970 and 1102.5. They are unfair because they offend established public policy against retaliation for reporting sexual assault, against the purchase of silence, against the shifting of tax liabilities to persons who did not receive the income, and against the use of a customer's own bank, accountant, payroll processor, IT vendor, and platform to take her property, and because the harm to Ritter and to the public vastly outweighs any utility. They are fraudulent because the closure letters, the "no books and records" representation, the "wind-down" representation, the Wind-Down Ledger, the 1099, the Idaho filing, the repurchase notice, and the "obstruction" declaration were each likely to deceive and did deceive. Ritter has lost money and property as a result. She is entitled under § 17203 to restitution of all money and property acquired by means of the unfair competition and to injunctive relief prohibiting its continuation, and under Code of Civil Procedure § 1021.5 to attorneys' fees.

## VII. PRAYER FOR RELIEF

193. WHEREFORE, Plaintiff Michelle Ritter prays for judgment against Defendants, and each of them, as follows:

(1) On Counts One and Two, for actual damages in an amount to be proven at trial, trebled under 18 U.S.C. § 1964(c), together with costs and reasonable attorneys' fees;

(2) On Count Three, for the greater of $5,000 or actual damages for each fraudulent information return, with costs and attorneys' fees under 26 U.S.C. § 7434(b);

(3) On Counts Four, Ten, Eleven, Twelve, Fourteen, Eighteen, and Nineteen, for compensatory damages in an amount to be proven at trial and for punitive and exemplary damages under Civil Code § 3294;

(4) On Count Five, for compensatory damages and for injunctive relief under 18 U.S.C. § 1030(g) restoring Ritter's administrative control of the steelperlot.com, starx.com, and audem-mgmt.com tenants and prohibiting further access to her devices and accounts;

(5) On Count Six, for actual damages and profits, but not less than $1,000 per violation, punitive damages, attorneys' fees and costs, and equitable relief under 18 U.S.C. § 2707;

(6) On Count Seven, for the greater of actual damages and profits or statutory damages under 18 U.S.C. § 2520(c)(2), punitive damages, attorneys' fees and costs, and equitable relief;

(7) On Count Eight, for compensatory damages, punitive damages, injunctive relief, and attorneys' fees under Penal Code § 502(e);

(8) On Count Nine, for injunctive relief, actual damages and unjust enrichment or a reasonable royalty, exemplary damages, and attorneys' fees under 18 U.S.C. § 1836(b)(3) and Civil Code §§ 3426.2–3426.4;

(9) On Count Thirteen, for actual damages, exemplary damages, a civil penalty of $25,000 per violation, injunctive relief, and attorneys' fees under Civil Code §§ 52 and 52.1;

(10) On Count Fifteen, for actual damages, exemplary damages, a civil penalty of $25,000 as to each Defendant found liable, and attorneys' fees under Civil Code § 52(b);

(11) On Count Sixteen, for damages and attorneys' fees under 18 U.S.C. § 1595(a);

(12) On Count Seventeen, for unpaid compensation, double damages under Labor Code § 972, waiting-time penalties, civil penalties, interest, and attorneys' fees under Labor Code §§ 218.5 and 1102.5(j);

(13) On Count Twenty, for a declaration that no arbitration agreement was formed under the purported March 17, 2022 Audem Services Agreement, that the instrument is void, and that no proceeding may be compelled or maintained under it;

(14) On Count Twenty-One, for a declaration that §§ 3(a) and 3(b) and Schedule D of the December 4, 2024 Agreement, § 1 of the December 17, 2024 Amendment, and the April–May 2025 Knox agreement are void and unenforceable, that no obligation, breach, or damages may be predicated on them, and that § 2 of the Agreement does not bar, release, or discharge any claim pleaded in this Complaint;

(15) On Count Twenty-Two, for a declaration under 9 U.S.C. § 402 and 28 U.S.C. § 2201 that, at Ritter's election, § 3(g) of the Agreement and any other predispute arbitration provision invoked by Schmidt, Hillspire, or Knox is invalid and unenforceable with respect to this case;

