Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)

First Amended Complaint

# EXHIBIT 16

Wells Fargo online-banking Account Summary and Statements & Documents screens for "ORION WING MANAGEMENT, LLC" captured May 1, 2025 (-4631 closed; -6449 $48,847.15; Time Account -4953 $207,370.86)

EXHIBIT 16



Safari File Edit View History Bookmarks Window Help
Thu May 1 7:23 PM
connect.secure.wellsfargo.com
WELLS FARGO
Sign Off
Welcome
The Private Bank
Accounts
Transfer & Pay
Plan & Learn
Security & Support
Account Summary
Account Summary
ORION WING MANAGEMENT, LLC Accounts
Set as default
BUSINESS CHECKING
...4631
$0.00
Available balance
This account is closed. You can view your account information, including statements and documents, for approximately 90 days after the closure date.
BUSINESS MARKET RATE SAVINGS
...6449
$48,847.15
Available balance
TIME ACCOUNT
...4953
$207,370.86
Account balance
Account Disclosures
Deposit products offered by Wells Fargo Bank, N.A. Member FDIC.
Equal Housing Lender
Now in the app!
Check your account security level
Screen image simulated.
Check out the redesigned Security Center in the mobile app.
Look for the green shield icon under Menu.

EXHIBIT 16


Safari File Edit View History Bookmarks Window Help
Thu May 1 6:24 PM
connect.secure.wellsfargo.com
WELLS FARGO
Sign Off
Welcome
The Private Bank
Accounts
Transfer & Pay
Plan & Learn
Security & Support
Account Summary
AUDEM MANAGEMENT, L...
Help
Statements and Documents
It's easy to access your account documents online. Wells Fargo offers a secure, convenient, and environmentally friendly way to manage your documents from one central place – helping you reduce clutter and stay organized.
Related Information
Manage Delivery Preferences
Statements and Disclosures
Select account
BUSINESS CHECKING ...4631
For time period
Recent statements
BUSINESS CHECKING ...4631
BUSINESS MARKET RATE SAVINGS ...6449
Statement 10/31/24 (34K, PDF)
Statement 09/30/24 (44K, PDF)
Statement 08/31/24 (36K, PDF)
Statement 07/31/24 (43K, PDF)
Statement 06/30/24 (60K, PDF)

EXHIBIT 16


Safari File Edit View History Bookmarks Window Help
Thu May 1 7:23 PM
connect.secure.wellsfargo.com
WELLS FARGO
Sign Off
Welcome
The Private Bank
Accounts
Transfer & Pay
Plan & Learn
Security & Support
Account Summary
ORION WING MANAGEM...
Help
It's easy to access your account documents online. Wells Fargo offers a secure, convenient, and environmentally friendly way to manage your documents from one central place – helping you reduce clutter and stay organized.
Manage Delivery Preferences
Statements and Disclosures
Select account
BUSINESS CHECKING ...4631
For time period
2018
2023
2022
2021
2020
2019
2018
You do not have any statements for the selected period.
Wells Fargo will notify you when your account statement is available online. If we do not
future online statements to paper statements via U.S. mail. As an online customer, you a
Online Access Agreement for details. If you receive both paper and online statements o
Tax Documents
Tax year
2017
You don't have any tax documents for this year.
You'll receive tax documents for accounts that earned, or paid, over a certain amount of interest. This amount depends on what type of account you
Get more details

EXHIBIT 36


Safari File Edit View History Bookmarks Window Help
Thu May 1 7:23 PM
connect.secure.wellsfargo.com
The Private Bank
Sign Off
Welcome
Accounts
Transfer & Pay
Plan & Learn
Security & Support
Account Summary
ORION WING MANAGEM...
Help
Wells Fargo will notify you when your account statement is available online. If we do not have a valid email address for you, we cannot provide this notice and will have to switch future online statements to paper statements via U.S. mail. As an online customer, you are responsible for notifying us if you change your email address. Please refer to the Online Access Agreement for details. If you receive both paper and online statements on an account, we will not notify you by email when your online statement is ready.
Tax Documents
Tax year
2017
2022
2021
2020
2019
2018
2017
t of interest. This amount depends on what type of account you
Get more details
Customer Reports

EXHIBIT 16


Safari File Edit View History Bookmarks Window Help
Thu May 1 7:23 PM
connect.secure.wellsfargo.com
The Private Bank
Sign Off
Welcome
Accounts
Transfer & Pay
Plan & Learn
Security & Support
Account Summary
ORION WING MANAGEM...
Help
Wells Fargo will notify you when your account statement is available online. If we do not have a valid email address for you, we cannot provide this notice and will have to switch future online statements to paper statements via U.S. mail. As an online customer, you are responsible for notifying us if you change your email address. Please refer to the Online Access Agreement for details. If you receive both paper and online statements on an account, we will not notify you by email when your online statement is ready.
Tax Documents
Tax year
2017
2020
2019
2018
2017
2016
2015
t of interest. This amount depends on what type of account you
Get more details
Customer Reports

EXHIBIT 16


Safari File Edit View History Bookmarks Window Help
Thu May 1 7:23 PM
connect.secure.wellsfargo.com
The Private Bank
Sign Off
Welcome
Accounts
Transfer & Pay
Plan & Learn
Security & Support
Account Summary
ORION WING MANAGEM...
Help
BUSINESS CHECKING ...4631
2018
You do not have any statements for the selected period.
Wells Fargo will notify you when your account statement is available online. If we do not have a valid email address for you, we cannot provide this notice and will have to switch future online statements to paper statements via U.S. mail. As an online customer, you are responsible for notifying us if you change your email address. Please refer to the Online Access Agreement for details. If you receive both paper and online statements on an account, we will not notify you by email when your online statement is ready.
Tax Documents
Tax year
2016
You don't have any tax documents for this year.
You'll receive tax documents for accounts that earned, or paid, over a certain amount of interest. This amount depends on what type of account you have.
Get more details
Save multiple documents in one file by selecting more than one checkbox.
Viewing Tax Documents Online
Please visit our FAQs for more information.

EXHIBIT 16


Safari File Edit View History Bookmarks Window Help
Thu May 1 7:23 PM
connect.secure.wellsfargo.com
The Private Bank
Sign Off
Welcome
Accounts
Transfer & Pay
Plan & Learn
Security & Support
Account Summary
ORION WING MANAGEM...
Help
You do not have any statements for the selected period.
Wells Fargo will notify you when your account statement is available online. If we do not have a valid email address for you, we cannot provide this notice and will have to switch future online statements to paper statements via U.S. mail. As an online customer, you are responsible for notifying us if you change your email address. Please refer to the Online Access Agreement for details. If you receive both paper and online statements on an account, we will not notify you by email when your online statement is ready.
Tax Documents
Tax year
2015
You don't have any tax documents for this year.
You'll receive tax documents for accounts that earned, or paid, over a certain amount of interest. This amount depends on what type of account you have.
Get more details
Save multiple documents in one file by selecting more than one checkbox.
Viewing Tax Documents Online
Please visit our FAQs for more information.

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)
First Amended Complaint

# EXHIBIT 17

Wells Fargo: Authorization for Information BBG18141 ("Submit manually"); SPM and Audem account-opening documents and Certifications of Beneficial Ownership (Dec. 2021)

# EXHIBIT 55

---

## Wells Fargo Authorization for Information (BBG18141)

**Description**

Wells Fargo Authorization for Information form (BBG18141) annotated 'Submit manually,' relevant to the bank-account-closure misrepresentation count.

**Status**

**ATTACHED — exhibit content follows this cover sheet.**

**Source**

[mounted]/__USE/Wells Fargo - 2021-24 asset transfer + de-banking/Authorization for Information_64ca0295-68b4-9f65-0d15-c2445a854f10.pdf

— Cover sheet compiled 2026-04-27 —

# Authorization For Information

In Connection With A Business Account Application

WELLS FARGO

| Banker Name: | Officer/Portfolio Number: | Date: | |
|---|---|---|---|
| SENCIL,JERALD | Q1790 | 05/04/2022 | |

| Banker Phone: | Branch Number: | Banker AU: | Banker MAC: |
|---|---|---|---|
| 206/292-3116 | 02681 | 0004390 | P6540-400 |

## Business Account Applicant

Business Name:
STEEL PERLOT MANAGEMENT LLC

Enterprise Customer Number (ECN):
105797112053210

## Owner/Key Individual 1 Information

| | | | |
|---|---|---|---|
| Customer Name: MICHELLE SHAMIM RITTER | | | |
| Enterprise Customer Number (ECN): 94366581747217 | | | |
| Position/Title: | Date of Birth: 01/07/1994 | Phone Number: 510/828-7772 | |
| Taxpayer Identification Number (TIN): 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 | TIN Type: SSN | | |
| Primary ID Type: DLIC | Primary ID Description: D3587501 | | |
| Primary ID St/Ctry/Prov: CA | Primary ID Issue Date: 01/16/2019 | Primary ID Expiration Date: 01/07/2024 | |
| Secondary ID Type: OTHR | Secondary ID Description: NDV:CIPVID-8D10F17074AD | | |
| Secondary ID State/Country: | Secondary ID Issue Date: 01/13/2022 | Secondary ID Expiration Date: | |

| | |
|---|---|
| Residence Address: 31 W 21ST ST | |
| Address Line 2: | |
| Address Line 3: | |
| City: NEW YORK | State: NY |
| ZIP/Postal Code: 10010-7044 | Country: US |
| Directional Address: *(Document when no physical residence, business or alternate street address.)* | |

## Signature Capture - Owners/Key Individuals

By signing this form, I authorize Wells Fargo Bank, N.A. ("the Bank") to obtain verifications and reports from time to time, such as credit bureau reports and account status reports on me as an individual, in connection with the business account application for the above-named business and any other account applications by this business. I understand the Bank requests this information for legitimate business reasons including reducing fraudulent accounts and preventing access to financial information and accounts by unauthorized persons. Should the information obtained from any such report cause the Bank to deny the account application for the business, I also authorize the Bank to communicate, either explicitly or implicitly, to any co-applicant and to any co-owner, director, officer, or employee of the business that the denial was based in whole or in part on such information.
I also authorize the Bank to use such information and to share it with its affiliates in order to determine whether the business is qualified for other products and services offered by the Bank and its affiliates.


© 2016 Wells Fargo Bank, N.A. All rights reserved.
2W02-001473349811-01

Owner/Key Individual 1 Name
MICHELLE SHAMIM RITTER

Position/Title:
Manager

Owner/Key Individual 1 Signature

DocuSigned by:
MICHELLE SHAMIM RITTER
DCA8E22F0B67417...

☐ Submit manually

☐ Signature not required

Date:
05/04/2022


© 2016 Wells Fargo Bank, N.A. All rights reserved.
2W02-001473349811-02

WELLS FARGO

# Acceptance of Services

1. Agreement to be Bound by Service Documentation

By signing this Acceptance of Services ("Agreement"), the customer identified on the signature block ("Customer" or "Company") confirms that it has received and agrees to be bound by the Service Documentation for the Treasury Management Services (each, a "Service"). Customer may also be referred to as "Company" in the Service Documentation. "Service Documentation" is defined in Wells Fargo Bank, N.A.'s ("Bank") Master Agreement for Treasury Management Services. Customer's use of any Service, including each Service Customer enrolls in, confirms Customer's receipt of and agreement to be bound by the Service Documentation relating to that Service.

2. Power and Authority of Signer

Customer has granted the person(s) signing this Agreement the authority on Customer's behalf to (i) enter into this Agreement and other agreements with Bank for Services on or after the Effective Date of this Agreement and (ii) amend, terminate or otherwise act on behalf of Customer with respect to this Agreement and the Services.

3. Security Procedures

Unless otherwise agreed, Customer agrees that "Security Procedure" is the applicable security procedure described in the Service Documentation for Customer's Initiation Method for the Service, which Bank will use to verify the authenticity of a Transaction. The term "Initiation Method" refers to the method Bank offers in the product enrollment form ("Set-up Form") or other Service Documentation for delivering Customer's Transaction instructions to Bank with respect to the applicable Service and includes any applicable transmission protocols. The term "Transaction" means (i) any funds transfer or payment instruction (including any communication cancelling or amending an instruction), and (ii) any instruction, data or other information which Bank receives in Customer's name with respect to a funds transfer.

The purpose of the Security Procedure is to verify the authenticity of the Transaction. Bank will not use the Security Procedure to detect an erroneous or duplicate transaction. Customer will be responsible for any erroneous or duplicate transaction Bank receives in Customer's name. Customer agrees to be bound by each Transaction, whether or not authorized by Customer, issued in Customer's name and accepted by Bank in compliance with the Security Procedure for the Service.



The document was approved by Lisa Larpenteur on Tue Nov 09 10:03:11 PST 2021

4. Commercially Reasonable

Customer acknowledges that it has had an opportunity to review the Security Procedures offered by Bank in the Security Procedure Reference Guide, available on our Commercial Electronic Office portal. Customer agrees that each Security Procedure for the Initiation Method Customer has elected in the Set-up Form or other Service Documentation for each of its Services (a) best meets Customer's requirements with regard to the size, type and frequency of its Transactions, and (b) is commercially reasonable.

If Customer has refused to use a standard Security Procedure and elects a non-standard Security Procedure, then Customer expressly agrees that the non-standard Security Procedure(s) Customer has elected better meets Customer's requirements than any standard Security Procedure with regard to the size, type and frequency of Transactions issued by Customer to Bank and is commercially reasonable.

5. Confidentiality of Security Procedure and Authentication devices/passwords

Customer and Bank will preserve the confidentiality of the Security Procedure(s) and any passwords, codes, security devices and related instructions provided by Bank. If one party becomes aware of a breach, or suspects that a breach may occur, it will promptly notify the other party. Customer will maintain effective internal procedures to safeguard against any unauthorized Transaction and warrants that no individual will be allowed to initiate a Transaction without proper supervision and safeguards.

**Customer Name(s)**

STEEL PERLOT MANAGEMENT LLC

| | |
|---|---|
| Printed Name of Authorized Representative | MANDY QUACH |
| Signature | Mandy Quach |
| Date | 11/8/21. |


© 2020 Wells Fargo Bank, N.A. All rights reserved


The document was approved by Lisa Larpenteur on Tue Nov 09 10:03:11 PST 2021

WELLS FARGO

# Acceptance of Services

**1. Agreement to be Bound by Service Documentation**

By signing this Acceptance of Services ("Agreement"), the customer identified on the signature block ("Customer" or "Company") confirms that it has received and agrees to be bound by the Service Documentation for the Treasury Management Services (each, a "Service"). Customer may also be referred to as "Company" in the Service Documentation. "Service Documentation" is defined in Wells Fargo Bank, N.A.'s ("Bank") Master Agreement for Treasury Management Services. Customer's use of any Service, including each Service Customer enrolls in, confirms Customer's receipt of and agreement to be bound by the Service Documentation relating to that Service.

**2. Power and Authority of Signer**

Customer has granted the person(s) signing this Agreement the authority on Customer's behalf to (i) enter into this Agreement and other agreements with Bank for Services on or after the Effective Date of this Agreement and (ii) amend, terminate or otherwise act on behalf of Customer with respect to this Agreement and the Services.

**3. Security Procedures**

Unless otherwise agreed, Customer agrees that "Security Procedure" is the applicable security procedure described in the Service Documentation for Customer's Initiation Method for the Service, which Bank will use to verify the authenticity of a Transaction. The term "Initiation Method" refers to the method Bank offers in the product enrollment form ("Set-up Form") or other Service Documentation for delivering Customer's Transaction instructions to Bank with respect to the applicable Service and includes any applicable transmission protocols. The term "Transaction" means (i) any funds transfer or payment instruction (including any communication cancelling or amending an instruction), and (ii) any instruction, data or other information which Bank receives in Customer's name with respect to a funds transfer.

The purpose of the Security Procedure is to verify the authenticity of the Transaction. Bank will not use the Security Procedure to detect an erroneous or duplicate transaction. Customer will be responsible for any erroneous or duplicate transaction Bank receives in Customer's name. Customer agrees to be bound by each Transaction, whether or not authorized by Customer, issued in Customer's name and accepted by Bank in compliance with the Security Procedure for the Service.



The document was approved by Kevin Kitchin on Fri Jan 21 07:16:59 PST 2022

**4. Commercially Reasonable**

Customer acknowledges that it has had an opportunity to review the Security Procedures offered by Bank in the Security Procedure Reference Guide, available on our *Commercial Electronic Office* portal. Customer agrees that each Security Procedure for the Initiation Method Customer has elected in the Set-up Form or other Service Documentation for each of its Services (a) best meets Customer's requirements with regard to the size, type and frequency of its Transactions, and (b) is commercially reasonable.

If Customer has refused to use a standard Security Procedure and elects a non-standard Security Procedure, then Customer expressly agrees that the non-standard Security Procedure(s) Customer has elected better meets Customer's requirements than any standard Security Procedure with regard to the size, type and frequency of Transactions issued by Customer to Bank and is commercially reasonable.

**5. Confidentiality of Security Procedure and Authentication devices/passwords**

Customer and Bank will preserve the confidentiality of the Security Procedure(s) and any passwords, codes, security devices and related instructions provided by Bank. If one party becomes aware of a breach, or suspects that a breach may occur, it will promptly notify the other party. Customer will maintain effective internal procedures to safeguard against any unauthorized Transaction and warrants that no individual will be allowed to initiate a Transaction without proper supervision and safeguards.

**Customer Name(s)**

AUDEM MANAGEMENT, LLC

| Printed Name of Authorized Representative |
|---|
| MANDY QUACH. |
| Signature |
| Mandy Quach |
| Date |
| 1/20/22 |


© 2020 Wells Fargo Bank, N.A. All rights reserved


The document was approved by Kevin Kitchin on Fri Jan 21 07:16:59 PST 2022

# WELLSONE® COMMERCIAL CARD AGREEMENT

This WellsOne® Commercial Card Agreement (this **"Agreement"**) is made and entered into effective as of the date last executed below (the **"Effective Date"**), by and between Wells Fargo Bank, National Association (**"Wells Fargo"**) and STEEL PERLOT MANAGEMENT LLC (**"Customer"**).

## Introduction

This Agreement governs the Visa® *WellsOne* Commercial Card and/or Mastercard® MultiCard Commercial Card (collectively, **"Card"**) issued by Wells Fargo for use by Customer and its designated employees, subsidiaries, affiliates, agents and representatives (**"Cardholders"**). In this Agreement, "Card" shall mean individually and collectively, all Visa® *WellsOne* and Mastercard® MultiCard Commercial Cards and account numbers issued to Customer, Cardholders and the associated accounts including all card-not-present transactions and account numbers. The transactions made using the Card constitute extensions of credit by Wells Fargo to Customer and not to individual employees, or agents of Customer. In order to participate in the *WellsOne* Commercial Card program, Customer shall at all times maintain ten (10) or more Cards. Attachment A (Program Information), Attachment B (Program Administrator), Attachment C-1 (Fee Schedule), and Attachment C-2 (Revenue Share Calculation), if applicable, are incorporated into this Agreement. In addition, the following Service Descriptions will be incorporated into this Agreement if Customer or its Cardholders elect, now or hereafter, to utilize a service or functionality described therein: (i) Wells Fargo Supplier Analysis & Onboarding Commercial Card Conversion Service Description; (ii) WellsOne Virtual Card Payment Service Description; (iii) WellsOne Expense Manager; (iv) Receipt Imaging Service Description; (v) Convenience Check Service Description; (vi) Custom Data Solutions Service Description; and (vii) any other Service Description with respect to an additional service or functionality related to the Card that specifically references, and provides that it is incorporated by reference into, this Agreement. Such Service Descriptions are available and may be accessed at **https://wellsoffice.wellsfargo.com/ceopub/prc/service-descriptions/index.jsp** or such other Internet website address as Wells Fargo may from time to time designate by notice to Customer. For good and valuable consideration, and intending to be legally bound hereby, Customer and Wells Fargo agree to each and every term and condition of this Agreement as set forth below:

1. **Permitted Uses of Card; Promise to Pay; Credit Limit.** The Card may be used for Cardholders' Customer-related purchasing, travel and entertainment, general payables and fleet purchases; to the extent such functionality is offered to Customer by Wells Fargo. Customer agrees that the Card shall be used for business purposes only. Customer represents and warrants that its execution of this Agreement and use of the Card will not in any way violate, conflict with or result in a breach of any contract or agreement between Customer (or any of its affiliates) and any third party, including any client of Customer or its affiliates, and Customer will indemnify, defend and hold Wells Fargo harmless from and against any claims relating to any such actual or alleged violation, conflict or breach. In no event shall the Card be used: (i) to make, directly or indirectly, any payment or engage in any other transaction by, on behalf of or for the benefit of any person(s) relating to personal, family or household purposes (*i.e.*, in no event may the Card be used, directly or indirectly, to make or facilitate consumer payments or consumer transactions of any type, regardless of whether Customer is in the business of making or facilitating such payments or transactions); or (ii) for any transaction that is unlawful or illegal under any applicable laws, rules and regulations and orders of any federal, state, local or foreign governmental authority ("**Applicable Law**"), including but not limited to, all economic sanctions, trade embargoes and anti-terrorism laws imposed by the U.S., the U.S. Foreign Corrupt Practices Act of 1977 (as amended), all applicable laws or regulations relating to money laundering and any predicate crime to money laundering, and **"restricted transactions"** as defined in the Unlawful Internet Gambling Enforcement Act of 2006 and Regulation GG issued thereunder. Except as otherwise provided in the "Liability for Unauthorized Use" Section below, Customer agrees to pay Wells Fargo, when due, the total of all purchases made with the Card. Customer also promises to pay the total of all other fees and charges due on the Card, as stated in this Agreement or as otherwise agreed to by Customer, and all costs and expenses, including all reasonable attorney's fees, and other reasonable legal costs incurred by Wells Fargo in enforcing this Agreement. Customer agrees that the total of all transactions charged to all Cards and account numbers issued hereunder outstanding at any time shall not exceed the Credit Limit specified in Attachment A, or as may be changed from time to time. Customer agrees that it is responsible for repaying outstanding balances under the Card, including but not limited to those that exceed its Credit Limit. Wells Fargo may change the Credit Limit at any time and will promptly notify Customer as may be required by applicable law. Termination or expiration of this Agreement does not terminate Customer's obligation for all amounts owed pursuant to this Agreement.

2. **Debit Authorization.** Customer hereby authorizes and directs Wells Fargo to pay the total of all amounts charged on the Card as a result of purchases, other transactions, fees, charges, costs and expenses by debiting Customer's bank deposit account(s) as indicated on the Amendment to WellsOne Commercial Card Agreement and Authorization to Debit Account Owner Account (the **"Account(s)"**), on the 5th (fifth) calendar day (or next Business Day if the calendar day is not a Business Day) (the **"Due Date"**) following the date of each *WellsOne* or MultiCard Commercial Card billing statement provided to Customer (the **"Billing Statement Date"**). Any payment received on or after the Billing Statement Date and before the Due Date will be applied to reduce the amount debited from the Account(s) on the Due Date. A **"Business Day"** shall mean any day (except Saturday or Sunday) that Wells Fargo is open for business. Wells Fargo may also debit the Account(s) at any time for the purpose of settling Card transactions and payoffs of any fees, charges, costs and expenses as stated in this Agreement or as otherwise agreed to and owed by Customer. The Account(s) shall also be subject to the terms and conditions of any netting or setoff provisions between Customer and Wells Fargo governing the Account(s) and any linked accounts. Customer represents and warrants that Customer owns and has sole and exclusive authority

over the Account(s), including the authority to grant the debit authorization under this Section Two (2), and that no third party, including any client or Customer or its affiliates, is required to consent to or otherwise authorize or approve Customer's exercise of authority with respect to such Account(s), including the grant of such debit authorization. If the funds in Customer's Account(s) are insufficient to pay when due any amount owing to Wells Fargo hereunder, Wells Fargo may exercise any of its rights under the Security Agreement granted by Customer to Wells Fargo as referenced in Section Twenty-Three (23) below captioned 'Secured Obligations'.

**3. Authorizations.** All transactions on Customer's Card are subject to prior approval by Wells Fargo (**"Authorizations"**). Wells Fargo reserves the right to limit the number of Authorizations given during any period of time (day, weekend, week, etc.) and Wells Fargo may deny an Authorization if Wells Fargo suspects that the Card is being used without Customer's permission. In the event the Authorization system is temporarily unavailable, an Authorization may be unable to be given even though the transaction would not exceed the Credit Limit and the Card is in good standing. For security reasons, Wells Fargo cannot explain the details of how the authorization system works. Wells Fargo shall not be liable for failing to give any such Authorization. Wells Fargo may, but is not required to, authorize transactions that will cause the balance on the Card to exceed the Credit Limit, and Customer agrees it is liable for any such transactions. In addition, Wells Fargo reserves the right to deny transactions or authorizations from merchants apparently engaging in the Internet gambling business or identifying themselves through the Card transaction record or otherwise as engaged in such business.

Notwithstanding the foregoing, Customer acknowledges and agrees that: (i) some or all of the Cards issued hereunder may be Cards that contain an embedded security microchip that works in tandem with personal identification number (PIN) authentication functionality (**"PIN & Chip Cards"**), rather than traditional magnetic stripe Cards; (ii) certain PIN & Chip Card transactions are authorized via Offline Authorization rather than Online Authorization; (iii) as a result, such PIN & Chip Card transactions authorized via Offline Authorization are not verified against restrictions applicable to the Customer's Card program generally or to a specific Card and/or Cardholder (such as credit limits, transaction type restrictions, etc.) prior to authorization; and (iv) Customer's liability and responsibility for PIN & Chip Card transactions shall not be in any way diminished or otherwise affected by whether such transactions have been authorized via Online Authorization or Offline Authorization. For purposes of the foregoing: (a) **"Online Authorization"** means authorization of a Card transaction via the electronic communications authorization system utilized for traditional magnetic stripe Card transactions, in which transaction information with respect to each Card transaction is electronically communicated to the Card issuer (i.e. Wells Fargo) for authorization; and (b) **"Offline Authorization"** means authorization of a PIN & Chip Card transaction by communication between the PIN & Chip Card and payment terminal using defined limiting parameters stored on the PIN & Chip Card, such as a cumulative offline transaction amount limit or a consecutive offline transaction limit, but without electronic communication with and authorization by the Card issuer (i.e. Wells Fargo) as would occur with an Online Authorization.

**4. Program Administrator.** Wells Fargo will require, and is authorized to rely on, written instructions it receives from the Customer's Program Administrator(s) named on Attachment B with regard to the following matters, without limitation: issuance of individual Cards to Cardholders; establishment of and changes to credit limits on individual Cards; notification of disputed transactions; and termination of individual Cards. Customer may substitute, remove or designate additional Program Administrators by written notice to Wells Fargo signed by an authorized officer of Customer. Notwithstanding any other provision of this Agreement to the contrary, if Customer enrolls to administer its *WellsOne* or MultiCard Commercial Card program(s) using the Internet to access Card information, Customer agrees that the primary Program Administrator named on Attachment B has full authority to substitute, remove or designate additional Program Administrators, each of whom may have the full authority of a Program Administrator including authority to designate other Program Administrators, and that written notice signed by an authorized officer of Customer is required only to substitute the primary Program Administrator. The primary Program Administrator may designate in writing one or more contacts for fraud or potential fraud related matters concerning Customer's Card program (**"Fraud Contact(s)"**), and in the absence of such designation the primary Program Administrator shall be deemed to be Customer's sole Fraud Contact. Customer may, but is not required to, execute additional Attachment Bs appointing separate program administrators for divisional or associated entity Card programs established under this Agreement.

**5. Liability for Unauthorized Use.** Customer shall be liable for all unauthorized use of the Card in any amount at any time, unless and until Customer has notified Wells Fargo that the Card or Card number has been lost, stolen or misappropriated or that the person or vehicle (in the event of a fleet program) in whose name the Card has been issued is no longer authorized to use the Card (for example, upon termination of employment). Notification concerning unauthorized use shall be made by Customer calling the customer service number most recently provided by Wells Fargo; provided however, that Customer shall cooperate with Wells Fargo to complete any required written correspondence requested by Wells Fargo. Customer shall be responsible for full payment of all purchases, fees and charges incurred prior to such notification, regardless of when actually posted to Customer's account. Notwithstanding the foregoing, Customer will not be liable for unauthorized use resulting from transactions made with a Card or Card number that has been skimmed or otherwise counterfeited; provided, that (i) such unauthorized use was not facilitated by the gross negligence, intentional misconduct or fraud of Customer or any of its Cardholders, (ii) such unauthorized use did not benefit Customer or any of its Cardholders or other employees or agents, and (iii) Customer timely submits a dispute with respect to such unauthorized use in accordance with the provisions of Section Eight (8) below.

6. **Visa® Liability Waiver Program/MasterCoverage® Liability Protection Program.** Subject to applicable Visa® or Mastercard® terms and conditions, as applicable, Customer may be eligible for coverage under Visa's® Liability Waiver Program and/or Mastercard's® MasterCoverage® Liability Protection Program, which provide coverage against employee misuse of the Card. Customer should consult, as applicable, the Visa® Liability Waiver Program brochure or the Mastercard® MasterCoverage® Liability Protection Program brochure, available upon request from Wells Fargo, for terms and conditions of coverage. Customer acknowledges that Wells Fargo is not responsible for providing any form of liability protection program on Customer's behalf and that Wells Fargo makes no representations or warranties regarding any such program that may be offered by third parties.

7. **Department Cards.** In the event Customer requests Wells Fargo to issue Cards to Customer in a department, group name or other such designation not bearing a name or signature of an authorized employee or individual, all such Cards shall be deemed as **"Department Cards"**. Customer hereby represents, acknowledges and agrees that: (i) such Department Cards will be used by more than one authorized employee or individual; (ii) physical Cards may or may not be issued in conjunction with such Department Cards; and (iii) issuance of Department Cards may increase the risk of fraudulent or unauthorized use. As such, Customer is responsible for all security and protection of the Department Cards and any and all Customer procedures concerning the use of such Department Cards by its Cardholders.

8. **Billing Disputes, Chargeback Requests.** Customer may dispute amounts reflected on a billing statement that Customer reasonably believes to be incorrect because: (i) the amount shown on the billing statement does not reflect the actual face value of the transaction; (ii) the transaction shown on the billing statement did not result from the use of the Cards; (iii) the statement reflects fees not properly accrued under this Agreement; or (iv) the transaction is disputable with the honoring merchant under applicable Visa® or Mastercard® rules, as applicable, however, such dispute is subject to the procedures and liability provisions set forth in this section or other sections of the Agreement. In the event of a dispute, Customer must notify Wells Fargo of its dispute within sixty (60) days from the transaction date of purchase. Each request to Wells Fargo must be in writing and contain the following information: (i) Cardholder name; (ii) Card account number; (iii) the dollar amount of any billing dispute or suspected error; (iv) reason for the dispute; and (v) a summary of the steps already taken with the merchant to resolve the matter. Wells Fargo shall investigate the disputed amount and determine whether the amount is properly payable by Customer. Until Wells Fargo completes its investigation and determines whether the disputed amount is properly payable by Customer, Customer shall not be liable for the amount of the disputed transaction. Customer agrees that its failure to dispute a charge or other item within sixty (60) days from the transaction date of purchase shall constitute a waiver of any right the Customer may have to dispute the charge. In the event that transactions are posted to the accounts as a result of any circumstance under which the honoring merchant may be held liable under applicable Visa® or Mastercard® rules, as applicable, Wells Fargo shall attempt to charge the transaction back to the merchant in accordance with applicable Visa® or Mastercard® procedures. However, such attempted chargeback by Wells Fargo shall not relieve Customer of liability for the amount of the transaction even though the transaction may have been provisionally credited to the Customer's accounts.

9. **Default.** The occurrence of any of the following conditions or events shall constitute an **"Event of Default"** by Customer under this Agreement in which case, any unpaid balances on the Card shall become immediately due and payable, and Wells Fargo may immediately debit the Account(s) for payment of such balances: (1) a payment is not made when due or a payment to Wells Fargo is returned or reversed for any reason; (2) a term of this Agreement is breached in any way; (3) Customer or any guarantor of Customer's account defaults under the terms of (a) any other agreement with Wells Fargo or any of its subsidiaries or affiliates or (b) any loan, credit or similar agreement with any third party; (4) a bankruptcy petition is filed by or against Customer or any guarantor of Customer's account; (5) a significant change occurs in the ownership or organizational structure of Customer or in the type or (if such change is adverse) volume of Customer's business; (6) Customer or any guarantor of Customer's account becomes insolvent or is dissolved; (7) there shall exist or occur any event or condition which Wells Fargo in good faith believes impairs, or is substantially likely to impair, the prospect of payment or performance of Customer's obligations under this Agreement; (8) Customer intentionally fails to submit required information Wells Fargo deems necessary; (9) Customer's account balance exceeds the Credit Limit; (10) any financial statement or certificate furnished to Wells Fargo in connection with, or any representation or warranty made by Customer or any other party under this Agreement, shall prove to have been incorrect, false or misleading in any material respect when furnished or made; (11) Customer or any guarantor of Customer's account, if any, fails to comply with any Applicable Law (as defined in Section One (1) above) materially affecting Customer, guarantor or the operations or property of either; (12) any owner of collateral given to secure the obligations hereunder, if any, shall fail to comply with any Applicable Law materially affecting any of the collateral; or (13) Customer, any guarantor of Customer's account, if any, or any other person with third party recourse liability hereunder, or an owner of any equity interest in Customer or any guarantor of other person with third party recourse liability hereunder or any subsidiary owned directly or indirectly by Customer, any guarantor or other person with third party recourse liability hereunder performs or engages in any act or series of acts that Wells Fargo reasonably believes could constitute money laundering or a predicate crime to money laundering under Applicable Law.

10. **Term; Right to Terminate.** Wells Fargo or Customer may, upon at least thirty (30) days' prior written notice to the other party, and with or without cause: (i) terminate this Agreement; (ii) terminate one or more services provided for in this Agreement; or (iii) terminate one or more Cards; provided, however, that the foregoing shall not affect Customer's ability to terminate the authority of a Cardholder as set forth below in this Section Ten (10). In addition, Wells Fargo may take any one or more of the actions referred to in the immediately preceding sentence immediately, without prior notice to Customer, upon the occurrence of an

Event of Default. If Customer has enrolled in WellsOne Expense Manager, any such notice required under this Agreement may be delivered to Customer electronically in the same manner that statements are delivered. If Wells Fargo or Customer terminates the Agreement, or upon the expiration of this Agreement, (i) all Cards shall automatically expire, (ii) Customer shall immediately, upon notice from Wells Fargo, destroy all Cards, (iii) Customer will continue to be responsible for full payment of the current balance on the Card and all purchases, fees and charges incurred before termination that post after termination, including, without limitation, recurring transactions that post after termination, and (iv) any unpaid balances on the Cards shall become immediately due and payable, and Wells Fargo may immediately debit the Account(s) for payment of such balances. If Wells Fargo terminates one or more Cards but not the Agreement, Customer shall immediately, upon notice from Wells Fargo, destroy all such Cards. Upon termination of the Agreement, Customer acknowledges and agrees that the Account(s) and any and all collateral or guarantees in support of this Agreement will remain in place for a period of sixty (60) days from the termination date to satisfy all payment obligations of Customer under this Agreement. Customer may, at any time, terminate the authority of any Cardholder to use the Card. Such termination by Customer shall become effective upon written or electronic notice via the internet to Wells Fargo along with written confirmation that the Cardholder's Card has been destroyed.

**11. <u>Liability of Wells Fargo; No Implied Warranties</u>.** Wells Fargo's liability hereunder shall be limited to Customer's actual money damages caused directly by Wells Fargo's breach of this Agreement (except to the extent such liability is further limited by the terms of this Agreement), and Wells Fargo shall not be liable for any other matters whatsoever, including, without limitation: (i) Customer's use of the Card; (ii) the inability of Customer to use the Card or the unavailability of Card reports or authorizations as a result of circumstances beyond Wells Fargo's control (such as, without limitation, fire, flood or the disruption of power, phone or computer service); or (iii) transmission errors or data security problems, or other acts or omissions, on the part of third parties (including, without limitation, third-party service providers in connection with transaction files sent to Customer or its designee). Notwithstanding the foregoing, in no event shall Wells Fargo be liable for any indirect, incidental, special, consequential or punitive damages, even if Wells Fargo has been advised of the possibility of any such damages. Except as expressly set forth in this Agreement, Wells Fargo makes no warranties with respect to the Card, any service related thereto, or any software used in connection therewith, including without limitation any warranty as to merchantability or fitness for a particular purpose.

**12. <u>Changes to Agreement or to Credit Limit; Other Changes</u>.** In addition to, and not in lieu of, Wells Fargo's termination rights in Section Ten (10) above, Wells Fargo may unilaterally, in its sole discretion: (i) change the Credit Limit for any reason, including but not limited to changes as may be required by law, upon prompt notice to Customer; and/or (ii) change any of the terms of this Agreement or any Attachments hereto upon thirty (30) days prior written notice to Customer. Customer may change the designated Program Administrator(s) or an Account number upon an authorized officer's notice in writing or via the Internet to Wells Fargo.

**13. <u>Foreign Currency Transactions</u>.** If a Card is used to engage in a transaction in a currency other than U.S. dollars (**"Foreign Currency Transaction"**), that amount will be converted into U.S. dollars before posting to Customer's account.

**13.1 <u>Foreign Currency Transaction Procedures</u>:** If a Foreign Currency Transaction occurs, and the transaction is not converted to U.S. dollars by the merchant itself, Visa® or Mastercard®, as applicable, will convert the transaction into a U.S. dollar amount by using its currency conversion procedure in effect at the time the transaction is processed. Currently, Visa® and Mastercard® regulations and procedures provide that the currency conversion rate they use is either: (1) a wholesale market rate, which rate may vary from the rate Visa® or Mastercard® itself receives; or (2) a government-mandated rate for the applicable currency as determined under Visa® or Mastercard® regulations and procedures, as applicable. This rate may differ from the rate in effect when the transaction occurred or when it was posted to the Cardholder's account.

**13.2 <u>Point of Sale Currency Conversion</u>:** Some merchants outside of the United States offer Cardholders the option of having card transactions converted to U.S. dollars by the merchant itself during the transaction (**"Point of Sale Currency Conversion"**). If that option is chosen the transaction is actually originated in U.S. dollars and the currency conversion rate is determined solely by the merchant.

**13.3 <u>Cross Border Transactional Fee</u>**. For each Foreign Currency Transaction that has been converted into a U.S. dollar amount by Visa® or Mastercard®, as applicable, and for each Point of Sale Currency Conversion transaction where a non-U.S. merchant originates a transaction in U.S. dollars, Wells Fargo will charge Customer a 1% fee ("**Cross Border Transactional Fee**").

**14. <u>Direct Transmissions</u>.** Customer may request to receive Card transaction data to be transmitted directly to Customer, or to a third party recipient designated by Customer, electronically from either the Card network (Visa® or Mastercard®) or its subcontractor (hereinafter, **"Direct Transmissions"**). Upon receipt of such request (which shall be in writing (including, without limitation, e-mail) and from an authorized officer or Program Administrator of Customer), Wells Fargo will arrange for such Direct Transmissions. Customer agrees that Wells Fargo will not be liable for any damages, losses, liability or any other claims whatsoever arising in any way out of transmission errors or data security issues on the part of the network or any third party (including, without limitation, any third party recipient designated by Customer) in connection with Direct Transmissions.

**15. Financial Information.** Customer shall provide, in form and detail satisfactory to Wells Fargo, current audited annual and certified quarterly financial statements and supporting footnotes and schedules.

**16. Confidential and Proprietary Information.**

(a). Customer and Wells Fargo acknowledge and agree that, in connection with this Agreement, it may be necessary and/or desirable to exchange Confidential Information (as defined below). For purposes hereof, "**Confidential Information**" means all non-public, confidential or proprietary information of a party that is disclosed by such party (including any of its Representatives (as defined below)) (the "**Disclosing Party**") to the other party (the "**Receiving Party**") under or in connection with this Agreement, and includes, without limitation, financial, technical, or business information relating to the Disclosing Party, including trade secrets, marketing or business plans, strategies, forecasts, budgets, projections and pricing, customer and supplier information. Notwithstanding the above, Confidential Information does not include information that: (i) is or becomes generally available to the public other than as a result of an unauthorized disclosure by the Receiving Party or its Representatives (as defined below) in violation of this Section; (ii) is already known by the Receiving Party at the time of its disclosure by the Disclosing Party; (iii) is or becomes available to the Receiving Party from a source not known to the Receiving Party to be under an obligation of confidentiality to the Disclosing Party; or (iv) is independently developed by the Receiving Party without the use of Confidential Information.

(b). For a period of two (2) years following its disclosure to the Receiving Party, the Receiving Party will: (i) keep Confidential Information confidential and not disclose it to any other person or entity, except disclosures (A) to federal and state bank examiners, and other regulatory officials having jurisdiction over the Receiving Party, as applicable, (B) to the Receiving Party's Representatives (as defined below), (C) in the case of Wells Fargo, to i) Visa® or Mastercard®, as applicable, ii) third party payment industry service providers with whom Wells Fargo has a business relationship and has entered into a non-disclosure agreement covering such Confidential Information, iii) as described in the Wells Fargo Supplier Analysis & Onboarding Commercial Card Conversion Service Description, if applicable, (D) required by applicable law or legal process in the opinion of the Receiving Party's counsel or any of its Representative's counsel, as applicable, or (E) otherwise authorized in writing by the Disclosing Party; and (ii) use Confidential Information only in connection with this Agreement (including the evaluation, negotiation, implementation, administration and enforcement hereof). For purposes hereof, "**Representatives**" means a party's or any of its affiliates' officers, employees, agents, legal counsel, auditors or other professional advisors who need to know Confidential Information in connection with this Agreement (including the evaluation, negotiation, implementation, administration and enforcement hereof). The Receiving Party will be responsible for any failure of its Representatives to treat the Confidential Information as confidential in accordance with the terms and conditions of this Agreement. In the event that the Receiving Party or any of its Representatives is, in the opinion of its counsel, required by applicable law or legal process to disclose any Confidential Information under clause (i)(D) of the first sentence of this paragraph, then the Receiving Party, unless prohibited by law, will provide notice of such disclosure to the Disclosing Party so that the Disclosing Party, at its sole option (but without an obligation to do so) and at its sole expense, may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Section.

(c). Following any termination of this Agreement, upon the Disclosing Party's request, the Receiving Party will use commercially reasonable efforts to destroy all copies of Confidential Information then in the possession of the Receiving Party; provided, however, that the Receiving Party may retain such copies as are required by applicable law or in accordance with its customary practices and procedures (any Confidential Information so retained will be held by the Receiving Party subject to this Agreement).

(d). If there is a breach of this Section by either party, the other party will have the right to seek any and all remedies at law or in equity, including without limitation appropriate injunctive relief or specific performance. The protections afforded to Confidential Information hereunder are in addition to, and not in lieu of, the protections afforded under any applicable trade secrets or other laws.

(e). Privacy Notice. Wells Fargo hereby provides its U.S. and International Privacy Notices, located at: https://www.wellsfargo.com/privacy-security/privacy/, the "**Notice**", to describe its practices regarding the collection, storage, use, disclosure and other processing of information about identifiable individuals ("**Personal Data**"). Customer confirms and acknowledges the following:

(i) it has received the privacy notices before transmitting or otherwise providing any Personal Data to Wells Fargo related to the Commercial Card;
(ii) it acknowledges the collection, use, processing, storage, and transfer of Personal Data in accordance with the terms and conditions contained in this Agreement and as further contained in the Notice;
(iii) to the extent that Customer provides or enables Wells Fargo to receive Personal Data of any individuals, Customer shall inform such individuals about Wells Fargo's data privacy practices by providing them with a copy of the Notice prior to providing or enabling Wells Fargo to receive their Personal Data;
(iv) the Notice supersedes any prior notice on this subject and will cover all Personal Data collected or maintained by Wells Fargo in connection with its relationship with Customer;
(v) Wells Fargo may amend the Notice at any time by posting an updated version on its website referenced above; and

(vi) By providing Personal Data to Wells Fargo, Customer acknowledges and agrees to the requirements described in this section and the Notice.

(f). Global Data Access. Please visit https://www.wellsfargo.com/privacy-security/ which contains, in the section titled Global Data Access, a description of how information, including Personal Data, may be accessed by Wells Fargo, its affiliated companies, and service providers, on a global basis.

**17. No Waiver; Right of Set-Off.** Neither party's failure to exercise any right or to pursue any remedy under this Agreement or otherwise shall constitute a waiver thereof. Wells Fargo shall have the right to, in its sole discretion, set-off or recoup any obligation of Customer to Wells Fargo under this Agreement or otherwise against any obligation Wells Fargo owes to Customer, including a set-off against any deposit account(s) Customer has with Wells Fargo to the extent permitted by law.

**18. Miscellaneous; Entire Agreement; Governing Law; Counterparts; No Assignment; Independent Contractor; Severability.** This Agreement contains the entire understanding between the parties on the subject matter hereof and supersedes all prior agreements, negotiations and representations. This Agreement shall be governed by and construed in accordance with the laws of the State of South Dakota. This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be deemed to be an original, and all of which when taken together shall constitute one and the same Agreement. Customer may not assign this Agreement or any of its rights, interest or obligations hereunder (by operation of law or otherwise). Nothing contained in this Agreement shall be construed as constituting or creating a partnership, joint venture, agency, or other association or relationship between Wells Fargo and Customer. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**19. Arbitration.** The parties hereto agree, upon demand by any party, to submit to binding arbitration all claims, disputes and controversies between or among them (and their respective employees, officers, directors, attorneys, and other agents), whether in tort, contract or otherwise in any way arising out of or relating to: (i) any credit subject hereto, or the Agreement and its negotiation, execution, collateralization, administration, repayment, modification, extension, substitution, formation, inducement, enforcement, default or termination; or (ii) requests for additional credit.

**19.1. Governing Rules.** Any arbitration proceeding will: (i) proceed in a location in South Dakota selected by the American Arbitration Association (**"AAA"**); (ii) be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any conflicting choice of law provision in any of the documents between the parties; and (iii) be conducted by the AAA, or such other administrator as the parties shall mutually agree upon, in accordance with the AAA's commercial dispute resolution procedures, unless the claim or counterclaim is at least $1,000,000.00 exclusive of claimed interest, arbitration fees and costs in which case the arbitration shall be conducted in accordance with the AAA's optional procedures for large, complex commercial disputes (the commercial dispute resolution procedures or the optional procedures for large, complex commercial disputes to be referred to herein, as applicable, as the **"Rules"**). If there is any inconsistency between the terms hereof and the Rules, the terms and procedures set forth herein shall control. Any party who fails or refuses to submit to arbitration following a demand by any other party shall bear all costs and expenses incurred by such other party in compelling arbitration of any dispute. Nothing contained herein shall be deemed to be a waiver by any party that is a bank of the protections afforded to it under 12 U.S.C. §91 or any similar applicable state law.

**19.2. No Waiver of Provisional Remedies; Self-Help and Foreclosure.** The arbitration requirement does not limit the right of any party to: (i) foreclose against real or personal property collateral; (ii) exercise self-help remedies relating to collateral or proceeds of collateral such as setoff or repossession; or (iii) obtain provisional or ancillary remedies such as replevin, injunctive relief, attachment or the appointment of a receiver, before during or after the pendency of any arbitration proceeding. This exclusion does not constitute a waiver of the right or obligation of any party to submit any dispute to arbitration or reference hereunder, including those arising from the exercise of the actions detailed in sections (i), (ii) and (iii) of this paragraph.

**19.3. Arbitrator Qualifications and Powers.** Any arbitration proceeding in which the amount in controversy is $5,000,000.00 or less will be decided by a single arbitrator selected according to the Rules, and who shall not render an award of greater than $5,000,000.00. Any dispute in which the amount in controversy exceeds $5,000,000.00 shall be decided by majority vote of a panel of three arbitrators; provided however, that all three arbitrators must actively participate in all hearings and deliberations. Such single arbitrator or panel of three arbitrators, as applicable, is hereafter referred to as the "arbitrator". Each arbitrator will be a neutral attorney licensed in the State of South Dakota or a neutral retired judge of the state or federal judiciary of South Dakota, in either case with a minimum of ten years experience in the substantive law applicable to the subject matter of the dispute to be arbitrated. The arbitrator will determine whether or not an issue is arbitratable and will give effect to the statutes of limitation in determining any claim. In any arbitration proceeding the arbitrator will decide (by documents only or with a hearing at the arbitrator's discretion) any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication. The arbitrator shall resolve all disputes in accordance with the substantive law of South Dakota and may grant any remedy or relief that a court of such state could order or grant within the scope hereof and such ancillary relief as is necessary to make effective any

award. The arbitrator shall also have the power to award recovery of all costs and fees, to impose sanctions and to take such other action as the arbitrator deems necessary to the same extent a judge could pursuant to the Federal Rules of Civil Procedure, the South Dakota Rules of Civil Procedure or other applicable law. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests such action for judicial relief.

**19.4.** **Discovery.** In any arbitration proceeding, discovery will be permitted in accordance with the Rules. All discovery shall be expressly limited to matters directly relevant to the dispute being arbitrated and must be completed no later than twenty (20) days before the hearing date. Any requests for an extension of the discovery periods, or any discovery disputes, will be subject to final determination by the arbitrator upon a showing that the request for discovery is essential for the party's presentation and that no alternative means for obtaining information is available.

**19.5.** **Class Proceedings and Consolidations.** No party hereto shall be entitled to join or consolidate disputes by or against others in any arbitration, except parties who have executed the Agreement, or to include in any arbitration any dispute as a representative or member of a class, or to act in any arbitration in the interest of the general public or in a private attorney general capacity.

**19.6.** **Payment Of Arbitration Costs And Fees.** The arbitrator shall award all costs and expenses of the arbitration proceeding.

**19.7.** **Miscellaneous.** To the maximum extent practicable, the AAA, the arbitrator and the parties shall take all action required to conclude any arbitration proceeding within 180 days of the filing of the dispute with the AAA. No arbitrator or other party to an arbitration proceeding may disclose the existence, content or results thereof, except for disclosures of information by a party required in the ordinary course of its business or by applicable law or regulation. If more than one agreement for arbitration by or between the parties potentially applies to a dispute, the arbitration provision most directly related to the Agreement or the subject matter of the dispute shall control. This arbitration provision shall survive termination, amendment or expiration of the Agreement or any relationship between the parties.

**20.** **Customer Provided Card Content.** For purposes of this Agreement, **"Customer Provided Card Content"** means any and all business, division, trade or assumed names, trade dress, service marks, trademarks, logos or other words or images that Customer or its representatives supply for inclusion on any Cards issued under this Agreement. Customer will defend, indemnify and hold harmless Wells Fargo and its affiliates, as well as the employees, officers, directors and agents of Wells Fargo and its affiliates (each an **"Indemnified Party"**) against all costs and expenses of the Indemnified Party (including without limitation any losses, liabilities, damages, fines, penalties or reasonable attorneys' fees) arising from or in connection with any dispute, claim, suit, action, proceeding or demand brought against an Indemnified Party relating to any actual or alleged violation of intellectual property rights of any third party as a result of the inclusion of any Customer Provided Card Content on the Cards.

**21.** **Foreign Personnel**. If Cards are distributed by Customer or at its instruction to Cardholders outside of the United States, Customer shall be solely responsible for complying with any applicable foreign employment and/or data privacy laws or requirements in connection therewith, including but not limited to any requirements to provide notices or disclosures to or to obtain consents from Cardholders. Wells Fargo shall have no liability for Customer's failure to comply with any such requirements.

**22.** **Cooperation.** Customer shall promptly provide Wells Fargo with any information that Wells Fargo may request to confirm that the Cards are being used in accordance with the terms and conditions of this Agreement. Such requested information may include, without limitation, information about any Cardholder and/or any other involved parties, and the intended purpose or use of a Card transaction. In the event that Customer does not comply with the terms of this section, Wells Fargo will have the right, in its sole and absolute discretion, to terminate immediately any Card issued in the name of such individual(s), and Customer shall not permit such individual(s) to use any other Cards issued pursuant to this Agreement.

**23.** **Secured Obligations.** Customer hereby acknowledges and agrees that Customer's obligations, liabilities and indebtedness arising under the Card and this Agreement are secured by Certificate of Deposit Number 3771424953 maintained with or issued by Wells Fargo, dated November 4, 2021, in the initial amount of $200,000, including interest now or hereafter earned thereon and all funds added thereto, and all renewals and replacements thereof, whether or not any such renewal or replacement is evidenced by a certificate of deposit, assigned a different number or in a greater or lesser amount, pursuant to that certain Security Agreement (Financial Assets), dated November 18, 2021 (as the same may be amended, modified, confirmed and/or ratified from time to time, the "**Security Agreement**") granted by Customer to Wells Fargo. All of the foregoing shall be evidenced by and subject to the terms of such security agreements, financing statements and other documents as Wells Fargo shall reasonably require, all in form and substance satisfactory to Wells Fargo. Customer shall pay to Wells Fargo immediately upon demand the full amount of all charges, costs and expenses (to include fees paid to third parties and all allocated costs of Wells Fargo personnel), expended or incurred by Wells Fargo in connection with any of the foregoing security, including without limitation, filing and recording fees and costs. Except for the Security Agreement detailed within this Section, Customer acknowledges and agrees no deed of trust, mortgage, security deed, or similar real estate collateral agreement, nor any other security agreement, pledge, assignment or similar personal property collateral agreement provided to Wells Fargo by Customer or any other

party shall now or hereafter secure the indebtedness and other obligations of Customer to Wells Fargo subject to this Agreement by reason of any cross-collateralization or similar provision purporting generally to expand the scope of obligations secured thereby to include the indebtedness and other obligations subject to this Agreement. For the elimination of doubt, except for the Security Agreement, unless specifically described as being secured hereby, no such document shall secure the indebtedness and obligations subject to this Agreement.

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

Authorized Officer: Lisa Larpenteur

Signature: [signature] 12/2/21

Title: Senior Vice President

Date: December 2, 2021

**STEEL PERLOT MANAGEMENT LLC**

Authorized Officer: Michelle Ritter

Signature: [signature]

Title: CEO

Date: 1 December 2021

**WELLSONE® COMMERCIAL CARD AGREEMENT**
**ATTACHMENT A**
**PROGRAM INFORMATION**

| | |
|---|---|
| CUSTOMER NAME | STEEL PERLOT MANAGEMENT LLC |
| TAX ID | 87-2771416 |
| ADDRESS | 140 Crosby Street<br>4th Floor<br>New York, NY 10012 |
| CREDIT LIMIT | $200,000 |
| BILLING STATEMENT CYCLE | Monthly |

# WELLSONE® COMMERCIAL CARD AGREEMENT
# ATTACHMENT B - PROGRAM ADMINISTRATOR
# December 1, 2021

Please provide the following information about each Program Administrator:

STEEL PERLOT MANAGEMENT LLC
Customer Name

Enter Division Name, if applicable

*The Attachment B to the Agreement may be updated at a later date in accordance with the terms of Section 4 of the Agreement, however it will replace the original Attachment B and all current Program Administrators of Customer must be included.

**PROGRAM ADMINISTRATOR (*Primary*)**
*Main point of contact for day to day business*

Mandy Quach - Chief Accounting Officer, Hillspire
(Name / Title)

140 Crosby Street 4th Floor
(Physical Street Address)

New York, NY 10012
(City / State / Zip Code)

650-468-1552
(Telephone) (Fax)

mandy@steelperlot.com
(Email Address)

**PROGRAM ADMINISTRATOR (*Secondary*)**

(Name / Title)

( Physical Street Address )

(City / State / Zip Code)

(Telephone) (Fax)

(Email Address)

**PROGRAM ADMINISTRATOR (*Secondary*)**

(Name / Title)

( Physical Street Address )

(City / State / Zip Code)

(Telephone) (Fax)

(Email Address)

**PROGRAM ADMINISTRATOR (*Secondary*)**

(Name / Title)

( Physical Street Address)

(City / State / Zip Code)

(Telephone) (Fax)

(Email Address)

*(add additional pages as necessary)*

Select the Program Administrator above authorized to provide instructions on Card delivery: Mandy Quach.*
**Requirements:*
(i) All Card delivery addresses must be a physical address; and
(ii) Card delivery addresses may include such Program Administrator's address above and/or to such other address(es) as instructed by such Program Administrator. If no instructions are provided, all Cards will be delivered to the address of such Program Administrator.

Select the Program Administrator above designated to receive billing statements: Mandy Quach

**WELLSONE® COMMERCIAL CARD AGREEMENT**
**ATTACHMENT C-1**
**FEE SCHEDULE**
**CUSTOMER NAME: STEEL PERLOT MANAGEMENT LLC**
**DATE: December 1, 2021**

**One Time Setup Fee:** $ 2000 Waived

| **RECURRING FEES:** | | **Ramp up period* through which fee is waived:** |
|---|---|---|
| Program Maintenance | $ Waived /Month | No ramp up period |
| Comm Card Expense Reporting Tool | $ Waived /Month | No ramp up period |
| Transaction Fee | $ Waived /Transaction | No ramp up period |
| Card Issuance | $ Waived /Account | No ramp up period |

**The ramp up period will begin the month the program is in its final stage of implementation. For example, if a program with a 6 month ramp up period is implemented on any day in January, January is month one. The ramp up period will end June 30.The first charges will be for July, seen on the August Account Analysis statement.*

**MISCELLANEOUS FEES (Applicable Only If Customer Elects and/or Uses This Service):**

| | |
|---|---|
| Cash Advance Fee | 2%/$2 minimum |
| Cross-Border Transactional Fee | 1 % / Transaction |
| Card Artwork (Logo) | $ 450 |
| Custom Card Design† | $ 1,000 per standard design set-up |
| WellsOne Virtual Card Payments | |
| *One Time Set-up* | $ 250 Waived specialized pricing |
| *Straight Through Processing Transaction Fee* | $ 0.50 / Transaction |
| Convenience Check: | |
| *Transaction Fee* | 2%/$2 minimum |
| *Program Maintenance* | $ 250/Month |
| Custom Data Solutions: | |
| *Custom Report Set-up* | $ 100/ Hour |
| *Custom File Mnthly Maint* | $ 100/ Month |
| *Custom File Transmission* | $ 5/ transmission |
| *WellsOne Expense Manager Custom Report Development* | The costs to build are variable based upon the customer's requirements and will be provided in advance of any work initiated |
| Executive Card | |
| *Annual Fee* | $250 / Year |

- No miscellaneous fees are assessed until services are used
- For those customers who opt to use ACH reimbursement for out-of-pocket expenses, separate ACH fees will apply.
- For those customers who opt to use WellsOne Virtual Card Payments, Separate Payment Manager fees may apply.
- For those customers who opt to use the Commercial Card online reporting solution, accessed through the Commercial Electronic Office (CEO), separate CEO access charges may apply.

† Non-standard designs may be subject to additional costs and requirements, including design creation fees and minimum card order requirements.

**WELLSONE® COMMERCIAL CARD AGREEMENT**
**ATTACHMENT C-2**
**REVENUE SHARE CALCULATION**
**CUSTOMER NAME: STEEL PERLOT MANAGEMENT LLC**
**December 1, 2021**

Revenue Share will be paid within forty-five (45) days following the end of each Program Year on Net Purchase Volume for such Program Year. For purposes of this Attachment C-2, **"Program Year"** shall mean the twelve month period beginning January 1 and ending December 31.

**Standard Revenue Share Schedule**

| Net Purchase Volume* | | | Revenue Share |
|---|---|---|---|
| $ 0 | to | $ 999,999 | 0 Basis points (bps) |
| $ 1,000,000 | to | $ 1,999,999 | 70 bps |
| $ 2,000,000 | to | $ 2,999,999 | 90 bps |
| $ 3,000,000 | to | $ 3,999,999 | 100 bps |
| $ 4,000,000 | to | $ 4,999,999 | 105 bps |
| $ 5,000,000 And Above | | | 110 bps |

**Custom Interchange Revenue Share Schedule**

| Net Purchase Volume* of Custom Interchange Transactions | Revenue Share |
|---|---|
| $ 1.00 and above | 40 - basis points (bps) |

Commencing on January 1, 2022 and annually thereafter ("**Anniversary Date**"), the Revenue Share amount to be paid to Customer (if any) shall be calculated and applied retroactively by multiplying the applicable Revenue Share bps times the Net Purchase Volume for the previous Program Year. No Revenue Share shall be owed for the previous Program Year if: (i) Customer terminates this Agreement prior to the Anniversary Date, or (ii) Wells Fargo terminates this Agreement for an Event of Default prior to the Anniversary Date. No Revenue Share shall be owed for the previous Program Year if the Customer's average transaction size for such Program Year is less than $300.

*** "Net Purchase Volume" shall mean total volume minus credits and cash advances (if applicable).** Wells Fargo will segregate or exclude Custom Interchange Transactions as defined and described below and as qualified by Visa® or Mastercard®, as applicable. The term **"Custom Interchange Transaction"** as used herein shall mean (i) certain transactions subject to select large ticket transaction requirements, qualified and determined by Visa or Mastercard®, as applicable, in its sole and absolute discretion and (ii) transactions with merchants participating in promotional interchange programs offered by Visa® or Mastercard® (including the Visa Partner Program or the Mastercard Partner Program) that qualify for non-standard promotional interchange rates. Such Visa® or Mastercard®, as applicable, large ticket transaction qualification requirements for large ticket interchange shall include, but not be limited to, custom payment service qualification with Level II and Level III data included with the transaction. Notwithstanding anything to the contrary contained herein, Wells Fargo may, in its reasonable discretion, exclude any Custom Interchange Transaction for which the interchange rate is below a minimum threshold established by Wells Fargo for purposes of Revenue Share calculation.

The following terms and conditions shall apply under this Attachment: i) Customer must obtain an annual minimum Net Purchase Volume of $1,000,000 per Program Year, which may include Custom Interchange Transactions, to receive a Revenue Share payment under this Attachment, and ii) if such Custom Interchange Transactions are segregated, the Custom Interchange Revenue Share Schedule will apply to the Net Purchase Volume for such segregated transactions.

# EXHIBIT 18

Audem Services Agreement DocuSign envelope EF878356 and certificate; Manekin–Frayer email (Mar. 17, 2022, 8:29 a.m.); Ritter–Manekin email (Mar. 17, 2022, 8:33 a.m.); Ritter–Blank Rome email (June 26, 2024); Uribe (CGNET) email (June 27, 2024)

# EXHIBIT 3

---

## March 17, 2022 Manekin DocuSign Email (8:29 a.m.)

**Description**

March 17, 2022 8:29 a.m. DocuSign-transmittal email from Manekin re: Hillspire / Audem Services Agreement, as later flagged by CGNet's June 27, 2024 fraud-DocuSign search.

**Status**

**ATTACHED — exhibit content follows this cover sheet.**

**Source**

[mounted]/__USE/Fraud docs to use in AAA - Audem/False Docusigns noted by CGNet - 27 June 2024 - Gmail - Fwd_ Please DocuSign_ Hillspire - 2022.03.XX Services Agr (Audem) final.docx.pdf

— Cover sheet compiled 2026-04-27 —

Gmail

Michelle Ritter <michelleritter929@gmail.com>

**Fwd: Please DocuSign: Hillspire - 2022.03.XX Services Agr (Audem) final.docx**

**Uribe, Ricardo** <r.uribe@cgnet.com>
To: Michelle Ritter <michelleritter929@gmail.com>

Thu, Jun 27, 2024 a

Hello,

I could not find any document at the SPM Docusign. This is our research

**Hillspire_Audem_Service_Agreement Mar 2022**: Looking at email, I can see that Jordan worked with Hillspire on the agreement and then it tells Tyler Gwinn to work v you to get it signed and a day later I see Mandy sending the signed document to Jordan, and then Jordan asks Maya to file it. Actually the message from Mandy is sent t Valdes, Claudia <claudia.valdes@pillsburylaw.com>, Audem <audem@pillsburylaw.com> and copied to Jordan. I see this message from Jordan to Hillspire:

jmanekin

Show details Print Original March 17, 2022 8:29 A

to sfrayer

No worries. I got it signed by Michelle and sent to Maria and Mandy.

•••

**Cetus_Photonics_Inc Common Stock Purchase:** This does not seem an official docusign document, when I open it, Adobe tells me that at least one signature is not v but I do see that Docusign did some processing. The document was created in January 17 and modified January 25. It looks like a Law Office, Cooley, was involved with creation so any docusign came from them. Ran and Steph were involved, by looking at email

**StarX Networks x Auth Consulting – Mutual NDA:** Not in the SPM docusign. From email I see Ioannis, Atos, Ran and Steph. Ioannis seems to be the main person. O 30th they said they will send the contract, but I can't find a message from them sending the contract at SPM. I also looked at StarX and I can find anything else about a s contract with Auth.

**Certificate CS-01**: I need more context, like who got it. This does not seems to be a docusign, just a pdf.

**StarX Networks Inc_Contract _2023-05-12 (CARTA):** Ran worked on the contract with Carta. The contract came from them. I do see an email from you to Carta sayin you signed:

mritter

Hide details Print Original May 12, 2023 12:07 PM

from: "mritter" <mritter@steelperlot.com Michelle Ritter>
to: "joseph.oswald" <joseph.oswald@carta.com Joseph Oswald>
cc: "rrabinowitch" <rrabinowitch@steelperlot.com Ran Rabinowitch>
date: May 12, 2023, 12:07:23 PM
subject: Re: Carta Updated Contract
system labels: Inbox, Opened

Signed, thank you!

•••

Other answers:

legalcorrespondence@steelperlot.com I can't find this address, mail account or distribution group.

Sbously Account was suspended on Jun 14th. On the 18th the suspension was removed but the password changed to give access to the Cyber Guys. I do not see anotl login since the 18th.

Mrteam: There are currently no delegated access to mrteam. The password was reset. And I do not see any email sent from there since June 14th. Also messages com mrteam gets forwarded t mr-repo.

Legal: This is a distribution list that goes only to you and Steph's account.

Mr-repo: Last time someone signed onto this was 11 months ago.

internal-legal: This is distrubion List, only Dave Taylor is a member of this.

legalnotices: This is a DL. You and Steph are the only members

legal review: This is a Distrisbution List. There are 4 members: David Charmin, Dave Taylor, Steph and sjg@angllc.com

team-Legal: This is a Distrisbution List. Two members David Charmin and Steph

There are about 77 groups (Dristribution list). Let em get Richard to look and see if there are any groups that have external people.

When you say you suspect Steph login in, can you tell me how, perhaps I can research.

Ricardo

---

**From:** Michelle Ritter <michelleritter929@gmail.com>
**Sent:** Wednesday, June 26, 2024 9:03 PM
**To:** Uribe, Ricardo <r.uribe@cgnet.com>
**Subject:** Fwd: Please DocuSign: Hillspire - 2022.03.XX Services Agr (Audem) final.docx

**External Sender**

Hi Ricardo,

Can you please tell me how this document was signed and the metadata? Same as the attached document that apparently was signed by me and yet the email is. Same goes for all of these documents attached.

legalcorrespondence@steelperlot.com

Separately, can you please send who has had access to MRTeam, LegalCorrespondence, Legal, MR-Repo, and all of the other DLs? Trying to understand how some individuals, such as Step could still be active as of the last few days and yet, she does not have access to her email, per your and counsel's advice.

Thank you so much.

Michelle

---------- Forwarded message ---------
From: **Michelle Ritter** <mritter@steelperlot.com>
Date: Wed, Jun 26, 2024 at 8:18 PM
Subject: Fwd: Please DocuSign: Hillspire - 2022.03.XX Services Agr (Audem) final.docx
To: Michelle Ritter <michelleritter929@gmail.com>, Lisa Coyle <lisa.coyle@blankrome.com>

Hi Lisa,

Please see attached. I never signed this agreement. And yet, it's being used against me. Please see above versus the attached.

Thanks,

Michelle

---------- Forwarded message ---------
From: **Michelle Ritter** <mritter@steelperlot.com>
Date: Thu, Mar 17, 2022 at 8:33 AM
Subject: Fwd: Please DocuSign: Hillspire - 2022.03.XX Services Agr (Audem) final.docx
To: Jordan Manekin <jmanekin@audem-mgmt.com>

I am not going to agree to the IP clause at all

—

**Michelle Ritter**

Steel Perlot

mritter@steelperlot.com

+1 510-828-7772

Begin forwarded message:

**From:** Sarah Frayer via DocuSign <dse_na2@docusign.net>
**Date:** March 17, 2022 at 11:30:23 AM EDT
**To:** Michelle Ritter <mritter@audem-mgmt.com>
**Subject: Please DocuSign: Hillspire - 2022.03.XX Services Agr (Audem) final.docx**
**Reply-To:** Sarah Frayer <sfrayer@hillspire.com>

DocuSign

Sarah Frayer sent you a document to review and sign.

**REVIEW DOCUMENT**



**Sarah Frayer**
sfrayer@hillspire.com

Hi, Michelle and Mandy:

Attached for your signature please find the finalized services agreement between Audem and Hillspire. Please let Maria Seferian or me know if you have any questions.

Many thanks,
Sarah Frayer

**Do Not Share This Email**
This email contains a secure link to DocuSign. Please do not share this email, link, or access code with others.

**Alternate Signing Method**
Visit DocuSign.com, click 'Access Documents', and enter the security code:
F75E0FF7DC5B413FB30870EA70D2DA3E2

**About DocuSign**
Sign documents electronically in just minutes. It's safe, secure, and legally binding. Whether you're in an office, at home, on-the-go -- or even across the globe -- DocuSign provides a professional trusted solution for Digital Transaction Management™.

**Questions about the Document?**
If you need to modify the document or have questions about the details in the document, please reach out to the sender by emailing them directly.

**Stop receiving this email**
Report this email or read more about Declining to sign and Managing notifications.

If you are having trouble signing the document, please visit the Help with Signing page on our Support Center.

Download the DocuSign App

This message was sent to you by Sarah Frayer who is using the DocuSign Electronic Signature Service. If you would rather not receive email from this sender you may contact the sender with your request.

--

**Michelle Ritter**

mritter@steelperlot.com

# EXHIBIT 6

## June 27, 2024 CGNET / Uribe DocuSign-Search Email

**Description**

June 27, 2024 CGNET (Uribe) DocuSign-search email: 'I could not find any document at the SPM Docusign.' Same artifact captures the underlying Manekin DocuSign transmittal.

**Status**

**ATTACHED — exhibit content follows this cover sheet.**

**Source**

[mounted]/__USE/Fraud docs to use in AAA - Audem/False Docusigns noted by CGNet - 27 June 2024 - Gmail - Fwd_ Please DocuSign_ Hillspire - 2022.03.XX Services Agr (Audem) final.docx.pdf

— Cover sheet compiled 2026-04-27 —

Gmail

Michelle Ritter <michelleritter929@gmail.com>

**Fwd: Please DocuSign: Hillspire - 2022.03.XX Services Agr (Audem) final.docx**

**Uribe, Ricardo** <r.uribe@cgnet.com> Thu, Jun 27, 2024 a
To: Michelle Ritter <michelleritter929@gmail.com>

Hello,

I could not find any document at the SPM Docusign. This is our research

**Hillspire_Audem_Service_Agreement Mar 2022**: Looking at email, I can see that Jordan worked with Hillspire on the agreement and then it tells Tyler Gwinn to work v you to get it signed and a day later I see Mandy sending the signed document to Jordan, and then Jordan asks Maya to file it. Actually the message from Mandy is sent t Valdes, Claudia <claudia.valdes@pillsburylaw.com>, Audem <audem@pillsburylaw.com> and copied to Jordan. I see this message from Jordan to Hillspire:

jmanekin Show details Print Original March 17, 2022 8:29 A

to sfrayer

No worries. I got it signed by Michelle and sent to Maria and Mandy.

•••

**Cetus_Photonics_Inc Common Stock Purchase:** This does not seem an official docusign document, when I open it, Adobe tells me that at least one signature is not v but I do see that Docusign did some processing. The document was created in January 17 and modified January 25. It looks like a Law Office, Cooley, was involved with creation so any docusign came from them. Ran and Steph were involved, by looking at email

**StarX Networks x Auth Consulting – Mutual NDA:** Not in the SPM docusign. From email I see Ioannis, Atos, Ran and Steph. Ioannis seems to be the main person. O 30th they said they will send the contract, but I can't find a message from them sending the contract at SPM. I also looked at StarX and I can find anything else about a s contract with Auth.

**Certificate CS-01**: I need more context, like who got it. This does not seems to be a docusign, just a pdf.

**StarX Networks Inc_Contract _2023-05-12 (CARTA):** Ran worked on the contract with Carta. The contract came from them. I do see an email from you to Carta sayin you signed:

mritter Hide details Print Original May 12, 2023 12:07 PM

from: "mritter" <mritter@steelperlot.com Michelle Ritter>
to: "joseph.oswald" <joseph.oswald@carta.com Joseph Oswald>
cc: "rrabinowitch" <rrabinowitch@steelperlot.com Ran Rabinowitch>
date: May 12, 2023, 12:07:23 PM
subject: Re: Carta Updated Contract
system labels: Inbox, Opened

Signed, thank you!

•••

Other answers:

legalcorrespondence@steelperlot.com I can't find this address, mail account or distribution group.

Sbously Account was suspended on Jun 14th. On the 18th the suspension was removed but the password changed to give access to the Cyber Guys. I do not see anoth login since the 18th.

Mrteam: There are currently no delegated access to mrteam. The password was reset. And I do not see any email sent from there since June 14th. Also messages com mrteam gets forwarded t mr-repo.

Legal: This is a distribution list that goes only to you and Steph's account.

Mr-repo: Last time someone signed onto this was 11 months ago.

internal-legal: This is distrubion List, only Dave Taylor is a member of this.

legalnotices: This is a DL. You and Steph are the only members

legal review: This is a Distrisbution List. There are 4 members: David Charmin, Dave Taylor, Steph and sjg@angllc.com

team-Legal: This is a Distrisbution List. Two members David Charmin and Steph

There are about 77 groups (Dristribution list). Let em get Richard to look and see if there are any groups that have external people.

When you say you suspect Steph login in, can you tell me how, perhaps I can research.

Ricardo

---

**From:** Michelle Ritter <michelleritter929@gmail.com>
**Sent:** Wednesday, June 26, 2024 9:03 PM
**To:** Uribe, Ricardo <r.uribe@cgnet.com>
**Subject:** Fwd: Please DocuSign: Hillspire - 2022.03.XX Services Agr (Audem) final.docx

**External Sender**

Hi Ricardo,

Can you please tell me how this document was signed and the metadata? Same as the attached document that apparently was signed by me and yet the email is. Same goes for all of these d documents attached.

legalcorrespondence@steelperlot.com

Separately, can you please send who has had access to MRTeam, LegalCorrespondence, Legal, MR-Repo, and all of the other DLs? Trying to understand how some individuals, such as Step could still be active as of the last few days and yet, she does not have access to her email, per your and counsel's advice.

Thank you so much.

Michelle

---------- Forwarded message ---------
From: **Michelle Ritter** <mritter@steelperlot.com>
Date: Wed, Jun 26, 2024 at 8:18 PM
Subject: Fwd: Please DocuSign: Hillspire - 2022.03.XX Services Agr (Audem) final.docx
To: Michelle Ritter <michelleritter929@gmail.com>, Lisa Coyle <lisa.coyle@blankrome.com>

Hi Lisa,

Please see attached. I never signed this agreement. And yet, it's being used against me. Please see above versus the attached.

Thanks,

Michelle

---------- Forwarded message ---------
From: **Michelle Ritter** <mritter@steelperlot.com>
Date: Thu, Mar 17, 2022 at 8:33 AM
Subject: Fwd: Please DocuSign: Hillspire - 2022.03.XX Services Agr (Audem) final.docx
To: Jordan Manekin <jmanekin@audem-mgmt.com>

I am not going to agree to the IP clause at all

—

**Michelle Ritter**

Steel Perlot

mritter@steelperlot.com

+1 510-828-7772

Begin forwarded message:

**From:** Sarah Frayer via DocuSign <dse_na2@docusign.net>
**Date:** March 17, 2022 at 11:30:23 AM EDT
**To:** Michelle Ritter <mritter@audem-mgmt.com>
**Subject: Please DocuSign: Hillspire - 2022.03.XX Services Agr (Audem) final.docx**
**Reply-To:** Sarah Frayer <sfrayer@hillspire.com>

DocuSign

Sarah Frayer sent you a document to review and sign.

**REVIEW DOCUMENT**



**Sarah Frayer**

sfrayer@hillspire.com

Hi, Michelle and Mandy:

Attached for your signature please find the finalized services agreement between Audem and Hillspire. Please let Maria Seferian or me know if you have any questions.

Many thanks,
Sarah Frayer

**Do Not Share This Email**
This email contains a secure link to DocuSign. Please do not share this email, link, or access code with others.

**Alternate Signing Method**
Visit DocuSign.com, click 'Access Documents', and enter the security code:
F75E0FF7DC5B413FB30870EA70D2DA3E2

**About DocuSign**
Sign documents electronically in just minutes. It's safe, secure, and legally binding. Whether you're in an office, at home, on-the-go -- or even across the globe -- DocuSign provides a professional trusted solution for Digital Transaction Management™.

**Questions about the Document?**
If you need to modify the document or have questions about the details in the document, please reach out to the sender by emailing them directly.

**Stop receiving this email**
Report this email or read more about Declining to sign and Managing notifications.

If you are having trouble signing the document, please visit the Help with Signing page on our Support Center.

Download the DocuSign App

This message was sent to you by Sarah Frayer who is using the DocuSign Electronic Signature Service. If you would rather not receive email from this sender you may contact the sender with your request.

--

**Michelle Ritter**

mritter@steelperlot.com

# EXHIBIT 5

## Hillspire/Audem Services Agreement (March 2022)

**Description**

Purported Hillspire/Audem Services Agreement (March 2022) — the operative March 2022 instrument referenced in the Audem arbitrability analysis.

**Status**

**ATTACHED — exhibit content follows this cover sheet.**

**Source**

[mounted]/__USE/Fraud docs to use in AAA - Audem/Hillspire Audem_Services_Agreement Mar 2022.pdf

— Cover sheet compiled 2026-04-27 —

## SERVICES AGREEMENT

This Services Agreement (together with all attachments, this "***Agreement***") is entered into as of March 17, 2022 and made effective as of February 14, 2022 (the "***Effective Date***"), by and between Audem Management, LLC, a Delaware limited liability company (the "***Contractor***"), and Hillspire, LLC, a Delaware limited liability company (the "***Company***" and, together with the Contractor, the "***Parties***").

**1. Appointment of the Contractor; Term.**

**a. Appointment and Acceptance.** The Company hereby appoints the Contractor to provide the services and other related activities described in one or more statements of work signed by both Parties from time to time (each a "***Statement of Work***"), including the Statement of Work attached hereto as Exhibit A (the "***Services***"). The Contractor hereby accepts such appointment and agrees to provide the Services subject to, and in accordance with, the terms and conditions of this Agreement.

**b. Term.** The term of this Agreement shall commence on the Effective Date and shall continue until the earlier of (i) the completion of all Services and (ii) termination by either Party in accordance with the terms of this Agreement.

**2. Consideration.** As consideration for the Services, the Company agrees to pay the Contractor according to the fee schedule included in each Statement of Work (the "***Consideration***").

**3. Services.**

**a. Statements of Work**. The Parties may agree to add or otherwise modify the Services by entering into additional or replacement Statements of Work, which shall be signed by both Parties and be attached hereto as part of Exhibit A and integrated herein.

**b. Terms & Conditions**. Further terms and conditions are attached hereto as Exhibit B hereto (the "***Terms***"), which are incorporated herein and made a part hereof and shall apply to all Statements of Work.

**4. Notices.** All notices, requests and other communications called for by or otherwise made in respect of the Agreement will be deemed to have been given and received if delivered by reputable overnight courier with tracking capability to the respective address indicated below or such other addresses as either Party specifies to the other in accordance with this Agreement (with copy to the email address provided):

If to the Contractor:

Name: Audem Management, LLC
Address: 140 Crosby Street, 4th Floor, New York, NY 10012
Phone: (410) 458-3040
Attention: Jordan Manekin
Email: jmanekin@audem-mgmt.com

Copy to (which shall not constitute notice):

Pillsbury Winthrop Shaw Pittman LLP
600 Brickell Avenue, Suite 3100
Miami, FL 33131
Attention: Keith Blum
Email: keith.blum@pillsburylaw.com

If to the Company:

Name: Hillspire, LLC
Address: 1010 Alma Street, Menlo Park, CA 94025
Phone: 650-468-1552

Email: mandy@hillspire.com

With a copy to:

Hillspire, LLC
555 Bryant Street, No. 347, Palo Alto, CA 94301
Attention: Office of General Counsel
Email: legalteam@hillspire.com

**5. Entire Agreement.** This Agreement, including any Statement of Work entered by the Parties hereunder and the Terms attached hereto, all of which are hereby incorporated herein and made a part hereof, constitutes the entire agreement of the Parties with regard to the subject matter hereof, and replaces and supersedes all other prior or concurrent agreements and understandings, whether written or oral. In the event of a specific conflict between any Statement of Work duly entered into pursuant to the terms of this Agreement, on the one hand, and the Agreement or the Terms, on the other hand, the express provisions of the applicable Statement of Work shall prevail with respect to that specified conflict.

AUDEM MANAGEMENT, LLC

By: DocuSigned by: Michelle Ritter
1375348D885F48D...
Name: Michelle Ritter
Title: CEO

HILLSPIRE, LLC

By: DocuSigned by: Mandy Quach
A813C8423B3949B...
Name: Mandy Quach
Title: Chief Accounting Officer

[*Remainder of page intentionally left blank*]

## *EXHIBIT A*

### *Statement of Work*

This Statement of Work (this "***SOW***") is entered into as of March 17, 2022 and made effective as of February 14, 2022 (the "***Statement Effective Date***") by and between Audem Management, LLC, a Delaware limited liability company (the "***Contractor***"), and Hillspire, LLC (the "***Company***" and, together with the Contractor, the "***Parties***").

Reference is herein made to that certain Services Agreement, dated as of the date hereof and made effective as of February 14, 2022 (together with all attachments thereto, the "***Agreement***"), between the Parties. Capitalized terms used but not defined in this SOW shall have the meanings set forth in the Agreement. This SOW is a "Statement of Work" as defined in the Agreement.

The Contractor agrees to provide the following services to the Company with respect to the following properties: (a) 38 Mathews Road, Wainscott, NY 11975; (b) 13 Manor Lane, East Hampton, NY 11937; (c) 1060 Brooklawn Drive, Los Angeles, CA 90077; (d) 1059 Angelo Drive, Beverly Hills, CA 90210; and (e) 36 Bleecker Street, Penthouse B, New York, NY 10012 (collectively, the "***Properties***"):

**Services:** The Contractor shall provide best-in-class property management and construction management services in accordance with the terms and conditions of the Agreement and this SOW, including, without limitation, managing and overseeing all domestic staff (whether independent contractors or employees), agents, contractors, and vendors at the Properties; procuring and maintaining insurance in accordance with the Agreement; complying with all applicable laws; and keeping the Company reasonably informed regarding all material developments relating to the Properties or that could otherwise adversely impact the Company or its affiliates.

**Budgeting and Approvals:** Contractor and Company (which for purposes of this provision may be satisfied by Eric Schmidt or Mandy Quach) shall agree upon an annual budget (the "***Approved Budget***"), broken down by month. On a monthly basis, the Company shall advance funds to Contractor's designee in charge of managing Contractor's back-office administration, i.e., Pillsbury (the "***Payment Designee***") against the Approved Budget (the "***Monthly Budgetary Advance***").

Each expenditure, bid or solicitation of services on behalf of the Contractor in excess of $250,000 is subject to prior approval (via email) by the Company (which for purposes of this provision shall be satisfied by Eric Schmidt). Additionally, the Contractor must obtain the prior written consent (via email) by the Company (which for purposes of this provision shall be satisfied by Eric Schmidt) to each full-time employee hired by the Contractor. Capital projects shall be subject to separate written approvals by the Company and separate fees paid to the Contractor in amounts as set forth in such separate capital project written approvals. Contractor shall provide monthly updates/flash reports with respect to the Approved Budgets to the Company, Attn: Chief Accounting Officer, Mandy Quach.

**Contracting:** Contractor shall manage all contracting using Company-approved contractor/vendor templates. All contracts shall include approved third-party beneficiary language and assignment language for the benefit of the Company. Contractor shall provide copies to the Company, Attn: Chief Accounting Officer, Mandy Quach, General Counsel, Maria Seferian, and Eric Schmidt of contracts, agreements, documents, certificates, permits and other documents pertaining to any of the Properties.

**Invoice Payment Processing:** The Contractor's Payment Designee shall provide invoicing and direct pay services for approved items in accordance with the Approved Budgets. Contractor shall be responsible for reviewing all invoices (e.g., confirming that invoices are consistent with the applicable contract, with the Approved Budget and the quality of services/goods received, etc.).

**Approval Rights:** Any and all approvals provided for herein may be made through email. Company shall have pre-approval rights over the following matters:

(i) litigation, settlements, and similar matters;
(ii) public filings that describe or name the Company or any of its affiliates or related persons;
(iii) deviations from approved contract templates; and
(iv) changes to building structure.

**No Liens:** Contractor shall not permit or suffer any mortgages, security interests, liens or other encumbrances on any Property. For clarity, neither Contractor nor any affiliate of Contractror shall have any ownership or similar rights to any of the Properties, and Contractor has no authority to sell or dispose of any of the Properties, in whole or in part, nor to enter into any lease or license with respect to any of the Properties without Company's prior written approval.

The Company agrees to pay the Contractor a recoupable advance payment in the amount of the applicable Monthly Budgetary Advance. This payment is intended to cover any and all expenses of Contractor for such month, including, without limitation, overhead, G&A, staffing, payments for all third-party invoice payments, etc. and expressly does not cover any payments for capital projects, which shall be subject to a separate mutually approved budget (but otherwise funded consistently with the terms herein with respect to the Approved Budget). The Contractor shall invoice the Company on a monthly basis for the succeeding Monthly Budgetary Advance, such invoice to be based on the Approved Budget. Contractor shall deliver a reasonably-detailed report (quickbooks being sufficient) at the end of each calendar month of its P&L, including all spending and revenue related to the Properties concurrently with such invoice, as well as any updates to the Approved Budget, so that the Parties may calculate the applicable Monthly Budgetary Advance consistent with this paragraph. At the end of each calendar month, Contractor shall promptly return to the Company all excess working capital (or, upon mutual agreement of Contractor and Company (which for purposes of this provision may be satisfied by Eric Schmidt or Mandy Quach), credit such excess to the immediately succeeding monthly payment. At the end of the Term of the Agreement, all remaining working capital shall be promptly returned to the Company. The Company shall have the right at all reasonable times to audit the books and records of Contractor (no more frequently than once per calendar year), and Contractor shall cooperate with such audit.

To the extent the Contractor anticipates a need to work above and beyond the Services and Consideration described herein, the Contractor will submit for the Company's prior written approval a proposal describing the additional Services and Consideration. No invoice for any additional Services shall be billed to the Company without the Company's prior written approval.

The term of this SOW shall commence on the Statement Effective Date and shall continue until terminated by either Party in accordance with the terms of the Agreement (including the Terms thereto).

The terms and conditions set forth in the Agreement (including the Terms) are hereby incorporated herein and shall apply to this SOW.

AUDEM MANAGEMENT, LLC

By: DocuSigned by: Michelle Ritter
13753480885F48D...
Name: Michelle Ritter
Title: CEO

HILLSPIRE, LLC

*Confidential*

By: DocuSigned by: Mandy Quach
A813CB422BB949B

Name: Mandy Quach
Title: Chief Accounting Officer

[*Remainder of page intentionally left blank*]

## *EXHIBIT B*

### *Terms & Conditions*

These "***Terms***" are hereby incorporated into and made a part of that certain Services Agreement, and all capitalized terms used but not defined in this Exhibit B shall have the meanings set forth in the Services Agreement (together with all attachments, the "***Agreement***") to which this Exhibit B is attached.

**1. Independent Contractor.**

**a. Relationship.** Nothing contained herein or any document executed in connection herewith shall be construed to create an employer-employee partnership or joint venture relationship between the Company and the Contractor. The Contractor is an independent contractor and not an employee of the Company or any of its subsidiaries or affiliates. The Consideration shall be the sole consideration due to the Contractor for the Services, unless otherwise agreed in writing between the Parties. It is understood that the Company will not withhold any amounts for payment of taxes from the payment(s) made to the Contractor hereunder. The Contractor will not represent itself to be or hold itself out as an employee of the Company, and the Contractor acknowledges that the Contractor shall not have any right or entitlement in or to any of the retirement, health, or other benefits now or hereafter available to the Company's employees. Any and all sums subject to deductions, if any, required to be withheld and/or paid under any applicable state, federal or municipal laws or union or professional guild regulations shall be the Contractor's sole responsibility, and the Contractor shall be solely responsible for timely notifications to all authorities of such amounts.

**b. Contractor Agents.** The Contractor shall be solely responsible for all of its directors, officers, employees, representatives, subcontractors, suppliers, laborers, and other agents (collectively, "***Contractor Agents***") and shall at all times supervise and oversee such Contractor Agents and assure compliance with applicable law.

**2. Confidentiality.**

**a. Confidential Information.** The Contractor agrees at all times during and after the term of the Agreement (i) to hold in strictest confidence all Confidential Information relating to the scope of the Services; (ii) not to use any Confidential Information relating to the scope of the Services except for the benefit of the Company in accordance with the terms of the Agreement; and (iii) not to disclose any Confidential Information relating to the scope of the Services to any person or entity without prior written authorization of an authorized officer of the Company; *provided*, *however*, that the Contractor may disclose Confidential Information relating to the scope of the Services to its employees solely if and to the extent (x) such employees have a need to know such Confidential Information in order to perform the Services; (y) such employees are bound by the same confidentiality obligations contained herein, and such confidentiality obligations expressly run for the benefit of the Company and its affiliates; and (z) the Contractor shall remain responsible for any and all breaches by such employees. "***Confidential Information***" means any and all information pertaining to the Company, related persons and entities, including its and their direct and indirect principals, equityholders, donors, managers, directors, employees, representatives or agents (collectively, "***Company Persons***"), the terms of the Agreement and any other information disclosed to or otherwise learned by the Contractor or Contractor Agents, either directly or indirectly, whether in writing, orally or by drawings or observation or inspection of parts or equipment, in connection with and relating to the Services or the Agreement. Notwithstanding the foregoing, "***Confidential Information***" does not include any of the foregoing items which has become publicly known and made generally available through no wrongful act of the Contractor or any of its employees (or any other person or entity who was under confidentiality obligations as to the item or items involved). The Contractor shall, upon expiration or termination of the Agreement, or at any other time upon written request by the Company, deliver to the Company (and will not keep in the Contractor's possession, recreate or deliver to anyone else) any Confidential Information relating to the scope of the Services or any copies thereof unless otherwise agreed in writing by an authorized representative of the Company. The Contractor shall notify the Company immediately in the event it becomes aware of any loss or disclosure of any Confidential Information. For the avoidance of doubt, the restrictive covenant set forth in this Section 2(a) shall not apply to any individual beneficial owner of the Contractor except to the extent pertaining to the scope of the Services provided by the Contractor.

**b. Non-Publicity and Non-Disparagement.** The Contractor acknowledges that the Company's direct and indirect equityholders and their respective family members, friends and Company Persons may include individuals who have highly visible public profiles or who might be or become of significant interest to the public. Without limitation of the Contractor's other duties and obligations in the Agreement, the Contractor, in its role as such, shall not (and the Contractor shall take all reasonable steps to ensure that none of its employees or other Contractor Agents shall) at any time during or after the term of the Agreement directly or indirectly publish, communicate or disseminate, or make available to any other person or entity for the purpose of publishing, communicating or disseminating, any information regarding the lives or affairs of such persons learned within the scope of the Services. The Contractor understands that the foregoing prohibition applies not only to

Confidential Information but also to information that is or may become publicly available through one or more sources. The Contractor, in its role as such, agrees to refrain from publicly or privately taking actions or making statements, written or oral, which might reasonably be expected to denigrate, disparage, ridicule, or defame the goodwill or reputation of the Company or the Company's direct and indirect equityholders and their respective family members, friends or Company Persons. For the avoidance of doubt, the restrictive covenant set forth in this Section 2(b) shall not apply to any individual beneficial owner of the Contractor except to the extent pertaining to the scope of Services provided by the Contractor.

**3. Termination.**

**a. Termination for Cause.** The Agreement or any Statement of Work may be terminated by either the Company or the Contractor if the other Party breaches the Agreement upon written notice. In the event that the Contractor terminates this Agreement or any Statement of Work as a result of breach by the Company under this Section 3(a), the Company shall pay the Contractor for that portion of Services completed, subject to any applicable adjustments specified in the Agreement.

**b. Termination for Convenience.** Each Party may, at its option at any time upon thirty (30) days' prior written notice to the other Party, terminate the Agreement, any Statement of Work or all or any portion of the Services under this Agreement or any Statement of Work for convenience. In the event that this Agreement or any Statement of Work is terminated under this Section 3(b) by the Company, the Company shall pay the Contractor for that portion of Services completed, subject to any applicable adjustments specified in the Agreement. In the event that this Agreement or any Statement of Work is terminated under this Section 3(b) by the Contractor, then the Contractor shall repay to the Company that portion of the Consideration related to Services not yet completed.

**c. Final Accounting; Delivery of Materials; Ownership of Project Documents.** Upon receipt of any notice of termination of the Agreement, the Contractor shall (i) cooperate with the Company and its designees to transition any projects in an orderly and expeditious fashion and otherwise conclude the Services, and (ii) return all property of the Company, including but not limited to any keys, passcodes, or garage-door openers.

**d. Survival.** Notwithstanding anything to the contrary, this Exhibit B will survive any termination or expiration of the Agreement.

**6. Indemnification.** The Contractor shall release, fully indemnify and hold harmless the Company and all other Company Persons from and against any losses, damages, liabilities, liens, claims, demands, actions, settlements, judgments, costs, expenses, fines, penalties and suits (including reasonable and documented outside legal fees and costs) (collectively, "***Losses***"), to the extent arising from (i) any breach by the Contractor of this Agreement (including, without limitation, any work conducted or actions taken by the Contractor or any Contractor Agent in breach of the Agreement), or (ii) any claim made by any Contractor Agents, including without limitation related to wages, benefits, tax and other amounts claimed to be due to or on behalf of such Agents; or (iii) any third-party claim resulting from any act of the Contractor or any Contractor Agents outside of the scope of its authority hereunder, in each case whether or not the claim has merit. The Company shall release, fully indemnify and hold harmless the Contractor and all other related persons and entities, including its and their direct and indirect principals, equityholders, donors, managers, directors, employees, representatives or agents (collectively, "***Contractor Persons***") from and against any Losses to the extent arising from a third-party claim, arising out of, pertaining to, or resulting from any breach by the Company of this Agreement.

**7. Insurance.** The Contractor shall maintain in force insurance on the terms and conditions set forth in Appendix I attached hereto to protect and indemnify the Company and Company Persons from any losses resulting from its acts or omissions or the acts or omissions of Contractor Persons.

**8. Intellectual Property Rights**

a. The Contractor confirms and agrees that any and all work prepared by the Contractor in the scope of the Services shall be considered a "work made for hire" to the fullest extent permitted under the Copyright Law of the United States and shall be the exclusive property of the Company, who shall be the sole author and copyright holder of such work. Without limitation of the foregoing, the Contractor agrees that the Company is the sole owner, in perpetuity, throughout the universe in any and all languages, of all right, title and interest in and to the results and proceeds of the Services, including, without limitation, all material, tangible or intangible, produced, conceived, developed, acquired, obtained, created and/or furnished by or submitted to the Contractor or submitted to the Company prior to or during the Services of any kind and nature whatsoever, including, without limitation, all materials, ideas, concepts, formats, suggestions, developments, arrangements, packages, programs, copyrights and other intellectual property or intangible rights (collectively, "*Work Product*"). Any Work Product created and/or

submitted to the Company while the Contractor is providing services to the Company will automatically become the sole property of the Company. The Company shall have the exclusive right to register any copyrights, trademarks or patents in any or all Work Product in its name or the name(s) of its designee(s).

**b.** To the extent any Work Product is not for any reason created as a work-for-hire, the Contractor hereby transfers and assigns to the Company all rights and materials related to or constituting Work Product. To the extent any such assignment is for any reason ineffective, the Contractor hereby grants to the Company a sole and exclusive, fully paid up, royalty free, perpetual, worldwide, sublicenseable, right and license to all Work Product for any and all uses in any and all media now known or hereafter discovered.

**c.** The Contractor shall be responsible for assuring that the Contractor obtains from its employees (and delivers to the Company) all rights that the Contractor is required to deliver to the Company under the Agreement. The Contractor shall, at the Company's request, execute and deliver to the Company such documents or other instruments which the Company may from time to time deem necessary or desirable to evidence, maintain, perfect, protect, enforce or defend the Company's right, title and interest in and to any Work Product and to carry out the intents and purposes of the Agreement. If the Contractor fails promptly to execute, acknowledge or deliver to the Company any agreements, assignments, quitclaims or other instruments required by the Company hereunder, the Company is hereby irrevocably appointed the Contractor's attorney-in-fact (which agency is hereby deemed coupled with an interest) with full right, power and authority to execute, acknowledge, verify and deliver the same in the name of and on behalf of the Contractor.

**9. Representations and Warranties; Additional Covenants.**

**a. Authority; No Conflict; Encumbrances.** The Contractor represents, warrants and covenants that (i) the Contractor has the legal right to enter into the Agreement and to perform in accordance with its terms and (ii) the entrance into the Agreement and the performance of the Services in each case by the Contractor do not and will not conflict with, or result in any breach or default under, any other agreement to which the Contractor is subject or violate any applicable law.

**b. Quality of Services**. The Contractor represents and warrants that it is qualified and capable in all respects to perform the Services and is qualified to do business in the applicable state where the Services are performed or provided. The Contractor agrees that (i) the Contractor shall perform all Services in a professional and workmanlike manner, consistent with all industry standards and in compliance with all applicable federal, state, and local laws and regulations, including by maintaining all licenses, permits and registrations required to perform the Services, and (ii) the Contractor will not disclose to the Company, or induce the Company to use, any confidential or proprietary information or material belonging to any other person or entity. The Company shall not control the manner or means by which the Contractor performs the Services. The Services performed are outside the usual course of the Company's business.

**c. Business Relationships.** The Contractor agrees that during the term of the Agreement and for a period of twelve months thereafter, the Contractor shall not directly or indirectly encourage any person who has a business relationship with the Company or its affiliates to terminate or diminish their services to the Company or such affiliate.

**d. Reporting.** With respect to all Services, the Contractor shall keep the Company reasonably apprised of all material developments and events relating to the Services, and the Contractor shall be reasonably available to consult and discuss the status of the Services.

**e. Record Keeping.** The Contractor shall establish and maintain reasonable records and accounts pertaining to the Services. Upon request, the Contractor shall provide the Company with a description of the Services performed and such other information, access and documents as the Company may reasonably request.

**f. No Authority to Bind.** The Contractor shall make no representations, warranties, or commitments binding upon the Company without the Company's prior written consent.

**g. COVID Policies.** To the fullest extent permitted by applicable law, the Contractor shall ensure that all Contractor Agents and others who provide services at any of the Properties are vaccinated and boosted prior to providing such services. In addition, the Contractor shall adopt reasonable and lawful policies and practices relating to COVID in order to ensure a safe workplace (and in no event less protective than those recommended by the CDC).

**10. Miscellaneous.**

**a. No Waiver; Amendments.** Failure to invoke any right, condition, or covenant in the Agreement by either Party shall not be deemed to imply or constitute a waiver of any rights, condition, or covenant, and neither Party may rely on such failure. No amendment or other modification of the Agreement shall be binding unless in writing and signed by both Parties.

**b. Delegation and Assignment Prohibited.** The Contractor may not assign or delegate any duties or assign any rights under the Agreement in whole or in part without the express prior written consent of the Company.

**c. Counterparts; Electronic Delivery; Signatures**. The Agreement (including any Statements of Work) may be executed in one or more counterparts and by facsimile, digital or electronic transmission, and each counterpart shall be deemed to be an original. Such facsimile, digital or electronic signatures shall be deemed original signatures for all purposes. The Company may, in its sole discretion, decide to deliver any documents related to the Agreement or any notices required by applicable law by email or any other electronic means. The Contractor hereby consents to (i) conduct business electronically, (ii) receive such documents and notices by such electronic delivery, and (iii) sign documents electronically.

**d. Binding Effect.** The Agreement shall be binding upon and shall inure to the benefit of the Contractor and the Company and to the Company's successors and assigns.

**e. Severability.** The invalidity or unenforceability of any provision of the Agreement shall not affect the validity or enforceability of any other provision. If any provision of the Agreement is held by a court of competent jurisdiction to be unenforceable, the remainder of the Agreement shall remain in full force and effect and shall in no way be impaired.

**f. Governing Law.** The Agreement shall be governed by the laws of the State of California.

**g. Arbitration; Prevailing Party.** Any and all controversies, claims and disputes arising out of or relating to the Agreement or the breach hereof (including the applicability of this clause), whether based on contract, tort, statute or other legal or equitable theory shall be settled solely by binding arbitration administered by the American Arbitration Association in accordance with its applicable rules then in effect. The arbitration shall be conducted in Santa Clara County, California by a sole arbitrator and the award of the arbitrator shall be final and binding, and judgment on the award may be entered, confirmed and enforced in any court having jurisdiction thereof. Except as required by judicial process or by law, no party or arbitrator may disclose the existence, contents or results of any arbitration hereunder without the prior written consent of the Parties. The arbitrator shall award the fees and costs (including attorneys' fees) to the Party whom the arbitrator deems to be the Party most prevailing in the proceeding. Nothing in this clause shall preclude the Company from seeking interim or provisional injunctive relief, including a preliminary injunction, either prior to or during arbitration, if necessary to protect the interests of the Company with respect to matters pertaining to privacy, confidentiality, publicity and similar matters.

[*Remainder of page intentionally left blank*]

## *APPENDIX I*

### *Insurance Requirements*

1. **Types and Limits of Coverage**

| a. Commercial General Liability Insurance | Minimum Limit |
|---|---|
| • Per Occurrence | $5,000,000 |
| • Products/Completed Operations Aggregate | $5,000,000 |
| • Personal and Advertising Injury | $5,000,000 |

Note: This requirement can be satisfied through a combination of primary and umbrella/excess policies.

| b. Business Automobile Liability Insurance | Minimum Limit |
|---|---|
| • Combined Single Limit | $5,000,000 |

The automobile liability insurance shall cover liability to third parties related to the Contractor's use of owned, scheduled, non-owned, hired, rented or leased vehicles

c. Workers' Compensation As required under state law where the Services are provided.

2. **Endorsements and Other Conditions**

The general liability insurance policy needs to include the Company and Company Persons as **"additional insureds"** either by a specific endorsement adding "Hillspire, LLC and its related persons and entities" or through a blanket provision (e.g., "Automatic Status for Other Parties").

The general liability insurance and workers' compensation insurance policies need to include a **"waiver of subrogation"** provision in favor of the Company and Company Persons, either by a specific endorsement adding "Hillspire, LLC and its related persons and entities" or by a blanket waiver (e.g., where required by contract).

All insurance coverage must be primary and shall not contribute, participate with or apply in excess of any other valid, collectible insurance or program of self-insurance of the Company.

The Contractor shall submit, and has attached hereto, all required insurance certificates and endorsements to the Company promptly following execution of the Agreement and within 30 days of policy renewals.

The "**Certificate Holder**" must be named as follows:

Hillspire, LLC and its related persons and entities
555 Bryant Street, No. 347, Palo Alto, CA 94301

The insurance companies must be authorized to do business in the state where the Services are provided and have an A.M. Best rating of A: VII or better, or an equivalent Standard & Poor's rating of AA or better, or Moody's rating of Aa or better.

DocuSign

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: EF8783567CA0442ABB521BF2D5430A4F | | Status: Completed |
| Subject: Please DocuSign: Services_Agreement_(3)_(1)_(1).docx.pdf | | |
| Source Envelope: | | |
| Document Pages: 10 | Signatures: 2 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | Sarah Frayer |
| AutoNav: Enabled | | 555 Bryant Street |
| EnvelopeId Stamping: Enabled | | 347 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | Palo Alto, CA 94301 |
| | | sfrayer@hillspire.com |
| | | IP Address: 104.32.240.148 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>3/17/2022 11:00:01 AM | Holder: Sarah Frayer<br>sfrayer@hillspire.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Mandy Quach<br>mandy@hillspire.com<br>Acting Treasurer-SIF<br>Hillspire, LLC<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>Mandy Quach<br>A813CB422B3949B...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 12.151.33.178 | Sent: 3/17/2022 11:01:38 AM<br>Viewed: 3/17/2022 12:21:24 PM<br>Signed: 3/17/2022 12:22:02 PM |

**Electronic Record and Signature Disclosure:**
Not Offered via DocuSign

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Hillspire Contracts<br>contracts@hillspire.com<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | COPIED | Sent: 3/17/2022 12:22:04 PM |
| John Bell<br>jbell@hillspire.com<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | COPIED | Sent: 3/17/2022 12:22:04 PM |

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Maria Seferian<br>mseferian@hillspire.com<br>General counsel<br>Hillspire, LLC<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Accepted: 3/16/2022 9:52:29 PM<br>ID: a37ce888-4309-4223-81ec-7a084ffff0cd | COPIED | Sent: 3/17/2022 12:22:04 PM<br>Viewed: 3/17/2022 12:22:48 PM |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 3/17/2022 11:01:38 AM |
| Certified Delivered | Security Checked | 3/17/2022 12:21:24 PM |
| Signing Complete | Security Checked | 3/17/2022 12:22:02 PM |
| Completed | Security Checked | 3/17/2022 12:22:04 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, Hillspire, LLC (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Hillspire, LLC:**
You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: axu@hillspire.com

**To advise Hillspire, LLC of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at axu@hillspire.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.
**To request paper copies from Hillspire, LLC**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to axu@hillspire.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.
**To withdraw your consent with Hillspire, LLC**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
ii. send us an e-mail to axu@hillspire.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| | |
|---|---|
| Operating Systems: | Windows2000? or WindowsXP? |
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and
- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and
- Until or unless I notify Hillspire, LLC as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  Hillspire, LLC during the course of my relationship with you.

# EXHIBIT 18

---

## Audem Management LLC Operating Agreement

**Description**

Audem Management LLC Operating Agreement — companion to the Hillspire/Audem Services Agreement architecture.

**Status**

**ATTACHED — exhibit content follows this cover sheet.**

**Source**

[mounted]/__USE/Fraud docs to use in AAA - Audem/Audem Management, LLC- Operating Agreement.docx.pdf

— Cover sheet compiled 2026-04-27 —

# OPERATING AGREEMENT
# OF
# AUDEM MANAGEMENT, LLC

This **Operating Agreement** (the "***Agreement***") is entered into by **MICHELLE RITTER** (the "***Sole Member***") and **AUDEM MANAGEMENT, LLC**, a Delaware limited liability company (the "***Company***"), dated as of December 28, 2021 (the "***Effective Date***").

## RECITALS

A. The Company was formed by the filing of a Certificate of Formation with the Secretary of State of the State of Delaware on December 28, 2021 (the "***Certificate of Formation***"), under the Delaware Limited Liability Company Act. The Company is a single member limited liability company, formed and operated for the purposes set forth herein.

B. The Sole Member and the Company now desire to enter into this Agreement in order to set forth the terms and conditions of the business and affairs of the Company and to determine the rights and obligations of its Sole Member and the Managers and Officers.

C. The Sole Member desires to structure the Company as a corporation for federal and state income tax purposes and file an election to be taxed as an S Corporation within the meaning of Internal Revenue Code ("***IRC***") § 1361(a)(1) ("***S Corporation***") pursuant to IRC § 1362(a).

NOW, THEREFORE, the parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.01** Definitions. Capitalized terms used in this Agreement and not otherwise defined in this Agreement shall have the meanings set forth below in this Section 1.01:

(a) "***Act***" means the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.), as amended from time to time, or any successor statute thereto.

(b) "***Capital Contribution(s)***" means the amount of cash and the agreed value of property, services rendered, or a promissory note or other obligation to contribute cash or property or to perform services contributed by the Sole Member for or related to such Sole Member's interest in the Company, equal to the sum of the Sole Member's initial Capital Contributions plus the Sole Member's additional Capital Contributions, if any, made pursuant to Sections 4.01 and 4.02, respectively.

(c) "***Membership Interest***" means the Sole Member's ownership interest in the Company, including such Sole Member's economic benefit (including the right of such Sole Member to any and all distributions (liquidating or otherwise)) and the right, if any, to vote on, consent to or otherwise participate in any decision or action of or by the Sole Member and the right to receive information concerning the business and affairs of the Company, in each case to the extent expressly provided in this Agreement or otherwise required by the Act.

(d) "***Person***" means any individual, partnership, firm, corporation, limited liability company, joint-stock company, trust or other entity.

(e) "***Transfer***" means, when used as a noun, any voluntary sale, hypothecation, pledge, assignment, attachment or other transfer, and, when used as a verb, means voluntarily to sell, hypothecate, pledge, assign or otherwise transfer.

## ARTICLE II
## COMPANY ORGANIZATION

**Section 2.01** Name. The name of the Company is **AUDEM MANAGEMENT, LLC**.

**Section 2.02** Registered Office and Agent. The address of the registered office of the Company in the State of Delaware is The Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, County of New Castle. The name of the registered agent of the Company at such address is The Corporation Trust Company.

**Section 2.03** Effectiveness of Agreement. This Agreement shall be considered effective as of the Effective Date.

## ARTICLE III
## PURPOSES; NATURE OF BUSINESS

**Section 3.01** Purposes; Nature of Business. The Company was formed to engage in certain domestic support services and employ certain individuals in furtherance of such domestic support services, and to conduct any other business or activities that may lawfully be engaged in by limited liability companies organized under the Act, as such activities may be determined by the Sole Member or a Manager from time to time, all upon the terms and conditions set forth in this Agreement.

**Section 3.02** Power and Authority. The Company shall have all power, authority and privilege of a limited liability company under the Act or any other law or as otherwise granted by this Agreement, together with any power, authority or privilege incidental thereto, so far as such power, authority and privilege are necessary or convenient to the conduct, promotion or attainment of the business purposes or activities of the Company or as otherwise determined by the Sole Member or a Manager.

## ARTICLE IV
## MEMBER AND CAPITAL

**Section 4.01** Member, Initial Capital Contribution and Membership Interest. The name and address of the Sole Member is set forth in the signature block of the Sole Member below. As of the Effective Date, the Sole Member shall have made the Capital Contributions sets forth in the books and records of the Company. The Sole Member owns 100% of the Membership Interests.

**Section 4.02** Additional Capital Contributions. The Sole Member shall have no obligation to make any additional Capital Contributions to the Company, and the Sole Member shall have no personal liability for any obligations of the Company. The Sole Member may make additional

Capital Contributions to the Company as the Sole Member determines are necessary, appropriate or desirable in its sole and absolute discretion.

**Section 4.03** Loans. The Sole Member may, at any time, make or cause a loan(s) to be made to the Company in any amount and on those terms upon which the Company and the Sole Member agree.

## ARTICLE V
## DISTRIBUTIONS AND ALLOCATIONS

**Section 5.01** Distributions. All distributions of cash or other assets of the Company shall be made and paid to the Sole Member at such time and in such amounts as the Sole Member may determine. If the Company is liquidated, the assets of the Company shall be distributed to the Sole Member. It is the intent of the Company and the Sole Member that the allocation of profit and loss to the Sole Member pursuant to this Agreement shall be consistent with the provisions of IRC § 1366 dealing with the allocation of net income and net loss to S Corporation shareholders.

## ARTICLE VI
## TAXATION

**Section 6.01** Tax Characterization. The Sole Member hereby consents to the election of the Company to be treated as an association taxable as a corporation for federal and state income tax purposes in accordance with Regulations Sections 301.7701-3 and shall elect to treat the Company as an S Corporation by filing an S Election on behalf of the Company pursuant to IRC § 1362(a) (the "***S Election***"), which election shall be effective as of the date the election to be treated as an association taxable as a corporation is made. From and after the effective date of the S Election, the Company shall be an S Corporation for federal and state tax purposes.

## ARTICLE VII
## MANAGEMENT

**Section 7.01** Management. The Company shall be manager-managed by one or more managers (each, a "***Manager***") selected, removed or replaced by the Sole Member at any time from time to time, for any reason or no reason and in any manner the Sole Member shall determine in its sole and absolute discretion. The initial Manager shall be **Michelle Ritter**. The Managers shall, each individually, have all powers to control and manage the business and affairs of the Company and may exercise all powers of the Company. A Manager shall not be required to devote his or her full time or attention to the business of the Company but shall devote so much of his or her time and efforts to the affairs of the Company as may in his or her judgment be reasonably necessary to accomplish the purposes of the Company. Nothing herein contained shall prevent a Manager from conducting or engaging in any other business or activities of any kind or nature (whether or not competitive with the business of the Company).

**Section 7.02** Reliance by Other Persons. Any Person dealing with the Company, other than the Sole Member, may rely on the authority of any Manager in taking any action in the name of the Company, if such Manager provides to such Person a copy of the applicable provisions of this

Agreement certified in writing by such Manager to be genuine and correct and not to have been revoked, superseded or otherwise amended.

**Section 7.03** More than One Manager. Unless otherwise expressly required by the Act, the Certificate of Formation, or the terms of this Agreement, if there is more than one Manager, each Manager may act individually on behalf of the Company in accordance with this Agreement without the consent, approval or vote of any other Manager.

**Section 7.04** Execution of Documents. Each Manager may execute, without the necessity of execution by any other Manager, any documents or take any other actions deemed necessary or desirable in furtherance of any action that any Manager may have authorized on behalf of the Company as provided in Section 7.01 above.

**Section 7.05** Officers and Other Delegation of Authority.

(a) A Manager may appoint individuals as officers of the Company (the "***Officers***") as any such Manager deems necessary or desirable to carry on the business of the Company. Such Manager may delegate to such Officers so much of the Managers' authority or responsibilities hereunder to act on behalf of the Company as such Manager may from time to time deem appropriate in its sole discretion; and, subject to such delegation and the terms of this Agreement, each Officer shall otherwise have such authority and responsibility a similarly named officer of a corporation would have, unless such authority or responsibility has been increased, decreased or otherwise specified in writing by the appointing Manager. Any individual may hold two or more offices of the Company. Each Officer shall hold office until his successor is designated by any Manager or until his earlier death, resignation or removal. Any Officer may resign at any time upon written notice to any Manager. Any Officer may be removed at any time by any Manager or by the Sole Member, with or without cause. A vacancy in any office occurring because of death, resignation, removal or otherwise, may, but need not, be filled by a Manager. The initial Officers and their offices shall be as follows: (a) **Michelle Ritter** shall be the President, Treasurer and Secretary; and (b) **Jordan Manekin** shall be a Vice President and the Assistant Treasurer and Secretary.

(b) Any Manager may delegate, from time to time, to any Person (an "***Authorized Person***") so much of a Manager's authorities or responsibilities hereunder to act on behalf of the Company for distinct or one-off matters as such Manager may from time to time deem appropriate in its sole discretion. Such Authorized Person will hold such authorities or responsibilities until such Authorized Person's death, liquidation or dissolution, as applicable, resignation or removal. Such Authorized Person may resign such authorities and responsibilities at any time upon written notice to any Manager. Any authority or responsibility delegated hereunder may be removed at any time by any Manager or by the Sole Member, with or without cause. A vacancy in the delegation of any authority or responsibility hereunder occurring because of death, resignation, removal or otherwise, may, but need not, be filled by a Manager.

(c) In connection with and notwithstanding the appointment of any Officer or any delegation of authority or responsibility hereunder to an Authorized Person, or otherwise and in all other cases, the Managers must retain the power to direct and control any such Person to whom any Manager appoints as an Officer or delegates any of a Manager's authority or

responsibilities hereunder as an Authorized Person or otherwise.

**Section 7.06** No Personal Liability of Managers, Officers, or Authorized Persons. Except as otherwise provided in the Act or expressly in this Agreement, no Manager, Officer, or Authorized Person shall be obligated personally for any debt, obligation or liability of the Company, whether arising in contract, tort or otherwise, solely by reason of being a Manager, Officer, or Authorized Person, as applicable.

**Section 7.07** Personal Services of Member. The Sole Member shall not be required to perform services for the Company solely by virtue of being a member.

## ARTICLE VIII
## TRANSFER OF INTERESTS AND ADMISSION OF THE SOLE MEMBER

**Section 8.01** Transfer. The Sole Member may Transfer all or any portion of its interest in the Company as the Sole Member may determine in its sole and absolute discretion.

**Section 8.02** Admission of Additional Members. One or more additional members of the Company may be admitted to the Company only with the written consent of the Sole Member.

**Section 8.03** S Election Protection. Notwithstanding any other provision to the contrary, no Transfer or issuance of any type, whether direct, indirect, beneficial or otherwise, of Membership Interest may be made if such Transfer or issuance would cause the Company's S Election to terminate, unless such Transfer or issuance and termination of the S Election is pre-approved in writing by the Sole Member or, if the Sole Member is no longer then a member then by all members of the Company.

## ARTICLE IX
## DISSOLUTION AND WINDING UP

**Section 9.01** Dissolution. The term of the Company shall be perpetual unless the Company is dissolved in accordance with the Act.

**Section 9.02** Procedure for Winding Up and Liquidation. If the Company is dissolved, the affairs of the Company shall be wound up. On winding up of the Company, the assets of the Company shall be distributed first to creditors of the Company in satisfaction of the liabilities of the Company, and then to the Sole Member.

**Section 9.03** Filing of Dissolution. Upon the completion of the winding up and liquidation of the Company, a Manager shall file a certificate of cancellation with the Secretary of State of the State of Delaware canceling the Company’s Certificate of Formation at which time the Company shall terminate.

## ARTICLE X
## BOOKS AND RECORDS

**Section 10.01** Books and Records. The Managers shall keep, or cause to be kept, at the principal place of business of the Company true and correct books of account at least to the extent required by the Act.

## ARTICLE XI
## LIMITED LIABILITY AND INDEMNIFICATION

**Section 11.01** Limited Liability. Except as otherwise expressly provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Sole Member shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or the management of its business or affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the Sole Member for any debts, liabilities or obligations of the Company. Except as otherwise expressly required by law, the Sole Member, in such member's capacity as such, shall have no liability in excess of (a) the amount of such member's net Capital Contributions, (b) such member's share of any assets and undistributed profits of the Company, and (c) the amount of any distributions required to be returned pursuant to Section 18-607 of the Act (this clause (c) shall not be considered an extension of the time a member may be required to return a covered distribution pursuant to Section 18-607 of the Act).

**Section 11.02** Indemnification. The Company (including any receiver or trustee of the Company) shall, to the fullest extent provided or allowed by law, indemnify, save harmless and pay all judgments and claims against the Sole Member, Managers, Officers, Authorized Persons and any of the their respective affiliates, agents, attorneys, heirs, legal representatives, successors and assigns (each, an "***Indemnified Party***") from, against and in respect of any and all liability, loss, damage and expense incurred or sustained by the Indemnified Party in connection with the business of the Company or by reason of any act performed or omitted to be performed in connection with the activities of the Company or in dealing with third parties on behalf of the Company, including costs and attorneys' fees before and at trial and at all appellate levels, whether or not suit is instituted (which attorneys' fees may be paid as incurred), and any amounts expended in the settlement of any claims of liability, loss or damage, *provided* that the act or omission of the Indemnified Party does not constitute fraud or willful misconduct by such Indemnified Party. The Company shall not pay for any insurance covering any liability of any Indemnified Party for actions or omissions for which indemnification is not permitted hereunder; *provided, however,* that nothing contained herein shall preclude the Company from (but the Company shall not be obligated to) purchasing and paying for such types of insurance, including extended coverage liability and casualty and worker's compensation, as would be customary for any Person owning, managing and/or operating comparable property or engaged in a similar business to that of the Company or from naming any Indemnified Party as additional insured parties thereunder.

**Section 11.03** Advances. To the fullest extent permitted by the Act and other applicable law, the Company shall advance to any Indemnified Party the expenses (including reasonable

attorneys' fees, disbursements, fines and amounts paid in settlement) and other indemnification payments incurred by such Indemnified Party in defending any claim, demand, action, suit or proceeding relating to or arising out of performance of the duties of such Indemnified Party on behalf of the Company; provided, however, that any such advance shall only be made if such Indemnified Party delivers a written affirmation and undertaking by such Indemnified Party of its good faith belief that it is entitled to indemnification hereunder and agrees to repay all amounts so advanced if it shall ultimately be determined that such Indemnified Party is not entitled to be indemnified hereunder. Advances hereunder shall be promptly made by Company upon written request by the Indemnified Party, but the failure to make such written request shall not obviate the obligation of the Company to make an Advance hereunder. The Company hereunder shall timely make advance payments hereunder so as not to adversely impact the Indemnified Party, provided that Company has notice of the need to make such advance.

**Section 11.04** Limitation of Liability. Except as otherwise provided herein and to the maximum extent permitted by the Act, each Manager, Officer and Authorized Person (the "***Covered Person***") shall not be liable to the Company or to the Sole Member for any act or omission performed or omitted by such Covered Person, in his or her capacity as a Covered Person; provided that such limitation of liability shall not apply to the extent the act or omission was attributable to such Covered Person's willful misconduct or knowing violation of law as determined by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected). Each Covered Person shall be entitled to rely upon the advice of legal counsel, independent public accountants and other experts and any act of or failure to act by such Covered Person in good faith reliance on such advice shall in no event subject such Covered Person to liability to the Company or the Sole Member. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of the Covered Person otherwise existing at law or in equity, are agreed by the Sole Member to replace such other duties and liabilities of the Covered Person.

**Section 11.05** Non-Exclusive Right. The provisions of this Article XI shall be in addition to and not in limitation of any other rights of indemnification and reimbursement or limitations of liability to which an Indemnified Party may be entitled under the Act, common law, or otherwise. Notwithstanding any repeal of this Article XI or other amendment hereof, its provisions shall be binding upon the Company (subject only to the exceptions set forth above) as to any claim, loss, expense, liability, action or damage due to or arising out of matters which occur during or relate to the period prior to any such repeal or amendment of this Article XI.

## ARTICLE XII
## MISCELLANEOUS

**Section 12.01** Amendment. This Agreement may not be altered or modified, except by the sole written consent of the Sole Member.

**Section 12.02** Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties and their legal representatives, heirs, successors and assigns.

**Section 12.03** Operating Agreement; Invalid Provisions. The parties, by executing this Agreement, hereby agree to the terms and conditions of this Agreement, as they may from time to time be amended. To the extent any provision of this Agreement is prohibited or ineffective under the Act, this Agreement shall be deemed to be amended to the least extent necessary in order to make this Agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to validate any provision of this Agreement that was formerly invalid, such provision shall be considered to be valid from the effective date of such amendment or interpretation.

**Section 12.04** Applicable Laws. The construction, validity and interpretation of this Agreement and the rights and duties of the parties hereunder shall be governed by, and interpreted and construed in accordance with, the laws of the State of Delaware.

**Section 12.05** Headings. The article and section headings in this Agreement are inserted as a matter of convenience and are for reference only and shall not be construed to define, limit, extend or describe the scope of this Agreement or the intent of any provision.

**Section 12.06** Number and Gender. Whenever required by the context hereof, the singular shall include the plural, and vice versa and the masculine gender shall include the feminine and neuter genders, and vice versa.

**Section 12.07** Severability. If any provisions of this Agreement shall be determined to be illegal or unenforceable by any court of law, the remaining provisions shall be severable and enforceable in accordance with their terms.

**Section 12.08** Jurisdiction and Venue. Jurisdiction for any suit, action or legal proceeding arising out of or relating to this Agreement shall be proper and brought only in the Court of Chancery of the State of Delaware sitting in New Castle County, Delaware or, to the extent such court does not have subject matter jurisdiction, the United States District Court for the District of Delaware or any other state court of the State of Delaware, in each case, sitting in New Castle County, Delaware. The parties to this Agreement consent to the jurisdiction of each such court in any such suit, action or proceeding and waive any objection which it may have to the laying of venue of any such suit, action or proceeding in any of such courts.

[*signatures on next page*]

IN WITNESS WHEREOF, this Agreement has been made and executed by the parties as of the date first written above.

**SOLE MEMBER:**

DocuSigned by:
Michelle Ritter
1375348D885F48D...

Michelle Ritter

Address:
140 Crosby Street, 4th Floor
New York, NY 10012

**COMPANY**:

**AUDEM MANAGEMENT, LLC**

DocuSigned by:
By: Michelle Ritter
1375348D885F48D...

Michelle Ritter, Manager

Address:
140 Crosby Street, 4th Floor
New York, NY 10012

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)
First Amended Complaint

# EXHIBIT 19

AAA Demand for Arbitration, No. 01-24-0005-8902 (June 7, 2024); AAA amended initiation letter (July 9, 2024); written objections of Shamim Ritter (July 10, 2024)

AMERICAN ARBITRATION ASSOCIATION® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

# COMMERCIAL ARBITRATION RULES
# DEMAND FOR ARBITRATION

| | | |
|---|---|---|
| **Mediation:** If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box . There is no additional administrative fee for this service. | | |
| You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement. | | |
| Name of Respondent: | | |
| Address: | | |
| City: | State: | Zip Code: |
| Phone No.: | Fax No.: | |
| Email Address: | | |
| Name of Representative (if known): | | |
| Name of Firm (if applicable): | | |
| Representative's Address: | | |
| City: | State: | Zip Code: |
| Phone No.: | Fax No.: | |
| Email Address: | | |
| The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration. | | |
| Brief Description of the Dispute: | | |
| Dollar Amount of Claim: $ | | |
| Other Relief Sought: Attorneys Fees Interest Arbitration Costs Punitive/Exemplary<br>Other: | | |
| Amount enclosed: $<br>In accordance with Fee Schedule: Flexible Fee Schedule Standard Fee Schedule | | |
| Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute: | | |
| Hearing locale:<br>*(check one)* Requested by Claimant Locale provision included in the contract | | |

***Please visit our website at www.adr.org/support to file this case online.***
***AAA Customer Service can be reached at 800-778-7879.***

AMERICAN ARBITRATION ASSOCIATION® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

| | | |
|---|---|---|
| Estimated time needed for hearings overall: hours or days | | |
| Type of Business: Claimant: Respondent: | | |
| Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each other? | | |
| Signature (may be signed by a representative): | Date: | |
| Name of Claimant: | | |
| Address (to be used in connection with this case): | | |
| City: | State: | Zip Code: |
| Phone No.: | Fax No.: | |
| Email Address: | | |
| Name of Representative: | | |
| Name of Firm (if applicable): | | |
| Representative's Address: | | |
| City: | State: | Zip Code: |
| Phone No.: | Fax No.: | |
| Email Address: | | |
| To begin proceedings, **please file online at www.adr.org/fileonline**. You will need to upload a copy of this Demand and the Arbitration Agreement, and pay the appropriate fee. | | |

# ATTACHMENT TO DEMAND FOR ARBITRATION – DESCRIPTION OF DISPUTE

Claimant Hillspire, LLC ("Hillspire") is the family office of Claimant Eric Schmidt ("Schmidt"). Audem Management, LLC ("Audem") is an entity controlled by Respondents Michelle Ritter and her parents Terry and Shamim Ritter (collectively the "Ritters"). On February 14, 2022, Hillspire entered into a property management agreement ("Services Agreement") with Audem. Pursuant to the Services Agreement, Audem managed several properties owned by Schmidt (collectively the "Properties"). The Ritters temporarily used certain of these Properties, including but not limited to 1060 Brooklawn Drive, Los Angeles, California 90077 and 1059 Angelo Drive, Beverly Hills, California 90210. Hillspire terminated the Services Agreement, and the Ritters breached the Services Agreement, including by failing to vacate.

Paragraph 10(g) of Exhibit B to the Services Agreement is titled "Arbitration" and states in pertinent part:

> Any and all controversies, claims and disputes arising out of or relating to the Agreement or the breach hereof (including the applicability of this clause), whether based on contract, tort, statute or other legal or equitable theory shall be settled solely by binding arbitration administered by the American Arbitration Association in accordance with its applicable rules then in effect. The arbitration shall be conducted in Santa Clara County, California by a sole arbitrator and the award of the arbitrator shall be final and binding, and judgment on the award may be entered, confirmed and enforced in any court having jurisdiction thereof.

Additionally, Schmidt and his affiliated entity Steel Perlot, LLC invested $115 million in Michelle Ritter's business, Steel Perlot Management, LLC and its affiliated entities (collectively "SPM"). Schmidt and Ritter are now in dispute over numerous facts relating to SPM, including the management, status and progress of the business, the parties' respective fiduciary duties, third party fundraising, compliance with the operating agreement, and other matters.

Claimants Schmidt and Steel Perlot, LLC seek arbitration of their direct and derivative claims for intentional misrepresentation, false promise, breach of fiduciary duty, corporate waste, conversion, breach of contract, breach of the implied covenant of good faith and fair dealing, violation of Penal Code § 632 and § 642.7, defamation per quod and defamation per se. Claimants Hillspire, LLC, WTY Properties, LLC, and GTE Properties, LLC seek arbitration of their claims for quiet title, breach of contract, breach of the implied covenant of good faith and fair dealing, declaratory relief, unjust enrichment, trespass, and ejectment.

AMERICAN ARBITRATION ASSOCIATION® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

Michael Powell, Vice President
725 South Figueroa Street, Suite 400
Los Angeles, CA 90017
Telephone: (213)362-1900

July 9, 2024

Patricia L. Glaser, Esq.
Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, CA 90067
Via Email to: pglaser@glaserweil.com

Lisa M. Coyle, Esq.
Blank Rome LLP
1271 Avenue of the Americas
New York, NY 10020
Via Email to: lisa.coyle@blankrome.com

Terry Ritter
1059 Angelo Drive
Beverly Hills, CA 90210
Via Email to: ritter_t2@ymail.com

Case Number: 01-24-0005-8902

Hillspire, LLC, GTE Properties, LLC,
WYT Properties, LLC, Steel Perlot, LLC and
Eric Schmidt
-vs-
Michelle Ritter and Audem Management, LLC
-vs-
Terry Ritter; Shamim Ritter

Dear Parties:

This will confirm that the matter was previously stayed pending the outcome of settlement discussions. Inasmuch as parties are now ready to proceed with administration, the American Arbitration Association has returned the matter to an active status and the following deadlines are now in place:

Thank you for choosing the American Arbitration Association (the AAA) to assist you in resolving your dispute. This letter - along with the attached Arbitration Information Sheet, AAA-ICDR® Best Practices Guide for Maintaining Cybersecurity and Privacy, and AAA-ICDR Cybersecurity Checklist - provide basic information about the AAA's arbitration process.

The above-captioned case was filed on June 7, 2024. This matter is being administered under the Procedures for Large Complex Commercial Disputes of the current Commercial Arbitration Rules, which may be obtained from our website at www.adr.org .

The AAA WebFile® Electronic Case Filing Guidelines apply to this dispute. The AAA requires the parties to use AAA WebFile® to file online their pleadings, including claims, counterclaims, answers, motion briefing, pre- and post-hearing briefs, and other substantive filings. To e-file or view documents on AAA WebFile, case participants must have an active AAA WebFile account and must have previously filed a notice of appearance or otherwise

appeared in the case. If you have any questions, please refer to the AAA WebFile® Electronic Case Filing ("ECF") Guidelines FAQ or contact your case manager.

Please note that in accordance with the Rules any answer, counterclaim or objection to Claimant's requested locale should be **filed within fourteen days from the date of this letter**. Please review the Rules and the enclosed Arbitration Information Sheet regarding the locale of hearings.

Inasmuch as the claim exceeds $100,000, the parties shall mediate their dispute pursuant to the AAA's Commercial Mediation Procedures, or as otherwise agreed upon by the parties, in accordance with Rule R-10 (Mediation). Absent agreement of the parties or otherwise noted in the parties contract, the mediation shall take place concurrently with the arbitration and shall not serve to delay the arbitration proceedings. The parties may mediate their dispute at any time while the arbitration is pending. **Unless the parties' agreement includes a requirement for mandatory mediation, any party may unilaterally opt-out of this rule upon notification to the AAA and the other parties to the arbitration.**

The parties' attention is directed to California Code of Civil Procedure Section 1282.4, regarding representation by an attorney not licensed to practice in the State of California. Please review the state bar's website if you need a certification form.

To help arbitrators during the appointment process, the parties must complete a Checklist for Conflicts form. This form helps to avoid the possibility of a last-minute disclosure and/or disqualification of the arbitrator(s). Parties are requested to provide the full and complete names of all persons, firms, companies or other entities involved in this matter including, but not limited to, subsidiaries, related entities, witnesses, consultants, and attorneys. Arbitrators may need to divulge any relevant information in order to make necessary disclosures, in accordance with the rules. This form is not a preliminary or final witness list, and the AAA will not share your Checklist with the opposing party and the parties are not required to exchange them. **The Checklist is due by July 23, 2024,** and may be completed online via the AAA's WebFile at www.adr.org. Subsequent updates to the Checklist may be completed at any time.

If you have an AAA WebFile account, you should see this case listed when you log in. If you do not see the case number when you login, please contact me. If you do not have an AAA WebFile account, please navigate to www.adr.org and click on "Create Account" at the top to enter your email address and begin the registration process.

Please do not hesitate to contact me with any questions.

Sincerely,

/s/ Kaylin Price
Director of ADR Services
Direct Dial: (404)320-5143
Email: KaylinPrice@adr.org

Enclosure
cc:
Craig Weiner, Esq.
Jill Harris, Esq.
Craig Marcus, Esq.
Shamim Ritter

American Arbitration Association® | International Centre for Dispute Resolution®

# AMERICAN ARBITRATION ASSOCIATION
## Initial Administrative Conference Agenda

Case Number:
Case Number: 01-24-0005-8902

Hillspire, LLC, GTE Properties, LLC,
WYT Properties, LLC, Steel Perlot, LLC and
Eric Schmidt
-vs-
Michelle Ritter and Audem Management, LLC
-vs-
Terry Ritter; Shamim Ritter

Case Manager: Kaylin Price
Date: initial administrative conference date
Time: initial administrative conference time

**I. Introduction**
- a. Introductory comments
- b. Brief discussion about the nature of the dispute
- c. Timeline for completion of the proceedings
- d. Final Hearing Locale

**II. Arbitrator Appointment**
- a. Checklist for Conflicts
- b. Special contract provisions regarding the arbitrator appointment process
- c. Use of AAA's Arbitrator Search Platform
- d. Arbitrator qualifications & geographical location
- e. Enhanced Arbitrator Selection Process
  (See enclosed Fact Sheet for additional information)

**III. Pre-Hearing Matters**
- a. Discovery
- b. Sample Scheduling Order
- c. The preliminary hearing with the Arbitrator

**IV. Administrative Information**
- a. The use of fax and e-mail
- b. Communication with your case manager
- c. Communication with the arbitrator
- d. Administrative extensions
- e. Billing for deposits

**V. Closing**
- a. Mediation
- b. Questions

Notes: ____________________

____________________

Your case manager will provide a written confirmation of arrangements made during this call.

AMERICAN ARBITRATION ASSOCIATION® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

**Arbitration Information Sheet**

This document provides information about your upcoming arbitration and the expectations concerning each party's conduct throughout the process. Please save this information sheet so that you may refer to it throughout the arbitration.

**Administrative Conference** – The AAA may conduct an Administrative Conference with the parties to discuss issues that will assist the AAA in administering the case as efficiently as possible. This is also a good time for the parties to discuss ways to conduct the arbitration to meet their specific needs. Please be prepared to discuss the following:

- Estimates on the expected duration of the case;
- Number of arbitrators/party-appointed arbitrator provision;
- Method of appointment of arbitrators, if applicable;
- Your views on the qualifications of the arbitrators to be proposed;
- The possibility of submitting this dispute to mediation;
- The handling of extension requests;
- Reminder for parties to review the *AAA-ICDR® Best Practices Guide for Maintaining Cybersecurity and Privacy*;
- Means of communication between the AAA and the parties;
- The possibility of utilizing a documents only process.

**Exchange of Correspondence and Documents** – It is also important to note that the parties must exchange copies of all correspondence during the course of the arbitration. The two exceptions are the Checklist for Conflicts mentioned above and the party's arbitrator ranking list, which you will receive further information on during the course of the arbitrator appointment process. The parties only need to send copies of documents, such as discovery, to the AAA if the document is to be transmitted to the arbitrator for a determination.

**Communications with Arbitrator** – It is very important that parties do not engage in any ex-parte communications with the arbitrator. So as to minimize the potential of such communications, this case will be administered by facilitating the exchange of appropriate written documents through the AAA. To ensure the proper handling of all case-related documents, the parties are asked not to submit correspondence directly to the arbitrator. Correspondence should be submitted to your primary contact for transmittal to the arbitrator, copying the other party.

**Timeliness of Filings** – Please pay particular attention to response dates included on any correspondence sent to you by the AAA. Untimely filings or responses will not be considered by the AAA. Therefore, if you need an extension to any deadline, please contact the other party to reach an agreement. In the event you are unable to agree, the AAA or the arbitrator will determine if an extension will be granted.

**International Arbitrations** – If either party believes a matter involves an arbitration agreement between parties from different countries or otherwise has an international nexus that may give rise to unique issues, please let the AAA know within fifteen days. The International Centre for Dispute Resolution (ICDR, www.ICDR.org ) is a Division of the AAA that administers international arbitrations worldwide, including in the US. The ICDR is available for assistance in any arbitration handled by the AAA, or, alternatively, can administer the case, if both parties agree. The AAA can also apply its Supplementary Procedures for International Arbitration under any of its Rules. The Supplementary Procedures are available on either www.ADR.org or www.ICDR.org.

**Locale of the Arbitration –** The parties may agree to a locale for the arbitration. This agreement can be made in the parties' agreement or contract, or when the arbitration is submitted to the AAA. The AAA will place the

arbitration within the agreed upon locale.

When the parties' arbitration agreement is silent or ambiguous with respect to locale, and the parties disagree as to locale, the AAA may determine the place of arbitration, subject to the power of the arbitrator after appointment, to make a final determination on the locale.

In these circumstances, the Claimant will generally request that the hearing be held in a specific locale. If the Respondent fails to file an objection to the locale requested by the Claimant within 14 calendar days after the notice of the request has been sent to the Respondent by the AAA, the AAA will confirm the locale requested by the Claimant is agreeable.

When a locale objection is filed, each party is requested to submit written statements regarding its reasons for preferring a specific locale. In preparing their written statements, the parties are asked by the administrator to address the following issues:

- Location of parties & attorneys;
- Location of witness and documents;
- Location of records;
- If construction, location of site, place or materials and the necessity of an on-site inspection;
- Consideration of relative difficulty in traveling and cost to the parties;
- Place of performance of contract;
- Place of previous court actions;
- Location of most appropriate panel;
- Any other reasonable arguments that might affect the locale determination.

**AAA WebFile –** We encourage the parties to visit our website to learn more about how to file and manage your cases online. As part of our administrative service, AAA's WebFile allows parties to perform a variety of case related activities, including:

- File additional claims;
- Complete and update the Checklist for Conflicts form;
- View invoices and submit payment;
- Merge forms that auto-populate with case and party information;
- Share and manage documents;
- Strike and rank listed neutrals;
- Review case status or hearing dates and times;
- Upload hearing exhibits in a dedicated space activated by the arbitrator.

AAA WebFile provides flexibility because it allows you to work online as your schedule permits - day or night. Cases originally filed in the traditional offline manner can also be viewed and managed online. If the case does not show up when you log in, you may request access to the case through WebFile. Your request will be processed within 24 hours after review.

**Refund Schedule –** The AAA has a refund schedule in the administrative fee section of the Rules. After 60 days of the AAA's receipt of the Demand or the appointment of the arbitrator the filing fees are non-refundable. The AAA will only refund filing fees as outlined in the Rules and does not refund neutral costs incurred when parties settle their dispute or withdraw their claims. Case service Final fees are fully refundable if the parties provide at least 24 hours' notice prior to the hearing.

*Revised 12/17/2020*

AMERICAN ARBITRATION ASSOCIATION® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

**Billing Information Sheet**

**Deposits –** After the preliminary management hearing, the arbitrator will notify the case manager how much time is anticipated for the arbitration process. The Manager of ADR Services will then notify the parties of this amount. Once billing is entered into our system an invoice is automatically generated and transmitted within 2 weeks. Should you need an immediate copy to expedite payment please contact your case manager. Your Invoice/Statement includes a list of "Payment Options." If paying by check, please make it payable to "American Arbitration Association" and send it to your case manager's attention at the office address specified on the "Payment Options" page of your Invoice/Statement. These deposits are typically due thirty days prior to the evidentiary hearings, but this may vary depending on the schedule specific to this case.

At the conclusion of the preliminary management hearing, the parties' representatives and the Manager of ADR Services may discuss the AAA's billing and deposit practices with regard to covering the arbitrator's anticipated fees and expenses for the entire proceeding. We ask that the representatives discuss this with their clients prior to the conference so that any questions they may have can be addressed.

Deposits are typically due thirty days prior to the first evidentiary hearing and failure to make deposits by the established due date may result in the arbitrator suspending the proceeding. Therefore, please comply with all established due dates for payment in order to avoid interruption in the progress of the case. All unused deposits shall be promptly refunded.

Parties are also reminded that you may view case financial information, as well as make payments with a credit card online via AAA's WebFile.

Compensation to the arbitrator represents an independent obligation of the parties, and it is understood that the AAA has no liability, direct or indirect, for such payment. Each party shall promptly deposit in advance with the AAA such sums of money as required by the administrator to defray the costs of the arbitrator(s) fees. Compensation incurred will be deducted from deposits on hand, if any.

**Abeyance Fee –** Should parties agree, it is the policy of the Association to hold cases in abeyance for up to one year. The parties may continue to hold the matter in abeyance beyond that period providing they remit a payment of $500.00 to the AAA to cover the administrative expense of continued tracking of such cases.

**Final Fee –** The Final Fee covers all AAA services from the time a hearing is scheduled to when the case is awarded, settled or withdrawn. The Final Fee is billed after an arbitrator has been appointed and a hearing has been scheduled and is payable in advance of the first scheduled hearing. The Final Fee will be incurred for all cases that proceed to their first evidentiary regardless of whether that hearing is held in person, via video conference, or via telephone and is payable by each party filing a claim or counterclaim, pursuant to the applicable fee schedule. If a hearing does not take place, the Final Fee will be fully refunded if the parties provide at least 24 hours' notice prior to the hearing.

**Refund Schedule –** The AAA has a refund schedule in the administrative fee section of the Rules. After 60 days of the AAA's receipt of the Demand or the appointment of the arbitrator the filing fees are non-refundable. The AAA will only refund filing fees as outlined in the Rules and does not refund arbitrator costs incurred when parties settle their dispute or withdraw their claims. The date of receipt by the AAA of the demand for arbitration will be used to calculate refunds of both claims and counterclaims.

AMERICAN ARBITRATION ASSOCIATION® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

**Enhanced Arbitrator Selection Process for Large Complex Cases**

The Enhanced Arbitrator Selection Process is a level of service that is designed to give parties in AAA arbitrations who use the Procedures for Large, Complex disputes greater flexibility and control in selecting the most appropriate arbitrator for their case. At no additional cost, parties can agree to customize their arbitrator selection process by agreeing to use one or more of the screening processes offered. Parties are encouraged to discuss options with each other and the AAA who will be knowledgeable in helping the parties' fine-tune their selection process.

The following is an overview of the suggested options offered using the Enhanced Arbitrator Selection Process:

***Representative sample review*** **–** The AAA will provide the parties with an initial sample of arbitrator resumes based on the qualifications requested by the parties. The parties will review the sample resumes and confer with the case manager to give feedback on whether the arbitrators presented meet their needs. This feedback will be used in developing the final list of arbitrators from which the parties will select.

***Pre-screening for arbitrator disclosures and availability*** **–** The AAA will pre-screen a select number of arbitrators who possess the qualifications requested by the parties. The arbitrators may be pre-screened for conflicts of interest, availability, or both.

***Supplemental Description of Arbitrator's Experience*** **–** The parties can request more information in the form of a brief synopsis regarding specific expertise in a specific field. The arbitrators will be requested to elaborate on experience in a specific area as requested by the parties. This may also include a request for references and/or a copy of a CV, where applicable.

***Oral or written interviews of the arbitrator candidates*** **–** The AAA will work with parties to develop an interview protocol in order for the parties to have an opportunity to present questions to a select number of potential arbitrator candidates, either through a telephone conference, or in writing. Examples of interview question topics might include: industry expertise, relative experience in similar disputes, the arbitrator's procedural handling practices, and any other questions that the parties would find helpful to the selection process.

***Block listing*** **–** For cases involving three-arbitrator panels, the AAA can provide separate lists of arbitrators to the parties, each one containing arbitrators with a specified background or level of expertise, i.e., one list of retired judges, one list of attorneys and one list of business and industry experts.

***Streamlined Three Arbitrator Panel Option*** **–** In cases where the rules or the parties' agreement requires a panel of three arbitrators to hear and decide the case, the **Streamlined Three Arbitrator Panel Option** allows parties to move through the preliminary and exchange of information (discovery) stages of a case working with a single arbitrator. The full panel would then participate in the evidentiary hearing and render the final award on the case. For additional information on the Streamlined Panel Option, please visit our website at www.adr.org.
Parties know how important the selection of the right arbitrator is in having an effective arbitration process. The above services can give the parties confidence that they have met that goal. This service is offered at no additional cost and your AAA contact will help facilitate an agreement during an administrative conference.

We encourage the parties to work together to agree on as many procedures as possible and we will work to try to find a process that is agreeable to everyone. However, if after full discussion with the parties, an agreement is not reached, the AAA will administer the case in accordance with the standard arbitrator selection process outlined in the rules.

*Revised April 2017*

From: Michelle Ritter michelleritter929@gmail.com
Subject: Fwd: Hillspire, LLC, GTE Properties, LLC, v. Michelle Ritter and Audem Management, LLC - Case 01-24-0005-8902
Date: Aug 8, 2024 at 8:43:17 PM
To: Shamim Ritter Email shamimr559@gmail.com

---

Begin forwarded message:

> **From:** Terry Ritter <ritter_t2@ymail.com>
> **Date:** July 11, 2024 at 6:10:08 PM PDT
> **To:** Michelle Ritter <michelleritter929@gmail.com>
> **Subject: Fwd: Hillspire, LLC, GTE Properties, LLC, v. Michelle Ritter and Audem Management, LLC - Case 01-24-0005-8902**
>
> I never got a response.
>
> Begin forwarded message:
>
> > **From:** Terry Ritter <ritter_t2@ymail.com>

**Date:** July 10, 2024 at 8:09:41 PM PDT
**To:** kaylinsokolik@adr.org
**Subject: Fwd: Hillspire, LLC, GTE Properties, LLC, v. Michelle Ritter and Audem Management, LLC - Case 01-24-0005-8902**

Hi Kaylin,

This is very concerning and confusing. I have a couple of comments and questions regarding the proposed arbitration that Eric and Hillspire have initiated against my wife and me.

1- what are the attachments since I do not see them in this email? As in, what attachments are Patti referring to?

2- I can be present on my own account and as an employee of Audem but on what grounds for both?

3- My wife, Shamim, is not part of Audem or any of these entities. I cannot speak for my wife but why is she even in this arbitration?

4- Some of these entities that are apparently adversarial are ones that I have never signed with or heard of. Who are the parties at GTE or WTY?

5- Eric and his core team certainly have Shamim's email and all of our contact information so this seems to be wasting time, resources, and money, as well as further distressing my wife and me. The lawyers are just now stating that they don't have Shamim's info, which is not true. What are the rules against wasting resources?

6- What is the process for selecting the arbitrator? How neutral is this process? Why are we subject to large complex commercial

rules in this arbitration?

7- Neither my wife nor I have had personal representation or counsel on any matters in relation to Eric or any of his world in this ongoing set of issues that really involve Michelle, Eric, and Hillspire.

8- Michelle has kept us updated on potential resolutions with Eric but this obviously isn't part of that and even in settlement, my wife and I would have to still sign off on our own accounts.

Please advise. Appreciate the help.

Terry

Begin forwarded message:

**From:** Jill Harris <jharris@glaserweil.com>
**Date:** July 10, 2024 at 7:06:57 PM PDT

**To:** KaylinPrice@adr.org
**Cc:** craig.weiner@blankrome.com, lisa.coyle@blankrome.com, "Patricia L. Glaser" <pglaser@glaserweil.com>, "Craig H. Marcus" <cmarcus@glaserweil.com>, ritter_t2@ymail.com, tritter@audem-mgmt.com, mritter@steelperlot.com, michelleritter929@gmail.com
**Subject: RE: Hillspire, LLC, GTE Properties, LLC, v. Michelle Ritter and Audem Management, LLC - Case 01-24-0005-8902**

Kaylin,

We were just informed that Blank Rome does not represent any of the respondents for the purposes of this arbitration. I have copied all of the email addresses we have for the respondents here. The only email address we do not have is Shamim Ritter. Hopefully, either her husband or daughter can provide it to you as they are both copied here.

Best,

Glaser Weil

**Jill Harris**
ASSOCIATE

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

jharris@glaserweil.com
**T** 310.282.6207

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

---

**From:** KaylinPrice@adr.org <KaylinPrice@adr.org>
**Sent:** Tuesday, July 9, 2024 8:45 AM
**To:** craig.weiner@blankrome.com; lisa.coyle@blankrome.com; Jill Harris <jharris@glaserweil.com>; Craig H. Marcus <cmarcus@glaserweil.com>; ritter_t2@ymail.com; Patricia L. Glaser <pglaser@glaserweil.com>
**Subject:** Hillspire, LLC, GTE Properties, LLC, v. Michelle Ritter and Audem Management, LLC - Case 01-24-0005-8902

Hello,

Please review the attached correspondence regarding the above-referenced case.

Feel free to contact me with any questions, comments or concerns you have related to this matter.

Thank you.

**AAA Kaylin Price**
**Director of ADR Services**

American Arbitration Association

T: 404 320 5143 ext 5317 E: KaylinPrice@adr.org

NPT's BEST NONPROFITS

1420 Fifth Avenue, Suite 2200, Seattle, WA 98101
adr.org | icdr.org | aaamediation.org

TO WORK FOR
★2024★

The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)
First Amended Complaint

# EXHIBIT 20

AAA Demand for Arbitration, No. 01-25-0000-2191 (Jan. 15, 2025) and Second Amended Demand (Sept. 16, 2025)

AMERICAN ARBITRATION ASSOCIATION® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

# COMMERCIAL ARBITRATION RULES DEMAND FOR ARBITRATION

**Mediation:** If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box ☐. There is no additional administrative fee for this service.

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

| | | |
|---|---|---|
| Name of Respondent: Michelle Ritter | | |
| Address: | | |
| City: Los Angeles | State: California | Zip Code: |
| Phone No.: | Fax No.: | |
| Email Address: ritter.sm@icloud.com | | |
| Name of Representative (if known): Scott Baron Esq., Elliott Joffe, Esq. | | |
| Name of Firm (if applicable): Baron Samson, LLP | | |
| Representative's Address: 330 Passaic Avenue, Suite 105 | | |
| City: Fairfield | State: New Jersey | Zip Code: 07004 |
| Phone No.: 973-244-0030 | Fax No.: 973-244-0016 | |
| Email Address: sbaron@baronsamson.com; ejoffe@baronsamson.com | | |

The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

Brief Description of the Dispute:

see attachment

Dollar Amount of Claim: $ undetermined

Other Relief Sought: ☑ Attorneys Fees ☑ Interest ☑ Arbitration Costs ☑ Punitive/Exemplary
☐ Other:

Amount enclosed: $ 7,700

In accordance with Fee Schedule: ☐ Flexible Fee Schedule ☑ Standard Fee Schedule

Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute:

former judge

Hearing locale: Los Angeles County, California

*(check one)* ☐ Requested by Claimant ☑ Locale provision included in the contract

AMERICAN ARBITRATION ASSOCIATION® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

| | | |
|---|---|---|
| Estimated time needed for hearings overall: hours or 7 days | | |
| Type of Business:<br>Claimant: Investor, minority member | Respondent: Managing member/CEO | |
| Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each other? | | |
| Signature (may be signed by a representative):<br>/s/ Craig Marcus | Date:<br>01/14/2025 | |
| Name of Claimant: see attachment | | |
| Address (to be used in connection with this case): 1010 Alma Street | | |
| City: Menlo Park | State: California | Zip Code: 94025 |
| Phone No.: 650-468-1552 | Fax No.: | |
| Email Address: mseferian@hillspire.com | | |
| Name of Representative: Patricia Glaser, Craig H. Marcus, Jill Harris | | |
| Name of Firm (if applicable): Glaser Weil Fink Howard Jordan & Shapiro LLP | | |
| Representative's Address: 10250 Constellation Blvd., 19th Floor | | |
| City: Los Angeles | State: California | Zip Code: 90067 |
| Phone No.: 310-282-6207 | Fax No.: | |
| Email Address: pglaser@glaserweil.com; cmarcus@glaserweil.com; jharris@glaserweil.com | | |
| To begin proceedings, **please file online at www.adr.org/fileonline**. You will need to upload a copy of this Demand and the Arbitration Agreement, and pay the appropriate fee. | | |

**ATTACHMENT TO DEMAND FOR ARBITRATION**

Claimants (i) Hillspire, LLC ("Hillspire"), (ii) Orion Wing, LLC, formally known as Steel Perlot, LLC ("SPLLC"), and (iii) Orion Wing Investments, LLC, formally known as Steel Perlot Investments, LLC ("SPI"), are all indirectly owned and/or controlled by claimant Eric Schmidt ("Schmidt"). Schmidt also currently indirectly owns and controls Orion Wing Management, LLC, formally known as Steel Perlot Management, LLC ("SPM").

Respondent Michelle Ritter ("Ritter") is individual residing in Los Angeles County.

Prior to December 4, 2024, (i) Ritter was the CEO and sole Manager of SPM; (ii) Ritter owned a 51% membership interest in SPM, and (iii) Schmidt indirectly owned a 49% passive membership interest in SPM.

On December 4, 2024, Claimants bought out Ritter's 51% interest in SPM and the parties resolved and mutually released various claims by and between them pursuant to an agreement.

Ritter subsequently breached the agreement by, *inter alia*: (a) disparaging and defaming Schmidt, including with false accusations of abuse; (b) disclosing information and/or document(s) encompassed by the confidentiality provisions in the Agreement; (c) failing to work in good faith to address the foregoing breaches; (d) violating the releases, non-disparagement clause, take down obligations, and confidentiality provisions of the agreement; (e) filing a false application for a temporary restraining order containing false and disparaging assertions and using the illegitimate TRO as leverage to extort additional consideration from Schmidt; (f) failing to timely relinquish and return property and assets owned by Schmidt; and (g) failing to reasonably cooperate in the transition of SPM.

Based on the foregoing, Claimants hereby assert causes of action against Ritter for breach of contract, breach of the implied covenant of good faith and fair dealing, defamation per se, and defamation per quod. Pursuant to these causes of action, Claimants seek the following relief: compensatory damages, punitive damages, injunctive relief, attorneys' fees, arbitration costs, AAA costs, arbitrator costs, expert costs, costs of suit, interest, and such other relief as the arbitrator deems just and appropriate.

Paragraph 3(g) of the Agreement is titled "Mandatory Arbitration" and states in pertinent part:

"The Parties stipulate and agree to submit any and all Claims between any Schmidt Party or their affiliates, on the one hand, and any Ritter Party or their affiliates, on the other hand, whenever and wherever arising to final, mandatory, binding arbitration including, without limitation, the following: (A) any and all Claims relating to and/or arising from this Agreement, any ancillary or other agreement referenced herein including without limitation any claimed breach of this Agreement or applicable ancillary or other agreements and/or any implied covenant or term; (B) any and all Claims relating to and/or arising from any duty and/or alleged breach of a duty relating to and/or arising from this Agreement or applicable ancillary or other agreement; (C) any and all Claims relating to and/or arising from any tort, statutory violation,

wrongdoing, and/or conduct of any nature relating to or arising from this Agreement or applicable ancillary or other agreement; (D) any and all Claims relating to and/or arising the validity, scope, interpretation, and/or enforceability of this Agreement or applicable ancillary or other agreement; (E) any and all Claims relating to and/or arising the validity, scope, interpretation, and/or enforceability of this arbitration clause; and (F) any and all Claims relating to the arbitrability of all issues, including but not limited to which Claims are subject to arbitration and which claims are not subject to arbitration."

PATRICIA L. GLASER – State Bar No. 55668
pglaser@glaserweil.com
CRAIG MARCUS – State Bar No. 156242
cmarcus@glaserweil.com
JILLIAN P. HARRIS – State Bar No. 300119
jharris@glaserweil.com
GLASER WEIL FINK HOWARD
JORDAN & SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone: (310) 553-3000
Fax: (310) 556-2920

Attorneys for Claimants Eric Schmidt, Hillspire, LLC, Orion Wing, LLC, Steel Perlot, LLC, and Orion Wing Investments, LLC

Glaser Weil

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| Eric Schmidt; Hillspire, LLC; Orion Wing, LLC; Steel Perlot, LLC; and Orion Wing Investments, LLC,<br><br>Claimants,<br><br>v.<br><br>MICHELLE RITTER,<br><br>Respondent. | AAA Case No. 01-25-0000-2191<br><br>**SECOND AMENDED DEMAND FOR ARBITRATION** |

Claimants (i) Hillspire, LLC ("Hillspire"), (ii) Orion Wing, LLC, formally known as Steel Perlot, LLC ("SPLLC"), and (iii) Orion Wing Investments, LLC, formally known as Steel Perlot Investments, LLC ("SPI"), are all indirectly owned and/or controlled by claimant Eric Schmidt ("Schmidt"). Schmidt also currently indirectly owns and controls Orion Wing Management, LLC, formally known as Steel Perlot Management, LLC ("SPM").

Respondent Michelle Ritter ("Ritter") is an individual residing in Los Angeles County.

Prior to December 4, 2024, (i) Ritter was the CEO and sole Manager of SPM, (ii) Ritter owned a 51% membership interest in SPM, and (iii) Schmidt indirectly owned a 49% passive membership interest in SPM.

On December 4, 2024, Claimants bought out Ritter's 51% interest in SPM and the parties resolved and mutually released various claims by and between them pursuant to an agreement ("Agreement").

Ritter subsequently breached the Agreement by, *inter alia*: (a) disparaging and defaming Schmidt, including with false accusations of abuse; (b) soliciting others to disparage and defame Schmidt; (c) disclosing information and/or document(s) encompassed by the confidentiality provisions in the Agreement; (d) failing to work in good faith to address the foregoing breaches; (e) violating the releases, non-disparagement clause, take down obligations, and confidentiality provisions of the agreement; (f) filing a false application for a temporary restraining order containing false and disparaging assertions and using the illegitimate TRO as leverage to extort additional consideration from Schmidt; (g) failing to timely relinquish and return property and assets owned by Schmidt; (h) failing to reasonably cooperate in the transition of SPM; (i) violating her take down obligations by, among other things, failing to remove Schmidt's profile from the Steel Perlot website; and (j) violating the "No Contact" provision by contacting Schmidt, including in August 2025.

Based on the foregoing, Claimants hereby assert causes of action against Ritter for breach of contract, breach of the implied covenant of good faith and fair dealing, defamation per se, and defamation per quod. Pursuant to these causes of action, Claimants seek the following relief: compensatory damages, punitive damages, injunctive relief, attorneys' fees, arbitration costs, AAA

costs, arbitrator costs, expert costs, costs of suit, interest, and such other relief as the arbitrator deems just and appropriate.

On March 29, 2025, Ritter purported to unilaterally rescind the Agreement and threatened to file a civil action asserting claims that were released by the Agreement. Ritter cannot rescind the Agreement because, among other things: (1) Ritter failed to restore to Claimants everything of value that she received pursuant to the Agreement, (2) Ritter has not—and cannot—restore Claimants to the status quo they would have been in but for the Agreement, (3) Ritter has unclean hands, and (4) Claimants substantially performed their obligations under the Agreement. Furthermore, any claim regarding the validity or enforceability of the Agreement, including whether there are grounds for rescission, must be arbitrated. Ritter cannot unilaterally declare the Agreement rescinded, disregard the dispute resolution procedures in the Agreement that mandate arbitration, and pursue a civil action for the claims released in the Agreement because, among other things, the arbitration clause in the Agreement expressly encompasses claims relating to the validity and enforceability of the Agreement and the arbitration clause remains valid and enforceable unless and until an arbitrator determines that the Agreement is rescinded and unenforceable.

Based on the foregoing, Claimants hereby assert causes of action against Ritter for declaratory relief and anticipatory breach of contract. As to the declaratory relief cause of action, Claimants request a declaration and determination that: (a) Ritter cannot rescind the Agreement, (b) Ritter's purported rescission was not effective, (c) Ritter cannot assert claims against Claimants that were released pursuant to the Agreement, (d) the arbitration clause in the Agreement remains valid and enforceable, and (e) Ritter's sole remedy is to arbitrate her claims against Claimants, including whether the Agreement has been rescinded, whether Ritter may sue for the claims released in the Agreement, and all other claims. Claimants also request attorneys' fees, arbitration costs, AAA costs, arbitrator costs, expert costs, costs of suit, interest, and such other relief as the arbitrator deems just and appropriate. As to the anticipatory breach of contract cause of action predicated on Ritter's threat to file a civil action in breach of the Agreement, Claimants seek money damages according to proof, along with injunctive relief, attorneys' fees, arbitration costs, AAA costs,

arbitrator costs, expert costs, costs of suit, interest, and such other relief as the arbitrator deems just and appropriate.

Pursuant to Section 3(b) of the Agreement, “as a material inducement to the Schmidt Parties entering into the Agreement,” Ritter agreed to execute the declaration attached to the Agreement as Schedule D (“Declaration”). By agreeing to voluntarily sign the Declaration under penalty of perjury, Ritter necessarily represented that the contents of the Declaration are accurate and truthful. Claimants are informed and believe, and based thereon allege, that Ritter is unwilling to and will not sign the Declaration that she is contractually obligated to sign, and that Ritter refuses and will refuse to sign the Declaration regardless of whether full performance is tendered. Ritter’s unwillingness and refusal to sign the declaration, regardless of whether full performance is tendered, constitutes yet another anticipatory breach of the Agreement. Claimants supplement their existing, above-described anticipatory breach cause of action with the foregoing additional anticipatory breach of contract. As to this additional anticipatory breach of contract, Claimants seek specific performance, injunctive relief, money damages according to proof, attorneys’ fees, arbitration costs, AAA costs, arbitrator costs, expert costs, costs of suit, interest, and such other relief as the arbitrator deems just and appropriate.

Pursuant to Section 1(l) of the Agreement and Paragraph 3 of Schedule A to the Agreement, the Ritter Parties are required to resolve all attorney liens, and “obtain a full, complete, and unconditional written release of” all attorney liens, as a condition precedent to payment the $14 million “MR Amount.” On September 5, 2025, the Ritter Parties’ prior attorney, Baron Samson, served a written notice wherein it asserted a “$5.7 million lien against the Schmidt Parties and its agents and attorneys (including the Glaser Weil firm)” (“Baron Lien”). We anticipate that, as soon as they complete their withdrawal as counsel for Michelle Ritter, the Liner Freedman first will likewise assert an attorney lien (“Liner Lien”). Given the existence of the Baron Lien and the possible Liner Lien, the condition precedent for payment of the MR Amount does not exist and the payment is not due and owing. Michelle Ritter disputes the foregoing and contends that payment is due to her notwithstanding the liens. Claimants are entitled to and hereby request a declaration of rights and determination that, given the existence of the Baron Lien and the possible Liner Lien, the

condition precedent for payment of the MR Amount does not exist and the payment is not due and owing. Claimants supplement and amend their existing, above-described declaratory relief cause of action to seek this additional declaration of rights, and Claimants also seek attorneys' fees, arbitration costs, AAA costs, arbitrator costs, expert costs, costs of suit, and such other relief as the arbitrator deems just and appropriate.

Pursuant to Section 3(g) of the Agreement, the Ritter Parties agreed to submit all claims against the Schmidt Parties to binding, mandatory arbitration, including "any and all Claims relating to and/or arising out of" "the validity, scope, interpretation, and/or enforceability of this Agreement," "the validity, scope, interpretation, and/or enforceability of this arbitration clause," and "the arbitrability of all issues, including but not limited to which Claims are subject to arbitration and which claims are not subject to arbitration." Pursuant to Sections 3(a) and 3(g) of the Agreement, the Ritter Parties agreed to keep several matters confidential and to refrain from disclosing said matters to third parties, including the existence of the Agreement and this arbitration, and various information about the Schmidt Parties and their prior dealings with the Ritter Parties. On September 8, 2025, Michelle Ritter notified the Schmidt Parties of her intention to disregard and breach the above-cited terms of the Agreement by filing a Complaint, TRO application, and other supporting documents with the Los Angeles Superior Court wherein: (1) she asserted claims subject to the mandatory arbitration clause in the Agreement, including claims challenging the enforceability of the Agreement; and (2) she revealed information protected by the confidentiality clause in the Agreement, including the existence of the Agreement and this arbitration, and other facts about the Schmidt Parties covered by the confidentiality clause. The Schmidt Parties immediately sent Ms. Ritter an e-mail wherein they set forth some of the reasons why her threatened filings were impermissible and constituted a breach of the Agreement, and urged her not to file the impermissible documents with the Superior Court. Ms. Ritter disregarded the Schmidt Parties' warning and filed the above-referenced materials with the Los Angeles Superior Court on September 8, 2025. Ms. Ritter used the pretext of the impermissible court filing to disclose and disseminate confidential information about the Schmidt Parties protected by the confidentiality clause. As such, Ms. Ritter breached both the confidentiality clause and the mandatory arbitration

clause in the Agreement (Sections 3(a) and 3(g) of the Agreement), as well as the implied covenant of good faith and fair dealing. Claimants hereby supplement their existing, above-described breach of contract and breach of the implied covenant causes of action to include the foregoing additional breaches of contract and the implied covenant. As to these additional breaches of contract and the implied covenant, Claimants seek money damages according to proof, injunctive relief, specific performance, attorneys' fees, arbitration costs, AAA costs, arbitrator costs, expert costs, costs of suit, interest, and such other relief as the arbitrator deems just and appropriate.

Beginning on September 14, 2025 and continuing thereafter, Respondent Michelle Ritter made a series of posts on social media accounts controlled by her wherein she both: (1) defamed one of more of the Claimants; and (2) further breached the Agreement and the implied covenant of good faith and fair dealing in the Agreement. Claimants hereby supplement their existing, above-described causes of action for defamation, breach of contract, and breach of the implied covenant to include the foregoing additional defamation and breaches of contract and the implied covenant. As to these additional breaches of contract and the implied covenant, and additional defamation, Claimants seek money damages according to proof, injunctive relief, specific performance, attorneys' fees, arbitration costs, AAA costs, arbitrator costs, expert costs, costs of suit, interest, and such other relief as the arbitrator deems just and appropriate.

Section 3(g) of the Agreement is titled "Mandatory Arbitration" and states in pertinent part:

"The Parties stipulate and agree to submit any and all Claims between any Schmidt Party or their affiliates, on the one hand, and any Ritter Party or their affiliates, on the other hand, whenever and wherever arising to final, mandatory, binding arbitration including, without limitation, the following: (A) any and all Claims relating to and/or arising from this Agreement, any ancillary or other agreement referenced herein including without limitation any claimed breach of this Agreement or applicable ancillary or other agreements and/or any implied covenant or term; (B) any and all Claims relating to and/or arising from any duty and/or alleged breach of a duty relating to and/or arising from this Agreement or applicable ancillary or other agreement; (C) any and all Claims relating to and/or arising from any tort, statutory violation, wrongdoing, and/or conduct of any nature relating to or arising from this Agreement or applicable ancillary or other agreement; (D)







Glaser Weil

any and all Claims relating to and/or arising the validity, scope, interpretation, and/or enforceability of this Agreement or applicable ancillary or other agreement; (E) any and all Claims relating to and/or arising the validity, scope, interpretation, and/or enforceability of this arbitration clause; and (F) any and all Claims relating to the arbitrability of all issues, including but not limited to which Claims are subject to arbitration and which claims are not subject to arbitration."

DATED: September 15, 2025

GLASER WEIL FINK HOWARD
JORDAN & SHAPIRO LLP

By: *Craig Marcus*

PATRICIA L. GLASER
CRAIG MARCUS
JILLIAN P. HARRIS
Attorneys for Claimants

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California; I am over the age of 18 and not a party to the within action; my business address is 10250 Constellation Blvd., 19th Floor, Los Angeles, CA 90067.

On September 16, 2025, I served the foregoing document(s) described as **SECOND AMENDED DEMAND FOR ARBITRATION** on the interested parties to this action at the following address(es):

**SERVICE LIST**

| | |
|---|---|
| Michelle Ritter<br>269 S. Beverly Dr. #1315<br>Beverly Hills, CA 90212<br>Email: ritter.sm@icloud.com<br>ritter_legal@outlook.com | *Respondent, in pro per* |

☒ **(BY E-MAIL SERVICE)** I caused such document to be delivered electronically via e-mail to the e-mail address of the addressee(s) set forth in the attached service list.

☒ (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on September 16, 2025, at Los Angeles, California.

*/s/ Simon Moradzadeh*
Simon Moradzadeh

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)
First Amended Complaint

# EXHIBIT 21

H, LLC Severance Agreement template (§§ 2, 4)

*Cover sheet only — exhibit identified above; native copy to be lodged.*

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)

First Amended Complaint

# EXHIBIT 22

Marcus email to SPM/Audem employees (Aug. 4, 2024); The Information article (Aug. 1, 2024)

From: Craig H. Marcus cmarcus@glaserweil.com
Subject: RE: Internal Memo - SP Status + Next Steps
Date: Aug 4, 2024 at 10:35:50 AM
To: Gregory Mitchell gmitchell@steelperlot.com, Jason Wilkinson jwilkinson@steelperlot.com, Ioannis Papapanagiotou ipapapa@steelperlot.com, Jonathan Gopel jgopel@steelperlot.com, Matt Fair mfair@steelperlot.com, David Javaheri djavaheri@steelperlot.com, Sebastian Hauer shauer@steelperlot.com, Accounting DL AccountingDL@steelperlot.com, allemployees@steelperlot.com, Connor Coit ccoit@steelperlot.com
Cc: Patricia L. Glaser pglaser@glaserweil.com, Jill Harris jharris@glaserweil.com, Joseph D. Hadacek jhadacek@glaserweil.com, Jacobs, Matt Matt.Jacobs@us.dlapiper.com, Valdez, Troy Troy.Valdez@us.dlapiper.com, jess.heim@dlapiper.com

---

Dear all:

We are disappointed that Ms. Ritter continues to disregard the interests of SPM's employees by making false statements for her own publicity purposes.

Ms. Ritter falsely states that Mr. Schmidt is responsible for managing the operations of Steel Perlot Management ("SPM"). Nothing could be further from the truth. Ms. Ritter has possessed all legal and actual authority and responsibility over the affairs of the Company since the beginning. In fact, the legal documents state that she is "solely" responsible "to control and manage the business and affairs" of SPM and Mr. Schmidt has "no voting rights or rights over the management or affairs of the Company." Ms. Ritter is the CEO of SPM, and she is accountable for SPM's daily operations and failings.

Ms. Ritter falsely states that she has been prohibited from fundraising for SPM. This is demonstrably false. Ms. Ritter has been trying to fundraise, but without success. The fact that she failed at fundraising is not the same as being prohibited from fundraising, and disproves her assertion that she was prohibited from fundraising. Ms. Ritter never presented a concrete proposal for funding from any investor. While any such proposal might be subject to approval, nothing has in fact been submitted for approval.

Ms. Ritter falsely states that: (i) she had no authorized permissions on SPM's TriNet account, (ii) she could not input information into TriNet, and (iii) Mr. Schmidt and his office are somehow responsible for Ms. Ritter's failings with TriNet. Again, nothing could be further from the truth. Ms. Ritter had full authorized permissions on SPM's TriNet account, including the ability to enter information regarding the status of SPM employees. This is borne out by the fact that Ms. Ritter and her management team have in fact been managing and controlling SPM's TriNet account for years, including recently. Unfortunately, when Ms. Ritter unilaterally furloughed all SPM employees, she failed to make the necessary changes within TriNet and failed to update TriNet regarding the departure of other SPM employees. Consequently, TriNet shut down SPM's account. Ms. Ritter's wrongful attempt to blame others for her own failings is inappropriate.

Mr. Schmidt has been offering to assist SPM's employees since as early as April 2024, but Ms. Ritter consistently failed to respond to these proposals. Ms. Ritter proclaims below that she "immediately approved" the most recent offer, but fails to address the multiple other neglected offers. Ms. Ritter contends that she is waiting for information in order to effectuate the most recent offer. This appears to be a delay tactic. In the meantime, we are continuing to offer transition support to all applicable employees.

The foregoing is not a complete response to Ms. Ritter's

email. All rights reserved.

Regards,

Craig

Glaser Weil

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

---

**From:** Michelle Ritter <mritter@steelperlot.com>
**Sent:** Thursday, August 1, 2024 11:58 PM
**To:** Gregory Mitchell <gmitchell@steelperlot.com>
**Cc:** Jason Wilkinson <jwilkinson@steelperlot.com>; Ioannis Papapanagiotou <ipapapa@steelperlot.com>; Jonathan Gopel <jgopel@steelperlot.com>; Matt Fair <mfair@steelperlot.com>; David Javaheri <djavaheri@steelperlot.com>; Sebastian Hauer <shauer@steelperlot.com>; Craig H. Marcus <cmarcus@glaserweil.com>; Accounting DL <AccountingDL@steelperlot.com>; allemployees@steelperlot.com; Connor

Coit <ccoit@steelperlot.com>; Patricia L. Glaser <pglaser@glaserweil.com>; Jill Harris <jharris@glaserweil.com>; Joseph D. Hadacek <jhadacek@glaserweil.com>; Jacobs, Matt <Matt.Jacobs@us.dlapiper.com>; Valdez, Troy <Troy.Valdez@us.dlapiper.com>; jess.heim@dlapiper.com; Michelle Ritter <michelleritter929@gmail.com>; Adriana Rosales <adriana.rosales@trinet.com>; Steven Gazza <steven.gazza@trinet.com>; Meredith, Lisa M <lisa.meredith@wellsfargo.com>
**Subject:** Re: Internal Memo - SP Status + Next Steps

Hi all,

I agree with many of your sentiments and I am extraordinarily disappointed with the existing state of affairs - this matter has gone on for far too long for the sake of employees and simply allowing us, including me, to get back to doing what we set out for, without unnecessary surprises - building, innovating, making money, and enjoying our work and what lies ahead. Having certainty in funding, healthcare, go-forward operations, and matters that materially impact you and your families is absolutely necessary.

As far as providing updates, I have provided the information to you all as I have received them and have been actively working behind the scenes to get this sorted, still. As our internal SP finance team, TriNet, and Wells Fargo have been and are fully aware, as well as some of the SP colleagues who have transitioned from SP to other entities, despite restrictions in all pertinent agreements, are leveraging to an extent, **the ultimate decision-making on funding certainty, including the related and much-needed health benefits for all as well as any options to externally fundraise or otherwise alleviate, rests with Hillspire and has apparently been / is**

**beyond me or any decisions I am empowered to make.**

Q&A:

1. **Why can't I change the status in Trinet?** - I cannot make the changes to Trinet that continue to be implied, as even Trinet representatives directed me to Hillspire and Mandy Quach on Friday, after I found out for the first time about the SP payroll account being shut down via legal representatives.
2. **What can I do directly to ensure that you are paid or to provide clarity? What are some potential solutions?** - As a contract matter and based on Delaware law, along with non-approvals or non-responses from Hillspire on terms regarding outside funding, I cannot simply fundraise, fund, or otherwise remedy this situation directly per the operating agreement without approval and enough certainty to actually execute, which was directly noted by Michael Kolcun and his firm.

    1. Despite not being paid myself for months because of this funding squeeze and uncertainty, I have done my absolute best to serve you and our team members, as well as to reflect the work achieved and go-forward trajectories, informed by outside diligence and market feedback directly.
    2. Such potential solutions that I have explored include fundraising, funding directly via some hybrid model, giving equity upside and partial ownership directly to you and other team members, and even stepping aside with fair terms while promoting internally and bringing in outside executives.

3. **<u>What has happened since Monday, July 22 on getting clarity?</u>** - Two weeks ago, I indicated via email directly to you all of my inability to / blockage in directly remedying the situation on funding and go-forward operations or next steps. Since then, I have pushed as much as possible alongside representatives to resolve this matter, even as false narratives has been encouraged about our work or me, and as I have faced consequences far beyond business itself.

    1. Late last week, it was directly clear that authorities to make any changes to employee status and pay at Trinet were and are held by Hillspire, as Trinet representatives explicitly directed me to Hillspire to resolve your questions. Hillspire's representatives have communicated with you all on behalf of their client, some of which I have not known about until after the fact.
    2. Hillspire's counsel has aimed to try to get a resolution on employees being paid with two months severance and releases, which is what I had requested as a backstop many months ago and agreed to with the chairman.
    3. **<u>I immediately approved of this latest offer</u>**, provided:

        1. The known caveats that such employee pay offers did not inherently indicate a wind-down of the firm itself; I did not have to make representations on behalf of the firm based on unknowns; and I did not have to make any agreements outside of solely business matters or that could further materially impact me in business or otherwise.

            1. To be clear, I did not make any such approval

contingent on me being paid and I have been waiting for the precise proposal for days.

2. Such offer was provided in writing to me so we could mutually agree and share expeditiously with you all.
3. Such offer on severance assumed standard employment contract compliance and releases, including non-breach of non-competes.

4. **What is the delay in providing this information?** - I explicitly re-approved this latest employee offer for finalization last Friday, July 26th and have been awaiting the latest proposal on funding for employees and specific terms by SP's funding partner at Hillspire. Counsel on all sides has been waiting.
5. **What happens now?** - The key answers on funding and related benefits depend upon Hillspire's decision-making and any clarity that can be provided to all on funding and other matters. If I could make these complications go away fairly for each of you while not facing highly pressured terms that leave me with unknown liabilities, then I would immediately make that happen.

All relevant parties are cc'ed on this chain. I am always available to speak and best assist. To the many individuals at SP currently and historically who have helped bring SP to life, I thank you for all and am truly humbled. Further, I am deeply grateful to those who have been understanding of the circumstances I have faced and who have extended grace.

I remain committed to you and the firm. Employees come first to me and always have, which is something that I know the historic chairman would

agree with inherently, by way of his own work. Thank you to counsel cc'ed above for helping provide the funding clarity and offer terms as soon as Hillspire provides such information for review.

Michelle

> On Thu, Aug 1, 2024 at 1:38 PM Gregory Mitchell <gmitchell@steelperlot.com> wrote:
>
> My medical plan is listed as inactive as of today. There has been no notice that healthcare plans were going to terminate, nor have I been given any (legally required) information regarding my (legally required) COBRA rights. We all need answers as to what is going on.
>
> Thank you.
>
>> On Sat, Jul 27, 2024 at 1:46 PM Jason Wilkinson <jwilkinson@steelperlot.com> wrote:
>>
>> I have similar questions and would want to hear more.
>>
>>> On Sat, Jul 27, 2024, 3:11 AM Ioannis Papapanagiotou <ipapapa@steelperlot.com> wrote:
>>>
>>> I also have the same concerns and questions.
>>>
>>> Best regards,
>>> Ioannis
>>>
>>>> On Fri, Jul 26, 2024 at 5:06 PM Jonathan Gopel <jgopel@steelperlot.com> wrote:

Hi all,

I'd like to echo everyone else's concerns. It would be great to have some idea of employment and insurance status. If I need to go get private insurance before the end of the month there is not a lot of time remaining. My employee status in TriNet is listed as "terminated", is that correct? If so, what is the status of the payout for accrued PTO? Additionally, in light of the fact that Mr Kolcun is no longer involved in this matter, who should I contact about the concern that I raised with him on June 24th around a bonus that was earned but not yet paid on June 20th?

I'm happy to have conversations with anyone associated with SPM or Hillspire who's able to help with any of these issues.

Regards,
Jonathan Gopel

On Fri, Jul 26, 2024 at 12:38 PM Matt Fair <mfair@steelperlot.com> wrote:

Hello,
I would also like some clarification on our current employment status, if we are still on furlough and will continue to get benefits or indeed SP no longer exists and our employment status has changed without any notification and compensation of outstanding liabilities owed to employees. As of this morning I was under the understanding I was in a furlough state, but still considered employed with benefits being paid. This is because I wasn't told otherwise by SPM. However, I contacted

Trinet regarding benefits and they said "It looks like your employer is no longer using TriNet's services so this would be why the benefits information is gone from your account." Can we get some clarification on what this means for everyone, considering we were all w2 under Trinet. Are benefits indeed ending at the end of the month?
Considering all of this, I am open to any discussions with Hillspire for options as well.
Thank you,
Matt

On Fri, Jul 26, 2024, 12:47 PM David Javaheri <djavaheri@steelperlot.com> wrote:

I called TriNet to see the status of my health insurance. I was told I had been terminated as of the 17th and my health insurance will run out at the end of the month. I'd be interested in hearing from anyone at SPM what exactly the plan going forward is. If we are all terminated then there are a number of outstanding issues that need to be resolved with regards to unused vacation days, setting up COBRA, etc.

Also, if Hillspire is offering assistance for transitioning employees, I'd love to hear more about it.

On Fri, Jul 26, 2024 at 5:45 AM Sebastian Hauer <shauer@steelperlot.com> wrote:

Dear Mr. Marcus,

Thank you for making me aware of this information. This is

> the first instance I've learned about Hillspire's offers of financial assistance to transitioning SPM employees mentioned in writing. I wasn't aware that such offers had been made to the company previously.
>
> I understand that as Hillspire's representative, you may not have direct insight into these operational matters. However, if you or anyone else from SPM management could provide any further details about our health insurance status, it would be greatly appreciated.
>
> In the latest TriNet paystub correction, I noticed that the employer contribution to medical has been reversed along with everything else. Does this mean we no longer have health insurance coverage? If so, this is quite unexpected, and I would have expected at least a written notice to allow those of us who rely on this coverage to prepare accordingly.
>
> Also, does the company offer COBRA to employees who opt to leave SPM?
>
> Sincerely,

Sebastian Hauer

On Thu, Jul 25, 2024 at 19:00 Craig H. Marcus <cmarcus@glaserweil.com> wrote:

Mr. Hauer,

Thank you for your e-mail. Yes, we represent Hillspire, among others. We do not represent Steel Perlot Management ("SPM").

"Transitioning employees" refers to current SPM employees who leave employment with the company, and former SPM employees who left the company following the announced furlough, and who seek financial assistance with their-transition (*i.e.*, two months severance and payment of accrued wages prior to the announced furlough). To be clear, we are not suggesting or encouraging any employees to leave SPM. Rather, we are merely offering assistance to employees who independently left or were terminated. As noted below, we previously made similar offers of assistance to the company multiple times.

We have no involvement with the operational issues addressed in the fourth paragraph of your e-mail. SPM's CEO and manager advised us that she furloughed employees but, to the best of our knowledge, did not make the necessary changes in the TriNet system to effectuate the furlough.

Regards,

Craig Marcus

Glaser Weil

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

---

**From:** Sebastian Hauer <shauer@steelperlot.com>
**Sent:** Wednesday, July 24, 2024 1:58 PM
**To:** Craig H. Marcus <cmarcus@glaserweil.com>

**Cc:** Accounting DL <AccountingDL@steelperlot.com>; allemployees@steelperlot.com; Connor Coit <ccoit@steelperlot.com>; Patricia L. Glaser <pglaser@glaserweil.com>; Jill Harris <jharris@glaserweil.com>; Joseph D. Hadacek <jhadacek@glaserweil.com>; Jacobs, Matt <Matt.Jacobs@us.dlapiper.com>; Valdez, Troy <Troy.Valdez@us.dlapiper.com>; jess.heim@dlapiper.com
**Subject:** Re: Internal Memo - SP Status + Next Steps

Dear Mr. Marcus,

Thank you for your email regarding the situation at Steel Perlot Management (SPM). I was one of the employees who replied to Ms. Ritter's last announcement on July 17, 2024, and I believe I cc'ed you and members of your firm as well.

First, am I correct in assuming that you and your firm represent Hillspire's interests? I ask this to ensure I understand the context of your communication.

I appreciate your concern for the employees and your offers of assistance. However, several points still require clarification. Could you please elaborate on what you mean by "transitioning employees"?

In my previous email, I raised concerns about irregularities regarding our paystubs and asked a number of questions that I, as well as members of my team and employees on other teams, have. These

questions remain unanswered. Given that SPM's counsel, Michael Kolcun, has withdrawn, who should we contact for critical information about our employment status, outstanding payments, and any other pressing concerns? Could you provide specific names, contact details, and their respective areas of responsibility?

Thank you for your time and assistance.

Regards,
Sebastian Hauer

On Wed, Jul 24, 2024 at 10:23 PM Craig H. Marcus <cmarcus@glaserweil.com> wrote:

Dear all:

We are disappointed and deeply concerned with the current circumstances facing SPM and its employees. We remain in the dark concerning the company's plans.

Over the past several months, we have made several offers of assistance to ensure a smooth transition for all employees, but have not received any response. We implore SPM's CEO and manager to accept our ongoing offers of financial assistance to the employees in order to alleviate the current situation.

A number of SPM employees have reached out and asked meaningful questions. We have been sending our responses to SPM's counsel, Michael Kolcun (prior to his withdrawal earlier today), reiterating our offers to financially assist transitioning employees, but again without response.

Because our ability to initiate contact with current employees is limited and SPM management has not accepted our offers to help employees transition, our hands are tied. We remain willing to provide financial assistance to employees who desire to move on and reach out to us on their own.

We urge SPM to respond to our emails and communicate the company's plans and prospects. We remain prepared to respond.

Regards,

Craig Marcus

Glaser Weil

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

---

**From:** Michelle Ritter <mritter@steelperlot.com>
**Sent:** Monday, July 15, 2024 5:55 AM
**To:** allemployees@steelperlot.com
**Cc:** Connor Coit <ccoit@steelperlot.com>; Accounting DL <AccountingDL@steelperlot.com>; Craig H. Marcus <cmarcus@glaserweil.com>; Patricia L. Glaser <pglaser@glaserweil.com>; Jill Harris <jharris@glaserweil.com>; Kolcun, Michael <mkolcun@sgrlaw.com>; Jones, Ian <ijones@sgrlaw.com>; Bickel, Roger <rbickel@sgrlaw.com>; Craig Weiner <craig.weiner@blankrome.com>; Lisa Coyle <lisa.coyle@blankrome.com>; Michelle Ritter <mritter@steelperlot.com>
**Subject:** Internal Memo - SP Status + Next Steps

Dear SPM team members and affiliates,

Thank you all for your patience as we have faced

> uncertain operational and funding commitments and guidance from our business partner and sole funder. As I have said many times before, **ensuring that you are paid and there is certainty in our go-forward operations have and remain the top priorities for me.**
>
> Unfortunately, my ability and authority to execute as 'manager' and common member of Steel Perlot Management LLC has been materially hampered, misguided, and constrained, in light of personal matters impacting professional certainties and with the breadth of this issue only recently known.
>
> Specifically, **per the latest Steel Perlot Operating Agreement with our business partner and as confirmed by outside legal representatives, I cannot effectively do anything to remedy our situation** (e.g., raise money, sell or transfer part of the SPM stake, obtain bridge funding, directly provide funds if I could without it being considered solely a gift, or even resign without the consent of the other member). To quote our outside counsel, Michael Kolkun and his team, with respect to my rights and authorities at SPM:
> "DE LLC Member: A member can only resign as specified in the OA, and cannot resign prior to dissolution unless the OA permits it. (DE LLC Act sec. 18-603.) Your OA does not address resignation, so absent consent from the other member, you cannot resign (or transfer/assign your membership interest per section 7 of the OA)."
>
> "DE LLC Manager: Your authority as a manager is limited. Section 12(b) of the OA prevents you from taking any of the following

> actions without the approval of the other member: (i) tax matters and filing returns, (ii) incurring debt or making a guaranty, (iii) taking fundamental transactions, like merger, selling material assets, filing bankruptcy, (iv) admitting a new member, and (v) conducting business requiring SEC registration for the other member."

Behind the scenes, there have been constant discussions and negotiations to try to resolve funding and provide clarity expeditiously, which is what I have relied upon in making the best business decisions possible given the information known, advice of counsel, and reliance upon commitments at the time.

Despite myself not being paid for the last several months, I have continued pushing forth at SP because of my commitment to each of you and your families. Talent and people come first and must be valued for their time on the basis of their contributions and work, as opposed to non-professional matters. I believe in you, our colleagues, and the SP vision and mission.

**Thus, to best serve you and in light of what is known, I am directing you all to counsel (cc'ed) and those - including our Hillspire counterparts and SPM finance - who are de facto managers and can best address the pressing questions on funding, which we can then best determine go-forward operations against.**

I remain motivated to support, resolve this matter, and retain my SPM stake as the common member, with the long-standing goal of

protecting our employees, the firm, the value you have created, and sharing that upside with you all.

Kind regards,

Michelle

##

**Highlights & Our Accomplishments**

As noted, I am proud of our team and the many individuals who have been ambitious and determined to make each project work, every idea possible, and genuinely helped build what I envisioned and co-founded operation - an innovation engine where big tech meets big finance.

These achievements thus far have included:

- Incubations such as **Tristero**, which we co-led with General Catalyst, and **Keeta**, as well as organizations that have used and continue to utilize some shared services from our team, such as **Knox Networks**, which has secured pilots with the World Bank, Central Bank of India, and other public-oriented groups;
- Impressive returns on our **early stage closed-end VC fund** as led by many former colleagues, including Sam Trautwein, Eli Reinhardt, Jonathan Mak, Jack Sun, and others;
    - For example, our **Hebbia** investment just raised a

$100M round with A16Z; our **Ondo** investment has produced an over 300% return; **Pryon**, for which I have a board seat, produced a 299.4% return; **Vannevar Labs** has turned over 300% at an over $640M valuation; our **VersusGame** investment has made impressive partnerships with the support of our VP of Engineering, Ioannis; our total AI fund has an over 250% return on investment thus far; our **First Spark Ventures Investment** has also produced a 30%+ return and raised additional capital with our business partner and chairman's approval.

- Early stage university-to-commercialization research and commercialization, including Sam Rodriques's official launch of **Future House** focused on synthetic biology and Matt Robbin's fantastic work on semiconductor technological developments and direct incubation of next-gen chips work at **Cetus Photonics**; and
- Our **AI- and analytics-driven asset management team**, which has built: the infrastructure for a $10B+ AUM platform per quant executives who many of you know and who diligenced our teams for months; a moonshot project to truly build the next AI RenTech; and a strong wealth management and AI innovation unit, initially created for a singular client but with the ability, as indicated by their client, to take on more clients and in line with all SEC rules and requirements for their active trading thus far and going forward.

I believe in you, our colleagues past and present, and the SP vision

and mission. Thank you to those who have helped provide the support operationally to execute and to our historic chairman and co-founding operational partner.

##

**Q&A**:

**February 2024 Budget vs Now**

Despite our momentum and the notable capabilities of our products as well as the buy-in of known executives to join us in March 2024, our former GC (David Charnin) wanting to rejoin to help build, and a recognized technologist and public company executive wanting to lead our venture side, the former collaboration and transparency needed for our success has dwindled due to unrelated personal matters. More recently, such collaboration has been hampered and execution of our milestones and work have been impacted.

In February 2024, in collaboration with our business partner and at the direction of our historic chairman/sole funder, there had been an agreed-upon budget and milestones plan for the firm, with all teams accounted for on a go-forward basis and with the direct involvement of SPM finance. These milestones and proposed budget were contingent upon several factors, including the support and involvement of our historical SP chairman and the approval of him/his team for us to raise outside capital.

However, by mid March, these funding and operational commitments became less certain due to matters unrelated to our work. As noted above, extensive discussions have occurred and the status and

guidance above are now provided.

**What happened to the furlough?**

As I noted to all key representatives two weeks ago, I could not trigger the furlough, as SPM external counsel advised, due to the fact that my actual authorities within TriNet were altered such that I could not make any changes on behalf of SPM in my role as SPM CEO, but rather could only execute as an advisor who has been present with the firm since July 2022, despite founding in 2021. Similarly, my abilities to resolve this issue were extremely limited at best, with no clear option to directly resolve, reduce costs, or obtain outside investment.

--

**Michelle Ritter**
Steel Perlot
mritter@steelperlot.com

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

This email has been scanned for viruses and malware, and may have been

automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

--

**Michelle Ritter**
mritter@steelperlot.com

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)
First Amended Complaint

# EXHIBIT 23

SPM Internal Memo "SP Status / Next Steps" (July 15, 2024) and replies (July 24 and Aug. 4, 2024)

# EXHIBIT 32

---

## July 15, 2024 SPM Internal Memorandum ('de facto managers')

**Description**

July 15, 2024 SPM internal memorandum identifying SPM finance personnel as 'de facto managers,' relied upon for Glaser Weil operational-conduct allegations.

**Status**

**ATTACHED — exhibit content follows this cover sheet.**

**Source**

[mounted]/__USE/2024-03 to 2024-10 - GW employee payoffs/2024-07-15 - Internal Memo - SP Status + Next Steps.pdf

— Cover sheet compiled 2026-04-27 —

From: Michelle Ritter mritter@steelperlot.com
Subject: Internal Memo - SP Status + Next Steps
Date: Jul 15, 2024 at 5:54:58 AM
To: allemployees@steelperlot.com
Cc: Connor Coit ccoit@steelperlot.com, Accounting DL AccountingDL@steelperlot.com, Craig H. Marcus cmarcus@glaserweil.com, Patricia L. Glaser pglaser@glaserweil.com, Jill Harris jharris@glaserweil.com, Kolcun, Michael mkolcun@sgrlaw.com, Jones, Ian ijones@sgrlaw.com, Bickel, Roger rbickel@sgrlaw.com, Craig Weiner craig.weiner@blankrome.com, Lisa Coyle lisa.coyle@blankrome.com, Michelle Ritter mritter@steelperlot.com
Bcc: michelleritter929@gmail.com

---

Dear SPM team members and affiliates,

Thank you all for your patience as we have faced uncertain operational and funding commitments and guidance from our business partner and sole funder. As I have said many times before, **ensuring that you are paid and there is certainty in our go-forward operations have and remain the top priorities for me.**

Unfortunately, my ability and authority to execute as 'manager' and common member of Steel Perlot Management LLC has been materially hampered, misguided, and constrained, in light of personal matters impacting professional certainties and with the breadth of this issue only recently known.

Specifically, **per the latest Steel Perlot Operating Agreement with our business partner and as confirmed by outside legal representatives, I cannot effectively do anything to remedy our situation** (e.g., raise money, sell or transfer part of the SPM stake, obtain bridge funding, directly provide funds if I could without it being considered solely a gift, or even resign without the consent of the other member). To quote our outside counsel, Michael Kolkun and his team, with respect to my rights and authorities at SPM:

"DE LLC Member: A member can only resign as specified in the OA, and cannot resign prior to dissolution unless the OA permits it. (DE LLC Act sec. 18-603.) Your OA does not address resignation, so absent consent from the other member,

you cannot resign (or transfer/assign your membership interest per section 7 of the OA)."

"DE LLC Manager: Your authority as a manager is limited. Section 12(b) of the OA prevents you from taking any of the following actions without the approval of the other member: (i) tax matters and filing returns, (ii) incurring debt or making a guaranty, (iii) taking fundamental transactions, like merger, selling material assets, filing bankruptcy, (iv) admitting a new member, and (v) conducting business requiring SEC registration for the other member."

Behind the scenes, there have been constant discussions and negotiations to try to resolve funding and provide clarity expeditiously, which is what I have relied upon in making the best business decisions possible given the information known, advice of counsel, and reliance upon commitments at the time.

Despite myself not being paid for the last several months, I have continued pushing forth at SP because of my commitment to each of you and your families. Talent and people come first and must be valued for their time on the basis of their contributions and work, as opposed to non-professional matters. I believe in you, our colleagues, and the SP vision and mission.

**Thus, to best serve you and in light of what is known, I am directing you all to counsel (cc'ed) and those - including our Hillspire counterparts and SPM**

**finance - who are de facto managers and can best address the pressing questions on funding, which we can then best determine go-forward operations against.**

I remain motivated to support, resolve this matter, and retain my SPM stake as the common member, with the long-standing goal of protecting our employees, the firm, the value you have created, and sharing that upside with you all.

Kind regards,

Michelle

##

**Highlights & Our Accomplishments**

As noted, I am proud of our team and the many individuals who have been ambitious and determined to make each project work, every idea possible, and genuinely helped build what I envisioned and co-founded operation - an innovation engine where big tech meets big finance.

These achievements thus far have included:

- Incubations such as **Tristero**, which we co-led with General Catalyst, and **Keeta**, as well as organizations that have used and continue to utilize some

shared services from our team, such as **Knox Networks**, which has secured pilots with the World Bank, Central Bank of India, and other public-oriented groups;

- Impressive returns on our **early stage closed-end VC fund** as led by many former colleagues, including Sam Trautwein, Eli Reinhardt, Jonathan Mak, Jack Sun, and others;
  - For example, our **Hebbia** investment just raised a $100M round with A16Z; our **Ondo** investment has produced an over 300% return; **Pryon**, for which I have a board seat, produced a 299.4% return; **Vannevar Labs** has turned over 300% at an over $640M valuation; our **VersusGame** investment has made impressive partnerships with the support of our VP of Engineering, Ioannis; our total AI fund has an over 250% return on investment thus far; our **First Spark Ventures Investment** has also produced a 30%+ return and raised additional capital with our business partner and chairman's approval.
- Early stage university-to-commercialization research and commercialization, including Sam Rodriques's official launch of **Future House** focused on synthetic biology and Matt Robbin's fantastic work on semiconductor technological developments and direct incubation of next-gen chips work at **Cetus Photonics**; and
- Our **AI- and analytics-driven asset management team**, which has built: the infrastructure for a $10B+ AUM platform per quant executives who many of you know and who diligenced our teams for months; a moonshot project to

truly build the next AI RenTech; and a strong wealth management and AI innovation unit, initially created for a singular client but with the ability, as indicated by their client, to take on more clients and in line with all SEC rules and requirements for their active trading thus far and going forward.

I believe in you, our colleagues past and present, and the SP vision and mission. Thank you to those who have helped provide the support operationally to execute and to our historic chairman and co-founding operational partner.

##

**Q&A:**

**February 2024 Budget vs Now**

Despite our momentum and the notable capabilities of our products as well as the buy-in of known executives to join us in March 2024, our former GC (David Charnin) wanting to rejoin to help build, and a recognized technologist and public company executive wanting to lead our venture side, the former collaboration and transparency needed for our success has dwindled due to unrelated personal matters. More recently, such collaboration has been hampered and execution of our milestones and work have been impacted.

In February 2024, in collaboration with our business partner and at the direction of our historic chairman/sole funder, there had been an agreed-upon budget and milestones plan for the firm, with all teams accounted for on a go-forward basis

and with the direct involvement of SPM finance. These milestones and proposed budget were contingent upon several factors, including the support and involvement of our historical SP chairman and the approval of him/his team for us to raise outside capital.

However, by mid March, these funding and operational commitments became less certain due to matters unrelated to our work. As noted above, extensive discussions have occurred and the status and guidance above are now provided.

**What happened to the furlough?**
As I noted to all key representatives two weeks ago, I could not trigger the furlough, as SPM external counsel advised, due to the fact that my actual authorities within TriNet were altered such that I could not make any changes on behalf of SPM in my role as SPM CEO, but rather could only execute as an advisor who has been present with the firm since July 2022, despite founding in 2021. Similarly, my abilities to resolve this issue were extremely limited at best, with no clear option to directly resolve, reduce costs, or obtain outside investment.

--
**Michelle Ritter**
Steel Perlot
mritter@steelperlot.com

From: Sebastian Hauer shauer@steelperlot.com
Subject: Re: Internal Memo - SP Status + Next Steps
Date: Jul 24, 2024 at 1:58:18 PM
To: Craig H. Marcus cmarcus@glaserweil.com
Cc: Accounting DL AccountingDL@steelperlot.com, allemployees@steelperlot.com, Connor Coit ccoit@steelperlot.com, Patricia L. Glaser pglaser@glaserweil.com, Jill Harris jharris@glaserweil.com, Joseph D. Hadacek jhadacek@glaserweil.com, Jacobs, Matt Matt.Jacobs@us.dlapiper.com, Valdez, Troy Troy.Valdez@us.dlapiper.com, jess.heim@dlapiper.com

---

Dear Mr. Marcus,

Thank you for your email regarding the situation at Steel Perlot Management (SPM). I was one of the employees who replied to Ms. Ritter's last announcement on July 17, 2024, and I believe I cc'ed you and members of your firm as well.

First, am I correct in assuming that you and your firm represent Hillspire's interests? I ask this to ensure I understand the context of your communication.

I appreciate your concern for the employees and your offers of assistance. However, several points still require clarification. Could you please elaborate on what you mean by "transitioning employees"?

In my previous email, I raised concerns about irregularities regarding our paystubs and asked a number of questions that I, as well as members of my team and employees on other teams, have. These questions remain unanswered. Given that SPM's counsel, Michael Kolcun, has withdrawn, who should we contact for critical information about our employment status, outstanding payments, and any other pressing concerns? Could you provide specific names, contact details, and their respective areas of responsibility?

Thank you for your time and assistance.

Regards,
Sebastian Hauer

> On Wed, Jul 24, 2024 at 10:23 PM Craig H. Marcus <cmarcus@glaserweil.com> wrote:

> Dear all:
>
> We are disappointed and deeply concerned with the current circumstances facing SPM and its employees. We remain in the dark concerning the company's plans.
>
> Over the past several months, we have made several offers of assistance to ensure a smooth transition for all employees, but have not received any response. We implore SPM's CEO and manager to accept our ongoing offers of financial assistance to the employees in order to alleviate the current situation.
>
> A number of SPM employees have reached out and asked

meaningful questions. We have been sending our responses to SPM's counsel, Michael Kolcun (prior to his withdrawal earlier today), reiterating our offers to financially assist transitioning employees, but again without response.

Because our ability to initiate contact with current employees is limited and SPM management has not accepted our offers to help employees transition, our hands are tied. We remain willing to provide financial assistance to employees who desire to move on and reach out to us on their own.

We urge SPM to respond to our emails and communicate the company's plans and prospects. We remain prepared to respond.

Regards,

Craig Marcus

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

---

**From:** Michelle Ritter <mritter@steelperlot.com>
**Sent:** Monday, July 15, 2024 5:55 AM
**To:** allemployees@steelperlot.com
**Cc:** Connor Coit <ccoit@steelperlot.com>; Accounting DL <AccountingDL@steelperlot.com>; Craig H. Marcus <cmarcus@glaserweil.com>; Patricia L. Glaser <pglaser@glaserweil.com>; Jill Harris <jharris@glaserweil.com>; Kolcun, Michael <mkolcun@sgrlaw.com>; Jones, Ian <ijones@sgrlaw.com>; Bickel, Roger <rbickel@sgrlaw.com>; Craig Weiner <craig.weiner@blankrome.com>; Lisa Coyle

<lisa.coyle@blankrome.com>; Michelle Ritter
<mritter@steelperlot.com>
**Subject:** Internal Memo - SP Status + Next Steps

Dear SPM team members and affiliates,

Thank you all for your patience as we have faced uncertain operational and funding commitments and guidance from our business partner and sole funder. As I have said many times before, **ensuring that you are paid and there is certainty in our go-forward operations have and remain the top priorities for me.**

Unfortunately, my ability and authority to execute as 'manager' and common member of Steel Perlot Management LLC has been materially hampered, misguided, and constrained, in light of personal matters impacting professional certainties and with the breadth of this issue only recently known.

Specifically, **per the latest Steel Perlot Operating Agreement**

**with our business partner and as confirmed by outside legal representatives, I cannot effectively do anything to remedy our situation** (e.g., raise money, sell or transfer part of the SPM stake, obtain bridge funding, directly provide funds if I could without it being considered solely a gift, or even resign without the consent of the other member). To quote our outside counsel, Michael Kolkun and his team, with respect to my rights and authorities at SPM:

"DE LLC Member: A member can only resign as specified in the OA, and cannot resign prior to dissolution unless the OA permits it. (DE LLC Act sec. 18-603.) Your OA does not address resignation, so absent consent from the other member, you cannot resign (or transfer/assign your membership interest per section 7 of the OA)."

"DE LLC Manager: Your authority as a manager is limited. Section 12(b) of the OA prevents you from taking any of the following actions without the approval of the other member: (i) tax matters and filing returns, (ii) incurring debt or making a guaranty, (iii) taking fundamental transactions, like merger, selling material assets, filing bankruptcy, (iv) admitting a new member, and (v) conducting business requiring SEC registration for the other member."

Behind the scenes, there have been constant discussions and negotiations to try to resolve funding and provide clarity expeditiously, which is what I have relied upon in making the best business decisions possible given the information known, advice of counsel, and reliance upon commitments at the time.

Despite myself not being paid for the last several months, I have continued pushing forth at SP because of my commitment to each of you and your families. Talent and people come first and must be valued for their time on the basis of their contributions and work, as opposed to non-professional matters. I believe in you, our colleagues, and the SP vision and mission.

**Thus, to best serve you and in light of what is known, I am directing you all to counsel (cc'ed) and those - including our Hillspire counterparts and SPM finance - who are de facto managers and can best address the pressing questions on funding, which we can then best determine go-forward operations against.**

I remain motivated to support, resolve this matter, and retain my

SPM stake as the common member, with the long-standing goal of protecting our employees, the firm, the value you have created, and sharing that upside with you all.

Kind regards,

Michelle

##

**Highlights & Our Accomplishments**

As noted, I am proud of our team and the many individuals who have been ambitious and determined to make each project work, every idea possible, and genuinely helped build what I envisioned and co-founded operation - an innovation engine where big tech meets big finance.

These achievements thus far have included:

- Incubations such as **Tristero**, which we co-led with General

Catalyst, and **Keeta**, as well as organizations that have used and continue to utilize some shared services from our team, such as **Knox Networks**, which has secured pilots with the World Bank, Central Bank of India, and other public-oriented groups;

- Impressive returns on our **early stage closed-end VC fund** as led by many former colleagues, including Sam Trautwein, Eli Reinhardt, Jonathan Mak, Jack Sun, and others;
    - For example, our **Hebbia** investment just raised a $100M round with A16Z; our **Ondo** investment has produced an over 300% return; **Pryon**, for which I have a board seat, produced a 299.4% return; **Vannevar Labs** has turned over 300% at an over $640M valuation; our **VersusGame** investment has made impressive partnerships with the support of our VP of Engineering, Ioannis; our total AI fund has an over 250% return on investment thus far; our **First Spark Ventures Investment** has also produced a 30%+ return and raised additional capital with our business partner and chairman's approval.
- Early stage university-to-commercialization research and commercialization, including Sam Rodriques's official launch of **Future House** focused on synthetic biology and

Matt Robbin's fantastic work on semiconductor technological developments and direct incubation of next-gen chips work at **Cetus Photonics**; and
- Our **AI- and analytics-driven asset management team**, which has built: the infrastructure for a $10B+ AUM platform per quant executives who many of you know and who diligenced our teams for months; a moonshot project to truly build the next AI RenTech; and a strong wealth management and AI innovation unit, initially created for a singular client but with the ability, as indicated by their client, to take on more clients and in line with all SEC rules and requirements for their active trading thus far and going forward.

I believe in you, our colleagues past and present, and the SP vision and mission. Thank you to those who have helped provide the support operationally to execute and to our historic chairman and co-founding operational partner.

##

**Q&A:**

**February 2024 Budget vs Now**

Despite our momentum and the notable capabilities of our products as well as the buy-in of known executives to join us in March 2024, our former GC (David Charnin) wanting to rejoin to help build, and a recognized technologist and public company executive wanting to lead our venture side, the former collaboration and transparency needed for our success has dwindled due to unrelated personal matters. More recently, such collaboration has been hampered and execution of our milestones and work have been impacted.

In February 2024, in collaboration with our business partner and at the direction of our historic chairman/sole funder, there had been an agreed-upon budget and milestones plan for the firm, with all teams accounted for on a go-forward basis and with the direct involvement of SPM finance. These milestones and proposed budget were contingent upon several factors, including the support and involvement of our historical SP chairman and the approval of him/his team for us to raise outside capital.

However, by mid March, these funding and operational commitments became less certain due to matters unrelated to our work. As noted above, extensive discussions have occurred and the status and guidance above are now provided.

**What happened to the furlough?**

As I noted to all key representatives two weeks ago, I could not trigger the furlough, as SPM external counsel advised, due to the fact that my actual authorities within TriNet were altered such that I could not make any changes on behalf of SPM in my role as SPM CEO, but rather could only execute as an advisor who has been present with the firm since July 2022, despite founding in 2021. Similarly, my abilities to resolve this issue were extremely limited at best, with no clear option to directly resolve, reduce costs, or obtain outside investment.

--

**Michelle Ritter**

Steel Perlot

mritter@steelperlot.com

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from

> malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

# EXHIBIT 24

Sixty-day notices to terminate occupancy (Aug. 7, 2024) as transmitted by Marcus to Ritter's counsel (Aug. 20, 2024); three-day notices to quit for both Los Angeles residences (Dec. 2, 2024)

Subject: FW: Notices of Terminate Occupancy
From: Heiferman, Erin
To: Jacobs, Matt; Heim, Jess■
Cc:
Date: Tue, 20 Aug 2024 19:43:35 +0000

Let me know if you want to discuss. Their next step would be to file an unlawful detainer action once the 60 days are up.

Erin Heiferman

Associate

T +1 415 615 6059
F +1 415 659 7359
M +1 845 321 1118
erin.heiferman@us.dlapiper.com

DLA Piper LLP (US)
dlapiper.com

From: Craig H. Marcus <cmarcus@glaserweil.com>
Sent: Tuesday, August 20, 2024 12:21 PM
To: Jacobs, Matt <Matt.Jacobs@us.dlapiper.com>
Cc: Jill Harris <jharris@glaserweil.com>; jess.heim@dlapiper.com; Valdez, Troy <Troy.Valdez@us.dlapiper.com>; Heiferman, Erin <Erin.Heiferman@us.dlapiper.com>
Subject: RE: Notices of Terminate Occupancy

■EXTERNAL MESSAGE

Matt,

We are in receipt of your August 19, 2024 letter. Your assertions regarding the August 7, 2024 Notices to Terminate Occupancy (“Notices”) are both factually and legally without merit and therefore rejected. If the Ritters do not vacate both properties as required by the Notices, my clients will proceed accordingly.

The foregoing is not a complete response to your August 19 letter, nor a complete statement of the relevant facts, law, or my clients’ position, rights, or remedies, and my clients reserve all rights and remedies.

Craig

<https://nam12.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.glaserweil.com%2F&data=05%

Craig H. Marcus
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com
<https://nam12.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.glaserweil.com%2F&data=05%

cmarcus@glaserweil.com <mailto:cmarcus@glaserweil.com>
T 310.556.7891 <tel:310.556.7891>

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

From: Jacobs, Matt <Matt.Jacobs@us.dlapiper.com <mailto:Matt.Jacobs@us.dlapiper.com> >
Sent: Monday, August 19, 2024 10:42 AM
To: Jill Harris <jharris@glaserweil.com <mailto:jharris@glaserweil.com> >; jess.heim@dlapiper.com <mailto:jess.heim@dlapiper.com> ; Valdez, Troy <Troy.Valdez@us.dlapiper.com <mailto:Troy.Valdez@us.dlapiper.com> >; Heiferman, Erin <Erin.Heiferman@us.dlapiper.com <mailto:Erin.Heiferman@us.dlapiper.com> >
Cc: Craig H. Marcus <cmarcus@glaserweil.com <mailto:cmarcus@glaserweil.com> >
Subject: RE: Notices of Terminate Occupancy

Hi Craig and Jill.

Please see correspondence regarding the eviction notices and proposing times for the

“inspection.”

Best regards,

Matt

■

From: Jill Harris <jharris@glaserweil.com <mailto:jharris@glaserweil.com> >
Sent: Thursday, August 8, 2024 11:06 AM
To: Jacobs, Matt <Matt.Jacobs@us.dlapiper.com <mailto:Matt.Jacobs@us.dlapiper.com> >; jess.heim@dlapiper.com <mailto:jess.heim@dlapiper.com> ; Valdez, Troy <Troy.Valdez@us.dlapiper.com <mailto:Troy.Valdez@us.dlapiper.com> >; Heiferman, Erin <Erin.Heiferman@us.dlapiper.com <mailto:Erin.Heiferman@us.dlapiper.com> >
Cc: Craig H. Marcus <cmarcus@glaserweil.com <mailto:cmarcus@glaserweil.com> >; Patricia L. Glaser <pglaser@glaserweil.com <mailto:pglaser@glaserweil.com> >; Harrison J. Dossick <hdossick@glaserweil.com <mailto:hdossick@glaserweil.com> >
Subject: Notices of Terminate Occupancy

■EXTERNAL MESSAGE

Counsel,

Please find the attached courtesy copies of notices that are being served personally served and and/or posted today.

<https://nam12.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.glaserweil.com%2F&data=05%

Jill Harris
ASSOCIATE

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com
<https://nam12.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.glaserweil.com%2F&data=05%

jharris@glaserweil.com <mailto:jharris@glaserweil.com>
T 310.282.6207 <tel:310.282.6207>
<https://nam12.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.linkedin.com%2Fcompany%2Fg
<https://nam12.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.twitter.com%2FGlaserWeil&d

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com <mailto:postmaster@dlapiper.com> . Thank you.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

**THREE DAY NOTICE TO QUIT**

TO: Michelle Ritter, Terry Ritter, Shamim Ritter, and all others in, at, or claiming a right to occupancy or possession of 1059 Angelo Drive, Los Angeles, CA 90210 (the "Premises"):

PLEASE TAKE NOTICE that, without conceding in any way whatsoever that you have any rights to possess or occupy the Premises, and without in anyway diminishing any prior written notice terminating such rights, within THREE (3) DAYS (excluding Saturdays, Sundays, and other judicial holidays) after service upon you of this Notice you are required to quit and deliver possession of the Premises to GTE Properties, LLC ("Owner"), or Owner will institute proceedings against you to recover possession of the Premises. You are being served with this Notice because you have committed waste and nuisance per Civil Code § 3479 and LAMC 165.03.C by renovating the Premises in an illegal and grossly non-compliant manner.

On or about March 2022 through approximately May 2024, you conducted substantial renovations throughout the Premises. It was recently discovered that you undertook the renovations without conforming to all applicable codes and obtaining all legally required inspections and permits. The witnesses include Charles Baker, Debra Smith, and Josh Pornter.

THEREFORE, without limitation of any and all other remedies and rights that Owner may have against you, you are hereby directed, within 3 days (not including Saturdays, Sundays, and other judicial holidays) of the date of service upon you of this Notice, to quit the Premises and to deliver possession of the Premises to Owner. Owner elects and declares a forfeiture of your possession of the Premises. If you fail to quit and vacate the Premises within the period of time set forth in this Notice, Owner will commence legal proceedings against you to recover possession of the Premises and for damages, costs, and fees as permitted by law.

FURTHERMORE, this Notice is not a concession that you have any possessory or occupancy rights, or that you are entitled legally to any notice of termination of any such rights you may have, all of which rights Owner denies you have presently. Instead, this Notice and the enclosed "Renter Protections Notice" are intended to comply with any law that might be deemed to govern your possession and/or occupancy of the Premises.

Dated: December 2, 2024 By: GTE Properties, LLC

*Nothing contained herein or omitted herefrom is a waiver of any of Owner's rights; all such rights are all expressly reserved. A copy of this Notice will be served on the LAHD as per LAHD rules.*

*encl. LAHD Renter Protections Notic*

# THREE DAY NOTICE TO QUIT

TO: Michelle Ritter, Terry Ritter, Shamim Ritter, and all others in, at, or claiming a right to occupancy or possession of 1060 Brooklawn Drive, Los Angeles, CA 90077 (the "Premises"):

PLEASE TAKE NOTICE that, without conceding in any way whatsoever that you have any rights to possess or occupy the Premises, and without in anyway diminishing any prior written notice terminating such rights, within THREE (3) DAYS (excluding Saturdays, Sundays, and other judicial holidays) after service upon you of this Notice you are required to quit and deliver possession of the Premises to WTY Properties, LLC ("Owner"), or Owner will institute proceedings against you to recover possession of the Premises. You are being served with this Notice because you have committed waste and nuisance per Civil Code § 3479 and LAMC 165.03.C by renovating the Premises in an illegal and grossly non-compliant manner.

On or about March 2022 through approximately May 2024, you conducted substantial renovations throughout the Premises. It was recently discovered that you undertook the renovations without conforming to all applicable codes and obtaining all legally required inspections and permits. The witnesses include Charles Baker, Debra Smith, and Josh Pornter.

THEREFORE, without limitation of any and all other remedies and rights that Owner may have against you, you are hereby directed, within 3 days (not including Saturdays, Sundays, and other judicial holidays) of the date of service upon you of this Notice, to quit the Premises and to deliver possession of the Premises to Owner. Owner elects and declares a forfeiture of your possession of the Premises. If you fail to quit and vacate the Premises within the period of time set forth in this Notice, Owner will commence legal proceedings against you to recover possession of the Premises and for damages, costs, and fees as permitted by law.

FURTHERMORE, this Notice is not a concession that you have any possessory or occupancy rights, or that you are entitled legally to any notice of termination of any such rights you may have, all of which rights Owner denies you have presently. Instead, this Notice and the enclosed "Renter Protections Notice" are intended to comply with any law that might be deemed to govern your possession and/or occupancy of the Premises.

Dated: December 2, 2024 By: WTY Properties, LLC

*Nothing contained herein or omitted herefrom is a waiver of any of Owner's rights; all such rights are all expressly reserved. A copy of this Notice will be served on the LAHD as per LAHD rules.*

*encl. LAHD Renter Protections Notice*

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)

First Amended Complaint

# EXHIBIT 25

Forensic analysis of SPM Operating Agreement, DocuSign envelope 805F7E18 (PDF Expert revisions, Sept. 3, 2024, 1:12:56 and 1:13:09 p.m. PDT)

*Cover sheet only — exhibit identified above; native copy to be lodged.*

# EXHIBIT 26

Nov. 8, 2024 Baron Samson preservation demand to Nobu Malibu; Feb. 21, 2025 counsel's evidence-preservation letter to Google; Dec. 5, 2025 Miller Barondess preservation demand to Google's Chief Legal Officer

# BARON SAMSON LLP

ATTORNEYS AT LAW

330 Passaic Avenue, Suite 105
Fairfield, New Jersey 07004

(973) 244-0030
Fax: (973) 244-0016
www.baronsamson.com

Please Reply to New Jersey Office

New York Office
255 West 36th Street, 2nd Floor
New York, New York 10018

Florida Office
20803 Biscayne Blvd., Suite 401
Aventura, FL 33180

**SCOTT D. BARON**
sbaron@baronsamson.com

November 8, 2024

**Via E-Mail** (ryanf@noburestaurants.com)

Ryan Ford
General Manager
Nobu Malibu
22706 Pacific Coast Highway
Malibu, CA 90265

***Re: Security Footage for November 7, 2024 Incident***

Dear Mr. Ford,

We represent Michelle Ritter, who was a victim of theft at your restaurant yesterday, November 7, 2024. In particular, the vehicle which Ms. Ritter placed in the custody of the restaurant's valet, as bailee, was taken without Ms. Ritter's knowledge or consent as well as the contents thereof, including her laptop computer containing highly confidential, privileged and sensitive information.

You are hereby notified to preserve and maintain all security and surveillance footage of the parking lot area from 3:00 p.m. through 5:00 p.m. on November 7, 2024.

Should you have any questions, please do not hesitate to contact me.

Very truly yours,

*Scott D. Baron*

SCOTT D. BARON

SDB/ag

February 21, 2025

VIA E-MAIL AND FEDEX

Halimah DeLaine Prado
General Counsel
Google
1600 Amphitheatre Parkway
Mountain View, CA 94043
hdelaine@gmail.com
hdelaine@google.com
uslawenforcement@google.com

**RE: NOTICE OF DUTY TO PRESERVE EVIDENCE IN PENDING LITIGATION**

To Whom It May Concern:

My name is Michelle Ritter. I am a party to a pending arbitration in the American Arbitration Association, AAA Case Number 01-25-0000-2191, entitled *Eric Schmidt, et al. v. Michelle Ritter*. I believe that Google and its affiliates entities are in possession, custody, and control of evidence relevant to this pending litigation.

Pursuant to California and federal law, Google has a duty to preserve evidence relevant to a legal proceeding. This includes the duty to preserve all electronic evidence, such as emails discussing the incident or related to matters at issue in the suit.

Your assistance and cooperation are required with respect to preserving Google's information pertaining to this case, including electronically stored information. Electronically stored information is an important and irreplaceable source of discovery and evidence.

Google is hereby notified to preserve all information relating to the following:

- All documents, communications, and financials relating to any Google Workspace related to "SteelPerlot.com"
- All documents, communications, and financials relating to any Google Workspace account related to "StarX.com"
- All documents, communications, and financials relating to any Google Workspace account related to "Audem-Mgmt.com"
- All documents, communications, and financials relating to any Google Workspace account related to "Knox-Networks.com"
- All documents, communications, and financials relating to any Google Workspace account related to "SchmidtEntity.co"
- All documents and communications relating to Michelle Ritter.
- All documents and communications relating to Michelle Ritter's google accounts including 'MichelleRitter929@gmail.com' and 'MichelleShamim9@gmail.com'

You are requested to preserve all information from Google's computer systems, removable electronic media, and any other locations in which Google stores relevant information.

This includes, but is not limited to, e-mail and other electronic communications, word processing documents, spreadsheets, databases, calendars, telephone logs, contact manager information, Internet usage files, and network access information.

You must take every reasonable step to preserve this information until further notice from myself. Failure to do so could result in serious penalties against Google.

This duty to preserve evidence is broad and extends to all documents, regardless of whether the document is stored electronically (such as email) or in hard-copy and regardless of the type of document. For example, reports, spreadsheets, photographs and videos are all considered documents that must be preserved. Furthermore, the duty to preserve this documentary evidence extends to all documents in existence as of the time Google reasonably anticipated this litigation.

To ensure that all relevant documents are preserved, Google should communicate directly with all employees who have possession or control of potentially relevant evidence, including but not limited to personnel who deal with email retention, deletion, and archiving. You should advise each of these employees to preserve any relevant documents in their custody. Furthermore, you should advise all such persons that any regularly scheduled and/or automatic deletion of email or other electronic documents must be discontinued with respect to any relevant data.

In addition, any document destruction (such as "auto-delete" policies and shredding of documents) must cease with respect to any relevant documents. All relevant documents, both electronic and physical, must be preserved for the duration of this litigation.

Current law and rules of civil procedure clearly apply to the discovery of electronically stored information just as they apply to other evidence, and confirm the duty to preserve such information for discovery. Google and its officers, employees, agents, and affiliated organizations must take all reasonable steps to preserve this information until this legal matter is finally resolved. Failure to take the necessary steps to preserve the information addressed in this letter or other pertinent information in Google's possession or control may result in serious sanctions or penalties. Notify all individuals and affiliated organizations of the need and duty to take the necessary affirmatives steps to comply with the duty to preserve evidence.

All relevant information must be preserved unless otherwise contacted by the undersigned.

Sincerely,

/S/

Michelle Ritter
Email: ritter.sm@icloud.com
Tel: 310-869-1247

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS
26TH FLOOR
LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400
FAX: (310) 552-8400
WWW.MILLERBARONDESS.COM

December 5, 2025

**LOUIS R. MILLER**
DIRECT DIAL: (310) 552-5251
SMILLER@MILLERBARONDESS.COM

***REQUEST FOR DOCUMENT PRESERVATION***

***VIA ELECTRONIC MAIL &***
***CERTIFIED MAIL – RETURN RECEIPT REQUESTED***

Counsel for Google
J. Kent Walker
President of Global Affairs/Chief Legal Officer
Google Inc.
1600 Amphitheatre Parkway
Mountain View, CA 94043
kwalker@google.com
kentwalker@google.com

Halimah DeLaine Prado
General Counsel
Google LLC
1600 Amphitheatre Parkway
Mountain View, CA 94043
hdelaine@google.com
uslawenforcement@google.com

Makesha Patterson
Director, Head of General Litigation
Google LLC
1600 Amphitheatre Parkway
Mountain View, CA 94043
mpatterson@google.com

Counsel for Eric Schmidt
Glaser Weil Fink Howard Jordan & Shapiro LLP
Patricia L. Glaser
Craig H. Marcus
Jill Harris
Simon K. Moradzadeh
Celia H. Spalding
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
pglaser@glaserweil.com
cmarcus@glaserweil.com
jharris@glaserweil.com
smoradzadeh@glaserweil.com
cspalding@glaserweil.com

**Re: Document Preservation Notice: *Ritter v. Schmidt, et al.*, Los Angeles Superior Court Case No. 25STCV26114**

Dear Counsel:

Our law firm and I represent Plaintiff Michelle Ritter in the above-referenced action (the "Action"). Enclosed is a redacted copy of Ms. Ritter's First Amended Complaint ("FAC"),

adding Google LLC ("Google") as a defendant. This amended complaint is attached to Ms. Ritter's Motion to Lift the Stay for the Purpose of filing a First Amended Complaint, and we anticipate it will be the operative pleading within a matter of days. We are providing you with this legal preservation notice (the "Preservation Notice") to inform you of a legal hold (the "Legal Hold") with respect to documents and information related to the Action. Please provide this notice to all necessary personnel. This letter is in furtherance of the pending litigation, to ensure that the evidence in your custody or control is preserved and not destroyed or spoliated.[1]

The Action arises from Ms. Ritter's relationship with Eric Schmidt—the former Chief Executive Officer and Chairman of Google—whom she met in 2020 through a professional introduction regarding her company, StarX Networks, Inc ("StarX"). What began as a professional relationship evolved into a romantic partnership and a joint business enterprise. Together they launched multiple business ventures as part of their plan to build a life together and incubated a portfolio of financial-technology companies.

The FAC details a pattern of coercive control, abuse, sexual harassment and financial exploitation perpetrated by Mr. Schmidt against Ms. Ritter, a woman nearly four decades his junior. When she finally broke up with him in 2024, he retaliated. Mr. Schmidt leveraged his technological sophistication to cyberstalk her, hijacked access to her Google Workspace and devices, and used surveillance and intimidation tactics.

Mr. Schmidt previously told Ms. Ritter that he and Google could spy on personnel by accessing their email and cloud accounts. During the conversation, he described his concerns about Google's competitiveness in artificial intelligence and the need to retain key employees. He recounted, while serving as CEO, collaborating with Google engineers to create a secret "backdoor" in Google's servers, which enabled him to covertly monitor private communications. Using this backdoor, Mr. Schmidt and his team identified an engineer preparing to leave Google and take information to a competitor. Mr. Schmidt expressed frustration that, after this information was shared with counsel, Google visited the employee's home to seize devices, potentially exposing and jeopardizing his secret server access.

As set forth in the FAC, Mr. Schmidt used his backdoor access to Google servers after he stopped serving as Chief Executive Officer and Chairman of Google Inc., and Executive Chairman of Alphabet Inc. Specifically, he used his backdoor access to Google servers to surveil Ms. Ritter, engaging in invasion of privacy and accessing Ms. Ritter's confidential communications.

Ms. Ritter has also discovered emails in her accounts that contain modified time stamps and content. For example, there are emails that a third-party responded to that were sent minutes, and sometimes hours, before Ms. Ritter sent the underlying email to which they were

---

[1] We have addressed this letter to Google's in-house counsel. We believe Wilson Sonsini Goodrich & Rosati is conflicted from representing Google in this matter due to their prior representation of Ms. Ritter and business entities that are at issue in this litigation. Because of the seriousness of this matter, we request that you share this letter with Google's CEO.

responding. There are emails that have been modified for attribution to her that she did not send. Ms. Ritter also discovered similar manipulation and alteration of her text messages.

In addition, as set forth in the enclosed complaint, the theft of Ms. Ritter's Google Workspace, which was enabled by Google, resulted in misappropriation of confidential information, including unauthorized and improper access by Open AI. Ms. Ritter believes that Mr. Schmidt used his backdoor access to Google servers to engage in covert surveillance and alter evidence pertinent to the parties' dispute.

**Request to Immediately Preserve and Retain All Relevant Information and Data**

We are hereby putting you on notice of your **immediate obligation** to preserve and retain documents, information, and data that are or could be relevant to the current dispute and the Action.[2]

The information and materials that are or could be relevant to the current dispute and the Action include, but are not limited to, information and data related to: (1) Michelle Ritter's personal Google accounts and all associated services; and (2) Entity Google accounts and associated services for: Steel Perlot/Orion Wing; Steel Perlot Investments/Orion Wing Investments; Knova/Knox Networks; StarX; Audem Management; Hillspire, and any re-provisioned or successor domains, including but not limited to "@Schmidtentity.co," and any Google-administered domains to which user accounts or data were migrated or from which they were accessed (the "Entities"):

- **Michelle Ritter Personal Accounts**: MichelleShamim9@gmail.com; MichelleRitter929@gmail.com; Msr2165@columbia.edu

- **Workspaces, and Domains (and all associated email accounts therewith)**: www.steelperlot.com; www.starX.com;www.starX.co; www.audem-mgmt.com; www.knox-networks.com; SchmidtEntity.co; and Hillspire LLC (and any workspace(s) where any of the data originating from these workspaces have been transferred);

- **Professional Enterprise Accounts**: MRitter@steelperlot.com; MRitter@starX.com; MRitter@Knox-Networks.com; MRitter@Audem-Mgmt.com; MRitter@schmidtentity.com.

- Any other email or Google Accounts for Steel Perlot/Orion Wing; Steel Perlot Investments/Orion Wing Investments; Knova/Knox Networks; StarX Networks; Audem Management, Eric Schmidt, Hillspire.

---

[2] On February 21, 2025, Ms. Ritter sent Ms. DeLaine Prado a prior Notice of Duty To Preserve Evidence in Pending Litigation. This preservation notice supplements the February 21, 2025 notice, and is applicable to all parties to whom this letter is addressed.

Specifically, materials, documents, information, and data that are or could be relevant to the current dispute and the Action include, but are not limited to the following categories:

- Michelle Ritter's personal Google accounts and all associated services. This includes, but is not limited to, Gmail, Workspace, Google Drive (My Drive and Shared Drives), Docs/Sheets/Slides, Google Chat, Google Meet, Google Calendar, Google Keep, Google Sites, Google Voice, Forms, AppSheet, and Google Photos content and associated metadata, including draft versions, prior revisions, comments, suggestions, embedded files, and version histories.

- All Google accounts, workspaces, and associated services for the Entities. This includes, but is not limited to, Gmail, Workspace, Google Drive (My Drive and Shared Drives), Docs/Sheets/Slides, Google Chat, Google Meet, Google Calendar, Google Keep, Google Sites, Google Voice, Forms, AppSheet, and Google Photos content and associated metadata, including draft versions, prior revisions, comments, suggestions, embedded files, and version histories.

- Any Google accounts, projects, or services accessed by or through Eric Schmidt, Hillspire, LLC, the Schmidt family office, their agents, employees, or service providers, or anyone acting at their direction or under their control in connection with the allegations.

- Any content or data made public or externally shared from Michelle Ritter accounts or any Entities' accounts or Workspaces, including public links, sharing permission settings, and activity logs reflecting changes to sharing or visibility.

- All data export artifacts initiated by users or administrators, and system logs reflecting such exports.

- Any content restored from or archived to backups, snapshots, archive storage, or other disaster recovery systems.

- All data and logs, including but not limited to administrative, access, security, and audit logs for any Google product or service, including but not limited to Gmail and Google Workspace.

- Logs and records showing domain ownership, domain transfer, MX/DNS configuration, and re-provisioning or migration of users or groups to or from Michelle Ritter accounts and any Entities' accounts.

- Logs reflecting administrator role assignments/changes, delegation of administrator authority or activity, service account creation/use, third-party marketplace app installations, and access scopes granted.

- Records of account compromises, suspicious logins, geo/IP anomalies, device fingerprint changes, authentication token issuance/revocation, and password changes or resets.

- Device management logs for any enrolled devices, including remote wipes, device reassignments, and configuration pushes.

- Logs or data showing Google employee access to Ms. Ritter's or the Entities' content or metadata.

- Logs or data showing access or usage of a "backdoor" to Google servers, including access by non-Google employees to non-public content hosted or administered by Google or its contractors.

- Any materials, communications, approvals, or audit trails concerning alleged "backdoor" or extraordinary access capabilities to Google servers or user data by Eric Schmidt or any other individual, including the identity of any Google engineers or teams involved and the scope, timing, and use of such access.

- Any documentation, design records, code repositories, tools, playbooks, runbooks, access control lists, exception processes, and approvals relating to privileged or non-standard access to Google user account data or Google Workspace content.

- Security policies, exception requests, elevated access grants (including "break glass" or emergency access), monitoring, and audit results affecting the covered accounts and domains.

- All user reports, support tickets, escalations, and correspondence concerning unauthorized access, lockouts, data deletions/alterations, domain re-provisioning, or Workspace duplication requests, including those beginning in or around June 2024 and thereafter

- Google internal triage notes, case files, Jira or equivalent tickets, chats, emails, postmortems, and investigation records related to the reported incidents and Google's responses.

- Communications and records reflecting any decision not to take remedial action, or to permit or maintain access by Schmidt or his agents after notice.

- Internal Google communications (email, Chat, Meet, ticket comments) and external communications with Eric Schmidt, Hillspire, their counsel or agents, and any third-party IT providers engaged by them, concerning the covered accounts, domains, Workspace duplication, re-provisioning, lockouts, or access.

- Communications with law firms, PR firms, or media in which Google discussed or was asked to take action concerning Ms. Ritter, her private and/or business accounts, the covered Workspaces, or the allegations.

- All applicable data retention, deletion, and auto-purge policies and configurations for the covered accounts and domains, including any changes to Vault retention rules, retention exceptions, or legal holds during the relevant period.

- Records of any deletions, purges, lifecycle events, or retention policy changes affecting the covered content or logs, including the timing, initiating user/service, and scope of impact.

- All documents and communications relating to Michelle Ritter; StarX Networks, Inc.; Steel Perlot Management LLC; Knox Networks Inc.; Audem Management LLC; SchmidtEntity.co; or Hillspire LLC.

- All communications with Eric Schmidt from 2021 to the present relating to Michelle Ritter; StarX Networks, Inc.; Steel Perlot Management LLC; Knox Networks Inc.; Audem Management LLC; SchmidtEntity.co; or Hillspire LLC.

- All documents and communications relating to the lawsuit or its allegations

Unless otherwise specified, the relevant time period for retention and preservation is from September 1, 2020 to the present.

You are under a legal duty to preserve all evidence—whether in print or electronic form—that might be or become relevant to this dispute. This duty applies to all sources of information that are in your possession, custody or control, regardless of physical location, and applies to all relevant Google systems and repositories, including production, backup, archival, disaster-recovery, and log systems, and encompasses data maintained by Google LLC, Alphabet Inc., and any affiliated entities. Your preservation obligation also includes any and all work and personal: (i) computers, laptops, tablets, hard drives, and phones; (ii) email accounts/services; (iii) network and shared drives; (iv) software applications; (v) "cloud"-based storage services; (vi) "thumb," flash, and other external or portable electronic media storage devices; (vii) CDs, DVDs, ZIP disks, and other similar media storage items; (viii) voicemails; (ix) instant messages, chats, texts, and screenshots of the same; and (x) paper files, wherever stored.

The duty to preserve includes all data regarding deleted files, such as images and backups containing deleted files. You must ensure that all potentially relevant evidence is preserved. To the extent you exercise any power or control over the actions of any third parties who have potentially relevant evidence, you must also ensure that these third parties preserve all such evidence.

For the avoidance of doubt, you must:

1. Preserve all existing electronic items in their original form, so that all information contained therein, whether visible or not (including file "metadata"), is available for inspection;

2. Preserve any new electronic items generated after you receive this notice;

3. Preserve any "hard copies" (*i.e.*, paper) in your possession, custody, or control;

4. Suspend deletion, overwriting, defragmentation or other processes that can destroy or alter potentially relevant information or documents on hard drives or servers; and

5. Avoid discarding any old or unused devices that may have such documents or information. Some examples of such items include: contracts; letters (including cover sheets); reports; e-mails (whether between you and Mr. Schmidt, or between others where the subject matter of the Action is referenced directly or indirectly); spreadsheets (e.g., Microsoft Excel); performance appraisals; personnel files; images; faxes; meeting notes or recordings; presentations (e.g., Microsoft PowerPoint); databases; text messages; chat histories; documents or reports summarizing any investigations that may have been conducted; contact or relationship management ("CRM") system files; drawings (e.g., computer-assisted-design or "CAD" files); network access or web server logs; regulatory agency documents and data; and other items.

All documents, paper or electronic, must be maintained in their original state. Additionally, these documents cannot be deleted, even if they would be in the normal course of operations. Potentially relevant information cannot be discarded, destroyed, modified, or deleted under any circumstances.

To the extent you have not already done so, please notify all other parties and third parties subject to these preservation requirements of their obligations set forth in this Preservation Notice. Please note that any party's failure to properly preserve such information could subject you to civil and/or criminal penalties, sanctions, and/or adverse inferences in this dispute. The duty to preserve should therefore be interpreted as broadly as possible.

If any relevant or potentially relevant information or materials are no longer available, please provide a written description identifying the material, the reason for unavailability, the relevant systems and retention settings, and any alternative sources where substantially similar information may be retrieved.

Thank you for your attention to this matter.

Sincerely,

Skip M

Louis R. Miller

LRM

# EXHIBIT 1

**(REDACTED)**

LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
CLAIRE-LISE Y. KUTLAY (State Bar No. 307080)
ckutlay@millerbarondess.com
SARAH E. DIAMOND (State Bar No. 281162)
sdiamond@millerbarondess.com
SAMANTHA RIFKIN (State Bar No. 349277)
srifkin@millerbarondess.com
MILLER BARONDESS, LLP
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400

Attorneys for Plaintiff
MICHELLE RITTER

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

MICHELLE RITTER,

Plaintiff,

v.

ERIC SCHMIDT; HILLSPIRE, LLC; ORION WING, LLC, formerly known as Steel Perlot, LLC; ORION WING INVESTMENTS, LLC, formerly known as Steel Perlot Investments, LLC; KNOVA FINANCE CORP., formerly known as Knox Networks Inc.; SPECIAL STRATEGIES I, LLC; STEEL PERLOT MANAGEMENT, LLC; GOOGLE LLC; and DOES 1 through 10, inclusive,

Defendants.

**CASE NO. 25STCV26114**

**PLAINTIFF'S FIRST AMENDED COMPLAINT FOR:**

1. **DECLARATORY RELIEF**
2. **SEXUAL BATTERY**
3. **DOMESTIC VIOLENCE (CIVIL CODE § 1708.6)**
4. **SEXUAL HARASSMENT (CIVIL CODE § 51.9)**
5. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
6. **VIOLATION OF THE CALIFORNIA COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT**
7. **VIOLATION OF CALIFORNIA PENAL CODE § 631 (WIRETAPPING)**
8. **VIOLATION OF CALIFORNIA PENAL CODE § 632 (RECORDING CONFIDENTIAL COMMUNICATIONS)**
9. **ACCOUNTING**

**[DEMAND FOR JURY TRIAL]**

Assigned for All Purposes to:
Hon. Michael Small, Dept. 57

Action Filed: September 8, 2025
Trial Date: None Set

Plaintiff Michelle Ritter, by and through her undersigned attorneys, brings this action against Defendants Eric Schmidt, Hillspire, LLC, Orion Wing, LLC, formerly known as Steel Perlot, LLC, Orion Wing Investments, LLC, formerly known as Steel Perlot Investments, LLC, Knova Finance Corp., formerly known as Knox Networks Inc., Special Strategies I, LLC, Steel Perlot Management, LLC, Google LLC, and DOES 1–10 (collectively, "Defendants") as follows:

**NATURE OF THE ACTION**

1. This case exposes how an extraordinarily powerful tech titan exploited his wealth, influence, and insider access at Google to groom, control, sexually abuse, and ultimately dispossess a young entrepreneur of the companies she built. Plaintiff Michelle Ritter ("Ritter")—who holds a JD/MBA from Columbia University and has a track record of innovation and leadership—met Google's former CEO Eric Schmidt ("Schmidt") through a professional introduction about her startup. When Ritter rebuffed Schmidt's romantic overtures, he recast himself as a mentor and prospective investor. Through relentless pursuit and manipulation, Schmidt blurred the boundaries between business and intimacy until the relationship became romantic. Ritter fell in love with Schmidt and believed his repeated assurances that he would divorce his wife, marry her, and they would start a family together. Unbeknownst to Ritter, Schmidt never intended to be partners in life and business; instead, he used her to build successful ventures and then stole them from her.

2. Under Schmidt's direction and with his funding, Ritter co-founded a portfolio of companies—including the Steel Perlot platform and incubated ventures—where she served as Chief Executive Officer and architect of the business strategy. While Schmidt publicly claimed to be only a passive investor, in reality he exercised total control over finances and governance through his family office; blocked Ritter's control of and access to complete records; and leveraged capital and payroll approvals as coercive tools. As the businesses succeeded and valuations soared, he wrested control from Ritter, sidelined her, and publicly claimed credit for her work. He and his affiliates also threatened Ritter and her elderly parents to deter her from speaking out.

Miller Barondess, LLP
Attorneys at Law
2121 Avenue of the Stars, Suite 2600 Los Angeles, California 90067
Tel: (310) 552-4400 Fax: (310) 552-8400

3. When Ritter finally left Schmidt in 2024, he retaliated by orchestrating a calculated campaign of escalating pressure, intimidation, misinformation, cyberstalking, surveillance, and threats to unduly pressure Ritter into assigning her valuable interests in the Steel Perlot ventures. Schmidt covertly installed remote-access software programs on her personal laptop, allowing him to monitor and control it in real time. He also gained unauthorized access to her other devices and Google Workspaces—using what he described as a "backdoor" he built with Google engineers to covertly spy on Google employees—and forged documents to alter corporate rights, and orchestrated a lockout of her data and companies. He also tracked her and her parents and installed clandestine monitoring devices in her home.

4. Terrified for her family—both parents battling serious health issues—Ritter entered into a [redacted] to end the harassment and to try and break free of Schmidt's control. She performed fully, [redacted]. By contrast, Schmidt and his affiliates immediately breached the [redacted]. Schmidt continued his stalking and surveillance of Ritter. He and his affiliates then refused to perform, concocted a false media-leak pretext, spread smears about her management of the joint business ventures, and continued their campaign of intimidation, including by weaponizing baseless legal proceedings against Ritter and her elderly parents to intimidate her into silence.

5. Through this action, Ritter seeks to hold Schmidt and his accomplices accountable for his multiple sexual assaults and other malfeasance and obtain redress for the physical, emotional, and economic harm they have caused.

## PARTIES

6. Plaintiff Michelle Ritter is an individual residing in Los Angeles County.

7. Defendant Eric Schmidt is an individual residing in Los Angeles County.

8. Defendant Hillspire, LLC, is a Delaware limited liability company, which conducts business in California and is the family office of Defendants Eric and Wendy Schmidt. On information and belief, Mr. and Mrs. Schmidt are the sole members of Hillspire.

Miller Barondess, LLP
Attorneys at Law
2121 Avenue of the Stars, Suite 2600 Los Angeles, California 90067
Tel: (310) 552-4400 Fax: (310) 552-8400

Miller Barondess, LLP
Attorneys at Law
2121 Avenue of the Stars, Suite 2600 Los Angeles, California 90067
Tel: (310) 552-4400 Fax: (310) 552-8400

9. Defendant Orion Wing, LLC, formerly known as Steel Perlot, LLC, is a Delaware limited liability company, which conducts business in California.

10. Defendant Orion Wing Investments, LLC, formerly known as Steel Perlot Investments, LLC, is a Delaware limited liability company, which conducts business in California.

11. Defendant Knova Finance Corp., formerly known as Knox Networks Inc., is a Delaware corporation, which conducts business in California.

12. Defendant Special Strategies I, LLC is a Delaware limited liability company, which conducts business in California.

13. Defendant Steel Perlot Management, LLC is a Delaware limited liability company, which conducts business in California.

14. Defendant Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California.

15. The true names and capacities, whether individual, corporate, or otherwise, of the Defendants named herein as DOES 1 through 10, inclusive, are presently unknown to Plaintiff, who therefore sues these Defendants by such fictitious names. Plaintiff will seek leave to amend this Complaint to allege the true names and capacities of DOES 1 through 10, inclusive, when Plaintiff has ascertained such information. Plaintiff is informed and believes, and on that basis alleges, that each Defendant named herein as DOES 1 through 10, inclusive, has participated in some or all of the acts or conduct alleged in this Complaint and is liable to Plaintiff by reason thereof.

16. Plaintiff is informed and believes, and on that basis alleges, that each Defendant conspired with, aided and abetted, ratified the conduct of, knowingly acquiesced in, and accepted the benefits of each other Defendant as alleged herein.

17. Plaintiff is informed and believes, and on that basis alleges, that except as otherwise alleged herein, each of the Defendants is, and at all times relevant to this Complaint was, the agent, employer, partner, joint venturer, alter ego, affiliate, and/or co-conspirator of the other Defendants and, in doing the things alleged herein, was acting within the course and scope of

such positions at the direction of, and/or with the permission, knowledge, consent, and/or ratification of the other Defendants.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this controversy, and the amount-in-controversy exceeds the jurisdictional minimum. The Court has personal jurisdiction over Defendants.

19. Venue is proper in this Court because a substantial part of the conduct alleged herein occurred in Los Angeles County.

## FACTUAL ALLEGATIONS

### A. Ritter Meets Schmidt

20. Michelle Ritter is a highly-educated entrepreneur with a background spanning law, business, and international policy. She researched cyber wargaming at Stanford's Hoover Institution, graduated from Johns Hopkins with a triple major in economics, international studies, and political science, and earned a JD/MBA from Columbia University. She serves on the advisory board for Columbia University's Richard Paul Richman Center for Business, Law, and Public Policy.

21. While pursuing her graduate studies at Columbia University, Ritter was working on developing her startup company StarX Networks, Inc. ("StarX")—an innovative technology platform that would enable sports teams and athletes to turn themselves into investable assets by allowing fans to invest directly in their performance and future success. One of her professors introduced her to Jared Cohen ("Cohen"), then CEO of Jigsaw at Alphabet, Inc. ("Alphabet") (Google's parent company) to discuss StarX. Cohen expressed enthusiasm for her idea and told Ritter he wanted to introduce her to Eric Schmidt, a titan in the technology industry and former Google CEO and Chairman, as a potential investor. Cohen met with Ritter to refine her pitch in advance of the introduction.

22. In September 2020, Ritter had dinner with Cohen and Schmidt to pitch StarX as a potential investment for Schmidt. At the time, Ritter was 26 years old, a full-time JD/MBA

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

student, and an emerging entrepreneur. Schmidt, by contrast, was 65 years old, had amassed vast wealth as the former CEO of Google, and had decades of experience and industry connections.

23. What began as a professional introduction quickly turned personal. When Ritter initially rebuffed Schmidt's romantic overtures given their 39-year age gap and his marital status, he pivoted to her intellect and ambition, positioning himself as a mentor and potential investor who could help elevate her career.

24. Between September 2020 and December 2020, Ritter and Schmidt regularly communicated about StarX and Ritter's professional goals. He offered guidance, feedback, and access to his extensive network—cultivating her trust as a professional mentor and friend.

**B. <u>Schmidt Seduces Ritter and Emotionally Manipulates Her</u>**

25. Schmidt used his wealth, influence, and sophistication to draw Ritter into his orbit. He jet-setted with her around the world, introduced her to diplomats and prominent industry figures, and presented her to his inner circle as the woman who had captured both his heart and admiration, often extolling her intelligence and business acumen.

26. Through his unrelenting pursuit, their relationship turned romantic. Ritter only allowed herself to fall in love with Schmidt because he repeatedly assured her that his marriage was over and that he and his wife were separated. Schmidt held himself out as the only person who could give Ritter what she was looking for—a partner in both love and business. Schmidt made clear that he saw his future with her and that she was the one he had been waiting for his whole life.

27. Schmidt involved Ritter in nearly every facet of his personal and professional life. He enlisted her to provide input and edit portions of his and Henry Kissinger's book *The Age of AI and Our Human Future*, for which Ritter received an acknowledgment. He sought her guidance in pursuing an appointment in President Biden's administration and relied on her assistance in drafting his Senate testimony on artificial intelligence and American competitiveness. Ritter advised Schmidt on sports transactions, including his eventual purchase of the Washington Commanders NFL team—an area in which Schmidt had shown no prior interest until meeting her.

Miller Barondess, LLP
Attorneys at Law
2121 Avenue of the Stars, Suite 2600 Los Angeles, California 90067
Tel: (310) 552-4400 Fax: (310) 552-8400

Schmidt also integrated Ritter into his family life as she helped his grandson prepare for the SAT and attended his football games, amongst other things.

28. Their romantic relationship quickly became serious. In early 2021, they began cohabitating in New York and shortly thereafter Ritter agreed to move to Los Angeles. Ritter refused to live in the same home as he and Wendy Schmidt ("Wendy"), his wife, so the couple secured new residences together. Schmidt acquired property in Los Angeles, California, and the Hamptons, New York, for the express purpose of cohabitating and raising a family with Ritter. Schmidt made sure Ritter designed children's bedrooms and a playroom in the Hamptons, New York house. To manage these residences, Schmidt and Ritter formed Audem Management, LLC ("Audem"), with Ritter as the Sole Member. Audem was intended to serve as a separate family office for Schmidt and Ritter.

29. Throughout his relationship with Ritter, Schmidt continually confirmed to her, both through his words and actions, that she would soon be his wife. At the end of January 2021, he flew to Palo Alto, California, to meet with Ritter's parents, assuring them that he was serious about their daughter and intended to marry her. Indeed, Schmidt insisted that Ritter's elderly parents move to Los Angeles, California, so they would be closer to their daughter and help raise their future grandchildren. He paid for Ritter's retired parents to live in an apartment in Beverly Hills and subsequently purchased them a single-family home directly behind the home he had acquired for Ritter. And per Schmidt's request, Ritter's father assumed day-to-day responsibility for managing and overseeing renovations and maintenance of their properties.

30. Schmidt also encouraged Ritter to undergo egg retrieval therapy. On May 20, 2021, Ritter sent Schmidt an email sharing that she "[j]ust had a great doctor's appointment and [] got the go-ahead to proceed with shots and retrieval." Schmidt responded enthusiastically: "Love you even more !! Great news[.]"

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

On May 20, 2021, at 11:59 AM, Eric Schmidt [redacted] wrote:

Love you even more !! Great news

> On May 20, 2021, at 11:45 AM, Michelle Ritter [redacted] wrote:
>
> Just had a great doctor's appointment and I got the go-ahead to proceed with shots and retrieval.
>
> This email includes: general schedule, shot plan, and other needs to have a successful egg retrieval procedure.

31. Schmidt accompanied Ritter to her egg retrieval procedure on or around May 2021. He later encouraged her to undergo a second round of egg retrieval in 2023, further reinforcing his commitment to starting a family together.

32. Throughout their relationship, Schmidt repeatedly assured Ritter that he intended to divorce his wife. For example, on May 6, 2022, Schmidt sent Ritter an email with the subject line "Divorce" stating that he would be divorced within three months.

---------- Forwarded message ---------
From: **Eric Schmidt** [redacted]
Date: Fri, May 6, 2022 at 11:35 PM
Subject: Divorce
To: Michelle Ritter EMail [redacted]

Should be inside 3 months

33. When Ritter graduated from Columbia University in or around May 2021 with her JD/MBA, Schmidt persuaded her not to take the bar examination. He advised her that preparing for and sitting for the bar would be a distraction and that her time would be better spent focusing on StarX and the other businesses they planned to build together. Relying on his guidance and assurances that they were partners in both life and business, Ritter did not take the bar exam and instead devoted herself fully to their shared ventures. Although Ritter has a JD degree from Columbia law school, she has never practiced law.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

**C. Schmidt and Ritter Start Joint Business Ventures**

34. Schmidt and Ritter launched multiple business ventures as part of their plan to build a life together. They envisioned a multi-billion-dollar enterprise under the brand name Steel Perlot that would incubate, fund, and scale a portfolio of technology companies across artificial intelligence, financial technology, and other high-growth sectors. To that end, Schmidt directed Maria Seferian and Mandy Quach in his family office, Hillspire, LLC ("Hillspire"), to assist with setting up the venture's legal and financial infrastructure.

35. Schmidt and Ritter formed Steel Perlot Management, LLC ("SPM") as a Delaware limited liability company on September 21, 2021. As set forth in the Amended and Restated Limited Liability Company Agreement of SPM, Ritter and Steel Perlot, LLC ("SP") are the sole members. SP is controlled by Hillspire, which is an integrated family office management company owned by Schmidt and his wife Wendy. Hillspire handles all the activities of Schmidt and Wendy, his family foundation, his ocean institute, and his Schmit Futures group.

36. Schmidt and Ritter agreed that she would serve as Chief Executive Officer of SPM and hold a 95% ownership interest while he would hold the remaining 5%. As CEO, Ritter developed the company's business plan, ran day-to-day operations, and oversaw recruiting and operations for all affiliated entities.

37. At Schmidt's insistence, Ritter served as CEO without any salary, relying on his repeated assurances that she should focus on growing the business because he would take care of her financially. In reliance on his representations, Ritter devoted herself full-time to SPM and its shared endeavors and became financially dependent on him for personal and living expenses. With the benefit of hindsight, Ritter realized that Schmidt had intentionally orchestrated this arrangement to ensure her complete reliance on him and to maintain control over her.

38. Through SPM, Ritter and Schmidt incubated a portfolio of financial-technology companies, including Keeta Network, Inc. ("Keeta"), Future House, Zo Labs., Inc., AI Quantitative Trading, and Tristero. SPM holds an ownership interest in each of the incubated companies. Several of those incubated companies—including Keeta, which is valued at a market

cap of approximately $161 million—have gone on to achieve extraordinary success, validating Ritter's vision and strategic execution.

39. Schmidt also asked Ritter to run Knox Networks, Inc. ("Knox"), alongside Martin Chavez ("Chavez")—who currently serves on the Board of Directors of Alphabet—given Ritter's background in game theory and prior work on payment rails. Knox is a fintech infrastructure company that builds unified-ledger software enabling banks and financial institutions to transact, settle, and manage traditional and digital assets. They formed Knox in or around January 2021, and Ritter served as CEO, board member, and original founder.

40. In addition, Ritter launched a hedging unit after Schmidt confided that he lacked confidence in Google's artificial intelligence capabilities and was concerned about Alphabet's stock price and stability. Recognizing his stock portfolio was insufficiently diversified, she proposed building a dedicated team of traders to manage and hedge his exposure. Schmidt agreed. The hedging strategy proved highly successful, and Schmidt later absorbed members of the team into his family office at Hillspire.

41. To support the investment activities of their businesses, Schmidt and Ritter established Steel Perlot Investments, LLC ("SPI"). Ritter's strategic vision was that SPI's investments would generate capital to fund SPM's operations incubating AI companies. They agreed that Ritter would receive a 20% carry in SPI's portfolio. SPI's investments were overseen by an investment committee with Ritter serving as the final decision maker. Under her leadership, SPI engaged in numerous investments and transactions that collectively generated an exceptionally strong portfolio, with overall fund returns exceeding 40%. SPI's successful investments include Ondo Finance, U.S. Data Mining Group, Triumph Labs, Betr, Vannevar Labs, Pryon, Pernuvo, and Hebbia.

42. Ritter worked closely with Schmidt in building Steel Perlot, drawing on his experience and advice as the former CEO of Google. Despite his repeated assurances that Steel Perlot was a joint enterprise, he and Hillspire exercised ultimate authority. Schmidt was not a passive investor. He personally participated in fundraising efforts and was involved in and approved the hiring of employees, including setting their salaries. He also directed the company's

Miller Barondess, LLP
Attorneys at Law
2121 Avenue of the Stars, Suite 2600 Los Angeles, California 90067
Tel: (310) 552-4400 Fax: (310) 552-8400

finances while Hillspire maintained control of the books. When Ritter sought complete accounting records, Schmidt and Hillspire refused to provide transparency or allow her participation. Schmidt's decision-making was erratic and inconsistent—he would become enthusiastic about a new project and direct Ritter to assemble a team and allocate resources, only to abruptly change course, leaving budgets and priorities in constant flux. Over time, Schmidt's unilateral control left Ritter hamstrung—unable to manage the business she had built and dependent on his approval for even routine operational matters, including payment of business expenditures.

43. Ritter later learned that, without her knowledge or approval, Schmidt and Hillspire had manipulated SPM's books to reflect liabilities incurred by other entities and had diverted assets out of the company. Among other things, Ritter later learned that Schmidt and Hillspire inflated and manufactured net operating losses by shifting unrelated debts and expenses from other entities onto SPM's balance sheet to mask profitability. These actions distorted SPM's financial records, concealing the company's true value and further undermining Ritter's ability to exercise oversight or protect her ownership interest.

44. Ultimately, Schmidt invested in excess of $100 million into Steel Perlot and its incubated portfolio companies. As those enterprises began to achieve success, Schmidt wrested control away from Ritter, publicly took credit for the companies' performance and growth, and orchestrated a public campaign of false information to discredit and smear Ritter's reputation. This conduct is consistent with Schmidt's pattern and practice of seizing control of companies at or near inflection points when value would be realized and consistent with his widely-reported advice to Stanford students to steal TikTok's IP and "hire a whole bunch of lawyers to go clean the mess up" later.

**D. <u>Schmidt Engages in a Pattern of Coercive Control and Abuse</u>**

45. As the relationship progressed, Schmidt's conduct toward Ritter became increasingly coercive and abusive. He engaged in a sustained pattern of psychological abuse—isolating her from colleagues and friends, undermining her confidence, and fostering dependence on his approval. Schmidt became fixated on Ritter's appearance, telling her that she needed to

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

attend meetings looking "really hot and sexy" and purchasing clothes for her that he believed fit that bill. He also began to criticize her body, pressuring Ritter to use prescription stimulants to lose weight, and when she did, mocked her for appearing "emaciated."

46. Schmidt did not limit himself to demeaning Ritter during their private interactions. He made sexually inappropriate remarks in front of employees, investors, and other business associates, undermining her professional authority. For example, at one business meeting when a colleague complimented Ritter by saying she looked nice, Schmidt interjected, "You should see her naked." At other times, he would prompt her business associates by asking, "Doesn't she look so sexy?" And if he thought Ritter misspoke, he would say, "At least she's good looking." Whereas Schmidt had once treated Ritter as a brilliant young entrepreneur, he came to objectify her as a mere sex object, humiliating her and damaging her professional reputation.

47. Schmidt frequently lost his temper during arguments and physically assaulted Ritter. At six feet two inches tall and approximately 190 pounds, Schmidt was substantially larger than Ritter, who is five feet nine inches tall and weighs about 120 pounds. By November 2021, he had already shoved her forcefully on multiple occasions, leaving her with bruises and scratches. During arguments, he often intimidated Ritter by cornering her, standing inches from her face, and screaming at the top of his lungs, using his physical size and aggression to instill fear and submission. While they were living together in New York, Schmidt shoved Ritter near the top of a staircase during an argument, causing her to fall against a desk. On another occasion while they were in Miami, he erupted during an argument and ripped the AirPods from Ritter's ears, hurling them into the ocean when she tried to disengage.

48. Schmidt also engaged in disturbing voyeuristic behavior. On multiple occasions, he surreptitiously photographed Ritter without her consent while she was undressed. On one such occasion, he entered the bathroom while Ritter was showering and took photographs of her naked. She immediately confronted him and told him to delete the images. This non-consensual conduct further eroded Ritter's sense of safety and bodily autonomy.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

49. Schmidt would pressure Ritter to engage in his sexual fetishes. She firmly declined, making it clear that she was not interested. Schmidt did not listen to Ritter and ignored her lack of consent.

50. In or around November 2021, while the couple was aboard a yacht off the coast of Mexico, Schmidt followed her into their shower, slammed her against the wall and forcibly raped her. She pleaded with him to stop and cried out that he was hurting her, but he ignored her protests and proceeded until completion. Ritter was utterly shocked and dejected, trapped on the yacht at sea without the ability to flee Schmidt. The following morning, Schmidt attempted to convince her that she had enjoyed the rape.

51. Because of the control and power Schmidt had over Ritter—both personally and professionally—and the methodical campaign of grooming to which he had subjected her, she did not take action against him after the rape, or even end the relationship. In fact, as a result of the gaslighting by Schmidt that continued after the assault, Ritter tried to convince herself it was her fault and she acquiesced to his later requests to engage in certain sexual conduct.

52. Despite her efforts to avoid further harm by keeping Schmidt satisfied and pretending to share his sexual interests, the abuse continued. In or about August 2023 while attending Burning Man, she awoke to find Schmidt penetrating her without consent. Ritter tried to get Schmidt to stop his assault and clearly told him "no," but her prior experiences had taught her that any attempt to resist physically would be futile and make things worse.

53. Schmidt's behavior became increasingly erratic, particularly when he was intoxicated, under the influence of marijuana which he used recreationally, or on prescription medication. He even transported and used marijuana while travelling internationally, including in countries where it is strictly prohibited—demonstrating his disregard for the law and Ritter's safety. Ritter declined his offers to partake in his drug usage. On one occasion aboard his private jet with Ritter, he undressed and exposed himself to the flight crew. This episode deeply unsettled Ritter and reflected a pattern of escalating volatility and disregard for boundaries.

54. Ritter made multiple attempts to leave Schmidt. Each time, he manipulated her into returning by exploiting her emotional, financial, and business dependence on him. He even

Miller Barondess, LLP
Attorneys at Law
2121 Avenue of the Stars, Suite 2600 Los Angeles, California 90067
Tel: (310) 552-4400 Fax: (310) 552-8400

enlisted his close friend Todd Meister to intervene on his behalf to help persuade Ritter to stay with Schmidt.

55. Schmidt's abuse and coercive control extended into their business relationship. He exploited the joint venture's burn rate, payroll deadlines, and access to capital as leverage for sex—repeatedly tying timely funding or operational approvals to Ritter's submission to his sexual demands, and at times withholding previously agreed-upon financing until she complied. He made clear that her professional success, and the livelihoods of her employees, depended on satisfying him and his needs.

56. In or around June 2022, while in Monaco, a conversation between them escalated into an argument over Schmidt's interest in SPM and his refusal to approve routine payroll expenses. At the time, Ritter held a 95% ownership interest, but Schmidt demanded a larger share and began yelling at her in a fit of rage. Fearing he might become physically aggressive if she refused, and concerned about obtaining approval to pay her employees payroll, she capitulated and agreed to reduce her ownership interest to 51%, giving Schmidt the remaining 49%.

57. Schmidt also sabotaged Ritter's efforts to secure outside funding in order to ensure she remained financially dependent on him. Between 2022 and 2023, she devoted months to cultivating investor relationships and advancing serious discussions that Schmidt had encouraged. But when investors expressed interest in buying out his stake, he abruptly killed the deal. This became a pattern and practice in which he dangled the prospect of autonomy and success, only to later withdraw support.

**E. <u>Schmidt's Cyberstalking and Harassment</u>**

58. In early 2024, Ritter finally found the courage to leave Schmidt after photographs surfaced showing him with a 22-year-old woman, confirming Ritter's suspicions of infidelity. Incredulously, Schmidt attempted to claim he was not in the pictures and did not know the woman.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

59. In retaliation, Schmidt drew on his technological sophistication and insider access at Google to wage a sustained campaign of cyberstalking and digital harassment designed to surveil Ritter, seize her data and businesses, and silence her through fear and intimidation.

60. In 2024, Ritter discovered that her email account, phone, and Google Workspace contained unexplained data manipulation and deletions. On various occasions, Ritter would be using her email account or Google Workspace and saw emails and documents being deleted or altered as if someone else were controlling her keystrokes.

61. She began documenting this unexplained data manipulation, believing she was the target of hacking so she would have evidence for a forensic expert to review. Ritter also noticed her phone reflecting text messages to Schmidt that she had never sent, including a message purportedly sent after the yacht incident. It appears that Schmidt sent these messages to himself in order to cover his assault and falsely suggest consent.

62. Ritter's suspicions were confirmed by cybersecurity experts. Ritter discovered that without her knowledge or authorization, Schmidt installed remote-access software programs on her MacBook computer, including TeamViewer and Jamf in or around November 2021, coinciding with Schmidt's first rape of Ritter. This software enabled Schmidt to remotely see, access, and control—in real time—the content on her MacBook, including text messages, emails, documents, and other forms of digital communications, many of which are subject to attorney-client privilege. It appears Schmidt had been cyberstalking Ritter since at least November 2021.

63. During their relationship, Schmidt confided that when he worked at Google, he built an insider "backdoor" to Google servers with a team of Google engineers in order to spy on Google employees. Accordingly, the backdoor enabled him to access anyone's Google account and private information. Schmidt was the CEO of Google from 2001–2011 and served as the Executive Chairman from 2011–2015. He also was the Executive Chairman of Google's parent company Alphabet from 2015–2017 and technical advisor of Alphabet from 2017–2020.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

64. Schmidt used this backdoor to obtain unauthorized access to Ritter's Google Workspaces and accounts, and other devices. On information and belief, Schmidt's misuse of his backdoor access to Google servers extended beyond Ritter and the Google employees he targeted.

65. Schmidt also leveraged his influence over the technology firm Ritter had engaged to manage IT for their businesses to seize control of Ritter's Steel Perlot Google Workspace (the "Workspace"). The Workspace—which Ritter owned, administered, and paid for—held her personal and business emails, proprietary and trade secret materials, code repositories, tax records, and privileged communications.

66. In or around December 2024, Ritter and Schmidt agreed the IT provider would duplicate the Workspace so that each of them would retain a copy. Yet Ritter never received her copy and was instead locked out of the Workspace entirely. Administrative control was transferred to accounts bearing a "@Schmidtentity.co" domain. Steel Perlot employee email domains were re-provisioned to the same Schmidt-affiliated domain. Despite Ritter's demands, the Workspace and data were not returned. In early 2025, Ritter discovered that confidential business information and intellectual property had become publicly accessible.

67. Schmidt also gained unauthorized access to Google Workspaces for StarX and Audem. These digital intrusions coincided with the execution and circulation of documents purporting to bear Ritter's signature, including governance and tax documents that Ritter did not authorize. These forged documents were then used to alter corporate rights and create a false paper trail.

68. In or around August 2024, Ioannis Papapanagiotou ("Papapanagiotou"), Vice President of Engineering for Steel Perlot, who also provided shared technical services to multiple business entities, including Keeta, Knox, and StarX, was paid to resign by Schmidt and affiliated parties. Shortly thereafter, he was hired by Google as a Principal Engineer in or around fall of 2024. In or around April 2025, Ritter discovered that critical IP and tax data from her Workspace—now under Schmidtentity.co—had been accessed and downloaded by unauthorized

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

third parties. Access was apparently obtained through Papapanagiotou who was working for Google and/or another affiliate.

69. Beginning in or around June 2024, Ritter repeatedly notified Google of data breaches, unauthorized access, and irregularities within both her business Google Workspaces and her personal Google accounts. Ritter put Google on notice that Schmidt's access to her Google accounts and Workspaces was unauthorized and that he had hijacked administrative control and re-provisioned accounts to his "@Schmidtentity.co" domain. Despite that notice, Google refused to take corrective action, failed to restore Ritter's administrative access, and allowed the lockout and domain transfers to occur.

**F. <u>Schmidt's Calculated Campaign of Undue Pressure to Force Ritter Out of The Steel Perlot Enterprise</u>**

70. In 2024, Schmidt orchestrated a calculated campaign of escalating pressure, intimidation, misinformation, cyberstalking, surveillance, and threats to unduly pressure Ritter into assigning her valuable interests in the Steel Perlot ventures. Schmidt's ongoing cyber campaign was paired with physical stalking and intimidation.

71. In or around April 2024, Schmidt orchestrated Ritter's secret removal as Knox's CEO and from its Board of Directors ("Knox Board"). Natalya Thakur, the current CEO of Knova (formerly known as Knox), has stonewalled Ritter's repeated requests for financial statements to which she is entitled as a shareholder.

72. Around that same period, Schmidt locked Ritter out of their shared residences and refused to allow her to retrieve her personal belongings—including clothing, computers, business files, and sentimental possessions—holding her property hostage.

73. Schmidt also initiated baseless arbitration proceedings against Ritter's elderly parents. Notably, Ritter's mother had never worked for Schmidt, was not an employee or contractor of any entity he controlled, and was not a party to any agreement containing an arbitration provision.

74. Schmidt pursued these groundless proceedings as a tactic to exert undue pressure on Ritter, knowing her close relationship with her parents and her desire to protect them. Indeed,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

Schmidt later expressly claimed he would drop the arbitration against Ritter's parents only if Ritter entered into a [redacted].

75. In the summer of 2024, Ritter also discovered Schmidt had covertly installed cameras and listening devices in the Los Angeles residence he had acquired for her. These devices were placed for the purpose of monitoring Ritter's movements within the home and intercepting her private conversations. The surveillance captured highly sensitive communications, including confidential discussions concerning her rights and options with respect to Schmidt and the entities he controlled. The discovery of these clandestine devices compounded Ritter's fear and distress, confirmed Schmidt's ongoing campaign to surveil and intimidate her even after the relationship ended, and infringed upon her privacy and safety.

76. At the same time, Schmidt engaged in a smear campaign against Ritter, leaking false stories to the media that she had mismanaged the companies and was unfit to serve as CEO. Schmidt even paid Ritter's employees to resign and then hired them into his own companies in order to ensure their loyalty to him rather than to Ritter. Schmidt then used the resignation of these employees as proof of the purported mismanagement by Ritter. Schmidt also refused to approve expenditures for routine operations or provide basic financial or operational information, causing Ritter to be unable to run or manage her companies.

77. On or about November 7, 2024, Schmidt tracked Ritter and her parents to Nobu restaurant in Malibu—over one hour from where they live. He and his driver followed them to the restaurant, gained access to the Tesla she was driving, then used the Tesla app to drive away with the car. He subsequently looped back around into the parking lot, removed Ritter's laptop from her mother's bag, and left the bag behind while keeping the computer. The General Manager of Nobu informed Ritter that Nobu's security cameras captured Schmidt's actions.

78. Amid months of escalating pressure, intimidation, threats, cyberstalking and surveillance, and fear for her and her parents' safety, Ritter entered into a [redacted] with Schmidt, Hillspire, SP LLC (renamed to Orion Wing, LLC), SPI (renamed to Orion Wing Investments, LLC), Knox (renamed to Knova Finance Corp.), and Special Strategies I, LLC (collectively, the "Schmidt Parties") on December 4, 2024 [redacted], a true

and correct copy of which is attached hereto as **Exhibit A**.[1] Ritter was particularly concerned for her parents, both of whom are cancer survivors and struggling with health issues, and feared that the ongoing harassment and stress were taking a serious toll on their health.

79. [redacted].

**G. Schmidt Materially Breached the [redacted]**

80. Ritter hoped the [redacted] would put an end to the harassment. It did not. The very next day, on December 5, 2024, Ritter observed individuals stationed outside her home, monitoring her house and movements. She was under constant surveillance, followed whenever she left her residence and tailed throughout Los Angeles. On December 6, 2024, her parents were followed as they left their Los Angeles home, prompting a call to LAPD. When officers responded, they questioned the individual who admitted to working for a "billionaire's private security detail." This surveillance was undertaken in violation of the parties' [redacted] which proscribes [redacted].

81. In response to the ongoing harassment and continuing fear for her family's safety, Ritter sought protection by filing a Request for a Domestic Violence Restraining Order on December 11, 2024 (the "DVRO Request"). The DVRO Request addressed Schmidt's ongoing sexual harassment and misconduct that occurred after the parties' execution of the [redacted] and concerned events outside the scope of the [redacted], which extended only to claims arising on or before the [redacted]. From December 11 through December 17, 2024, Ritter and her parents remained under continuous physical surveillance at their homes and around Los Angeles.

---

[1] Pursuant to prior Court Orders, Ritter is redacting the [redacted] (defined below) without prejudice to later filing unredacted copies with the Court's permission.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

82. In the days that followed, Ritter was met with concerted pressure from Schmidt's lawyers and security team. On December 17, 2024, Schmidt sent multiple attorneys from law firm Glaser Weil, along with his security team, to meet with Ritter in person. Alone and without her attorney present, and in violation of ethical rules governing attorney conduct, Ritter was warned that they would keep her parents tied up in litigation and that the stalking and harassment would stop only if she agreed to withdraw her DVRO Request.

83. Frightened and desperate to protect her parents, she dismissed the DVRO Request and, on December 17, 2024, executed an [redacted], a true and correct copy of which is attached hereto as **Exhibit B**. [redacted] expressly provides "[redacted]."

84. Despite Ritter's full performance—including [redacted]—the Schmidt Parties refused to perform their obligations under the [redacted]. They instead advanced a pretextual allegation that Ritter had leaked the [redacted] to the Wall Street Journal to justify [redacted], while their surveillance and harassment persisted. Indeed, the sexual harassment—including stalking—has been ongoing, and continued after the parties executed the [redacted].

85. No article was published, but shortly after the [redacted] was executed, a Wall Street Journal reporter contacted Ritter and asked questions that, based on their content and specificity, made it readily apparent the reporter was reading from the [redacted] itself.

86. Ritter did not and had no incentive to leak the [redacted], as she had performed under the [redacted] whereas the Schmidt Parties' had not performed. At the time, Ritter wished for complete performance of the [redacted] so she could escape Schmidt and move on with her life. The Schmidt Parties, by contrast, had every reason to breach, having already secured the benefit of her performance. Ritter is informed and

believes that one of the Schmidt Parties leaked the [redacted] to the Wall Street Journal.

87. In January 2025, the Schmidt Parties initiated a baseless arbitration against Ritter, breaching the [redacted]. The arbitration was another act of retaliation, designed to weaponize the [redacted] and coerce Ritter into silence following the [redacted]. Schmidt's representatives went so far as to threaten Ritter and demand that she terminate her then-counsel. She ultimately proceeded pro per and objected to the arbitration, asserting that it was improper and brought in bad faith to keep her tied up in post-[redacted] proceedings.

88. The Schmidt Parties materially breached and failed to perform under the [redacted] by: [redacted]. The Schmidt Parties' attempt to justify [redacted] by asserting that Ritter's DVRO filing breached [redacted] is contrary to the plain terms of the [redacted] and was advanced in bad faith to evade [redacted] obligations.

89. It is apparent the Schmidt Parties never intended to perform their obligations under the [redacted] but instead falsely represented they would do so in order to induce Ritter to [redacted]. Once she [redacted], the Schmidt Parties immediately failed to perform, confirming their fraudulent intent from the outset.

90. The Schmidt Parties' material breaches and their refusal to comply with their obligations under the [redacted] resulted in termination of both [redacted], including but not limited to, the [redacted] contained therein. Accordingly, no applicable arbitration agreement exists, and Ritter is entitled to pursue her claims in court. Moreover, Ritter's claims fall squarely within the scope of the Ending

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

Forced Arbitration of Sexual Assault and Sexual Harassment Act, which provides her the right to have her claims adjudicated in a public court of law.

91. Ritter brings this action to hold Defendants accountable for their pattern of abuse, coercion, and bad-faith conduct. She seeks to recover the property, compensation, and business interests wrongfully taken from her, to obtain redress for the physical, emotional, and economic harm she has suffered, and to end the ongoing intimidation and retaliation that continue to threaten her and her family.

**FIRST CAUSE OF ACTION**

**Declaratory Relief**

**(*Against the Schmidt Parties*)**

92. Plaintiff repeats and realleges the allegations contained in the preceding and subsequent paragraphs of this Complaint, as though set forth fully herein.

93. An actual controversy has arisen and now exists between the parties over whether the Schmidt Parties can enforce the [redacted]. Plaintiff contends that despite her full performance—[redacted]—the Schmidt Parties refused to perform their obligations under the [redacted].

94. The Schmidt Parties materially breached and failed to perform under the [redacted] by, *inter alia*, violating the [redacted] through continued surveillance and harassment of Ritter and her parents; [redacted]. The Schmidt Parties' attempt to justify [redacted] to Ritter based on alleged [redacted] breaches arising from an alleged leak of the [redacted] to the Wall Street Journal is pretextual and advanced in bad faith.

95. Plaintiff contends the Schmidt Parties' material breaches and refusal to comply with their obligations resulted in the complete termination of both the [redacted]

Miller Barondess, LLP
Attorneys at Law
2121 Avenue of the Stars, Suite 2600 Los Angeles, California 90067
Tel: (310) 552-4400 Fax: (310) 552-8400

[redacted], including but not limited to, the [redacted]. Accordingly, Ritter is entitled to be placed back in the position she was prior to the [redacted], including [redacted] are believed to be valued in excess of $100 million, or according to proof at trial.

96. Plaintiff further contends the [redacted] in the [redacted] is unenforceable under the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (the "EFAA"). The parties' arbitration agreement constitutes a "predispute" arbitration agreement because the dispute arose at the time Plaintiff filed this First Amended Complaint, and the sexual harassment continued after execution of the [redacted].

97. Ritter did not consent to arbitration and did not authorize her counsel to waive any challenge to arbitrability. The Schmidt Parties' initiation of arbitration was the culmination of their plan to keep her tied up in costly proceedings after [redacted] and attempting to keep her silent.

98. Plaintiff seeks a judicial declaration that: (1) the Schmidt Parties' material breaches and refusal to comply with their obligations resulted in the complete termination of both the [redacted], including but not limited to, the [redacted]; (2) Ritter is entitled to be placed back in the position she was prior to the [redacted], including [redacted]; and (3) the EFAA renders the arbitration agreement unenforceable.

**<u>SECOND CAUSE OF ACTION</u>**

**Sexual Battery**

**(*Against Defendant Eric Schmidt*)**

99. Plaintiff repeats and realleges the allegations contained in the preceding and subsequent paragraphs of this Complaint, as though set forth fully herein.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

100. Schmidt intended to cause harmful or offensive contact with Ritter by use of her sexual organ, and a sexually offensive contact with her resulted. Ritter did not consent to such sexual contact.

101. Schmidt's conduct amounts to a violation of, *inter alia*, Civil Code section 1708.5(a) and Penal Code sections 242 and 243.4.

102. As a direct and proximate result of Schmidt's conduct, Ritter has suffered physical, emotional, and psychological harm in an amount according to proof at trial.

103. Schmidt's conduct has been intentional, deliberate, willful, malicious, and reckless, entitling Ritter to punitive damages.

## THIRD CAUSE OF ACTION

**Domestic Violence (Civil Code § 1708.6)**

**(*Against Defendant Eric Schmidt*)**

104. Plaintiff repeats and realleges the allegations contained in the preceding and subsequent paragraphs of this Complaint, as though set forth fully herein.

105. Schmidt inflicted injury upon Ritter resulting from abuse, as defined in Penal Code section 13700(a).

106. The abuse was committed by Schmidt, a person having a relationship with Ritter as defined in Penal Code section 13700(b).

107. Schmidt subjected Ritter to a continuing course of abusive conduct, including physical, sexual, emotional, and psychological abuse.

108. As a direct and proximate result of Schmidt's conduct, Ritter has sustained physical injury, emotional distress and anxiety, fear, humiliation, embarrassment, economic harm, and other consequential damages. Schmidt's conduct was a substantial factor in causing Ritter's harm. The injuries suffered by Plaintiff are substantial and continuing, and Schmidt is liable for damages in an amount according to proof at trial.

109. Schmidt's conduct has been intentional, deliberate, willful, malicious, and reckless, entitling Ritter to punitive damages.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

110. Ritter also seeks reasonable attorneys' fees as provided under California Civil Code section 1708.6(c).

**FOURTH CAUSE OF ACTION**

**Sexual Harassment (Civil Code § 51.9)**

**(*Against Defendant Eric Schmidt*)**

111. Plaintiff repeats and realleges the allegations contained in the preceding and subsequent paragraphs of this Complaint, as though set forth fully herein.

112. Ritter and Schmidt were in a business, service, or professional relationship.

113. Schmidt made sexual advances, solicitations, sexual requests, and demands for sexual compliance by Ritter, or engaged in other verbal, visual, or physical conduct of a sexual nature or of a hostile nature based on gender that were unwelcome and pervasive or severe.

114. Ritter has suffered economic loss or disadvantage or personal injury, including, but not limited to, emotional distress or the violation of a statutory or constitutional right, as a result of Schmidt's sexual advances.

115. Schmidt's conduct has been intentional, deliberate, willful, malicious, and reckless, entitling Ritter to punitive damages.

116. As a result of this unlawful conduct, Ritter is entitled to actual damages and exemplary damages pursuant to California Civil Code section 52, subdivision (b)(1), and attorneys' fees pursuant to Civil Code section 52, subdivision (b)(3).

**FIFTH CAUSE OF ACTION**

**Intentional Infliction of Emotional Distress**

**(*Against Eric Schmidt and DOES 1-10*)**

117. Plaintiff repeats and realleges the allegations contained in the preceding and subsequent paragraphs of this Complaint, as though set forth fully herein.

118. Defendants engaged in outrageous conduct and acted with the intent of causing, or with reckless disregard of the probability of causing, Ritter to suffer emotional distress.

119. As a proximate result of Defendants' tortious conduct, Ritter experienced severe emotional distress, and Defendants' conduct was a substantial factor in causing Ritter's severe

emotional distress. Ritter has suffered damages in an amount according to proof at trial. Defendants' conduct has been intentional, deliberate, willful, malicious, and reckless, entitling Ritter to punitive damages.

**SIXTH CAUSE OF ACTION**

**Violation of the California Comprehensive Computer Data Access and Fraud Act**

**(*Against Defendants Eric Schmidt, Google, and DOES 1-10*)**

120. Plaintiff repeats and realleges the allegations contained in the preceding and subsequent paragraphs of this Complaint, as though set forth fully herein.

121. Ritter is the owner of a computer, computer system, computer network, computer program, and/or data.

122. Schmidt violated California Penal Code section 502(c)(1) by knowingly and without permission accessing and using, causing to be used, and manipulating Ritter's computers, computer systems, computer networks, and/or data.

123. Schmidt installed remote-access software on Ritter's MacBook, including TeamViewer and Jamf, in or around November 2021, enabling him to monitor in real-time Ritter's device, communications, emails, text messages, documents, and privileged materials.

124. During their relationship, Schmidt confided that when he worked at Google, he built an insider "backdoor" to Google servers with a team of Google engineers in order to spy on Google employees. Accordingly, the backdoor enabled him to access anyone's Google account and private information. Schmidt was the CEO of Google from 2001–2011 and served as the Executive Chairman from 2011–2015. He also was the Executive Chairman of Google's parent company Alphabet from 2015–2017 and technical advisor of Alphabet from 2017–2020.

125. Schmidt used this backdoor to obtain unauthorized access to Ritter's Google Workspaces and accounts, and other devices.

126. Schmidt also leveraged his influence over the technology firm Ritter had engaged to manage IT for their businesses to seize control of Ritter's Steel Perlot Google Workspace. The Workspace—which Ritter owned, administered, and paid for—held her personal and business emails, proprietary and trade secret materials, code repositories, tax records, and privileged

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

Miller Barondess, LLP
Attorneys at Law
2121 Avenue of the Stars, Suite 2600 Los Angeles, California 90067
Tel: (310) 552-4400 Fax: (310) 552-8400

communications. While Ritter and Schmidt had agreed the IT provider would duplicate the Workspace so that each of them would retain a copy, Ritter never received her copy and was instead locked out. Administrative control was transferred to accounts bearing a "@Schmidtentity.co" domain. Steel Perlot employee email domains were re-provisioned to the same Schmidt-affiliated domain. Despite Ritter's demands, the Workspace and data were not returned.

127. Schmidt also gained unauthorized access to Google Workspaces for StarX and Audem. These digital intrusions coincided with the execution and circulation of documents purporting to bear Ritter's signature, including governance and tax documents that Ritter did not authorize. These forged documents were then used to alter corporate rights and create a false paper trail.

128. Google aided and abetted Schmidt's violations by knowingly acquiescing in, failing to remedy, and materially assisting the unauthorized access and control of Ritter's accounts and Workspaces after Ritter provided notice to Google of Schmidt's unauthorized access, re-provisioned domains, and lockouts. Despite notice, Google refused to restore Ritter's administrative control or prevent continued unauthorized access, enabling Schmidt's ongoing misuse of Ritter's computer services and data.

129. As a direct and proximate result of Schmidt's, Google's, and DOES 1-10's unlawful conduct within the meaning of California Penal Code section 502, Ritter was damaged in an amount according to proof at trial.

130. Schmidt's, Google's, and DOES 1–10's conduct has been intentional, deliberate, willful, malicious, and reckless, entitling Ritter to punitive damages.

131. Ritter has suffered irreparable injury from these acts, and due to the continuing threat of such injury, has no adequate remedy at law, entitling Ritter to injunctive relief. Ritter is also entitled to recover her attorneys' fees pursuant to California Penal Code section 502(e).

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

**SEVENTH CAUSE OF ACTION**

**Violation of California Penal Code § 631 (Wiretapping)**

**(*Against Defendants Eric Schmidt, Google, and DOES 1-10*)**

132. Plaintiff repeats and realleges the allegations contained in the preceding and subsequent paragraphs of this Complaint, as though set forth fully herein.

133. Schmidt violated California Penal Code section 631 by willfully and without consent intercepting wire and electronic communications; reading or attempting to read the contents of communications in transit; and using devices to accomplish such interception or reading.

134. Schmidt intentionally tapped and/or made unauthorized connection onto Ritter's personal computer in order to read, attempt to read, or learn the contents of messages, documents, and communications. Schmidt also accessed Ritter's other devices and Google Workspaces through his "backdoor" access to Google servers, thereby intercepting and reading communications and their contents without her consent.

135. Schmidt also intentionally installed cameras and listening devices in Ritter's Los Angeles residence to monitor her movements and intercept her private conversations.

136. Google aided and abetted Schmidt's violations of Penal Code section 631 by knowingly allowing Schmidt's continued unauthorized access to Ritter's Google accounts and Workspaces and refusing to remediate after notice, thereby enabling interception and reading of Ritter's electronic communications.

137. As a direct and proximate result of Defendants' conduct, Ritter has suffered damages in an amount according to proof at trial. She is entitled to actual damages, statutory damages or penalties, and treble damages under California Penal Code section 637.2.

**EIGHTH CAUSE OF ACTION**

**Violation of California Penal Code § 632 (Recording Confidential Communications)**

**(*Against Eric Schmidt and DOES 1-10*)**

138. Plaintiff repeats and realleges the allegations contained in the preceding and subsequent paragraphs of this Complaint, as though set forth fully herein.

139. Schmidt violated California Penal Code section 632 by intentionally, and without the consent of all parties to the communications, using electronic amplifying or recording devices to eavesdrop upon and record confidential communications of Ritter.

140. Schmidt covertly installed and used electronic listening devices and cameras in Ritter's Los Angeles residence to monitor, eavesdrop upon, and record her private conversations and communications, including confidential discussions concerning her rights and options with respect to Schmidt and the entities he controlled, and personal conversations with family and associates. These communications were carried on in circumstances that reasonably indicated Ritter and the other participants desired them to be confined to the parties, including inside Ritter's private home and in private rooms, and were not made in public gatherings or proceedings open to the public. Neither Ritter nor any other party to those communications consented to Schmidt's eavesdropping or recording.

141. Ritter has been injured by these actions. Accordingly, she is entitled to actual damages, statutory damages or penalties, and treble damages under California Penal Code section 637.2.

## NINTH CAUSE OF ACTION

### Accounting

**(*Against Schmidt Parties, SPM, and DOES 1-10*)**

142. Plaintiff repeats and realleges the allegations contained in the preceding and subsequent paragraphs of this Complaint, as though set forth fully herein.

143. An accounting is warranted because the Schmidt Parties controlled funds and assets belonging to or held for the benefit of Ritter. The Schmidt Parties exercised exclusive control over finances, capital allocations, and corporate records. The Schmidt Parties further denied Ritter access to books and records. On information and belief, the Schmidt Parties misappropriated, diverted, or otherwise mishandled funds and assets in which Ritter held interests.

144. Ritter seeks an equitable accounting of all funds and assets managed by Defendants in connection with SPM, SPI, Knox; all capital contributions, expenditures, and distributions; the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

value and disposition of portfolio interests; and all data and records withheld, to ascertain amounts owed to Ritter.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully prayers for judgment against Defendants as follows:

(1) For general, compensatory, consequential, and special damages, in excess of $100 million, or according to proof;

(2) For punitive and exemplary damages;

(3) For attorneys' fees, costs, and interest;

(4) For a declaration that: (i) the Schmidt Parties' material breaches and refusal to comply with their obligations resulted in the complete termination of both the [redacted], including but not limited to, the [redacted]; (ii) Ritter is entitled to be placed back in the position she was prior to the [redacted], including [redacted]; and (iii) the EFAA renders the arbitration agreement unenforceable;

(5) For any other relief the Court deems just and proper.

DATED: ________, 2025 MILLER BARONDESS, LLP

By: ______________________________
CLAIRE-LISE Y. KUTLAY
Attorneys for Plaintiff
MICHELLE RITTER

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

**DEMAND FOR JURY TRIAL**

Plaintiff hereby requests a trial by jury.

DATED: ____________, 2025 MILLER BARONDESS, LLP

By: ______________________________

CLAIRE-LISE Y. KUTLAY
Attorneys for Plaintiff
MICHELLE RITTER

# EXHIBIT A

**(REDACTED)**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

# EXHIBIT B

## (REDACTED)

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)
First Amended Complaint

# EXHIBIT 27

Harris–Joffe "MR/ES Settlement Obligations" exchange (Dec. 5–6, 2024) re SPI cryptocurrency-account passcodes and CGNET's custody of SPI information

From: Elliott Joffe ejoffe@baronsamson.com
Subject: Re: MR/ES Settlement Obligations
Date: Dec 6, 2024 at 7:03:46 AM
To: Jill Harris jharris@glaserweil.com
Cc: Scott Baron sbaron@baronsamson.com, Craig H. Marcus cmarcus@glaserweil.com

---

Thank you for clarifying.

Ms. Ritter did not handle the passcodes and does not have them currently.

The SPI information that was within SPM's control during Ms. Ritter's time with SPM is all in the custody of CGNET. Ms. Ritter has previously and again today authorized CGNET to provide access to all such information to SPM personnel. She has also asked CGNET to provide Hillspire with all such information and records in its possession today to avoid any doubt. If there is someone specific with whom CGNET should communicate regarding that information, please let us know, and Ms. Ritter can so advise CGNET, although as Hillspire has its own relationship with CGNET, it may be simpler to go directly to them.

If there is specific information that you believe Ms. Ritter can assist your clients with, please let us know, but as per my statement above, Ms. Ritter is not holding any passcodes or related information.

We believe the foregoing satisfies Ms. Ritter's information delivery obligations under the agreement between our clients.

Elliott Joffe, Esq., Senior Counsel
BARON SAMSON LLP
**[PLEASE NOTE NEW ADDRESS]**
**330 Passaic Avenue, Suite 105**
**Fairfield, NJ 07004**
(973) 244-0030 x 106 (tel)
(973) 244-0016 (fax)
(201) 452-4319 (cell)
ejoffe@baronsamson.com
www.baronsamson.com

New York Office:
255 West 36th Street, 2nd Floor
New York, NY 10018

---

**From:** Jill Harris <jharris@glaserweil.com>
**Sent:** Thursday, December 5, 2024 9:39:35 PM
**To:** Elliott Joffe <ejoffe@baronsamson.com>
**Cc:** Scott Baron <sbaron@baronsamson.com>; Craig H. Marcus <cmarcus@glaserweil.com>
**Subject:** RE: MR/ES Settlement Obligations

Apparently, MR and her team created a wallet to store ERN tokens, OSMO tokens, and ONDO tokens that were purchased/invested in 2021 and 2022.

Glaser Weil

**Jill Harris**
ASSOCIATE

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

jharris@glaserweil.com
T 310.282.6207

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

---

**From:** Elliott Joffe <ejoffe@baronsamson.com>
**Sent:** Thursday, December 5, 2024 6:31 PM
**To:** Jill Harris <jharris@glaserweil.com>
**Cc:** Scott Baron <sbaron@baronsamson.com>; Craig H. Marcus <cmarcus@glaserweil.com>
**Subject:** Re: MR/ES Settlement Obligations

Well, some details would be helpful.

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

---

**From:** Jill Harris <jharris@glaserweil.com>
**Sent:** Thursday, December 5, 2024 9:16:33 PM
**To:** Elliott Joffe <ejoffe@baronsamson.com>
**Cc:** Scott Baron <sbaron@baronsamson.com>; Craig H. Marcus <cmarcus@glaserweil.com>
**Subject:** RE: MR/ES Settlement Obligations

That's all I know at the moment

Glaser Weil

**Jill Harris**
ASSOCIATE

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

jharris@glaserweil.com
**T** 310.282.6207

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

---

**From:** Elliott Joffe <ejoffe@baronsamson.com>
**Sent:** Thursday, December 5, 2024 6:16 PM
**To:** Jill Harris <jharris@glaserweil.com>
**Cc:** Scott Baron <sbaron@baronsamson.com>; Craig H. Marcus <cmarcus@glaserweil.com>
**Subject:** Re: MR/ES Settlement Obligations

What type of crypto are we talking about?

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

---

**From:** Jill Harris <jharris@glaserweil.com>
**Sent:** Thursday, December 5, 2024 9:12:17 PM

**To:** Elliott Joffe <ejoffe@baronsamson.com>
**Cc:** Scott Baron <sbaron@baronsamson.com>; Craig H. Marcus <cmarcus@glaserweil.com>
**Subject:** Re: MR/ES Settlement Obligations

Ms. Ritter shall ensure that all information, documentation, tokens, passcodes, certificates and agreements relating to any investment or commitment made by SPI that is in her possession, custody, or control is delivered to Hillspire

I am merely flagging that we know there is an SPI crypto account that we need the information that will allow us to access it. (There are likely other things that she must provide tomorrow but I've received questions about the crypto account already so that's why I'm pointing it out.)

Glaser Weil

**Jill Harris**
ASSOCIATE

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

jharris@glaserweil.com
**T** 310.282.6207

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

On Dec 5, 2024, at 6:07 PM, Elliott Joffe <ejoffe@baronsamson.com> wrote:

Ms. Ritter shall ensure that all information, documentation, tokens, passcodes, certificates and agreements relating to any investment or commitment made by SPI that is in her possession, custody, or control is delivered to Hillspire

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from

malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)

First Amended Complaint

# EXHIBIT 28

Harris email, "CGNet/google" (Dec. 10, 2024, 7:03 p.m.), with Marcus/Baron replies

**From:** **Scott Baron** sbaron@baronsamson.com
**Subject:** FW: CGNet/google
**Date:** October 9, 2025 at 1:00 PM
**To:** Michelle Ritter ritter.sm@icloud.com

SB

Hi—the below thread is the closest I found relating to whether you are a released party in the various releases. I construe this as the releases release SPM and its officers, directors, representatives, affiliates, etc. That would include you, personally, even if not named personally.

Scott D. Baron, Esq.
BARON SAMSON LLP
330 Passaic Avenue, Suite 105
Fairfield, NJ 07004
973-244-0030 (office)
973-244-0016 (fax)
201-303-0767 (cell)
Email: sbaron@baronsamson.com
Website: baronsamson.com
Bio: baronsamson.com/our-attorneys-scott-d-baron

Manhattan Office:
255 West 36th Street, 2nd Floor
New York, NY 10018

Florida Office:
20803 Biscayne Blvd., Suite 300
Aventura, FL 33180

---

**From:** Craig H. Marcus <cmarcus@glaserweil.com>
**Sent:** Tuesday, December 10, 2024 7:59 PM
**To:** Scott Baron <sbaron@baronsamson.com>; Elliott Joffe <ejoffe@baronsamson.com>; Jill Harris <jharris@glaserweil.com>
**Subject:** RE: CGNet/google

Ms. Ritter is not a signatory, nor a named party, to the subject release agreements. Again, if one of the former employees who signed the releases – you have the list – threatens a claim against Ms. Ritter, such that the scope of the release thereafter becomes relevant, please forward the threat and will address Ms. Ritter's request in that context.

Happy to discuss the pragmatic considerations. Feel free to call me.

Glaser Weil

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**From:** Scott Baron <sbaron@baronsamson.com>
**Sent:** Tuesday, December 10, 2024 4:48 PM
**To:** Craig H. Marcus <cmarcus@glaserweil.com>; Elliott Joffe <ejoffe@baronsamson.com>; Jill Harris <jharris@glaserweil.com>
**Subject:** RE: CGNet/google

Craig, if agreements were procured wherein Ms. Ritter was made a party (i.e. a Releasee), are you really saying she is not entitled to see them? Is there some reason you wouldn't simply provide them rather than argue that you don't think there is a legal requirement to do so (with which we disagree). How can this be construed in any way other than there is either something to hide or you just want to flex muscles? Wouldn't it be easier to just send them? If you don't think you are legally obligated (with which, again, we disagree) how about just sending them as a courtesy?

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: "Craig H. Marcus" <cmarcus@glaserweil.com>
Date: 12/10/24 7:26 PM (GMT-05:00)
To: Elliott Joffe <ejoffe@baronsamson.com>, Jill Harris <jharris@glaserweil.com>
Cc: Scott Baron <sbaron@baronsamson.com>
Subject: RE: CGNet/google

Disagree. The releases were signed long before the settlement agreement was signed and the associated unwinding commenced, and are unrelated to the current unwinding process. Moreover, other than cooperating with my clients' unwinding efforts and providing documents, information, and access for that purpose, Ms. Ritter is not meaningfully involved with the current unwinding process and has no need for the releases in order to contribute to and cooperate with the unwinding. If you can articulate a legitimate reason why Ms. Ritter genuinely needs the releases in order to satisfy her cooperation duties in relationship to the unwinding, please do so and we will thereafter reconsider your request in that context.

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**From:** Elliott Joffe <ejoffe@baronsamson.com>
**Sent:** Tuesday, December 10, 2024 4:10 PM
**To:** Jill Harris <jharris@glaserweil.com>

**Cc:** Craig H. Marcus <cmarcus@glaserweil.com>; Scott Baron <sbaron@baronsamson.com>
**Subject:** Re: CGNet/google

For clarity, those releases are part of the unwinding of SPM as to which the parties have agreed to cooperate.

Elliott Joffe, Esq., Senior Counsel

BARON SAMSON LLP

**[PLEASE NOTE NEW ADDRESS]**

**330 Passaic Avenue, Suite 105**

**Fairfield, NJ 07004**

(973) 244-0030 x 106 (tel)

(973) 244-0016 (fax)

(201) 452-4319 (cell)

ejoffe@baronsamson.com

www.baronsamson.com

New York Office:

255 West 36th Street, 2nd Floor

New York, NY 10018

---

**From:** Elliott Joffe <ejoffe@baronsamson.com>
**Sent:** Tuesday, December 10, 2024 7:08 PM
**To:** Jill Harris <jharris@glaserweil.com>
**Cc:** Craig H. Marcus <cmarcus@glaserweil.com>; Scott Baron <sbaron@baronsamson.com>
**Subject:** Re: CGNet/google

Jill,

It would very much help me if I had, in writing, a proposal as to how to solve your client's problem vis a vis the delivery of steelperlot.com to Ms. Ritter.

Additionally, a response regarding whether or not your client will be providing copies of releases that may benefit one or more of the Ritter Parties would be appreciated.

Thank you.

Elliott Joffe, Esq., Senior Counsel

BARON SAMSON LLP

**[PLEASE NOTE NEW ADDRESS]**

**330 Passaic Avenue, Suite 105**

**Fairfield, NJ 07004**

(973) 244-0030 x 106 (tel)

(973) 244-0016 (fax)

(201) 452-4319 (cell)

ejoffe@baronsamson.com

www.baronsamson.com

New York Office:

255 West 36th Street, 2nd Floor

New York, NY 10018

---

**From:** Jill Harris <jharris@glaserweil.com>
**Sent:** Tuesday, December 10, 2024 7:03 PM
**To:** Elliott Joffe <ejoffe@baronsamson.com>
**Cc:** Craig H. Marcus <cmarcus@glaserweil.com>; Scott Baron <sbaron@baronsamson.com>
**Subject:** CGNet/google

Elliott – Since we got off the phone, I have learned that CGNet has been informed that MR keeps reporting suspicious activity and attempting to suspend the google accounts which are controlled through CGNet. Please have her withdraw her requests and reports as they are interfering with our ability to access everything in CGNet.

As you have emphasized, much of the important information we need is in CGNet. It is the company's CGNet account and we are responsible for the CGNet bill. MR is not entitled to maintain access to CGNet now that the agreement has been signed. Please bear in mind that the agreement requires her cooperation on this transition. I understand from your voicemail that she likely initiated these requests thinking there was a hack. There was no hack. We are simply taking over CGNet now.

**Jill Harris**
ASSOCIATE

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

jharris@glaserweil.com
**T** 310.282.6207

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient

world. To find out more, visit our website.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

# EXHIBIT 29

Knopf notice to CGNET and Google re unauthorized access, alteration, and preservation (Dec. 10, 2024)

# EXHIBIT 28

---

## December 10, 2024 Knopf Notice to CGNET

**Description**

December 10, 2024 Knopf preservation/lockout notice to CGNET — basis for the password-change-and-lockout allegations under CFAA / SCA counts.

**Status**

**ATTACHED — exhibit content follows this cover sheet.**

**Source**

[mounted]/__USE/2024-03 to 2024-10 - GW employee payoffs/2024_12_10 - FW CGNetgoogle - GW advises SB on releases & GW lies about scope of releases to my lawyers.pdf

— Cover sheet compiled 2026-04-27 —

**From:** **Scott Baron** sbaron@baronsamson.com
**Subject:** FW: CGNet/google
**Date:** October 9, 2025 at 1:00 PM
**To:** Michelle Ritter ritter.sm@icloud.com

SB

Hi—the below thread is the closest I found relating to whether you are a released party in the various releases. I construe this as the releases release SPM and its officers, directors, representatives, affiliates, etc. That would include you, personally, even if not named personally.

Scott D. Baron, Esq.
BARON SAMSON LLP
330 Passaic Avenue, Suite 105
Fairfield, NJ 07004
973-244-0030 (office)
973-244-0016 (fax)
201-303-0767 (cell)
Email: sbaron@baronsamson.com
Website: baronsamson.com
Bio: baronsamson.com/our-attorneys-scott-d-baron

Manhattan Office:
255 West 36th Street, 2nd Floor
New York, NY 10018

Florida Office:
20803 Biscayne Blvd., Suite 300
Aventura, FL 33180

---

**From:** Craig H. Marcus <cmarcus@glaserweil.com>
**Sent:** Tuesday, December 10, 2024 7:59 PM
**To:** Scott Baron <sbaron@baronsamson.com>; Elliott Joffe <ejoffe@baronsamson.com>; Jill Harris <jharris@glaserweil.com>
**Subject:** RE: CGNet/google

Ms. Ritter is not a signatory, nor a named party, to the subject release agreements. Again, if one of the former employees who signed the releases – you have the list – threatens a claim against Ms. Ritter, such that the scope of the release thereafter becomes relevant, please forward the threat and will address Ms. Ritter's request in that context.

Happy to discuss the pragmatic considerations. Feel free to call me.

Glaser Weil

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**From:** Scott Baron <sbaron@baronsamson.com>
**Sent:** Tuesday, December 10, 2024 4:48 PM
**To:** Craig H. Marcus <cmarcus@glaserweil.com>; Elliott Joffe <ejoffe@baronsamson.com>; Jill Harris <jharris@glaserweil.com>
**Subject:** RE: CGNet/google

Craig, if agreements were procured wherein Ms. Ritter was made a party (i.e. a Releasee), are you really saying she is not entitled to see them? Is there some reason you wouldn't simply provide them rather than argue that you don't think there is a legal requirement to do so (with which we disagree). How can this be construed in any way other than there is either something to hide or you just want to flex muscles? Wouldn't it be easier to just send them? If you don't think you are legally obligated (with which, again, we disagree) how about just sending them as a courtesy?

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: "Craig H. Marcus" <cmarcus@glaserweil.com>
Date: 12/10/24 7:26 PM (GMT-05:00)
To: Elliott Joffe <ejoffe@baronsamson.com>, Jill Harris <jharris@glaserweil.com>
Cc: Scott Baron <sbaron@baronsamson.com>
Subject: RE: CGNet/google

Disagree. The releases were signed long before the settlement agreement was signed and the associated unwinding commenced, and are unrelated to the current unwinding process. Moreover, other than cooperating with my clients' unwinding efforts and providing documents, information, and access for that purpose, Ms. Ritter is not meaningfully involved with the current unwinding process and has no need for the releases in order to contribute to and cooperate with the unwinding. If you can articulate a legitimate reason why Ms. Ritter genuinely needs the releases in order to satisfy her cooperation duties in relationship to the unwinding, please do so and we will thereafter reconsider your request in that context.

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**From:** Elliott Joffe <ejoffe@baronsamson.com>
**Sent:** Tuesday, December 10, 2024 4:10 PM
**To:** Jill Harris <jharris@glaserweil.com>

**Cc:** Craig H. Marcus <cmarcus@glaserweil.com>; Scott Baron <sbaron@baronsamson.com>
**Subject:** Re: CGNet/google

For clarity, those releases are part of the unwinding of SPM as to which the parties have agreed to cooperate.

Elliott Joffe, Esq., Senior Counsel
BARON SAMSON LLP
**[PLEASE NOTE NEW ADDRESS]**
**330 Passaic Avenue, Suite 105**
**Fairfield, NJ 07004**
(973) 244-0030 x 106 (tel)
(973) 244-0016 (fax)
(201) 452-4319 (cell)
ejoffe@baronsamson.com
www.baronsamson.com

New York Office:
255 West 36th Street, 2nd Floor
New York, NY 10018

---

**From:** Elliott Joffe <ejoffe@baronsamson.com>
**Sent:** Tuesday, December 10, 2024 7:08 PM
**To:** Jill Harris <jharris@glaserweil.com>
**Cc:** Craig H. Marcus <cmarcus@glaserweil.com>; Scott Baron <sbaron@baronsamson.com>
**Subject:** Re: CGNet/google

Jill,

It would very much help me if I had, in writing, a proposal as to how to solve your client's problem vis a vis the delivery of steelperlot.com to Ms. Ritter.

Additionally, a response regarding whether or not your client will be providing copies of releases that may benefit one or more of the Ritter Parties would be appreciated.

Thank you.

Elliott Joffe, Esq., Senior Counsel
BARON SAMSON LLP
**[PLEASE NOTE NEW ADDRESS]**
**330 Passaic Avenue, Suite 105**
**Fairfield, NJ 07004**
(973) 244-0030 x 106 (tel)
(973) 244-0016 (fax)

(201) 452-4319 (cell)

ejoffe@baronsamson.com

www.baronsamson.com

New York Office:

255 West 36th Street, 2nd Floor

New York, NY 10018

---

**From:** Jill Harris <jharris@glaserweil.com>
**Sent:** Tuesday, December 10, 2024 7:03 PM
**To:** Elliott Joffe <ejoffe@baronsamson.com>
**Cc:** Craig H. Marcus <cmarcus@glaserweil.com>; Scott Baron <sbaron@baronsamson.com>
**Subject:** CGNet/google

Elliott – Since we got off the phone, I have learned that CGNet has been informed that MR keeps reporting suspicious activity and attempting to suspend the google accounts which are controlled through CGNet. Please have her withdraw her requests and reports as they are interfering with our ability to access everything in CGNet.

As you have emphasized, much of the important information we need is in CGNet. It is the company's CGNet account and we are responsible for the CGNet bill. MR is not entitled to maintain access to CGNet now that the agreement has been signed. Please bear in mind that the agreement requires her cooperation on this transition. I understand from your voicemail that she likely initiated these requests thinking there was a hack. There was no hack. We are simply taking over CGNet now.

**Jill Harris**
ASSOCIATE

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

jharris@glaserweil.com
**T** 310.282.6207

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient

world. To find out more, visit our website.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

From: James Knopf jsk@knopflaw.com
Subject: SteelPerlot.com unauthorized access
Date: Dec 10, 2024 at 5:52:08 PM
To: r.uribe@cgnet.com, g.lindsey@cgnet.com
Cc: MR Client Ritter.sm@icloud.com

Re: **Request for Explanation and Remediation of Unauthorized Access, Data Alteration, and Identity Theft Related to SteelPerlot.com and Associated Domains**

Dear Ricardo and Georg,

As you know, I am assisting Michelle Ritter with various personal and corporate matters. I am writing regarding her domain **SteelPerlot.com** and associated domains, including **StarX.com** and **Audem-Mgmt.com**. This letter concerns unauthorized access, potential data theft, identity theft, and improper record alterations involving these domains, which constitute serious legal violations.

**Background**

Ms. Ritter provided administrative access to **CGNET** via the following accounts:

- **cgnet@steelperlot.com** (SteelPerlot.com)
- **cgnet@starx.com** (StarX.com)
- **cgnet@audem-mgmt.com** (Audem-Mgmt.com)

These accounts were granted administrative rights under the understanding they would be used solely to fulfill the technical and operational requirements authorized by Ms. Ritter. Despite this, Ms. Ritter has been locked out of her **mritter@steelperlot.com** account—the primary admin account for SteelPerlot.com. During this recent lockout, records show that her account was accessed through her credentials, without authorization. Documents were accessed and altered, raising grave concerns about identity theft, data integrity, and security breaches.

Ms. Ritter has previously flagged ongoing unauthorized incursions and data alterations to you, Google, and related parties without any meaningful resolution. These issues reflect a pattern of unauthorized control over her property, compromising the domains, data, and records.

We are seeking your help in investigating and resolving these issues.

We hereby requesting information re the following:

1. **Access Logs**:
   - A detailed log of all activities conducted through the accounts **cgnet@steelperlot.com**, **cgnet@starx.com**, **cgnet@audem-mgmt.com**, and **mritter@steelperlot.com**
   - Identification of all individuals or entities who accessed these accounts or had access to these accounts.

2. **Communications Re Access to Account** :
   - Instructions, requests or communications to or from any CGNET employees or agents, or any 3rd parties re requests for access, log in credentials or other account information.

3. **Status of Data and Records**:
   - Confirmation of whether any data, documents, or records were copied, altered, or deleted.

4. **Access by Jill Harris**
   - In addition to the above, we have just learned that Jill Harris has indicated she accessed the

mritter@steelperlot.com account, changed the password and attempted to access all files. Please provide any confirming information re her access.

**Preservation of Evidence**

Finally, you are hereby placed on notice to preserve all evidence related to the domains, including but not limited to access logs, communications, and actions taken with respect to these accounts. Ms. Ritter has filed a report with local law enforcement for investigation re unauthorized access and identity theft as well as potential fraudulent alteration of records.

Thank you in advance for your cooperation in resolving these issues.

Please contact Michelle directly or me if any questions.

Regards,

James Knopf

Law Offices of James S. Knopf
2000 Broadway St.
Redwood City, CA 94063
Tel: 650-627-9500
Fax: 650-627-9595

# EXHIBIT 30

Marcus email re DVRO dismissal (Dec. 23, 2024); Baron–Marcus emails re declaration timing (Jan. 13–15, 2025); Harris email re Workspace return (Jan. 16, 2025); Harris email (Dec. 13, 2024)

# EXHIBIT 35

---

## December 23, 2024 Marcus Email (DVRO Pressure)

**Description**

December 23, 2024 Marcus email pressuring Plaintiff regarding DVRO dismissal and settlement performance.

**Status**

**ATTACHED — exhibit content follows this cover sheet.**

**Source**

[mounted]/__USE/2024-12 - Agreements + DVRO/2024-12-23 - MR view on dvro dismissal req + GW Marcus role to pressure - Re DVRO dismissal stipulation.pdf

— Cover sheet compiled 2026-04-27 —

**From:** ritter.sm@icloud.com
**Subject:** Re: DVRO dismissal stipulation
**Date:** December 23, 2024 at 10:01 AM
**To:** Elliott Joffe ejoffe@baronsamson.com
**Cc:** James Knopf jsk@knopflaw.com, Scott Baron sbaron@baronsamson.com, Michelle Ritter ritter.sm@icloud.com

MR

Please push back on the language that he is using. The settlement amendment straight up does NOT require the ACTUAL dismissal. It requires filing what is necessary for dismissal. Not ensuring the outcome of whether or not a dismissal occurs. Please clarify with him.

Can someone please send me the stipulation with the PO Box address in it? Then I will send my signatures.

I want us to reconfirm that they want the stipulation filed as well. If we file it and the court does not require the stipulation (which it does not), and then the court denies the dismissal, we will be blamed. If we do not file the stipulation and the court denies the CIV-110 (which is the appropriate route for dismissal), we will still be blamed.

As a result, I want an actual confirmation from them on filing the stipulation, given that we know it is NOT required and will be rejected. Their language will not be seen by the court. We cannot change what the court utilizes for dismissals.

Thanks

> On Dec 23, 2024, at 9:56 AM, Elliott Joffe <ejoffe@baronsamson.com> wrote:
>
> Elliott Joffe, Esq., Senior Counsel
> BARON SAMSON LLP
> **[PLEASE NOTE NEW ADDRESS]**
> **330 Passaic Avenue, Suite 105**
> **Fairfield, NJ 07004**
> (973) 244-0030 x 106 (tel)
> (973) 244-0016 (fax)
> (201) 452-4319 (cell)
> ejoffe@baronsamson.com
> www.baronsamson.com
>
> New York Office:
> 255 West 36th Street, 2nd Floor
> New York, NY 10018
>
> ---
>
> **From:** Craig H. Marcus <cmarcus@glaserweil.com>
> **Sent:** Sunday, December 22, 2024 4:32 PM
> **To:** Elliott Joffe <ejoffe@baronsamson.com>
> **Cc:** Scott Baron <sbaron@baronsamson.com>; Jill Harris <jharris@glaserweil.com>; Adam Pines <apines@glaserweil.com>
> **Subject:** RE: DVRO dismissal stipulation
>
> Elliot,
>
> Respectfully, you have it backwards. Pursuant to the Amendment to the Settlement Agreement, Ms. Ritter agreed to "file any and all applicable paperwork necessary or desirable to dismiss the DVRO against Mr. Schmidt with prejudice and provide evidence of the same (the 'Filing Condition')" and the Schmidt Parties agreed to make the second payment within "72 hours after the Filing Condition." Amendment, ¶¶ 1-2. Therefore, Mr. Ritter must satisfy the "Filing Condition," including filing all applicable paperwork necessary [] to dismiss the DVRO against Mr. Schmidt with prejudice and provide evidence of same," before the 72 hour window commences for payment. Ms. Ritter has not yet satisfied the Filing Condition.
>
> I am pleased to learn that Ms. Ritter approved and will sign the stipulation and proposed order. My signature is attached. Please note that Ms. Ritter must insert her address on the first page

address on the first page.

Subject to consultation with my partner and client, we will file a notice of appearance tomorrow morning.

Craig

Glaser Weil

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan &Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

---

**From:** Elliott Joffe <ejoffe@baronsamson.com>
**Sent:** Sunday, December 22, 2024 1:01 PM
**To:** Craig H. Marcus <cmarcus@glaserweil.com>
**Cc:** Scott Baron <sbaron@baronsamson.com>
**Subject:** DVRO dismissal stipulation

Craig,

Michelle is signing the stipulation.

We can deliver the stipulation to be held by your firm in escrow pending our acknowledgment of receipt of funds.

Please let me know if that procedure is acceptable.

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

stip-dism DVRO-1.pdf

Ritter v. Schmidt — U.S. District Court, Central District of California
Plaintiff's Exhibit Binder, Volume I — compiled in support of Complaint filed April 24, 2026

# EXHIBIT 31

## Jan. 12–15, 2025 Marcus–Baron 'Semantics' Email Chain

**Description**

January 12–15, 2025 Marcus–Baron correspondence — including the 'Semantics' email and Marcus's representations re: declaration content during second-tranche payment negotiations.

**Status**

**ATTACHED — exhibit content follows this cover sheet.**

**Source**

[mounted]/__USE/2025-01 05 08 + 2026-03 04 - GW requires agmt modification and dec/2025-01-15 - GW modification of agreement - Fwd- WSJ.pdf

— Cover sheet compiled 2026-04-27 —

From: ritter.sm@icloud.com
Subject: Fwd: WSJ
Date: Mar 24, 2025 at 10:50:31 AM
To: Samantha F. Spector ss@spectorlawfirm.com

Begin forwarded message:

**From:** Scott Baron <sbaron@baronsamson.com>
**Date:** January 15, 2025 at 2:42:34 PM PST
**To:** Michelle Ritter <ritter.sm@icloud.com>
**Cc:** Elliott Joffe <ejoffe@baronsamson.com>
**Subject: FW: WSJ**

Scott D. Baron, Esq.
BARON SAMSON LLP
330 Passaic Avenue, Suite 105
Fairfield, NJ 07004
973-244-0030 (office)
973-244-0016 (fax)
201-303-0767 (cell)
Email: sbaron@baronsamson.com
Website: baronsamson.com
Bio: baronsamson.com/our-attorneys-scott-d-baron

Manhattan Office:
255 West 36th Street, 2nd Floor
New York, NY 10018

Florida Office:
20803 Biscayne Blvd., Suite 401
Aventura, FL 33180

---

**From:** Scott Baron

**Sent:** Wednesday, January 15, 2025 3:52 PM
**To:** Craig H. Marcus <cmarcus@glaserweil.com>; Elliott Joffe <ejoffe@baronsamson.com>
**Cc:** Jill Harris <jharris@glaserweil.com>
**Subject:** RE: WSJ

Semantics. You requested cooperation in the form of a public statement which mirrors the statements in the declaration.

Scott D. Baron, Esq.
BARON SAMSON LLP
[PLEASE NOTE NEW ADDRESS]
330 Passaic Avenue, Suite 105
Fairfield, NJ 07004
973-244-0030 (office)
973-244-0016 (fax)
201-303-0767 (cell)
Email: sbaron@baronsamson.com
Website: baronsamson.com
Bio: baronsamson.com/our-attorneys-scott-d-baron

Manhattan Office:
255 West 36th Street, 2nd Floor
New York, NY 10018

Florida Office:
20803 Biscayne Blvd., Suite 401
Aventura, FL 33180

---

**From:** Craig H. Marcus <cmarcus@glaserweil.com>
**Sent:** Monday, January 13, 2025 11:40 PM
**To:** Scott Baron <sbaron@baronsamson.com>; Elliott Joffe <ejoffe@baronsamson.com>
**Cc:** Jill Harris <jharris@glaserweil.com>
**Subject:** RE: WSJ

I never expressly, nor effectively, requested the declaration, nor

even mentioned the declaration. Rather, you and Elliott invoked the declaration and the inaccurate notion of a modification of the agreement.

Glaser Weil

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
T 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

---

**From:** Scott Baron <sbaron@baronsamson.com>
**Sent:** Monday, January 13, 2025 8:28 PM
**To:** Craig H. Marcus <cmarcus@glaserweil.com>; Elliott Joffe <ejoffe@baronsamson.com>
**Cc:** Jill Harris <jharris@glaserweil.com>
**Subject:** RE: WSJ

You effectively requested the declaration now (publicly) instead of after Michelle is paid in full as provided in the agreement. That is a monumental modification.

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: "Craig H. Marcus" <cmarcus@glaserweil.com>
Date: 1/13/25 11:17 PM (GMT-05:00)
To: Elliott Joffe <ejoffe@baronsamson.com>

Cc: Scott Baron <sbaron@baronsamson.com>, Jill Harris <jharris@glaserweil.com>
Subject: RE: WSJ

It is undeniable that your clients are the source of the recent defamation of Eric and associated disclosures of confidential information.

I never requested, nor even mentioned, a modification of the settlement agreement, nor threatened litigation absent such a modification.

<image001.png>

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

---

**From:** Elliott Joffe <ejoffe@baronsamson.com>
**Sent:** Monday, January 13, 2025 6:32 PM
**To:** Craig H. Marcus <cmarcus@glaserweil.com>
**Cc:** Scott Baron <sbaron@baronsamson.com>; Jill Harris <jharris@glaserweil.com>
**Subject:** Re: WSJ

It also bears noting that these recent negotiations commenced with your clients falsely and without any evidence accusing our clients of leaking confidential information and threatening litigation unless our clients agreed to a material modification of the settlement agreement in your clients' favor and to the detriment of our clients.

We reject your accusations and your proposed modification and do not consider the abatement of your threats to be adequate consideration.

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

---

**From:** Elliott Joffe <ejoffe@baronsamson.com>
**Sent:** Monday, January 13, 2025 9:19:03 PM
**To:** Craig H. Marcus <cmarcus@glaserweil.com>
**Cc:** Scott Baron <sbaron@baronsamson.com>; Jill Harris <jharris@glaserweil.com>
**Subject:** Re: WSJ

Craig, our client denies unequivocally that she or anyone on her behalf has breached the settlement agreement or defamed any of your clients.

Further, our client asserts that the leak of information appears to have originated from one or more of your clients and/or their agents.

I remind you of the as-yet uncured breaches of the settlement agreement on the part of your clients that were described in my prior emails.

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

---

**From:** Craig H. Marcus <cmarcus@glaserweil.com>
**Sent:** Monday, January 13, 2025 9:12:36 PM
**To:** Elliott Joffe <ejoffe@baronsamson.com>
**Cc:** Scott Baron <sbaron@baronsamson.com>; Jill Harris <jharris@glaserweil.com>
**Subject:** WSJ

Elliott,

Thanks for your calls today. I relayed your client's request for us to send a proposed statement that Michelle would make to the reporter, along with your request for additional consideration in exchange for the statement. My client declined to accept the

offer (just as he declined to accept Scott's similar, earlier offer). He does not feel he should pay any more money for another person's breach and defamation, which I hoped we could resolve amicably together. You asked for a response within two hours, so I wanted to get back to you in a timely fashion.

Regards,

Craig

<image001.png>

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward

> building a more resilient world. To find out more, visit our website.

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)

First Amended Complaint

# EXHIBIT 31

Marcus email re modification of Agreement ("Fwd: WSJ") (Jan. 15, 2025)

From: ritter.sm@icloud.com
Subject: Fwd: WSJ
Date: Mar 24, 2025 at 10:50:31 AM
To: Samantha F. Spector ss@spectorlawfirm.com

Begin forwarded message:

**From:** Scott Baron <sbaron@baronsamson.com>
**Date:** January 15, 2025 at 2:42:34 PM PST
**To:** Michelle Ritter <ritter.sm@icloud.com>
**Cc:** Elliott Joffe <ejoffe@baronsamson.com>
**Subject: FW: WSJ**

Scott D. Baron, Esq.
BARON SAMSON LLP
330 Passaic Avenue, Suite 105
Fairfield, NJ 07004
973-244-0030 (office)
973-244-0016 (fax)
201-303-0767 (cell)
Email: sbaron@baronsamson.com
Website: baronsamson.com
Bio: baronsamson.com/our-attorneys-scott-d-baron

Manhattan Office:
255 West 36th Street, 2nd Floor
New York, NY 10018

Florida Office:
20803 Biscayne Blvd., Suite 401
Aventura, FL 33180

---

**From:** Scott Baron

**Sent:** Wednesday, January 15, 2025 3:52 PM
**To:** Craig H. Marcus <cmarcus@glaserweil.com>; Elliott Joffe <ejoffe@baronsamson.com>
**Cc:** Jill Harris <jharris@glaserweil.com>
**Subject:** RE: WSJ

Semantics. You requested cooperation in the form of a public statement which mirrors the statements in the declaration.

Scott D. Baron, Esq.
BARON SAMSON LLP
**[PLEASE NOTE NEW ADDRESS]**
330 Passaic Avenue, Suite 105
Fairfield, NJ 07004
973-244-0030 (office)
973-244-0016 (fax)
201-303-0767 (cell)
Email: sbaron@baronsamson.com
Website: baronsamson.com
Bio: baronsamson.com/our-attorneys-scott-d-baron

Manhattan Office:
255 West 36th Street, 2nd Floor
New York, NY 10018

Florida Office:
20803 Biscayne Blvd., Suite 401
Aventura, FL 33180

---

**From:** Craig H. Marcus <cmarcus@glaserweil.com>
**Sent:** Monday, January 13, 2025 11:40 PM
**To:** Scott Baron <sbaron@baronsamson.com>; Elliott Joffe <ejoffe@baronsamson.com>
**Cc:** Jill Harris <jharris@glaserweil.com>
**Subject:** RE: WSJ

I never expressly, nor effectively, requested the declaration, nor

even mentioned the declaration. Rather, you and Elliott invoked the declaration and the inaccurate notion of a modification of the agreement.

Glaser Weil

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

---

**From:** Scott Baron <sbaron@baronsamson.com>
**Sent:** Monday, January 13, 2025 8:28 PM
**To:** Craig H. Marcus <cmarcus@glaserweil.com>; Elliott Joffe <ejoffe@baronsamson.com>
**Cc:** Jill Harris <jharris@glaserweil.com>
**Subject:** RE: WSJ

You effectively requested the declaration now (publicly) instead of after Michelle is paid in full as provided in the agreement. That is a monumental modification.

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: "Craig H. Marcus" <cmarcus@glaserweil.com>
Date: 1/13/25 11:17 PM (GMT-05:00)
To: Elliott Joffe <ejoffe@baronsamson.com>

Cc: Scott Baron <sbaron@baronsamson.com>, Jill Harris <jharris@glaserweil.com>
Subject: RE: WSJ

It is undeniable that your clients are the source of the recent defamation of Eric and associated disclosures of confidential information.

I never requested, nor even mentioned, a modification of the settlement agreement, nor threatened litigation absent such a modification.

<image001.png>

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

---

**From:** Elliott Joffe <ejoffe@baronsamson.com>
**Sent:** Monday, January 13, 2025 6:32 PM
**To:** Craig H. Marcus <cmarcus@glaserweil.com>
**Cc:** Scott Baron <sbaron@baronsamson.com>; Jill Harris <jharris@glaserweil.com>
**Subject:** Re: WSJ

It also bears noting that these recent negotiations commenced with your clients falsely and without any evidence accusing our clients of leaking confidential information and threatening litigation unless our clients agreed to a material modification of the settlement agreement in your clients' favor and to the detriment of our clients.

We reject your accusations and your proposed modification and do not consider the abatement of your threats to be adequate consideration.

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

---

**From:** Elliott Joffe <ejoffe@baronsamson.com>
**Sent:** Monday, January 13, 2025 9:19:03 PM
**To:** Craig H. Marcus <cmarcus@glaserweil.com>
**Cc:** Scott Baron <sbaron@baronsamson.com>; Jill Harris <jharris@glaserweil.com>
**Subject:** Re: WSJ

Craig, our client denies unequivocally that she or anyone on her behalf has breached the settlement agreement or defamed any of your clients.

Further, our client asserts that the leak of information appears to have originated from one or more of your clients and/or their agents.

I remind you of the as-yet uncured breaches of the settlement agreement on the part of your clients that were described in my prior emails.

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

---

**From:** Craig H. Marcus <cmarcus@glaserweil.com>
**Sent:** Monday, January 13, 2025 9:12:36 PM
**To:** Elliott Joffe <ejoffe@baronsamson.com>
**Cc:** Scott Baron <sbaron@baronsamson.com>; Jill Harris <jharris@glaserweil.com>
**Subject:** WSJ

Elliott,

Thanks for your calls today. I relayed your client's request for us to send a proposed statement that Michelle would make to the reporter, along with your request for additional consideration in exchange for the statement. My client declined to accept the

offer (just as he declined to accept Scott's similar, earlier offer). He does not feel he should pay any more money for another person's breach and defamation, which I hoped we could resolve amicably together. You asked for a response within two hours, so I wanted to get back to you in a timely fashion.

Regards,

Craig

<image001.png>

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward

building a more resilient world. To find out more, visit our website.

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)
First Amended Complaint

# EXHIBIT 32

Ritter/counsel notices to Glaser Weil re Workspace theft and Google breaches (Dec. 31, 2024; Jan. 19, 2025)

From: Elliott Joffe ejoffe@baronsamson.com
Subject: Draft of email to GW
Date: Dec 31, 2024 at 10:24:45 AM
To: ritter.sm@icloud.com
Cc: Scott Baron sbaron@baronsamson.com

*Michelle, below is a draft of the email we propose to send to GW regarding Eric's breaches of the Settlement Agreement. It may be better to send this AFTER we attempt to negotiate with GW the issues related to the FTC lien, as something may be accomplished during that negotiation that this email could make more difficult. Let us know your thoughts once you've read this carefully.*

Subject: Eric Schmidt's and the Schmidt Parties' ongoing breaches of the Settlement Agreement

Dear Mr. Marcus:

This will recap and summarize Mr. Schmidt's and the Schmidt Parties' continuing breaches of the Settlement Agreement between our clients and other actionable conduct.

<u>Steel Perlot name and domain name</u>

As you know, "Steel Perlot" is a name that has been used by multiple entities and by Ms. Ritter for multiple purposes. The name, as well as the domain name "steelperlot.com" have always been the property of Ms. Ritter, a fact recognized clearly by the language of Section 1(d) of the Settlement Agreement, which provides that "Ms. Ritter shall be entitled to **keep** the "Steel Perlot" trademark, name and websites (which, for the avoidance of doubt, includes the domain address "Perlot.com" and any other domain addresses currently held by SPM that include any variation of the name "Steel Perlot" or "Perlot")." (Emphasis has been added.) The use of the word "keep" clearly denotes that the foregoing were the property of Ms. Ritter before the Settlement Agreement was executed and remain so at all times thereafter.

Ownership of the domain name "steelperlot.com" clearly includes the right to use email addresses containing that domain name. Nothing in the Settlement Agreement authorizes any Schmidt Party to continue to use the name "Steel Perlot" or the domain name "steelperlot.com" at any time after its Effective Date. To the extent continued use was implied by the "cooperation" provisions of the Settlement Agreement, which is debatable, the **exclusive** use of the domain name was **never** contemplated, bargained for or agreed upon. Nevertheless, not only have the Schmidt Parties continued, without authority, to utilize the name and domain name in violation of the Settlement Agreement and Ms. Ritter's rights of ownership, but the proposal recently offered to rectify this breach and conversion of her property included no proposal as to when the Schmidt Parties will cease their use of the name and domain name that remains Ms. Ritter's property. The offer to allow Ms. Ritter to use a brand new email address containing her domain name is wholly insufficient to cure this ongoing breach and conversion.

Steel Perlot Google workspace

The steelperlot.com domain name is the domain associated with a Google workspace identified on Ms. Ritter's credit card statements as "GOOGLE *GSUITE_steelpe co@google.com CA" in the monthly sum of $2,052.00. That domain name was used by the parties, including the Schmidt Parties, for multiple entities bearing the name "Steel Perlot," as well as by Ms. Ritter and Mr. Schmidt for other purposes, and the Schmidt Parties' recent efforts to distance Mr. Schmidt from this collective use of the workspace notwithstanding, all of the parties share responsibility for the complications arising out of that commingled usage. As the workspace is a product/service offered by Google, its ownership can only really be determined by reference to contract, and the contract was clearly between Ms. Ritter, who first obtained and has consistently paid for the workspace, and Google, the provider. Consequently, while some of the data contained in the workspace may be the property of one or more Schmidt Parties, the workspace has always been the property of Ms. Ritter, the Google customer, payor and owner of the associated domain name "steelperlot.com."

In fact, the Settlement Agreement clearly contemplates the fact that some documents and information belonging to the Schmidt Parties was to remain, after the Effective Date, in Ms. Ritter's custody and control. This is why the Settlement Agreement provides, at Section 1(i), that "Ms. Ritter shall ensure that all information, documentation, tokens, passcodes, certificates and agreements relating to any investment or commitment made by SPI that is in her possession, custody, or control is delivered to Hillspire within 2 business days after the Effective Date." If the foregoing were not expected to remain, on and after the Effective Date, in Ms. Ritter's "possession, custody, or control," then the quoted language would have been wholly unnecessary.

As a simple way of complying with the foregoing requirement of Section 1(i), Ms. Ritter asked CGNet to provide Hillspire with a complete copy of the workspace, the segregation of the required material being far too cumbersome a project to complete in only two days. This would have resulted in the Schmidt Parties having more than they were entitled to receive. Additionally, the Schmidt Parties were given permission to utilize their existing access to the workspace to locate the documents and information they sought.

In response to Ms. Ritter's largesse, someone acting on behalf of the Schmidt Parties obtained and utilized Ms. Ritter's credentials to change her password and lock her out of her workspace, connected to her domain name, paid by for her and subject to her contract with Google. This conversion of Ms. Ritter's workspace is not remotely authorized by the Settlement Agreement and represents separate, post-Effective Date tortious (and, perhaps, criminal) conduct not

covered by the releases or confidentiality provisions contained in the Settlement Agreement.

The proposed resolution, whereby the Schmidt Parties continue to control Ms. Ritter's workspace and allow her supervised access in order to make requests to the Schmidt Parties for return of her data contained in her now converted workspace is wholly unacceptable.

Defamatory emails sent to former SPM employees/SPI investment partners

The Settlement Agreement, at Section 1(a), provides that "[a]ny Party may hire any SPM employee." On or about December 18, Ms. Ritter learned that Hillspire employee Joon Hur had sent emails to former SPM employees (some of whom were also investment partners of SPI) which contained the language and example of which follows: "When Steel Perlot Management invested in your company, Michelle Ritter was inappropriately identified as the contact person for Steel Perlot Management … Should you receive any communications from Ms. Ritter, please forward them to me for handling." These emails clearly interfere with Ms. Ritter's right to communicate with former SPM employees, as is clearly provided in Section 1(a).

Furthermore, taken as a whole, the emails clearly paint Ms. Ritter "in a negative or disapproving light" and represent attempts to prevent Ms. Ritter "from being invited to networks, conferences, events, and/or social events hosted or presented by third parties." Consequently, the emails violate the non-disparagement provisions of Section 3(a)(iv) of the Settlement Agreement. When confronted with these violations of the Settlement Agreement by your clients, you responded that unless Ms. Ritter could produce the emails authored by your client's employee, on which she was not copied, there was nothing to talk about. That statement is both legally deficient and utterly absurd. To date, your clients have not represented that these emails and other similar communications will cease, which we take as an admission that your client intends to continue defaming and disparaging Ms. Ritter and interfering with her communications with former SPM employees in violation of the Settlement Agreement.

Please note that unless the above ongoing breaches and tortious conduct are immediately remedied and ceased, Ms. Ritter reserves all of her rights under the Settlement Agreement and, as to the new tortious conduct not specifically addressed therein, at law. Please guide your clients accordingly.

Elliott Joffe, Esq., Senior Counsel
BARON SAMSON LLP
**[PLEASE NOTE NEW ADDRESS]**
**330 Passaic Avenue, Suite 105**

**Fairfield, NJ 07004**
(973) 244-0030 x 106 (tel)
(973) 244-0016 (fax)
(201) 452-4319 (cell)
ejoffe@baronsamson.com
www.baronsamson.com

New York Office:
255 West 36th Street, 2nd Floor
New York, NY 10018

From: ritter.sm@icloud.com
Subject: Follow up
Date: Jan 19, 2025 at 5:45:55 PM
To: H. Marcus Craig cmarcus@glaserweil.com, Patricia L. Glaser pglaser@glaserweil.com
Cc: Michelle Ritter ritter.sm@icloud.com

---

Craig,

Hope you and your family are doing well. I always have an open line to get matters resolved. But this madness needs to stop. On the workspace, I can guarantee that your client is entirely wrong and is putting all related parties in jeopardy for it.

We have reviewed this thoroughly.

I always have an open line. I can promise you that I want nothing to do with your client or his family office for any longer than I need to deal with. But you all have breached the contract over something that could easily be fixed, aside from everything else. I directed CGNET to make two copies of the entire workspace because I had nothing to hide. Instead, it was stolen from me. I told you to keep a copy of my workspace and give me back the workspace operationally. This only helps your client! I wasn't obligated to do this per the settlement agreement!

Now I'm concerned that things far beyond SPM or SPI or gone. Why do you think I negotiated for steelperlot.com and the workspace? I am beyond concerned other access points have been used to alter emails. This is well evidenced as of June 2024 and I have hard copies.

At this point, your firm would be complicit in this matter. While I understand your strong representation of your clients, I am telling you directly, yet again, that your firm is enabling, on behalf of your clients, a direct breach of Google terms of services. I need my data and my privacy. Please advise.

Michelle

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)
First Amended Complaint

# EXHIBIT 33

Knox Shareholders' Written Consent and Board Written Consent removing Ritter (Apr. 26, 2024; DocuSign envelope A5DA96EA; signed for Steel Perlot, LLC by Big Hen Group I, LLC / Hillspire, LLC / Eric Schmidt, Co-Manager, and by directors Eric Schmidt and R. Martin Chávez); Carta capitalization records for Knox and StarX (Jan. 19, 2022; June 2024)

**WRITTEN CONSENT**
**OF**
**THE SHAREHOLDERS OF**
**KNOX NETWORKS, INC.**

**April 26, 2024**

The undersigned (the "**Consenting Shareholders**"), being shareholders of Knox Networks, Inc., a Delaware corporation (the "**Company**"), acting by this written consent (this "**Written Consent**") without a meeting pursuant to Section 228 of the Delaware General Corporation Law and Section 2.11 of the Company's Amended and Restated Bylaws, do hereby waive all formal requirements, including the necessity of holding a formal or informal meeting, and any requirements that notice of such meeting be given, and consent to the adoption of the following resolutions:

**WHEREAS**, pursuant to Article III (Board Composition) and Article V, Part B, Section 2.2 (Election of Directors) of the Company's Certificate of Incorporation, Section 2.9 (Voting) and Section 3.13 (Removal of Directors) of the Company's Amended and Restated Bylaws, holders of record of a majority of the issued and outstanding shares of the Company's Preferred Stock and Common Stock, voting as a single class, have the authority to elect and remove (without cause) any of the directors on the Company's Board of Directors.

**WHEREAS**, pursuant to Section 2.11 (Stockholder Action By Written Consent Without a Meeting) of the Company's Amended and Restated Bylaws, the Company's shareholders may take action by written consent without a meeting provided that such written consent is signed by the holders of outstanding stock having no less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

**WHEREAS**, the Company does not have any issued and outstanding shares of its Preferred Stock.

**WHEREAS**, the Consenting Shareholders hold a majority of the issued and outstanding shares of the Company's Common Stock.

**WHEREAS**, the Consenting Shareholders desire to execute this Written Consent for the purpose of removing Michelle Ritter as a director on the Company's Board of Directors (the "**Proposed Action**").

**WHEREAS**, the Consenting Shareholders represent a majority of the issued and outstanding shares of the Company's Common Stock, and therefore have the necessary authority to take the Proposed Action pursuant to the Company's Certificate of Incorporation, Amended and Restated Bylaws and the Delaware General Corporation Law.

**NOW THEREFORE**, it is hereby:

**RESOLVED**, that the Consenting Shareholders do hereby consent to, approve, and effect to the fullest extent possible with immediate effect as of the date first set forth above, the removal of Michelle Ritter as a director on the Company's Board of Directors.

**RESOLVED**, that the remaining directors on the Company's Board of Directors and officers of the Company (collectively, the "**Authorized Persons**") be, and each of them individually is hereby, authorized and empowered to do and perform or cause to be done and performed all such acts, deeds, and things, and to make, execute, and deliver, or cause to be made, executed, and delivered, all such agreements, undertakings, documents, instruments, or certificates in the name of

the Company and to retain such counsel, agents, and advisors and to incur and pay such expenses, fees, and taxes as shall, in the opinion of the Authorized Persons executing the same, be deemed necessary or advisable (such necessity or advisability to be conclusively evidenced by the execution or performance thereof) to effectuate or carry out fully the purposes and interests of all of the foregoing resolutions; and that any and all such actions heretofore or hereafter taken by the Authorized Officers relating to and within the terms of these resolutions be, and they hereby are, adopted, affirmed, approved, and ratified in all respects as the acts and deeds of the Company.

**RESOLVED**, that this Written Consent may be executed electronically and in multiple counterparts, each of which shall be deemed an original, and all of which together shall be deemed one instrument.

**RESOLVED**, the undersigned hereby direct the Secretary of the Company to file an executed copy of this Written Consent, including multiple counterparts, with the minutes of the proceedings of the Shareholders.

[*Signature Page Follows*]

**IN WITNESS WHEREOF**, the undersigned have duly executed this Written Consent effective as of the date first set forth above.

**CONSENTING SHAREHOLDER:**

STEEL PERLOT, LLC

By: Big Hen Group I, LLC
Title: Member

By: Hillspire, LLC
Title: Manager

By: DocuSigned by: Eric Schmidt 5F5358F21163405...
Name: Eric Schmidt
Title: Co-Manager

Dated: 4/26/2024

**WRITTEN CONSENT**
**OF**
**THE BOARD OF DIRECTORS**
**OF**
**KNOX NETWORKS, INC.**

**April 26, 2024**

The undersigned ("**Consenting Directors**"), being all of the directors on the Board of Directors (the "**Board**") of Knox Networks, Inc., a Delaware corporation (the "**Company**"), acting by this written consent (this "**Written Consent**") without a meeting pursuant to Section 141(f) of the Delaware General Corporation Law and Section 3.10 of the Company's Amended and Restated Bylaws, do hereby waive all formal requirements, including the necessity of holding a formal or informal meeting, and any requirements that notice of such meeting be given, and consent to the adoption of the following resolutions:

**WHEREAS**, on April 26, 2024, certain shareholders of the Company, constituting holders of a majority of the Company's issued and outstanding Common Stock, acting by written consent without a meeting, removed Michelle Ritter as a director on the Board.

**WHEREAS**, pursuant to Section 5.4 (Removal and Resignation of Officers) of the Company's Amended and Restated Bylaws, the Board has the authority to remove (with or without cause) any officer, authorized signatory or agent of the Company.

**WHEREAS**, the Consenting Directors desire, to the extent not already terminated by actions of the shareholders, to remove Michelle Ritter from each and every office or other position which she holds with the Company, including as Chief Executive Officer, independent contractor, employee, or agent of the Company.

**WHEREAS**, pursuant to Section 3.10 (Board Action By Written Consent Without A Meeting) of the Company's Amended and Restated Bylaws, the Board may take action by written consent without a meeting provided that such written consent is signed by all directors on the Board.

**NOW THEREFORE LET IT BE:**

**RESOLVED**, that, to the extent not already terminated by actions of the shareholders, Michelle Ritter is hereby removed from each and every office or other position which she holds with the Company, including as Chief Executive Officer, independent contractor, employee, or agent of the Company, effective with immediate effect as of the date first set forth above.

**RESOLVED**, that the directors and officers of the Company (collectively, the "**Authorized Persons**") be, and each of them individually is hereby, authorized and empowered to do and perform or cause to be done and performed all such acts, deeds, and things, and to make, execute, and deliver, or cause to be made, executed, and delivered, all such agreements, undertakings, documents, instruments, or certificates in the name of the Company and to retain such counsel, agents, and advisors and to incur and pay such expenses, fees, and taxes as shall, in the opinion of the Authorized Persons of the Company executing the same, be deemed necessary or advisable (such necessity or advisability to be conclusively evidenced by the execution or performance thereof) to effectuate or carry out fully the purposes and interests of all of the foregoing resolutions; and that any and all such actions heretofore or hereafter taken

by the Authorized Persons relating to and within the terms of these resolutions be, and they hereby are, adopted, affirmed, approved, and ratified in all respects as the acts and deeds of the Company.

**RESOLVED**, that this Written Consent may be executed electronically and in multiple counterparts, each of which shall be deemed an original, and all of which together shall be deemed one instrument.

**RESOLVED**, the undersigned hereby direct the Secretary of the Company to file an executed copy of this Written Consent, including multiple counterparts, with the minutes of the proceedings of the Board.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned directors have duly executed this Written Consent effective as of the date first set forth above.

**CONSENTING DIRECTORS:**

DocuSigned by:
Eric Schmidt
5F5358F21163405...

Eric Schmidt

DocuSigned by:
R. Martin Chavez
F83DB95AD8E24E4...

R. Martin Chavez

carta

333 Bush Street Floor 23, Suite 2300
San Francisco, CA 94104

## Contract for StarX Networks, Inc.

1840 Century Park E
Los Angeles, CA, USA 90067-2101

**Subscription Term:** 12 months
**Billing Frequency:** 12 months

| Subscription: Grow Plan | |
|---|---|
| Pricing model | Annual rate |
| Per security holder | $120.00 |
| **Pricing at Current Security Holder Count:** | |
| Up to 25 security holders | $3,000.00 |
| First year discount | -$600.00 |
| Estimated tax | $0.00 |
| Subtotal | $2,400.00 |

| Summary | |
|---|---|
| Subtotal: Grow | $2,400.00 |
| Implementation Fee (Waived) | - |
| Total Amount Due Today | $2,400.00 |

## Customer Payment Terms

Total amount to be charged to billing information on file.
Contract begins at time of electronic signature.
First Year Discount is applied only to payments in the Subscription Term above.
All currency is in U.S. Dollars unless otherwise stated.

**Grow - Included services**

**SEC Transfer Agent & Registrar Services - for US domiciled companies only:** Maintain source of truth for ownership.

**Security Issuances:** The ongoing issuance of securities such as common stock, preferred stock, option grants, warrants and convertible notes.

**Initial Conversion:** Covers company setup on Carta platform and the conversion of paper securities to electronic versions, including up to 90 days of implementation assistance. If not completed within 90 days due to customer readiness, customer may be subject to an additional fee to complete remaining work, not to exceed 20% of the first years Annual fee.

**Participant Portal:** Digital portfolio for stakeholders, including exercise workflow, 83(b) as needed.

**HRIS:** Integrate with existing business systems to keep stakeholder information up to date in Carta.

**Data room:** Securely store and share disclosures, term sheets and other documents

**Form 3921:** Generating and Distributing IRS Form 3921

**Reporting:** Standard reports included. Export transaction data to spreadsheets.

**Board consents:** Send board resolutions to approve option grants, 409As valuations, or any other resolution through the Carta platform

**Waterfall:** Tools to model exit scenarios for your company see the economic payouts to share classes and top stakeholders

**Round modeling:** Pro-forma modeling tools and scenario analysis for financing events

**Investor updates:** Send company updates to stakeholders through the Carta platform.

**409A valuations:** Valuations every 12 months or as needed for material updates, e.g, financings, and audit support. (Subject to additional terms and conditions at time of request of any valuation.)

**Advanced reporting templates:** Custom reporting offers column customization, filtering, quick downloads, and intuitive search functionality.

## General Terms

Customer acknowledges and agrees that renewal Subscription Terms following the initial Subscription Term will be for a period of one year.

carta

CONTRACT FOR STARX NETWORKS, INC.

This Order Form incorporates the terms and conditions of the Master Subscription Agreement (https://carta.com/msa). Where applicable, the defined terms in the Agreement shall have the same meaning as in this Order Form. By entering your full name below your signature will be applied to this Order Form as the representative of StarX Networks, Inc..

CUSTOMER

Michelle Ritter

Michelle Ritter, CFO

rrabinowitch@steelperlot.com

Signed May 12, 2023, 10:57 a.m.

208eb029-9323-45ac-a6d7-458f59f9e93d

ESHARES, INC.

Christie Hansen

Christie Hansen, Finance operations

christie.hansen@carta.com

Signed May 12, 2023, 10:57 a.m.

4ba3e12a-0806-4a5a-84e4-a83c28aa9c2d

carta

333 Bush Street Floor 23, Suite 2300
San Francisco, CA 94104

## Contract for Knox Networks Inc.

**Subscription plan:** Starter
**Subscription term:** 12 months
**Billing frequency:** 12 months

### Core software fee

| Security holders | Annual rate |
|---|---|
| 1 - 25 | $2,800.00 |
| 26 - 50 | $4,900.00 |
| 51 - 75 | $7,000.00 |
| 76 - 100 | $9,000.00 |
| 101 - 125 | $11,000.00 |
| 126 - 150 | $13,000.00 |
| 151 - 175 | $15,000.00 |
| 176 - 200 | $17,000.00 |
| 201 - 300 | $20,000.00 |
| 301 - 400 | $23,000.00 |
| 401 - 500 | $26,000.00 |
| 501 - 600 | $28,000.00 |
| 601+ in increments of 100 | $3,000.00 |

### Summary

| Initial conversion | Total initial conversion fee |
|---|---|
| Implementation Fee (Waived) | - |
| First year discount | -$700.00 |
| Subtotal | $2,100.00 |
| Estimated tax | $0.00 |
| Total amount due | $2,100.00 |

Customer payment terms

Total amount to be charged to billing information on file.

Contract begins at time of electronic signature.

## Included services

SEC Transfer Agent & Registrar Services - for US domiciled companies only

Maintain source of truth for ownership.

Security Issuances

The ongoing issuance of securities such as common stock, preferred stock, option grants, warrants and convertible notes.

Initial Conversion

Covers company setup on Carta platform and the conversion of paper securities to electronic versions, including up to 90 days of implementation assistance. If not completed within 90 days due to customer readiness, customer may be subject to an additional fee to complete remaining work, not to exceed 20% of the first years Annual fee.

Reporting

Standard reports included. Export transaction data to spreadsheets.

409A valuations

Valuations every 12 months or as needed for material updates, e.g, financings, and audit support.

Form 3921

Generating and Distributing IRS Form 3921

Board Consents

Send board officers resolutions to approve option grants, 409As valuations, or any other resolution through the Carta platform

Deal room

Securely store and share disclosures, term sheets and other documents

All Order Forms below incorporate the terms and conditions of the Master Subscription Agreement (www.carta.com/msa). Where applicable, the defined terms in the Agreement shall have the same meaning as in any Order Form below. By entering your full name on the signature page below, our signature will be applied to all Order Forms below as the representative of Knox Networks Inc.

carta

| | |
|---|---|
| **Customer Name:** | Knox Networks Inc. |
| **Quote Date:** | 1/19/2022 |
| **Quote Valid Until:** | 1/26/2022 |
| **Quote Presented in:** | USD |

**Subscription Plan:** **Carta Total Comp Plan**
**Subscription Term:** **12 Months**

| **Employee Range** | **Renewal Price** | |
|---|---|---|
| 1 - 10 | $ 1,000 | x |
| 11 - 25 | $ 3,375 | |
| 26 - 50 | $ 5,250 | |
| 51-100 | $ 9,000 | |
| 101-200 | $ 16,500 | |
| 200+ in increments of 100 | $ 7,500 | |

| | | | **Subtotal** |
|---|---|---|---|
| **List Price** | | | $1,000.00 |
| **First-year Discount Amount:** | 25% | Discount Description | ($250.00) |
| **Total Amount Due** | | | **$750.00** |

**Customer Payment Terms:**
Upon signing, total Amount to be charged via ACH or CC to billing information on file.

**Included Services:**
**Carta Total Comp Product:** Carta Total Comp enables start-ups to instantly benchmark employee total compensation against market data and peers.

**eShares, Inc. DBA Carta confidential and proprietary information. This document may not be reproduced or distributed without the written permission of eShares, Inc. DBA Carta.**

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)
First Amended Complaint

# EXHIBIT 34

Knox Networks, Inc. Notice of Stock Repurchase (Apr. 26, 2025; 4,500 "Unvested Shares" at $1.00 per share); Knox proposed NDA (May 19, 2025); Knox § 220 demand response (May 9, 2025); Knox letter re NDA (May 30, 2025)

**Knox Networks, Inc.**

**Notice of Stock Repurchase**

April 26, 2025

***Via Electronic Mail***

Michelle Ritter
michelleritter929@gmail.com
9 Island Ave Unit #503, Miami Beach, FL 33139, USA

Dear Michelle:

Reference is made to Section 2 of the Restricted Stock Agreement, dated June 28, 2021 (the "Restricted Stock Agreement"), by and between Knox Networks, Inc., a Delaware corporation (the "Company"), and you. Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Restricted Stock Agreement.

As of your Termination of Service effective on April 26, 2024, an aggregate of 4,500 Shares (as currently adjusted for all companywide stock splits, dividends, combinations, recapitalizations and the like) were subject to the Unvested Share Repurchase Option (the "Unvested Shares"). In connection with your Termination of Service, the Company is repurchasing the Unvested Shares at a purchase price per share equal to $1.00 per share, for an aggregate purchase price equal to $4,500.00 (the "Purchase Amount"). The Company will pay the Purchase Amount to you via electronic transfer or check. Following the Company's exercise of the Unvested Share Repurchase Option as set forth herein, you will continue to hold your vested 19,500 Shares (as currently adjusted for all companywide stock splits, dividends, combinations, recapitalizations and the like).

**KNOX NETWORKS, INC.**

By: Natalya Thakur
Name: Natalya Thakur
Title: CEO

# CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT

This Confidentiality and Nondisclosure Agreement (the "Agreement") is made and entered into as of May 19, 2025 by and between Michelle Ritter ("Shareholder"), Law Offices of James S. Knopf ("Shareholder's Counsel"), and Knox Networks, Inc. ("Knox Networks"). Knox Networks, Shareholder's Counsel, and Shareholder shall collectively be referred to herein as the "Parties" and each as a "Party."

WHEREAS, Shareholder hereby represents and warrants that she is the beneficial owner of shares of common stock of Knox Networks;

WHEREAS, Shareholder, through Shareholder's Counsel, served a demand (the "Demand") to inspect certain books and records of Knox Networks, received by Knox Networks on April 29, 2025;

WHEREAS, Shareholder has appointed Shareholder's Counsel as her lawful agent and attorney-in-fact with the power and authority to act in her place and stead and on her behalf with respect to the Demand;

WHEREAS, Knox Networks believes the books and records sought by Shareholder contain non-public, confidential, proprietary, and/or commercially sensitive information of Knox Networks or any of its subsidiaries or affiliates;

WHEREAS, without conceding the validity or sufficiency of the Demand and subject to Shareholder and Shareholder's Counsel executing this Agreement, Knox Networks has agreed to make a production of certain documents that Knox Networks considers confidential and which may be relevant to the stated purposes of the Demand (the "Purposes");

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. The term "Confidential Information" shall mean (a) any and all documents, agreements, files and other written materials, that are furnished to Shareholder, Shareholder's Counsel, or their Representatives by or on behalf of Knox Networks after the date of this Agreement in response to the Demand, that are designated as such and contain information that is sensitive, confidential, proprietary, privileged, trade secrets, and/or protected by common law, statutory, jurisprudential, and/or other privileges and protections and (b) any copies, extracts, reproductions or summaries of such information or documentation.

2. The term "Representative" shall mean, as to any person, such person's affiliates and its and their trustees, directors, officers, employees, attorneys, agents and advisors, including without limitation any legal counsel, accountants, consultants, financial advisors, or experts that Shareholder or Shareholder's Counsel have retained for the purpose of fulfilling the Purposes; provided, however, that in no event shall a Representative be (i) a person, entity, or party as to whom communications are prohibited pursuant to Section 4(a), 4(c), 4(d), or 4(f) of this Agreement, or (ii) any plaintiff or prospective plaintiff, expert, advisor, or consultant who is involved directly or indirectly in any litigation pending or threatened against Knox Networks. As

used in this Agreement, the term "person" shall be broadly interpreted to include, without limitation, any corporation, bank, partnership, association, trust, other entity or individual.

3. By entering into this Agreement and/or producing documents, Knox Networks does not admit that Shareholder has stated a proper purpose for the inspection of such information, and expressly reserves all rights and defenses with regard to the Demand. This includes the right to assert, including in any subsequent legal proceedings of any type, and without exclusion to any other arguments or defenses it has or may have, that the Demand is improper in whole or in part, including but not limited to expressly reserving the right to assert that: (i) the Demand does not comply with Delaware law; (ii) Shareholder has not stated a proper purpose; (iii) the Purposes are not Shareholder's actual purposes; (iv) Shareholder already has all information required to investigate the matters in the Demand, or such information is publicly available; (v) the Demand is overly broad and seeks documents not reasonably related to the Purposes; (vi) for any other reason, Shareholder is not entitled to the inspection demanded; and (vii) the requested documents are neither relevant to nor admissible in any subsequent proceeding.

4. The Confidential Information shall be used solely for the Purposes and for no other purpose, and subject to the restrictions on confidentiality set forth herein. Prohibited purposes include, but are not limited to, the following:

a. Communications with any competitor or competitors of Knox Networks;

b. Communications with any person or entity other than Shareholder, Shareholder's Counsel, or their Representatives, including but not limited to communications with any plaintiff, attorney, expert, advisor, or consultant who is involved directly or indirectly in any litigation pending or threatened against Knox Networks or any of its subsidiaries or its affiliates;

c. Communications with any shareholder or potential shareholder other than Shareholder, any counsel representing any shareholder other than Shareholder, or any experts, advisors or consultants retained by a shareholder other than Shareholder;

d. Communications with press or news media representatives, analysts, or other content publishers;

e. Publication, including posting to any social media, blogs, or websites;

f. Communications with any investor organizations or associations;

g. As a basis for trading in the securities of Knox Networks; and

h. Any other purpose, except as set forth herein or expressly agreed to by Knox Networks or its counsel in writing.

5. The Parties agree that the designation of any information as Confidential Information for purpose of this Agreement may be made either by (i) affixing the legend "Confidential" to each page containing any confidential material or by stamping the word "Confidential" on the first page of multi-page documents bound together by staple or other permanent binding, in order for the entire document to be treated as confidential, or (i) designating

the information as "Confidential" in a cover letter producing the materials. The failure to designate the information as "Confidential" in such a manner does not constitute a waiver of such claim.

6. Shareholder, Shareholder's Counsel, and their Representatives agree to hold all documents received and any Confidential Information in trust and strict confidence. Without the prior written consent of Knox Networks, Shareholder and Shareholder's Counsel shall not, and shall direct their Representatives not to, disclose, publish, or communicate such documents or Confidential Information to anyone, either directly or indirectly, except as expressly permitted in this Agreement, nor shall Shareholder, Shareholder's Counsel, or their Representatives disclose, publish, or communicate to any other person the fact that they have sought, received, or reviewed such documents or Confidential Information.

7. Confidential Information may be disclosed to Representatives of Shareholder or Shareholder's Counsel who need to know such information for the evaluation of the Purposes; provided, however, that (a) such Representatives shall be informed by Shareholder or Shareholder's Counsel of the confidential nature of such Confidential Information and shall be directed by Shareholder or Shareholder's Counsel to treat such information confidentially and in accordance with the terms of this Agreement and (b) such Representatives, except for Shareholder's Counsel and employees of their law firms, shall be required to sign a confidentiality statement in the form attached hereto as Exhibit A and deliver such executed confidentiality statement to Knox Networks. Shareholder and Shareholder's Counsel shall be responsible for any breach of this Agreement by any of their Representatives and agree to take all necessary measures (including litigation) to restrain their Representatives from prohibited or unauthorized disclosure or use of Confidential Information.

8. If Shareholder determines to commence an action, suit, or proceeding using documents produced in connection with the Demand in any tribunal of competent jurisdiction, Shareholder's Counsel shall first provide Knox Networks with a copy of each exhibit or attachment to the complaint before filing and shall provide Knox Networks with five (5) business days to determine whether the exhibits and the complaint should be filed under seal. Any legal filing that Shareholder might make that uses, describes, attaches, references, or contains any Confidential Information must be made under seal and subject to a confidentiality agreement and/or court order with terms and restrictions materially similar to those of this Agreement, and which restrict access to any Confidential Information to the court, court personnel, the persons listed in this paragraph of the Agreement, and Knox Networks and its counsel and Representatives. In the event that Shareholder, Shareholder's Counsel, or their Representatives should file a document containing Confidential Information, the document shall be filed in accordance with the terms of the relevant court's confidential filing rules and shall either: (i) redact all references to Confidential Information in any pleadings filed with the court, serve an unredacted copy of any such pleadings on counsel for Knox Networks, and simultaneously file a motion to file the unredacted legal pleading and any other documents containing Confidential Information under seal; or (ii) file the pleading under seal with the court, serve an unredacted copy of any such pleadings on counsel for Knox Networks, and file a redacted version of such filing within the period required by the court's rules that redacts all references to Confidential Information, including all references to Confidential Information that Knox Networks believes in good faith should remain under seal and requests that the Shareholder redact.

9. If Shareholder, Shareholder's Counsel, or their Representatives become legally compelled to disclose any Confidential Information pursuant to any legal or administrative

proceeding or investigation or other requirement of applicable law, rule or regulation or request of a governmental agency or other regulatory authority, including any self-regulatory organization with jurisdiction over Shareholder, Shareholder's Counsel, or their Representatives, Shareholder or Shareholder's Counsel shall, unless prohibited by law, (i) provide Knox Networks with prompt written notice, within two (2) business days of such receipt and in advance of such disclosure, of such requirement so that Knox Networks may seek a protective order or other appropriate remedy, and (ii) at Knox Networks' reasonable request, cooperate with Knox Networks in pursuing any such course of action. If such protective order or other remedy is not obtained or Knox Networks waives such compliance with the provisions of this Agreement, Shareholder and Shareholder's Counsel agree to disclose only that portion of the Confidential Information which they are advised by counsel is legally required to be disclosed and take all reasonable steps to preserve the confidentiality of the Confidential Information.

10. All Confidential Information shall remain the property of Knox Networks. The provision or creation of Confidential Information hereunder shall not transfer any right, title or interest in such information to Shareholder or Shareholder's Counsel. Following the conclusion of (i) Shareholder's investigation in connection with the Purposes and (ii) subsequent litigation Shareholder may commence in connection with the Purposes, Knox Networks may request that Shareholder, Shareholder's Counsel, and their Representatives, within 30 (thirty) days of receiving Knox Networks' request, return all copies of Confidential Information and/or certify to Knox Networks' counsel that all Confidential Information possessed by them has been destroyed (the "Knox Networks Request"). Notwithstanding the foregoing, Shareholder and Shareholder's Counsel shall be entitled to retain court papers, written discovery responses, and objections signed by counsel, deposition and trial transcripts, and Shareholder's attorney work product containing Confidential Information, provided that Shareholder and Shareholder's Counsel shall not disclose court papers or attorney work product to any person except pursuant to court order or written agreement with Knox Networks' counsel. Shareholder, Shareholder's Counsel, and their Representatives shall, within 30 (thirty) days of receiving the Knox Networks Request, return all copies of Confidential Information to Knox Networks and/or certify to Knox Networks' counsel that all Confidential Information possessed by them has been destroyed, with the exception of the documents that Shareholder and Shareholder's Counsel are permitted to retain. Notwithstanding the above, Shareholder's Counsel may retain copies of any documents filed with a court and any confidential attorney work product that attach, cite, or refer to any Confidential Information. Shareholder's Counsel shall continue to be bound by this Agreement regarding these documents.

11. By entering into this Agreement, Knox Networks does not waive its rights to assert any objection or defense to the Demand. Knox Networks hereby reserves its rights to assert any such objections or defenses. By entering into this Agreement, Shareholder does not admit that Knox Networks has satisfied the Demand, and Shareholder hereby reserves her rights to contest the completeness of the production in response to the Demand.

12. The Parties agree that any production is not, and shall not be construed as, a waiver of any applicable privilege, protection, or immunity, including without limitation the attorney-client privilege or the work product doctrine. Knox Networks expressly reserves the right to withhold Confidential Information or documents, or to redact portions thereof, that are protected from disclosure by the attorney-client privilege, the work product doctrine, or any other applicable privilege, protection, or immunity, or that do not relate to the subject matter hereof.

13. If information subject to a claim of attorney-client privilege, attorney work product, or any other privilege, protection, or immunity is or has been produced to Shareholder, Shareholder's Counsel, or their Representatives ("Produced Privileged Documents"), such production shall in no way waive, forfeit, or otherwise prejudice any claim of privilege, work product, or other privilege, protection, or immunity. If a claim of privilege or other protection is made with respect to any Produced Privileged Documents in the custody of Shareholder, Shareholder's Counsel, or their Representatives, then Shareholder's Counsel or any of their Representatives each shall, within three (3) business days, (i) destroy or return to Knox Networks all copies of the Produced Privileged Documents (including all copies of documents containing information derived from the Produced Privileged Documents); and (ii) confirm in writing that the Produced Privileged Documents and all documents containing information derived therefrom have been destroyed or returned. Shareholder, Shareholder's Counsel, and their Representatives shall not use such Produced Privileged Documents for any purpose. Should Shareholder, Shareholder's Counsel, or any of their Representatives thereafter seek to compel production of such material, none shall assert the fact or circumstance of the prior production as a ground for compelling production.

14. Shareholder and Shareholder's Counsel agree that any and all documents produced in response to the Demand are deemed incorporated by reference into any future complaint that Shareholder may file relating to, involving, or in connection with the Demand, including but not limited to the full contents of any document containing the information that is referred to or relied upon in any such complaint.

15. Nothing in this Agreement shall be held to prevent Knox Networks from disclosing or otherwise using any of its own documents or materials, including any that may be provided to Shareholder in connection with the Demand.

16. Because of the importance and value of the Confidential Information and the likelihood that any breach of the provisions of this Agreement would irreparably harm Knox Networks, the Parties acknowledge that money damages may not be a sufficient remedy for any breach or threatened breach of this Agreement by Shareholder or Shareholder's Counsel and that Knox Networks shall be entitled to equitable relief, including injunction and specific performance, without proof of actual damages or any requirement to post a bond, in addition to any other remedy to which Knox Networks may be entitled at law or in equity in the event of any such breach or threatened breach, in addition to all other remedies available to Knox Networks at law or in equity. If any action, suit, or proceeding is initiated by Knox Networks to enforce the provisions hereof, and Knox Networks prevails in such action, suit, or proceeding, Knox Networks shall be entitled to reimbursement of all costs and expenses, including attorneys' fees, incurred by Knox Networks in connection therewith.

17. The Parties expressly agree that all terms and provisions of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without regard to Delaware's principles governing choice of law.

18. If any portion of this Agreement should be deemed by a court or other tribunal of valid jurisdiction to be void or unenforceable, in whole or in part, the other provisions of this Agreement shall continue to be valid and the Parties shall replace the void or unenforceable provision with one that is valid and enforceable and most nearly approximates their original intentions.

19. This Agreement may be amended, changed, waived, discharged or terminated only by an agreement in writing executed by the Parties that expressly amends, changes, discharges or terminates this Agreement, and no waiver of compliance with any provision or condition of this Agreement and no consent provided for in this Agreement shall be effective unless evidenced by a written instrument executed by the party against whom such waiver or consent is to be effective. The waiver by any Party of any breach of this Agreement will not be deemed or construed as a waiver of any other breach of this Agreement, whether prior, subsequent, or contemporaneous. No failure or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, and no single or partial exercise of any right, power, or privilege hereunder shall preclude any other or further exercise of any right, power, or privilege.

20. This Agreement shall be binding upon and inure to the benefit of each of the Parties hereto, and their respective successors and permitted assigns. No Party shall assign or delegate all or any portion of its rights, obligations or liabilities under this Agreement without the prior written consent of the other Parties. Any purported assignment in violation of this Section shall be null and void.

21. All notices and other communications under this Agreement shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person or by Federal Express or by email with attachments in portable document format (.pdf) or other similar format as follows:

If to Knox Networks:

Michael A. Mugmon, Esq.
WilmerHale
50 California Street
Suite 3600
San Francisco, CA 94111
michael.mugmon@wilmerhale.com

If to Shareholder or Shareholder's Counsel:

James S. Knopf, Esq.
Law Offices of James S. Knopf
2000 Broadway Street
Redwood City, CA 94063
jsk@knopflaw.com

22. This Agreement constitutes the entire agreement between the Parties with respect to its subject matter and supersedes any and all prior understandings or agreements with respect to the same. This Agreement may be signed in one or more counterparts, each of which shall be deemed an original, but all of which when taken together shall be deemed to be one and the same instrument.

23. If a court is called upon to interpret this Agreement, then the Parties shall be deemed to have jointly and equally drafted the Agreement, which will not be construed against any of them by reason of authorship.

IN WITNESS WHEREOF, the Parties hereto have used this Agreement to be executed by their respective duly authorized representatives on the date set forth above.

On Behalf of Knox Networks, Inc

By: [signature]
Name: Michael Mugmon

*Attorney for Knox Networks, Inc.*

On Behalf of Michelle Ritter

By: ______________________________

Name: ____________________________

Title: _____________________________

On Behalf of Law Offices of James S. Knopf

By: ______________________________

Name: ____________________________

Title: _____________________________

**EXHIBIT A**

**UNDERTAKING**

I hereby certify (i) my understanding that Confidential Information is being provided to me pursuant to the terms and restrictions of the Confidentiality and Nondisclosure Agreement by and among Michelle Ritter, Law Offices of James S. Knopf, and Knox Networks, Inc. dated May 19, 2025 (the "Agreement"), (ii) that I have read the Agreement, and (iii) that I understand the terms of the Agreement and agree to be fully bound by the Agreement. I agree and consent to submit to personal jurisdiction and venue in the Chancery Court for the State of Delaware for purposes of enforcement of any provision of the Agreement. I agree not to disclose or use Confidential Information, as defined in the Agreement, for purposes other than those permitted in the Agreement. I understand that any violation of the terms of the Agreement may be punishable by such relief as is deemed appropriate by a Delaware court.

Dated:____________________ Signature: __________________________

WILMERHALE

May 9, 2025

**Michael A. Mugmon**

+1 628 235 1006 (t)
+1 628 235 1001 (f)
michael.mugmon@wilmerhale.com

By Email

James S. Knopf, Esq.
Law Offices of James S. Knopf
2000 Broadway Street
Redwood City, CA 94063
email: jsk@knopflaw.com

Re: **Demand for Inspection of Books and Records of Knox Networks Inc. Pursuant to 8 Del C. § 220**

Dear Mr. Knopf:

We represent Knox Networks, Inc. ("Knox Networks" or the "Company"). The Company is in receipt of your letter dated April 28, 2025 ("Demand"), and received on April 29, 2025, on behalf of your client Michelle Ritter ("Ms. Ritter") seeking to inspect certain books and records of the Company pursuant to 8 Del. C. § 220 ("Section 220"). In the Demand, you asked that Knox Networks respond to you, and we spoke on the phone on May 2, 2025 to acknowledge the Company's receipt of the Demand. As confirmed by your email on May 3, Ms. Ritter agreed to extend our response deadline to May 9, 2025. We appreciate the courtesy, and we are providing this initial response to the Demand, as discussed.

As an initial matter, we note that the Demand appears to have been served in response to the April 26, 2025 "Notice of Stock Repurchase," which is attached to the Demand. As you know, Ms. Ritter was removed from her positions as Chief Executive Officer (CEO) and Company board member on April 26, 2024. As part of Ms. Ritter's former employment, she executed a Common Stock Purchase Agreement ("Purchase Agreement") on June 28, 2021 which, among other things, provided that the Company will automatically exercise its Unvested Share Repurchase Option on the last day of the repurchase period in the event of Ms. Ritter's termination of service. Because Ms. Ritter had unvested shares in the Company as of the date of her removal, she was notified on April 26, 2025, the final day of the repurchase period, that the Company would be exercising its contractual right to repurchase her unvested shares.

Separately, Ms. Ritter and Knox Networks, among others, entered into a settlement agreement on December 4, 2024 (the "Settlement Agreement"), in which Ms. Ritter acknowledged her removal as a director and officer of Knox Networks effective April 26, 2024, the Company's right to repurchase Ms. Ritter's unvested Knox Networks shares, and the waiver of her rights to dispute the disposition of those shares.

With this context, we address Ms. Ritter's Demand below.

## I. The Demand's Purposes are Pretextual and Fail to Provide a Credible Basis of Wrongdoing

Ms. Ritter has not demonstrated, as required under Delaware law, that she has a "proper purpose" in seeking to examine the Company's books and records. 8 Del. C. § 220(b)(2)(a); *see, e.g.*, *Haque v. Tesla Motors, Inc.*, No. CV 12651-VCS, 2017 WL 448594, at *3 (Del. Ch. Feb. 2, 2017). The Demand states that Ms. Ritter's purported purposes are to: (1) "Evaluate the Company's financial condition and management performance"; (2) "Monitor the management and governance of the Corporation"; (3) "Investigate potential mismanagement, breaches of fiduciary duty, or self-dealing by directors or officers"; (4) "Determine the value of her shares and assess the viability of potential legal or business actions in her capacity as a stockholder"; and (5) "Communicate with other stockholders concerning Company affairs." In support of these purposes, Ms. Ritter alleges that the Company failed to "observe even basic corporate formalities." Yet, she provides no evidence—documents, testimony, or otherwise—or citation to support her claim that Knox Networks has not complied with its legal obligations to shareholders and her motive for the Demand is clearly animated by purposes not contemplated by the statute. As noted, Ms. Ritter was the CEO and a board member of the Company until April 26, 2024. To the extent that any "corporate formalities" were not followed throughout the three-year period of Ms. Ritter's requests—which, to be clear, was not the case and is not one of the enumerated purposes for the Demand—Ms. Ritter would have had access to all relevant information throughout her tenure.

Despite the litany of purposes described in the Demand, Ms. Ritter fails to establish that any stated purpose is proper. The "mere statement of purpose, without more," does not entitle a stockholder to inspect corporate books and records. *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 122 (Del. 2006). Rather, a stockholder wishing to investigate suspected wrongdoing "must present 'some evidence' to suggest a 'credible basis' from which a court can infer that mismanagement, waste or wrongdoing may have occurred." *Id.* at 118. Mere "suspicion of wrongdoing" is not enough. *City of Westland Police & Fire Ret. Sys. v. Axcelis Techs., Inc.*, No. CIV.A. 4473-VCN, 2009 WL 3086537, at *4 (Del. Ch. Sept. 28, 2009), *aff'd*, 1 A.3d 281 (Del. 2010).

Specifically, regarding purpose two, to "[m]onitor the management and governance of the Corporation" and purpose three, to "investigate potential mismanagement, breaches of fiduciary duty, or self-dealing by directors or officers," those are not proper purposes here because the Demand provides no credible basis to suspect any wrongdoing. *See, e.g.*, *La. Mun. Police Emps.' Ret. Sys. v. Lennar Corp.*, No. CIV.A. 7314-VCG, 2012 WL 4760881, at *4 (Del. Ch. Oct. 5, 2012) (requiring Section 220 plaintiff to prove a "credible basis" for investigating claims of mismanagement); *see also Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 568 (Del. 1997) (to demonstrate a specific proper purpose, a Section 220 plaintiff must come forward with "documents, logic, testimony or otherwise" that suggests there are "legitimate issues of wrongdoing"). As noted, the Demand makes a vague, passing reference to the Company's alleged lack of "corporate formalities," which is not an expressly stated purpose.

Regardless, it offers *no* evidence to support a credible basis for Ms. Ritter's requests and offers no explanation for Ms. Ritter's own role in enforcing them for most of the relevant period.

Even if the stated purposes were proper on their face—and they are not—Delaware law is clear that pretextual purposes are not proper. *See, e.g.*, *Simeone v. Walt Disney Co.*, 302 A.3d 956, 967-68 (Del. Ch.), judgment entered *sub nom*. *Simeone v. The Walt Disney Co.* (Del. Ch. 2023) (holding that plaintiff's stated purpose "[t]o investigate potential wrongdoing, mismanagement and breaches of fiduciary duties" may be facially proper, however, the purposes stated were "pretextual" and the demand was animated by plaintiff's political beliefs and not supported by a "credible basis of wrongdoing").

Notwithstanding that Ms. Ritter's Purchase Agreement and separate Settlement Agreement include provisions that expressly permit the Company to repurchase her unvested shares, Ms. Ritter issued a Section 220 Demand just three days after receiving notice from the Company about the repurchase of her unvested shares (attached to Ms. Ritter's Demand as purported "proof of her status as a shareholder"). Stated differently, it now appears that she is seeking another avenue through which she can reopen what has already been agreed to and settled. Certainly, any attempt to use Section 220 to evade the letter or spirit of the Purchase Agreement and Settlement Agreement and the rights she waived thereunder is improper.

Against this backdrop, it seems apparent that Ms. Ritter's actual purpose is not to investigate mismanagement or monitor the Company's governance. Rather, Ms. Ritter is attempting to engage in a dispute that is personal in nature. Delaware does not recognize such extraneous personal factors as a proper purpose for obtaining corporate records. *See Ad-Venture Cap. P'rs, L.P. v. ISN Software Corp.*, C.A. No. 5172-CC, at 5-6, 10 (Del. Ch. May 4, 2010) (TRANSCRIPT) (denying inspection demand where it is "abundantly clear to th[e] Court that this dispute is more about an unfortunate and unhappy family dispute ... than it is about valuing the plaintiff's stock in the defendant"); *see also Bizzari v. Suburban Waste Servs., Inc.*, No. CV 10709-JL, 2016 WL 4540292, at *8 (Del. Ch. Aug. 30, 2016) (largely denying inspection demand where "evidence of [stockholder's] conflicting motives and past conduct in competing with [defendant] leaves [the Court] firmly convinced that he is not seeking that information for valuation purposes").

## II. The Requests are Not Limited to "Books and Records" as Defined in Section 220 or Identified with Reasonable Particularity

Additionally, every single request goes far beyond the narrow definition of "books and records" recently codified in 8 Del. C. §220 (a)(1) and is not defined with reasonable particularity as required by Section 220. First and foremost, Ms. Ritter was the CEO and a board member for two of the three previous years. Up until her removal as CEO and a member of the board on April 26, 2024, she had full access to the very materials she now seeks.

In Section 220, "books and records" consist only of nine types of materials, including, among other items, the certificate of incorporation, bylaws then in effect, minutes of all meetings of stockholders for the three years preceding the date of the demand, "minutes of any meeting of the board of directors or any committee of the board of directors and records of any action of the board of directors or any such committee," and "materials provided to the board of directors or any committee of the board of directors in connection with actions taken by the board of directors or any such committee." 8 Del. C. §§220 (a)(1)(a), (a)(1)(b), (a)(1)(c), (a)(1)(e), (a)(1)(f). It is only if a shareholder demonstrates that a corporation does not have any of the books and records described in certain of these provisions that the Court of Chancery may order the corporation "to produce additional records of the corporation constituting the functional equivalent of any such books and records" brought by a shareholder under Section 220 and "only to the extent necessary and essential to fulfill the stockholder's proper purpose." 8 Del. C. §220 (f); *see also* 8 Del. C. §220(b)(2)(b). In March 2025, the Delaware legislature sought to "curb a stockholder's right to inspect the 'books and records' of a corporation," by limiting the term "books and records" to a formally defined list of materials. 43 No. 5 Fletcher Corp Law Adviser NL 15. As such, Delaware's recent amendments to Section 220 curtail the very type of requests Ms. Ritter makes here. In particular, Ms. Ritter's request for correspondence and written communications (Request 8) is far beyond what is permitted under Section 220.

Additionally, the stockholder's demand must define "with reasonable particularity the stockholder's purpose and the books and records the stockholder seeks to inspect." 8 Del. C. §220(b)(2)(b). Ms. Ritter neither limits her request to these narrow categories, nor demonstrates that Knox Networks does not have the books and records described in Section 220's provisions, and therefore, cannot show (as required) that the Requests are "necessary and essential" to any purpose identified in the Demand. *See Brehm v. Eisner*, 746 A.2d 244, 266 (Del. 2000) (explaining stockholders "bear the burden of showing a proper purpose and make specific and discrete identification, with rifled precision, of the documents sought"); *Inter-Loc. Pension Fund GCC/IBT v. Calgon Carbon Corp.*, No. CV 2017-0910-MTZ, 2019 WL 479082, at *16 (Del. Ch. Jan. 25, 2019) (any document sought must be "necessary and essential" to stated purpose); *see also Simeone v. Walt Disney Co.*, 302 A.3d at 973 (stating that the 220 plaintiff "[bears the] burden of proving that the information in the records sought is essential to [the stated] purpose").

Even prior to the recent update to Section 220, Delaware courts have made clear that "[t]he starting point (and often the ending point) for an adequate inspection will be board-level documents." *Woods, Tr. of Avery L. Woods Tr. v. Sahara Enters., Inc.*, No. CV 2020-0153-JTL, 2020 WL 4200131 (Del. Ch. July 22, 2020); *see Ok. Firefighters Pension and Ret. Sys. v. Amazon.com*, No. CV 2021-0484-LWW, 2022 WL 1760618, at *12-13 (denying inspection beyond formal board-level documents); *In re Zendesk, Inc. Section 220 Litigation*, No. 2023-0454-BWD, 2023 WL 5496485, at *10 (Del. Ch. Aug. 21, 2023) (denying inspection of emails and other electronic communications); *Jacob v. Bloom Energy Corp.*, No. CV 2020-0023-JRS, 2021 WL 733438, at *9 (Del. Ch. Feb. 25, 2021) (same); *Gross v. Biogen Inc.*, No. CV 2020-0096-PAF, 2021 WL 1399282, at *16 (Del. Ch. Apr. 14, 2021) (same); *In re Plains All Am. Pipeline, L.P.*, No. 11954-VCMR, 2017 WL 6016570, at *5 (Del. Ch. Aug. 8, 2017) (same); *Cook v. Hewlett-Packard*, No. CIV.A. 8667-VCG, 2014 WL 311111, at *4 (Del. Ch. Jan. 30,

2014) (same). Ms. Ritter has made no showing that documents beyond those defined in the statute are "necessary and essential" to fulfill the purpose of the Demand here, yet her Requests call for far more documents than merely board-level ones, notably "correspondence or other written communications between any board member, officer or agent and Ms. Ritter."

Further, some of the documents sought by the Demand may be subject to the attorney-client privilege, and thus would not be subject to production at all or may contain confidential information and could only be produced subject to an appropriate confidentiality order. Your Demand fails to indicate that the records you seek will be kept confidential, notwithstanding that Delaware law clearly permits a company to maintain confidentiality over materials produced pursuant to Section 220. *See, e.g.*, *Disney v. Walt Disney Co.*, 857 A.2d 444, 447-48, 450 (Del. Ch. 2004).

**III. The Demand is Procedurally Defective**

Finally, the Demand is procedurally defective because Section 220 requires, among other things, that a demand "be accompanied by documentary evidence of beneficial ownership of the stock, and state that such documentary evidence is a true and correct copy of what it purports to be." 8 Del. C. § 220(b). While the Demand includes a purported declaration and a letter from the Company, this material fails to provide evidence of current stock ownership – *e.g.*, an account statement reflecting stock ownership as of the date of the Demand. *See Cent. Laborers Pension Fund v. News Corp.*, 45 A.3d 139, 146 (Del. 2012) ("Strict adherence to the section 220 procedural requirements for making an inspection demand protects the right of the corporation to receive and consider a demand in proper form before litigation is initiated.") (internal quotation marks omitted). The Notice of Stock Repurchase includes no such evidence of Ms. Ritter's vested ownership of Company stock. Additionally, Ms. Ritter has not provided any evidence that she owned the Company's stock during the entire time period that she seeks to investigate. Ms. Ritter would need to establish continuous ownership during the period of alleged wrongdoing to have standing to pursue a breach of fiduciary duty claim on behalf of the Company against the Board, which is a stated purpose of the Demand. *See Lewis v. Anderson*, 477 A.2d 1040, 1046 (Del. 1984) (holding that to have standing to assert a derivative claim, the plaintiff must be a stockholder at the time of the alleged wrongdoing and must maintain her stockholder status in the corporate entity throughout the litigation).

For all these reasons, Knox Networks rejects the Demand as presently framed. Nonetheless, and without conceding the propriety of the Demand, Knox Networks is willing to discuss your client's Demand, including whether a more narrowly tailored inspection request would be appropriate, subject to an appropriate confidentiality agreement. Knox Networks is committed to addressing stockholder inquiries and fulfilling its obligations under Delaware law.

Best regards,

/s/ Michael Mugmon

Michael A. Mugmon

WILMERHALE

May 30, 2025

**Michael A. Mugmon**

+1 628 235 1006 (t)
+1 628 235 1001 (f)
michael.mugmon@wilmerhale.com

**By Email**

James S. Knopf, Esq.
Law Offices of James S. Knopf
2000 Broadway Street
Redwood City, CA 94063
jsk@knofplaw.com

**Re: Demand for Inspection of Books and Records of Knox Networks Inc. Pursuant to 8 Del C. § 220**

Dear Mr. Knopf:

I write on behalf of Knox Networks, Inc. ("Knox Networks" or the "Company") in response to your letter dated May 28, 2025 (the "Demand"), on behalf of your client Michelle Ritter ("Ms. Ritter") regarding her demand to inspect certain books and records of the Company pursuant to 8 *Del. C.* § 220 ("Section 220").

We provided Ms. Ritter with a proposed non-disclosure agreement ("NDA") on May 19, 2025. As you are well aware, because Section 220 demands, like this one, seek non-public company information, shareholders seeking books and records agree to NDAs as a matter of course.

We have now discussed with you multiple times, including on our May 19, 2025 call, that the Company is committed to addressing shareholder inquiries, and intends to share documents reasonably connected to Ms. Ritter's stated purposes so long as Ms. Ritter agrees to an appropriate confidentiality agreement. Given Ms. Ritter's history with the Company as former Chief Executive Officer and the December 4, 2024 settlement agreement in which Ms. Ritter acknowledged the Company's right to repurchase her unvested Knox Networks shares and that her percentage of ownership may be diluted during future funding rounds, the Company must take reasonable steps to protect the confidentiality of the books and records sought by the Demand.

We spoke again on May 21, 2025. During that call, you expressed Ms. Ritter's concern that the NDA would restrict her ability to share produced documents and discuss the contents therein with other Knox Networks shareholders. You did not identify any other specific concerns Ms. Ritter had with the Company's proposed NDA. We reiterated on that call that the Company was willing to produce to Ms. Ritter books and records as long as the parties could agree on an appropriate NDA. While the Company's proposed NDA was standard, in order to address Ms. Ritter's purported concerns regarding the scope of the NDA, we provided you with a revised NDA on May 23, 2025. The revised NDA permits Ms. Ritter to share confidential materials and discuss the contents therein with other Company shareholders subject to their signing the

undertaking attached to the NDA at Exhibit A. *See CM & M Grp., Inc. v. Carroll*, 453 A.2d 788, 794 (Del. 1982) (requiring shareholder to obtain an "agreement of confidentiality" before sharing documents).

In response to both drafts, you have asserted that the NDA is "inconsistent" with Ms. Ritter's rights under Section 220 without making *any* effort to identify specific concerns beyond her ability to discuss the documents with other shareholders – which we have now addressed. We also note that we have tried to speak with you multiple times to discuss the revised NDA, including on May 28 and May 29, 2025.[1] On May 28, you responded via email that "further discussion is simply delay" and refused to respond to our subsequent call. We're left to conclude that your client is unwilling to engage in good faith conversations about the scope of an NDA.

Section 220 permits a corporation to "impose reasonable restrictions on the confidentiality, use, or distribution of books and records." § 220(b)(3). A company can require a confidentiality agreement if the company has concerns that a shareholder will improperly use books and records. *See Tiger v. Boast Apparel*, 214 A.3d 933, 940 (2019) (imposing an indefinite confidentiality period where the company's concern that the stockholder "might improperly use the books and records" outweighed the stockholder's concerns that an indefinite confidentiality agreement would interfere with his work in the market). Further, a shareholder cannot use the Section 220 right to inspect books and records to "publicly disseminate otherwise confidential corporate information." *See Disney v. Walt Disney Co.*, 2005 WL 1538336, *1 (Del. Ch. 2005).

Ms. Ritter's refusal to even discuss an appropriate NDA suggests she is seeking these documents for an improper purpose. Given this concern, a reasonable NDA is not only appropriate, but necessary. *See id*.

We remain willing to discuss this with you if there are specific provisions of the NDA with which your client takes issue. As we have discussed with you on multiple calls and via email, the Company intends to comply with the statutory requirements of Section 220, subject to Ms. Ritter agreeing to reasonable, standard confidentiality provisions.

Sincerely,

/s/ Michael A. Mugmon

Michael A. Mugmon

---

[1] My colleague, Tom Davidson, called your office phone (650-627-9500) and left a voicemail shortly after 2pm PT on May 29, 2025. He provided his number, but did not receive a call back from you.

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)

First Amended Complaint

# EXHIBIT 35

Notice to Preserve All Records (Sept. 11, 2025); Marcus response (Sept. 12, 2025)

**DATE:** September 11, 2025
**TO:** Defendants (including Eric Schmidt and Hillspire LLC), and Defendants' Counsel, Glaser Weil Fink Howard Jordan & Shapiro LLP (including Patricia Glaser, Craig Marcus, and Jill Harris)
**FROM:** Michelle Ritter, Plaintiff

**NOTICE TO PRESERVE ALL RECORDS AND COMMUNICATIONS**

**PLEASE TAKE NOTICE** that I, Michelle Ritter, Plaintiff, hereby demand that Defendants' counsel Glaser Weil LLP, including Patricia Glaser, Craig Marcus and Jill Harris, and Defendants, including Eric Schmidt and Hillspire LLC, **preserve and maintain** all records, documents, communications, and electronically stored information ("ESI") in your / their possession, custody, or control concerning the following:

1. Any and all documents, communications, drafts, memoranda, text messages, encrypted messages, or other correspondence between Eric Schmidt and Glaser Weil LLP regarding efforts made to require Plaintiff (Michelle Ritter) to execute a declaration recanting or withdrawing her allegations against Defendant Eric Schmidt;
2. Any and all documents, communications, drafts, memoranda, text messages, encrypted messages, or other correspondence between Hillspire LLC and Glaser Weil LLP regarding efforts made to require Plaintiff (Michelle Ritter) to execute a declaration recanting or withdrawing her allegations against Defendant Hillspire LLC;
3. All communications between Defendants and Glaser Weil LLP attorneys relating to such declaration or related agreements;
4. Any related instructions, guidance, or communications concerning the content, preparation, or execution of such declaration or related agreements; and
5. Any records evidencing intent, discussion, or strategy to induce Plaintiff into making statements that contradict her allegations.

**LEGAL BASIS FOR PRESERVATION**

- **California Code of Civil Procedure §§ 1001–1002** prohibit settlement agreements, contracts, or declarations that restrain disclosure of factual information related to sexual harassment and related misconduct.
- **California Evidence Code § 956** provides that attorney-client privilege does not apply when legal services are sought or obtained to enable or aid anyone to commit or plan to commit a crime or fraud. Any communications or records relating to coercing or inducing Plaintiff to recant her allegations fall within this exception and are therefore **discoverable**.

**SCOPE OF PRESERVATION**

Defendants and counsel (Glaser Weil LLP) are hereby instructed to preserve all responsive materials, including, but not limited to:

- Emails, messages, or chat communications;
- Handwritten or typed notes, drafts, or memoranda;
- Cloud-based or third-party platform records; and
- Any related communications with consultants, agents, or representatives acting on behalf of Defendants or their counsel.

**DUTY TO PRESERVE**

Failure to preserve the above materials may constitute spoliation of evidence. This notice serves as a formal demand that all relevant information be preserved intact pending discovery in this matter.

**From:** **Craig H. Marcus** cmarcus@glaserweil.com
**Subject:** RE: Ritter v Eric Schmidt et al.; Case No. 25STCV26114 – Lawyer/Witness
**Date:** September 12, 2025 at 5:50 PM
**To:** Michelle Ritter ritter_legal@outlook.com
**Cc:** Patricia L. Glaser pglaser@glaserweil.com, Celia H. Spalding cspalding@glaserweil.com, Simon K. Moradzadeh smoradzadeh@glaserweil.com

CM

Ms. Ritter,

Yet again, your below e-mail is inaccurate and denied. Moreover, your ad hominem insults are inappropriate. Please cease and desist your efforts to create a false record.

Craig Marcus

Glaser Weil

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**From:** Michelle Ritter <ritter_legal@outlook.com>
**Sent:** Friday, September 12, 2025 5:43 PM
**To:** Craig H. Marcus <cmarcus@glaserweil.com>
**Cc:** Patricia L. Glaser <pglaser@glaserweil.com>; Celia H. Spalding <cspalding@glaserweil.com>; Simon K. Moradzadeh <smoradzadeh@glaserweil.com>
**Subject:** Re: Ritter v Eric Schmidt et al.; Case No. 25STCV26114 – Lawyer/Witness

Mr. Marcus,

The level of your advocacy has taken on a very personal tone, as opposed to simply advocating for Mr. Schmidt and professionally representing your firm, Glaser Weil.

In working for Patricia Glaser, who is renowned in her field, and with Eric Schmidt as a client, your conduct is incredibly condescending and frankly, should be uninspiring for anyone who works for you. Please spare me yet another threat or more harassment. You should know the difference between being zealous counsel versus being an accomplice. You forced me to withdraw the DVRO in order to save my parents. I didn't even have CA counsel and your entire firm knew that.

If you are implying that I cannot legally protect myself in court or any venue without constant harassment or retaliation from you, your clients, or your firm, then simply say so. As I said, I can't help that you filed a signed declaration last week making you a witness, alongside your firm; what's even more incredible is that it's over issues substantively at the heart of multiple claims and for which I categorically deny.

With respect to jurisdiction, I am exercising my rights, protecting myself, and pursuing proper procedure. If you are further retaliating or stating that you are not a witness despite your opposition papers, that is the prerogative of your own firm. There are issues with CCP 1001-1002, which you know, issues with crime-fraud exceptions to attorney-client privilege rules, and attorney-witness issues. Your rewrite of history is unfortunately par for the course. I'd hope for better.

Craig - for someone who works for a woman who runs her own business, you are incredibly rude to women.

My notices remain and I'll see you in court

My notices remain and I'll see you in court.

Respectfully,

Michelle

On Sep 12, 2025, at 5:11 PM, Craig H. Marcus <cmarcus@glaserweil.com> wrote:

Ms. Ritter,

Respectfully, your below e-mail is unintelligible, inaccurate, non-responsive, and denied.

Craig Marcus

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

---

**From:** Michelle Ritter <ritter_legal@outlook.com>
**Sent:** Friday, September 12, 2025 4:59 PM
**To:** Craig H. Marcus <cmarcus@glaserweil.com>
**Cc:** Patricia L. Glaser <pglaser@glaserweil.com>; Celia H. Spalding <cspalding@glaserweil.com>; Simon K. Moradzadeh <smoradzadeh@glaserweil.com>; Michelle Ritter <ritter_legal@outlook.com>
**Subject:** Re: Ritter v Eric Schmidt et al.; Case No. 25STCV26114 – Lawyer/Witness

Craig,

Thanks. I am operating off of the facts, which were even compounded by own opposition papers that are still delayed in filing with the court. Those papers included a declaration explicitly signed by you, in which you materially misstated facts. I appreciate that you are now trying to bring in your firm but you forced me to sign the DVRO stipulation and even your declaration admitted as much.

You actually appear to know a lot about my personal and professional life with Eric as well. Your firm does too. I can't help that your client was incapable of not stalking me to Nobu and stealing my computer with evidence back in November 2024.

Finally, on the arbitration clause that you claim I'm held to, let's not forget the commitments that you and Jill Harris made to give me back my workspace or my assets prior to December 17, 2024 and even in stipulating I would give them back.

Craig - please stop the charade. I'll see you all in court because I am done being harassed by you, your clients, and your firm. I am following the rules. It's been 18+ months.

Michelle

On Sep 12, 2025, at 4:48 PM, Craig H. Marcus <cmarcus@glaserweil.com> wrote:

Ms. Ritter,

Your below e-mail is inaccurate and without merit for several reasons and, therefore, we respectfully reject your request.

First, Rule 3.7 states that "[a] lawyer shall not act as an advocate in a trial in which the lawyer is likely to be a witness" unless the lawyer obtains informed written consent (or an exception applies). In this case, no lawyer from Glaser Weil will testify at trial. Moreover, as explained below, given the mandatory arbitration clause in the Agreement, there will never be a trial of this case. Therefore, Rule 3.7 is inapplicable.

Second, you cannot unilaterally deem attorneys from Glaser Weil trial witnesses in order to artificially invoke Rule 3.7 or otherwise seek to disqualify the firm. *See, e.g.*, *Optyl Eyewear Fashion Intern. Corp. v. Style Cos., Ltd.,* 760 F.2d 1045, 1050 (9th Cir. 1985) ("The drafters of the ABA Code have cautioned that the ethical rules '[were] not designed to permit a lawyer to call opposing counsel as a witness and thereby disqualify him as counsel'."); *Smith, Smith & Kring v. Superior Court*, 60 Cal. App. 4th 573, 581 (1997) ("Should counsel freely be able to disqualify opposing counsel simply by calling them as witnesses, it would 'pose the very threat to the integrity of the judicial process that motions to disqualify purport to prevent' [Citation omitted].").

Third, a party's attempt to compel the testimony of opposing counsel is "***presumptively improper, severely restricted, and require[s] 'extremely' good cause***—a high standard[.]" *Carehouse Convalescent Hosp. v. Superior Ct.*, 143 Cal. App. 4th 1558, 1562-63 (2006) (emphasis added). Such efforts "chill the attorney-client relationship, impede civility and easily lend themselves to gamesmanship and abuse." *Id*. Therefore, your attempt to seek testimony from Glaser Weil is "presumptively invalid" and you cannot possibly satisfy the "extremely" high standard required to obtain such testimony.

Fourth, in the unlikely event that Rule 3.7 ever becomes applicable, we will comply with the Rule at that time, in the manner contemplated by the Rule. However, given the mandatory arbitration clause in the Agreement, there will never be a trial of this case that could trigger Rule 3.7.

Fifth, as explained in opposition to your meritless application for a temporary restraining order ("TRO Application"), the confidentiality clause and declaration that are components of the December 4, 2024 Agreement ("Agreement") do not violate Code of Civil Procedure Sections 1001-1002. Rather, Sections 1001-1002, by their express terms, are inapplicable to the Agreement. Section 1001 only prohibits "a provision within a settlement

agreement that prevents or restricts the disclosure of factual information *related to a claim filed in a civil action or a complaint filed in an administrative action*" regarding an act of sexual assault, sexual harassment, or workplace harassment or discrimination. Code Civ. Proc. § 1001(a)(1)-(4) (emphasis added). Likewise, Section 1002 only prohibits "a provision within a settlement agreement that prevents the disclosure of factual information *related to the action . . . in any civil action* the factual foundation for which establishes a cause of action for civil damages for" certain sexual offenses. Code Civ. Proc., § 1002(a)(1)-(4) (emphasis added). You have never filed an action against any of the Defendants alleging any sexual offenses or discrimination claims, and certainly not before the Agreement was executed. Therefore, Sections 1001-1002 do not apply to the Agreement and do not invalidate the confidentiality clause or declaration contained therein.

Sixth, as also explained in our opposition to your meritless TRO Application, your claims asserted in the Superior Court action are subject to mandatory arbitration. In particular, you expressly agreed "to submit any and all Claims between" the parties "to final, mandatory, binding arbitration," including all issues "relating to and/or arising out of the validity, scope, interpretation, and/or enforceability of the Agreement," "the validity, scope, interpretation, and/or enforceability of this arbitration clause," and "the arbitrability of all issues, including but not limited to which Claims are subject to arbitration and which claims are not subject to arbitration." Agreement, § 3(g)(i). Moreover, during the pending arbitration, you waived any "challenge [to] the validity of the arbitration agreement or the arbitrability of the alleged claims" and "agree[d] that the arbitrator has jurisdiction to resolve all pending claims." Preliminary Scheduling Order (Ex. 2, ¶¶ 2, 6). Therefore, your current claims challenging the enforceability of the Agreement must be arbitrated. We will be filing a motion to compel arbitration at the appropriate time.

Seventh, your filing and prosecution of this meritless and malicious Superior Court action, that is indisputably subject to arbitration, constitutes a breach of the mandatory arbitration and confidentiality provisions in the Agreement, and your continuing breach has and continues to cause harm to the Schmidt Parties.

For all the foregoing reasons, your below e-mail and threatened action are meritless, inaccurate, and rejected.

Finally, please include my colleagues, Celia Spalding and Simon Moradzadeh (both copied), on all communications going forward.

Regards,

Craig Marcus

<image001.png> **Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

---

**From:** Michelle Ritter <ritter_legal@outlook.com>
**Sent:** Friday, September 12, 2025 9:20 AM
**To:** Patricia L. Glaser <pglaser@glaserweil.com>; Craig H. Marcus <cmarcus@glaserweil.com>
**Cc:** Michelle Ritter <ritter_legal@outlook.com>
**Subject:** Ritter v Eric Schmidt et al.; Case No. 25STCV26114 – Lawyer/Witness

Patti and Craig,

It is my understanding that, in order for you to proceed in this matter both as Counsel and as a Witness, your clients must execute an informed written consent authorizing you to serve in both capacities pursuant to Rule 3.7 of the Rules of Professional Conduct.

Please confirm by **5:00 PM today** as to whether the Informed Written Consent has been obtained from your Clients. I am eager to avoid unnecessary delays and to proceed expeditiously with depositions of attorneys and all other participants involved in the violation of CCP §§ 1001–1002.

If I do not receive confirmation by the deadline above, I intend to promptly file a request with the Court to address these issues.

Thank you for your attention to this matter.

Sincerely,

Michelle Ritter

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)

First Amended Complaint

# EXHIBIT 36

Control Risks Device Collection Report (Aug. 8, 2024); Paley residence TeamViewer findings

# EXHIBIT 29

## August 8, 2024 Control Risks — Device Collection Report

**Description**

August 8, 2024 Control Risks — Steel Perlot — Michelle Ritter Device Collection Report (forensic intake on which the Pixley Declaration relies).

**Status**

**ATTACHED — exhibit content follows this cover sheet.**

**Source**

[mounted]/__USE/Y- Signed Decs/2024-08-08 - Control Risks - Steel Perlot - Michelle Ritter Device Collection Report 2024.08.08.pdf

— Cover sheet compiled 2026-04-27 —

Privileged and Confidential – Prepared at the Direction of Counsel

# Steel Perlot / Michelle Ritter: Device Collection Report c/o DLA Piper LLP (US)



Background

Control Risks was contacted by DLA Piper LLP (US) ("Counsel") on Tuesday, July 23rd inquiring about availability to perform device imaging in the Los Angeles area on a rush basis. Control Risks quickly responded and confirmed availability to support with device imaging that same afternoon. Control Risks followed up on Wednesday, July 24th asking Counsel for a call to discuss further details around the potential engagement. Counsel responded with the physical address for the imaging and information about the four devices to be imaged on Thursday, July 25th and provided the client information as Steel Perlot and Michelle Ritter ("the Client") for clearing conflicts. Based upon this information, Control Risks cleared conflicts on Thursday, July 25th and deployed a consultant on-site to retrieve the four devices for imaging the same day. Control Risks provided an engagement agreement for execution by Counsel and the Client on Friday, July 26th – this was signed by Counsel on Monday, July 29th. At the time of drafting this collection report, the Client has yet to execute the agreement. This report summarizes the collection efforts performed by Control Risks as well as observations around potential malware affecting Client devices and the Client network.

On-site – Thursday, July 25th, 2024

Control Risks Senior Consultant, Sergio Aguilar, arrived at 1060 Brooklawn Dr, Los Angeles, CA 90077 on Thursday, July 25th, 2024, at approximately 11:39 AM PT. Upon arrival, Mr. Aguilar was greeted at the door by a woman who identified herself as the Client's mother. She and Mr. Aguilar then proceeded to the backyard of the property where the Client was sitting at a large table with the four devices to be imaged. Mr. Aguilar then identified himself as Sergio Aguilar from Control Risks, and that he was there to collect the 2 iPhones and 2 MacBook Pro laptops per the scope of work as described by Counsel. The Client advised Mr. Aguilar that she needed to transfer her phone numbers to her new phone for both phones.

Shortly after Mr. Aguilar arrived on-site, a male by the name of Misha arrived at the residence and identified himself as the Client's friend and IT person. Misha then asked what procedures Control Risks would undertake with each device. Mr. Aguilar advised that he was there to pick up the devices, take them back to the Control Risks lab and wait for further instructions from Counsel and/or his line management. Misha then advised that he had tried to do a forensic image himself as he was a former forensic examiner. Misha also stated that he tried to do a side boot (booting the system from an externally attached USB device) on the 2023 MacBook Pro laptop but was unsuccessful. Misha mentioned there was some type of management software installed by IT.

Copyright © Control Risks.
All rights reserved. This document cannot be reproduced without the express written permission of Control Risks. Any reproduction without authorization shall be considered an infringement of Control Risks' copyright.

Misha then proceeded to attach a USB external hard drive to one of the MacBook Pro laptops and started to transfer information to it. Misha advised that he was just copying contact, keychain password, and documents. Mr. Aguilar waited for approximately one and a half hours until Misha finished copying data from both laptops. At approximately 12:56 PM PT, Mr. Aguilar had the Client sign the Chain of Custody documentation and took custody of the devices. When the Client finished transferring data from the iPhone 12, she stated, “oh you’re going to have fun with this” to Mr. Aguilar.

Mr. Aquilar noticed that while on the property he did not have any cell phone reception, but as he left the property and got to the bottom of the hill, he was able to obtain cell phone reception, but his phone was prompting that it was going into private browsing mode. Mr. Aguilar called his manager, Michael D’Angelo, to provide a timeline of the device collection. Mr. Aguilar then proceeded back to the Control Risks lab and securely stored the devices, awaiting instructions from Counsel and/or line management.

Off-site imaging and potential malware observations

On Monday, July 29th, 2024, Mr. Aguilar was advised to start imaging the devices following a call between Brad Kolacinski, Partner of Control Risks and Matt Jacobs, Partner at DLA Piper. The first device imaged was the Client’s iPhone 15, which completed successfully with no errors or issues. Next, Mr. Aguilar attempted to image the Client’s iPhone 12 by plugging it into one of Control Risks’ forensic machines via USB cable. When the iPhone 12 was connected to Control Risks’ forensic machine, it closed the VPN connection, but stayed connected to Wi-Fi. Mr. Aguilar unplugged the iPhone, disabled Wi-Fi and reconnected it to the forensic machine and opened iTunes to determine that the phone was encrypted. Using the password 1234, Mr. Aguilar was able to unlock the iPhone backup system.

Once the forensic machine was reconnected to the Wi-Fi and iPhone 12 re-attached, the forensic machine crashed and the network router was reset. Attempts were made using two other forensic machines with similar results. The third machine used locked up and Mr. Aguilar could not use the keyboard or mouse on that forensic machine. At this point, Mr. Aguilar immediately disconnected the network on each device and proceeded to shut off all the machines affected.

At approximately 6:30PM PT on Monday, July 29th, 2024, Mr. Aguilar notified his manager, Mr. D’Angelo, and advised him of the situation with the iPhone 12 and the affected forensic machines. Additionally, an attempt was made to image the 2021 MacBook Pro laptop with Digital Collector, but the imaging process froze and would not progress past .83%. Mr. D'Angelo and Mr. Aguilar decided to stop the imaging process and reconvene the forensic imaging the next morning. At this time, Mr. Aguilar also notified Brad Kolacinski, Partner at Control Risks, and advised him of the situation.

**Control Risks’ Digital Forensics team met internally to discuss the issues stemming from the Client’s Apple iPhone 12 device. These issues seemed to be emanating from an unknown piece of malware, with capabilities to jump from an iOS device to a Windows computer system, quick write/infection times and, possible, capabilities to infect devices in close proximity. At the culmination of this discussion, and based on the complex nature of these details, Control Risks determined the best course of action was to refer Counsel and the Client to a specialty cyber firm with reverse engineering capabilities.**

**On Tuesday, July 30th, 2024, Mr. Aguilar did a system refresh of one of the forensic machines. After the rebuild, one file was found in the Recycle Bin. The file is listed in the table below. Multiple malware scans were run against the file using Microsoft Defender and Malware Bytes and each scan came back with no results indicating that it was not a known malicious file. The creation date and time of this file, matches the time Mr. Aguilar made the first attempt of imaging said the Client's iPhone 12. Despite File Explorer stating this file is about 7.4GB in size, the write time was very quick. The file type appears to be an 'ipsw' which is an iPhone firmware file. An Apple firmware file has the ability to make significant changes at a system level, which can impact the functionality and usage of said device.**

| Name | Original Location | Date Deleted | Size | Item type | Date modified |
|---|---|---|---|---|---|
| iPhone11,2,iPhone11,4,iPhone11,6_17.1.2_21B101_Restore.ipsw | C:\Users\saguilar\AppData\Roaming\Ap... | 7/29/2024 16:14 | 7,434,361 KB | IPSW File | 11/30/2023 17:59 |

<u>On-site – Wednesday, July 31st, 2024 - Additional scope of work requested</u>

On Wednesday, July 31st, 2024 Mr. Aguilar returned the iPhone 15 to the Client at the provided address. Upon arriving, the Client asked if it was possible to look at her router and take some pictures. Given the nature of the case, Mr. Aguilar agreed then proceeded to the basement of the property. The photographs below document what the Client showed to Mr. Aguilar, which is a network rack and firewall.


AFL
LS Series

Control Risks




araknis
AN-310-RT-4L2W
WATTBOX

Control Risks

Further inside the basement, the Client pointed out two more similar setups, which appeared to be camara control access and a cell phone booster, used to amplify an existing phone signal and improve coverage, as seen in pictures below.











The Client advised that she did not know anything about the equipment and had just found out about it the day before. The Client then stated that she would like someone from the Control Risks' team to run a sweep at the residence and requested copies of the forensic images of the four devices that Control Risks had been retained to image. Mr. Aguilar advised that he would relay the requested additional scope of work and someone from Control Risks would reach out to her to discuss further.

<u>Referral to specialist cyber firm</u>

In an effort to refer Counsel and the Client to a suitable firm to conduct analysis on the malware and to perform the additional scope of work requested by the Client, Control Risks used first-hand account information to confidentially

discuss what Mr. Aguilar had experienced with the iPhone 12 device with potential specialist malware reverse engineering and analysis firms. Control Risks did not disclose the name of the Client or Counsel to any potential cyber firms. Control Risks discussed high-level details of the behaviors of each device and malware, as well as concerns that were shared internally. Ultimately, Control Risks made a referral to PNG Cyber due to their comfort level and experience with similar malware and having a large incident response capability managed out of Los Angeles.

On-site – Saturday, August 3rd, 2024 – returning devices

On Saturday, August 3rd, 2024, Mr. Aguilar returned the MacBook Pro 2021 laptop and iPhone 12 to the Client. Mr. Aguilar also provided the Client with a printed copy of the Control Risks Engagement Letter to sign. The Client declined to sign, stating that she would like to discuss with Counsel before signing the engagement.

Off-site – Monday, August 5th, 2024 - continued imaging attempts of MacBook Pro 2023 and summary of devices and image sizes

On Monday, August 5, 2024, Mr. Aguilar attempted to image the MacBook Pro 2023 multiple times using Digital Collector, but each attempt failed. Mr. Aguilar also started making copies of the forensic images for counsel and the Client per their requests. The table below includes details and results of the collection efforts.

| Device | Storage Capacity | Forensic Image Size | Acquisition Tool |
|---|---|---|---|
| iPhone 15 | 1 TB | 597 GB | Cellebrite |
| iPhone 12 | 1 TB | 604 GB | Cellebrite |
| MacBook Pro 2023 | 2 TB | N/A | Digital Collector |
| MacBook Pro 2021 | 500 GB | 195 GB | Digital Collector |

Off-site – Tuesday, August 6th – 8th, 2024 – image copies to Client and Counsel – report running is ongoing

On Tuesday, August 6th, 2024, Mr. Aguilar shipped the forensic image copies to Counsel via Fedex for delivery on Wednesday, August 7th, 2024 and delivered the copies to the Client in person. Mr. Aguilar also began processing the forensic images and creating system reports as requested by Counsel. These reports include all available mobile data extracted from each Apple iPhone device, as typically produced from Cellebrite. Additionally, Control Risks will provide imaging logs for each device (as available).

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)
First Amended Complaint

# EXHIBIT 37

AAA Order to Show Cause (Mar. 5, 2026); Order of Default (Mar. 16, 2026); arbitrator letter (Oct. 7, 2025); AAA deposit request (July 23, 2025)

ORDER TO SHOW CAUSE

American Arbitration Association

Commercial Tribunal

ERIC SCHMIDT, HILLSPIRE, LLC, ORION WING, LLC, STEEL PERLOT, LLC, and ORION WING INVESTMENTS, LLC,

Claimants,

v.

MICHELLE RITTER,

Respondent.

Case # 01-25-0000-2191

By order dated February 3, 2026, I as arbitrator scheduled a discovery conference for March 4, 2026, at 2 p.m., to address any ongoing discovery disputes between the Schmidt Claimants and Respondent Michelle Ritter. At the time of this order, Respondent Ritter was represented by counsel. Her counsel participated in the January 30, 2026, discovery conference in which I orally set a subsequent status conference date and time for March 4, 2026. Shortly after the issuance of the February 3, 2026, order, a Microsoft Teams meeting invitation for the March 4 discovery conference was sent to counsel of record, including Respondent Ritter's then attorney.

On February 11, 2026, counsel for Ms. Ritter withdrew and represented to AAA and this arbitrator that Ms. Ritter would thereafter appear as her own counsel. Counsel provided contact information for Ms. Ritter as: 269 S. Beverly Drive, #1315, Beverly Hills, CA 90212, ritter_legal@outlook.com. Per email from AAA Case Manager Julie Collins, AAA provided Ms. Ritter with notice of this discovery conference by letter dated February 25, 2026. This letter was emailed to Ms. Ritter's two email addresses: ritter.sm@icloud.com and ritter_legal@outlook.com. The latter email is the one tied to Ms. Ritter's online profile attached to the case in AAA's web portal.

In addition to formal notice of the status conference provided to Ms. Ritter's counsel and to Ms. Ritter personally after her counsel withdrew, Ms. Ritter was copied on an email dated February 20, 2026 from counsel for the Schmidt Claimants to me regarding setting an agenda for the March 4, 2026, discovery conference, and was copied on an email dated February 23, 2026, from me to the parties in which I explicitly referenced the "discovery conference scheduled for March 4, 2026, at 2 pm PST."

Based on the foregoing, I find that Ms. Ritter received actual notice of the date and time of the discovery conference that I conducted on March 4, 2026, at 2 pm. I monitored the lobby of this Microsoft Teams meeting and would have been available to admit her into the meeting had she

attempted to participate. At no time during the conference did Ms. Ritter contact me or the AAA to obtain instructions on how to log into the meeting.

The following persons attended the discovery conference:

| | |
|---|---|
| Craig H. Marcus<br>Patricia L. Glaser | Counsel for the Schmidt Claimants |
| Arbitrator Beth M. Andrus | |

During the discovery conference, counsel for the Schmidt Claimants stated, consistent with their correspondence to me prior to the conference (and copied to Ms. Ritter), that they had made multiple attempts to confer with Ms. Ritter regarding discovery and compliance with my prior orders on discovery. They indicated that Ms. Ritter had refused to discuss this arbitration or discovery in the arbitration with them and appeared to have abandoned the proceeding.

Counsel for the Schmidt Claimants requested that I issue an Order to Show Cause to Ms. Ritter, requiring her to appear at a hearing to explain her non-compliance with previous discovery orders I had issued. This request was made in lieu of the previous request for leave to file a motion for terminating sanctions. I granted this request and requested counsel for the Schmidt Claimants to prepare a proposed order to show cause. The proposed order was submitted to me and copied to Ms. Ritter late on March 4, 2026.

In light of Ms. Ritter's failure to attend the March 4, 2026, hearing, her non-compliance with discovery obligations and my discovery orders, including her failure to produce documents, and her refusal to address or explain her non-compliance, **I hereby order Ms. Ritter to appear at a hearing on March 13, 2026, at 10:00 am PT, to show cause why I should not enter an order finding her to be in default.**

**ATTENDANCE AT THE MARCH 13, 2026, SHOW CAUSE HEARING IS MANDATORY.**

At the March 13, 2026, show cause hearing, Ms. Ritter must explain to me why she did not attend the March 4, 2026, hearing, and why she has not complied with her discovery obligations and my orders, including why she has not produced any documents to the Schmidt Claimants.

IF RESPONDENT DOES NOT ATTEND THE MARCH 13, 2026, SHOW CAUSE HEARING, OR FAILS TO ADEQUATELY EXPLAIN HER NON-COMPLIANCE, I MAY ENTER AN ORDER:

1. Finding that Ms. Ritter is knowingly and intentionally refusing to participate in this arbitration;

2. Finding that Ms. Ritter has intentionally breached my discovery orders.

3. Finding that Ms. Ritter has repeatedly breached her discovery obligations concerning this arbitration.

4. Deeming Ms. Ritter to be in default;

5. Striking Ms. Ritter's answer and all affirmative defenses;

6. Scheduling one or more hearings during the week of April 13, 2026, to fully and finally adjudicate: (a) the Schmidt Claimants' causes of action against Ms. Ritter; (b) the Schmidt Claimants' claims for monetary damages; and (c) the Schmidt Claimants' other requested relief, including requests for declaratory relief and attorneys' fees ("Prove-Up Hearing"). If I order a Prove-Up Hearing, that hearing will be conducted by video conference.

7. Ordering the Schmidt Claimants to submit an arbitration brief, declarations, and evidence to me in support of their causes of action, claimed damages, and requested relief. If I order a Prove-Up Hearing, I will determine which declarants I would like to question at that hearing, and the Schmidt Claimants will arrange for the selected declarants to attend the video Prove-Up Hearing for questioning by me.

8. Prohibiting Ms. Ritter from:

(a) submitting, filing, or introducing an arbitration brief, any other brief, declarations, testimony (her own or any witness), documents, evidence, facts, or argument before, during, or after the Prove-Up Hearing;

(b) objecting to, disputing, challenging, rebutting, contradicting, or refuting the arbitration brief, declarations, documents, evidence, and testimony offered and/or introduced by the Schmidt Claimants before, during, or after the Prove-Up Hearing; and

(c) participating in the Prove-Up Hearing in any respect other than as a silent observer at the hearing itself.

**IF RESPONDENT RITTER DOES NOT WISH TO BE FOUND IN DEFAULT, THEN SHE HAS SEVEN (7) DAYS FROM THE DATE OF THIS ORDER TO BEGIN COMPLYING WITH ALL OUTSTANDING DISCOVERY REQUESTS AND DISCOVERY ORDERS.**

I hereby specifically order Ms. Ritter to do the following:

1. Immediately contact counsel for the Schmidt Claimants to discuss all outstanding discovery requests and discovery orders, a request to mirror her electronic devices to investigate her allegations of surveillance, and a request to take her deposition.

2. Immediately begin producing documents requested by the Schmidt Claimants.
3. Immediately begin complying with all discovery orders I have issued.
4. Develop a written plan for completing discovery, including the production of documents within 60 days (with firm commitments as to dates of production and her deposition) and provide this plan to counsel for the Schmidt Claimants and to me by uploading a copy of the plan to the AAA web portal.

If Ms. Ritter fails to take each of these actions before the March 13, 2026, show cause hearing, I may find that her non-compliance with this order is an additional basis for entering an order of default against her.

Dated: March 5, 2026.

Arbitrator Signature: *Judge Beth M. Andrus (ret.)*

# ORDER OF DEFAULT AGAINST RESPONDENT MICHELLE RITTER

American Arbitration Association

Commercial Tribunal

ERIC SCHMIDT, HILLSPIRE, LLC, ORION WING, LLC, STEEL PERLOT, LLC, and ORION WING INVESTMENTS, LLC,

Claimants,

v.

MICHELLE RITTER,

Respondent.

Case # 01-25-0000-2191

## INTRODUCTION

This matter came before me on March 13, 2026, at 10 a.m., Pacific Time, for a show cause hearing as required by my March 5, 2026, Order to Show Cause. The purpose of this hearing was for Respondent Michelle Ritter to appear and show cause why she should not be deemed to be in default based on her refusal to communicate with counsel, to participate in discovery, to comply with rulings I have made, or to participate in mandatory hearings scheduled in this arbitration.

## NOTICE OF AND APPEARANCES AT SHOW CAUSE HEARING

I find that all parties, including Ms. Ritter, received proper and timely notice of the Order to Show Cause. AAA emailed my March 5, 2026, Order to Show Cause to all parties on March 5, 2026, using email addresses the parties provided to AAA. AAA sent Ms. Ritter the order to two separate email addresses: ritter_legal@outlook.com, and ritter.sm@icloud.com. The first email address was provided to AAA by Ms. Ritter's former counsel in her notice of withdrawal and substitution. The second email address was provided to AAA by Ms. Ritter herself.

Accompanying the Order to Show Cause was a Notice of Hearing letter informing the parties of this March 13, 2026, Show Cause Hearing and providing details for how to log in to Zoom to attend the hearing. AAA also mailed copies of the Order to Show Cause and the Notice of Hearing via regular mail to Ms. Ritter at 269 South Beverly Drive, #1315, Beverly Hills, California, 90212, an address provided by her withdrawing attorney.

On the morning of March 13, 2026, AAA sent an email reminder to all parties again providing details for how to log in to the Zoom hearing.

Ms. Ritter did not contact AAA to seek a change in the date and/or time of the show cause hearing.

Counsel Craig Marcus, Patricia Glacier, and Jill Harris, appeared for the Schmidt Claimants at the Show Cause Hearing. Ms. Ritter failed to attend. I monitored the lobby of the Zoom meeting and was available to admit her into the hearing, had she attempted to participate. At no time during the hearing did Ms. Ritter contact me or the AAA to obtain instructions on how to log into the hearing.

Ms. Ritter has not provided any explanation for her non-appearance, either before the show cause hearing or thereafter. Although Ms. Ritter sent emails on the evening of Saturday, March 14, 2026, and during the day of Sunday, March 15, 2026, she did not explain her non-appearance at the March 13 hearing.

Based on the foregoing, I find that Ms. Ritter's non-attendance at the March 13, 2026, show cause hearing was knowing, willful, and unjustified.

## HISTORY OF RESPONDENT RITTER'S REFUSAL TO PARTICIPATE IN THIS ARBITRATION

The Schmidt Claimants initiated this arbitration with a demand for arbitration dated January 15, 2025. Ms. Ritter appeared through counsel and submitted an answer dated June 10, 2025.

After my appointment, I scheduled a preliminary scheduling hearing, at which counsel for all parties appeared and agreed to a set of prehearing deadlines, including a deadline for amending pleadings, asserting counterclaims, conducting discovery, and attending an evidentiary hearing on June 22, 2026.

Despite initially asserting a jurisdictional challenge and a challenge to the validity of the arbitration agreement in her answer, counsel for Ms. Ritter stated at the preliminary hearing that Ms. Ritter did not challenge either. The parties also agreed that I, as arbitrator, have jurisdiction to resolve all pending claims.

In September 2025, however, Ms. Ritter's counsel withdrew after Ms. Ritter, acting pro se, initiated a lawsuit against the Schmidt Claimants in Los Angeles Superior Court, *Ritter v. Schmidt et al.* (LASC Case No. 25STCV26114). In the state lawsuit, she claimed that the arbitration agreement was invalid and that AAA lacked jurisdiction over her claims. Ms. Ritter attempted unsuccessfully to have the superior court stay this arbitration. Instead, that court stayed her lawsuit.

Ms. Ritter then refused to participate in the arbitration, including discovery. The Schmidt Claimants filed a motion in superior court to compel arbitration of Ms. Ritter's claims. In November 2025, Ms. Ritter retained new counsel who contested jurisdiction in this forum. Ms. Ritter attempted to stay this arbitration a second time. The superior court again rejected her request. Ms. Ritter also asked me to stay the arbitration pending a court ruling on the Schmidt Claimants' motion to compel. I, too, denied her request for a stay.

Although the deadline for filing counterclaims had passed, I gave Ms. Ritter multiple opportunities to file counterclaims in this forum by extending the deadlines on several occasions. Twice she filed pleadings styled as counterclaims, but each time she failed to perfect the filing by refusing to

pay the AAA filing fee. Ms. Ritter did not seek relief from the fee requirement from AAA or from me. Because she failed to perfect her counterclaims, Ms. Ritter does not currently have any counterclaims pending here.

On March 2, 2026, the superior court granted the Schmidt Claimants' motion to compel arbitration. In its ruling, the superior court held that the claims Ms. Ritter asserted against the Schmidt Claimants in state court are subject to arbitration. It reasoned:

> Plaintiff's effort to avoid arbitration rests principally on the proposition that the parties' arbitration agreement is invalid and unenforceable because this is a case that relates to a sexual assault dispute or sexual harassment dispute within the meaning of the federal Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("the EFA"), 9 U.S.C. Section 402 et seq. The Court disagrees with that proposition. To be sure, Plaintiff has asserted claims of sexual assault and sexual harassment in the First Amended Complaint. However, the EFAA applies only to arbitration agreements that were entered into before the sexual assault disputes and/or sexual harassment disputes arose. Here, the record shows that the reverse[] occurred: the sexual assault and sexual harassment disputes arose before the parties entered into the arbitration agreement. Plaintiff's allegations of conduct by the Defendants that occurred post-entry into the arbitration agreement do not rise to the level of actionable sexual assault or sexual harassment so as to trigger application of the EFAA.
>
> Plaintiff's only other argument in opposition to the motion is that Defendants breached the contract of which the arbitration agreement is a part and thus they cannot enforce the arbitration agreement. This argument is mistaken. A claim against a party for breach of a contract containing an arbitration provision does not forfeit that party's right to move for arbitration of that claim under the arbitration provision.

Despite this ruling, Ms. Ritter has refused to participate in this arbitration. She failed to attend a scheduled March 4, 2026, discovery conference. She failed or refused to confer with counsel for the Schmidt Claimants regarding discovery. She failed to attend the March 13, 2026, show cause hearing.

## POST-HEARING OBJECTIONS FROM MS. RITTER

During the March 13, 2026, show cause hearing, I made various oral findings and rulings. I asked counsel for the Schmidt Claimants to prepare a proposed order documenting my oral rulings. I requested that counsel copy Ms. Ritter on any and all email communications with me. On March 14, 2026, Craig Marcus, counsel for the Schmidt Claimants emailed a draft order of default for my consideration, copying Ms. Ritter with that correspondence, as I had requested.

Ms. Ritter responded to this email, arguing that the arbitration forum "is not the proper forum for these disputes" and that the "process has been procedurally biased and unfair." See copy of this March 14, 2026, email attached to this order. She alleges that her attempts to object or to raise

concerns "have been met with additional sanctions and retaliation and abuse of process rather than meaningful consideration." She further contends that counsel for the Schmidt Claimants are fact witnesses and their continued role as counsel "raises serious fairness and evidentiary concerns."

The Schmidt Claimants responded to this email, on March 15, 2026, arguing that the superior court rejected her jurisdictional objection, that the proceedings have been fair and impartial, and that her email demonstrates her intention to abandon the arbitration. See copy attached.

Ms. Ritter submitted a reply email, also dated March 15, 2026, arguing that "[p]reserving objections to jurisdiction and fairness cannot properly be characterized as a refusal to participate" in the arbitration. She further stated that she does not waive "any rights to challenge the jurisdiction of this arbitration, the procedural integrity of these proceedings, or the conduct of the parties or counsel involved. See copy of this email attached.

I take this opportunity to address the allegations in Ms. Ritter's emails.

First, while Ms. Ritter has stated that attorneys for the Schmidt Claimants might be fact witnesses, she has never asked me to rule on the substance of any such allegation. She has not filed a motion to disqualify counsel, nor has she submitted any evidence supporting her allegation that they should be disqualified.

Allegations in emails are not a substitute for admissible evidence submitted with a motion asking for specific relief. The July 17, 2025, Preliminary Scheduling Order provided all parties with clear procedures for bringing disputes to my attention for resolution. Ms. Ritter and her counsel participated in discovery motions, demonstrating a knowledge and understanding of the appropriate and procedurally fair way to have disputes resolved. Ms. Ritter was not barred from filing motions of any kind in this proceeding.

Second, Ms. Ritter has not identified any specific "procedural irregularities." The only procedural rulings to which Ms. Ritter has objected are my rulings denying her requests to stay this arbitration or to stay deadlines pending the outcome of the superior court ruling on the Schmidt Claimants' motion to compel arbitration. I addressed this issue in my February 3, 2026, Order on Discovery Conference, the findings and conclusions of which I incorporate by reference here.

Third, Ms. Ritter appears to suggest that it is unfair to proceed with this arbitration given that "[p]arallel legal proceedings and appellate review of the order compelling arbitration remain ongoing." If there are ongoing superior court or appellate court proceedings, this is news to me. The only information I have is that Ms. Ritter's case in superior court is stayed. Ms. Ritter has had at least two weeks to correct the record if this information is incorrect.

Finally, Ms. Ritter alleges that she has "neutrality concerns." Ms. Ritter has not identified any facts to substantiate such concerns. To show evident partiality of an arbitrator, a party must establish specific facts indicating actual bias toward or against a party. *Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 645–46 (9th Cir. 2010). Ms. Ritter has made no such showing here nor, to my knowledge, has she sought to do so in superior court. While Ms. Ritter argues that her "concerns" have not been "meaningfully addressed," it is impossible to do so when she has failed to file a motion seeking any specific relief, has not submitted any legal

argument supporting her "concerns," and has provided no factual evidence to substantiate her allegations.

Moreover, I have ruled in her favor on several occasions over the course of this proceeding. For example, I sustained her attorney-client privilege objection in discovery, I placed limits on some of the discovery sought by the Schmidt Claimants and I limited the scope of third-party subpoenas to which her counsel objected. The record demonstrates my willingness to evaluate impartially appropriate and timely objections.

But often, Ms. Ritter's objections are neither appropriate nor timely. She has repeatedly chosen to not respond to the Schmidt Claimants' requests to meet and confer or their motions, or she has repeatedly chosen not to participate in hearings. After receiving adverse rulings, she has sent emails claiming the ruling was the product of bias. These untimely objections are not credible.

To the extent Ms. Ritter's emails of March 14 and March 15 are objections to the entry of an order of default following the March 13 show cause hearing, I overrule these objections as either untimely, unsubstantiated or inappropriate given her history of non-participation and the superior court ruling on jurisdiction.

FINDINGS

Based on the foregoing, I find that Ms. Ritter has knowingly, intentionally, and willfully, and without justification:

1. refused to participate in any substantive way in this arbitration, both before and after the superior court's March 2, 2026, ruling;
2. failed to appear at the March 4, 2026, discovery conference;
3. failed to produce any documents requested by the Schmidt Claimants in discovery;
4. failed to respond to discovery requests;
5. failed to comply with my December 5, 2025, order compelling Ms. Ritter to respond to the Schmidt Claimants' discovery;
6. failed to pay the monetary sanctions of $25,000 that I imposed for her non-compliance with discovery;
7. failed to comply with my February 3, 2026, order compelling Ms. Ritter to produce documents that were readily available to her without a forensic search, to negotiate terms of a protective order, and to agree to an ESI protocol;
8. failed to comply with my March 5, 2026, order to meet and confer about discovery with counsel for the Schmidt Claimants, to immediately begin production of documents, and to develop a plan for completing discovery; and
9. abandoned this arbitration proceeding through her non-participation and non-compliance with my orders.

I further find that Ms. Ritter's conduct has caused substantial prejudice to the Schmidt Claimants. Ms. Ritter's conduct has caused unnecessary delays and unnecessary costs. In addition, by refusing to participate in discovery, she has denied the Schmidt Claimants access to evidence to support or refute her defenses to their claims.

## AUTHORITY TO ENTER ORDER OF DEFAULT

The Schmidt Claimants seek an order of default based on my finding that Ms. Ritter has abandoned this arbitration. They ask that I enter an order (1) striking Ms. Ritter's answer, affirmative defenses, and/or counterclaims; (2) setting an expedited schedule and process for the Schmidt Claimants to submit briefing and evidence supporting their claims and damages; and (3) prohibiting Ms. Ritter participating in this process in any way going forward.

The AAA Commercial Rule applicable to these requests is R-60. This rule provides:

> (a) The arbitrator may, upon a party's request, order appropriate sanctions where a party fails to comply with its obligations under these Rules or with an order of the arbitrator. In the event that the arbitrator enters a sanction that limits any party's participation in the arbitration or results in an adverse determination of an issue or issues, the arbitrator shall explain that order in writing and shall require the submission of evidence and legal argument prior to making of an award. The arbitrator may not enter a default award as a sanction.
>
> (b) The arbitrator must provide a party that is subject to a sanction request with the opportunity to respond prior to making any determination regarding the sanctions application.

This rule authorizes an arbitrator to find a respondent to be in default but that finding is not sufficient to enter an award in a claimant's favor. The claimant must still present evidence to support any requested relief. The Schmidt Claimants acknowledge that they must convince me of their claims through an evidentiary process.

Based on the foregoing, I conclude that Ms. Ritter's intentional conduct warrants a finding of default. As a sanction under R-60, I hereby strike her answer and affirmative defenses and any counterclaim she attempted to file in this proceeding.

Also, as a sanction for her refusal to participate in discovery, I grant the request that Ms. Ritter be precluded from presenting any testimony or documentary evidence to dispute the Schmidt Claimants' claims. I will not, however, prevent her from challenging the legal or factual sufficiency of those claims.

I further find that Ms. Ritter was provided the opportunity to address the Schmidt Claimants' sanctions request prior to this ruling, as required by R-60(b). The March 5, 2026, Order to Show Cause notified Ms. Ritter that I would consider finding her in default and striking her answer and affirmative defenses if she failed to appear at the March 13, 2026, hearing. She thus had notice of and an opportunity to address the sanctions before I imposed them.

## REQUEST FOR EXPEDITED HEARING PROCESS

I grant the Schmidt Claimants' request for an expedited schedule and process for evaluating evidence and ruling on their claims based on written submissions. The Schmidt Claimants shall file their arbitration brief and supporting evidence by 6:00 p.m. on **April 6, 2026**.

I decline to prohibit Ms. Ritter from responding to this submission. Ms. Ritter may submit a legal brief in response no later than 6:00 p.m. on **April 13, 2026**. I will permit Ms. Ritter to challenge the legal or factual sufficiency of any of the Schmidt Claimants' claims, should she choose to do so. She may not present evidence herself due to her default in these proceedings.

In the event the Schmidt Claimants seek to submit a reply, any reply brief shall be submitted no later than 6:00 p.m. on **April 16, 2026**.

I will conduct a remote hearing to address the parties' written submissions on **Friday, April 17, 2026, at 10 a.m. Pacific Time**. I will not take live evidence during this hearing. The purpose shall be limited to arguments based on the parties' respective written submissions.

All future dates and deadlines set out in the July 17, 2025, Preliminary Scheduling Order are hereby vacated and no longer applicable, including the previously scheduled June 22, 2026, evidentiary hearing, the March 24, 2026, expert witness disclosure, the May 22, 2026, and June 15, 2026, dates for exchanging and filing exhibits, and the June 12, 2026, date for pre-hearing briefs and evidentiary objections.

REVOCATION OF DIRECT EXCHANGE PROGRAM

Paragraph 26 of the July 17, 2025, Preliminary Scheduling Order allowed parties to communicate directly with me and submitting materials to me via email. I hereby revoke permission to communicate directly with me via email. Any and all further communications directed to me should be submitted to AAA in accordance with the AAA's WebFile Electronic Case Filing Guidelines.

SERVICE

I ask the Schmidt Claimants to continue serving Ms. Ritter with any and all communications to AAA via the two email addresses she has provided AAA (the two email addresses set out above). I also ask the Schmidt Claimants to provide Ms. Ritter with a copy of this order via the same email addresses.

In the event Ms. Ritter wishes to receive personal service of submissions and/or arbitration rulings, in addition to service by email, she must provide a service address (not a post office box) to AAA and the opposing party within five calendar days of this order. Unless AAA is instructed otherwise, it will continue to serve Ms. Ritter via the two email addresses she has provided AAA.

Dated: March 16, 2026.

Arbitrator Signature: *Judge Beth M. Andrus (ret.)*

**From:** ritter.sm@icloud.com
**To:** H. Marcus Craig
**Cc:** Beth M. Andrus; JulieCollins@adr.org; Danielle M. Skeen; ritter_legal@outlook.com; Patricia L. Glaser; Jill Harris; Celia H. Spalding; Wogai Mohmand
**Subject:** Re: Hillspire, LLC;Orion Wing, LLC fka Steel Perlot, v. Michelle Ritter - Case 01-25-0000-2191
**Date:** Sunday, March 15, 2026 9:29:02 AM

---

CAUTION: This email was sent from an external sender.

---

Dear Arbitrator Andrus and Ms. Collins,

I write in response to Mr. Marcus's March 15 submission, which attempts to characterize my prior correspondence as an "abandonment" of this proceeding and requests that such a characterization be incorporated into a default order. Further, it is yet another example of retaliation when I speak, par for the course with Glaser Weil, the claimants, and this forum.

The representation by Glaser Weil is inaccurate.

My March 14th email did not state that I was abandoning this matter. It reiterated objections that I have consistently raised throughout this proceeding regarding jurisdiction, procedural fairness, and the neutrality of the forum. Preserving objections to jurisdiction and fairness cannot properly be characterized as a refusal to participate.

For the avoidance of doubt, I have not waived, and do not waive, any rights to challenge the jurisdiction of this arbitration, the procedural integrity of these proceedings, or the conduct of the parties and counsel involved.

As previously raised, there are serious concerns regarding the fairness of this process. Among other issues:

• Counsel for Claimants have submitted sworn declarations in related court proceedings concerning the same underlying events, making them potential fact witnesses. Their continued role as advocates in this arbitration raises substantial fairness and evidentiary concerns.

• Repeated objections regarding procedural irregularities and bias have not been meaningfully addressed, while sanctions and other procedural measures have continued to be imposed.

• Parallel legal proceedings and appellate review of the order compelling arbitration remain ongoing.

Under these circumstances, it would be inappropriate to characterize the preservation of jurisdictional and fairness objections as "misconduct" or "abandonment."

Additionally, I advise the parties, including opposing counsel and others, that the conduct of this proceeding and others held in AAA—including procedural irregularities, neutrality concerns, and actions taken by counsel—will be addressed in appropriate forums. This includes potential claims relating to abuse of process and violations of fundamental procedural fairness. This also includes Glaser Weil's explicit refusal to preserve records and communications subject to the crime-fraud exception.

Nothing in my prior communications, or in this correspondence, should be interpreted as a concession of jurisdiction, a waiver of rights, or consent to the characterization advanced by Claimants.

Respectfully,

Michelle Ritter

> On Mar 15, 2026, at 8:56 AM, Craig H. Marcus <cmarcus@glaserweil.com> wrote:

Your Honor,

As you know, Ms. Ritter repeatedly tried to terminate this arbitration for six months and she repeatedly failed. Her endless requests to terminate or stay this arbitration were denied by both the Superior Court and Your Honor. Finally, on March 2, 2026, the Superior Court unequivocally held that this arbitration will proceed, stayed Ms. Ritter's illegitimate Superior Court lawsuit, and put an end to Ms. Ritter's meritless efforts to stop this arbitration. In so doing, the Superior Court expressly rejected Ms. Ritter's frivolous argument that "[t]his forum is not the proper forum for these disputes." Likewise, given the Superior Court's stay of the civil proceedings, there are not "parallel proceedings" that "remain pending in the Los Angeles Superior Court." Finally, contrary to Ms. Ritter's meritless and unsubstantiated assertion, these proceedings have been entirely fair and impartial from start to finish. Ms. Ritter's current circumstances are the direct result of her own sustained and repetitive misconduct. She chose to repeatedly disregard her legal obligations and your express orders. She chose to disregard mandatory appearances and not participate in these proceedings. Her conduct dictated the current course of these proceedings and she has only herself to blame.

Importantly, Ms. Ritter's March 14 e-mail further demonstrates that she has abandoned this arbitration and has no intention of participating. Upon reading the proposed language for the default order, she had the opportunity to explain her failure to attend the March 13 OSC hearing and her repeated failures to comply with discovery and Your Honor's prior orders. She had the opportunity to reverse her past misconduct and to pledge her participation going forward. Instead, Ms. Ritter doubled down and restated her refusal to participate in this proceeding. Therefore, Claimants respectfully suggest that Ms. Ritter's affirmation of her refusal to participate, in response to the proposed order, be incorporated into the final order.

Respectfully submitted,

Craig Marcus

<image001.png>

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

---

**From:** ritter.sm@icloud.com <ritter.sm@icloud.com>
**Sent:** Saturday, March 14, 2026 8:07 PM
**To:** Craig H. Marcus <cmarcus@glaserweil.com>
**Cc:** JulieCollins@adr.org; BAndrus@skellengerbender.com; dskeen@skellengerbender.com; ritter_legal@outlook.com; Patricia L. Glaser <pglaser@glaserweil.com>; Jill Harris <jharris@glaserweil.com>; Celia H. Spalding <cspalding@glaserweil.com>; Wogai Mohmand <wmohmand@glaserweil.com>; Michelle Ritter <ritter.sm@icloud.com>
**Subject:** Re: Hillspire, LLC;Orion Wing, LLC fka Steel Perlot, v. Michelle Ritter - Case 01-25-0000-2191

Dear Arbitrator Andrus and Ms. Collins:

I object to these proceedings and the proposed default order. This forum is not the proper forum for these disputes, and the process has been procedurally biased and fundamentally unfair. AAA has been made aware of these concerns, which I have repeatedly raised in this proceeding. Both historically and more recently, my attempts to communicate objections or concerns have been met with additional sanctions or retaliation and abuse of process rather than meaningful consideration. This is particularly concerning given that parallel proceedings have been and remain pending in the Los Angeles Superior Court.

In addition, counsel for the claimants have submitted sworn declarations in related court proceedings regarding the same underlying events, making them fact witnesses to the matters at issue. Their continued role as counsel in this arbitration raises serious fairness and evidentiary concerns.

I reserve all rights to challenge the jurisdiction of this arbitration, the fairness of this process, and the conduct of related parties in the appropriate court.

Respectfully,

Michelle Ritter

On Mar 14, 2026, at 10:32 AM, Craig H. Marcus <cmarcus@glaserweil.com> wrote:

Your Honor,

Pursuant to your direction at the March 13, 2026 OSC Hearing, attached is the proposed language you requested for an order of default.

Respectfully submitted,

Craig Marcus

<image001.png>

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**From:** Craig H. Marcus <cmarcus@glaserweil.com>
**Sent:** Thursday, March 12, 2026 4:50 PM
**To:** JulieCollins@adr.org; bandrus@skellengerbender.com; dskeen@skellengerbender.com
**Cc:** ritter_legal@outlook.com; ritter.sm@icloud.com; Patricia L. Glaser <pglaser@glaserweil.com>; Jill Harris <jharris@glaserweil.com>; Celia H. Spalding <cspalding@glaserweil.com>; Wogai Mohmand <wmohmand@glaserweil.com>
**Subject:** RE: Hillspire, LLC;Orion Wing, LLC fka Steel Perlot, v. Michelle Ritter - Case 01-25-0000-2191

Your Honor,

The following is a brief status report in advance of the March 13 OSC Hearing.

On February 4, 2026, Claimants served interrogatories and document requests intended to aid in the enforcement and collection of the $25,000 monetary sanction that Ms. Ritter refused to pay. Ms. Ritter did not respond to the subject discovery. Claimants' March 11, 2026 meet and confer e-mail to Ms. Ritter is attached.

In the attached March 5, 2026 OSC Order, Your Honor ordered Ms. Ritter to:

> "1. Immediately contact counsel for the Schmidt Claimants to discuss all outstanding discovery requests and discovery orders, a request to mirror her electronic devices to investigate her allegations of surveillance, and a request to take her deposition.
> 2. Immediately begin producing documents requested by the Schmidt Claimants.
> 3. Immediately begin complying with all discovery orders I have issued."

Claimants have not received any communications from Ms. Ritter since your March 5 OSC Order. She has not "contact[ed] counsel for the Schmidt Claimants," as you ordered. Likewise, Claimants have not received a single document from Ms. Ritter since your March 5 OSC Order (nor before your OSC Order). She has not begun producing documents, as you ordered. Lastly, Ms. Ritter has not served any discovery responses since your March 5 OSC Order, nor taken any apparent steps to comply with your discovery orders, as you also ordered.

In the attached March 5, 2026 OSC Order, Your Honor also ordered Ms. Ritter to "[d]evelop a written plan for completing discovery, including the production of documents within 60 days (with firm commitments as to dates of production and her deposition) and provide this plan to counsel for the Schmidt Claimants and to me by uploading a copy of the plan to the AAA web portal." Claimants have not received a written plan from Ms. Ritter.

In short, Ms. Ritter has taken no actions whatsoever to comply with your March 5 OSC Order.

Respectfully submitted,

Craig Marcus

<image001.png>

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

---

**From:** JulieCollins@adr.org <JulieCollins@adr.org>
**Sent:** Thursday, March 5, 2026 1:26 PM
**To:** bandrus@skellengerbender.com; Simon K. Moradzadeh <smoradzadeh@glaserweil.com>; ritter.sm@icloud.com; dskeen@skellengerbender.com; Celia H. Spalding <cspalding@glaserweil.com>; Jill Harris <jharris@glaserweil.com>; Craig H. Marcus <cmarcus@glaserweil.com>; Patricia L. Glaser <pglaser@glaserweil.com>
**Cc:** ritter_legal@outlook.com
**Subject:** Hillspire, LLC;Orion Wing, LLC fka Steel Perlot, v. Michelle Ritter - Case 01-25-0000-2191

Hello,

Please review the attached correspondence regarding the above-referenced case.

Feel free to contact me with any questions, comments or concerns you have related to this matter.

Thank you.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

<Draft Order re Default.docx>

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

From: Beth M. Andrus BAndrus@skellengerbender.com
Subject: Re: AAA Case No. 01-25-0000-2191 — Urgent Request for Extension; Request to Stay; Request to Disqualify Counsel; Objection to Arbitrability; Scheduling Order
Date: Oct 7, 2025 at 3:01:33 PM
To: Craig H. Marcus cmarcus@glaserweil.com, Danielle M. Skeen DSkeen@skellengerbender.com, AAA Julie Collins JulieCollins@adr.org
Cc: Patricia L. Glaser pglaser@glaserweil.com, Simon K. Moradzadeh smoradzadeh@glaserweil.com, Celia H. Spalding cspalding@glaserweil.com, Michelle Ritter ritter_legal@outlook.com, ritter.sm@icloud.com

---

Counsel,

I have now had the opportunity to review Ms. Ritter's request for another extension of time and Hillspire et al's opposition. Ms. Ritter has not demonstrated the existence of any extraordinary circumstance warranting another extension of time to file her answer and/or counterlaims. If Ms. Ritter intends to file such a pleading, she must do so by end of business today. If she chooses not to, then pursuant to Rule 5, I will deem her lack of a response to be a general denial of all claims asserted against her.

As for any remaining motions (a motion to stay the arbitration, to disqualify claimant's counsel, or an objection to arbitrability), I direct the parties' attention to paragraph 14 of the Preliminary Hearing Order, which provides that no party shall file any motion without my permission. I therefore interpret Ms. Ritter's email this morning to be a request for leave to file motions to stay the arbitration, to disqualify claimant's counsel and to interpose objections to arbitratbility. I interpret Mr. Marcus's email below as his response and opposition to Ms. Ritter's request for leave to file these motions.

Based on the foregoing, I deny Ms. Ritter leave to file the motions she seeks to file. First, she has not certified that she has conferred with the opposing parties about the proposed motions before asking permission to file them ( as required by my order). Second, Ms. Ritter stipulated to the arbitrability of the claims at the preliminary hearing and I see no basis in law or in fact to reopen this issue, as she was fully represented by counsel at the time the stipulation occurred. Third, Ms. Ritter has made an inadequate showing of a basis for

disqualifying claimants' counsel at this stage.

As the parties know, I will be unavailable to address any further issues from October 10 through October 25.

Judge Beth M. Andrus (ret.)
AAA Arbitrator

---

**From:** Craig H. Marcus <cmarcus@glaserweil.com>
**Sent:** Tuesday, October 7, 2025 2:30 PM
**To:** Beth M. Andrus <BAndrus@skellengerbender.com>; Danielle M. Skeen <DSkeen@skellengerbender.com>; AAA Julie Collins <JulieCollins@adr.org>
**Cc:** Patricia L. Glaser <pglaser@glaserweil.com>; Simon K. Moradzadeh <smoradzadeh@glaserweil.com>; Celia H. Spalding <cspalding@glaserweil.com>; Michelle Ritter <ritter_legal@outlook.com>; ritter.sm@icloud.com <ritter.sm@icloud.com>
**Subject:** RE: AAA Case No. 01-25-0000-2191 — Urgent Request for Extension; Request to Stay; Request to Disqualify Counsel; Objection to Arbitrability; Scheduling Order

---

CAUTION: This email was sent from an external sender.

---

Your Honor,

With this e-mail, Claimants oppose Respondent's unwarranted and meritless request for yet another extension of the deadline for her answer and counterclaim. Claimants will address Respondent's various other equally meritless requests in a separate e-mail.

Respondent's request for yet another extension of the deadline for her answer and counterclaim is merely the latest step in an enduring, nine-month campaign to delay this arbitration and thereby prevent timely adjudication of Claimants' claims against Respondent. In a September 9, 2025 e-mail (attached), Your Honor expressly stated that "*[n]o further delays [of the deadline for Respondent's counterclaim] will be permitted absent extraordinary circumstances.*" (Emphasis added). No such extraordinary circumstances exist. Therefore, as explained below in greater detail, Claimants respectfully request that you refuse to condone Respondent's relentless delay tactics and instead deny Respondent's latest request.

Claimants commenced this arbitration nine months ago on January 15, 2025. Thereafter, Respondent objected to five different arbitrators appointed by the AAA, including Your Honor, and thereby delayed the proceedings for several months. Notably, she served every one of her objections on the last permissible day (exactly two weeks after the prospective arbitrator's disclosure statement was transmitted). Finally, over Respondent's objection, the AAA confirmed Your Honor as the arbitrator in June 2025, five months after the arbitration was commenced.

On July 17, 2025, over six months after the arbitration was commenced, a Preliminary Scheduling Conference was finally held. At that conference and beforehand, Respondent requested permission to file an untimely counterclaim. Notwithstanding Respondent's enduring delays, Claimants agreed to allow a tardy counterclaim. Therefore, in the Preliminary Scheduling Order, Your Honor stated: "*Respondent shall file any counterclaims by July 25, 2025*," one week after the Preliminary Scheduling Conference. Preliminary Scheduling Order, ¶ 7 (emphasis added). Notably, *that was the date requested by Respondent*. The Preliminary Scheduling Order further states that "*[a]ll deadlines* in this order *will be strictly enforced* to avoid unnecessary delay and to ensure expeditious and fair resolution of this matter." *Id*., ¶ 29 (emphasis added).

Two-and-a-half months have passed since the Preliminary Scheduling Order and Respondent still has not filed her counterclaim. On August 25, Respondent requested another extension of the deadline for her answer and counterclaim. Over Claimants' objection, Your Honor graciously extended the deadline to September 9 (even though Respondent only requested an extension through August 29). Your Honor's August 25 order states: "I will extend the deadline for Respondent Ritter to file her answer and counterclaims from today to September 9, 2025. *This extension will give her time to present the counter[claim] she is in the process of preparing*." (Emphasis added).

Thus, it was incumbent upon Respondent to use the additional two weeks "to present the counter[claim] she is in the process of preparing." Did she do that? No! Instead, Respondent spent the

intervening two weeks preparing 167 pages of Los Angeles Superior Court filings, including a comprehensive Complaint, *Ex Parte* Application to stay this arbitration, 123 paragraph supporting declaration, motion to seal, and various other documents.

*The extension requested by Respondent on August 25, ostensibly "to present the counter[claim] she is in the process of preparing," was a ruse intended to buy time for Respondent to prepare her 167 pages of Superior Court filings*. She could have worked on and completed her counterclaim during the intervening two-weeks, as she represented to Your Honor and Your Honor ordered, but she instead elected to spend her time drafting her Superior Court filings. In short, Respondent misrepresented her intentions in order to obtain the August 25 extension.

On September 9, the Superior Court flatly *denied* Respondent's *Ex Parte* Application to stay this arbitration (the Court did not even set an OSC regarding a preliminary injunction).

On September 9, an hour after the Superior Court denied her requested stay of this arbitration, Respondent asked Your Honor for yet another extension of the deadline for her arbitration answer and counterclaim. Over Claimants' objections, Your Honor graciously granted Respondent yet another extension of the deadline. In the attached September 9 e-mail, Your Honor stated: "I grant Respondent 5 business days to file any counterclaims she intends to file in the arbitration. ***No further delays will be permitted absent extraordinary circumstances***. Any counterclaims are thus required to be filed no later

than end of business, Tuesday, September 16, 2025." (Emphasis added).

Having received yet another extension of the deadline, it again was incumbent upon Respondent to use the additional week to complete the counterclaim that she previously told Your Honor was "in process." Did Respondent do so? Again, no! Instead, Respondent used the additional week to draft and prepare a second *Ex Parte* Application in the Superior Court action that she filed on September 13 and the Court denied on September 14. *Respondent again used the additional time granted by Your Honor to work on her Superior Court case rather than her arbitration answer and counterclaim.*

On September 16, after granting Claimants leave to file a Second Amended Arbitration Demand, Your Honor sua sponte further extended the deadline for Respondents' answer and counterclaim by 21 days (the new deadline is today). Again, it was incumbent upon Respondent to use the additional 21 days to complete the counterclaim that she previously told Your Honor was "in process." Did she do so? Again, no! Instead, Respondent again squandered the time with superfluous and unsuccessful make-work.

Meanwhile, Claimants promptly filed a Motion to Compel Arbitration of Respondents' Superior Court claims. Thereafter, over Respondent's objection, the Superior Court stayed the litigation pending the adjudication of Claimants' motion.

Respondent contends that she needs yet another extension of the deadline for her answer and counterclaim because she supposedly is in the process of retaining new counsel. This is yet another ruse.

Respondent represents herself in the Superior Court case that she commenced, including drafting and filing a complaint, two ex parte applications, a motion to seal, an opposition to Claimants' *ex parte* application, and oppositions to Claimants' motions to seal. Moreover, Respondent represented herself for several months in this arbitration before hiring counsel. Respondent is a graduate of Columbia Law School and, as demonstrated by the foregoing, she is very capable of representing herself.

In her September 15 *ex parte* e-mail to Your Honor (attached to your September 16 order), Respondent stated that she lacks the ability to pay the AAA fees related to this arbitration (she repeatedly made the same claim in her Superior Court action). If she cannot pay the arbitration fees, how can she possibly pay the fees for her attorney? Again, it is a ruse.

As stated upfront, we will address Respondent's various other requests in a separate e-mail, including Respondent's request to stay this arbitration. That said, it is noteworthy that Respondent already asked the Superior Court to stay this arbitration and the Court refused. Instead, the Superior Court stayed Respondent's Superior Court action. Now, Respondent is forum-shopping by seeking the same relief from Your Honor that was already denied by the Superior Court.

Finally, at the July 17, 2025 preliminary scheduling hearing with Your Honor, *Respondent—while represented by counsel—expressly waived any "challenge [to] the validity of the arbitration agreement or the arbitrability of the alleged claims" and "agree[d] that the*

*arbitrator has jurisdiction to resolve all pending claims."* Preliminary Scheduling Order, ¶¶ 2, 6 (emphasis added). Respondent also agreed that the arbitration will be administered pursuant to the AAA Large Complex procedures and the evidentiary hearing will take place in June 2026. *Id*., ¶¶ 4, 8. Now, months later, Respondent is attempting to undermine these arbitration proceedings with further delays predicated on issues that she previously waived.

Based on the foregoing, Your Honor should deny Respondent's requested extension of the deadline for her answer and counterclaim. Pursuant to the AAA Rules, when an answer is not filed, the claims are deemed denied. *See* Rule R-5(a) ("If no answering statement is filed within the stated time, the respondent will be deemed to deny the claim.").

Respectfully submitted,

Craig Marcus

Glaser Weil

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**From:** ritter.sm@icloud.com <ritter.sm@icloud.com>
**Sent:** Tuesday, October 7, 2025 11:02 AM
**To:** BAndrus@skellengerbender.com; dskeen@skellengerbender.com; AAA Julie Collins <JulieCollins@adr.org>
**Cc:** Patricia L. Glaser <pglaser@glaserweil.com>; Craig H. Marcus <cmarcus@glaserweil.com>; Simon K. Moradzadeh <smoradzadeh@glaserweil.com>; Celia H. Spalding <cspalding@glaserweil.com>; Michelle Ritter <ritter_legal@outlook.com>
**Subject:** AAA Case No. 01-25-0000-2191 — Urgent Request for Extension; Request to Stay; Request to Disqualify Counsel; Objection to Arbitrability; Scheduling Order

RE: AAA Case No. 01-25-0000-2191 — **Urgent Request for Extension; Request to Stay; Request to Disqualify Counsel; Objection to Arbitrability; Scheduling Order**

------------

Dear Judge Andrus:

I respectfully submit this letter and the accompanying filings--without waiving any objections to jurisdiction in AAA, arbitrability, or other threshold matters--to request: (1) a **short extension of time** to file my Answer and any Counterclaims, given that responsive pleadings are due today, while I secure new counsel and obtain my client files from prior counsel, (2) a **stay of all**

**current proceedings and deadlines** given an existing LA Superior Court hearing set for December 4, 2024 on arbitrability and enforceability, and (3) the Arbitrator's **consideration of threshold issues** that go directly to arbitrability, due process, and the integrity of these proceedings, including the involvement of Glaser Weil. My request stem primarily from the following matters and concerns:

**<u>1- Request for Extension as Respondent retains representation and obtains complete client files:</u>**

Since my prior counsel withdrew on September 15, 2025, I have been seeking and interviewing potential new counsel over the last three weeks and am in the process of securing representation. Simultaneously, I have not yet received my full client file, exhibits, or communications from former counsel at LFTC, all of which are essential to preparing my responsive pleadings.  I have requested my file again as recently as yesterday. By way of example – and without waiving any objections to jurisdiction, arbitrability, or other threshold matters – I cannot completely address discovery sent by Glaser Weil on behalf of Schmidt, Hillspire, and others without my former counsel's files. Without these materials, I am severely prejudiced in meeting the current October 7, 2025 filing deadline.

**<u>2- Existing LA Superior Court Case with a December 4, 2024 hearing on arbitrability, enforceability, and other threshold matters, such as fraudulent inducement and fraudulent transfer:</u>**

In addition to these logistical challenges, I do not believe that AAA is the proper forum for these disputes whatsoever. I filed a related action in Los Angeles Superior Court Case No. 25STCV26114 (the "LASC Case") seeking in part, judicial determination of arbitrability, rescission, and public policy violations under California Code of Civil Procedure §§ 1001–1002 and the Ending Forced Arbitration of Sexual Assault and Harassment Act (9 U.S.C. §402), amongst others.

A hearing on these threshold issues is currently scheduled for December 4, 2025, which is also the date when the statute of limitations runs on my claims re the fraudulent transfer of my business assets. These claims span multiple business entities, including even those entities over which I should theoretically have complete and full control but do not, due in part to the actions of and Petitioners and Glaser Weil. I have filed superior court actions against third parties, such as Google and Alphabet, and will need to further file direct claims against additional parties who are also not subject to this arbitration.

These assets, related tax and intellectual property matters, critical evidence and records – for litigation and for business and personal records -- and the surrounding circumstances of the alleged December 4, 2024 Settlement Agreement and the subsequent December 17, 2024 Amendment are in active controversy.

**3- Petitioners, Glaser Weil directly, and other third parties shown to have made false representations to my counsel and me:**

Newly uncovered evidence shows that opposing counsel (Glaser Weil) and other third parties—including business and financial service providers—made false representations and/or coercive actions that directly influenced both the signing and subsequent enforcement of the alleged December 4, 2024 Settlement Agreement and the subsequent December 17, 2024 DVRO withdrawal and Amendment, at issue.

Specifically, I have only recently learned of concrete misrepresentations made not only to me but also to my former counsel, which led me to sign under duress (which was amplified by matters relating to the safety of my parents and physical and digital security issues), deception and provable misrepresentations by Petitioners, Glaser Weil, and other third

parties, and economic coercion.

**4- Critical and immediate issues with Glaser Weil's status as a fact witness; information received on third party witness intimidation by Marcus, including in the last 14 days:**

These facts are further complicated by the direct involvement of Glaser Weil attorneys—specifically Craig Marcus and Jill Harris.

First, Glaser Weil's Craig Marcus and Jill Harris engaged with third parties, including my employees, directly, despite stating that they were not representing the business or me, and made extrajudicial statements about me, which has only now come to light.

Second, Mr. Marcus and Ms. Harris-- who appeared in person with security at my home-- directly drafted and coerced my withdrawal of my Domestic Violence Restraining Order on December 17, 2024. In the current Los Angeles Superior Court case proceeding on this matter, Glaser Weil's Mr. Marcus filed a sworn declaration.  As the Superior Court judge noted, the declaration by Marcus testifies re the same disputed facts and further included his other perspectives, thereby making him a fact witness. Glaser Weil's participation makes them necessary witnesses under Rule 3.7 of the California Rules of Professional

Conduct. Their continued role as counsel, therefore, presents a serious advocate–witness conflict, undermining the fairness of these proceedings and the integrity of the AAA process.

Third, just in the last two weeks, Glaser Weil's Mr. Marcus has directly and definitively reached out to third parties in a manner that intimidates and silences others from speaking up. On information and belief, Petitioners have also reached out to additional formerly affiliated parties to seek "cooperation."

**5- Petitioners and Glaser Weil have demanded – through the Alleged Settlement Agreement and Amendment – that I sign a Declaration of non-coercion and non-abuse, which is unlawful and untruthful:**

Despite clear state and federal prohibitions against compelling a party to execute a false "non-abuse" declaration—conduct that would itself contravene laws protecting victims of harassment and abuse from coercion, silencing, or retaliation—Petitioners and their counsel, Glaser Weil, have repeatedly demanded that I sign such a declaration. They did so even though the declaration is wholly inapplicable to the matters between Petitioners and me, both prior to any alleged settlement and unquestionably since I was compelled to file a Domestic Violence Restraining Order on December 11, 2024.

This issue—particularly under Code of Civil Procedure §§ 1001-1002—was expressly raised with Glaser Weil by my then-California counsel at LFTC in late July and early August 2024. Notwithstanding that notice, Glaser Weil's attorney, Mr. Marcus, subsequently contacted my former New York-licensed counsel, Scott Baron, to suggest that he re-enter the matter and induce me to sign the declaration.

Petitioners and Glaser Weil continue to attempt to enforce a fraudulently induced agreement and a declaration that is clearly untruthful, using even AAA as a means to do so.

**Requested Relief**

For these reasons and while reserving all rights, I respectfully request that the Arbitrator:

1. **Stay all current deadlines and proceedings**, including the October 7, 2025 Answer/Counterclaim deadline, given the late-stage counsel withdrawal, my active interviews to retain counsel, the need for my legal files, and the complexity of these threshold issues;
2. **Disqualify Glaser Weil, and/or individual attorneys Mr. Craig Marcus and Ms. Jill Harris**, based on their roles as fact witnesses, as supported by Mr. Marcus's own declaration, and based on the newly-learned information of third-party witness intimidation (or in the alternative, allow time for briefing and motion to address the issue);

3. **Preserve and address as threshold issues** the objections to jurisdiction and arbitrability, including fraud in the inducement, coercion, and public-policy violations under California and federal law;
4. In the alternative, please **grant a short extension of the October 7 deadline** to allow for the retrieval of my files and completion of counsel substitution; and
5. **Set a limited case-management conference** to address these threshold matters (arbitrability, disqualification, etc.) and determine appropriate scheduling before any further merits filings proceed, with enough time for me to finalize retaining counsel.

These requests are made solely in the interest of fairness and due process and without waiving any objections to jurisdiction, venue, arbitrability, or bias/misconduct. Proceeding on the merits before these issues are resolved would cause irreparable harm, particularly given the conflicts, coercion, and misconduct now on record.

Consistent with the September 16, 2025 Order prohibiting ex parte communication, I am serving this letter and all attached materials simultaneously on all parties of record. Thank you for your time and consideration.

Respectfully submitted,

Michelle Ritter

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)

First Amended Complaint

# EXHIBIT 38

AAA Claimants' Apr. 6, 2026 declarations of Craig Marcus (with Appendix Ex. 72), Kelly Young, Mandy Quach, Eric Schmidt, and Eric Rose (excerpts); Claimants' Ex. 34 (Glaser Weil billing); Exs. 26–28 (RSI and Bullpen invoices)

# EXHIBIT 51

---

## Debra Smith Declaration

**Description**

Declaration of Debra Smith ISO Claimants' Arbitration Brief (April 6, 2026 AAA filing) — corroborates Dec. 17, 2024 on-site event.

**Status**

**ATTACHED — exhibit content follows this cover sheet.**

**Source**

[mounted]/__USE/2025-01-15 start - AAA/2026-04-06 - AAA/AAA - 2026-04-06 - ES Pleadings/2026-04-06 Declaration of Debra Smith ISO Claimants' Arbitration Brief.pdf

— Cover sheet compiled 2026-04-27 —

PATRICIA L. GLASER – State Bar No. 55668
pglaser@glaserweil.com
CRAIG MARCUS – State Bar No. 156242
cmarcus@glaserweil.com
JILLIAN P. HARRIS – State Bar No. 300119
jharris@glaserweil.com
CELIA SPALDING – State Bar No. 313121
cspalding@glaserweil.com
GLASER WEIL FINK HOWARD
JORDAN & SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone: (310) 553-3000
Fax: (310) 556-2920

*Attorneys for Claimants*

Glaser Weil

**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| Eric Schmidt; Hillspire, LLC; Orion Wing, LLC; Steel Perlot, LLC; and Orion Wing Investments, LLC,<br><br>Claimants,<br><br>v.<br><br>Michelle Ritter,<br><br>Respondent. | AAA Case No. 01-25-0000-2191<br><br>**DECLARATION OF DEBRA SMITH IN SUPPORT OF CLAIMANTS' ARBITRATION BRIEF** |

I, Debra Smith, declare as follows:

1. I have personal knowledge of the facts set forth in this Declaration and, if called upon to testify thereto, I could and would competently do so under oath.

2. I was the Senior Director of Real Estate for Hillspire, LLC from January 2022 to December 2023 and Executive Director of Real Estate from January 2024 through August 2025. As part of my duties as Executive Director, I was responsible for managing Eric Schmidt's real estate assets and all related personal property. This included the "Paley" and "Angelo" properties indirectly owned by Schmidt and previously occupied by Michelle Ritter ("Ritter") and her parents.

3. "Paley" is the name used by the parties to identify the real property and residence indirectly owned by Schmidt where Ritter was residing on December 4, 2024, when the written Agreement between Ritter and Schmidt was signed. The address of the Paley property is 1060 Brooklawn Drive, Los Angeles, California 90077.

4. "Angelo" is the name used by the parties to describe the real property and residence indirectly owned by Schmidt where Ritter's parents were residing on December 4, 2024, when the Agreement was signed. Angelo is around the block from Paley.

5. I visited the Paley property during my tenure at Hillspire. The Paley property is a large estate encompassing over 2.5 acres. The perimeter of the property is walled and/or gated with landscaping and large trees throughout. When standing outside the property on the street, only a small portion of the driveway is visible. The residence is not visible from the street.

6. My team and I at Hillspire maintained a detailed spreadsheet of each item of personal property purchased by Schmidt/Hillspire for Paley, and kept at Paley.

7. On December 11, 2024, my assistant and I conducted a thorough physical inspection of Paley, including the entire residence and all other structures, and the entire property. During our December 11 inspection, my assistant and I carefully took photographs of every single piece of personal property at Paley. Thereafter, I painstakingly compared the photo inventory from the December 11 inspection to the above-described spreadsheet of the personal property owned by Schmidt at Paley. I determined that numerous items of personal property owned by Schmidt, including furniture, décor, artwork, furnishings, and household goods, were missing from the Paley

property. I estimate that the combined value of the missing personal property from Paley, owned by Schmidt, is approximately $1,183,429.05. Attached to the Appendix of Exhibits as Exhibit 17 is a true and correct copy of a spreadsheet containing an inventory of the missing personal property and their individual and total value.

8. On December 17, 2024, I went to the Paley property at noon to take possession of the property on behalf of Schmidt. I planned to oversee the changing of the locks and related tasks associated with the transfer of possession of the property from Ritter. Upon my arrival at noon on December 17, Ritter stated her ardent refusal to vacate the Paley property on that date as previously agreed.

9. After Ritter refused to vacate Paley at noon on December 17, I observed Ritter demand additional consideration and concessions from Schmidt's attorneys before she would agree to physically vacate the Paley property. Ritter demanded that Schmidt waive his contractual right to reimbursement for any missing personal property identified during my inspection on December 11, 2024, and any claims for damage to the Paley property. Ritter also demanded that the due date for the second payment under the Agreement be advanced. Schmidt's attorneys agreed to Ritter's demands and an amendment to the Agreement was drafted and signed on December 17.

10. After Ritter finally vacated the Paley property late at night on December 17, 2024, I again conducted a thorough inspection of the Paley property and residence. Over the course of several days of inspection, I noticed several more items were missing which were originally on site during the December 11th inspection. In addition, I confirmed that the subject personal property belonging to Schmidt that was missing on the December 11th inspection was still missing from the Paley residence.

11. After signing the amendment to the Agreement, I observed Ritter and her parents physically vacate the Paley property late at night on December 17, 2024. They also vacated Angelo on December 17, 2024.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on 3/27/2026, at Menlo Park, CA.

DocuSigned by:
Debra Smith
9AF952B07531430...

DEBRA SMITH

# EXHIBIT 39

Final Arbitration Award (June 4, 2026), p. 13 (recital concerning Ex. 8)

**FINAL ARBITRATION AWARD**

American Arbitration Association

Commercial Tribunal

HILLSPIRE, LLC, ORION WING, LLC, fka STEEL PERLOT, LLC, ORION WING INVESTMENTS, LLC, AND ERIC SCHMIDT

Claimants,

v.

MICHELLE RITTER,

Respondent.

Case # 01-25-0000-2191

**FINAL ARBITRATION AWARD**

I, THE UNDERSIGNED ARBITRATOR, having been appointed by the American Arbitration Association (AAA) in accordance with the arbitration agreement set out in Paragraph 3(g) of the December 4, 2024, Agreement entered into between the above-named parties, and having been duly sworn, and having reviewed the written submissions, exhibits, and declarations of the Schmidt Claimants, issued an INTERIM ARBITRATION AWARD on April 20, 2026. Subsequently, on May 1, 2026, as allowed by the Interim Arbitration Award, the Schmidt Claimants submitted a motion for attorney fees and costs. Respondent Ritter opposed this request through a timely written response on May 13, 2026. The Schmidt Claimants submitted a timely reply on May 20, 2026.

Having now considered the entirety of the record, the following FINAL ARBITRATION AWARD is hereby issued:

## I. INTRODUCTION

After the entry of an order of default (discussed in more detail below) against Respondent Michelle Ritter, this matter came before me for a hearing on the merits of the Schmidt Claimants' claims against Ms. Ritter, submitted for decision through written declarations and exhibits. I held a remote hearing to address this evidence and the legal arguments supporting the Schmidt

Claimants' claims on April 17, 2026. Notice of this hearing was provided to all parties. Ms. Ritter, although previously found in default, attended the hearing and had the opportunity to challenge the legal and factual sufficiency of the evidence presented by the Schmidt Claimants.

This Final Award discusses the procedural history of this dispute, sets forth my findings of fact and conclusions of law regarding the Schmidt Claimants' claims against Ms. Ritter, and addresses the Schmidt Claimants' request for an award of attorney fees and costs.

## II. PROCEDURAL HISTORY OF DISPUTE

### A. Parties and Counsel

Claimants Hillspire LLC, Orion Wing, LLC (fka Steel Perlot, LLC), Orion Wing Investments (fka Steel Perlot Investments, LLC), and Eric Schmidt (hereafter "the Schmidt Claimants") are represented by Patricia L. Glaser, Craig Marcus, Jillian P. Harris, and Celia Spalding, with Glaser Weil Fink Howard Jordan & Shapiro LLP.

Respondent Michelle Ritter currently represents herself. She was previously represented by Bryan J. Freedman, Miles Cooley, and Sean Hardy, with Liner Freedman Taitelman + Cooley, LLP (between June 10, 2025, and September 15, 2025), and by Clair-Lise Kutlay and Sarah Diamond of Miller Barondess (between November 7, 2025, and February 11, 2026).

### B. Schmidt Claimants' Demand for Arbitration

On January 15, 2025, the Schmidt Claimants filed a demand for arbitration against Ms. Ritter, with AAA, pursuant to Paragraph 3(g) of the Agreement executed by the parties on December 4, 2024. Ex. 1 (Agreement). The Schmidt Claimants initially alleged claims of breach of contract, breach of the implied covenant of good faith and fair dealing, defamation per se, and defamation per quod. They sought compensatory damages, punitive damages, injunctive relief, attorney fees and costs, including the cost of any experts, AAA administrative fees, and arbitrator compensation.

Ms. Ritter, representing herself, filed an answering statement on February 14, 2025, denying the allegations in the demand and raising multiple affirmative defenses, including a challenge to the validity of the Agreement. She did not allege any counterclaims against any of the Schmidt Claimants in this initial pleading.

On June 2, 2025, the Schmidt Claimants filed an Amended Demand for Arbitration, adding new causes of action for declaratory relief and anticipatory breach of contract based on Ms. Ritter's alleged attempt to rescind the Agreement and her allegation that the arbitration agreement set out in that Agreement was unenforceable.

On June 10, 2025, Ms. Ritter, through counsel, Bryan Freedman, answered this Amended Demand, restating the same general denial and same affirmative defenses previously filed by Ms. Ritter, in February 2025. Once again, Ms. Ritter raised no counterclaims in this pleading.

**C. Preliminary Hearing and Preliminary Scheduling Order**

On July 17, 2025, I conducted a remote preliminary hearing with counsel of record. In the course of this hearing, Ms. Ritter, through counsel, represented that she did not challenge the validity of the arbitration agreement or the arbitrability of the alleged claims or anticipated counterclaims. Ms. Ritter agreed that the arbitrator had jurisdiction to resolve all pending claims.

As a part of the Preliminary Scheduling Order, I set a July 25, 2025, deadline for Ms. Ritter to file any counterclaims. I simultaneously set a December 5, 2025, deadline for the parties to seek leave to file new or different claims or counterclaims. Based on counsel's representations as to the anticipated duration of any evidentiary hearing, I set a 5-day merits hearing for June 22, 2026. The parties also agreed, and I documented in the agreement in the Preliminary Scheduling Order, that their arbitration agreement permitted the parties to conduct discovery pursuant to the California Civil Procedure Act.

After entry of this order, the parties notified me that they wished to stay the arbitration for a period of time to further settlement discussions. Based on this agreement, I entered two agreed orders staying this proceeding, including discovery, from July 25, 2025, to August 25, 2025. The parties thereafter could not resolve their disputes and I denied Ms. Ritter's request for an additional stay. In lieu of granting such a request, to which the Schmidt Claimants objected, I extended the deadline for Ms. Ritter to file her answer and counterclaims to September 9, 2025, and extended deadlines for disclosing fact witnesses and to seek a protection order to October 20, 2025.

**D. Respondent Ritter's Lawsuit in Los Angeles Superior Court**

On September 8, 2025, Ms. Ritter, representing herself, filed a complaint in Los Angeles Superior Court, against the Schmidt Claimants seeking a rescission of the Agreement based on allegations of fraud, duress, unconscionability, and "public policy concerns," including allegations

of "sexual assault and extreme inequality of bargaining power." Marcus Decl. at ¶10; Ex. 20 ("LA Lawsuit"). Ms. Ritter simultaneously sought an ex parte temporary restraining order from the court to stay or terminate this arbitration proceeding. Marcus Decl. at ¶11; Ex. 10. The court denied her request. Ex. 26.

On September 9, 2025, her counsel sought leave to file a motion to withdraw as Ms. Ritter's representatives and asked me to extend the deadline for filing counterclaims until Ms. Ritter could obtain new counsel. By email ruling, and over the objection of the Schmidt Claimants, I granted Ms. Ritter a five-day extension to file any counterclaims she intended to file in this arbitration. I set a new date of September 16, 2025, for Ms. Ritter to perfect her counterclaims. I also granted counsel leave to file their motion to withdraw.

On September 15, 2025, Ms. Ritter's attorney, Miles Cooney, sought to withdraw because "[t]here has been a complete breakdown in the attorney-client relationship between Respondent and LFTC. The breakdown in the attorney-client relationship has rendered it impossible to effectively represent Respondent in this Action, necessitating withdrawal. Respondent has elected to assume her own representation in this Action." I granted the motion the same day and, based on information provided by Mr. Cooney, identified Ms. Ritter's last known address and contact information as:

Michelle Ritter
269 S. Beverly Drive #1315
Beverly Hills, CA 90212
Tel. 510-878-7772
Email: ritter_legal@outlook.com

**E. Schmidt Claimants' Second Amended Demand for Arbitration**

On September 16, 2025, I granted the Schmidt Claimants' request to file a Second Amended Demand for Arbitration. Based on the existence of new allegations against Ms. Ritter, I extended the time for her to respond to the allegations and, once again, extended the deadline for her to file any counterclaims to 21 days from the date of the Second Amended Demand.

**F. Respondent Ritter's Requests to Stay Arbitration**

On September 22, 2025, the Schmidt Claimants moved to compel arbitration of Ms. Ritter's claims asserted against them in the LA Lawsuit. Marcus Decl. at ¶12. They also sought to stay the LA Lawsuit until the court could rule on this motion. *Id.* at ¶14. On September 30,

2025, the LA superior court stayed the LA Lawsuit pending resolution of the motion to compel arbitration. *Id.* at ¶14; Ex. 28.

On October 7, 2025, Ms. Ritter asked me to extend the deadline for her to file her answer and any counterclaims because she was in the process of securing counsel. She alternatively sought a stay of all arbitration proceedings until the LA superior court could rule on the motion to compel arbitration, then set for a December 4, 2025, hearing. Ms. Ritter also asked that I disqualify the Schmidt Claimants' attorneys and set a case management conference to address what she identified as "threshold issues of arbitrability and disqualification." After reviewing the Schmidt Claimants' objections, I issued an email ruling denying Ms. Ritter leave to file a motion to stay arbitration, to disqualify counsel, or to challenge arbitrability. I ruled:

> First, [Ms. Ritter] has not certified that she has conferred with the opposing parties about the proposed motions before asking permission to file them (as required by my order). Second, Ms. Ritter stipulated to the arbitrability of the claims at the preliminary hearing and I see no basis in law or in fact to reopen this issue, as she was fully represented by counsel at the time the stipulation occurred. Third, Ms. Ritter has made an inadequate showing of a basis for disqualifying claimants' counsel at this stage.

I denied her request for an extension of time for filing her answer and counterclaims based on her failure to demonstrate extraordinary circumstances warranting another extension of time.

Ms. Ritter filed an answer to the Second Amended Demand on October 7, 2025, as I ordered her to do. Ex. 13. In this answer, she asserted 20 affirmative defenses and explicitly denied that AAA had jurisdiction over "certain claims and/or parties." She also filed a second document entitled "Counterclaim for: Rescission, Declaratory Relief, Declaratory Relief and Rescission (§§1001-1002); Public Policy, Breach of Contract, Breach of the Implied Covenant of Good faith and Fair Dealing." She noted that she filed that document "under protest and without waiving objection to the jurisdiction of the AAA." *Id.*

By email dated October 10, 2025, Ms. Ritter objected to AAA jurisdiction, denied that she had stipulated to the arbitrability of any claims, raised allegations of witness intimidation and abuse of process, and claimed that AAA's request for her to pay administrative fees and arbitrator fee deposits was unfair in light of her financial position. In the concluding paragraph, Ms. Ritter stated that "I am not asking the tribunal to take any action by this email" and that she was merely documenting what she claimed was an "abuse-of-process" pattern. I took no action on these allegations because Ms. Ritter did not ask me for any relief.

On October 27, 2025, AAA Manager of ADR Services, Julie Collins, notified the parties that AAA had not received information regarding one of the respondents Ms. Ritter had named in her counterclaims and that Ms. Ritter had not paid the filing fee. AAA concluded that "[t]he counterclaim is considered not properly filed at this time and is therefore not up for consideration. Permission may need to be sought from the arbitrator once respondent is willing to cure all filing deficiencies." Marcus Decl. at ¶39. Although Rule R-55 allows AAA to defer or reduce administrative fees in cases of "extreme hardship," Ms. Ritter did not request an R-55 deferral or reduction of AAA fees.

**G. Discovery Disputes**

On October 29, 2025, the Schmidt Claimants sought leave to file a dispositive motion to strike Ms. Ritter's answer and counterclaims based on her non-compliance with discovery. They alternatively sought a ruling that Ms. Ritter had waived all objections to their multiple discovery requests based on her noncompliance with relevant provisions of California's Code of Civil Procedure.

On November 10, 2025, after receiving pleadings from both parties, I sustained Ms. Ritter's objection to the filing of any dispositive motion under R-34, finding that the Schmidt Claimants had not made the requisite showing to permit the filing of such a motion. I overruled Ms. Ritter's objection to the request to file a non-dispositive discovery motion. I set a briefing schedule to address the parties' discovery disputes.

On December 4, 2025, after receiving briefing from both parties, I issued an Order on Claimants' Omnibus Motion to Compel Discovery. In this order, I overruled Ms. Ritter's objection to discovery based on the pendency of the LA Lawsuit, I sustained her attorney-client privilege objections, I found she had waived her relevance, vagueness, and burden objections to the Schmidt Claimants' discovery requests, and I refused to deem the requests for admissions admitted based on Ms. Ritter's non-response. Finally, I imposed $25,000 in sanctions against Ms. Ritter for her refusal to participate in discovery.

Throughout January and February 2026, I ruled on several discovery disputes between the parties, including Ms. Ritter's objections to the scope of third-party subpoenas that the Schmidt Claimants served on her parents.

**H. Stipulation to Amend Pleadings**

On December 3, 2025, the parties stipulated to allowing the Schmidt Claimants to amend their claims and to allow Ms. Ritter to file counterclaims in this proceeding. Pursuant to their stipulation, I ordered the Schmidt Claimants to serve and file their third amended demand for arbitration by December 5, 2025, and Ms. Ritter to serve and file any counterclaims by December 17, 2025. The Schmidt Claimants timely filed their Third Amended Demand for Arbitration. Ex. 12.

**I. Ritter's First Amended Complaint in LA Lawsuit**

On December 8, 2025, Ms. Ritter obtained permission from the LA superior court to file a First Amended Complaint in the LA Lawsuit. Marcus Decl. at ¶19; Ex. 30. In this First Amended complaint, Ms. Ritter alleged claims of sexual battery, domestic violence, sexual harassment, intentional infliction of emotional distress, and computer hacking. Ex. 21.

**J. Schmidt Claimants' Renewed Motion to Compel Arbitration**

On December 29, 2025, the Schmidt Claimants filed a revised motion to compel arbitration of all of Ms. Ritter's claims alleged in her First Amended Complaint. Marcus Decl. at ¶20; Ex. 22.

During the pendency of this motion, Ms. Ritter asked me on multiple occasions to stay the arbitration until the trial court ruled on the Schmidt Claimants' motion. I denied each request, including a request that corresponded with the renewed December 17, 2025, deadline to file counterclaims. In a December 18, 2025, Order Denying Respondent's Motion to Stay Arbitration, I explained in detail the reasoning for my refusal to postpone deadlines and ruled that unless a court ordered a stay of the arbitration, no stay was warranted.

On December 31, 2025, Ms. Ritter returned to LA superior court with a renewed ex parte application to stay the arbitration. Marcus Decl. at ¶21. The court again denied her request, finding that "Plaintiff has failed to demonstrate an exigency that warrants the relief that she is seeking." Ex. 31.

On January 9, 2026, Ms. Ritter filed counterclaims against the Schmidt Claimants in this proceeding but did so "under protest." The alleged claims, different in part from the counterclaims Ritter previously filed with AAA in October 2025, reiterated the claims she had filed in her First Amended Complaint in the LA Lawsuit—sexual battery, domestic violence, sexual harassment,

intentional infliction of emotional distress, violations of California's Comprehensive Computer Data Access and Fraud Act, wiretapping in violation of California's penal code, illegal recording of confidential communications in violation of California Penal Code §632, and a request for an accounting.

But once again, Ms. Ritter did not pay the AAA filing fee. By Order on Discovery Conference dated February 3, 2026, I extended the deadline to perfect the filing of her counterclaims until the end of business, February 6, 2026. I ruled that "failure to do so will be deemed a waiver of the right to prosecute any counterclaims against the Schmidt Claimants in this arbitration." Ms. Ritter did not meet this deadline, thereby waiving her right to prosecute any counterclaims in this forum.

Ultimately, on March 2, 2026, the court granted the Schmidt Claimants' motion to compel arbitration, rejecting Ms. Ritter's argument that the arbitration agreement is invalid under the federal Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act (the EFAA), 9 U.S.C. §402 et seq. Ex. 25. It stayed further litigation pending completion of this arbitration. *Id.*

**K. Respondent Ritter's Refusal to Participate in Arbitration**

On February 3, 2026, I scheduled a discovery conference for March 4, 2026, to address any ongoing discovery disputes between the parties. Shortly thereafter, Ms. Ritter's second counsel withdrew and represented to AAA that Ms. Ritter intended to appear as her own counsel. Ms. Ritter failed to attend the March 4, 2026, discovery conference. On March 5, 2026, I issued an Order to Show Cause, requiring Ms. Ritter to appear at a March 13, 2026, hearing to show cause why she should not be found in default based on her refusal to participate in discovery, respond to communications from counsel for the Schmidt Claimants, and comply with my prior discovery orders. I notified Ms. Ritter that her failure to produce documents, comply with discovery orders, and prepare a plan for completing discovery prior to the March 13, 2026, hearing, could lead to the entry of an order of default.

**L. Order of Default**

On March 13, 2026, Ms. Ritter failed to attend the show cause hearing. I found that she knowingly, intentionally, and willfully, refused to participate in any substantive way in the arbitration, failed to appear at the March 4, 2026 discovery conference, failed to produce any documents in discovery, failed to respond to discovery requests, failed to comply with my

December 5, 2025, order compelling her to respond to discovery, failed to pay the monetary sanctions I imposed for her non-compliance, failed to comply with my February 3, 2026, order to meet and confer about discovery with counsel for the Schmidt Claimants, to immediately begin producing documents, and to develop a discovery plan, and abandoned the arbitration proceeding through her non-participation and non-compliance with my orders. I thus found Ms. Ritter in default.

I also granted the Schmidt Claimants' request to strike the June 22, 2026, evidentiary hearing date, and established a briefing schedule to evaluate evidence and to rule on the merits of their claims based on written submissions. I declined to prohibit Ms. Ritter from responding to the Schmidt Claimants' submission. I set April 6, 2026, as the deadline for the Schmidt Claimants to submit their arbitration brief, declarations, and exhibits. I allowed Ms. Ritter the opportunity to submit a response by April 13, 2026, if she chose to challenge the legal or factual sufficiency of any of the Schmidt Claimants' claims. But, because she refused to produce evidence in discovery, I precluded her from presenting any evidence in her defense. I scheduled a remote hearing on the written submissions for Friday, April 17, 2026, at 10 a.m.

**M. Expedited Merits Hearing**

The Schmidt Claimants timely submitted an arbitration brief, the declarations of Eric Schmidt, Craig Marcus, Eric Rose, Debra Smith, Matthew Hiltzik, Kelly Young, and Mandy Quach, and Exhibits 1 through 74. Ms. Ritter submitted a responsive brief on April 13, 2026.

On April 17, 2026, as scheduled, I held oral argument on the Schmidt Claimants' request for relief. Ms. Ritter participated in this remote hearing and addressed the legal and factual sufficiency of the Schmidt Claimants' claims.

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

The following findings of fact and conclusions of law are based on my review and independent assessment of the evidence, claims, witness credibility, and legal authorities brought to my attention.

**A. Applicability of R-32, R-60, R-33, and R-59**

Ms. Ritter contends that the AAA Commercial Arbitration Rules do not permit the entry of a default award in favor of the Schmidt Claimants. She cites R-32, R-33, R-59, and R-60 for this proposition. I did not indicate in any prior order that I intended to enter a default award in

favor of the Schmidt claimants and, in fact, complied with these rules by requiring them to present evidence for my consideration.

R-32 provides:

> Unless the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement. An award shall not be made solely on the default of a party. The arbitrator shall require the party who is present to submit evidence as the arbitrator may require for the making of an award.

This rule does not prohibit my finding that Ms. Ritter abandoned these proceedings; it merely requires a presentation of evidence on the merits of the Schmidt Claimants' claims. That is exactly what I ordered to occur.

R-33(c) provides that an arbitrator may allow parties to present evidence by alternative means. R-33(d) permits the parties to waive an oral hearing and to submit their dispute on documentation under Procedure E-6. In this case, after finding Ms. Ritter to have abandoned the proceeding, the Schmidt Claimants waived their right to an oral hearing and asked to submit their claims to me to resolve on the documents. I granted this request pursuant to R-33(d). Ms. Ritter had the opportunity to challenge this request at the March 13, 2026, hearing, which she chose not to attend.

R-59 addresses remedies for nonpayment. It does not address the procedure to be followed when one party abandons the proceeding altogether. I did not rely on R-59 for finding Ms. Ritter in default or in limiting her participation in the proceeding. Although Ms. Ritter did fail to pay AAA's administrative fees, I did not take any action against her for this nonpayment. R-59 does not apply here.

As I explained in my March 16, 2026, Order of Default, the applicable rule is R-60. This rule does give me the authority to find a party to be in default as a sanction for non-compliance with arbitrator orders. It similarly authorizes an arbitrator to limit a party's participation in the arbitration, as long as the order is in writing and the arbitrator requires the non-defaulting party to submit evidence and legal argument before entry of any award. I complied with this rule by requiring the Schmidt Claimants to prove their claims with evidence and legal argument.

Although Ms. Ritter complains that my rulings have precluded her from presenting testimony or documentary evidence to dispute the Schmidt Claimants' evidence, she brought this

situation on herself by refusing to participate in this arbitration, refusing to answer reasonable discovery, and refusing to comply with my orders on discovery. She was on notice by virtue of the March 5, 2026, Order to Show Cause that she could be precluded from presenting evidence if she did not immediately begin to produce the evidence she claims she has. She chose not to comply; she thus has no one to blame but herself.

I therefore overrule Ms. Ritter's objections based on R-32, R-33, R-59, and R-60.

**B. Events Leading Up to Execution of Settlement Agreement**

Eric Schmidt is the former CEO and Chairman of Google and its parent company, Alphabet. He is currently the CEO of Relativity Space, Inc., an aerospace manufacturing company in Long Beach, California. Schmidt Decl. at ¶5-6. Hillspire, LLC is a management company owned by Schmidt and through which Schmidt invests in other companies.

Mr. Schmidt met Ms. Ritter in 2020 when she sought financing for a startup business called Steel Perlot Management (SPM). He agreed to invest in SPM. He formed Steel Perlot LLC (SP) for this purpose. He and Ms. Ritter entered into an agreement in which Mr. Schmidt's company, SP, became a "preferred member" of SPM, holding 49% ownership of the LLC. Ex. 4. Ms. Ritter, originally the sole member of SPM, retained her status as a "common member" owning 51% of the LLC. Ex. 4. Over a 3-year period, SP invested approximately $100 million in SPM, with amendments to the SPM operating agreement memorializing each tranche of funding. Ex. 5.

In 2024, Mr. Schmidt came to believe that Ms. Ritter had mismanaged SPM and squandered his investment through a series of improper actions, including misappropriation of investment funds and SPM assets, self-dealing, abdication of management duties, misrepresentation, false claims of third-party funding, verbal abuse of SPM employees, and breaches of fiduciary duties. Schmidt Decl. at ¶15. Mr. Schmidt asked Ms. Ritter to wind up SPM, terminated a Services Agreement he had entered into with Ms. Ritter for the management of certain of his properties, and asked her to vacate his properties. *Id.* at ¶16. Mr. Schmidt and Ms. Ritter parted ways and have not been in the physical presence of the other since May 2024. *Id.* at ¶19.

In June 2024, Mr. Schmidt initiated arbitration against Ms. Ritter alleging widespread wrongdoing concerning SPM. Marcus Decl. at ¶2, Ex. 7. Also in June 2024, Ms. Ritter raised—

for the first time—a claim that Mr. Schmidt had sexually assaulted her in 2021. Schmidt Decl. at ¶18. Mr. Schmidt denies any allegation that he sexually or physically assaulted Ms. Ritter. *Id.*

**C. December 4, 2024, Settlement Agreement**

On December 4, 2024, Mr. Schmidt, and his affiliated companies (together identified as the Schmidt Parties) executed a settlement agreement with Ms. Ritter, her parents, Terry and Shamim Ritter, StarX Networks, Inc., and Audem Management, LLC (together identified as the Ritter Parties) (the Agreement). Ex. 1. Under this Agreement, the parties agreed to dismiss the arbitration and to wind up the business of SPM, with the Schmidt Parties agreeing to pay off its outstanding debts. In exchange for payments totaling $15 million, to be paid upon completion of certain actions, Ms. Ritter transferred all rights she had in SPM and SP to the Schmidt Parties. Ms. Ritter retained her interests in StarX and Audem. She acknowledged that StarX owed SPM $6.5 million and the Schmidt Parties, on behalf of SPM, agreed to forgive this loan. This loan forgiveness relieved Ms. Ritter of personal liability for this debt.

Additionally, Ms. Ritter and her parents, Terry and Shamim Ritter, agreed to vacate all properties owned by Mr. Schmidt no later than December 17, 2024. Ms. Ritter was living in one of Mr. Schmidt's properties, located at 1060 Brooklawn Drive, Los Angeles, California, identified by the parties as the "Paley" property. The Paley property is a large estate encompassing over 2.5 acres. Smith Decl. at ¶5. Ms. Ritter's parents were residing in a second Schmidt property located around the block from the Paley property, identified by the parties as the "Angelo" property. Smith Decl. at ¶3-4.

Also, as a part of the Agreement, Ms. Ritter agreed to retract all allegations of sexual assault and harassment against Mr. Schmidt and to sign a declaration set out in Schedule D of the Agreement. This declaration stated:

> I, Michelle Ritter, declare:
>
> 1. I am an individual over the age of 18 and have personal knowledge of the matters stated herein. If Called and sworn as a witness, I could and would competently testify under oath hereto.
> 2. At all times, any and all contact by and between Eric Schmidt and myself was entirely consensual and never coerced or compelled. I wish to correct any prior statements made to the contrary.

Ex. 1, p. 26. For Mr. Schmidt, the agreement to execute this declaration was an essential component of the Agreement and he would never have agreed to pay her and her parents $15

million, to forgive a multi-million loan to Ms. Ritter's company, or to pay off SPM's million-dollar debts, had Ms. Ritter not agreed to execute this declaration. Schmidt Decl. at ¶26-27.

The Agreement also contained a confidentiality clause to ensure that Ms. Ritter's allegations of misconduct and the settlement of those allegations remained confidential. Schmidt Decl. at ¶30.

Ms. Ritter was represented by counsel, Scott Baron of Baron Samson, at the time she signed this Agreement. The evidence shows that Baron exchanged multiple drafts of the settlement with counsel for Mr. Schmidt, that all of the material terms of the Agreement were thoroughly negotiated, and that Baron approved the final agreement on Ms. Ritter's behalf before she signed it. Marcus Decl. at ¶4.

After the Agreement was executed in December 2024, Mr. Schmidt took steps to change the name of SP to Orion Wing, LLC. Quach Decl. at ¶5. He also changed the name of SPM to Orion Wing Management, LLC. *Id.* at ¶6; Schmidt Decl. at ¶23. On December 9, 2024, Hillspire's Chief Accounting Officer, Mandy Quach, wired $125,000 to the trust account of Ms. Ritter's law firm, Baron Samson LLP, pursuant to Schedule A(1) of the Agreement. Quach Decl. at ¶7; Schmidt Decl. at ¶22. This payment was for the benefit of Ms. Ritter's parents. Ex. 1, Sch. A.

Mr. Schmidt also had Hillspire and the Orion Wing entities pay $1,060,943 to resolve SPM debts to third parties and to wind down the entity. Quach Decl. at ¶8; Ex. 8. On December 19, 2024, he caused Orion Wing Management LLC (formerly SPM) to forgive the $6.57 million loan owed by Ms. Ritter's company, StarX, to SPM. *Id.* at ¶24; Ex. 1, Schedule B; Ex. 9. Mr. Schmidt also dismissed the 2024 AAA arbitration against Ms. Ritter that was pending when the parties signed the Agreement. *Id.* at ¶25.

**D. December 17, 2024, Amendment to Settlement Agreement**

On December 11, 2024, Debra Smith, the Executive Director of Real Estate for Hillspire, and her assistant, conducted an inspection of Paley. They took photographs of all of the personal property located there. They compared these photos to the inventory of Mr. Schmidt's personal property that Ms. Smith maintained. She determined that numerous items owned by Mr. Schmidt, including furniture, décor, artwork, furnishings, and household goods, were missing. She valued the missing items at $1,183,429.05. Smith Decl. at ¶7, Ex. 17.

On December 12, 2024, Ms. Ritter filed a motion for a domestic violence restraining order (DVRO) against Mr. Schmidt in LA Superior Court. Ex. 2. In this pleading, she indicated she could not discuss any facts or events that occurred before December 2024 but alleged that as of December 2024, Mr. Schmidt had directed his "affiliates" to steal her corporate website and other intellectual property, that Mr. Schmidt had directed his team to change her password for her email account on steelperlot.com, and that Mr. Schmidt had subjected her to "repeated surveillance and stalking" by having his security detail follow her and her parents as they left a restaurant. Ex. 10. She also alleged computer surveillance. *Id.*

On December 17, 2024, Ms. Smith returned to the Paley property at noon to take possession of the property on Mr. Schmidt's behalf, as authorized by the Agreement. Ms. Smith planned to oversee the changing of the locks and related tasks associated with Ms. Ritter's move out of the property. *Id.* at ¶8. When she arrived, Ms. Ritter refused to vacate the property. *Id.* at ¶9. Instead, Ms. Ritter demanded more money and additional concessions from Mr. Schmidt before she would physically vacate the property, including a waiver of any right to reimbursement for the missing personal property Ms. Smith had identified. *Id.* She also demanded that the due date for a second payment under the Agreement be advanced. *Id.*

The Schmidt Claimants' attorneys, Jillian Harris and Craig Marcus, traveled to the Paley property to address Ms. Ritter's demands. Marcus Decl. at ¶6. Over a period of 11 hours, the attorneys were in constant contact with Ms. Ritter's attorney, Scott Baron, as they attempted to negotiate an amendment to the Agreement, to address Ms. Ritter's new demands. Baron approved the final Amendment on behalf of Ms. Ritter and she signed it late that night. *Id.* at 7.

Under the Amendment, Ms. Ritter "irrevocably and forever rescinds, revokes, retracts, and denies" the allegations she asserted against Schmidt in the DVRO. She agreed to file a retraction and to dismiss the petition. Once she completed these filing conditions, and if she complied with all other requirements of the Agreement, the Schmidt Claimants agreed to pay Ms. Ritter's parents the additional $875,000 under Schedule A(2) of the Agreement within 72 hours after the dismissal of the DVRO. Ex. 2, ¶2. In addition, as long as Ms. Ritter moved out of Paley, Mr. Schmidt agreed to waive any claims he might have for the missing personal property that Ms. Smith had identified. Ex. 2, ¶3. All other provisions of the Agreement remained in effect, including the

mandatory arbitration provision. *Id.*, ¶4-5. Ms. Ritter signed this Addendum and her signature was notarized. *Id.*

Ms. Ritter vacated the Paley property and her parents vacated the Angelo property late at night on December 17, 2024. Smith Decl. at ¶10. Ms. Smith then conducted a thorough inspection of the Paley property and residence. *Id.* Once again, she identified more items missing that had been in the house when she had inspected it on December 11, 2024. *Id.* One item of value was a coin collection worth $25,000. Marcus Decl. at ¶8. By mutual agreement between Marcus and Ms. Ritter's attorney, Baron, the aggregate amount to be paid to Ritter and her parents under Paragraphs 1 and 2 of Schedule A was reduced from by $12,500 to reflect half of the value of the missing coin collection. *Id.* The second payment owing to Ms. Ritter's parents was thus reduced from $875,000 to $862,500. *Id.* On December 24, 2024, Quach caused Hillspire to wire $862,500 to the Baron Samson trust account pursuant to the Agreement and Amendment. Quach Decl. at ¶7.

On December 23, 2024, Ritter executed a stipulation and agreed order to dismiss the DVRO matter. In this document, she stated that she "has irrevocably and forever rescinded, revoked, retracted, and denied the request underlying the TRO, and hereby affirms her rescission, revocation, retraction, and denial." Ex. 10.

**E. Ritter's Refusal to Execute Schedule D**

After moving out of the property, Ms. Ritter refused to execute the declaration set out in Schedule D of the Agreement. Initially, she claimed that she did not have to sign any declaration until she was paid the last tranche of the $14 million owed to her under the Agreement. She later claimed that she would not sign the declaration because the statements in it were untrue. Ex. 10, ¶¶7, 8 and 11; Ex. 11, ¶¶3, 12; Ex. 13, ¶24; Ex. 20, ¶40.

In discovery in this arbitration, Ms. Ritter claimed that "Claimants misrepresented the scope and effect of the anticipated declaration in Exhibit D to the Agreement as it was only supposed to be an agreement that Respondent would not pursue any criminal charges for Schmidt's prior sexual assaults." Ex. 16.

**F. Ms. Ritter's Disclosure of the Confidential Information**

On January 9, 2025, Matthew Hiltzik, a legal advisor and public relations agent for Mr. Schmidt, received an email from Georgia Wells, a reporter from the Wall Street Journal asking

him questions about the content of the December 4, 2024, Agreement. Hiltzik Decl. at ¶3; Ex. 18. Wells was in possession of extensive personal and confidential information about the Agreement and about the claims Ms. Ritter had alleged against Mr. Schmidt. *Id.* at ¶4. As of the date of Wells' email, none of the information she possessed was publicly available or in the public domain. *Id.* at ¶5. Neither the Agreement itself nor the fact of the existence of the Agreement was publicly available information. *Id.* Likewise, the fact, existence, and details of Ms. Ritter's claims of sexual assault and harassment against Mr. Schmidt had never been published. *Id.*

As noted above, the Schmidt Claimants lodged their initial demand for arbitration in this proceeding on January 15, 2025—within a week of learning of the disclosure of the Agreement to the WSJ journalist.

**G. Schmidt Claimants' Legal Claims**

The Schmidt Claimants allege multiple claims against Ms. Ritter: (1) fraudulent inducement of the December 4, 2024, Agreement; (2) breach of the Agreement on multiple occasions, and (3) the tort of defamation.

**1. Fraudulent Inducement**

The Schmidt Claimants first allege that Ms. Ritter promised to execute the Schedule D declaration without any intention of signing it, thereby committing "promissory fraud" under California law. Cl. Arb. Br. at 16-17.[1] Under California Civil Code §1709, one is liable for fraudulent deceit if he "willfully deceives another with intent to induce him to alter his position to his injury or risk." California Civil Code § 1710(4) defines deceit as including "[a] promise, made without any intention of performing it." The elements of promissory fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage. Beckwith v. Dahl, 205 Cal. App. 4th 1039, 1059–60, 141 Cal. Rptr. 3d 142, 159 (2012).

The Schmidt Claimants have established that Ms. Ritter promised to execute the Schedule D declaration. Section 3(b) of the Agreement provides:

[1] The Schmidt Claimants' brief will be referred to as "Cl. Arb. Br." Ms. Ritter's brief will be referred to as "Ritter Arb. Br."

> (b) Warranty, Representation, and Declaration. As a material inducement to the Schmidt Parties entering into this Agreement, concurrently with the final payment set forth in Schedule A(2), Ms. Ritter will voluntarily deliver the certification and declaration in the form attached hereto as Schedule D.

Ms. Ritter's parents received the final payment identified in Schedule A(2) on or about December 24, 2024. Her contractual obligation to sign the Schedule D declaration thus triggered on that date. It is undisputed that Ms. Ritter refused, thereafter, to execute this declaration.[2]

Although Ms. Ritter contends that she did not read the Agreement or Schedule D, did not understand that the Agreement required her to sign a declaration retracting allegations of nonconsensual sex, and thought the Agreement only required her to agree not to press criminal charges against Schmidt, Ex. 16, this "understanding" contravenes black letter law and lacks any basis in the actual text of the Agreement or Schedule D.

In California, the law effectively presumes that everyone who signs a contract has read it thoroughly, whether or not that is true. Roldan v. Callahan & Blaine, 219 Cal. App. 4th 87, 93–94, 161 Cal. Rptr. 3d 493, 497–98 (2013). A basic rule of contract law is, " 'in the absence of fraud, overreaching or excusable neglect, that one who signs an instrument may not avoid the impact of its terms on the ground that he failed to read the instrument before signing it.' " *Id.* quoting Stewart v. Preston Pipeline Inc*.,* 134 Cal. App.4th 1565, 1588, 36 Cal. Rptr. 3d 901 (2005). Moreover, courts must also presume parties understood the agreements they sign, and that the parties intended whatever the agreement objectively provides, whether or not they subjectively did. *Id.* " 'Where the parties have reduced their agreement to writing, their mutual intention is to be determined, whenever possible, from the language of the writing alone.' ... '[T]he parties' expressed objective intent, not their unexpressed subjective intent, governs.' " *Id.*, quoting In re Tobacco Cases I, 186 Cal. App. 4th 42, 47, 111 Cal. Rptr. 3d 313 (2010).

There is evidence supporting this legal presumption in this case. Ms. Ritter initialed the form in Schedule D, thereby manifesting her assent to its clear and unambiguous language. Ex. 1.

---

[2] Ms. Ritter suggests that her duty to sign the Schedule D declaration did not trigger until the Schmidt Claimants paid her the final tranche of the $14 million for her ownership interest in SPM. Ritter Arb. Br. at 4. She is mistaken. The clear and unambiguous language of the Agreement provides that she was required to sign that declaration "concurrently with the final payment set forth in Schedule A(2)." Schedule A(2) is the provision providing for a payment of $875,000 to her parents. The payment provision relating to the $14 million payout is in Schedule A(3), not A(2).

I find that Ms. Ritter knew the Agreement required her to sign the Schedule D declaration, as written, and her current statements to the contrary are not credible.

The Schmidt Claimants argue that Ms. Ritter's current justification for not signing Schedule D establishes fraud. They contend that she never intended to sign the declaration despite her promise in the Agreement to do so. I do not agree. They have to prove that on the date Ms. Ritter executed the Agreement, she had no intention of signing the Schedule D declaration. The evidence of her contemporaneous intent is lacking here.

First, all of the evidence that Ms. Ritter was unwilling to execute the Schedule D declaration post-dates her execution of the Agreement. Ms. Ritter made statements in several declarations in the LA Lawsuit that she did not sign the declaration because it was untrue, but each of these statements occurred months after she executed the Agreement and after the Schmidt Claimants initiated this arbitration. I find it more likely that intervening events provided her with a motive for refusing to sign—she simply needed or wanted to find leverage to re-negotiate the deal with Mr. Schmidt.

Second, Ms. Ritter was willing to retract accusations when provided sufficient consideration for doing so. Shortly after Ms. Ritter signed the Agreement, she publicly retracted allegations of misconduct, including harassment, against Mr. Schmidt under the terms of the Amendment. On December 23, 2024, Ms. Ritter explicitly retracted the allegations she made in her DVRO petition—including allegations of cyberstalking, surveillance, and harassment by Mr. Schmidt. Had Ms. Ritter intended not to disavow her allegations of nonconsensual sex, it is unlikely that she would have agreed to retract her allegations of sexual harassment in the DVRO action.

Third, I find it much more likely that Ms. Ritter chose not to sign the declaration after executing the Agreement simply because she thought there was more to be gained economically by doing so. I find that her intent not to sign the document arose after executing the Agreement, not before. I therefore deny the claim of fraudulent inducement.

**2. Breach of Contract**

The Schmidt Claimants allege that Ms. Ritter breached the Agreement and Amendment on multiple occasions and in multiple ways. Ms. Ritter contends the Agreement is unenforceable because she received no consideration, that her performance is excused by the Schmidt Claimants'

failure to pay her $14 million owing under Schedule A(3), and that the confidentiality and non-disparagement clauses are void under California's Code of Civil Procedure.

a. *Consideration Supporting Agreement and Amendment.*

Ms. Ritter first argues that the Agreement is void for lack of consideration. This argument lacks merit under California law. It is basic contract law that, in a bilateral contract, "consideration" is any benefit that the parties confer on or agree to confer on the other. Gaulding v. Gifford, No. F086014, 2025 WL 1692400, at *24 (Cal. Ct. App. June 17, 2025). Courts do not assign a value to bilateral promises. *Id.*

The Agreement and the Amendment are both bilateral contracts. Ms. Ritter promised to take certain actions, including transitioning ownership of SPM and transferring its assets to the Schmidt Claimants, executing the Schedule D declaration, vacating the Paley property by a date and time certain, resolving any outstanding attorney fee liens, removing Mr. Schmidt's name, photograph and bio from the Steelperlot.com website, and releasing the Schmidt Claimants from any and all liability for alleged actions occurring before December 4, 2024.

In turn, the Schmidt Claimants agreed to pay Ms. Ritter $14 million, contingent on her performing her obligations under the deal, to give her two weeks to vacate the Paley property, to forgive a multi-million loan that Ms. Ritter's company, StarX, obtained from SPM, to pay off SPM's outstanding debts, and to release claims they had against Ms. Ritter predating the date of the Agreement. These bilateral promises are more than ample consideration to support the Agreement itself.

The Amendment is also bilateral in nature and supported by mutual promises. Ms. Ritter promised to dismiss her DVRO petition by a date certain and to retract her allegations of stalking and harassment. The Schmidt Claimants agreed to accelerate payment of the A(2) payment by several days and to release Ms. Ritter from any liability for items missing from the Paley property. And according to Ms. Ritter, the Schmidt Claimants also agreed to waive any claim that her filing the DVRO petition after signing the Agreement constituted a breach of the covenant not to sue in the Agreement. Ex. 20, ¶39. These mutual promises provide consideration for the Amendment.

Ms. Ritter's consideration argument is therefore rejected.

b. *Material Breach by the Schmidt Claimants predating Material Breach by Ritter*

Ms. Ritter alternatively argues that any breach she committed is excused by the fact that the Schmidt Claimants breached the Agreement before she did. I disagree.

To prevail on a claim for breach of contract, the Schmidt Claimants must prove (1) the existence of a contract; (2) their performance of, or excuse for nonperformance of, the contract; (3) breach by Ritter; and (4) resulting damage. Richman v. Hartley, 224 Cal. App. 4th 1182, 1186, 169 Cal. Rptr. 3d 475, 478 (2014). California law recognizes that a contract may be breached by nonperformance, by repudiation, or a combination of the two. Cent. Valley Gen. Hosp. v. Smith, 162 Cal. App. 4th 501, 514, 75 Cal. Rptr. 3d 771, 781 (2008). Breach by repudiation is referred to as anticipatory breach. *Id.*

The Schmidt Claimants have proven the existence of the valid and enforceable contract – the December 4, 2024, Agreement and the December 17, 2024, Addendum to that Agreement.[3] They have also established that they performed their obligations to pay Ms. Ritter's parents pursuant to Schedule A, that they forgave a $6.5 million loan made by SPM to her business, StarX, that they paid off SPM debts incurred during Ms. Ritter's management of the company, and that they dismissed the 2024 AAA arbitration.

Ms. Ritter contends, however, that the Schmidt Claimants failed to pay her $14 million that they promised to pay under Paragraph A(3) of Schedule A, and argues that the first installment of the $14 million payout became due as soon as she moved out of Paley. Ms. Ritter's reading of the Agreement is not supported by its unambiguous text.

[3] Ms. Ritter argued at the April 17, 2026, hearing, that Mr. Schmidt placed her under economic duress, forcing her into signing the Agreement and the Amendment. The doctrine of economic duress may come into play when one party engages in a wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure. Rich & Whillock, Inc. v. Ashton Dev., Inc., 157 Cal. App. 3d 1154, 1158, 204 Cal. Rptr. 86, 89 (Ct. App. 1984). Here, Ms. Ritter alleges she was under duress because she and her parents faced exposure to claims asserted against them in the 2024 AAA arbitration. Ex. 7. But filing a lawsuit against another is not a "wrongful act" under the economic duress doctrine. Louisville Title Ins. Co. v. Surety Title & Guar. Co., 60 Cal. App. 3d 781, 801, 132 Cal. Rptr. 63 (1976) (taking legal action or the threat to take legal action is not duress, unless those claims are known to be false). There is no evidence that Mr. Schmidt's initiation of arbitration against Ms. Ritter or her parents was wrongful. I therefore reject any contention that the Agreement is unenforceable under the theory of economic duress.

Schedule A of the Agreement provided that the Schmidt Claimants would pay Ms. Ritter $14 million in three equal installments. The first installment became due upon "the resolution of the FTC Lien." The second installment was due within 7.5 months of the date Ms. Ritter moved out of the Paley property, December 17, 2024, or the resolution of the FTC Lien, whichever occurred later. The third installment was due within 12 months after December 17, 2024, or the resolution of the FTC Lien, whichever occurred later. The Agreement unambiguously provides that "[c]ertain payments under and as set forth Schedule A attached hereto are expressly contingent upon the release and/or payment of the FTC Lien." *Id.* Schedule A similarly provides that the $14 million payment to Ms. Ritter would not be due unless and until she paid off the FTC lien. Ex. 1, Sch. A.

On May 1, 2025, Baron Samson and Ms. Ritter executed a release of attorney lien, which they emailed to counsel for the Schmidt Claimants on May 13, 2025. Ex. 68. Ms. Ritter contends that her lawyers with Freedman Taitelman Cooley similarly issued a lien release in May 2025. Although I have not been provided this release, I will assume for purposes of this discussion that it existed. If both lien releases materialized in May 2025, this date would have been the earliest date on which the Schmidt Claimants had a duty to pay Ms. Ritter the first installment under Schedule A(3).

By the time the Schmidt Claimants received these releases, they had already initiated this arbitration, claiming that Ms. Ritter had materially breached the Agreement. When a party's failure to perform a contractual obligation constitutes a material breach of the contract, the other party may be discharged from its duty to perform under the contract. Brown v. Grimes, 192 Cal. App. 4th 265, 277, 120 Cal. Rptr. 3d 893, 902 (2011). The question of whether a breach of an obligation is a material breach, so as to excuse performance by the other party, is a question of fact. *Id.* Whether a partial breach of a contract is material depends on "the importance or seriousness thereof and the probability of the injured party getting substantial performance." *Id.* citing, 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 852, pp. 938–940. A material breach of one aspect of a contract generally constitutes a material breach of the whole contract. *Id.*

Thus, at issue here is whether the Schmidt Claimants have established that Ms. Ritter materially breached the Agreement between December 4, 2024, and May 13, 2025, justifying their non-payment of any of the installment payments under Schedule A. As detailed below, I find that

they have established that Ms. Ritter materially breached the Agreement months before the Schmidt Claimants had a duty to make any of the three installment payments under Schedule A(3), thereby discharging their duty to perform that term of the Agreement.

The Schmidt Claimants also claim that their duty to make any of the Schedule A(3) installments was based on a condition precedent that Ms. Ritter failed to meet—she failed to obtain attorney fee lien releases. On September 5, 2025, Baron Samson "re-asserted" an attorney fee lien of $5.7 million against the Schmidt Parties. Ex. 68. On September 15, 2025, her attorneys with Liner Freedman Taitelman Cooley, withdrew as counsel for Ms. Ritter in this arbitration, and on October 28, 2025, that law firm also asserted an attorney fee lien of $6 million against any settlement proceeds that the Schmidt Parties may be required to pay Ms. Ritter under the Agreement. Ex. 70. The existence of these attorney fee liens similarly excused the Schmidt Claimants from paying Ms. Ritter any money under the Agreement.

Because Ms. Ritter materially breached the Agreement before the Schmidt Claimants' duty to pay her triggered, and because Ms. Ritter failed to obtain attorney fee releases from her law firms, Ms. Ritter's breaches cannot be excused or justified by any nonperformance by the Schmidt Claimants.

c. *Enforceability of Confidentiality and Non-Disparagement Clauses*

Ms. Ritter next contends that the confidentiality and non-disparagement provisions in the Agreement are "void or unenforceable as applied." Ritter Arb. Br. at 7.

Section 3(a)(i) of the Agreement provides that the parties "shall keep all Confidential Information relating to or concerning the other strictly confidential." It also provided that none of the parties would "disclose, discuss, mention, reveal, share, publish, make available, disseminate, communicate, sell, or distribute, directly or indirectly, any Confidential Information relating to the other," or "solicit, encourage, suggest, promote, approve, condone, ratify, participate in, or facilitate, directly or indirectly, the disclosure … of any Confidential Information." Ex. 1.

"Confidential Information" is defined in Section 3(a)(i) very broadly to include "all confidential, personal, or private information concerning or relating to Mr. Schmidt or Ms. Ritter, including without limitation the existence and terms of this Agreement, and any and all information regarding the relationship, interaction, communications, dealings, and activities by and between [them]." *Id.*

Section 3(a)(iv) of the Agreement further provides that none of the parties will "disparage, criticize, or defame the other." The Agreement defines "disparaging, criticizing or defaming" as "making any unflattering statement about a person or entity that paints such person or entity in a negative or disapproving light." The parties agreed to "immediately take down all social media posts or re-posts that directly or indirectly pertain to the other" and not to "create, like, or share any posts or re-posts … on social media that could reasonably be inferred as a veiled reference to" the other party.

Ms. Ritter contends that these provisions violate California Code of Civil Procedure §§1001 and 1002, and Civil Code §1670.11, and that the law renders unenforceable her agreement not to disclose factual information about her allegations of sexual assault or harassment by Schmidt. The Schmidt Claimants argue that none of these statutory provisions apply to Ms. Ritter. I agree with the Schmidt Claimants' analysis. California Code of Civil Procedure §1001 provides in pertinent part as follows:

> (a) Notwithstanding any other law, <u>a provision within a settlement agreement that prevents or restricts the disclosure of factual information related to a claim filed in a civil action or a complaint filed in an administrative action</u>, regarding any of the following, is prohibited:
>
> (1) <u>An act of sexual assault</u> that is not governed by subdivision (a) of Section 1002.
>
> (2) <u>An act of sexual harassment</u>, as defined in Section 51.9 of the Civil Code. (emphasis added).

California's Code of Civil Procedure §1002 provides in pertinent part:

> (a) Notwithstanding any other law, a provision within <u>a settlement agreement that prevents the disclosure of factual information related to the action is prohibited in any civil action the factual foundation for which establishes a cause of action for civil damages</u> for any of the following:
>
> (1) <u>An act that may be prosecuted as a felony sex offense</u>. (emphasis added).

Both §1001 and §1002 apply only to settlement agreements entered into <u>after</u> a lawsuit alleging sexual assault or harassment is filed. Section 1001 refers "a claim filed in a civil action." Section 1002 refers to "any civil action the foundation for which establishes a cause of action" for a felony sex offense.

Because there is no precedent interpreting these two statutes, I must rely on California rules of statutory construction. Under these rules, the first principle of statutory interpretation is to

ascertain the intent of the enactors. Courts determine intent by first looking to the language of the text. "If the language is clear, there is no need for construction." Zumbrun L. Firm v. California Legislature, 165 Cal. App. 4th 1603, 1619, 82 Cal. Rptr. 3d 525, 537 (2008). Only if the language is ambiguous is it necessary to resort to evidence of the intent of the Legislature in the case of a statute. *Id.*

The language of §1001 and §1002 is unambiguous. Section 1001 applies only to settlement agreements of "claims filed in a civil action." Section 1002 applies only to settlement agreements in "civil actions," the factual foundation of which establishes a cause of action based on an alleged felony sex offense. Neither existed on the date Ms. Ritter signed the Agreement and agreed to the non-disclosure provision. Because Ms. Ritter had not filed a claim in a civil action alleging a cause of action for sexual harassment or assault before she signed the Agreement, neither §1001 nor §1002 render the non-disclosure provision of the Agreement invalid.

Even if these statutes applied, however, neither §1001 nor §1002 renders the Agreement, or even the NDA in the Agreement, unenforceable in their entirety. Nor do these statutes immunize Ms. Ritter from liability for defamation.[4] If her accusations of sexual assault or harassment are false, and she makes such statements public, such disclosures may expose her to liability for defamation. Finally, I reject Ms. Ritter's argument, articulated at the April 17, 2026, hearing, that §1001 and §1002 somehow render unenforceable Section 3(b) of the Agreement in which Ms. Ritter agreed to sign a declaration retracting her allegations of sexual assault and harassment. The only "right" conferred under §1001 and §1002 is the right to disclose factual information about instances of sexual assault and/or sexual harassment after having filed a lawsuit alleging claims based on that factual information.

Ms. Ritter also relies on California Civil Code §1670.11 as a defense against liability. This statute similarly does not apply here. It provides:

> Notwithstanding any other law, a provision in a contract or settlement agreement entered into on or after January 1, 2019, that waives a party's right to testify in an administrative, legislative, or judicial proceeding concerning alleged criminal conduct or alleged sexual harassment on the part of the other party to the contract or settlement agreement, or on the part of the agents or employees of the other party, when the party has been required or

[4] As I discuss below in my analysis of Mr. Schmidt's defamation claim, Ms. Ritter did engage in defamation by falsely and with malice accusing Mr. Schmidt of sexual assault and sexual harassment. Nothing in §1001 or §1002 immunizes her from liability for this misconduct.

> requested to attend the proceeding pursuant to a court order, subpoena, or written request from an administrative agency or the Legislature, is void and unenforceable (emphasis added).

The Agreement does not prevent Ms. Ritter from testifying in an administrative, legislative, or judicial proceeding concerning alleged criminal conduct or alleged sexual harassment when ordered by a court to do so or when served with a subpoena or a written request to attend a proceeding. Section 3(a)(ii) clearly states that the Agreement expressly permits the disclosure of "Confidential Information" when "compelled by law." California Civil Code §1670.11 does not apply to excuse Ms. Ritter's violations of the non-disclosure provision of the Agreement.

d. *Breach of Contract – Refusal to cooperate in the transition of SPM assets to the Schmidt Claimants.*

The Schmidt Claimants contend that Ms. Ritter breached the Agreement by refusing to cooperate with the transition of SPM's assets and accounts to the Schmidt Claimants and by impeding their access to SPM's Google Workspace and email accounts. Cl. Arb. Br. at 19.

Under paragraph 1(b) of the Agreement, Ms. Ritter transferred to the Schmidt Claimants "any and all right, title and interest she or any of her affiliates may have in SPM," defined in the Agreement as the "Acquired Interest." Under that same provision, Ms. Ritter agreed to provide a "duly executed and notarized Assignment of the Acquired Interest in the form attached as Schedule H."

On December 10, 2024, Mr. Marcus sent an email to Ms. Ritter's attorney, Elliot Joffe, at Baron Samson, to confirm that, under the Agreement, the Schmidt Claimants then owned all of SPM's assets, including all electronically stored information, and including the content of all email accounts associated with the SPM domain. Marcus Decl. at ¶9. Joffe confirmed this understanding of the Agreement. Marcus Decl. at ¶9; Ex. 15.

After the Agreement was executed, Hillspire's Chief Information Officer, Kelly Young, attempted to gain access to SPM's digital accounts. Young Decl. at ¶7. When SPM was formed in 2021, Young helped Ms. Ritter set up technology and information systems for SPM. The majority of SPM's business operations were conducted through Google Workspace. Information relating to accounting and bookkeeping functions and the payment of bills was located on shared drives and email accounts on the Google Workspace. Young Decl. at ¶5. Young attempted to

access SPM accounts to access, secure, and manage SPM assets and pay its outstanding bills and debts. *Id.* at ¶7.

Ms. Ritter, however, refused to cooperate with the transition of SPM's assets and accounts to the Schmidt Claimants. Instead, she impeded Young's efforts to access SPM's Google Workspace and email accounts. Young Decl. at ¶8. She contacted SPM's IT provider and Google, claiming that the Schmidt Claimants' use of SPM's Google Workspace and email accounts was improper (despite her attorney's confirmation that Ms. Ritter no longer owned these digital assets). *Id.* She convinced Google to reset passwords and temporarily lock the Schmidt Claimants out of the systems. *Id.* By January 2025, the Schmidt Claimants were able to transfer all SPM accounts, assets, and debts to new email accounts and they ceased using all SPM email accounts. Cl. Arb. Br. at 21, n.16.

Based on this evidence, I find that Ms. Ritter breached the Agreement by failing to cooperate with the transition of SPM assets and accounts, including SPM's Google Workspace, to the Schmidt Claimants.

The Schmidt Claimants admit that they did not sustain any quantifiable, legally recoverable damages caused by this breach. Cl. Arb. Br. at 21. Instead of damages, the Schmidt Claimants seek a "declaration of rights" that Ms. Ritter's breach constitutes "unclean hands." As the unclean hands argument is based on the cumulative effect of Ms. Ritter's conduct after the execution of the Agreement, I will address this issue below.

e. *Breach of Contract - Failing to remove references to Schmidt from the Steel Perlot website and Ritter's social media accounts within the contractually agreed deadline.*

The Schmidt Claimants next allege that Ms. Ritter breached the Agreement by failing to remove all references to Mr. Schmidt and Knox from the Steel Perlot website and from Ms. Ritter's social media accounts within the required deadline. Cl. Arb. Br. at 18.

Under Paragraph 1(d) of the Agreement, Ms. Ritter was required to remove, within 24 hours of the Agreement, all references to any of the Schmidt Claimants from all websites and marketing materials in her custody and control and from any personal social media accounts. This provision was explicitly identified as a material term of the Agreement.

Ms. Ritter breached this provision in the Agreement because she did not remove Mr. Schmidt's name, photograph, and biography from the Steel Perlot website. Young Decl. ¶4. According to Young, references to Mr. Schmidt remained on this website through March 2026 when Ms. Ritter took the entire website offline. *Id.*

f. *Breach of Contract – Referencing to Schmidt in LinkedIn Post*

The Schmidt Claimants argue that Ms. Ritter violated Section 3(a)(iv) of the Agreement by talking about him in a September 14, 2025, LinkedIn Post.

Section 3(a)(iv) of the Agreement provides in pertinent part that "no Party shall create, like, or share any posts or re-posts, whether directly themselves or indirectly through others, on social media that could be inferred as a veiled reference to, or otherwise related to, any other Party if such inference (taken as true) along with the subject matter of the post or re-post would otherwise be a violation of this Agreement."

On September 14, 2025, Ms. Ritter posted the following statement to her LinkedIn account:

> Over four years ago, I founded a company in the financial payments space and later brought on a cofounder. I built it from the ground up and was the largest equity holder aside from a single investor and board member. After a professional relationship with that investor — one I later discovered was inseparably tied to personal dynamics — ended, I was pushed out. That was over 15 months ago.

Ex. 41. This post indirectly referred to her relationship with Mr. Schmidt, thereby violating Section 3(a)(iv) of the Agreement.

g. *Breach of Contract - Stealing personal property from Paley*

The Schmidt Claimants contend that Ms. Ritter stole $1.2 million in personal property belonging to Schmidt, in violation of Paragraph 1(k) of the Agreement. They seek a monetary judgment for the value of this stolen property.

Paragraph 1(k) provides that Ritter had no right to any personal property owned by Mr. Schmidt in the Paley property. The Agreement set up an inspection schedule so that the Schmidt Claimants could verify whether any personal property was missing. Ms. Ritter had seven days from the date of inspection to return property she had removed from the property. *Id.*

After Ms. Ritter signed the Agreement, the Schmidt Claimants asked Debra Smith to conduct the agreed-upon inspection. She identified property valued at $1,183,429 that was missing

from Paley. Smith Decl. at ¶7; Ex. 17. Mr. Schmidt did not authorize Ms. Ritter to remove this property. He had not been in the residence for at least eight months before Ms. Ritter left and did not remove the personal property himself. Schmidt Decl. at ¶28.

Apparently when Ms. Ritter was notified of the missing property, she refused to vacate the property unless Mr. Schmidt released her from any liability for these items. After extensive negotiations, Mr. Schmidt and Ms. Ritter executed the Amendment addressing these items:

> Subject to compliance by the Ritter Parties of the Agreement, including the Payment Condition and Filing Condition, and so long as the Ritter Parties evacuate the properties on the Move Out Date, the Schmidt Parties agree to forego and forbear any claims they have based on items missing, or based on the condition of, such properties after the first and/or second inspections as referenced in Section 1(k) of the Agreement.

Ex. 2, ¶3.

The Schmidt Claimants contend that this conditional release of liability does not apply because the conditions on which it was based did not occur. Although Ms. Ritter left the property on December 17, 2024, and she withdrew her DVRO petition and retracted the allegations made in that petition, she did not otherwise comply with the Agreement (i.e., she did not facilitate the transfer of SPM assets and digital accounts to the Schmidt Claimants; she did not remove Mr. Schmidt's name and photograph from her web site; she revealed the existence of the Agreement and its terms to the WSJ reporter). Nor has she obtained an attorney fee lien release. For these reasons, Ms. Ritter remains legally liable for the personal property she removed from the Paley property and failed to return.

Ms. Ritter challenges the reliability of Ms. Smith's spreadsheet, Ex. 17, contending that it contains pictures of catalogue items or stock imagery rather than on-site photos. Ritter Arb. Br. at 14. Yet, as the Schmidt Claimants argued, Smith could not photograph missing furniture or furnishings. The images in the spreadsheet are depictions of what should have been in the house. Ms. Ritter suggests that the Schmidt Claimants could have presented more evidence to prove the conversion. The law does not require surveillance footage, gate logs, access records, or security reports. Smith testified, based on her personal knowledge, that she maintained a "detailed spreadsheet of each item of personal property purchased by Schmidt/Hillspire for Paley, and kept at Paley." Smith Decl. at ¶6. She also testified that she took photographs of what was physically present on December 11, 2024, and compared those photographs to her spreadsheet. *Id.* at ¶7.

This evidence is sufficient to prove by a preponderance of evidence that property valued at over $1.18 million was missing from the home.

The Schmidt Claimants have provided credible evidence in Ex. 17 that the value of the property Ms. Ritter converted is $1,183,429, and I award this sum to the Schmidt Claimants.

h. *Breach of Contract – Refusal to vacate the Paley property without additional consideration – Extortion*

The Schmidt Claimants contend that on December 17, 2024, Ms. Ritter refused to leave the Paley property by noon, as she had agreed to do, and instead extorted additional consideration from the Schmidt Parties. They seek to recover the $21,550 in attorney fees that they incurred negotiating the December 17, 2024, Amendment to the Agreement.

The crime of extortion is defined as "the obtaining of property from another, with his consent … induced by a wrongful use of force or fear." Cal. Penal Code §518. Fear, for purposes of extortion, may be induced by a threat to accuse the other of any crime, or to expose him or impute to him some disgrace or crime. Cal. Penal Code §519. Extortion criminalizes the making of a threat coupled with a demand for money. Malin v. Singer, 217 Cal. App. 4th 1283, 1294, 159 Cal. Rptr. 3d 292 (2013).

There is no evidence that Ms. Ritter made any "threats" that led the Schmidt Claimants to agree to the Amendment. She simply would not leave the home without additional concessions. They negotiated with her and achieved an agreement to retract allegations she made against Schmidt in a DVRO proceeding. In exchange, they promised to give her more time to vacate the property and to release her from any liability for the personal property she had removed from the Paley residence. The Schmidt Claimants have presented no evidence that Ms. Ritter threatened to report a crime or to publicly accuse Mr. Schmidt of committing a crime (actions she did in fact take at a later point in time). I therefore do not find she committed extortion as defined by California law.

The Schmidt Claimants also contend that Ms. Ritter's refusal to vacate the property by noon without additional favorable terms constitutes a breach of the implied covenant of good faith and fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Foley v. Interactive Data Corp., 47 Cal. 3d 654, 683, 765 P.2d 373, 389 (1988) (citing Restatement (2d) Contracts, § 205). The implied promise requires

each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement. Egan v. Mut. of Omaha Ins. Co., 24 Cal. 3d 809, 818, 620 P.2d 141, 145 (1979).

Here, Ms. Ritter refused to comply with her agreement to vacate the Paley property by noon on December 17, 2024, which injured the right of the Schmidt Claimants to receive the benefit of the Agreement. Her refusal was not justified by any other provision of the Agreement—she took this step for the sole purpose of negotiating new terms to the deal she had just negotiated with the Schmidt Claimants. While she may have believed that the Schmidt Claimants were "ginning up" a new claim against her for conversion of property from the Paley residence, that belief (justified or not) did not give her the contractual right to refuse to vacate the residence by the noon deadline.

I therefore agree with the Schmidt Claimants that the refusal to vacate the Paley residence by noon and the demand for additional consideration before leaving violated the implied covenant of good faith and fair dealing in the Agreement. I also find that the legal fees incurred on December 17, 2024, were proximately caused by Ms. Ritter's breach and award the Schmidt Claimants the requested $21,550 in damages.

i. *Breach of Contract – Disclosure of the fact of the Agreement and its terms to the Wall Street Journal.*

The Schmidt Claimants next contend that Ms. Ritter breached the Agreement by disclosing the Agreement and other confidential information to a Wall Street Journal reporter in violation of Section 3(a)(i) of the Agreement. They seek to recover $50,000 that they paid to Matthew Hiltzik for his professional services in responding to the reporters' questions about Ms. Ritter's allegations.

Ms. Ritter argues that the Schmidt Claimants have no evidence that she was the source of the leak to the WSJ. Ritter Arb. Br. at 11. This argument is not persuasive. As set out above, Hiltzik received an email from a WSJ reporter asking detailed questions about the terms of the Agreement. The questions the reporter posed to Hiltzik reflected very specific information about the Agreement, such as the date, the amount of money to be paid to Ms. Ritter, the amount of money to be paid to her parents, the amount of StarX's debt that SPM was going to forgive, the requirement to remove references to Mr. Schmidt from her web sites, the content of her allegations

of sexual assault, and the language of the Schedule D declaration. It is clear from the content of the reporter's questions that she had a copy of the Agreement.

Ms. Ritter argues that the Schmidt Claimants or their attorneys must have leaked the Agreement to the WSJ as a way to "concoct a breach and give themselves a reason not to perform under the Agreement." This accusation is not credible. The Schmidt Claimants had no incentive to disclose any of this information to the WSJ. Indeed, they wanted it kept confidential and demanded confidentiality in the Agreement. Had the Schmidt Claimants wanted to fabricate a breach on Ms. Ritter's part, they could have done so without compromising confidentiality (by, for example, alleging she had stolen more personal property from Paley).

Moreover, the reporter's questions track Ms. Ritter's personal narrative about the relationship with Mr. Schmidt. For example, the reporter's statements included "the reporting shows that Ritter told people that Schmidt sexually assaulted her in early 2024," and "the reporting shows that Ritter and Schmidt were aboard a private plane that Schmidt owned. The reporting shows that the plane was a Gulfstream 650. The reporting shows the plane was en route to Costa Rica. The reporting shows that the flight was in February 2024." Ex. 18. These details could have come from only one person—Ms. Ritter herself. It is reasonable to infer from this evidence that Ms. Ritter was the source of the leak.

Moreover, Ms. Ritter was explicitly asked to produce records regarding any contacts she had with the WSJ and the reporter who reached out to Hiltzik; she refused to produce these documents. The only reasonable inference I can draw from her refusal to produce documents is that the documents would have clearly shown she was the source of the disclosure.

I therefore conclude that Ms. Ritter breached the confidentiality provision of the Agreement by disclosing to the WSJ reporter details about the existence and content of the Agreement, in violation of Section 3(a)(i). I further conclude that the Schmidt Claimants sustained $50,000 in damages as they had to retain Hiltzik to mitigate the damage caused by Ms. Ritter's breach. I award the requested $50,000 to the Schmidt Claimants.[5]

[5] In her May 13, 2026, opposition to the Schmidt Claimants' fee petition, Ms. Ritter contends that there is an internal inconsistency in awarding $50,000 after finding that the WSJ article was not published. There is no inconsistency. Ms. Ritter breached the Agreement by disclosing the existence of the Agreement and its terms to the

j. *Breach of Contract - Disparaging or defaming Schmidt publicly.*

The Schmidt Claimants also claim that Ms. Ritter's disclosures to the WSJ reporter and her multiple postings on social media sites breached the non-disparagement clause in the Agreement. Cl. Arb. Br. at 31, 68.

The Schmidt Claimants have presented post after post after post in which Ms. Ritter disparaged and criticized Mr. Schmidt. Exs. 50-54, 56-67. She also made a false accusation of sexual assault to the WSJ. These actions are clear violations of Section 3(a)(iv) of the Agreement.

k. *Breach of Contract - Violating the no contact provision of the Agreement by contacting Mr. Schmidt via text messages and What's App.*

The Schmidt Claimants next contend that Ms. Ritter violated Section 3(c) of the Agreement by contacting Mr. Schmidt with unwanted text messages. Cl. Arb. Br. at 34. Section 3(c) provides that "[n]either Ms. Ritter nor Mr. or Mrs. Ritter shall ever knowingly directly or indirectly initiate communication with, contact, or approach Eric Schmidt." Ms. Ritter sent two text messages to Mr. Schmidt on August 16, 2025. Ex. 19; Schmidt Decl. at ¶31. I find that these text messages violated the no-contact clause of the Agreement.

The Schmidt Claimants also allege that on January 22, 2026, Ms. Ritter again breached the no-contact provision of the Agreement by sending him two messages on WhatsApp. Cl. Arb. Br. at 62-63. The evidence shows that on January 22, 2026, Ms. Ritter sent Mr. Schmidt two messages on WhatsApp informing him that she intended to publish a document about him and was sending him a draft as "a courtesy." Ex. 48; Schmidt Decl. at ¶33. She threatened to disclose "what you've done to people via Google and what you've enabled." *Id.* Mr. Marcus, the Schmidt Claimants' attorney, notified Ms. Ritter's attorneys at the time, Claire-Lise Kutlay and Sarah Diamond, of the unwanted contact and of Ms. Ritter's threats to publicize certain information that disparaged Mr. Schmidt. Ex. 49. He informed counsel that the unwanted contact violated Section 3(c) of the Agreement and that if Ms. Ritter published the draft attached to the messages, her actions would constitute a breach of the confidentiality provision of the Agreement. *Id.*

---

WSJ reporter. The damages flowing from this breach were the costs Schmidt incurred in convincing the reporter not to publish a story based on Ms. Ritter's accusations. It is immaterial that the article was never published by the WSJ.

Despite being informed that her contacts were unwanted, Ms. Ritter again sent a message via WhatsApp to Mr. Schmidt in which she quoted from a news article reporting her allegations of "rape, harassment, domestic violence," and "using hacking and wiretapping to spy on her." Ex. 55; Schmidt Decl. at ¶34. She ended the message with the statement "Pathetic. All you know how to do is lie and pay people off to tell your lie." Ex. 55. Again, this contact violated the no-contact provision of the Agreement.

l. *Breach of Contract - Violating the release and covenant not to sue by commencing the LA Lawsuit.*

The Schmidt Claimants next contend that Ms. Ritter violated Section 3(g) of the Agreement by initiating and prosecuting the LA Lawsuit—claims she agreed to release in Section 2(a)(ii) of the Agreement.

Section 2(a)(iii)(1) of the Agreement provides that Ms. Ritter and her parents "hereby absolutely, irrevocably, finally and forever release and discharge the Schmidt Parties, each of their respective affiliates, and their respective members, managers, shareholders, officers, directors, partners (general and limited), employees, agents, and assigns (the 'Schmidt Releasees') from any and all Released Claims." The Agreement defined the "Released Claims" under Section 2(a)(ii) of the Agreement as including:

> any and all Claims directly or indirectly arising from or out of any act, failure to act, conduct, transaction, contract, agreement, instrument, occurrence, event, incident, error, omission, performance, non-performance, breach, breach of contract, tort, detrimental reliance, representation, misrepresentation, concealment, ambiguity, mutual mistake, unilateral mistake, fraud, duty, breach of duty, breach of fiduciary duty, conversion, theft, malfeasance, and/or nonfeasance occurring at any time <u>prior to the Effective Date</u>, regardless of the genesis, context, circumstances, acts, omissions, conduct, transactions, agreements, and/or subject matter, without limitation, whether known or unknown, to the greatest extent permitted by law …. Ex. 1.

The "effective date" referenced here is the date of the Agreement, December 4, 2024. Section 2(a)(iii)(4) further provides that:

> Each of the Parties covenants and agrees to the other Parties that <u>it will not institute, maintain or prosecute against the Schmidt Releasees</u> or the Ritter Releasees (as the applicable case may be) any claim, lawsuit or other proceeding with respect to any matter released by the terms of Section 2. If any party breaches this covenant not to sue, any party aggrieved by such breach may recover, as part of its damages arising from such breach, its attorneys' fees and other expenses and losses incurred as a result of such breach.

As for any claims arising after the effective date of the Agreement, Section 3(g)(i) of the Agreement provides that any and all disputes between the parties would be resolved by arbitration. The arbitration clause extends to any claims relating to the validity, scope, interpretation, and enforceability of the Agreement, the arbitration clause in the Agreement, and any challenge to the arbitrability of any claims. *Id*. Section 3(g)(ix) provides in pertinent part:

> (ix) Except as otherwise provided herein, the Parties hereby waive and relinquish any and all right to file a lawsuit or other civil action or proceeding regarding the claims, controversies, and disputes subject to mandatory arbitration, and likewise waive and relinquish any and all rights to a trial by jury. Notwithstanding the foregoing, the Parties may seek injunctive relief from the Superior Court of the State of California, County of Los Angeles, including a temporary restraining order, preliminary injunction, and permanent injunction.

Ex. 1.

Despite these clear and unambiguous provisions, Ms. Ritter initiated the LA Lawsuit against Mr. Schmidt and his affiliated companies on September 8, 2025, several months after the Schmidt Claimants filed a demand for arbitration with AAA. Ex. 20. She alleged that the Agreement and the arbitration clause in the Agreement were unenforceable and she sought to invalidate and rescind the Agreement. Ex. 20 at ¶43-55.

Ms. Ritter then amended her complaint in December 2025, to add claims of sexual battery, domestic violence, sexual harassment, intentional infliction of emotional distress, and computer hacking. Ex. 21. Most of the factual allegations she raised related to events before December 4, 2024.

I find that Ms. Ritter agreed to release all Schmidt Claimants, including Mr. Schmidt, from any and all liability for any actions, including the alleged sexual battery claim, arising before December 4, 2024. I also find that she agreed to submit any claims arising after that date to arbitration and waived her right to file a lawsuit in superior court. I thus find that Ms. Ritter breached the Agreement by initiating and prosecuting the LA Lawsuit. As a result, I find her liable for all attorney fees that the Schmidt Claimants incurred as a result of her breach.

The Schmidt Claimants sustained attorney fees and costs of $1,409,882 which were directly and proximately caused by Ritter's initiation of the LA Lawsuit. Marcus Decl. at ¶26; Ex. 34. I award the Schmidt Claimants this sum in damages for Ms. Ritter's breach of contract.

Mr. Schmidt also seeks reputational damages of $8 million based on Ms. Ritter's breach of the release, covenant not to sue, and arbitration clauses. Ex. 39. Mr. Schmidt argues that Ms. Ritter's publication of disparaging and false accusations of sexual assault, physical abuse, sexual harassment, cyberstalking, and surveillance, will require him to undertake a reputation remediation program. I do not dispute this evidence. But the reputation damages were not proximately caused by the mere act of filing the LA Lawsuit. They were proximately caused by the substance of her accusations in the pleadings, not by the act of breaching the covenant not to sue. The reputational harm damages are recoverable under different provisions of the Agreement but not under Sections 2(a)(iii), 3(g)(i), or 3(g)(ix). I thus deny their request for reputational harm damages based on Ms. Ritter's breach of these three provisions.

m. *Breach of Contract -- Disclosure of "Confidential Information" & disparagement of Mr. Schmidt in LA Lawsuit*

The Schmidt Claimants contend that Ritter violated the confidentiality and disparagement provisions of the Agreement and the Amendment by disclosing the fact of this arbitration and the existence of the DVRO, and making inappropriate disclosures in pleadings filed in the LA Lawsuit. Cl. Arb. Br. at 51-52.

I find that Ms. Ritter's complaint, Ex. 20, her first amended complaint, Ex. 21, her September 8, 2025, declaration, Ex. 10, her November 19, 2025, opposition to the motion to compel arbitration, Ex. 35, her November 19, 2025, declaration, Ex. 36, and her January 14, 2026, opposition to the second motion to compel arbitration, Ex. 23, are peppered with actionable disclosures of "Confidential Information" and disparaging information about Mr. Schmidt.

These pleadings disclose the existence of the Agreement, the parties to the Agreement, the existence of this arbitration, the parties to this proceeding, and claims asserted against her by Mr. Schmidt. Her pleadings also contain disparaging allegations against Mr. Schmidt. In her complaint, for example, she alleged that Mr. Schmidt had caused her and her family to be surveilled and followed, leading her to seek a DVRO. Ex. 20, ¶80-81. Ms. Ritter made these allegations in the LA Lawsuit, however, after she executed a stipulation and proposed order of dismissal of the DVRO in which she "irrevocably and forever rescind[ed], revok[ed], retract[ed,] and den[ied] the allegations she made in this petition. Ex. 10, p. Ex. D.

Ms. Ritter contends that any claims based on statements she made in the LA Lawsuit, in her petition for a temporary restraining order, or the DVRO proceedings, are privileged statements under California Civil Code §47(b) and cannot be the basis for liability against her. The Schmidt Claimants argue that the litigation privilege does not apply to these statements because (1) she waived her legal right to file the LA Lawsuit; and (2) the privilege is an affirmative defense that Ms. Ritter waived.

California Civil Code §47 provides in pertinent part:

> A privileged publication or broadcast is one made: (a) In the proper discharge of an official duty; (b) In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 ….

The litigation privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of litigation; and (4) that have some connection or logical relationship to the actions. Silberg v. Anderson, 50 Cal. 3d 205, 212, 786 P.2d 365 (1990). The purpose of the privilege in section 47 is to afford litigants and witnesses the utmost freedom to access the courts without fear of being harassed subsequently by derivative tort actions. *Id.* at 213. The privilege has been held to be "absolute" in nature to protect a defendant from tort liability for statements made in the course of litigation. *Id.* at 215. Any doubt as to whether the privilege applies is resolved in favor of applying it. Crossroads Invs., L.P. v. Fed. Nat'l Mortg. Assn., 13 Cal. App. 5th 757, 786, 222 Cal. Rptr. 3d 1, 26 (2017).

The litigation privilege, however, does not apply to contract claims. Crossroads, 13 Cal. App. 5th at 787. "If one expressly contracts not to engage in certain speech or petition activity and then does so, applying the privilege would frustrate the very purpose of the contract if there was a privilege to breach it." *Id.* The litigation privilege thus applies to contract claims "only if the agreement does not 'clearly prohibit' the challenged conduct, and if applying the privilege furthers the policies underlying the privilege. *Id.* *See also* ; Weeden v. Hoffman, 70 Cal. App. 5th 269, 288, 285 Cal. Rptr. 3d 262, 276 (2021) (litigation privilege precludes liability for damages in tort and generally is not extended to liability based on a claim for breach contract).

In this case, the Agreement clearly prohibited Ms. Ritter from bringing a lawsuit against Mr. Schmidt; she agreed to a covenant not to sue him for any actions predating December 4, 2024,

and agreed to arbitrate any claims against him that arose thereafter. Allowing Ms. Ritter to invoke the litigation privilege would immunize her from liability for her breach of contract. And it would not advance any policies underlying the privilege. Ms. Ritter had the option of prosecuting counterclaims against Mr. Schmidt in this forum and would have had the benefit of the litigation privilege here had she followed the terms of the Agreement. She cannot invoke the privilege to insulate herself from contractual liability when the act of litigating in superior court itself constitutes a breach of the covenant not to sue.

I conclude that the litigation privilege does not protect Ms. Ritter from contractual liability for her breaches of Sections 3(a)(i), 3(a)(iv), and 3(g)(x) of the Agreement, and Section 1 of the Amendment to the Agreement.

The Schmidt Claimants seek, in addition to the legal fees incurred to compel this arbitration and stay the LA Lawsuit, reputational harm damages in the form of projected costs to repair Schmidt's reputation on the Internet. Cl. Ar. Br. at 42-43. They retained public affairs expert, Eric Rose, to analyze the nature and extent of harm Schmidt has suffered as a result of Ritter's accusations in the LA Lawsuit and the media reporting of those accusations. Ex. 39. Rose has presented credible evidence that Ritter's accusations of misconduct were widely disseminated through established media outlets and then amplified across multiple digital platforms. Rose concluded that Ritter introduced allegations about Schmidt into the public arena by filing the LA Lawsuit in September 2025. None of these allegations had been publicly disclosed prior to Ritter's complaint.

Rose concluded that this complaint, because it was a legal document, was given presumptive credibility by the media outlets that covered it. *Id.*at 14. As a result, her allegations were published in 115 media stories and social media posts that repeated the allegations. *Id.* The reports were then indexed by search engines and news aggregators, making it likely that the allegations would persist in searchable information systems. *Id.* at 11.

Rose also quantified 35 Facebook posts reaching approximately 66.7 million followers, generating over 6,000 "likes" and 1,733 comments. *Id.* On LinkedIn, 19 posts reached innumerable professional and institutional audiences, including executives, journalists, and business decision-makers. *Id.* On Instagram, Rose found posts associated with approximately 3.3 million followers, generating over 1,400 "likes" and 307 comments. *Id.*, pp. 15-16. On Reddit,

11 posts accumulated over 15,500 "upvotes" and 876 comments. Nine YouTube videos generated over 66,000 views, 1,244 "likes," and 509 comments. *Id.* p. 16. Rose also found six broadcast clips on the Law and Crime Network and One America News Network. *Id.*

Recurring terms like "predator" were found in multiple posts on multiple sites across multiple platforms. *Id.* This term, in the age of Harvey Weinstein and Jeffrey Epstein, has significance and, as Rose indicates, turns speculation into assumed fact. *Id.*

Rose concludes that Ms. Ritter's decision to breach the Agreement by filing such sensational accusations in a court filing became an "uncontrolled disclosure" of disparaging comments that will require 12 months of work through paid media to repair Mr. Schmidt's reputation, at a cost of $8,080,138. *Id.*, p. 12.

Ms. Ritter argues that Rose did not calculate any economic damages recoverable under law. She contends he merely proposes a budget to "flood search results and digital channels," costs that cannot be characterized as "compensatory damages." Ritter Arb. Br. at 14. She also argues it is unfair to "convert a billionaire's preferred image-management spend into a legal damages award against a pro se opponent who could not afford counsel." *Id.*

The basic object of damages is compensation, and in the law of contracts, the theory is that the party injured by a breach should receive as nearly as possible the equivalent of the benefits of performance. Auerbach v. Great W. Bank, 74 Cal. App. 4th 1172, 1191, 88 Cal. Rptr. 2d 718, 731 (1999). The aim is to put the injured party in as good a position as he would have been had performance been rendered as promised. *Id.* Contractual damages may be "general damages," or direct damages, and "special damages," or consequential damages. Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist., 34 Cal. 4th 960, 968, 102 P.3d 257, 261 (2004). General damages are those that flow directly and necessarily from a breach of contract. *Id.* They are presumed to have been within the contemplation of the parties at the time of contracting. Id.

Special damages are those losses that do not arise directly and inevitably from the breach but are secondary and derivative losses arising from circumstances particular to the contract or the parties. *Id.* Special damages are recoverable if the special or particular circumstances from which they arise were actually communicated to or known by the breaching party (a subjective test) or were matters of which the breaching party should have been aware at the time of contracting (an

objective test). *Id.* at 969. Special damages must be losses that are foreseeable and proximately caused by the breach of contract. *Id.*

This rule has been codified in California in Civil Code §3300:

> For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.

Courts have recognized that special losses that a party incurs in a reasonable effort to avoid losses resulting from a breach are recoverable as damages. Brandon & Tibbs v. George Kevorkian Acct. Corp., 226 Cal. App. 3d 442, 461, 277 Cal. Rptr. 40, 51 (Ct. App. 1990). The costs Mr. Schmidt estimates he will incur are in essence special damages resulting from efforts he will need to undertake to mitigate the harm Ms. Ritter has caused him and his reputation. I deem these expenses to be recoverable compensatory damages under California law.

As to Ms. Ritter's claim of poverty, I can find no California reported case law deeming admissible a defendant's financial status when analyzing liability for breach of contract damages. In general, the financial status of a breaching party is not admissible. Under California Civil Code §3295, the financial condition of a defendant may not even be discoverable.

In this case, Schmidt has established that had Ms. Ritter complied with the Agreement and refrained from publishing accusations that she had previously retracted or agreed in the Schedule D declaration were not true, he would have no need to take steps to repair his reputation. I therefore award Schmidt the full amount of mitigation damages he seeks, $8,080,138.

In her May 13, 2026, opposition to the Schmidt Claimants' fee petition, Ms. Ritter contends that it is manifest error to deny the reputation harm damages for one of the Schmidt Claimants' contract claims, as I did in Section 2(l) above, but then award the same reputation harm damages for a different contract claim as I do here. She argues that these two findings are inconsistent and the award of the $8 million thus exceeds my powers in this case. I reject this argument because Ms. Ritter misunderstands the nature of the two distinct contract-based claims and the basis of my decision to deny an award of damages under one theory and to grant an award of damages under a different theory.

The Schmidt Claimants alleged two distinct breach of contract claims – one based on Ms. Ritter breaching a covenant not to sue and one based on a promise not to disparage Mr. Schmidt. I find that while Ms. Ritter breached both provisions, the reputational harm for which Mr. Schmidt seeks an $8 million award was proximately caused by the disparagement, not by the breach of the covenant not to sue. Two separate and distinct breaches of the Agreement proximately caused different damages. I see nothing inconsistent in my factual findings or legal conclusions and thus reject Ms. Ritter's contention that the Interim Award or this Final Award contains materially inconsistent rulings.

n. *Breach of Contract – Disclosing Confidential Information in allegedly sham lawsuit against Google*

The Schmidt Claimants next alleged that Ms. Ritter violated the confidentiality clause of the Agreement by disclosing Confidential Information in the complaint she filed against Google in Santa Clara Superior Court (the "Google Complaint"). Cl. Arb. Br. at 58.

The evidence shows that on September 18, 2025, Ms. Ritter filed a lawsuit against Google, alleging that it had denied her access to her Google Workspace account, had permitted the Schmidt Claimants to assume control over this Workspace, had disclosed her personal data in violation of California law, and had misappropriated her trade secrets in doing so. Ex. 42.

In her lawsuit, Ritter alleged that the Schmidt Claimants had "fraudulently induced and forced" her to sign an assignment of SPM to Schmidt and his affiliated companies. Ex. 42, ¶22. She also alleged Schmidt stole her parked vehicle and personal computer on November 7, 2024. *Id.*, ¶26.

After Ritter retained counsel, she dismissed this lawsuit without prejudice on November 18, 2025. Ex. 43.

I do not need to conclude that Ms. Ritter's complaint was a "sham." All that is before me is whether she disclosed Confidential Information in violation of the Agreement in the pleading she filed, and later dismissed, against Google. I conclude that she did. Her specific allegations against Mr. Schmidt had nothing to do with her claims against Google and appear to have been added simply to impugn Mr. Schmidt. But, as the Schmidt Claimants acknowledge, they did not sustain any damage caused by this separate and distinct breach.

o. *Breach of Contract – Statements made by Louis Miller to media outlets*

As a separate claim of breach, the Schmidt Claimants contend that Ms. Ritter's attorney, Louis Miller, made statements that disparaged Mr. Schmidt and disclosed "Confidential Information" in an interview with various media outlets. Cl. Arb. Br. at 60-61.

The evidence shows that on October 30, 2025, the New York Post published an article that included statements attributed to Louis Miller. Ex. 45. In the article, he is quoted as saying that Ms. Ritter dumped Mr. Schmidt, leading Mr. Schmidt to engage in a "smear campaign" against Ms. Ritter. The attorney described statements Mr. Schmidt made about Ms. Ritter as "a pack of lies" intended to tarnish her reputation. *Id.* The statements were subsequently picked up and published by the Daily Mail and were republished in a second article in the New York Post. Ex. 46-47.

Ms. Ritter admits that Mr. Miller made these statements to the New York Post, Ex. 47, but argues that there is no evidence linking Mr. Miller's statements to her. I agree. While Mr. Miller made disparaging comments about Mr. Schmidt, there is no evidence to suggest that Mr. Miller made these statements at Ms. Ritter's direction or request. I therefore reject the Schmidt Claimants' claim of this alleged breach by Ms. Ritter.

p. *Breach of Contract – Publication of the "Manifesto"*

The Schmidt Claimants next contend that Ms. Ritter's online publication entitled "The Predator's Playground: How Silicon Valley Built a System to Pay Abusers and Bankrupt Victims," (an article they call her "Manifesto"), violated Section 3(a)(iv) of the Agreement.

The evidence shows that on January 29, 2026, Ritter published an article on the social media sites X, LinkedIn, Threads, and Instagram. Exs. 50-54. In this article, Ms. Ritter claimed that wealthy men and Google pay large sums of money to settle sexual harassment or sexual assault claims, that they demand arbitration provisions in the settlement agreements and set AAA as the forum for these arbitrations, creating an economic disincentive for victims to litigate their claims. She claimed that arbitration forums are "pay-to-play" and that law firms like Glaser Weil (also the Schmidt Claimants' counsel) are often hired by the perpetrators to assist them in defeating victims' claims. Ex. 50. She argued that the federal "Ending Forced Arbitration" Act was enacted to ensure public accountability for sexual misconduct. *Id.*

Ms. Ritter's article then pivoted to discuss Google, suggesting that Google was "willing to allow extensive data deletion and alteration in relation to the sexual assault." Ex. 50. She linked Google to her personal situation: "how many other situations – presumably those that are much "higher stakes" than mine, at least at the surface level – are implicated? She went on to say that "Google has undoubtedly failed in protecting against sexual harassment or enabling it—directly or indirectly—through insiders, former executives, affiliates, or investment partners…." *Id.*

The evidence also shows that on the date of this publication, the Schmidt Claimants' motion to compel arbitration was pending in the LA Lawsuit. Glaser Weil appeared on behalf of the Schmidt Claimants in that case, advocating for mandatory arbitration of Ms. Ritter's sexual assault and harassment claims at the very moment that Ms. Ritter published this article.

The Schmidt Claimants argue that "it was obvious to even an uninformed reader that Ritter's Manifesto – published on her social media – indirectly related to Schmidt." Cl. Arb. Br. at 64. I reluctantly have to agree. Ms. Ritter referred to "former executives" of Google who had allegedly engaged in sexual misconduct and subsequently entered into settlement agreements with alleged victims requiring arbitration of future disputes. When this post went public, Ms. Ritter had filed her first amended complaint in the LA Lawsuit in which she alleged that a former executive of Google had raped her, forced her into a settlement, and was seeking to compel her to prosecute her claims against him in an AAA arbitration. The connection between the two is obvious. Ms. Ritter's post was thus published "on social media that could reasonably be inferred as a veiled reference to" Mr. Schmidt, in breach of the Agreement.

While Ms. Ritter's article raised valid critiques relating to the adequacy of the legal system for victims of sexual misconduct, she also made it clear that she was one of these victims at the exact time that she was seeking to convince a judge to allow her to avoid an arbitral forum. I do not criticize Ms. Ritter for participating in the national debate about whether institutions in our society are adequately demanding accountability for people (usually men, and even more typically, powerful men) who commit sexual misconduct. But Ms. Ritter contractually agreed not to turn

her personal situation into headline news.[6] I find that her publication of the article in Exs. 50-54 constituted a breach of Section 3(a)(iv) of the Agreement.

q. *Breach of Contract –Ritter's Letter to Congress*

The Schmidt Claimants next contend that Ms. Ritter violated Section 3(a)(iv) of the Agreement by publishing a lengthy "Letter to Congress," in which she explicitly referred to Mr. Schmidt and accused him of all manner of misdeeds.

The evidence shows that on February 10 and 11, 2026, Ritter drafted a "Letter to Congress" which she published on X, LinkedIn, Substack, Instagram, and Threads. Exs. 56-62. In this letter, she asked for "urgent Congressional oversight into systemic risks affecting the integrity of digital evidence relied upon in whistleblower actions, sexual assault and harassment investigations and federal matters of national importance." She stated that her concerns arose from "my direct, first-hand experience over the past eighteen months while litigating against Eric Schmidt, former CEO and Chairman of Google, and Google itself." She said she had observed "serious, unresolved risks that extend far beyond my individual case and implicate federal investigations, corporate governance, tax compliance, and democratic accountability." Ex. 56. She argued that there was reason to believe that certain "Epstein-related email records were altered" before produced to the government because they were hosted on Google's infrastructure and "the same technical trace indicator of Google server-side data alteration" that she had documented in her lawsuit against Mr. Schmidt and Google appeared to be "consistent with anomalies" in the DOJ's "Epstein-related email records." *Id.* She claimed that Schmidt used the alias, Eric Ross, a name she claimed was found in the Epstein files released by the DOJ. She also alleged that this alias was "flagged to Mr. Schmidt, his team, and Google" after which "the number of files with "Eric Ross" diminished dramatically, including in the late January 2026 DOJ records release." *Id.* She alleged that Schmidt had told her that Google has a "backdoor" and the capability to alter data and insisted that this statement was "corroborated by technical findings" that were "either not authentic or otherwise

[6] Ms. Ritter suggested in her arbitration brief, as she stated in this article, that victims (like her) cannot afford the fees that AAA charges to participate. But it appears that the Schmidt Claimants have paid 100% of the AAA fees to ensure that this arbitration could proceed. Additionally, Ms. Ritter never asked me to defer or reduce the AAA filing fee when she filed her counterclaims. Moreover, Ms. Ritter decries the cost of discovery in arbitration. But, as I explicitly told her attorney during a hearing, these costs are no less in a judicial forum than they are in an arbitral one. And if Ms. Ritter lacked the financial resources to produce documents, she did not submit anything to me to establish this fact nor did she file a motion asking me to shift the burden of the cost of discovery to the Schmidt Claimants.

altered remotely." *Id.* at p. 2. She also alleged that "Google's internal logging architecture is intentionally limited, materially constraining post-hoc forensic auditing and shielding institutional exposure for evidentiary manipulation." *Id.* She referred Congress to the "relevant context and further details" in her lawsuit against Google and Schmidt. *Id.*

Further in this letter, Ms. Ritter alleged that in her litigation, she saw Mr. Schmidt and his company, Hillspire, "submit fraudulent tax files to state and federal agencies as enabled by the breaches, remote access, and data alteration via Google," enabling "significant asset and liability shifting as well as fraudulent corporate governance and tax documents." *Id.* at p. 2, n.2.

Ms. Ritter further claimed that "Google insiders and executives routinely deploy arbitration and economic coercion to suppress disclosure and avoid accountability." She alleged that "[i]n my case, I was forced into a corporate arbitration forum despite being an individual litigant, dramatically increasing the cost of defense." She contended she was repeatedly pressured to "waive protections afforded under the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act," execute declarations restricting disclosure, and "bind family members to punitive terms, including penalties exceeding $1,000,000 per alleged breach, or else be barred from future business dealings and denied access to a fair legal forum." *Id.* at p. 3.

Ms. Ritter posted this document repeatedly in various social media posts.

This letter is either confabulation (unconscious fabrication, distortion, or misinterpretation of memory) or intentional fabrication. Ms. Ritter has, to my knowledge, never produced evidence to support any of these allegations. When asked about this letter in the April 17, 2026, hearing, Ms. Ritter argued that she was not impugning Mr. Schmidt's character but was instead criticizing Google. That explanation is not credible. The document makes multiple, explicit references to Mr. Schmidt, including accusations that he committed tax fraud and that he somehow had the ability to alter the DOJ's Epstein files to remove any reference to him in those files. These statements constitute disparaging or critical comments about Mr. Schmidt in violation of Section 3(a)(iv) of the agreement.

For the foregoing reasons, I find in favor of the Schmidt Claimants on their breach of contract claims and award damages totaling $10,744,999 as set out in the summary of the award.

**3. Defamation**

Mr. Schmidt alleges that Ms. Ritter committed the tort of defamation per se under California Civil Code §46, by falsely accusing him of rape and sexual assault, that her statements were not privileged, and that he has suffered economic harm and reputational damages as a result of her false accusations. Cl. Arb. Br. at 32-22.

Ms. Ritter contends she had the legal right to disclose factual information regarding her claim of sexual assault under California Civil Code §1001 and §1002, that her disclosures fall within the litigation privilege, and that Mr. Schmidt has not proven actual damages as a result of her disclosures.

"To establish a prima facie case for defamation, a claimant must demonstrate an oral publication to third persons of specified false matter that has a natural tendency to injure or that causes special damage." Gonzalez v. Fire Ins. Exchange, 234 Cal. App. 4th 1220, 1240, n. 5, 164 Cal. Rptr. 3d 394 (2015). Section 46 provides:

> Slander is a false and unprivileged publication, orally uttered, and also communicated by radio or any mechanical or other means which:
>
> 1. Charges any person with crime, or with having been indicted, convicted, or punished for crime;
> 2. Imputes in him the present existence of an infectious, contagious, or loathsome disease;
> 3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits;
> 4. Imputes to him impotence or a want of chastity; or
> 5. Which, by natural consequence, causes actual damage.

Words falling within this statutory section are deemed slander per se; uttering the words is actionable without proof of special damage. Gonzalez, at n. 5.

The United States Supreme Court has held that federal constitutional principles require persons who qualify as public figures to prove an additional element–that the communication was made with actual malice. Bui v. Ngo, 101 Cal. App. 5th 1061, 1072, 320 Cal. Rptr. 3d 788, 798 (2024). A claimant who is a public figure must prove actual malice by clear and convincing evidence, but they may rely on circumstantial evidence to do so. Collins v. Waters, 92 Cal. App. 5th 70, 73, 308 Cal. Rptr. 3d 326, 329 (2023).

a. *Falsity*

I find that Ms. Ritter's statement that she had been raped by Mr. Schmidt to be false. Mr. Schmidt categorically denies under oath that he ever sexually assaulted or physically abused Ms. Ritter. Ms. Ritter agreed to retract the allegation by agreeing to sign the Schedule D declaration in which she affirmed that all sexual contact with Mr. Schmidt had been consensual. Either her accusation of rape was false, she knew it was false, and the declaration confirmed it was false; or Ms. Ritter was willing to swear out a false declaration in exchange for $14 million and a payment of $1 million to her parents. As she has repeatedly stated, she would never execute a false declaration. Thus, I find the statements in the declaration were in fact true.

Circumstantial evidence also supports a finding of falsity. Ms. Ritter has done everything she possibly could do to avoid having to be questioned about her rape accusations under oath. She unjustifiably refused to participate in this arbitration and attempted to stay the proceeding on multiple occasions, she refused to undergo a deposition, where she would have had to answer questions under oath, and she refused to produce documents relating to her accusations.

I thus find that Ms. Ritter's accusation of sexual assault was false.

b. *Publication*

Ex. 18 demonstrates that Ritter communicated the false accusation of rape to a WSJ reporter. [7]

[7] In her May 13, 2026, opposition to the Schmidt Claimants' fee petition, Ms. Ritter argues that there is an internal inconsistency between my finding that the WSJ article was not published and my finding that she published the false accusation when Ms. Ritter communicated the accusation to a reporter. I find no inconsistency. "In general, each time the defamatory statement is communicated to a third person who understands its defamatory meaning as applied to the plaintiff, the statement is said to have been "published," although a written dissemination, as suggested by the common meaning of that term, is not required. Each publication ordinarily gives rise to a new cause of action for defamation." Shively v. Bozanich, 31 Cal. 4th 1230, 1242, 80 P.3d 676, 683 (2003). Ms. Ritter's communication to the reporter was the initial act of "publication." Had the reporter published a story in the newspaper, that act would have been an act of "republication." There was a completed "publication" within the meaning of the law of defamation when Ms. Ritter communicated false information to the WSJ reporter and this publication is separate and apart from the "publication" which could have occurred had the newspaper printed Ms. Ritter's statements. *See* Denney v. Lawrence, 22 Cal. App. 4th 927, 937, 27 Cal. Rptr. 2d 556, 562 (1994).

c. *Privilege*

The only privilege invoked by Ms. Ritter is the litigation privilege. The Schmidt Claimants have indicated that their defamation claim does not rely on statements made in the LA Lawsuit and they instead base their claims on disclosures Ms. Ritter made to the WSJ reporter.

The litigation privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." Michael K. v. Cho, 113 Cal. App. 5th 1, 13, 335 Cal. Rptr. 3d 102, 112 (2025). The privilege attaches even though the publication was made outside a courtroom, but the statement must be "reasonably relevant" to pending or contemplated litigation, not extraneous to the action. *Id.*

The litigation privilege does not apply to any communication made to the WSJ because her statements to the reporter occurred in January 2025, months before Ms. Ritter filed the LA Lawsuit. None of the statements to this reporter were "reasonably relevant" to any pending or contemplated litigation. The litigation privilege does not apply to the specific statements at issue here.

d. *Malice*

To prove actual malice, a claimant must show that statements were made with knowledge that they were false or with reckless disregard of whether they were false or not. Balla v. Hall, 59 Cal. App. 5th 652, 682–83, 273 Cal. Rptr. 3d 695, 722 (2021). I find that the Schmidt Claimants established by clear and convincing evidence that Ms. Ritter claimed that Mr. Schmidt had raped her with knowledge that her accusation was false. By signing the Agreement, she represented and warranted that all sexual contact with Schmidt had been consensual. Yet, one month later, she told a WSJ reporter that Schmidt had assaulted her sexually. I find that in January 2025, she knew her accusation of rape was false when she uttered it.

e. *Damages*

The Schmidt Claimants seek to recover the $50,000 paid to Mr. Hiltzik to mitigate the harm caused by Ritter's defamatory statements to the WSJ reporter. Cl. Arb. Br. at 33. I find that they

are entitled to recover these damages under a tort theory of recovery as they were proximately caused by Ritter's defamation.[8]

However, because the Schmidt Claimants limited the scope of their defamation claim to the communications Ritter had with the WSJ reporter and did not base this tort claim on the disclosures made in the LA Lawsuit, I deny their request for reputational harm damages. The reputational harm arose out of the public disclosures in the LA Lawsuit, not the more limited act of communicating false information to the WSJ reporter.

**H. Request for Declaratory Relief**

**1. Schmidt Claimants' Request for Finding of Unclean Hands**

The Schmidt Claimants ask for a finding that Ms. Ritter's conduct constitutes unclean hands. Under California law, the doctrine of unclean hands is a defense and not an affirmative basis for relief. The doctrine demands that a plaintiff act fairly in the matter for which she seeks a remedy. "[She] must come into court with clean hands, and keep them clean, or [she] will be denied relief, regardless of the merits of [her] claim." Kendall-Jackson Winery, Ltd. v. Superior Ct., 76 Cal. App. 4th 970, 978, 90 Cal. Rptr. 2d 743, 749 (1999). I have found that Ms. Ritter released all claims against the Schmidt Claimants that accrued before December 4, 2024, and that she waived the right to seek damages from the Schmidt Claimants in this forum for any claims accruing after that date. As a result, the Schmidt Claimants' affirmative defense of unclean hands is not before me.

**2. Ritter Request to Rescind Agreement**

The Schmidt Claimants next request a finding that Ms. Ritter has not and cannot restore the pre-Agreement status quo and is thus not entitled to rescind or terminate the Agreement. Cl. Arb. Br. at 73. But Ritter waived any claim to rescind the Agreement by failing to prosecute that claim in this proceeding. There is no claim of rescission to be resolved here.

**3. Pending Attorney Fee Liens**

The Schmidt Claimants next ask for a finding that the pendency of two attorney fee liens preclude them from paying any compensation directly to Ms. Ritter under Schedule A(3) of the

[8] In the Interim Award, I did not address this requested relief. After reviewing the parties' pleadings submitted with the Schmidt Claimants' fee petition, I reviewed the arbitration briefs and realized I had not addressed this damage claim. I correct that oversight here.

Agreement. I find that the pendency of these liens constitutes an unfilled condition precedent under the Agreement such that payment of the $14 million is not due to Ms. Ritter.

## IV. ATTORNEY FEES AND COSTS, ARBITRATION FEES, AND FEES OF ARBITRATOR

The Schmidt Claimants seek an award of $1,372,877.19 in attorney fees and $376,464.43 in costs. Marcus Supp. Decl. at ¶17. Under California Civil Code §1717(a), in any action on a contract which provides for an award of attorney fees to the prevailing party, that party is entitled to an award of reasonable attorney fees and costs. Paragraph 3(g)(v) of the Agreement provides:

> The prevailing party in the arbitration sha11 be entitled to recover any and all costs, expenses, fees, expert fees, attorneys' fees, American Arbitration Association costs and fees, and the arbitrator's costs and fees incurred as a result of the arbitration; and the arbitrator shall award said costs and fees to the prevailing party.

Ex. 1. In the Interim Arbitration Award, I found that the Schmidt Claimants are the prevailing party and are entitled to an award of attorney fees and costs, expert fees, AAA costs and fees, and arbitrator costs and fees.

Ms. Ritter has raised general objections to any fee award and has raised specific objections to the fees the Schmidt Claimants' attorneys charged in this matter. I will address each set of objections separately.

### A. Ritter's General Objections to Fee Award

Ms. Ritter first challenges the finding that the Schmidt Claimants are the prevailing party and asks that I deny the fee petition in its entirety because the Interim Award "is subject to vacatur" under various provisions of the Federal Arbitration Act, the United States Constitution and Section 402(b) of the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (EFAA). Although none of these legal arguments are a basis for denying a fee petition, they are akin to a motion for reconsideration of the Interim Award.

As to the EFAA argument, the Los Angeles Superior Court considered and rejected Ms. Ritter's jurisdictional argument in its March 2, 2026, ruling. I agree with the Schmidt Claimants that this issue is a matter to be addressed either by a California appellate court or by the federal district court. It does not change my findings or legal conclusions on the causes of action before me.

With regard to Ritter's FAA arguments, the parties stipulated at the July 15, 2025, preliminary hearing that the California Arbitration Act (CCP §1281.85) and, not the FAA, applies to this arbitration. Nevertheless, even if the FAA applies, none of her arguments for vacatur are supported by this record.

Ritter first contends that I exceeded my authority by finding that her allegations of sexual assault were untrue. I disagree. California Code of Civil Procedure §1283.4 provides that an arbitration award "shall include a determination of all the questions submitted to the arbitrators the decision of which is necessary in order to determine the controversy." In the Schmidt Claimants' Second Amended Demand for Arbitration, they specifically alleged that Ms. Ritter "breached the Agreement by, *inter alia*, (a) disparaging and defaming Schmidt, including with false accusations of abuse; … (f) filing a false application for a temporary restraining order containing false and disparaging assertions . . .." They asserted causes of action against Ms. Ritter for breach of contract, defamation per se, and defamation per quod. In their arbitration brief, the Schmidt Claimants alleged that Ms. Ritter falsely claimed that Mr. Schmidt had sexually assaulted her, Cl. Arb. Br. at p. 10. They further alleged that after agreeing to execute a declaration in which she was to state, under oath, that all sexual contact with Mr. Schmidt had been consensual, she then breached the Agreement by "falsely assert[ing] that the Agreed Declaration was untrue." Cl. Arb. Br. at 16.

As to their defamation claim, they specifically alleged and argued that Ms. Ritter's statement to the Wall Street Journal reporter that Mr. Schmidt had sexually assaulted her was false, that she knew it was false, and that the statement was defamatory. Cl. Arb. Br. at 32. I was required by California law to resolve all disputes submitted to me. Thus, the truth or falsity of Ms. Ritter's allegation of sexual assault was directly at issue here and resolving that factual issue was necessary to determine Mr. Schmidt's claims.

Ms. Ritter next argues that I erred in finding her in default for nonpayment of arbitration fees and in refusing to hear evidence from her. This argument is factually unfounded. As my March 16, 2026, Order of Default makes clear, Ms. Ritter's knowing, intentional, and willful misconduct during this proceeding, including the refusal to participate in the arbitration, the refusal to produce documents, the failure to respond to discovery requests, and the failure to comply with

my discovery orders, formed the basis for my finding of default. It was not based on the nonpayment of arbitration fees.

Ms. Ritter also contends that asking opposing counsel to provide draft proposed orders for my consideration constituted an inappropriate "outsourcing" of my judicial drafting function justifying vacatur of the award under the FAA. It is routine practice in this jurisdiction for arbitrators and judicial officers to ask a prevailing party to submit a proposed order for the court's consideration. Indeed, in most jurisdictions, the rules of civil procedure require counsel to submit a proposed order with every motion they file. *See e.g.,* California Rules of Court, Rule 3.1312 (prevailing party to prepare and submit proposed order for court approval). As is my practice, I reviewed any draft order I received from counsel and edited it significantly to ensure that it accurately reflected my oral rulings. The fact that I asked counsel to submit proposed orders is not a basis for reconsidering the Interim Award or for denying the Schmidt Claimants' fee petition.

Ms. Ritter similarly suggests that my factual findings against her are "evident partiality" against a "pro se sexual assault reporter," whose fees are being paid by the perpetrator of abuse. Arbitrators and judicial officers must make hard credibility decisions on a daily basis. I ruled in Ms. Ritter's favor on several occasions, including in this award, when the law and facts supported her arguments. But I ruled against her when the law and facts supported the Schmidt Claimants. Neither Ms. Ritter's status as a pro se litigant, nor the fact that the Schmidt Claimants have advanced AAA fees for my work as the neutral in this arbitration played any role in my decision-making. The record does not support her claims of bias.

Finally, Ms. Ritter raises First Amendment, Fifth Amendment, and Fourteenth Amendment arguments. As I understand the First Amendment contention, Ms. Ritter suggests that she cannot be held liable for raising issues of public concern, citing Snyder v. Phelps, 562 U.S. 443, 452 (2011). But Snyder did not change the law of defamation. "When vigorous criticism descends into defamation," "constitutional protection is no longer available." ZL Techs., Inc. v. Does 1-7, 13 Cal. App. 5th 603, 611, 220 Cal. Rptr. 3d 569, 579 (2017) (quoting Ashcroft v. Free Speech Coalition, 535 U.S. 234, 245-246 (2002)(the First Amendment's speech protections do not extend to defamation); and Gertz v. Robert Welch, Inc., 418 U.S. 323, 340 (1974) ("there is no constitutional value in false statements of fact"; "[n]either the intentional lie nor the careless error

materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues")).

Ms. Ritter next argues that I somehow violated the Fifth Amendment by drawing an impermissible adverse inference from "a pro se respondent's exercise of her Fifth Amendment privilege in a quasi-criminal defamation posture" in violation of Spevack v. Klein, 385 U.S. 511 (1967) and Griffin v. California, 380 U.S. 609 (1965). Neither of these cases apply here. Spevack was an attorney disciplinary proceeding which the Supreme Court recognized as "quasi-criminal" because the state agency prosecuting the case had the power to revoke an attorney's license to practice law. It held that the state could not disbar an attorney solely for invoking a Fifth Amendment right to remain silent. 385 U.S. at 516. The Schmidt Claimants' case is not an attorney disciplinary proceeding and there is no state actor seeking to revoke a professional license. Spevack simply does not apply here.

Griffin is even less applicable. In that case, the Supreme Court held that the defendant's murder conviction and death sentence had to be reversed because the prosecutor inappropriately argued in closing that the defendant's failure to testify in his own defense was a basis for finding the defendant guilty. 380 U.S. at 612. This is not a criminal case in which a government actor seeks to impose imprisonment or death. Ms. Ritter never raised the Fifth Amendment in this private arbitration.

Finally, Ms. Ritter invokes the Fourteenth Amendment, suggesting she was denied due process in various ways, including the order denying her repeated stay requests, my decision to conduct a March 4, 2026, discovery conference without her participation, and my decision to set a briefing schedule for the prove-up hearing that gave her limited time to respond to the Schmidt Claimants' materials.

I have issued multiple orders addressing Ms. Ritter's stay requests and need not address the argument again. I similarly addressed Ms. Ritter's argument about notice of the March 4, 2026, discovery hearing in my March 5, 2026, Order to Show Cause. Finally, as for the briefing schedule, Ms. Ritter could have sought an extension of time to submit her response once she received the Schmidt Claimants' materials. She did not do so and her responsive brief was thorough and, in some cases, persuasive. I found in her favor on the Schmidt Claimants' fraudulent inducement claim and on some of their requests for relief.

I therefore overrule Ms. Ritter's general objections to the fee petition.[9]

**B. Ritter's Lodestar Objections to Fee Petition**

Ms. Ritter objects to the requested fee award, arguing that the number of hours spent by counsel were unreasonable or duplicative, not segregated between successful and unsuccessful claims, and disproportionate to the recovery. She also raises a number of objections as to the costs that the Schmidt Claimants incurred in discovery.

The fee setting inquiry begins with determining the "lodestar," or the number of hours reasonably expended multiplied by the reasonable hourly rate. PLCM Grp. V. Drexler, 22 Cal. 4th 1084, 1095 n. 5 (2000). "The touchstone figure may then be augmented or diminished by taking various relevant factors into account, including (1) the novelty and difficulty of the questions involved and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; and (3) the contingent nature of the fee award, based on the uncertainty of prevailing on the merits and of establishing eligibility for the award. Pulliam v. HNL Auto. Inc., 60 Cal. App. 5th 396, 406, 274 Cal. Rptr. 3d 547, 554–55 (2021).

**1. Reasonableness of Hourly Rates**

The reasonable hourly rate is the prevailing rate in the community for similar work. *Id.* Ms. Ritter has not challenged the reasonableness of the hourly rates charged by the Schmidt Claimants' attorneys at Glaser Weil Fink Howard Jordan & Shapiro LLP. Based on the materials submitted by Glaser Weil, I find the hourly rates to be reasonable because they are the prevailing rates in the community for similar work.

**2. Disproportionality of Fees to Award**

Ms. Ritter argues that the fees requests are not proportionate to the damages awarded. California courts, however, do not consider the amount of damages recovered in rendering a fee award. Concepcion v. Amscan Holdings, Inc., 223 Cal. App. 4th 1309, 1321 (2014). I also find that a fee request of $1.3 million compared to the award of over $10 million is not disproportionate.

[9] Ms. Ritter also pointed out some inconsistencies in my Interim Award. I have addressed her arguments by clarifying my rulings or by amending the decision to address issues or claims I did not address in full in the Interim Award.

**3. Apportionment Between Successful and Unsuccessful Claims**

Ms. Ritter argues that because the Schmidt Claimants did not prevail on their claim of fraudulent inducement, any time spent on that claim must be apportioned from the recoverable lodestar. The Schmidt Claimants contend apportionment is not possible because all of their claims arose out of a common set of facts and were based on overlapping legal theories.

When a claimant is successful, "the fact that he or she has prevailed on some claims but not on others is a factor to be considered in determining the amount of the fee awarded." Pulliam, 60 Cal. App. 5th at 407-408. Attorney's fees need not be apportioned between distinct causes of action where a claimant's various claims involve a common core of facts or are based on related legal theories. *Id.*

I conclude that the unsuccessful fraudulent inducement claim and the successful contract and tort claims involved a common core of facts and were based on related legal theories. It is therefore impossible to apportion the attorney fees between the unsuccessful and successful claims. I overrule Ms. Ritter's request for apportionment.

**4. Alleged Overstaffing**

Ms. Ritter next argues that this case did not warrant the work of multiple attorneys. The focus of my analysis, however, is not on the number of attorneys who might have worked on the matter over a period of 18 months, but instead on the actual number of hours each attorney expended in light of the complexity of the case and the issues involved. By my calculation, a total of 1,187.75 hours were spent investigating the claims, preparing pleadings in this arbitration, conducting discovery, attending hearings, and preparing the fee petition. This expenditure of time averages out to 66 hours per month, not an unreasonable amount of time given Ms. Ritter's intransigence in this case. I do not find that counsel overstaffed the case and therefore overrule Ms. Ritter's objection on this basis.

**5. LA Lawsuit Fees**

Ms. Ritter next argues that the fee petition may result in a double award of the legal fees incurred in the LA Lawsuit. I have reviewed the invoices attached to the fee petition and compared them to the invoices that were submitted as a part of the prove-up hearing exhibits to justify an award of damages for legal fees incurred in the LA Lawsuit, Ex. 34. This review leads me to

conclude that counsel did in fact remove all fees and costs incurred in the arbitration from Ex. 34 as the time entries and attorneys identified differ. This is consistent with counsel's declaration in which he testifies under oath that the law firm segregated the fees associated with the LA Lawsuit from the fees associated with this arbitration. I thus find that the fee petition does not include charges associated with the LA Lawsuit.

**6. Striking of Sanctions Award**

In the fee petition, the Schmidt Claimants ask that I strike the $25,000 sanctions award and instead assess one single attorney fee award. Ms. Ritter objects to this request, arguing that the sanctions order should stand on its own. The sanction award, however, has not been paid. I see no detriment to Ms. Ritter in granting this request. Striking the sanctions award and issuing a single fee award does not result in a double-count of time spent on the omnibus discovery motion. Indeed, striking the sanction order avoids the possibility of any double-counting. The request is therefore granted and Ms. Ritter's objection is overruled.

**7. Time Spent Authenticating Exhibit 73**

Finally, Ms. Ritter asks that I not award any fees associated with time spent authenticating Ex. 73. But counsel spent only minutes authenticating this document. Marcus Supp. Decl. at ¶4. Even if Ex. 73 was not properly admitted at the hearing, I did not rely on it in rendering my decision. Ms. Ritter stipulated in Schedule B of the Agreement that "there is an outstanding loan in the principal amount of $6,575,000 under that certain Multi-Draw Loan Agreement, dated December 1, 2021, by and between StarX, as borrower, and SPM, as lender." I see no basis for reducing counsel's fee request for any time dealing with Ex. 73. Ms. Ritter's objection is overruled.

**C. Objections to Requested Costs**

**1. Eric Rose's Expert Fees**

Ms. Ritter opposes the request for reimbursement of Eric Rose's expert witness fees. I find that these fees were necessarily incurred as a result of the arbitration and awardable under Section 3(g)(v) of the Agreement. Ms. Ritter's objection is overruled.

**2. Media data collection by Bullpen Strategy Group**

Ms. Ritter argues that the fees charged by Bullpen Strategy Group to monitor the internet and collect data relating to Mr. Schmidt for Eric Rose's expert report is not compensable under the Agreement. I disagree. Mr. Rose used this data in developing his opinions on the amount and content of internet traffic relating to Ms. Ritter's unfounded accusations against Mr. Schmidt. I find this expense to be necessarily incurred as a result of the arbitration under Section 3(g)(v) of the Agreement.

**3. RSI Monitoring of Public Social Media Sites**

Ms. Ritter next objects to the fees incurred by RSI to monitor Ms. Ritter's public social media sites to identify any posts relating to the Schmidt Claimants. I find that RSI was not conducting surveillance of Ms. Ritter, as she argues, but was instead identifying instances when Ms. Ritter breached the Agreement by posting confidential or disparaging information about Mr. Schmidt. This research was necessarily incurred to gather evidence of Ms. Ritter's breaches of the Agreement. The fees charged by RSI are therefore recoverable under Section 3(g)(v) of the Agreement.

**4. Attempted Service of Subpoenas on Ritter Parents**

Finally, Ms. Ritter objects to an award of costs paid to a process server for attempting to locate and serve subpoenas on Ms. Ritter's parents. Ms. Ritter claims that because service was unsuccessful, the Schmidt Claimants should not be able to recover the cost of this service of process. I am unaware of any legal support for Ms. Ritter's argument. The evidence before me is that Shamim and Terry Ritter evaded service of process and that RSI billed the Schmidt Claimants over $8,000 in the effort to locate and serve these individuals. I see no basis for rejecting the request for reimbursement of this expense. The objection is thus overruled.

**D. AAA Administrative Fees and Arbitrator Compensation**

Paragraph 3(g)(v) of the Agreement provides that the prevailing party is entitled to recover "American Arbitration Association costs and fees, and the arbitrator's costs and fees incurred as a result of the arbitration; and the arbitrator shall award said costs and fees to the prevailing party." Pursuant to the parties' agreement, I award 100% of AAA's administrative fees and 100% of the arbitrator compensation to the Schmidt Claimants.

The administrative fees and expenses of the American Arbitration Association totaling $16,745.00 shall be borne $16,745.00 by Michelle Ritter, and the compensation and expenses of the arbitrator totaling $63,420.00 shall be borne $63,420.00 by Michelle Ritter. Therefore, Michelle Ritter shall pay Hillspire, LLC, Orion Wing, LLC fka Steel Perlot LLC, Orion Wing Investments, LLC, and Eric Schmidt an amount of $80,165.00.

## V. CONCLUSION

Based on the foregoing analysis, I find in favor of the Schmidt Claimants on their breach of contract claims and their defamation claim. I award total damages in the amount of $10,744,999, as summarized below. I further award attorney fees of $1,372.877.19, and costs of $376,464.43. Finally, I award the Schmidt Claimants AAA administrative fees of $16,745.00, and arbitrator compensation of $63,420.00.

**Summary of Final Arbitration Award**

| Claim | Damage Award |
|---|---|
| Value of property missing from Paley | $1,183,429.00 |
| Failure to vacate Paley property by deadline | $21,550.00 |
| Disclosures to WSJ reporter | $50,000.00 |
| Legal fees to defend LA Lawsuit | $1,409,882.00 |
| Mitigation Damages – Reputational Harm | $8,080,138.00 |
| Subtotal | $10,744,999.00 |
| Fees & Costs of Arbitration | Attorney Fees & Costs Award |
| Attorney fees awarded | $1,372,877.19 |
| Costs awarded | $376,464.43 |
| AAA administrative fees | $16,745.00 |
| AAA arbitrator compensation | $63,420.00 |
| Subtotal | $1,829,506.62 |
| | |
| TOTAL AWARD | $12,574,505.62 |

This FINAL AWARD is full settlement of all claims, counterclaims, and defenses that the parties submitted or could have submitted in this arbitration relating to or arising out of the December 4, 2024, Agreement and the December 17, 2024, Amendment to the Agreement.

Dated: June 4, 2026.

Beth Andrus

Judge Beth M. Andrus (ret.)
Arbitrator