Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)

First Amended Complaint

# EXHIBIT 40

Google Workspace Terms of Service; Complaint, Ritter v. Google LLC et al., No. 25CV475336 (Santa Clara Super. Ct., filed Sept. 18, 2025); Request for Dismissal (Nov. 18, 2025)

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

(ENDORSED)
FILED
SEP 18 2025
Clerk of the Court
Superior Court of CA County of Santa Clara
BY A. HERNANDEZ DEPUTY

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
Google LLC; Alphabet Inc.; and DOES 1 through 100 inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
Michelle Ritter

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

***¡AVISO!*** *Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
**Downtown Superior Court (DTS)**
**191 North First Street**
**San Jose CA 95113**

CASE NUMBER:
*(Número del Caso):*
25CV475336

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
**Michelle Ritter in pro per** **510-828-7772**
**269 S. Beverly Dr. #1315 Beverly Hills CA 90212**

DATE: *(Fecha)* SEP 18 2025 Clerk of the Court Clerk, by *(Secretario)* A. HERNANDEZ, Deputy *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

THE GREAT SEAL OF THE STATE OF CALIFORNIA
EUREKA

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☐ on behalf of *(specify)*:

under: ☐ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify)*:

4. ☐ by personal delivery on *(date)*:

**CM-010**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Michelle Ritter In pro per
269 S. Beverly Dr., #1315, Beverly Hills, CA 90212

TELEPHONE NO.: 510-828-7772 FAX NO. :
EMAIL ADDRESS: ritter_legal@outlook.com
ATTORNEY FOR *(Name):* Michelle Ritter (in pro per)

*FOR COURT USE ONLY*

(ENDORSED)
FILED
SEP 18 2025
Clerk of the Court
Superior Court of CA County of Santa Clara
BY A. HERNANDEZ DEPUTY

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Santa Clara
STREET ADDRESS: 191 North First Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Jose 95113
BRANCH NAME: Downtown Superior Court (DTS)

CASE NAME:
Michelle Ritter v. Google LLC et al.

**CIVIL CASE COVER SHEET**

[x] **Unlimited** (Amount demanded exceeds $35,000)
[ ] **Limited** (Amount demanded is $35,000 or less)

**Complex Case Designation**

[ ] Counter [ ] Joinder

Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

CASE NUMBER: 25CV475336

JUDGE:

DEPT.:

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[x] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [x] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply):* a. [x] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [x] punitive
4. Number of causes of action *(specify):* 9
5. This case [ ] is [x] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: September 18, 2025

Michelle Ritter
(TYPE OR PRINT NAME)

▶ [signature]
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

MICHELLE RITTER, in pro per
269 S. Beverly Dr. #1315
Beverly Hills, CA 92102
Tel.: (510)-828-7772
Email: ritter_legal@outlook.com

(ENDORSED)
FILED
SEP 18 2025
Clerk of the Court
Superior Court of CA County of Santa Clara
BY A. HERNANDEZ DEPUTY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SANTA CLARA**

**Unlimited Jurisdiction**

MICHELLE RITTER,

Plaintiff,

v.

GOOGLE LLC; ALPHABET INC.; and DOES 1 through 100 inclusive

Defendants.

Case No.: 25CV475336

**COMPLAINT FOR**

1. **Breach of Contract**
2. **Breach of the Implied Covenant of Good Faith and Fair Dealing**
3. **Negligence**
4. **Conversion**
5. **Trespass to Chattels**
6. **Violation of California Computer Data Access and Fraud Act (Cal. Penal Code ¬§ 502)**
7. **Misappropriation of Trade Secrets (Cal. Civ. Code §3426 et seq.)**
8. **Declaratory Relief**
9. **Injunctive Relief**

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

1. Plaintiff Michelle Ritter ("Plaintiff" or "Ritter") brings this action against Defendants Google LLC and Alphabet Inc. (together, "Defendants") seeking declaratory and injunctive relief, as well as damages for breach of contract, negligence, and conversion arising from Defendants' wrongful conduct concerning her Google Workspace account for SteelPerlot.com (the "Workspace").

2. Plaintiff seeks immediate restoration of her access to the Workspace and the return of all information and materials contained therein. She further seeks damages resulting from Defendants' wrongful denial of access, their failure to safeguard her data, and their unauthorized disclosure of her private, confidential, proprietary, and trade secret information, both within the Workspace, and other workspaces owned directly or indirectly by her including her StarX.com workspace, her Audem-Mgmt.com workspace, and in her associated personal Google accounts.

3. Plaintiff is the sole and rightful owner of the SteelPerlot.com domain. She has maintained and currently maintains ownership of the domain and personally paid for the subscription fees for the Workspace associated with it until it was illegally transferred or enabled for transfer by Defendants in December 2024.

4. Despite her ownership and payment of all fees, and despite Defendants' Terms of Services requiring ownership of the domain for ownership of the Workspace, Defendants have, for over nine months, deprived Plaintiff of access to her Workspace, transferred control of it to others without authorization or notice, and converted—or permitted others to convert—her documents, data, and other materials, including highly sensitive private, confidential, proprietary, and trade secret information. This includes the transfer of all assets therein to other workspaces, including SchmidtEntity.co, with such workspace including identity theft of Michelle Ritter and other individuals.

5. Defendants have further disclosed and released Plaintiff's sensitive information to unauthorized third parties, compounding the harm caused by their misconduct; this includes enabling the transfer of StarX Neworks Inc. intellectual property and trade secret information to OpenAI via SteelPerlot.com workspace aka SchmidtEntity.co workspace in April 2025.

6. Defendants have further failed to protect Plaintiff's data privacy and security across her personal and business accounts, with data privacy issues having been repeatedly flagged to Google and relevant executives and board members.

7. Plaintiff therefore brings this action to vindicate her rights, secure the return and protection of her Workspace content, and obtain compensation for the substantial damages she has suffered.

**PARTIES**

8. Plaintiff Michelle Ritter ("Ritter") is an individual residing in Los Angeles County, California.

9. Defendant Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California, doing business in Santa Clara County.

10. Defendant Alphabet Inc. is a Delaware corporation with its principal place of business in Mountain View, California, doing business in Santa Clara County.

11. The true names and capacities, whether individual, corporate, associate, or otherwise, of Respondents sued herein as DOES 1 through 100, inclusive, are unknown to Plaintiff at this time, who therefore sues said Respondents by such fictitious names pursuant to California Code of Civil Procedure section 474. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named DOE Respondents is in some manner legally responsible for, participated in, directed, ratified, or otherwise contributed to the acts, omissions, concealments, breaches, or other misconduct alleged in this Petition, including but not limited to fraudulent inducement and concealment in connection with the settlement agreement, breaches of contractual obligations, and wrongful efforts to compel arbitration.

12. Plaintiff will amend this Petition to allege the true names and capacities of said DOE Respondents when the same have been ascertained.

13. Plaintiff is informed and believes, and thereon alleges, that at all times relevant herein, each of the Respondents, including DOES 1 through 100, was the agent, servant, employee, officer, director, partner, joint venture, shareholder, alter ego, successor, assignee, parent, subsidiary, affiliate, and/or co-conspirator of each of the remaining Respondents, and in doing the acts and omissions

alleged in this Petition, was acting within the course and scope of such relationship, and with the permission, ratification, and consent of the other Respondents.

**JURISDICTION AND VENUE**

14. This Court has jurisdiction pursuant to Code of Civil Procedure § 1060 and related provisions, as an actual controversy exists between the parties concerning the ownership, and rights of access of materials in the Workspace and the data privacy and protections involving personal and professional accounts maintained or housed by Google LLC and/or Defendants.

15. Venue is proper in this Court because Defendants are located in this County.

**GENERAL ALLEGATIONS**

**BACKGROUND & OWNERSHIP**

16. Plaintiff is the rightful and personal owner of the domain SteelPerlot.com and the assets therein, including the Workspace. As of 2021, Ritter or one of her entities has continuously maintained ownership of the SteelPerlot.com domain. Ritter had personally paid subscription fees associated with the Google Workspace account linked to it, even through the end of 2024 and even following the attempts by her former business partner and former Google CEO and Chairman to block all business activity that Ritter was pursuing, which pertains to a separate case referenced below.

17. For years, Ritter has maintained a paid Google Workspace subscription pursuant to Defendants' agreements, Terms of Service, and representations. A true and correct copy of Defendants' Terms of Service is attached hereto as Exhibit A.

18. Plaintiff stored private, confidential, proprietary, and trade secret information within her Workspace account, including materials essential to her business and livelihood.

19. The Workspace contained highly sensitive business records and data, including those belonging to various business entities to which Plaintiff had an ownership and/or management interest. These include without limitation: (a) Steel Perlot Investments LLC information; (b) StarX Networks Inc. intellectual property, state and federal tax records; (c) Audem Management LLC materials; (d) Steel Perlot Management LLC entity records, including financial, accounting, and tax records (federal and state) which have been disputed by Plaintiff in other controversies; (e) stock certificate records pertaining to other businesses which Ritter has an interest, including Knox

Networks Inc. (on information and belief, now Knova Financial); (f) Ritter's personal financial, accounting, and tax records (federal and state); (g) attorney-client privileged communications for various controversies, including pertinent evidence to this case; and (h) additional confidential business and personal information, including medical records, investment records, educational records, financial information, and information pertinent to abuse, harassment, and federal claims.