(16) On Count Twenty-Three, for a decree imposing a constructive trust over the 51% interest in SPM, SPM's cash and its proceeds, StarX's records and intellectual property, the Knox shares, the tax benefits derived from Ritter's companies' losses, and the personal property taken; for restitution; and for an accounting, including of the allocation and use of the $26,800,000 of fiscal-year-2022 adjustments and of SPM's 2023 and 2024 losses;

(17) On Count Twenty-Four, for restitution and injunctive relief under Business and Professions Code § 17203 and attorneys' fees under Code of Civil Procedure § 1021.5;

(18) For a preliminary and permanent injunction (a) prohibiting Defendants and their agents from accessing, altering, deleting, or transferring any device, account, tenant, or data of Ritter, StarX, or Audem; (b) requiring the preservation and production of the Google Workspace administrator, login, and Drive audit logs for the three tenants from June 1, 2024 to the present, the hillspire.jamfcloud.com enrollment and session records, the CGNET administrative logs, the DocuSign certificates of completion for envelopes EF878356, 805F7E18, 7A36843B, and 3988DF98, the Wells Fargo records for accounts -4631, -6449, -4953, and -0882, and the KPMG and TriNet engagement, invoice, and filing records for SPM, StarX, Knox, and Audem; and (c) prohibiting Defendants from filing or transmitting any tax return or information return in the name of Ritter, StarX, or Audem without her written authorization;

(19) For an order, on noticed motion, disqualifying Glaser Weil Fink Howard Jordan & Shapiro LLP and Craig H. Marcus from representing any party in this action under the Court's inherent authority, Local Rule 83-3.1.2, and California Rule of Professional Conduct 3.7;

(20) For prejudgment and post-judgment interest at the maximum lawful rate;

(21) For costs of suit; and

(22) For such other and further relief as the Court deems just and proper.

## VIII. DEMAND FOR JURY TRIAL

194. Plaintiff demands trial by jury on all issues so triable.

Dated: September 21, 2026

Respectfully submitted,

MICHELLE RITTER

By: [signature]

Michelle Ritter, Plaintiff

**EXHIBIT INDEX**

Exhibit 1 — Declaration of Bruce W. Pixley, CISSP, GCFA, EnCE (Apr. 9, 2026), with forensic findings on MacBook Pro serial TFWF7V17GQ and the steelperlot.com GoDaddy DNS record

Exhibit 2 — Declaration of Elijah Reinhardt (Sept. 25, 2025)

Exhibit 3 — Settlement Agreement dated December 4, 2024, with Schedules A–I (including Schedule B, Schedule C, Schedule D, Schedule H), and the November 20–24, 2024 Glaser Weil drafting redlines

Exhibit 4 — Amendment to Agreement dated December 17, 2024, with the FL-300 dismissal stipulation

Exhibit 5 — AAA Claimants' Appendix Ex. 8 (Apr. 6, 2026): "Orion Wing Management, LLC (fka Steel Perlot Management, LLC) — Privileged & Confidential — Payments: 12/4/2024 to 3/16/2026" (40 lines; $1,060,943.78)

Exhibit 6 — AAA Claimants' Appendix Ex. 9 (Apr. 6, 2026): Written Consent of the Manager of Orion Wing Management, LLC (Dec. 19, 2024), executed by Joon Hur for Hillspire (DocuSign 7A36843B), and the Multi-Draw Loan Agreement as produced

Exhibit 7 — KPMG Tax Compliance Information Request, FY2023 (SPM / StarX / Knox), including Fed. Request, State Request, KPMG Request, Knox, and Tracker sheets

Exhibit 8 — Hillspire "Summary budgeting analysis" and Updated Schedule C (Nov. 18, 2024) (rows 43, 51)

Exhibit 9 — "SPM Scenario Expectations" V1 (July 12, 2024) (rows 21, 34–36, 87)