20. The assets and evidence within the SteelPerlot.com Workspace also include information relevant to Plaintiff's protections under CCP § 1001-1002, harassment and retaliation records, ABA 3.7 issues, and state- and federal-level corporate fraud, conversion, and other claims.

**RELEVANCE TO EXISTING LITIGATION**

21. Plaintiff Ritter is a party in an active litigation in Los Angeles Superior Court, *Michelle Ritter v. Eric Schmidt, Hillspire LLC et al.*, Case No. 25STCV26114 ("*Ritter v. Schmidt et al.*"). Many of the subject Workspace documents are of critical importance to the *Ritter v. Schmidt et al.* matter, other litigation proceedings, and Ritter's and her entities' efforts to work with various government agencies, organizations, and individuals – in the US and internationally – to ensure accurate financial and tax records as well as other securities and data matters. The withholding or denial of access to these records is prejudicial to Ritter.

22. Defendants in the *Ritter v. Schmidt et al.* matter had previously fraudulently induced and forced an assignment of Ritter's Steel Perlot Management LLC stake in December 2024. In pleadings in the *Ritter v. Schmidt et al.* case on September 9, 2025 presented by Schmidt's counsel under penalty of perjury in the Los Angeles Superior Court, Schmidt and parties thereafter represented that over 9 months from the forced assignment of Steel Perlot Management LLC assets, "Ritter is the managing member of SPM" (i.e., Steel Perlot Management LLC).

23. Thus, Defendants in the *Ritter v. Schmidt et al.* case have specifically represented in legal pleadings on September 9, 2025 in Superior Court of Los Angeles that Ritter is in control of Steel Perlot Management LLC, even until today, removing any outlier explanations for breach, for the sake of Defendants in this matter as to Ritter's ownership and "control" of Steel Perlot Management LLC and regardless of the fact that SteelPerlot.com Workspace has historically and should still maintain assets prevalent to at least all items in Paragraph 19.

**REPEATED NOTICES OF SECURITY CONCERNS & BREACHES IN 2024**

24. Despite Plaintiff's continued payment and following Plaintiff's repeated notices to Google prior to December 2024, Defendants wrongfully denied Plaintiff secure and stable access to her Workspace account, other business accounts, and personal accounts.

~~25.~~ Beginning in or about June 2024, Ritter repeatedly notified Google in writing of data breaches, unauthorized access, and irregularities within not only her business Google Workspaces that she owned but also her personal Google accounts. These breaches singularly pertained to business and personal matters involving Ritter, Eric Schmidt, and his various entities.

26. On November 7, 2024, Ritter sent yet another formal letter to Google regarding breaches and unauthorized access. Later that same day, Eric Schmidt and his affiliates—named parties in a related controversy pending in Los Angeles Superior Court—illegally took Ritter's parked vehicle and her personal computer while she was at a family lunch in Malibu, CA The computer holding evidence of security breaches to Ritter's Google accounts. This once again demonstrated insider influence and access to confidential information, further piercing Google's alleged privacy protections.

27. On or about December 6, 2024, Ritter provided temporary administrative access to the Workspace to a third-party IT group in order to provide a complete copy of the Workspace to Schmidt and various other parties. Instead, she was unlawfully locked out of her SteelPerlot.com Workspace and repeatedly advised that such access would be restored immediately.

28. On December 9, 2024, Plaintiff was temporarily restored access, but within one hour, was once again locked out of her Workspace without justification or notice.

29. Ritter filed a Domestic Violence Restraining Order related in part to the theft of her assets and livelihood in December 2024. She was forced to withdraw said DVRO under duress and with a promised commitment of receiving the Workspace back in order to reflect her ownership of the SteelPerlot.com domain.

30. Defendants wrongfully transferred control of Plaintiff's Workspace to unauthorized parties, denied her access for over nine months, and converted or permitted the conversion of her documents, data, and other proprietary materials.

31. Ritter notified Google and demanded restoration of her Workspace rights, but Google failed to take corrective action.

32. In January 2025, Ritter informed not only Google and Defendants but also an Alphabet board member of these breaches and ongoing unauthorized access.

33. Despite receiving clear notice, Defendants failed to remedy and secure accounts, failed to preserve evidence, and failed to take corrective action, thereby materially breaching their contractual and legal obligations.

34. Shortly thereafter, Defendants enabled the transfer of all assets from the Steel Perlot.com Workspace to a SchmidtEntity.co workspace.

35. In the following months into early 2025, Defendants enabled disclosure or release of Plaintiff's sensitive information to unauthorized third parties.

**TRADE SECRET WITHHOLDING AND TRANSFER TO THIRD PARTIES IN 2025**

36. Following the December 2024 lockout of Ritter from her SteelPerlot.com Workspace and the continued breaches, the SteelPerlot.com Workspace and its associated emails had been transferred to SchmidtEntity.co in January 2025, including newly created email accounts impersonating Ritter (e.g., MRitter@SchmidtEntity.co) and potentially others.

37. Further, in August 2024, Ioannis P., head of engineering for Ritter's businesses —who also provided shared technical services to multiple business entities, including Keeta, Knox, and StarX—was paid to resign by Schmidt and affiliated parties. Shortly thereafter, he was hired by Defendant Google as a Principal Engineer in Fall 2024.

38. In April 2025, Ritter discovered that critical IP and tax data from her former SteelPerlot.com Workspace—now under SchmidtEntity.co—had been accessed and downloaded by third parties, including OpenAI. Access was apparently obtained through aforementioned former employee Ioannis P., now working for Google and/or another affiliate.

39. Ritter specifically discovered that critical StarX Networks Inc. intellectual property had been accessed and downloaded by an OpenAI employee, who had previously been engaged in business discussions with StarX Networks Inc., a company created by Ritter in 2020 and confirmed by Schmidt and parties to be wholly owned by Ritter. Ritter promptly reported these issues to Google,

the Schmidt parties, and Ioannis P., asking for direct clarification. Ritter had additionally contacted an OpenAI executive at the instance of this discovery, despite the data issue residing solely with Google and Defendants.

**ENABLING ONGOING HARM**

40. Defendants negligently, knowingly, or intentionally allowed third parties unauthorized access to Plaintiff's Workspace account and its contents. Defendants have enabled individuals and entities with significant Google and Alphabet share ownership, namely Eric Schmidt, his beneficiaries, and his family office, Hillspire LLC, to exercise control and influence as corporate insiders, despite not being deemed as such in public shareholder filings. Part of the Workspace matters pertain to records wherein Plaintiff has raised questions about the validity of Schmidt and Hillspire's compliance with the Investment Advisors' Act. Part of the records also involve emails being forwarded and redirected to Schmidt's family office at Hillspire LLC, in connection with tax, financial, and filing information. Defendants violated, in part, their own Terms of Services, which require ownership of a domain in order to maintain a Google Workspace.

41. A controversy exists as to the Plaintiff's ownership interests and right to access the Information. Plaintiff seeks declaratory relief under CCP §1060.

42. Google's own Terms of Service for require that the customer and domain owner retain control of the associated Workspace account. Ritter, as the domain owner, retained all rights under these provisions. Despite this, Defendants improperly permitted the transfer of control of the SteelPerlot.com Workspace in violation of its own contractual obligations.

43. As a direct and proximate result, Plaintiff has suffered loss of access to her own property, disclosure of confidential and trade secret information, business and financial damages, and other harm.

**OVERALL BREACHES**

44. Further, Google has enabled, or been negligent in enabling, individuals—including but not limited to Schmidt and his affiliates—who are not formally deemed Google "insiders" under SEC public company rules, to exercise influence and gain unauthorized access to Ritter's accounts and data, in violation of Google's own Terms of Service, data privacy obligations, and applicable law.

45. On information and belief, Google's failures have facilitated theft, misuse of intellectual property, alteration of tax data, and violations of securities and investment regulations, including undisclosed trading in Google shares by entities connected to Schmidt and other individuals, including by Google's and / or Defendants' own employees.

46. Ritter repeatedly advised Google and Defendants, beginning in June 2024, of evidence of targeted data alteration, deletion, and breaches within her SteelPerlot.com Workspace, other Workspaces that she wholly owned, and her personal Google accounts. These issues implicate not only Ritter's rights but also raise broad concerns for all individuals and companies using Google products.

47. **General reliance on Google Workspaces:** In general, Ritter subscribed to the Google Workspace on behalf of herself and her business entities, entering into a paid contractual relationship with Defendants. Through this subscription, Ritter expected heightened reliability, data protection, and responsive customer support, especially when her business communications and records were at stake. Defendants expressly and impliedly undertook obligations to maintain uninterrupted access, safeguard business-critical data, and promptly respond to reports of unauthorized access or breaches. Beginning in or about June 2024, Ritter personally and repeatedly notified Defendants of ongoing breaches, targeted deletion, and data manipulation that were undermining her ability to conduct her professional affairs. Despite these notices, Defendants failed to fully investigate or correct the violations, and Defendants failed to account for the severity of potential and actual interference in Ritter's Google accounts via former Google and Defendant executives and insiders. Their disregard, despite clear evidence and repeated pleas for assistance, reflects not just neglect but bad faith, malice, and a willful disregard of Ritter's rights as both a paying business customer and an individual seeking basic digital security.