Exhibit 10 — KPMG (Tahiliani)–Coit email thread (Apr. 9, 2024) with Quach cover page ("our investor")

Exhibit 11 — KPMG–SPM Finance "SPM – additional information request" correspondence (Apr. 9, 2024 et seq.; Tahiliani, Cho, Kierzkowski, Aum, and

Auriemma with Coit, Bajema, and Rabinowitch) (excerpts); July 31, 2024 records of the SPM/StarX tax-allocation discrepancies

Exhibit 12 — Audem Employment Development Department notices and Marcus's transmittals of them to Ritter (Apr. 21, May 15, and July 6, 2026), including Marcus's July 6, 2026 email ("Attached is an EDD Notice of Form Delinquency for Audem Management … that was sent to Hillspire")

Exhibit 13 — StarX Networks, Inc. Idaho Department of Labor Power of Attorney and cover letter transmitted through TriNet (June 2024), with DocuSign signing log; Apr. 1, 2024 DocuSign package of California EDD and Idaho employment-tax forms executed in Ritter's name

Exhibit 14 — Wells Fargo: Oct. 8, 2024 closure letters (SPM -4631/-6449; Audem -0882) and Meredith transmittal email; Oct. 10, 2024 Meredith email; Oct. 11, 2024 commercial-card termination letter; Oct. 18 and Oct. 25, 2024 Meredith emails; Nov. 14, 2024 "Steel Perlot Management Connection" email

Exhibit 15 — Wells Fargo: Meredith "sole member" / "sole owner and control person" correspondence (July 11–17, 2024) and July 26, 2024 follow-up; Sencil email of July 29, 2024 ("joint written confirmation from you and Hillspire")

Exhibit 16 — Wells Fargo online-banking Account Summary and Statements & Documents screens for "ORION WING MANAGEMENT, LLC" captured May 1, 2025 (-4631 closed; -6449 $48,847.15; Time Account -4953 $207,370.86)

Exhibit 17 — Wells Fargo: Authorization for Information BBG18141 ("Submit manually"); SPM and Audem account-opening documents and Certifications of Beneficial Ownership (Dec. 2021)

Exhibit 18 — Audem Services Agreement DocuSign envelope EF878356 and certificate; Manekin–Frayer email (Mar. 17, 2022, 8:29 a.m.); Ritter–Manekin email (Mar. 17, 2022, 8:33 a.m.); Ritter–Blank Rome email (June 26, 2024); Uribe (CGNET) email (June 27, 2024)

Exhibit 19 — AAA Demand for Arbitration, No. 01-24-0005-8902 (June 7, 2024); AAA amended initiation letter (July 9, 2024); written objections of Shamim Ritter (July 10, 2024)

Exhibit 20 — AAA Demand for Arbitration, No. 01-25-0000-2191 (Jan. 15, 2025) and Second Amended Demand (Sept. 16, 2025)

Exhibit 21 — H, LLC Severance Agreement template (§§ 2, 4)

Exhibit 22 — Marcus email to SPM/Audem employees (Aug. 4, 2024); The Information article (Aug. 1, 2024)

Exhibit 23 — SPM Internal Memo "SP Status / Next Steps" (July 15, 2024) and replies (July 24 and Aug. 4, 2024)

Exhibit 24 — Sixty-day notices to terminate occupancy (Aug. 7, 2024) as transmitted by Marcus to Ritter's counsel (Aug. 20, 2024); three-day notices to quit for both Los Angeles residences (Dec. 2, 2024)

Exhibit 25 — Forensic analysis of SPM Operating Agreement, DocuSign envelope 805F7E18 (PDF Expert revisions, Sept. 3, 2024, 1:12:56 and 1:13:09 p.m. PDT)

Exhibit 26 — Nov. 8, 2024 Baron Samson preservation demand to Nobu Malibu; Feb. 21, 2025 counsel's evidence-preservation letter to Google; Dec. 5, 2025 Miller Barondess preservation demand to Google's Chief Legal Officer