48. **Consumer rights:** Plaintiff Ritter, as an individual consumer and long-time Gmail user, entrusted her most personal communications, records, and digital identity to Google under the belief that Defendants would uphold their contractual Terms of Service and industry-standard duties of data privacy and security. Ritter reasonably relied on Google and Defendants to provide consistent and reliable access to her Gmail account, to preserve the integrity of her private communications, and

to shield her personal data from intrusion, alteration, or loss. Defendants owed Ritter these duties, along with the implied covenant of good faith and fair dealing, which forbids arbitrary conduct that would strip her of the benefits she reasonably expected from the contract. By allowing unauthorized parties to gain access to Ritter's Gmail accounts, tolerating the alteration and deletion of her personal data, and interfering with her ability to access her account in an arbitrary and unexplained manner, Defendants betrayed those duties. These acts were not accidental; they were carried out with conscious disregard and oppression toward Ritter's rights, thereby justifying an award of punitive damages, including potentially enabling significant shareholders who are allegedly non-insiders per public filings of Google and Defendants to exercise extraordinary influence while Google and Defendants turned a blind eye, at a minimum.

49. **Broader Implications:** The harm to Ritter is profound—spanning her entire life – personal and professional—but Defendants' conduct also demonstrates a larger pattern of disregard that threatens the public at large. By consciously ignoring evidence of account breaches and data manipulation, Defendants acted with fraudulent intent, withholding from Ritter and others the secure, trustworthy, and good-faith services they marketed and promised. Defendants' actions reveal a systemic willingness to place consumers and paying business customers at risk in order to avoid accountability. Their conduct toward Ritter was malicious, oppressive, and fraudulent, warranting not only compensatory damages for her individual losses but also punitive damages sufficient to deter such misconduct in the future.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION – BREACH OF CONTRACT

**(Against Defendants Google LLC and Alphabet Inc.)**

50. Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

51. Defendants and Plaintiff entered into valid and enforceable contracts, including but not limited to Defendants' Terms of Service governing Plaintiff's Gmail account and Defendants' Google Workspace Agreement governing Plaintiff's paid Workspace account associated with the domain SteelPerlot.com (collectively, the "Agreements").

52. Under the Agreements, Defendants were obligated to: (a) provide Plaintiff with continued and reliable access to her Google accounts; (b) safeguard and preserve the data, documents, and information stored therein; (c) prevent unauthorized access by third parties; and (d) honor the rights of the domain owner—including Plaintiff—to retain control over the associated Workspace account.

53. Plaintiff fully performed all obligations required of her under the Agreements, including paying all subscription fees and complying with the stated terms and conditions.

54. Defendants materially breached the Agreements by, among other things: (a) denying Plaintiff access to her Workspace account despite her continued ownership and payment; (b) transferring control of the Workspace to unauthorized third parties; (c) permitting unauthorized access, alteration, and conversion of Plaintiff's confidential, proprietary, and trade secret information; and (d) failing to investigate or correct the breaches after repeated notice from Plaintiff.

55. As a direct and proximate result of Defendants' breaches, Plaintiff has suffered damages, including but not limited to: loss of access to her Workspace and Gmail accounts; loss, misuse, and disclosure of confidential and proprietary data; business and financial damages; and other consequential and general damages in an amount to be proven at trial.

## **SECOND CAUSE OF ACTION – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

**(Against Defendants Google LLC and Alphabet Inc.)**

56. Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

57. Every contract in California contains an implied covenant of good faith and fair dealing. This covenant requires that neither party do anything to unfairly interfere with the right of the other to receive the benefits of the contract.

58. Plaintiff and Defendants entered into valid and enforceable contracts, including but not limited to Defendants' Terms of Service governing Plaintiff's Gmail account and Defendants' Google Workspace Agreement governing Plaintiff's paid Workspace account associated with the domain SteelPerlot.com (collectively, the "Agreements").

59. Plaintiff fully performed her obligations under the Agreements, including maintaining ownership of the SteelPerlot.com domain, paying all required subscription fees, and complying with all applicable terms and conditions.

60. Defendants breached the implied covenant of good faith and fair dealing by, among other things: (a) arbitrarily and without justification denying Plaintiff access to her Workspace and Gmail accounts; (b) permitting unauthorized third parties to assume control over Plaintiff's Workspace; (c) failing to safeguard Plaintiff's confidential, proprietary, and trade secret information despite repeated notice of breaches and irregularities; (d) failing to safeguard Plaintiff's confidential, proprietary, and trade secret information despite repeated notice of breaches and irregularities; (e) failing to safeguard Plaintiff's confidential, proprietary, and trade secret information despite repeated notice of breaches and irregularities;

61. Defendants' actions and omissions unfairly frustrated Plaintiff's justified expectations under the Agreements, including her right to secure access, control, and protection of her Workspace and related Google accounts.

62. As a direct and proximate result of Defendants' breaches of the implied covenant, Plaintiff has sustained damages, including but not limited to: loss of access to her Workspace and Gmail accounts; disclosure and misuse of her confidential and proprietary data; disruption to her businesses; and financial and consequential damages in an amount to be proven at trial.

**THIRD CAUSE OF ACTION – NEGLIGENCE**

**(Against Defendants Google LLC and Alphabet Inc.)**

63. Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

64. At all relevant times, Defendants owed Plaintiff a duty of reasonable care in operating, managing, and securing her Google Workspace and Gmail accounts. This duty included, but was not limited to: (a) safeguarding Plaintiff's private, confidential, proprietary, and trade secret information; (b) preventing unauthorized access by third parties; (c) maintaining the integrity and availability of Plaintiff's data; and (d) responding appropriately to Plaintiff's repeated reports of breaches, irregularities, and unauthorized access.

65. Defendants breached these duties of care by, among other things: (a) transferring control of Plaintiff's Workspace account to unauthorized third parties; (b) allowing unauthorized access, alteration, deletion, and conversion of Plaintiff's confidential and proprietary data; (c) failing to investigate, correct, or prevent ongoing breaches despite repeated written notice from Plaintiff beginning in June 2024; (d) failing to preserve critical evidence after being notified of breaches and irregularities; and (e) ignoring industry standards and their own contractual representations regarding data security, confidentiality, and account control.

66. As a direct and proximate result of Defendants' negligence, Plaintiff has suffered substantial harm, including but not limited to: (a) loss of access to her Workspace and Gmail accounts; (b) loss, misuse, and disclosure of confidential, proprietary, and trade secret information; (c) disruption of her business operations; (d) financial damages and lost economic opportunities; and (e) consequential and general damages in an amount to be proven at trial.

67. Defendants' conduct also constitutes gross negligence, recklessness, and willful indifference to Plaintiff's rights and interests.

68. Plaintiff is entitled to recover compensatory damages, consequential damages, and all other relief as the Court deems just and proper.

**FOURTH CAUSE OF ACTION – CONVERSION**

**(Against Defendants Google LLC and Alphabet Inc.)**

69. Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

70. Plaintiff is, and at all relevant times has been, the rightful owner of, and entitled to possession of, the data, documents, communications, and information stored within her Google Workspace account associated with the domain SteelPerlot.com, as well as within her related Gmail accounts (collectively, the "Property").

71. The Property includes Plaintiff's private, confidential, proprietary, and trade secret information, as well as personal and business records essential to her livelihood.

72. Without Plaintiff's consent or legal justification, Defendants wrongfully transferred control of the Workspace to unauthorized third parties, denied Plaintiff access to her own Property, and allowed others to access, alter, delete, and misuse it.

73. Defendants' conduct constitutes a wrongful exercise of dominion and control over Plaintiff's Property, inconsistent with Plaintiff's rights of ownership and possession.

74. As a direct and proximate result of Defendants' conversion, Plaintiff has suffered substantial damages, including but not limited to: loss of access to her Property; disclosure and misuse of confidential and trade secret information; disruption of her business operations; and financial and consequential damages in an amount to be proven at trial.

75. Defendants' acts of conversion were willful, malicious, and oppressive, carried out with conscious disregard of Plaintiff's rights. Plaintiff is therefore entitled to an award of punitive and exemplary damages in addition to compensatory damages.

**FIFTH CAUSE OF ACTION – TRESPASS TO CHATTELS**

**Against Defendants Google LLC and Alphabet Inc.)**

76. Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

77. Defendants' acts substantially interfered with Plaintiff's possessory rights in her Property.

78. As a direct and proximate result, Plaintiff suffered harm including loss of access to her accounts, loss and misuse of confidential and trade secret information, business disruption, and financial damages in an amount to be proven at trial.

79. Defendants' conduct was willful, malicious, and oppressive, entitling Plaintiff to punitive damages in addition to compensatory damages.