Exhibit 27 — Harris–Joffe "MR/ES Settlement Obligations" exchange (Dec. 5–6, 2024) re SPI cryptocurrency-account passcodes and CGNET's custody of SPI information

Exhibit 28 — Harris email, "CGNet/google" (Dec. 10, 2024, 7:03 p.m.), with Marcus/Baron replies

Exhibit 29 — Knopf notice to CGNET and Google re unauthorized access, alteration, and preservation (Dec. 10, 2024)

Exhibit 30 — Marcus email re DVRO dismissal (Dec. 23, 2024); Baron–Marcus emails re declaration timing (Jan. 13–15, 2025); Harris email re Workspace return (Jan. 16, 2025); Harris email (Dec. 13, 2024)

Exhibit 31 — Marcus email re modification of Agreement ("Fwd: WSJ") (Jan. 15, 2025)

Exhibit 32 — Ritter/counsel notices to Glaser Weil re Workspace theft and Google breaches (Dec. 31, 2024; Jan. 19, 2025)

Exhibit 33 — Knox Shareholders' Written Consent and Board Written Consent removing Ritter (Apr. 26, 2024; DocuSign envelope A5DA96EA; signed for Steel Perlot, LLC by Big Hen Group I, LLC / Hillspire, LLC / Eric Schmidt, Co-Manager, and by directors Eric Schmidt and R. Martin Chávez); Carta capitalization records for Knox and StarX (Jan. 19, 2022; June 2024)

Exhibit 34 — Knox Networks, Inc. Notice of Stock Repurchase (Apr. 26, 2025; 4,500 "Unvested Shares" at $1.00 per share); Knox proposed NDA (May 19, 2025); Knox § 220 demand response (May 9, 2025); Knox letter re NDA (May 30, 2025)

Exhibit 35 — Notice to Preserve All Records (Sept. 11, 2025); Marcus response (Sept. 12, 2025)

Exhibit 36 — Control Risks Device Collection Report (Aug. 8, 2024); Paley residence TeamViewer findings

Exhibit 37 — AAA Order to Show Cause (Mar. 5, 2026); Order of Default (Mar. 16, 2026); arbitrator letter (Oct. 7, 2025); AAA deposit request (July 23, 2025)

Exhibit 38 — AAA Claimants' Apr. 6, 2026 declarations of Craig Marcus (with Appendix Ex. 72), Kelly Young, Mandy Quach, Eric Schmidt, and Eric Rose (excerpts); Claimants' Ex. 34 (Glaser Weil billing); Exs. 26–28 (RSI and Bullpen invoices)

Exhibit 39 — Final Arbitration Award (June 4, 2026), p. 13 (recital concerning Ex. 8)

Exhibit 40 — Google Workspace Terms of Service; Complaint, Ritter v. Google LLC et al., No. 25CV475336 (Santa Clara Super. Ct., filed Sept. 18, 2025); Request for Dismissal (Nov. 18, 2025)

Exhibit 41 — Screenshots (Apr. 6–18, 2025) of StarX records hosted in and owned by the SchmidtEntity.co tenant, with share-permission records showing mrteam@schmidtentity.co as owner and an account in Ritter's name at that domain

Exhibit 42 — StarX–FIFA Memorandum of Understanding (Sept. 14, 2023)

Exhibit 43 — "The Predator's Playground" op-ed (Jan. 2026); Feb. 2026 letter to Members of Congress (images)

Exhibit 44 — Marcus correspondence refusing attorney-witness status (Sept. 12, 2025)

Exhibit 45 — Rad Rectangle, LLC "Review of StarX" (July 27, 2024) with StarX admin-event log excerpts and CGNET audit log

Exhibit 46 — DV-100 Request for Domestic Violence Restraining Order (Dec. 11, 2024), LASC No. 24SMRO00444