**SIXTH CAUSE OF ACTION – VIOLATION OF CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT (PENAL CODE § 502)**

**(Against Defendants Google LLC and Alphabet Inc.)**

80. Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

81. Defendants knowingly permitted access, use, and interference with Plaintiff's stored data without authorization.

82. Plaintiff's Google Workspace and Gmail accounts are "computers," "computer systems," and "computer networks" as defined in Penal Code § 502(b).

83. Plaintiff is the rightful owner and authorized user of these accounts.

84. Defendants, and those acting in concert with them, knowingly and without permission: (a) accessed and took data from Plaintiff's accounts in violation of Penal Code §502(c)(1); (b) used and disclosed Plaintiff's data in violation of §502(c)(2); (c) disrupted and denied Plaintiff's access to her accounts in violation of §502(c)(5); (d) introduced and enabled the introduction of instructions and code to alter and delete data in violation of §502(c)(7); and (e) otherwise engaged in conduct prohibited by §502.

85. As a direct and proximate result of Defendants' violations, Plaintiff has suffered damages including loss of access to her data, misuse and disclosure of confidential and trade secret information, loss of business opportunities, and consequential financial harm.

86. Plaintiff is entitled to compensatory damages, injunctive relief, and other equitable relief as authorized by Penal Code §502(e)(1).

87. Plaintiff is further entitled to punitive damages and recovery of attorneys' fees and costs under Penal Code §502(e)(2).

**SEVENTH CAUSE OF ACTION – MISAPPROPRIATION OF TRADE SECRETS (CAL. CIV. CODE § 3426 ET SEQ.)**

**(Against Defendants Google LLC and Alphabet Inc.)**

88. Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

89. Plaintiff possessed and maintained trade secrets within her Google Workspace and Gmail accounts, including but not limited to: (a) proprietary business plans, strategies, and investment analyses relating to Steel Perlot Investments LLC and affiliated entities; (b) intellectual property, research, and technical documentation related to StarX Networks Inc.; (c) confidential financial, contractual, and tax information relating to multiple business entities; and (d) personal financial and

business data of Plaintiff necessary for the operation and management of her ventures (collectively, the "Trade Secrets").

90. These Trade Secrets derive independent economic value from not being generally known to the public or to other persons who could obtain economic value from their disclosure or use. Plaintiff took reasonable steps under the circumstances to maintain their secrecy and confidentiality, including limiting access, using password-protected accounts, and storing them in her secured Workspace environment.

91. Defendants, without consent, misappropriated Plaintiff's Trade Secrets by: (a) transferring control of her Workspace account to unauthorized third parties; (b) allowing unauthorized individuals access to, use of, and disclosure of the Trade Secrets; (c) failing to take reasonable measures to safeguard the Trade Secrets after repeated notice of breaches; and (d) permitting alteration, deletion, misuse, and conversion of the Trade Secrets for the benefit of unauthorized individuals.

92. Defendants' conduct constitutes "misappropriation" as defined by Civil Code §3426.1(b), including both improper acquisition and improper disclosure and use of Plaintiff's Trade Secrets.

93. As a direct and proximate result of Defendants' misappropriation, Plaintiff has suffered, and continues to suffer, damages, including loss of the value of her Trade Secrets, loss of business opportunities, financial harm, and other consequential damages in an amount to be proven at trial.

94. Defendants' misappropriation was willful and malicious, entitling Plaintiff to an award of exemplary damages and reasonable attorneys' fees under Civil Code ¬ß§3426.3(c) and 3426.4.

95. Plaintiff has suffered and will continue to suffer irreparable harm for which she has no adequate remedy at law. Accordingly, Plaintiff is entitled to injunctive relief under Civil Code §3426.2, including orders restraining Defendants from further using, disclosing, or benefiting from Plaintiff's Trade Secrets and requiring Defendants to take affirmative steps to preserve and return such information.

**EIGHTH CAUSE OF ACTION – DECLARATORY RELIEF**

**(Against Defendants Google LLC and Alphabet Inc.)**

96. Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

97. Under California Code of Civil Procedure section 1060 et seq., a Court may declare rights, status, and other legal relations whether or not further relief is or could be claimed.

98. An actual and justiciable controversy has arisen and now exists between Plaintiff and Defendants concerning their respective rights and obligations under Defendants' Terms of Service and Workspace Agreements, including Plaintiff's ownership, control, and access rights to her Workspace account associated with the SteelPerlot.com domain.

99. Plaintiff contends, and is informed and believes Defendants deny, that: (a) Plaintiff is the rightful owner of the SteelPerlot.com domain and Workspace account; (b) Plaintiff is entitled to access, control, and possession of her Workspace data and accounts; and (c) Defendants wrongfully transferred control, denied Plaintiff access, and permitted unauthorized third-party access in violation of contractual, statutory, and common law obligations.

100. Declaratory relief is necessary and proper under Code of Civil Procedure § 1060 to determine the respective rights and obligations of the parties, and to resolve uncertainty and insecurity surrounding Plaintiff's rights to her accounts, data, and information.

**NINTH CAUSE OF ACTION – INJUNCTIVE RELIEF**

**Against Defendants Google LLC and Alphabet Inc.)**

101. Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

102. Defendants have wrongfully denied Plaintiff access to her Workspace account, transferred control to unauthorized parties, and permitted the unauthorized use, alteration, deletion, and disclosure of Plaintiff's private, confidential, proprietary, and trade secret information.

103. Unless restrained by this Court, Defendants' wrongful acts will continue to cause Plaintiff irreparable injury, including ongoing denial of access to her accounts, continued exposure of her confidential and trade secret information, disruption of her business operations, and further loss of her property rights.

104. Plaintiff has no adequate remedy at law because monetary damages alone cannot fully restore her control over her accounts or prevent further unauthorized disclosure and misuse of her sensitive information.

105. Plaintiff is therefore entitled to temporary, preliminary, and permanent injunctive relief, including but not limited to orders: (a) compelling Defendants to immediately restore Plaintiff's full access to her Workspace account and related Google accounts; (b) prohibiting Defendants from transferring or permitting third-party control of Plaintiff's Workspace account; (c) requiring Defendants to take immediate steps to safeguard and preserve Plaintiff's data and prevent further unauthorized access, alteration, or disclosure; and (d) directing Defendants to account for and return all of Plaintiff's confidential, proprietary, and trade secret information.

106. Absent injunctive relief, Plaintiff will suffer irreparable harm, including the loss of her access to her data, and continued disclosure thereof.

107. Unless enjoined, Google's conduct will continue to cause irreparable harm to Ritter. Injunctive relief is necessary to prevent further alteration, deletion, or misuse of her data.

108. This action is necessary to obtain declaratory relief, ensure a litigation hold is placed on Google's records, prevent further data alteration or asset movement, and preserve evidence critical to Ritter's ongoing disputes and business operations.

## PRAYER FOR RELIEF

Plaintiff prays for judgment against Defendants, and each of them, as follows:

1. For Declaratory Relief: A judicial declaration that Plaintiff is the rightful owner of, and entitled to control and access, her Google Workspace account associated with the SteelPerlot.com domain, and that Defendants have no right to deny her such access or transfer control to unauthorized third parties;
2. For Injunctive Relief:
   a. Compelling Defendants to immediately restore Plaintiff's full access to her Workspace and associated Google accounts;
   b. Enjoining Defendants from transferring or permitting third-party control of Plaintiff's accounts;
   c. Requiring Defendants to safeguard and preserve all of Plaintiff's data, including private, confidential, proprietary, and trade secret information;
   d. Enjoining Defendants from further use, disclosure, or misappropriation of Plaintiff's confidential and trade secret information;
   e. Requiring Defendants to return and account for all of Plaintiff's misappropriated information and materials; and
   f. Requiring Defendants to ensure no spoilation of evidence in this matter or other controversies.
3. For Compensatory Damages: In an amount according to proof at trial, including but not limited to damages for loss of access to accounts, disclosure and misuse of Plaintiff's confidential and trade secret information, lost business opportunities, financial harm, and consequential damages;
4. For Punitive and Exemplary Damages: In an amount sufficient to punish Defendants and deter similar future misconduct, as permitted by law, including under Civil Code § 3294 and Civil Code § 3426.3(c) and for Defendants' complicity in enabling evidence spoilation pertinent to CCP §§ 1001-1002, federal protections against harassment and discrimination, protections enabling individuals and businesses to file accurate taxes and to maintain securities, and whistleblower protections, including those relevant to tax and accounting as well as the Investment Advisor's Act;
5. For Attorneys' Fees and Costs: Including reasonable attorneys' fees pursuant to Civil Code § 3426.4 and any other applicable statute or provision;
6. For Such Other and Further Relief: As the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

Dated: September 18, 2025

**MICHELLE RITTER**

By: [signature]

Michelle Ritter, in pro per

# EXHIBIT A

# Google Workspace Terms of Service

Last modified: October 16, 2024

**This is not the current version of this document and is provided for archival purposes. View the current version here. If you ordered the Services before December 21, 2020, the current version will only take effect at the beginning of your next Order Term, at which time your continued use of the Services will constitute your acceptance of the current version.**

New to Google Cloud? A quick overview of Google Cloud's online contracting can be found here.