Exhibit 47 — Releases provided by Hillspire to Steel Perlot (Oct. 2024); SPM release correspondence

Exhibit 48 — Ritter buyout request and Marcus response ("false assertions and is generally denied") (Oct. 24–26, 2024)

Exhibit 49 — Fried Frank "SPM Potential Claims Outline" (Apr. 17, 2024); Fried Frank invoice transmittals and invoices for SPM and StarX matters (Apr. 1, 2024)

Exhibit 50 — July 2021 SPM Amended and Restated Limited Liability Company Agreement (95%/5%) and July 1, 2022 Agreement resetting the Percentage Interests to 51% Common Member / 49% Preferred Member (DocuSign A6BCF8E3)

Exhibit 51 — Coit emails of May 23, 2024 ("URGENT REGARDING 2022 TAX RETURNS/AMENDMENTS," 10:26 a.m.; "Re: 2022 Amended return for SPM," 11:29 a.m. and 3:36 p.m.) re the $26.8M FY2022 amendment, "massive tax

benefit," and "Michelle will need to amend her 2022 K1, and Big Hen will need to amend their 2022 K1"

Exhibit 52 — Coit email of May 29, 2024 ("Re: 2022 Amended return for SPM") transmitting KPMG's $40K–$45K addendum for DocuSign, with draft notice to Big Hen Group I, LLC, and Ritter's forwarding note ("Please share with the appropriate counsel")

Exhibit 53 — "Meeting w/ KPMG 05.31.2024" minutes (3 pp.): "Discussion Topic: $26.8M amendment to SPM FY2022 Tax Return"; attendees Coit, Bajema, Rabinowitch, Keel, Lennon, Cho, Kierzkowski, Minyong, Quach; "All losses will be allocated to hillspire, MR K1 will not be impacted"

Exhibit 54 — Steel Perlot Management, LLC book-to-tax reconciliation, year ended December 31, 2023 (book loss $(20,580,161); taxable income $(15,777,531); "Written off capitalized labour cost" $3,388,013)

Exhibit 55 — SPM capital model dated November 1, 2022 ($MM; FY21–FY23 capital invested $95.3M; "Inhouse Startups" including StarX; "Incremental Investment Needed" $61.2M)

Exhibit 56 — Rabinowitch email to "Michelle and Eric" (June 16, 2023) re Knox/SPM/StarX headcount, June budget, and funding request; Quach reply (June 21, 2023) copying Eric Schmidt, Seferian, Hur, and Manuel

Exhibit 57 — "Wire scheduled - SPM to StarX for May-2024 Coverage" thread (May 1–6, 2024): Rabinowitch–Quach; Quach's "Eric has no further funding obligation" / "recoupable loan to SPM" / "broader transition" email (May 6, 2024) (Google Vault preservation export by Ritter, July 13, 2024)

Exhibit 58 — The Corporation Trust Company "Important Delaware Tax Information" and "2023 State of Delaware 1st Estimated Tax Notice" for StarX Networks, Inc. (DE File No. 7944901), addressed to "Natalya Thakur-COO, Knox Networks Inc., 555 Bryant St PMB 374, Palo Alto, CA" (Apr. 24, 2023); Delaware Division of Corporations status for StarX ("AR Delinquent, Tax Due," as of Mar. 2,

2025); StarX 2023 Delaware Annual Franchise Tax Report filed by Ritter (July 15, 2024)

Exhibit 59 — StarX (Papapanagiotou)–Auth.Inc (Greene) email thread (May 14, 2024) (Google Vault preservation export by Ritter, July 13, 2024)

Exhibit 60 — Still image from video recorded by Ritter at her residence, December 17, 2024, 12:21 p.m., showing Marcus inside the home

Exhibit 61 — WhatsApp messages from Emina (United Kingdom) to Ritter, September 2025, reporting Schmidt's statements ("He told me more than once 'I will bankrupt her' as if it was his vengeance for you not submitting to him")