These Google Workspace Terms of Service (together, the "Agreement") (formerly known as "Google Workspace (Online) Agreement" or "Google Workspace Agreement") are entered into by Google and the entity or person agreeing to them ("Customer") and govern Customer's access to and use of the Services. "Google" has the meaning given at https://cloud.google.com/terms/google-entity.

This Agreement is effective when Customer clicks to accept it (the "Effective Date"). If you are accepting on behalf of Customer, you represent and warrant that (i) you have full legal authority to bind Customer to this Agreement; (ii) you have read and understand this Agreement; and (iii) you agree, on behalf of Customer, to this Agreement.

1. **Provision of the Services**.

    1.1 **Services Use**. During the Term, Google will provide the Services in accordance with the Agreement, including the SLA. Customer may use the Services ordered in the applicable Order Form or Reseller Order in accordance with this Agreement.

    1.2 **Admin Console**. Customer will have access to the Admin Console, through which Customer may manage its use of the Services.

    1.3 **Accounts; Verification to Use Services**.

    (a) **Accounts**. Customer must have an Account to use the Services and is responsible for the information it provides to create the Account, the security of its passwords for the Account, and any use of its Account. Google has no obligation to provide multiple

accounts to Customer.

(b) **Verification to Use Services**. Customer must verify a Domain Email Address or a Domain Name to use the Services. If Customer does not have valid permission to use the Domain Email Address or does not own or control the Domain Name, then Google will have no obligation to provide Customer with the Services and may delete the Account without notice.

1.4 **Updates**.

(a) **To the Services**. Google may make commercially reasonable updates to the Services from time to time.

(b) **To the Agreement**. Google may update the terms of this Agreement from time to time by posting any such update at https://workspace.google.com/terms/premier_terms.html. These updates will only take effect if and when Customer's Order term renews. This Section 1.4(b) (Updates to the Agreement) does not apply to updates to URL Terms.

(c) **To the URL Terms**. Google may update the URL Terms from time to time by posting any such update at the relevant URL Term. Unless otherwise noted by Google, material updates to the URL Terms will become effective 30 days after they are posted. Notwithstanding the preceding sentence, to the extent the updates apply to new functionality or the Cloud Data Processing Addendum, or are required to comply with applicable law, they will be effective immediately.

(d) **To the Cloud Data Processing Addendum**. Google may only update the Cloud Data Processing Addendum where such update is required to comply with applicable law, is expressly permitted by the Cloud Data Processing Addendum, or:

(i) is commercially reasonable;

(ii) does not result in a material reduction of the security of the Services;

(iii) does not expand the scope of or remove any restrictions on Google's processing of "Customer Personal Data," as described in the "Compliance with Customer's Instructions" Section of the Cloud Data Processing Addendum; and

(iv) does not otherwise have a material adverse impact on Customer's rights under the Cloud Data Processing Addendum.

(e) **Discontinuation of Core Services**. Google will notify Customer at least 12 months before discontinuing any Core Service (or associated material functionality) unless Google replaces such discontinued Core Service or functionality with a

materially similar Core Service or functionality. Nothing in this Section 1.4(e) (Discontinuation of Core Services) limits Google's ability to make changes required to comply with applicable law, address a material security risk, or avoid a substantial economic or material technical burden. This Section 1.4(e) (Discontinuation of Core Services) does not apply to Other Services or to pre-general availability Services, offerings, or functionality.

2. **Payment Terms**.

2.1 **Usage Measurement and Billing Options**. Google's measurement tools will be used to determine Customer's usage of the Services. Customer may elect one of the billing options below or any other option offered by Google when Customer places its order for the Services.

(a) **Flexible Plan**. If Customer selects this option, Customer will not be committed to purchase the Services for a pre-defined term, but will pay Fees based on its daily usage of the Services, billed monthly in arrears. Any partial day of Services usage will be rounded up to a full day of Services usage for the purposes of calculating Fees.

(b) **Annual/Fixed-Term Plan**. If Customer selects this option, Customer will be committed to purchasing the Services for one or more annual terms (as selected by Customer). Google will bill Customer according to the terms associated with Customer's elections on the Order Form.

Google may change its offering of billing options (including by limiting or ceasing to offer any billing option) upon 30 days' notice to Customer and any such change will take effect at the beginning of Customer's next Order Term. Billing options may not be available to all customers. Customer may pay for the Services using the payment options listed in Section 2.2 (Payment) below.

2.2 **Payment**. All payments are due in the currency stated on the Order Form or invoice.

(a) **Credit Card or Debit Card**. If Customer is paying with a credit card, debit card, or other non-invoice form of payment payments are due at the end of the month during which Customer received the Services. For credit cards or debit cards, as applicable: (i) Google will issue an electronic bill for all applicable Fees when due, and (ii) these Fees are considered overdue 30 days after the end of the month during which Customer received the Services.

(b) **Invoices**. Payments for invoices are due 30 days after the invoice date (unless otherwise specified on the Order Form) and are considered overdue after such date.

(c) **Other Forms of Payment**. Customer may change its payment method to any other

method that Google may enable in the Admin Console, subject to acceptance by Customer of any additional terms applicable to that payment method.

(d) **Payment Information**. Payments made via wire transfer must include the bank information provided by Google.

2.3 **Taxes**.

(a) Customer is responsible for any Taxes, and will pay Google for the Services without any reduction for Taxes. If Google is obligated to collect or pay any Taxes, the Taxes will be invoiced to Customer and Customer will pay such Taxes to Google, unless Customer provides Google with a timely and valid tax exemption certificate in respect of those Taxes.

(b) Customer will provide Google with any applicable tax identification information that Google may require under applicable law to ensure its compliance with applicable tax regulations and authorities in applicable jurisdictions. Customer will be liable to pay (or reimburse Google for) any taxes, interest, penalties, or fines arising out of any mis-declaration by Customer.

2.4 **Payment Disputes**. Any payment disputes must be submitted in good faith before the payment due date. If Google, having reviewed the dispute in good faith, determines that certain billing inaccuracies are attributable to Google, Google will not issue a corrected invoice, but will instead issue a credit memo specifying the incorrect amount in the affected invoice. If a disputed invoice has not yet been paid, Google will apply the credit memo amount to the disputed invoice and Customer will be responsible for paying the resulting net balance due on that invoice. Nothing in this Agreement obligates Google to extend credit to any party.

2.5 **Delinquent Payments; Suspension**. Late payments (which, for clarity, do not include amounts subject to a good faith payment dispute submitted before the payment due date) may bear interest at the rate of 1.5% per month (or the highest rate permitted by law, if less) from the payment due date until paid in full. Customer will be responsible for all reasonable expenses (including attorneys' fees) incurred by Google in collecting such delinquent amounts. Further, in the event of any late payment for the Services, Google may Suspend the Services.

2.6 **No Purchase Order Number Required**. Customer is obligated to pay all applicable Fees without any requirement for Google to provide a purchase order number on Google's invoice (or otherwise).

2.7 **Price Revisions**. Google may change the Prices at any time unless otherwise expressly agreed in an addendum or Order Form. Google will notify Customer at least 30 days in

advance of any changes. Customer's pricing will change if and when Customer's Order Term renews after the 30-day period.

3. **Customer Obligations**.

3.1 **Compliance**. Customer will (a) ensure that Customer and its End Users' use of the Services complies with the Agreement, (b) use commercially reasonable efforts to prevent and terminate any unauthorized use of, or access to, the Services, and (c) promptly notify Google if Customer becomes aware of any unauthorized use of, or access to, the Services, Account, or Customer's password. Google reserves the right to investigate any potential violation of the AUP by Customer, which may include reviewing Customer Data.

3.2 **Privacy**. Customer is responsible for any consents and notices required to permit (a) Customer's use and receipt of the Services, and (b) Google's accessing, storing, and processing of data provided by Customer (including Customer Data) under the Agreement.

3.3 **Restrictions**. Customer will not, and will not allow End Users to, (a) copy, modify, or create a derivative work of the Services; (b) reverse engineer, decompile, translate, disassemble, or otherwise attempt to extract any or all of the source code of, the Services (except to the extent such restriction is expressly prohibited by applicable law); (c) sell, resell, sublicense, transfer, or distribute any or all of the Services; or (d) access or use the Services (i) for High Risk Activities; (ii) in violation of the AUP; (iii) in a manner intended to avoid incurring Fees (including creating multiple Customer Accounts to simulate or act as a single Customer Account or to circumvent Service-specific usage limits or quotas); (iv) to engage in cryptocurrency mining without Google's prior written approval; (v) to place or receive emergency service calls, unless stated otherwise in the Service Specific Terms; (vi) for materials or activities that are subject to the International Traffic in Arms Regulations (ITAR) maintained by the United States Department of State; (vii) in a manner that breaches, or causes the breach of, Export Control Laws; or (viii) to transmit, store, or process health information subject to United States HIPAA regulations, except as permitted by an executed HIPAA BAA.

3.4 **Additional Products and Third-Party Offerings**. Optional Additional Products and Third-Party Offerings may be available for use in conjunction with the Services, and may be enabled or disabled through the Admin Console. Any use of Additional Products is subject to the Additional Product Terms, which are incorporated by reference into the Agreement and which may be updated by Google from time to time. Any use of Third-Party Offerings is subject to separate terms and policies with the relevant service provider.

3.5 **Administration of Services**. Customer may specify through the Admin Console one or more Administrators who will have the right to access Admin Accounts. Customer is responsible for (a) maintaining the confidentiality and security of the End User Accounts and

associated passwords and (b) any use of the End User Accounts. Customer agrees that Google's responsibilities do not extend to the internal management or administration of the Services for Customer or any End Users.

3.6 **Abuse Monitoring**. Customer is solely responsible for monitoring, responding to, and otherwise processing emails sent to the "abuse" and "postmaster" aliases for Customer Domain Names, but Google may monitor emails sent to these aliases to allow Google to identify Services abuse.

3.7 **Requesting Additional End User Accounts During Order Term**. Customer may purchase additional End User Accounts during an Order Term by means of an additional Order Form or Reseller Order or by ordering via the Admin Console. Such additional End User Accounts will have a pro-rated term ending on the last day of the applicable Order Term.

3.8 **Copyright**. Google responds to notices of alleged copyright infringement and terminates the Accounts of repeat infringers in appropriate circumstances as required to maintain safe harbor for online service providers under the U.S. Digital Millennium Copyright Act.

4. **<u>Suspension</u>**.

4.1 **AUP Violations**. If Google becomes aware that Customer's or any End User's use of the Services violates the AUP, Google will notify Customer and request that Customer correct the violation. If Customer fails to correct the violation within 24 hours of Google's request, then Google may Suspend all or part of Customer's use of the Services until the violation is corrected. Suspension of the Services may include removal or unsharing of content that violates the AUP.

4.2 **Other Suspension**. Notwithstanding Section 4.1 (AUP Violations), Google may immediately Suspend all or part of Customer's use of the Services (including use of the underlying Account) if (a) Google reasonably believes Suspension is needed to protect the Services, Google's infrastructure supporting the Services, or any other customer of the Services (or their end users); (b) there is suspected unauthorized third-party access to the Services; (c) Google reasonably believes that immediate Suspension is required to comply with any applicable law; or (d) Customer is in breach of Section 3.3 (Restrictions) or the Service Specific Terms. Google will lift any such Suspension when the circumstances giving rise to the Suspension have been resolved. At Customer's request, Google will, unless prohibited by applicable law, notify Customer of the basis for the Suspension as soon as is reasonably possible. For Suspension of End User Accounts, Google will provide Customer's Administrator the ability to restore End User Accounts in certain circumstances.

5. **<u>Intellectual Property Rights; Protection of Customer Data; Feedback; Using Brand</u>**

**Features Within the Services**.

5.1 **Intellectual Property Rights**. Except as expressly stated in this Agreement, this Agreement does not grant either party any rights, implied or otherwise, to the other's content or any of the other's intellectual property. As between the parties, Customer retains all Intellectual Property Rights in Customer Data, and Google retains all Intellectual Property Rights in the Services.

5.2 **Protection of Customer Data**. Google will only access, use, or otherwise process Customer Data in accordance with the Cloud Data Processing Addendum and will not access, use, or process Customer Data for any other purpose. Google has implemented and will maintain technical, organizational, and physical safeguards to protect Customer Data, as further described in the Cloud Data Processing Addendum.

5.3 **Customer Feedback**. At its option, Customer may provide feedback or suggestions about the Services to Google ("Feedback"). If Customer provides Feedback, then Google and its Affiliates may use that Feedback without restriction and without obligation to Customer.

5.4 **Using Brand Features Within the Services**. Google will display within the Services only those Customer Brand Features that Customer authorizes by uploading them into the Services. Google will display those Customer Brand Features within designated areas of the web pages displaying the Services to Customer or its End Users. Customer may specify details of this use in the Admin Console. Google may also display Google Brand Features on such web pages to indicate that the Services are provided by Google.

6. **Technical Support Services**. Subject to payment of applicable Fees, Google will provide TSS to Customer during the Term in accordance with the TSS Guidelines. Certain TSS levels include a minimum recurring Fee as described at https://workspace.google.com/terms/tssg.html. If Customer downgrades its TSS level during any calendar month, Google may continue to provide TSS at the same level and for the same TSS Fees as applied before the downgrade for the remainder of that month.

7. **Confidential Information**.

7.1 **Obligations**. The recipient will only use the disclosing party's Confidential Information to exercise the recipient's rights and fulfill its obligations under the Agreement, and will use reasonable care to protect against the disclosure of the disclosing party's Confidential Information. The recipient may disclose Confidential Information only to its and its Affiliates' employees, agents, subcontractors, or professional advisors ("Delegates") who need to know it and who have agreed in writing (or in the case of professional advisors are otherwise bound) to keep it confidential. The recipient will ensure that its Delegates use the received

Confidential Information only to exercise rights and fulfill obligations under this Agreement.

7.2 **Required Disclosure**. Notwithstanding any provision to the contrary in this Agreement, the recipient or its Affiliate may also disclose Confidential Information to the extent required by applicable Legal Process; provided that the recipient or its Affiliate uses commercially reasonable efforts to (a) promptly notify the other party before any such disclosure of its Confidential Information, and (b) comply with the other party's reasonable requests regarding its efforts to oppose the disclosure. Notwithstanding the foregoing, subsections (a) and (b) above will not apply if the recipient determines that complying with (a) and (b) could (i) result in a violation of Legal Process; (ii) obstruct a governmental investigation; or (iii) lead to death or serious physical harm to an individual.

8. **Term and Termination**.

8.1 **Agreement Term**. The term of this Agreement (the "Term") will begin on the Effective Date and continue until the Agreement is terminated or not renewed as stated in this Section 8 (Term and Termination).

8.2 **Renewal**.

(a) **With a Flexible Plan**. Order Terms for the Flexible Plan are monthly. At the end of each month, the Order Term will automatically renew for another month, unless canceled by Customer via the Admin Console.

(b) **With an Annual/Fixed-Term Plan**. At the end of each Order Term for an Annual/Fixed-Term Plan, the Services will renew consistent with Customer's elections in the Order Form or Admin Console.

(c) **Generally**. Customer may use the Admin Console to adjust the number of End User Accounts to be renewed. Customer will continue to pay Google the then-current Fees for each renewed End User Account unless Customer and Google mutually agree otherwise. If either party does not want the Services to renew, then it must notify the other party to this effect at least 15 days before the end of the then-current Order Term, and this notice of non-renewal will take effect at the end of the then-current Order Term.

8.3 **Termination for Breach**. To the extent permitted by applicable law, either party may terminate this Agreement immediately on written notice if (a) the other party is in material breach of the Agreement and fails to cure that breach within 30 days after receipt of written notice of the breach, or (b) the other party ceases its business operations or becomes subject to insolvency proceedings and the proceedings are not dismissed within 90 days.

8.4 **Termination for Convenience**. Customer may stop using the Services at any time.

Subject to Customer fulfilling all its financial commitments under an Order Form or otherwise under this Agreement (including payment of all Fees for the Order Term), Customer may also terminate this Agreement for its convenience at any time on prior written notice.

8.5 **Termination Due to Applicable Law; Violation of Laws**. Google may terminate this Agreement and/or any applicable Order Form immediately on written notice if Google reasonably believes that (a) continued provision of any Service used by Customer would violate applicable law(s) or (b) Customer has violated or caused Google to violate any Anti-Bribery Laws or Export Control Laws.

8.6 **Effect of Termination or Non-Renewal**. If the Agreement is terminated or not renewed, then (a) all rights and access to the Services will cease (including access to Customer Data), unless otherwise described in this Agreement, and (b) all Fees owed by Customer to Google are immediately due upon Customer's receipt of the final electronic bill or as stated in the final invoice.

8.7 **No Refunds**. Unless expressly stated otherwise in this Agreement or required by law, termination or non renewal under any section of this Agreement (including the Cloud Data Processing Addendum) will not oblige Google to refund any Fees.

9. **Publicity**. Neither party may use the other party's Brand Features or issue, publish, or present a press release, blog post, speech, social media post, or investor relations call or announcement discussing Customer's use of the Services or this Agreement without the prior written consent of the other party, except as expressly permitted in this Agreement. Subject to the preceding sentence, Customer may state publicly that it is a Google Cloud customer and display Brand Features in accordance with the Branding Guidelines. Google may use Customer's name and Brand Features in online or offline promotional materials of the Services. Any use of a party's Brand Features will inure to the benefit of the party holding Intellectual Property Rights to those Brand Features.

10. **Representations and Warranties**. Each party represents and warrants that (a) it has full power and authority to enter into the Agreement, and (b) it will comply with all laws applicable to its provision, receipt, or use of the Services, as applicable.

11. **Disclaimer**. **Except as expressly provided for in the Agreement, Google does not make and expressly disclaims to the fullest extent permitted by applicable law (a) any warranties of any kind, whether express, implied, statutory, or otherwise, including warranties of merchantability, fitness for a particular use, title, non-infringement, or error-free or uninterrupted use of the Services and (b) any representations about content or information accessible through the Services.**

12. **Limitation of Liability**.

12.1 **Limitation on Indirect Liability. To the extent permitted by applicable law and subject to Section 12.3 (Unlimited Liabilities), neither party will have any Liability arising out of or relating to the Agreement for any (a) indirect, consequential, special, incidental, or punitive damages or (b) lost revenues, profits, savings, or goodwill.**

12.2 **Limitation on Amount of Liability. Each party's total aggregate Liability for damages arising out of or relating to the Agreement is limited to the Fees Customer paid during the 12 month period before the event giving rise to Liability, except Google's total aggregate Liability for damages arising out of or related to Services provided free of charge is limited to $5,000.**

12.3 **Unlimited Liabilities. Nothing in the Agreement excludes or limits either party's Liability for:**

**(a) its fraud or fraudulent misrepresentation;**

**(b) its obligations under Section 13 (Indemnification);**

**(c) its infringement of the other party's Intellectual Property Rights;**

**(d) its payment obligations under the Agreement; or**

**(e) matters for which liability cannot be excluded or limited under applicable law.**

13. **Indemnification**.

13.1 **Google Indemnification Obligations**. Google will defend Customer and its Affiliates using the Services under Customer's Account and indemnify them against Indemnified Liabilities in any Third-Party Legal Proceeding to the extent arising from an allegation that any Service or any Google Brand Feature, in each case used in accordance with the Agreement, infringes the third party's Intellectual Property Rights.

13.2 **Customer Indemnification Obligations**. Customer will defend Google and its Affiliates providing the Services and indemnify them against Indemnified Liabilities in any Third-Party Legal Proceeding to the extent arising from (a) any Customer Data or Customer Brand Features or (b) Customer's or an End User's use of the Services in breach of the AUP or Section 3.3 (Restrictions).

13.3 **Exclusions**. Sections 13.1 (Google Indemnification Obligations) and 13.2 (Customer Indemnification Obligations) will not apply to the extent the underlying allegation arises from (a) the indemnified party's breach of the Agreement, (b) a combination of the indemnifying party's technology or Brand Features with materials not provided by the indemnifying party under the Agreement, unless the combination is required by the Agreement, or (c) in the

case of Google or any of its Affiliates as the indemnifying party, any Services provided to Customer free of charge.

13.4 **Conditions**. Sections 13.1 (Google Indemnification Obligations) and 13.2 (Customer Indemnification Obligations) are conditioned on the following:

(a) Any indemnified party must promptly notify the indemnifying party in writing of any allegation(s) that preceded the Third-Party Legal Proceeding and cooperate reasonably with the indemnifying party to resolve the allegation(s) and Third-Party Legal Proceeding. If breach of this Section 13.4(a) prejudices the defense of the Third-Party Legal Proceeding, the indemnifying party's obligations under Section 13.1 (Google Indemnification Obligations) or 13.2 (Customer Indemnification Obligations) (as applicable) will be reduced in proportion to the prejudice.

(b) Any indemnified party must tender sole control of the indemnified portion of the Third-Party Legal Proceeding to the indemnifying party, subject to the following: (i) the indemnified party may appoint its own non-controlling counsel, at its own expense and (ii) any settlement requiring the indemnified party to admit liability, pay money, or take (or refrain from taking) any action, will require the indemnified party's prior written consent, not to be unreasonably withheld, conditioned, or delayed.

13.5 **Remedies**.

(a) If Google reasonably believes the Services might infringe a third party's Intellectual Property Rights, then Google may, at its sole option and expense (i) procure the right for Customer to continue using the Services; (ii) modify the Services to make them non-infringing without materially reducing their functionality; or (iii) replace the Services with a non-infringing alternative that has materially equivalent functionality.

(b) If Google does not believe the remedies in Section 13.5(a) are commercially reasonable, then Google may Suspend or terminate Customer's use of the impacted Services. If Google terminates the impacted Services, then Google will provide a pro-rata refund of any unearned Fees actually paid by Customer applicable to the period following termination of such Services.

13.6 **Sole Rights and Obligations**. Without affecting any other termination rights of either party and to the extent permitted by applicable law, this Section 13 (Indemnification) states the parties' sole and exclusive remedy under this Agreement for any third-party allegations of Intellectual Property Rights infringement covered by this Section 13 (Indemnification).

14. **Resold Customers**. This Section 14 (Resold Customers) applies only if Customer orders the Services from a Reseller under a Reseller Agreement (such Services, "Resold Services").

14.1 **Applicable Terms**. For the purposes of Resold Services:

(a) Section 2 (Payment Terms) of this Agreement will not apply;

(b) Reseller Fees will apply and be payable directly to the Reseller, and all prices for Resold Services will be solely determined between Reseller and Customer;

(c) Customer will not enter into any Order Form with Google for Resold Services; Google will provide to Customer the Resold Services described in the Reseller Order and communicated by Reseller to Google;

(d) Customer will receive any applicable SLA credits or monetary refunds described in the Agreement from Reseller only;

(e) In the event of termination of this Agreement, Google will send Reseller (and not Customer) the final invoice (if applicable) for payment obligations related to Resold Services. Customer will notify (i) Reseller of any termination of this Agreement and (ii) Google of any termination of the Reseller Agreement;

(f) Any renewal(s) of the Services and/or any Reseller Order will be as agreed between Customer and Reseller.

(g) If Reseller fails to pay an undisputed invoice for Resold Services to Google due to Customer's failure to pay Reseller, Google may Suspend Customer's access to the Services;

(h) "Order Term," as it is used in the Agreement, means the period of time starting on the Services Start Date or the renewal date (as applicable) for the Resold Services and continuing for the period indicated on the then-current Reseller Order unless terminated in accordance with the Agreement; and

(i) "Services Start Date," as it is used in the Agreement, means either the start date described in the Reseller Order or, if none is specified in the Reseller Order, the date Google makes the Resold Services available to Customer.

14.2 **Liability Cap**. For the purposes of Section 12.2 (Limitation on Amount of Liability), where the event giving rise to Liability is a breach of this Agreement or otherwise arises in connection with the Resold Services, "Fees" as it is used in that Section means "Reseller Fees". If Customer or Google brings a claim under the Agreement, then for the purposes of establishing the Liability cap under Section 12.2, upon Google's request, Customer will (a) promptly disclose to Google the amount of any Reseller Fees paid or payable under the Reseller Agreement; (b) consent to Reseller disclosing such amount to Google, notwithstanding Reseller's confidentiality obligations under the Reseller Agreement; and (c) procure any consents necessary to enable Customer's or Reseller's disclosure under this

extent caused by circumstances beyond its reasonable control, including acts of God, natural disasters, terrorism, riots, or war.

15.6 **Subcontracting**. Google may subcontract obligations under the Agreement but will remain liable to Customer for any subcontracted obligations.

15.7 **No Agency**. This Agreement does not create any agency, partnership, or joint venture between the parties.

15.8 **No Waiver**. Neither party will be treated as having waived any rights by not exercising (or delaying the exercise of) any rights under this Agreement.

15.9 **Severability**. If any part of this Agreement is invalid, illegal, or unenforceable, the rest of the Agreement will remain in effect.

15.10 **No Third-Party Beneficiaries**. This Agreement does not confer any benefits on any third party unless it expressly states that it does.

15.11 **Equitable Relief**. Nothing in this Agreement will limit either party's ability to seek equitable relief.

15.12 **U.S. Governing Law**.

(a) **For U.S. City, County, and State Government Entities**. If Customer is a U.S. city, county, or state government entity, then the Agreement will be silent regarding governing law and venue.

(b) **For U.S. Federal Government Entities**. If Customer is a U.S. federal government entity, then the following applies: ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE SERVICES WILL BE GOVERNED BY THE LAWS OF THE UNITED STATES OF AMERICA, EXCLUDING ITS CONFLICT OF LAWS RULES. SOLELY TO THE EXTENT PERMITTED BY FEDERAL LAW, (I) THE LAWS OF THE STATE OF CALIFORNIA (EXCLUDING CALIFORNIA'S CONFLICT OF LAWS RULES) WILL APPLY IN THE ABSENCE OF APPLICABLE FEDERAL LAW AND (II) FOR ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE SERVICES, THE PARTIES CONSENT TO PERSONAL JURISDICTION IN, AND THE EXCLUSIVE VENUE OF, THE COURTS IN SANTA CLARA COUNTY, CALIFORNIA.

(c) **For All Other Entities**. If Customer is any entity not identified in Section 15.12(a) (U.S. Governing Law for U.S. City, County, and State Government Entities) or (b) (U.S. Governing Law for Federal Government Entities), then the following applies: ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE SERVICES WILL BE GOVERNED BY CALIFORNIA LAW, EXCLUDING THAT

STATE'S CONFLICT OF LAWS RULES, AND WILL BE LITIGATED EXCLUSIVELY IN THE FEDERAL OR STATE COURTS OF SANTA CLARA COUNTY, CALIFORNIA, USA; THE PARTIES CONSENT TO PERSONAL JURISDICTION IN THOSE COURTS.

15.13 **Amendments**. Except as stated in Section 1.4(b) (Updates: To the Agreement), (c) (Updates: To the URL Terms), or (d) (Updates: To the Cloud Data Processing Addendum), any amendment to this Agreement after the Effective Date must be in writing, signed by both parties, and expressly state that it is amending this Agreement. For clarity, Google's provision of an updated URL in place of any URL stated in this Agreement will not constitute an amendment to or modification of the terms of the Agreement.

15.14 **Survival**. The following Sections will survive expiration or termination of this Agreement: Section 2 (Payment Terms), Section 5 (Intellectual Property Rights; Protection of Customer Data; Feedback; Using Brand Features within the Services), Section 7 (Confidential Information), Section 8.6 (Effect of Termination or Non-Renewal), Section 11 (Disclaimer), Section 12 (Limitation of Liability), Section 13 (Indemnification), Section 14.1(e) (termination of Reseller Agreement), 14.2 (Liability Cap), 14.3 (Sharing Confidential Information), Section 14.4 (Reseller-Customer Relationship), and Section 15 (Miscellaneous).

15.15 **Entire Agreement**. This Agreement sets out all terms agreed between the parties and terminates and supersedes any and all other agreements between the parties relating to its subject matter, including any prior versions of this Agreement. In entering into this Agreement, neither party has relied on, and neither party will have any right or remedy based on, any statement, representation, or warranty (whether made negligently or innocently), except those expressly stated in this Agreement. The URL Terms are incorporated by reference into the Agreement. After the Effective Date, Google may provide an updated URL in place of any URL in this Agreement.

15.16 **Conflicting Terms**. If there is a conflict between the documents that make up this Agreement, the documents will control in the following order (of decreasing precedence): the Order Form, the Cloud Data Processing Addendum, the remainder of the Agreement (excluding the URL Terms), and the URL Terms (other than the Cloud Data Processing Addendum).

15.17 **Headers**. Headings and captions used in the Agreement are for reference purposes only and will not have any effect on the interpretation of the Agreement.

15.18 **Conflicting Languages**. If this Agreement is translated into any language other than English, and there is a discrepancy between the English text and the translated text, the English text will govern unless expressly stated otherwise in the translation. Unless

otherwise specified, all references to "$" in the Agreement refer to United States dollars

15.19 **Definitions**.

"Account" means Customer's Google account credentials and correlating access to the Services under this Agreement.

"Additional Products" means products, services, or applications offered by Google or its affiliates that are not incorporated into the Services but that may be accessible for use in conjunction with the Services.

"Additional Product Terms" means the then-current terms stated at https://workspace.google.com/terms/additional_services.html.

"Admin Account" means a type of End User Account that Customer (or Reseller, if applicable) may use to administer the Services.

"Admin Console" means the online console(s) or dashboard provided by Google to Customer for administering the Services.

"Administrators" mean the Customer-designated personnel who administer the Services to End Users on Customer's behalf, and have the ability to access Customer Data and End User Accounts. Such access includes the ability to access, monitor, use, modify, withhold, or disclose any data available to End Users associated with their End User Accounts.

"Affiliate" means any entity that directly or indirectly Controls, is Controlled by, or is under common Control with a party.

"Anti-Bribery Laws" means all applicable commercial and public anti-bribery laws, including the U.S. Foreign Corrupt Practices Act of 1977 and the UK Bribery Act 2010, that prohibit corrupt offers of anything of value, either directly or indirectly, to anyone, including government officials, to obtain or keep business or to secure any other improper commercial advantage. Government officials include: any government employees, candidates for public office, members of royal families, and employees of government-owned or government-controlled companies, public international organizations, and political parties.

"AUP" means the then-current acceptable use policy for the Services stated at https://workspace.google.com/terms/use_policy.html.

"BAA" or "Business Associate Agreement" is an amendment to the Agreement covering the handling of Protected Health Information (as defined in HIPAA).

"Brand Features" means the trade names, trademarks, service marks, logos, domain

names, and other distinctive brand features of each party, respectively, as secured by such party from time to time.

"Branding Guidelines" means Google's then-current Google branding guidelines at https://services.google.com/fh/files/misc/external_customer_co_branding_eligibility.pdf, as may be updated by Google from time to time.

"Cloud Data Processing Addendum" means the then-current terms describing data processing and security obligations with respect to Customer Data, as described at https://cloud.google.com/terms/data-processing-addendum.

"Confidential Information" means information that one party (or an Affiliate) discloses to the other party under or in connection with this Agreement, and that is marked as confidential or would normally under the circumstances be considered confidential information. It does not include information that is independently developed by the recipient, is rightfully given to the recipient by a third party without confidentiality obligations, or becomes public through no fault of the recipient. Subject to the preceding sentence, Customer Data is considered Customer's Confidential Information.

"Control" means control of greater than 50 percent of the voting rights or equity interests of a party.

"Core Services" means the then-current "Core Services" as described in the Services Summary, excluding any Third-Party Offerings.

"Customer Data" means data submitted, stored, sent or received via the Services by Customer or its End Users.

"Domain Email Address" means the email address on the Domain Name for use in connection with the Services.

"Domain Name" means the domain name specified in the Order Form or Reseller Order to be used in connection with the Services.

"End Users" means the individuals who are permitted by Customer to use the Services and managed by an Administrator. For clarity, End Users may include employees of Customer Affiliates and other third parties.

"End User Account" means a Google-hosted account established by Customer through the Services in order for an End User to use the Services.

"Export Control Laws" means all applicable export and re-export control laws and regulations, including (a) the Export Administration Regulations ("EAR") maintained by

Section 14.2 (Liability Cap).

14.3 **Sharing Confidential Information**. Google may share Customer Confidential Information with Reseller as a Delegate subject to Section 7.1 (Obligations).

14.4 **Reseller-Customer Relationship**. At Customer's discretion, Reseller may access Customer's Account or End User Accounts. As between Google and Customer, Customer is solely responsible for (a) any access by Reseller to Customer's Account or End User Accounts and (b) defining in the Reseller Agreement any rights or obligations as between Reseller and Customer with respect to the Resold Services. Google will not have any Liability arising out of Reseller's (x) suspension or termination of Customer's access to the Services; (y) access to and visibility of Customer's Account and Customer's Account's billing-related metadata; or (z) offering or provisioning of Reseller or third party products or services.

14.5 **Reseller Technical Support**. Customer acknowledges and agrees that Reseller may disclose End User personal data to Google as reasonably required in order for Reseller to handle any support issues that Customer escalates to or via Reseller.

15. **Miscellaneous**.

15.1 **Notices**. Under the Agreement, notices to Customer must be sent to the Notification Email Address and notices to Google must be sent to legal-notices@google.com. Notice will be treated as received when the email is sent. Customer is responsible for keeping its Notification Email Address current throughout the Term.

15.2 **Emails**. The parties may use emails to satisfy written approval and consent requirements under the Agreement.

15.3 **Assignment**. Neither party may assign any part of this Agreement without the written consent of the other, except to an Affiliate where (a) the assignee has agreed in writing to be bound by the terms of this Agreement, and (b) the assigning party has notified the other party of the assignment. Any other attempt to assign is void. If Customer assigns this Agreement to an Affiliate in another jurisdiction such that there is a change in the Google contracting entity as defined at https://cloud.google.com/terms/google-entity this Agreement is automatically assigned to the new Google contracting entity.

15.4 **Change of Control**. If a party experiences a change of Control other than as part of an internal restructuring or reorganization (for example, through a stock purchase or sale, merger, or other form of corporate transaction), that party will give written notice to the other party within 30 days after the change of Control.

15.5 **Force Majeure**. Neither party will be liable for failure or delay in performance to the

# Google Workspace Terms of Service

Last modified: October 16, 2024

**This is not the current version of this document and is provided for archival purposes. View the current version here. If you ordered the Services before December 21, 2020, the current version will only take effect at the beginning of your next Order Term, at which time your continued use of the Services will constitute your acceptance of the current version.**

New to Google Cloud? A quick overview of Google Cloud's online contracting can be found here.

These Google Workspace Terms of Service (together, the "Agreement") (formerly known as "Google Workspace (Online) Agreement" or "Google Workspace Agreement") are entered into by Google and the entity or person agreeing to them ("Customer") and govern Customer's access to and use of the Services. "Google" has the meaning given at https://cloud.google.com/terms/google-entity.

This Agreement is effective when Customer clicks to accept it (the "Effective Date"). If you are accepting on behalf of Customer, you represent and warrant that (i) you have full legal authority to bind Customer to this Agreement; (ii) you have read and understand this Agreement; and (iii) you agree, on behalf of Customer, to this Agreement.

1. **Provision of the Services**.

   1.1 **Services Use**. During the Term, Google will provide the Services in accordance with the Agreement, including the SLA. Customer may use the Services ordered in the applicable Order Form or Reseller Order in accordance with this Agreement.

   1.2 **Admin Console**. Customer will have access to the Admin Console, through which Customer may manage its use of the Services.

   1.3 **Accounts; Verification to Use Services**.

      (a) **Accounts**. Customer must have an Account to use the Services and is responsible for the information it provides to create the Account, the security of its passwords for the Account, and any use of its Account. Google has no obligation to provide multiple