Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)

First Amended Complaint

# EXHIBIT 41

Screenshots (Apr. 6–18, 2025) of StarX records hosted in and owned by the SchmidtEntity.co tenant, with share-permission records showing mrteam@schmidtentity.co as owner and an account in Ritter's name at that domain

EXHIBIT 41


Safari File Edit View History Bookmarks Window Help
Sun Apr 6 10:52 PM
drive.google.com
Shared wit...
Failed to open page
apple icloud export "feedback assistant activ...
Search in Drive
Google
Share "Notes - StarX Analytics [weekly]"
Add people, groups, and calendar events
People with access
mrteam@schmidtentity.co
mrteam@schmidtentity.co
Owner
Michelle Ritter (you)
mritter@starx.com
Editor
jlukas@starx.com
jlukas@starx.com
Editor
ksingh@starx.com
ksingh@starx.com
Editor
mritter@schmidtentity.co
mritter@schmidtentity.co
Editor
General access
Restricted
Only people with access can open with the link
Copy link
Done
Notes - StarX Analytics [weekly]
Activity
Approvals
has access
by mrteam. Shared with jlukas, ksingh, le Ritter, mritter, and 7 others.
Security limitations
limitations applied
If any are applied, they will appear here
Shared with me
Notes - StarX Analytic...
Ticket - 5th Annual Milken YLC x Asian Mafia Di...
Name
Size
Kind
Date Added
weekly].docx
10 KB
Microso...(.docx)
Today at 10:52 PM
..k StarX Partnerships.docx
9 KB
Today at 10:51 PM
Privacy Statement

EXHIBIT 41


Safari File Edit View History Bookmarks Window Help
Sun Apr 6 10:05 PM
drive.google.com
Shared wit...
Drive
Search in Drive
Google
New
Shared with me
3 selected
Summarize these files
STARX_BRANDING...
Team Evaluation N...
Tech Onboarding ...
Shared drives
Accounting
Payroll
05.05.2024
StarX
StarX Documents
StarX Data Room
Shared with me
Recent
Starred
Spam
Trash
Admin console
15.07 GB of shared 180 TB used
Name
Shared by
Share date
Top 10 Partners
Ato Eyiah
May 21, 2024
March 17th StarX Deep Dive Prep Materials
Stephanie Bousley
May 15, 2024
Notes - Chloe-Rustin-Ato-Steph talk StarX Partnerships
Stephanie Bousley
May 15, 2024
Notes - StarX Analytics [weekly]
mrteam@schmidtentity.co
May 15, 2024
Notes - Steph <> MR talk Regulated Assets and Funds (Star...
mrteam@schmidtentity.co
May 15, 2024
Notes - StarX Team Deep Dive
Stephanie Bousley
May 14, 2024
Notes - StarX Event Check-in
Stephanie Bousley
May 14, 2024
Notes - StarX - Daily Stand Up
sbousley@schmidtentity....
May 14, 2024
Notes - StarX Partnerships + Misc [weekly]
mrteam@schmidtentity.co
May 9, 2024
Notes - AI Research Weekly (SB-RR-EC-MDLR)
sbousley@schmidtentity....
May 7, 2024
Shared with me
3 selected

EXHIBIT 41


Safari File Edit View History Bookmarks Window Help
Sun Apr 6 10:05 PM
drive.google.com
Shared wit...
Drive
Search in Drive
Google
New
Shared with me
3 selected
Summarize these files
STARX_BRANDING...
Team Evaluation N...
Tech Onboarding ...
Shared drives
Accounting
Payroll
05.05.2024
StarX
StarX Documents
StarX Data Room
Shared with me
Recent
Starred
Spam
Trash
Admin console
15.07 GB of shared 180 TB used
Name
Shared by
Share date
StarX Pitch Deck.pdf
Rustin Domingos
Oct 30, 2023
StarX Deck for FIFA review [ext] - 23 August 2023 - CONFID...
Rustin Domingos
Oct 10, 2023
Wellness Center_Overview
carter@m13.co
Sep 24, 2023
MR Memo Re: Positioning + Thought Leadership
jimmy@ahlevy.com
Sep 18, 2023
StarX deck for FIFA review - 23 August 2023 - CONFIDENTIAL
zane@nothingprojects.xyz
Sep 7, 2023
StarX deck for NFLPA review [ext] - 28 August 2023 - CONF...
Rustin Domingos
Aug 28, 2023
StarX deck for NFL review [ext] - 28 August 2023 - CONFID...
Rustin Domingos
Aug 25, 2023
StarX Analytics Timeline - Assignments
Rustin Domingos
Meeting Agendas and Schedule
Rustin Domingos
StarX Financial Model QA
Rustin Domingos
sbousley@schmidtentity.co
Send Mail
Open detailed view
Shared with me
3 selected

EXHIBIT 41


Safari File Edit View History Bookmarks Window Help
Sun Apr 6 10:10 PM
drive.google.com
Home - Go...
Drive
Search in Drive
Google
New
Home
Activity
Workspaces
My Drive
Shared drives
Shared with me
Recent
Starred
Spam
Trash
Storage
5.67 GB used
Admin console
Welcome to Drive
Suggested files
Copy of Timesheets_05.05.24_StarX Networks, Inc. (2).xlsx
You created • 10:01 PM
Accounting
05.05.2024
Copy of steelperlot.com Mail - Eric 05_06 timesheet.pdf
You created • 10:01 PM
Accounting
05.05.2024
StarX - Fund I
me
Decks
StarX tech collabo
me
OpenAI
steelperlot.com M
me
Save post th...
White Label
me
Consumer A...
StarX - App Overv
me
Consumer A...
Timesheets_05.05
me
Save post th...
NOTHING Projects
You opened • Feb 11, 2025
zane@nothin...
Shared with ...
StarX Credentials.xlsx
You opened • Aug 13, 2024
me
Save post th...
User_Download_15082024_022010
You modified • Aug 15, 2024
me
Google Adm...
Budget_FY24-Applied_AI-ML_For_Entertainment.xlsx
Owned by you
Analytics Code Repositories
Owned by you
Files cannot be downloaded
Try downloading each file individually
StarX (Decommissioning this - use the StarX from the StarX folder))/Branding/STARX_DESIGN_GUIDES_V2***
StarX (Decommissioning this - use the StarX from the StarX folder))/Branding/StarX Design System***
/NOTHING Projects
Got it
Can't download file.
Learn more
Download ready
Not all files were zipped
View 3 errors

EXHIBIT 41


Safari File Edit View History Bookmarks Window Help
Sun Apr 6 10:15 PM
drive.google.com
Shared wit...
Drive
Search in Drive
Google
New
Home
Activity
Workspaces
My Drive
Shared drives
Accounting
StarX
StarX Data Room
Shared with me
Recent
Starred
Spam
Trash
Storage
Admin console
15.11 GB of shared 180 TB used
Shared with me
Type
People
Modified
Source
Name
Shared by
Share date
Bond Street Personal Items.eml
michelleritter929
Dec 3, 2024
STARX CONSUMER APP_SEPT '24.pptx
ian.bester@gmail.com
Oct 24, 2024
NOTHING Projects
zane@nothingprojects.xyz
Oct 3, 2024
StarX tech collaboration with OpenAI
Ioannis Papapanagiotou
Sep 6, 2024
StarX recipes Jul 10 2024
Cgnet Support
Jul 16, 2024
IQEQ / Constellation
afiedler@schmidtentity.co
Jul 11, 2024
StarX recipes Jul 10 2024.csv
Cgnet Support
Jul 10, 2024
Plan for Spring 2024
steelperlot.com
Jul 7, 2024
HG Token Guide
sam@tristero.com
Jul 6, 2024
Foresight Fund
a.duettmann@foresight.o...
Jun 30, 2024
Foresight Crypto, Security & AI Workshop 1 pager
a.duettmann@foresight.o...
Jun 30, 2024

EXHIBIT 41


Safari File Edit View History Bookmarks Window Help
Sun Apr 6 10:16 PM
drive.google.com
Shared wit...
Drive
Search in Drive
Google
New
Home
Activity
Workspaces
My Drive
Shared drives
Accounting
StarX
StarX Data Room
Shared with me
Recent
Starred
Spam
Trash
Storage
Admin console
15.11 GB of shared 180 TB used
Shared with me
1 selected
Name
Bond Street Personal
STARX CONSUMER AF
NOTHING Projects
StarX tech collaborati
StarX recipes Jul 10 2
IQEQ / Constellation
StarX recipes Jul 10 2
Plan for Spring 2024
HG Token Guide
Foresight Fund
Shared with me > StarX tech collaboratio...
Share "StarX tech collaboration with OpenAI"
Add people, groups, and calendar events
People with access
~~marc@openai.com~~
marc@openai.com
Remove
michelleritter929@gmail.com
michelleritter929@gmail.com
Commenter
~~rdomingos@starx.com~~
rdomingos@starx.com
Remove
~~tmackay@rubenstein.com~~
tmackay@rubenstein.com
Remove
~~toki@openai.com~~
toki@openai.com
Remove
General access
STARX
Anyone in this group with the link can edit
Editor
Copy link
Pending changes
Save
StarX tech collaboration with OpenAI
Details
Activity
Approvals
Who has access
Owned by ioannis. Shared with STARX, Ato, btom, rdomingos, and 4 others.
Manage access
Security limitations
No limitations applied
If any are applied, they will appear here

EXHIBIT 41


Safari File Edit View History Bookmarks Window Help
Wed Apr 16 1:23 PM
drive.google.com
Drive
Search in Drive
New
Home
Activity
Workspaces
My Drive
Shared drives
Shared with me
Recent
Starred
Spam
Trash
Storage
5.74 GB used
Admin console
15.11 GB of shared 180 TB used
Shared with me > StarX (Decommissionin... > Contacts/Partnership Tr...
Summarize this folder
Type
People
Modified
Source
Name
Last modified
File size
Zelus Contact Sheet Apr 11, 2024 mkane_contra... 2 KB
Team Owners Apr 7, 2024 chyun@schmid... 6 KB
StarX Partnership Tracker Apr 6, 2024 chyun@schmid... 32 KB
StarX Reachout Apr 6, 2024 chyun@schmid... 30 KB
Largest Football Clubs by Social Media Following Apr 5, 2024 Ato@schmidte... 3 KB
Inflection Mar 25, 2024 ipapapa@sch... —
Proposal: StarX <> Newcastle Mar 21, 2024 ipapapa@sch... 5 KB
Attendee List MIT Analytics Conference Mar 12, 2024 Ato@schmidt... 153 KB
PSG Mar 8, 2024 ipapapa@sch... —
Mar 8, 2024ipapapa@schmidtentity.co
Newcastle Mar 8, 2024 ipapapa@sch... —
DeepMind Mar 6, 2024 ipapapa@sch... —
OpenAI Mar 6, 2024 ipapapa@sch... —
output.csv Feb 28, 2024 Ato@schmidt... 111 KB
Contacts/Partnership Trackers
Details
Activity
Couldn't load details. Try again.
Google
Documents
Screenshots
from G Armor

EXHIBIT 41


Safari File Edit View History Bookmarks Window Help
Fri Apr 18 4:07 PM
drive.google.com
Drive
Search in Drive
Google
Google Account
Michelle Ritter
mritter@starx.com
New
Home
Activity
Workspaces
My Drive
Shared drives
Shared with me
Recent
Starred
Spam
Trash
Storage
5.74 GB used
Admin console
Shared with me > StarX (Decommissionin... > Contacts/Partnership Tr...
Summarize this folder
Type
People
Modified
Source
Name
Last modified
File size
Zelus Contact Sheet
Apr 11, 2024 mkane_contra...
2 KB
Team Owners
Apr 7, 2024 chyun@schmid...
6 KB
StarX Partnership Tracker
Apr 6, 2024 chyun@schmid...
32 KB
StarX Reachout
Apr 6, 2024 chyun@schmid...
30 KB
Largest Football Clubs by Social Media Following
Apr 5, 2024 Ato@schmidte...
3 KB
Inflection
Mar 25, 2024 ipapapa@sch...
—
Proposal: StarX <> Newcastle
Mar 21, 2024 ipapapa@sch...
5 KB
Attendee List MIT Analytics Conference
Mar 12, 2024 Ato@schmidt...
153 KB
PSG
Mar 8, 2024 ipapapa@sch...
—
Newcastle
Mar 8, 2024 ipapapa@sch...
—
DeepMind
Mar 6, 2024 ipapapa@sch...
—
OpenAI
Mar 6, 2024 ipapapa@sch...
—
Feb 28, 2024 Ato@schmidt...
111 KB
You are offline. Some functionality may be unavailable.

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)
First Amended Complaint

# EXHIBIT 42

StarX–FIFA Memorandum of Understanding (Sept. 14, 2023)

14 September 2023

**MEMORANDUM OF UNDERSTANDING**

This Memorandum of Understanding ("MOU") sets forth a high-level description of certain actions and negotiations that the Fédération Internationale de Football Association ("FIFA") and StarX Networks, Inc. ("StarX", and together with FIFA, the "Parties") intend to pursue in connection with fan-engagement technologies to be developed by StarX. This MOU is non-binding except as specifically provided below. A binding agreement with respect to the overall relationship between the Parties will not occur unless and until the Parties have negotiated, approved, executed and delivered the appropriate definitive agreements. The terms and conditions of this MOU shall be governed in all respects by Swiss law.

1. **Strategic Objective**
    a. The Parties' goal is to create a cohesive global football community through various technologies to be developed by StarX (the "Fan-Engagement Technologies") to be designed and implemented by StarX with certain specified support from FIFA as described below.

2. **General Terms**
    a. While specific terms of the relationship between FIFA and StarX with respect to the Fan-Engagement Technologies are to be negotiated as discussed below, the general terms of the relationship will include:
        i. Basic guaranteed revenues for FIFA and for participating football federations, leagues, clubs and players globally.
        ii. FIFA will not be responsible for any costs or expenses relating to the development or implementation by StarX of the Fan-Engagement Technologies.
        iii. A revenue share model to be negotiated by the Parties will be developed providing for revenue sharing over a threshold.
        iv. A data ownership sharing model.
        v. The revenue generated by the Fan-Engagement Technologies will not be generated from or negatively impact current income streams.

3. **Six-Month Test Period**
    a. The Parties agree that they will generally work together over the six-month period following the date of this MOU (the "Test Period") on the creation of the Fan-Engagement Technologies and in negotiating the contractual terms of the StarX and FIFA relationship.
    b. During the Test Period, StarX will use commercially reasonable efforts to design and build out the Fan-Engagement Technologies, with the goal of beta testing the Fan-Engagement Technologies at or around the end of the Test Period. FIFA will support StarX's design and build-out efforts as may be mutually agreed by the Parties.

c. During the Test Period, the Parties will consider all forms of collaboration on fan engagement projects with other stakeholders such as Leagues, Clubs, and Players associations, and use its commercially reasonable efforts to seek the participation of one or more of such stakeholders in the beta-testing process.
d. During the Test Period, the Parties will negotiate in good faith the specific terms of the relationship, including the terms described in Section 2 above and terms relating to the protection of confidential information and intellectual property.
e. Exclusivity During the Test Period: Subject to existing fan engagements initiatives already in place with commercial partners, FIFA during the Test Period, will not engage in substantive discussions or negotiations with respect to new proposals relating to fan engagement technologies of the same or similar type or goals as the fan engagement technologies that are the subject of this MOU.
f. Test-Period Expenses: During the Test Period, StarX shall be responsible for all of its expenses in connection with the development of the Fan-Engagement Technologies.

4. **Termination**: If as of the end of the Test Period the Parties have not come to a definitive agreement, unless the Parties agree otherwise, this MOU shall terminate and be of no further force or effect other than with respect to the provisions titled “Exclusivity During the Test Period”, “Test-Period Expenses”, “Termination”, “Expenses” and “Confidentiality”, which shall be binding and shall survive any termination of this MOU.

5. **Expenses**: Without limiting in any way Section 3.f above, each Party shall be responsible for any fees and expenses incurred by such Party in connection with the negotiation this MOU and the terms of the relationship contemplated hereby.

6. **Confidentiality**: The existence and terms of this MOU and the fact that negotiations may be ongoing between the Parties shall not be disclosed by a Party to any other person or entity without the consent of the other party.

The Parties acknowledge their agreement to the terms contained herein by signing below as of 14 September 2023.

**Fédération Internationale de Football Association**

By: DocuSigned by: Giuliano Giorgetti DE52E64F7234404...

Name:

Title:

By: DocuSigned by: Romy Gai 788881762E92406...

Name:

Title:

**StarX Networks, Inc.**

By: DocuSigned by: Michelle Ritter BE9623987F49413...

Name:

Title:

DS

LWT

DS

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)
First Amended Complaint

# EXHIBIT 43

"The Predator's Playground" op-ed (Jan. 2026); Feb. 2026 letter to Members of Congress (images)

# The Predator's Playground: How Silicon Valley Built a System to Pay Abusers and Bankrupt Victims

Google's history of sexual harassment scandals, legal settlements, and arbitration culture reveals how economic coercion—not truth—determines who gets justice in modern America.



MICHELLE RITTER
JAN 23, 2026

Silicon Valley likes to brand itself as a meritocracy. Its largest companies insist their cultures are built on talent, transparency, and "doing the right thing." Yet behind the glossy recruiting slogans and diversity statements sits an uncomfortable truth: the modern workplace has quietly become a predator's playground—one where power is enforced not merely through sex or status, but through economics, litigation, and data, including intellectual property theft.

Few companies illustrate this better than Google.

---

## Google's Culture of Quiet Payouts

Google has a long and well-documented history of sexual harassment controversies. In 2018, New York Times reporting revealed that Andy Rubin, the creator of Android, left the company after a sexual misconduct complaint—and received a $90 million exit package for his troubles. [1] Another senior executive, Amit Singhal, reportedly received $35 million. [2] The pattern was unmistakable: senior men accused of violating women were paid handsomely to go away.

The women who reported them were left to navigate attorneys, internal processes, skepticism, professional exile, forced arbitration in an inherently biased arbitration forum in favor of their repeat corporate defendants and litigants, and an impossible calculus—fight, or disappear.

This dynamic is not abstract. Women who report harassment routinely face stalled

careers, isolation, retaliation, and reputational labeling. Even when believed, they become "victims," marked professionally for years. Most are forced to choose between attempting to fight through mandatory arbitration clauses—often without pay, without discovery, and without public accountability—or taking a settlement that buys their silence through airtight nondisclosure agreements (NDAs).

The men get millions. Whereas the victims get warnings about ruining their careers.

This is not conjecture. It was documented by *The New York Times* and later confirmed by a shareholder derivative lawsuit that Google settled for more than $300 million in 2020 due to misconduct claims. [3] The company claimed it was serious about reform to address sexual misconduct and harassment, as well as eliminating the procedural and structural gaps that enabled executives and Google insiders to have persisted in such an exploitative culture for so long.

In fact, Alphabet CEO Sundar Pichai said:

> "I hope these commitments will serve as a strong signal to all of you that we are not going back in time." [4]

Specifically, as Jennifer Elias reported via CNBC:

> "*Companies originally used NDAs to protect trade secrets, but they've gradually expanded to cover a blanket of topics, including workplace conditions, which critics say silences victims and enables perpetrators. Under the [Google sexual harassment] settlement terms, workers can now discuss facts of cases related to harassment or discrimination.*"[5]

Yet, the Google sexual harassment settlement never addressed the underlying economic structure that incentivizes silence and protects abusers. It also certainly did not sufficiently address the levers through which abusers continued, even more fiercely, to silence their victims and whistleblowers.

---

## Why Victims Don't Speak

Corporate America likes to suggest that victims and whistleblowers stay quiet out of

shame or fear. In reality, they stay quiet because the economics are brutal, and retaliation is real.

***1. Sexual assault and harassment, inherently, involve economic control.***

Speaking up often means losing income, health insurance, professional networks, references, investors, and the ability to continue working in the same industry. People do not set out to build careers hoping to become whistleblowers. As journalist Anna North and others have documented, the financial and logistical costs of reporting harassment frequently outweigh any potential upside—even before litigation begins. [6]

An easy example here are the countless stories regarding Harvey Weinstein's victims – what were the consequences of not acquiescing to Weinstein's sexual assaults or of even considering reporting them? Blackballing from the entertainment industry and thus, economic consequences. [7]

---

***2. Arbitration forums are pay-to-play and like any entity structured to maximize profits, biases and structures form to protect repeat "customers," which are often well-capitalized corporate defendants and litigants.***

Arbitration forums such as the American Arbitration Association (AAA) – which controls over 85% of the US arbitration market – are marketed as efficient alternatives to court. In practice, they are businesses dependent on repeat corporate customers. Those customers control the tempo and hire familiar firms – for example, Glaser, Weil, Fink, Howard, Jordan & Shapiro, LLP is a well-renowned firm for having represented Harvey Weinstein and other high-powered defendants in sexual abuse cases. [8] A one-time victim is not a valued participant; the individual is simply an expensive inconvenience and typically intended as a deterrent for others. Lawsuits have alleged systemic bias in favor of repeat corporate defendants. [9] Arbitration favors commercial leverage and those that can "pay" for time.

---

***3. Reputation, Public Narrative, and Character Assassination***

Victims and whistleblowers are often labeled "crazy" for a reason. Character

assassination is not incidental to abuse; it is one of its most effective tools.

Reputation is economic power. In business, credibility determines access to capital, partnerships, customers, and future opportunity. It should come as no surprise, then, that one of the fastest ways to silence a victim or whistleblower is to undermine their credibility as publicly and decisively as possible.

This tactic is familiar in corporate warfare. Hostile takeovers and activist campaigns often begin by attacking management and executives, not by debating facts. People are easier to discredit than systems. Once a person is reduced to a caricature – "unstable," "difficult," "emotional," "self-interested" – their claims can be dismissed without examination.

The same logic applies to abuse.

After a victim or whistleblower raises allegations, the next move of a predator is almost always to attack the character of the person speaking, regardless of the truth. The objective is not rebuttal; it is narrative control. Misleading the public becomes a strategic necessity.

There is a name for this pattern: **DARVO**—*deny, attack, reverse victim and offender.* [10] It is a technique widely documented in predatory dynamics, sexual and otherwise. The abuser denies wrongdoing, attacks the credibility of the accuser, and reframes themselves as the real victim of persecution or opportunism.

This is why victims of sexual assault are so often called "crazy," and why whistleblowers are portrayed as having ulterior motives. It is not accidental. It is intentional, strategic, and efficient.

Power and money tend to congregate. So do the people most skilled at protecting them.

---

### *4. Time and Costs as Weapons*

Predators also understand something else: victims and whistleblowers do not want to relive the past. Victims and whistleblowers also do not inherently want a deeply

personal experience to be presented for the world to dissect, or for them or their families to relive for years on end, or to become professionally radioactive.

Recounting abuse is exhausting. Being a victim or whistleblower is also not an attractive line item on a résumé. The language of "speaking your truth" collapses under the math of capitalism and often times, reality.

Not because the claims were false, but because the real-world costs of sustained resistance—economic, reputational, legal—were too high for most people, their families, their attorneys, or their colleagues to bear.

---

### *5. "Why Not Just Move On?"*

This question is often asked with feigned innocence: *Why not just walk away? Why not start over?*

Because predators rarely let go. Abuse is not only about the initial conduct; it is about control. Economic entanglement creates a false choice: fight, or submit. Walking away often means forfeiting work, equity, intellectual property, professional standing, or years of effort. Silence becomes the price of escape.

At some point, each victim faces the same decision: whether to accept quiet erasure, or resist knowing the cost may be severe.

For some, there is no choice and systemic issues are in play. This is why I'm speaking out. "It is better to die on your feet than to live on your knees." [11]

---

## The EFAA and the Evolution of Silence

In 2021, Congress passed the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act (EFAA), reflecting bipartisan concern that forced arbitration was suppressing public accountability for sexual misconduct. [12] Victims could no longer be compelled into private arbitration simply for reporting harassment.

It was a real step forward. But like all partial reforms, it reshaped the battlefield –

predatory behavior did not stop; it adapted.

Before the EFAA, the strongest silencing tools were NDAs, arbitration clauses, and industry reputation. After the EFAA weakened those contracts, predators adapted. They shifted to a more modern toolkit: economic coercion and legal forums that favor the repeat clients (defendants). Plus, in some cases, data alteration.

If silence can no longer be guaranteed upfront, the goal becomes to ensure the victim cannot function economically or fairly in any forum. Counsel is deployed. Negotiations are stretched. Payments are stalled. Arbitration is threatened on adjacent contractual issues. Time is weaponized. Witnesses are intimidated. False narratives are circulated. Capital is outspent.

Most people eventually conclude that the costs of continued entanglement with a vindictive predator operating inside a structurally biased legal and business environment far exceed the benefits of persistence.

And if a settlement is extracted, it can still be breached. Arbitration can still be invoked. Following the rules for abusers can be delayed, making it effectively optional. Meanwhile, the victim *bleeds* capital.

In ordinary business, a party that refuses to perform does not receive the benefit of the bargain. In arbitration, perversely, it sometimes does—especially when the “benefit” is silence.

At that point, the victim or whistleblower is not merely silenced. They are economically owned.

This is the dimension of sexual harassment the law has never fully confronted. Abuse does not end with the conduct itself. It continues through the economic aftermath—through withheld payments, sabotaged opportunities, arbitration filings, surveillance, data manipulation, reputational smearing, and professional interference.

Domestic violence courts have recognized economic control as a form of coercive abuse for decades. The EFAA finally acknowledged it in workplace law. But the statute is new, victims rarely have the resources to litigate, and most corporate misconduct never reaches public view.

## Why Google Matters

This is not only about Google's past scandals. It is about what Google represents in 2026.

Google sits at the intersection of data, money, artificial intelligence, surveillance, communications, and identity. It influences nearly every industry.

- Google **controls almost 90% of global search out of over 6 billion people.** [13]
- Google is **one of the "big three" global cloud providers**, alongside Amazon and Microsoft. [14] (The difference between the others and Google is the next stat.)
- **Google processes more than 121 billion emails per day and accounts for roughly 28% of global consumer email traffic.** [15]

**That's a lot of data involving a lot of people globally. That's also a lot of evidence.** Few institutions—public or private—exercise comparable influence over how information is stored, accessed, transmitted, or erased.

Which raises a fundamental question: is Google merely a for-profit company, or has it become a global utility in all but name?

And if it is a utility in practice, who governs it in reality? Can any single country meaningfully regulate a company that controls such vast cross-border data flows? Who ultimately owns whom?

These questions are not theoretical. Google has been sued repeatedly for privacy violations, digital surveillance, and data-based abuses around the world, including a **nearly $1.4 billion settlement with the State of Texas in 2025.** [16] The European Union hit Google with an **over €2.95B billion EU fine in 2025 for discriminatory practices and privacy breaches.** [17] In 2024, **Russia imposed a fine on Google so large—$2.5 decillion**—imposed over YouTube-related disputes alone, not even the entirety of Alphabet's operations. [18]

The scale of these conflicts underscores a reality that regulators increasingly struggle to confront: Google's power routinely exceeds the reach of traditional enforcement mechanisms.

A company that once said "don't be evil," and now asks the public to trust it to build the future of artificial intelligence and to continue serving as the digital backbone to society.

Taking an even bigger step back – **if Google and its insiders are willing to allow extensive data deletion and alteration in relation to the sexual assault and to businesses, how many other situations – presumably those that are much "higher stakes" than mine, at least at the surface level – are implicated?**

History offers sobering answers. **When Google executives and insiders can control the data in high-stakes situations, everything could theoretically be for sale to the highest bidder, or greatest cost – including in sexual assault cases with executives, Epstein, government elections, and maybe even something as seemingly benign as the accuracy of your home insurance policy sitting in your email.**

Accountability depends on transparency.

Google has undoubtedly failed in protecting against sexual harassment or enabling it —directly or indirectly—through insiders, former executives, affiliates, or investment partners; Google has also been lax in supporting domestic violence victims in protecting against digital stalking and other forms of abuse. The truth is this: sexual harassment in the 21st century is not just about sex; it is about economics, data, and power.

Thus, whether or not Google should have greater oversight or be split up is for a later discussion. **I've posed a number of rhetorical questions for Google but there is one that only Sundar, Sergey, Larry, Ruth, and the board can answer – what does Google stand for ethically as a company?**

---

1 *New York Times*, "How Google Protected Andy Rubin," Oct. 25, 2018.

2 NYT, ibid.

3 CNBC, "Google's $310 million sexual harassment settlement aims to set new industry standards," Sept. 2020.

4 CNBC, ibid.

5 CNBC, ibid.

6 Vox, Anna North, "What I've learned covering sexual misconduct this year," 2017.

7 Vox, ibid. "In the months since the New York Times first published women's reports about Harvey Weinstein, I've learned from people who have experienced deep trauma as a result of workplace sexual harassment and violence. I've also learned from people — sometimes the same people — who have had to change fields or careers to get away from powerful men whose harassment also functioned, practically speaking, as a form of discrimination."

8 Variety, "Harvey Weinstein Hires Patricia Glaser to Do Battle with TWC," October 10, 2017. Variety, "Charlie Walk Retains Harvey Weinstein Lawyer to Fight Sexual Misconduct Allegations," February 1, 2018.

9 Wikipedia, "*Stephens v. American Arbitration Association*," last updated June 2025.

10 Freyd, Jennifer J. "*II. Violations of Power, Adaptive Blindness and Betrayal Trauma Theory*", February 1997.

11 Wikipedia, "Emiliano Zapata," last updated January 2026.

12 U.S. Congress, H.R.4445 - Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021, March 2022. Holland & Knight, "Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act Signed into Law," March 2022.

13 Statista, "Market share of leading desktop search engines worldwide from January 2015 to October 2025," November 2025.

14 Marketing4eCommerce, "Amazon, Google, and Microsoft control 60% of the global cloud. As we observed with the AWS outage, it poses (many) problems," October 21, 2025.

15 DemandSage, "Gmail Statistics (2026): Users by Country & Market Share," January 6, 2026. SQMagazine, "Gmail Statistics 2026: User Growth, Market Share & Emerging Trends," August 6, 2025. Statista, "Gmail Dominates U.S. Market," March 28, 2025.

16 Bloomberg Law, "Google to Pay Texas $1.4 Billion to End Privacy Cases (1)," May 9, 2025.

17 Reuters, "Google hit with $3.45 billion EU antitrust fine over adtech practices," September 5, 2025.

[redacted]

**Date:** February 10, 2026

**To:** **The Honorable Members of the United States Congress, including the United States Senate and House of Representatives**

**From:** Michelle Ritter
Los Angeles, CA, USA
ritter_legal@outlook.com

---

**Subject:** **Urgent Request for Congressional Oversight in relation to (1) Epstein Files, (2) Evidence Integrity, (3) Whistleblower Suppression via Arbitration, and (4) Google's Data Alteration and Risks to Federal Investigations Involving Google-Hosted Records**

---

**Dear Honorable Members of the United States Congress**,

I write to formally request urgent Congressional oversight into systemic risks affecting the integrity of digital evidence relied upon in whistleblower actions, sexual assault and harassment investigations, and federal matters of national importance.

These concerns arise from my direct, first-hand experience over the past eighteen months while litigating against Eric Schmidt, former CEO and Chairman of Google, and Google itself. What I have observed presents serious, unresolved risks that extend far beyond my individual case and implicate federal investigations, corporate governance, tax compliance, and democratic accountability.

**My primary concerns are as follows:**

**I. Integrity Risks to Epstein-Related Digital Records and potential Google-based alteration.**

There is substantial reason to question whether certain Epstein-related email records were altered prior to production to government authorities.

- Jeffrey Epstein's email accounts were hosted on Google infrastructure.
- The same technical trace indicators of Google server-side data alteration that I documented in my own litigation against Eric Schmidt and Google appear to be consistent with anomalies in and portions of the DOJ's Epstein-related email records.
- The documented use of alternate identities by senior individuals is prevalent.[1]
- I possess first-hand knowledge of Google-facilitated server-side data alteration conducted on behalf of senior insiders in the context of high-stakes litigation, sexual assault matters, and sensitive corporate and tax records.

[1] For example, one of Eric Schmidt's aliases is "Eric Ross." This name was seen in multiple files in the December 2025 DOJ records release. After the name was flagged to Eric Schmidt, his team, and Google, the number of files with "Eric Ross" diminished dramatically, including in the late January 2026 DOJ records release.



[redacted]

[redacted]

  - Direct statements made to me by Eric Schmidt regarding Google's internal backdoors and data-alteration capabilities, were later corroborated by technical findings and an extensive number of agreements and emails that were either not authentic or otherwise altered remotely.
- Google's internal logging architecture is intentionally limited, materially constraining post-hoc forensic auditing and shielding institutional exposure for evidentiary manipulation.

These factors together create an unacceptable risk to the reliability of digital evidence submitted to federal investigators. The relevant context and further details are listed within my lawsuit against Google and Eric Schmidt; the Google lawsuit, in particular and as alleged, demonstrates the extent to which Google directly enables, participates, and profits from such data alteration pre-production to legal processes.

**II. Broader Scope of Data-Integrity Vulnerabilities**

These risks are not confined to sexual misconduct cases. They extend to any digital records hosted, processed, or preserved on Google's servers, including:

- Corporate governance documentation
- Tax and financial records[2]
- Election-related information and search integrity
- Regulatory and court-submitted evidence

This issue is not just surveillance or targeted advertising; rather, it is the unaccountable, opaque capacity to dynamically alter Google's server-side data in ways that defeat preservation, auditing, and reliable chain of custody.

To be direct, the evidence or digital records that Congress is viewing may have been subject to alteration prior to presentation, previewed illegally by some of Epstein's co-conspirators and clients, and prepared such that some well-placed individuals will likely be held unaccountable.

**III. Weaponization of Arbitration to Silence Victims and Whistleblowers**

Google insiders and executives routinely deploy arbitration and economic coercion to suppress disclosure and avoid accountability.

In my case, I was forced into a corporate arbitration forum despite being an individual litigant, dramatically increasing the cost of defense. I was repeatedly pressured to:

- Waive protections afforded under the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act (EFAA),
- Execute declarations restricting disclosure,

[2] This includes, in my litigation, seeing Eric Schmidt and his family office, Hillspire LLC, submit fraudulent tax files to both state and federal agencies as enabled by the breaches, remote access, and data alteration via Google. This mechanism has ultimately enabled significant asset and liability shifting as well as fraudulent corporate governance and tax documents.



[redacted]

- Bind family members to punitive terms, including penalties exceeding $1,000,000 per alleged breach, or else be barred from future business dealings and denied access to a fair legal forum.

Unfortunately, arbitration has been weaponized for the haves against the have-nots; it is built, in these cases for protecting perpetrators and their enablers, to ensure that victims and whistleblowers are judged and ultimately lose on the basis of economics, not justice. The victory goes to deep-pocketed defendants who are repeat parties in arbitration, which is ultimately a pay-for-play forum that aims to serve their repeat clients.[3]

**IV. Escalating Risk in the Era of AI-Mediated Communications**

As Google deploys AI systems such as Gemini across email and communications infrastructure, these risks will accelerate absent enforceable safeguards, transparency requirements, and independent auditability.

Without oversight, federal investigators, courts, and victims may increasingly rely on digital evidence whose integrity cannot be independently verified.

I respectfully request that Congress initiate oversight and inquiry into these matters before further compromise of federal investigations, victims' rights, and the integrity of digital evidentiary systems occurs.

I am prepared to provide technical evidence, sworn testimony, and full cooperation to assist Congress in assessing and addressing these risks.

Thank you for your attention to this urgent matter.

Respectfully,

**Michelle Ritter**

[3] Michelle Ritter, "**The Predator's Playground: How Silicon Valley Built a System to Pay Abusers and Bankrupt Victims**," January 23, 2026. https://rittermichelle.substack.com/p/the-predators-playground-how-silicon.

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)

First Amended Complaint

# EXHIBIT 44

Marcus correspondence refusing attorney-witness status (Sept. 12, 2025)

**From:** **Craig H. Marcus** cmarcus@glaserweil.com
**Subject:** RE: Ritter v Eric Schmidt et al.; Case No. 25STCV26114 – Lawyer/Witness
**Date:** September 12, 2025 at 5:50 PM
**To:** Michelle Ritter ritter_legal@outlook.com
**Cc:** Patricia L. Glaser pglaser@glaserweil.com, Celia H. Spalding cspalding@glaserweil.com, Simon K. Moradzadeh smoradzadeh@glaserweil.com

CM

Ms. Ritter,

Yet again, your below e-mail is inaccurate and denied. Moreover, your ad hominem insults are inappropriate. Please cease and desist your efforts to create a false record.

Craig Marcus

Glaser Weil

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**From:** Michelle Ritter <ritter_legal@outlook.com>
**Sent:** Friday, September 12, 2025 5:43 PM
**To:** Craig H. Marcus <cmarcus@glaserweil.com>
**Cc:** Patricia L. Glaser <pglaser@glaserweil.com>; Celia H. Spalding <cspalding@glaserweil.com>; Simon K. Moradzadeh <smoradzadeh@glaserweil.com>
**Subject:** Re: Ritter v Eric Schmidt et al.; Case No. 25STCV26114 – Lawyer/Witness

Mr. Marcus,

The level of your advocacy has taken on a very personal tone, as opposed to simply advocating for Mr. Schmidt and professionally representing your firm, Glaser Weil.

In working for Patricia Glaser, who is renowned in her field, and with Eric Schmidt as a client, your conduct is incredibly condescending and frankly, should be uninspiring for anyone who works for you. Please spare me yet another threat or more harassment. You should know the difference between being zealous counsel versus being an accomplice. You forced me to withdraw the DVRO in order to save my parents. I didn't even have CA counsel and your entire firm knew that.

If you are implying that I cannot legally protect myself in court or any venue without constant harassment or retaliation from you, your clients, or your firm, then simply say so. As I said, I can't help that you filed a signed declaration last week making you a witness, alongside your firm; what's even more incredible is that it's over issues substantively at the heart of multiple claims and for which I categorically deny.

With respect to jurisdiction, I am exercising my rights, protecting myself, and pursuing proper procedure. If you are further retaliating or stating that you are not a witness despite your opposition papers, that is the prerogative of your own firm. There are issues with CCP 1001-1002, which you know, issues with crime-fraud exceptions to attorney-client privilege rules, and attorney-witness issues. Your rewrite of history is unfortunately par for the course. I'd hope for better.

Craig - for someone who works for a woman who runs her own business, you are incredibly rude to women.

My notices remain and I'll see you in court

My notices remain and I'll see you in court.

Respectfully,

Michelle

On Sep 12, 2025, at 5:11 PM, Craig H. Marcus <cmarcus@glaserweil.com> wrote:

Ms. Ritter,

Respectfully, your below e-mail is unintelligible, inaccurate, non-responsive, and denied.

Craig Marcus

Glaser Weil

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

---

**From:** Michelle Ritter <ritter_legal@outlook.com>
**Sent:** Friday, September 12, 2025 4:59 PM
**To:** Craig H. Marcus <cmarcus@glaserweil.com>
**Cc:** Patricia L. Glaser <pglaser@glaserweil.com>; Celia H. Spalding <cspalding@glaserweil.com>; Simon K. Moradzadeh <smoradzadeh@glaserweil.com>; Michelle Ritter <ritter_legal@outlook.com>
**Subject:** Re: Ritter v Eric Schmidt et al.; Case No. 25STCV26114 – Lawyer/Witness

Craig,

Thanks. I am operating off of the facts, which were even compounded by own opposition papers that are still delayed in filing with the court. Those papers included a declaration explicitly signed by you, in which you materially misstated facts. I appreciate that you are now trying to bring in your firm but you forced me to sign the DVRO stipulation and even your declaration admitted as much.

You actually appear to know a lot about my personal and professional life with Eric as well. Your firm does too. I can't help that your client was incapable of not stalking me to Nobu and stealing my computer with evidence back in November 2024.

Finally, on the arbitration clause that you claim I'm held to, let's not forget the commitments that you and Jill Harris made to give me back my workspace or my assets prior to December 17, 2024 and even in stipulating I would give them back.

Craig - please stop the charade. I'll see you all in court because I am done being harassed by you, your clients, and your firm. I am following the rules. It's been 18+ months.

Michelle

On Sep 12, 2025, at 4:48 PM, Craig H. Marcus <cmarcus@glaserweil.com> wrote:

Ms. Ritter,

Your below e-mail is inaccurate and without merit for several reasons and, therefore, we respectfully reject your request.

First, Rule 3.7 states that "[a] lawyer shall not act as an advocate in a trial in which the lawyer is likely to be a witness" unless the lawyer obtains informed written consent (or an exception applies). In this case, no lawyer from Glaser Weil will testify at trial. Moreover, as explained below, given the mandatory arbitration clause in the Agreement, there will never be a trial of this case. Therefore, Rule 3.7 is inapplicable.

Second, you cannot unilaterally deem attorneys from Glaser Weil trial witnesses in order to artificially invoke Rule 3.7 or otherwise seek to disqualify the firm. *See, e.g.*, *Optyl Eyewear Fashion Intern. Corp. v. Style Cos., Ltd.,* 760 F.2d 1045, 1050 (9th Cir. 1985) ("The drafters of the ABA Code have cautioned that the ethical rules '[were] not designed to permit a lawyer to call opposing counsel as a witness and thereby disqualify him as counsel'."); *Smith, Smith & Kring v. Superior Court*, 60 Cal. App. 4th 573, 581 (1997) ("Should counsel freely be able to disqualify opposing counsel simply by calling them as witnesses, it would 'pose the very threat to the integrity of the judicial process that motions to disqualify purport to prevent' [Citation omitted].").

Third, a party's attempt to compel the testimony of opposing counsel is "***presumptively improper, severely restricted, and require[s] 'extremely' good cause***—a high standard[.]" *Carehouse Convalescent Hosp. v. Superior Ct.*, 143 Cal. App. 4th 1558, 1562-63 (2006) (emphasis added). Such efforts "chill the attorney-client relationship, impede civility and easily lend themselves to gamesmanship and abuse." *Id*. Therefore, your attempt to seek testimony from Glaser Weil is "presumptively invalid" and you cannot possibly satisfy the "extremely" high standard required to obtain such testimony.

Fourth, in the unlikely event that Rule 3.7 ever becomes applicable, we will comply with the Rule at that time, in the manner contemplated by the Rule. However, given the mandatory arbitration clause in the Agreement, there will never be a trial of this case that could trigger Rule 3.7.

Fifth, as explained in opposition to your meritless application for a temporary restraining order ("TRO Application"), the confidentiality clause and declaration that are components of the December 4, 2024 Agreement ("Agreement") do not violate Code of Civil Procedure Sections 1001-1002. Rather, Sections 1001-1002, by their express terms, are inapplicable to the Agreement. Section 1001 only prohibits "a provision within a settlement

agreement that prevents or restricts the disclosure of factual information *related to a claim filed in a civil action or a complaint filed in an administrative action*" regarding an act of sexual assault, sexual harassment, or workplace harassment or discrimination. Code Civ. Proc. § 1001(a)(1)-(4) (emphasis added). Likewise, Section 1002 only prohibits "a provision within a settlement agreement that prevents the disclosure of factual information *related to the action . . . in any civil action* the factual foundation for which establishes a cause of action for civil damages for" certain sexual offenses. Code Civ. Proc., § 1002(a)(1)-(4) (emphasis added). You have never filed an action against any of the Defendants alleging any sexual offenses or discrimination claims, and certainly not before the Agreement was executed. Therefore, Sections 1001-1002 do not apply to the Agreement and do not invalidate the confidentiality clause or declaration contained therein.

Sixth, as also explained in our opposition to your meritless TRO Application, your claims asserted in the Superior Court action are subject to mandatory arbitration. In particular, you expressly agreed "to submit any and all Claims between" the parties "to final, mandatory, binding arbitration," including all issues "relating to and/or arising out of the validity, scope, interpretation, and/or enforceability of the Agreement," "the validity, scope, interpretation, and/or enforceability of this arbitration clause," and "the arbitrability of all issues, including but not limited to which Claims are subject to arbitration and which claims are not subject to arbitration." Agreement, § 3(g)(i). Moreover, during the pending arbitration, you waived any "challenge [to] the validity of the arbitration agreement or the arbitrability of the alleged claims" and "agree[d] that the arbitrator has jurisdiction to resolve all pending claims." Preliminary Scheduling Order (Ex. 2, ¶¶ 2, 6). Therefore, your current claims challenging the enforceability of the Agreement must be arbitrated. We will be filing a motion to compel arbitration at the appropriate time.

Seventh, your filing and prosecution of this meritless and malicious Superior Court action, that is indisputably subject to arbitration, constitutes a breach of the mandatory arbitration and confidentiality provisions in the Agreement, and your continuing breach has and continues to cause harm to the Schmidt Parties.

For all the foregoing reasons, your below e-mail and threatened action are meritless, inaccurate, and rejected.

Finally, please include my colleagues, Celia Spalding and Simon Moradzadeh (both copied), on all communications going forward.

Regards,

Craig Marcus

<image001.png> **Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

---

**From:** Michelle Ritter <ritter_legal@outlook.com>
**Sent:** Friday, September 12, 2025 9:20 AM
**To:** Patricia L. Glaser <pglaser@glaserweil.com>; Craig H. Marcus <cmarcus@glaserweil.com>
**Cc:** Michelle Ritter <ritter_legal@outlook.com>
**Subject:** Ritter v Eric Schmidt et al.; Case No. 25STCV26114 – Lawyer/Witness

Patti and Craig,

It is my understanding that, in order for you to proceed in this matter both as Counsel and as a Witness, your clients must execute an informed written consent authorizing you to serve in both capacities pursuant to Rule 3.7 of the Rules of Professional Conduct.

Please confirm by **5:00 PM today** as to whether the Informed Written Consent has been obtained from your Clients. I am eager to avoid unnecessary delays and to proceed expeditiously with depositions of attorneys and all other participants involved in the violation of CCP §§ 1001–1002.

If I do not receive confirmation by the deadline above, I intend to promptly file a request with the Court to address these issues.

Thank you for your attention to this matter.

Sincerely,

Michelle Ritter

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

# EXHIBIT 45

Rad Rectangle, LLC "Review of StarX" (July 27, 2024) with StarX admin-event log excerpts and CGNET audit log

Gmail

**Misha Makara <misha.makara@radrectangle.com>**

# Review of StarX

1 message

**Misha Makara** <misha.makara@radrectangle.com> Sat, Jul 27, 2024 at 6:56 PM
To: Ritter.sm@icloud.com

Michelle,

Attached is the quick review you requested of Starx.

This account has clear evidence of tampering and unauthorized access.

As such, I continue to recommend formal forensics on the account and would be happy to provide direction similar to earlier this week with your physical devices.

Please let me know if you have any questions.

**QUICK POINTS on Starx:**

Here are the definitive and defensible points you can bring up.

#1) **Mystery GCP Project w/ Service Account having full admin rights**
A project was setup by you that had a service account with access to everything and ran the gmail.insert command. Moreover, the key for this project was used earlier this week. We only learned about it on July 23rd at 6:23PM when setting up the Synology backup.

This means that there was an attempt to manipulate this week.




#2) **Gmail.Insert command**
The following command was run supposedly by you on July 4th from your house's IP address.
(from StarX Admin event logs).

| | | | | |
|---|---|---|---|---|
| **2024-07-04T23:17:08-07:00** | Authorize API Client Access | API client access to your organization from client 955661971872-ie97v0ns6ndb19rbr9nlpkahpmfk9ugf.apps.googleusercontent.com authorized for scopes https://mail.google.com/, https://www.googleapis.com/auth/email.migration, https://www.googleapis.com/auth/gmail.insert, https://www.googleapis.com/auth/gmail.labels (domain_name: {starx.com}) | mritter@starx.com | 76.53.8.234 |
| **2024-07-04T23:17:08-** | Authorize API Client Access | API client access to your organization from client 955661971872-ie97v0ns6ndb19rbr9nlpkahpmfk9ugf.apps.googleusercontent.com authorized | mritter@starx.com | |

| | | | | |
|---|---|---|---|---|
| **07:00** | | for scopes https://mail.google.com/,https://www.googleapis.com/auth/email.migration,https://www.googleapis.com/auth/gmail.insert,https://www.googleapis.com/auth/gmail.labels (domain_name: {Google Workspace Data Migration Service}) | | |

Unless you've been hiding your developer abilities and expert knowledge of Gsuite, I'm betting this isn't you.

#3) **Mystery idfr@starx.com**
This user was created on June 17th and was given admin rights to the organization, and then changed your password. We assume this was for a security firm.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **2024-06-17T12:15:25-07:00** | Password Change | Password changed for mritter@starx.com | cgnet@starx.com | 69.209.19.223 | | | |
| **2024-06-17T10:45:23-07:00** | User Put in 2-Step Verification Grace Period | 2-step verification grace period has been enabled on idfr@starx.com till 2024-06-18 10:45 PDT | cgnet@starx.com | 69.209.19.223 | | | |
| **2024-06-17T10:45:23-07:00** | 2-Step Verification Scratch Codes Generate | New 2-step verification scratch codes generated for the user idfr@starx.com | cgnet@starx.com | 69.209.19.223 | | | |
| **2024-06-17T10:44:39-07:00** | Assign Role | Role Super Admin assigned to user idfr@starx.com | cgnet@starx.com | 69.209.19.223 | | | |
| **2024-06-17T10:43:48-07:00** | User Creation | idfr@starx.com created | cgnet@starx.com | 69.209.19.223 | | | |

#4) **A linux device w/ full rights.**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2024-06-18T12:49:20-07:00** | 624c25e5-4d46-4a8e-b393-fa28a71af1c4 | Account registration change | idfr@starx.com's account registered on Linux | idfr@starx.com | Linux | Linux | | | Unknown | | | |
| **2024-06-18T11:57:58-07:00** | 181acbdb-4447-4ad2-9c6d-ad61f17cb347 | Account registration change | Michelle Ritter's account registered on Linux | mritter@starx.com | Linux | Linux | | | Unknown | | | |

#5) **CGNET's Actions**
Like we saw with SP, CGNET is doing a lot of stuff, almost on a daily basis.
As your service provider, I would expect them to maintain a detailed audit trail of who requested what and when.

See Attached: Starx - CGNET Audit Log.xls

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)

First Amended Complaint

# EXHIBIT 46

DV-100 Request for Domestic Violence Restraining Order (Dec. 11, 2024), LASC No. 24SMRO00444

# EXHIBIT 84

## Dec. 11, 2024 DVRO Request (LASC 24SMRO00444)

**Description**

December 11, 2024 Domestic Violence Restraining Order Request, filed in Los Angeles Superior Court Case No. 24SMRO00444 before Judge David W. Swift (Form DV-100).

**Status**

**ATTACHED — exhibit content follows this cover sheet.**

**Source**

[mounted]/__USE/2024-12 - Agreements + DVRO/2024-12-11 *-DVRO filing/2024-12-11 - DV100-DVRO Request-3.pdf

— Cover sheet compiled 2026-04-27 —

# DV-100 Request for Domestic Violence Restraining Order

*Clerk stamps date here when form is filed.*

Electronically FILED by
Superior Court of California,
County of Los Angeles
12/11/2024 2:29 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By Aracely Quiroz, Deputy Clerk
24SMRO00444

Assigned for all purposes to:
David W. Swift,
(Department, SME).

*Fill in court name and street address:*

**Superior Court of California, County of** Los Angeles

West District
1725 Main St.
Santa Monica, CA 90401

*Court fills in case number when form is filed.*

**Case Number:** 24SMRO00444

**Instructions**

To ask for a domestic violence restraining order, you will need to complete this form and other forms (see page 12 for list of forms). If this case includes sensitive information about a minor child (under 18 years old), see form DV-160-INFO, *Privacy Protection For a Minor (Person Under 18 Years Old) Domestic Violence Prevention* for more information on how to protect the child's information.

## 1 Person Asking for Protection

a. **Your name:** Michelle S Ritter

b. **Your age:** 30

c. (!) **Address where you can receive court papers**

(This address will be used by the court and by the person in (2) to send you official court dates, orders, and papers. For privacy, you may use another address like a post office box, a Safe at Home address, or another person's address, if you have their permission and can get your mail regularly. If you have a lawyer, give their information.)

Address: 1060 Brooklawn Dr
City: Los Angeles State: CA Zip: 90077

d. (!) **Your contact information** *(optional)*

(The court could use this information to contact you. If you don't want the person in (2) to have this information, leave it blank or provide a safe phone number or email address. If you have a lawyer, give their information.)

Telephone: ______ Fax: ______
Email Address: ______

e. **Your lawyer's information** *(if you have one)*

Name: ______ State Bar No.: ______
Firm Name: ______

## 2 Person You Want Protection From

a. **Full name**: Eric E Schmidt

b. **Age** *(give estimate if you do not know exact age)*: 69

c. **Date of birth** *(if known)*: 4/27/1955

d. **Gender**: ☒ M ☐ F ☐ Nonbinary

e. **Race**: White

**This is not a Court Order.**

**Case Number:** 24SMRO00444

## (3) Your Relationship to the Person in (2)

(If you do not have one of these relationships with the person in (2), do not complete the rest of this form. You may be eligible for another type of restraining order. Learn more at https://selfhelp.courts.ca.gov/restraining-orders.)

***(Check all that apply)***

a. ☐ We have a child or children together *(names of children):* __________

b. ☐ We are married or registered domestic partners.

c. ☐ We used to be married or registered domestic partners.

d. ☒ We are dating or used to date.

e. ☐ We are or used to be engaged to be married.

f. ☐ We are related. The person in (2) is my *(check all that apply):*

- ☐ Parent, stepparent, or parent-in-law
- ☐ Child, stepchild, or legally adopted child
- ☐ Child's spouse
- ☐ Brother, sister, sibling, step-sibling, or sibling in-law
- ☐ Grandparent, step-grandparent, or grandparent-in-law
- ☐ Grandchild, step-grandchild, or grandchild-in-law

g. ☐ We live together or used to live together. *(If checked, answer question below):*

Have you lived together with the person in (2) as a family or household (more than just roommates)?

☐ Yes ☐ No (If no, you do not qualify for this kind of restraining order unless you checked one of the other relationships listed above.)

## (4) Other Restraining Orders and Court Cases

a. Are there any restraining orders currently in place **or** that have expired in the last six months (examples: Did the police give you a restraining order that lasts a few days? Do you have one from the criminal court?)

☒ No

☐ Yes *(If yes, give information below and attach a copy if you have one.)*

(1) *(date of order):* __________ *(date it expires):* __________

(2) *(date of order):* __________ *(date it expires):* __________

b. Are you involved in any other court case with the person in (2)?

☐ No

☒ Yes *(If you know, list where the case was filed (city, state, or tribe), the year it was filed, and case number.)*

- ☐ Custody __________
- ☐ Divorce __________
- ☐ Juvenile *(child welfare or juvenile justice):* __________
- ☐ Guardianship __________
- ☐ Criminal __________
- ☒ Other *(what kind of case?):* Civil, 2024.

**This is not a Court Order.**

Case Number: 24SMRO00444

## Describe Abuse

In this section, explain how the person in (2) has been abusive. The judge will use this information to decide your request. Listed below are some examples of what "abuse" means under the law. **It is not a complete list** of all examples of abuse. Give information on any incident that you believe was abusive.

- made repeated unwanted contact with you
- tracked, controlled, or blocked your movements
- kept you from getting food or basic needs
- isolated you from friends, family, or other support
- made threats based on actual or suspected immigration status
- made you do something by force, threat, or intimidation
- stopped you from accessing or earning money
- tried to control/interfere with your contraception, birth control, pregnancy, or access to health information
- harassed you
- hit, kicked, pushed, or bit you
- injured you or tried to
- threatened to hurt or kill you
- sexually abused you
- abused a pet or animal
- destroyed your property
- choked or strangled you
- abused your children

## (5) Most recent abuse

a. Date of abuse *(give an estimate if you don't know the exact date)*: 12/10/2024

b. Did anyone else hear or see what happened on this day?
☐ I don't know ☐ No ☒ Yes *(If yes, give names)*: Ricardo Uribe, Georg Lindsey, Jill Harris, Terry Ritter, Shamim R

c. Did the person in (2) use or threaten to use a gun or other weapon?
☒ No ☐ Yes *(If yes, describe gun or weapon)*:

d. Did the person in (2) cause you any emotional or physical harm?
☐ No ☒ Yes *(If yes, describe harm)*:
The extent of emotional harm to me is enormous when I have been building businesses and finally have a clear path to working on my own, thankfully, and yet, once again, my path has been blocked by his cyber crime and theft, as well as harassment. His use of his capital to extort and harass me have been daunting, and I need help to make this stop please, once and for all.

e. Did the police come? ☐ I don't know ☒ No ☐ Yes *(If the police gave you a restraining order, list it in (4).)*

f. Give more details about how the person in (2) was abusive on this day. Details can include what was said, done, or sent to you (examples: text messages, emails, or pictures), how often something happened, etc.
Eric directed his affiliates to steal my corporate website - www.steelperlot.com and other intellectual property, as well as litigation documents, personal materials, and contacts related to my broader network of friends, colleagues and family, with the businesses served through my website serving as my primary avenue and sources of income; this theft occurred despite his and his own affiliates' recognition that I wholly own steelperlot.com and the data therein mutually agreed to in early December 2024. This seizure was recognized by his own counsel just yesterday, again, after Eric directed his team to change my password for my own email on steelperlot.com (which I own and pay for directly out of my own accounts to Google and all related services); the access to my account and all other 98 email accounts that I pay for included changes to documents that Eric wanted access to on 12/08/2024 and despite his own employees owning those documents digitally, he seized my account to specifically access them and then lock me out of my own companies' and entities' data. He has also directed individuals, by way of giving them access to my own account, to alter the records of what "I" am doing on legal record, despite me not even having access. This has a severe economic impact on me as I am moving my businesses forward and trying to clearly separate. Unfortunately, his extensive capital and influence have been repeatedly used to block me from business, as well as threaten and harass me, my family, and my colleagues into complete silence or total shutdown. I cannot operate

g. How often has the person in (2) abused you like this?
☐ Just this once ☐ 2–5 times ☐ Weekly ☒ Other: Can only discuss as of 12/2024

Give dates or estimates of when it happened, if known:
Can only discuss as of 12/2024.

**This is not a Court Order.**

Case Number: 24SMRO00444

**6 Has the person in ② abused you in a different way from the abuse you described in ⑤? Yes**
**If yes, describe below.**

a. Date of abuse *(give an estimate if you don't know the exact date):* 12/6/2024

b. Did anyone else hear or see what happened on this day?
☐ I don't know ☐ No ☒ Yes *(If yes, give names):* LAPD Officer Lovo (and his police officer partner)

c. Did the person in ② use or threaten to use a gun or other weapon?
☒ No ☐ Yes *(If yes, describe gun or weapon):*

d. Did the person in ② cause you any emotional or physical harm?
☐ No ☒ Yes *(If yes, describe harm):*
I want my parents to be out of harm's way and my mother has been terrified. Both of my parents are older and should not be caught in the crossfire of personal and business matters. They both have their own health issues and have been close to this matter for 4+ years. I simply cannot have them being stalked and chased around town when they are just trying to eat dinner.

e. Did the police come? ☐ I don't know ☐ No ☒ Yes *(If the police gave you a restraining order, list it in ④.)*

f. Give more details about how the person in ② was abusive on this day. Details can include what was said, done, or sent to you (examples: text messages, emails, or pictures), how often something happened, etc.
Repeated surveillance and stalking via personal investigators by our home - used to follow my parents (Terry Ritter (72 years old) and Shamim Ritter (65+ years old)) from my home at 1060 Brooklawn Dr, Los Angeles, CA 90077 as they were trying to leave to get dinner. They have video of the incident and police were called. This was then reported to LAPD investigators. The two PIs followed my parents back to my home. There is video that my mother, Shamim Ritter, can provide filming the incident. Police obtained the individual's name and details, wherein he indicated that he worked for a "billionaire's private security detail" and was "not going to wake him up." Officers advised that I immediately seek a TRO, especially given early December 2024 contractual commitments from Eric to no longer contact or harass me, even through his affiliates, which had at this point been breached. The PI license plates include: 9NBZ449 (Kia - followed my parents on the evening of 12/06) and 9CXM150, amongst others.

This surveillance and stalking of my parents and me, even beyond the homes, and then the theft of my website and stoppage of business activities (so I cannot even make a living or get access to my own records) has been absolutely debilitating.

g. How often has the person in ② abused you like this?
☐ Just this once ☐ 2–5 times ☐ Weekly ☒ Other: Can only discuss as of 12/2024
Give dates or estimates of when it happened, if known:
Repeated incidents. Can only disclose as of early December 2024

**This is not a Court Order.**

## 7 Is there other abuse by the person in 2 that you want the judge to know about? Yes
## If yes, describe below.

a. Date of abuse *(give an estimate if you don't know the exact date):* 12/9/2024

b. Did anyone else hear or see what happened on this day?
☐ I don't know ☐ No ☒ Yes *(If yes, give names):* Ricardo Uribe, Officer Duran, Jill Harris, Terry Ritter

c. Did the person in 2 use or threaten to use a gun or other weapon?
☒ No ☐ Yes *(If yes, describe gun or weapon):*

d. Did the person in 2 cause you any emotional or physical harm?
☐ No ☒ Yes *(If yes, describe harm):*
I live in an absolute digital surveillance system created by my former partner, and it has required me to spend significant time and resources to try to continually secure my accounts. There is a constant fear that my accounts are surveilled or being altered. The theft of my website + data within, even though it pertains to legal and business matters, are examples.

e. Did the police come? ☐ I don't know ☒ No ☐ Yes *(If the police gave you a restraining order, list it in 4.)*

f. Give more details about how the person in 2 was abusive on this day. Details can include what was said, done, or sent to you (examples: text messages, emails, or pictures), how often something happened, etc.
Cyber breaches and computer surveillance utilized to impact calls, wifi service, emails, and otherwise compromise cybersecurity, including across my Google email accounts for both personal and professional accounts, which Google has been flagged to again as of December 9, 2024. Please note Eric's technical background. Video and forensic evidence of the above dating to even 12/08/2024. This has become debilitating as I literally cannot have a private phone call or send a private email without surveillance.

The cyber issues have already been repeatedly raised to Google and again, to Apple. I intend to scale them further if my access stops being breached. Unfortunately, my former partner is extraordinarily powerful and capable and has used every mean to block me from getting access to secure data, devices, finances, or businesses, or to simply live my life in peace.

g. How often has the person in 2 abused you like this?
☐ Just this once ☐ 2–5 times ☐ Weekly ☒ Other: Can only discuss as of 12/2024
Give dates or estimates of when it happened, if known:
Can only discuss as of 12/2024

☐ **Check this box if you need more space to describe the abuse**. You can use form DV-101, *Description of Abuse*, and turn it in with this form. You can also use a separate sheet of paper, write "Describe Abuse" abuse at the top, and turn it in with this form.

**This is not a Court Order.**

**Case Number:** 24SMRO00444

## 8 Other Protected People

Do you want the restraining order to protect your children, family, or someone you live with?

a. ☐ No

b. ☒ Yes *(If yes, complete the section below):*

(1)

| Full name | Age | Relationship to you | Lives with you? |
|---|---|---|---|
| Terry Ritter | 72 | Father | ☐ Yes ☒ No |
| Shamim Ritter | 66 | Mother | ☐ Yes ☒ No |
| | | | ☐ Yes ☐ No |
| | | | ☐ Yes ☐ No |

☐ Check this box if you need to list more people. Use a separate piece of paper and write "DV-100, Other Protected People" at the top. Turn it in with this form.

(2) Why do these people need protection?

Unfortunately, former relations pertaining to me have impacted my parents negatively. My dad and mom are both older with significant health issues. I cannot allow for my parents to be surveilled or harassed due to other matters, with individuals chasing them around the city when they are simply trying to get dinner, as my mom's video would show from December 6, 2024. This is not ok. My parents cannot and should not be part of this matter or be hurt by it any further.

## 9 Does Person in 2 Have Firearms (Guns), Firearm Parts, or Ammunition?

(A firearm includes a handgun, rifle, shotgun, and assault weapon. A firearm part means a receiver or frame or any item that may be used as or easily turned into a receiver or frame. Ammunition includes bullets, shells, cartridges, and clips.)

a. ☒ I don't know

b. ☐ No

c. ☐ Yes *(If you have information, complete the section below.)*

| | Describe Firearms (Guns), Firearm Parts, or Ammunition | Number or Amount | Location, if known |
|---|---|---|---|
| (1) | | | |
| (2) | | | |
| (3) | | | |
| (4) | | | |
| (5) | | | |
| (6) | | | |

**This is not a Court Order.**

Case Number: 24SMRO00444

## Choose the Orders That You Want a Judge to Make

In this section, you will choose the orders you want a judge to make now. Every situation is different. Choose the orders that fit your situation.

**Check all the orders that you want a judge to make (order).**

### 10 ☒ Order to Not Abuse

**I ask the judge to order the person in (2) to not do the following things to me or anyone listed in (8):**
Harass, attack, strike, threaten, assault (sexually or otherwise), hit, follow, stalk, molest, destroy personal property, keep under surveillance, impersonate (on the internet, electronically, or otherwise), block movements, annoy by phone or other electronic means (including repeatedly contact), or disturb the peace. (For more information on what "disturbing the peace" means, read form DV-500-INFO, *Can A Domestic Violence Restraining Order Help Me?*)

### 11 ☒ No-Contact Order

I ask the judge to order the person in (2) to not contact me or anyone listed in (8).

### 12 ☒ Stay-Away Order

a. I ask the judge to order the person in (2) to stay away from:

*(Check all that apply)*

☒ Me.
☒ My home.
☒ My job or workplace.
☒ My vehicle.
☐ My school.
☒ Each person in (8).
☐ My children's school or childcare.
☐ Other *(please explain):* ______

b. How far do you want the person to stay away from all the places you checked above?

☒ 100 yards (300 feet) ☐ Other *(give distance in yards):* ______

c. Do you and the person in (2) live together or live close to each other?

☐ No ☒ Yes *(If yes, check one):*
☒ Live together *(If you live together, you can ask that the person in (2) move out in (13).)*
☐ Live in the same building, but not in the same home
☐ Live in the same neighborhood
☐ Other *(please explain):* ______

d. Do you and the person in (2) have the same workplace or go to the same school?

☒ No ☐ Yes *(If yes, check all that apply):*
☐ Work together at *(name of company):* ______
☐ Go to the same school *(name of school):* ______
☐ Other *(please explain):* ______

**This is not a Court Order.**

**Case Number:** 24SMRO00444

## (13) ☐ Order to Move Out

a. I ask the judge to order the person in (2) to move out of the home, located at:

*(Give address)*: ______________________________

b. I have a right to live at this address because:

*(Check all that apply)*

- ☐ I own the home.
- ☐ My name is on the lease.
- ☐ I live at this address with my child(ren).
- ☐ I have lived at this address for ______ years, ______ months.
- ☐ I pay for some or all the rent or mortgage.
- ☐ Other *(please explain)*: ______________________________

## (14) ☐ Other Orders

*(Describe any additional orders you want the judge to make to keep you, your children, or the people in (8) safe.)*:

______________________________

______________________________

______________________________

______________________________

______________________________

______________________________

______________________________

______________________________

*(No minor children involved)*

## (15) ☐ Child Custody and Visitation

(Check this box if you have a child with the person in (2) and want the judge to make or change a child custody or visitation order. **You must fill out** form DV-105, ***Request for Child Custody and Visitation Orders*****, and attach it to this form.**)

Orders that you can request on form DV-105 include:

- Child custody
- Stop person in (2) from accessing your child's school or medical information
- No visits with your children
- Supervised (monitored) visits with your children
- Unsupervised (unmonitored) visits with your children

**This is not a Court Order.**

**Case Number:** 24SMRO00444

## (16) ☒ Protect Animals

a. (You may ask the court to protect your animals, your children's animals, or the person in (2)'s animals.)

| Name *(or other way to ID animal)* | Type of animal | Breed *(if known)* | Color |
|---|---|---|---|
| (1) Henry | Dog | German Shepherd | Black/Brown |
| (2) | | | |
| (3) | | | |
| (4) | | | |

b. I ask the judge to protect the animals listed above by ordering the person in (2) to:

*(Check all that apply)*

(1) ☒ Stay away from the animals by at least: ☒ 100 yards (300 feet) ☐ Other *(number of yards):* ______

(2) ☒ **Not** take, sell, hide, molest, attack, strike, threaten, harm, get rid of, transfer, or borrow against the animals.

(3) ☒ Give me sole possession, care, and control of the animals because *(check all that apply):*

☐ Person in (2) abuses the animals.
☒ I take care of these animals.
☒ I purchased these animals.
☐ Other *(please explain):* ______

## (17) ☒ Control of Property

a. I ask the judge to give **only me** temporary use, possession, and control of the property listed here *(describe):*

1060 Brooklawn Dr, Los Angeles, CA 90077

b. Explain why you want control of the property you listed:

Currently included, in the interim, as under my sole possession and control. Would like for surveillance to stop and for all other agreed upon matters to proceed, assuming no other harassment and theft.

## (18) ☒ Health and Other Insurance

I ask the judge to order the person in (2) to **not** make any changes to any insurance or other coverage for me, the person in (2), or our children, including not being allowed to cancel, cash, borrow against, transfer, dispose of, or change the beneficiaries for the insurance.

## (19) ☒ Record Communications

I ask the judge to allow me to record calls or communications the person in (2) makes to me, when those calls or communications violate this restraining order.

**This is not a Court Order.**

(20) ☐ **Property Restraint** *(only if you are married or a registered domestic partner with the person in (2).)*

I ask the judge to order the person in (2) **not to** borrow against, sell, hide, or get rid of or destroy any possessions or property, except in the usual course of business or for necessities of life. I also ask the judge to order the person in (2) to notify me of any new or big expenses and to explain them to the court.

(21) ☐ **Extend My Deadline to Give Notice to Person in (2)**

(Usually, the judge will give you about two weeks to give notice, or to "serve" the person in (2) of your request. If you need more time to serve, the judge may be able to give you a few extra days.)

I ask the judge to give me more time to serve the person in (2) because *(explain why you need more time):*

______________________________________________

______________________________________________

(22) ☐ **Pay Debts (Bills) Owed for Property**

(If you want the person in (2) to pay any debts owed for property, list them and explain why. The amount can be for the entire bill or only a portion. Some examples include rent, mortgage, car payment, etc.)

a. I ask the judge to order the person in (2) to make these payments while the restraining order is in effect:

(1) Pay to: ____________ For: ____________ Amount: $ ________ Due date: ________

(2) Pay to: ____________ For: ____________ Amount: $ ________ Due date: ________

(3) Pay to: ____________ For: ____________ Amount: $ ________ Due date: ________

Explain why you want the person in (2) to pay the debts listed above:

______________________________________________

______________________________________________

b. **Special decision (finding) by the judge if you did not agree to the debt** *(optional)*

(If you did not agree to the debt or debts listed above, you can ask the judge to decide (find) that one or more debts was made without your permission and resulted from the person in (2)'s abuse. This may help you defend against the debt if you are sued in another case.)

Do you want the judge to make this special decision (finding)?

☐ No ☐ Yes *(If yes, answer the questions below.)*

(1) Which of the debts listed above resulted from the abuse? *(check all that apply):*

☐ a(1) ☐ a(2) ☐ a(3)

(2) Do you know how the person in (2) made the debt or debts?

☐ No ☐ Yes

*(If yes, explain how the person in (2) made the debt or debts):*

______________________________________________

______________________________________________

______________________________________________

______________________________________________

**This is not a Court Order.**

**Case Number:** 24SMRO00444

## Orders That You Want a Judge to Make at Your Court Date

Below is a list of orders that a judge cannot make right away but can make at your court date in a few weeks. The person in (2) must be notified of your court date before the judge can consider making any of the orders listed below. Check all the orders that you want the judge to make at your court date.

**(23)** ☐ **Pay Expenses Caused by the Abuse**

I ask the judge to order the person in (2) to pay for things **caused directly** by the person in (2) (damaged property, medical care, counseling, temporary housing, etc.). Bring proof of these amounts to your court date.

Pay to: ______________________ For: ______________ Amount: $ __________

Pay to: ______________________ For: ______________ Amount: $ __________

**(24)** ☐ **Child Support** *(this only applies if you have a minor child with the person in (2))*

*(Check all that apply)*

a. ☐ I do not have a child support order and I want one.

b. ☐ I have a child support order and I want it changed *(attach a copy if you have one)*.

c. ☐ I now receive or have applied for TANF, Welfare, or CalWORKS.

**(25)** ☐ **Spousal Support** *(this only applies if you are married or a registered domestic partner with person in (2))*

I ask the judge to order the person in (2) to give me financial assistance.

**(26)** ☒ **Lawyer's Fees and Costs**

I ask that the person in (2) pay for some or all of my lawyer's fees and costs. (If you ask for fees and costs and the court grants your restraining order, the court must award you fees and costs if the respondent can afford to pay.)

**(27)** ☐ **Batterer Intervention Program**

I ask the judge to order the person listed in (2) to go to a 52-week batterer intervention program.
(The goal of this program is to stop abuse. There are weekly classes on accountability, abuse effects, and gender roles. If ordered, the person in (2) has to show the judge that they enrolled and completed the program.

**(28)** ☐ **Transfer of Wireless Phone Account**

(If the person in (2) holds the rights to your cell phone account, you can ask the judge to transfer your number or your child's number to you. This means you will be financially responsible for these accounts. If you want to have control over a mobile device, like a cell phone, make this request at (17).)

I ask the judge to order the wireless service provider to transfer the billing responsibility and rights to the wireless phone numbers listed below to me because the account currently belongs to the person in (2):

a. ☐ My number ☐ Number of child in my care (including area code): ______________________

b. ☐ My number ☐ Number of child in my care (including area code): ______________________

**This is not a Court Order.**

## Automatic Orders if the Judge Grants Restraining Order

### (29) No Firearms (Guns), Firearm Parts, or Ammunition

If the judge grants you a restraining order, the person in (2) must turn in, sell, or store any firearms (guns), firearm parts, or ammunition that they have or control. The person in (2) would also be prohibited from buying firearms (guns), firearm parts, and ammunition.

### (30) Cannot Look for Protected People

If the judge grants you a restraining order, the person in (2) will not be allowed to look for the address or location of any person protected by the restraining order, unless the court finds good cause not to make this order.

### (31) Additional pages

If you used additional paper or forms, enter the number of extra pages attached to this form: 0

### (32) Your signature

I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date: December 11, 2024

Michelle S Ritter
*Type or print your name*

/s/ Michelle S Ritter
*Sign your name*

### (33) Your lawyer's signature *(if you have one)*

Date: ____________________

____________________
*Lawyer's name*

____________________
*Lawyer's signature*

## Your Next Steps

❶ **You must complete at least three additional forms**:

- Form DV-110, *Temporary Restraining Order (only items 1, 2 and 3)*
- Form DV-109, *Notice of Court Hearing (only items 1 and 2)*
- Form CLETS-001, *Confidential CLETS Information*
- **If you are asking for child custody and visitation orders**, you must complete form DV-105, *Request for Child Custody and Visitation Orders*, and form DV-140, *Child Custody and Visitation Order*.

❷ Turn in your completed forms to the court. Find out when your forms will be ready for you.

❸ Once you get your forms back from the court, have someone "serve" a copy of all forms on the person in (2). The sheriff or marshal can do this for free. See form SER-001, *Request for Sheriff to Serve Court Papers*. Learn more about service at *https://selfhelp.courts.ca.gov/sheriff-serves-your-request-restraining-order.*

❹ If you are asking for child support or spousal support you must also complete form FL-150, *Income and Expense Declaration*. If you are only asking for child support, you may be eligible to fill out a simpler form, FL-155. Read form DV-570 to see if you are eligible. Turn in your completed form to the court before your court date. You must also have someone mail or personally deliver a copy to the person in (2).

**This is not a Court Order.**

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)

First Amended Complaint

# EXHIBIT 47

Releases provided by Hillspire to Steel Perlot (Oct. 2024); SPM release correspondence

From: Mich Ritt rsmich@icloud.com
Subject: Releases provided by Hillspire to SP
Date: Oct 3, 2024 at 7:02:09 PM
To: Craig H. Marcus cmarcus@glaserweil.com
Cc: Michelle Ritter RitterMichelle@outlook.com, Jill Harris jharris@glaserweil.com

We have emails that demonstrate otherwise. I received copies of said correspondences from your firm with my former employees and correspondence with your firm and my and SPM's attorneys would tell you otherwise.

However, I won't "litigate the facts" with you.

Michelle

On Oct 3, 2024, at 8:37 PM, Craig H. Marcus <cmarcus@glaserweil.com> wrote:

Michelle,

The facts and evidence clearly demonstrate otherwise.

Again, you do not need us to tell you who remains employed by SPM, if anyone.

You conveniently ignore and refuse to respond to my inquiries.

Glaser Weil

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**From:** rsmich@icloud.com <rsmich@icloud.com>
**Sent:** Thursday, October 3, 2024 6:29 PM
**To:** Craig H. Marcus <cmarcus@glaserweil.com>
**Cc:** Michelle Ritter <rittermichelle@outlook.com>; Jill Harris <jharris@glaserweil.com>
**Subject:** Re: Releases provided by Hillspire to SP

Craig,

I never abandoned my employees or the firm. You involved yourself and decided to run my business.

Please send the list.

Michelle

On Oct 3, 2024, at 8:25 PM, Craig H. Marcus <cmarcus@glaserweil.com> wrote:

Michelle,

Respectfully, you do not need us to tell you who remains employed by SPM. You have internal lists of SPM's employees, as well as TriNet data, and you know which employees resigned or were terminated.

Given that you furloughed (and abandoned) all SPM employees as of late June 2024 – over three months ago – why do you believe that SPM currently has any remaining employees? Were there any furloughed employees that did not subsequently resign?

In your below e-mail, you reference "corporate filing obligations." What corporate filing obligations are you referring to?

<image001.png>

**Craig H. Marcus**
PARTNER

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
glaserweil.com

cmarcus@glaserweil.com
**T** 310.556.7891

|

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

---

**From:** Michelle Ritter <rittermichelle@outlook.com>
**Sent:** Thursday, October 3, 2024 1:06 PM
**To:** Jill Harris <jharris@glaserweil.com>; Craig H. Marcus <cmarcus@glaserweil.com>
**Cc:** rsmich@icloud.com
**Subject:** Releases provided by Hillspire to SP

Hi both,

Can I please get a complete list of all of the employees or other individuals and groups affiliated with any of my shared work with Schmidt and Hillspire for whom releases and “transition” payments were provided?

I cannot manage any of the businesses or even fulfill our corporate filing obligations without knowledge of which employees remain, what assets remain, and what liabilities remain. DLA Piper previously stated that you refused to share the actual releases and the list of individuals impacted.

Thank you for expeditiously providing.

Michelle

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

# EXHIBIT 48

Ritter buyout request and Marcus response ("false assertions and is generally denied")
(Oct. 24–26, 2024)

From: ritter.sm@icloud.com
Subject: Re: Request for Business Purchase Prices
Date: Oct 26, 2024 at 5:07:58 AM
To: Craig H. Marcus cmarcus@glaserweil.com
Cc: Jill Harris jharris@glaserweil.com, Patricia L. Glaser pglaser@glaserweil.com

---

Craig,

As a business matter, are you indicating that your clients are now reneging on a buyout term? If not, what is the price?

If so, then what is the proposal for SPM and the equity ownership stakes in various companies and assets, including Keeta? Additionally, what is the proposal for the carry that is owed as part of SPI and First Spark?

Thanks,

Michelle

> On Oct 26, 2024, at 1:45 AM, Craig H. Marcus <cmarcus@glaserweil.com> wrote:
>
> Michelle,
>
> Your below e-mail contains false assertions and is generally denied.
>
> Glaser Weil
> **Craig H. Marcus**
> PARTNER
> Glaser Weil Fink Howard Jordan & Shapiro LLP
> 10250 Constellation Blvd., 19th Floor
> Los Angeles, CA 90067
> glaserweil.com
> cmarcus@glaserweil.com
> T 310.556.7891

This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Jordan & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

---

**From:** ritter.sm@icloud.com <ritter.sm@icloud.com>
**Sent:** Thursday, October 24, 2024 9:41 AM
**To:** Craig H. Marcus <cmarcus@glaserweil.com>; Jill Harris <jharris@glaserweil.com>; Patricia L. Glaser <pglaser@glaserweil.com>
**Cc:** Michelle Ritter <ritter.sm@icloud.com>
**Subject:** Request for Business Purchase Prices

All,

As we look to formalize a disentanglement finally and to enable me to actually move forward in business as I intend to move forward with my own businesses that I've built alongside others, I'm requesting information on the following:

- What is the complete buyout price of Eric + Hillspire's stake in SPM that is now being proposed after the transition incentives provided by Hillspire and after the altered terms of Eric's role as chairman? I'd like to end up with Steel Perlot without Hillspire or Eric's involvement.
- What is the buyout price of my carry in SPI?

If these numbers make sense, then I will work with my new investors to solidify this transaction.

Thank you for your assistance here as I genuinely want to move on with my own businesses.

Regards,

Michelle

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)

First Amended Complaint

# EXHIBIT 49

Fried Frank "SPM Potential Claims Outline" (Apr. 17, 2024); Fried Frank invoice transmittals and invoices for SPM and StarX matters (Apr. 1, 2024)

**Steel Perlot Management LLC**
*Preliminary Overview of Potential Claims*

As discussed, set forth below is a preliminary outline of potential claims that could be considered by Steel Perlot Management LLC ("SPM") or Michelle Ritter arising out of the business relationship with Eric Schmidt and his business entities. In addition to summarizing the elements of these claims we have - where appropriate - included an overview of certain of the significant impediments to moving forward, along with factual questions the answers to which would be relevant to the viability or worth of any potential claims. In the event a determination is reached to pursue any or the below claims, significant additional legal and factual research would be required to determine whether they are legally viable and factually supported.

I. **Threshold Issues to Potential Claims** (outlined below are certain threshold issues that we discussed in our last conversation)

A. "Material Litigation" Prior Written Consent Provision.[1]

1. **Issue**: Section 12(b)(iii) of the Steel Perlot Amended & Restated LLC Agreement provides that SPM cannot bring or settle "material litigation" without the prior written consent of Steel Perlot LLC ("SPL"), an entity controlled by Schmidt. The obvious issue here is that SPL is not going to provide consent to any litigation by SPM against him or any of his business entities.

2. **Argument to Overcome the SPL Consent Requirement**: SPM could argue that Section 12(b)(iii) should not apply in this circumstance because (i) the prior written consent provision is tantamount or analogous to a demand requirement; (ii) demand would be futile under the circumstances where the entity whose consent is required is either the target of the potential litigation or controlled by the target of the potential litigation; and (iii) demand (or consent) should therefore be excused. In this regard the law around demand futility - set forth below - is well-established, but not directly applicable to the contractual provision at issue. The argument would thus be one of analogy.

(a) The demand futility test is whether the plaintiff can plead facts creating a reasonable doubt that the member with litigation authority is "incapable of making an impartial decision regarding the pursuit of the litigation."[i]

(b) This showing can be made by demonstrating the member "is interested in the outcome of the litigation or is otherwise not

[1] The Amended and Restated Limited Liability Company Agreement of Steel Perlot Management, LLC (made effective September 21, 2021), as amended from time to time [hereinafter, the "Steel Perlot A&R LLC Agreement" or "LLC Agreement"].

independent."[ii] This would be satisfied in a circumstance where the target of potential litigation is SPL/its affiliates.

3. Other Arguments:

(a) Specific to potential breach of fiduciary duty claims, SPM could argue that requiring SPL's prior written consent for claims against SPL or its affiliates is the functional equivalent of immunizing SPL (and its affiliates) from a claim for breach of fiduciary duty, which is not permitted under Delaware law absent a "plain and unambiguous" intent to do so.[iii] The argument would be that the LLC Agreement does not reflect any such intent.

(i) As further support for SPM's position, SPM could observe that the drafters knew how to be explicit about liability (i.e., by including an indemnity provision). Thus, if the parties wanted to remove liability, they knew how to be "plain and unambiguous."

(b) Specific to a potential claim for breach of the covenant of good faith and fair dealing, SPM could argue that requiring SPL's prior written consent is the functional equivalent of (i) eliminating the covenant vis-à-vis SPL (and its affiliates) in contravention of 6 Del. C. §§ 18-1101(c); and (ii) limiting or eliminating SPL's (or its affiliates') liability for bad faith violations of the covenant in contravention of 6 Del. C. §§ 18-1101(e).

(c) While SPM could attempt to argue that an action by SPM against SPL or its affiliates is not a "material litigation," it is difficult to see that position having any credibility, particularly if the claims sought meaningful damages.

B. Indemnification Clause.

1. **<u>Issue</u>**: Section 14 of the Steel Perlot Amended & Restated LLC Agreement is a broad indemnity that covers SPM's members (*i.e.*, Ritter and SPL) and members' affiliates (*e.g.*, Hillspire and Schmidt) for "any loss, damage, claim or liability incurred" in connection with actions/inactions on behalf of SPM "or in furthering the Company's purposes."

2. **<u>Practical Impact</u>**: Absent a contrary argument, SPM will have an obligation to indemnify SPL and its affiliates both for fees and costs associated with any litigation against it, as well as the satisfaction of any judgment obtained against it. To the extent the claims at issue are (at their core) for violations of duties owed by SPL to SPM, the argument would be

that the indemnity should not apply because it vitiates those claims. It is probably reasonable to expect SPM to be required to honor the indemnity as to fees and costs unless and until the claims are proven in which case those amounts may be recoverable.

II. **Key Facts and/or Factual Arguments** (set forth below are facts and / or factual arguments that could be advanced based on the facts as we presently understand them; of course, it is important to understand that any such arguments will be disputed)

A. The Steel Perlot Amended & Restated LLC Agreement is a skeletal overview agreement that (i) does not have an integration clause; and (ii) does not speak to the operation of SPM. The argument would be that the operational details - including the respective roles and responsibilities of the participants - must be found elsewhere.

B. Next step in the argument: the gaps in the LLC Agreement were filled by a detailed April 2022 email agreement (below) that was extensively negotiated by Ritter and Schmidt.

1. *See* Doc. 1 (Dec. 20, 2021 email from Ritter to Manekin reflecting negotiations between Schmidt and Ritter); Doc. 2 (Apr. 18, 2022 email from Schmidt to Manekin and Seferian, cc to Ritter, reflecting substantially identical terms).

2. The email agreement provides: "Eric [Schmidt] is the Executive Chairman" and "an employee at $1/year." Doc. 2.

C. In recognition of the fact that it filled the gaps in the LLC Agreement, Ritter and Schmidt acted in accordance with the terms of the April 2022 email agreement.

1. For example, Ritter received the $1M agreed salary and Schmidt worked with the Steel Perlot team "to help operationalize SP, and see if we can scale the machine we are building even faster." *See* Doc. 3 (Apr. 20, 2022 email from Schmidt coordinating Steel Perlot team meeting).

D. On July 1, 2022, Ritter signed a supplemental "Letter Agreement." The July 2022 Letter Agreement modified the ownership split set forth in the LLC Agreement, but did not supplement or change the terms of the April 2022 email. In fact, the July 2022 Letter aligned with the April 2022 email, which also reflected a change to a 51/49 ownership allocation.

E. The July 1, 2022 "Letter Agreement" did not contain an integration clause. In fact, it specifically acknowledged that the parties had agreed to terms regarding SPM and committed the parties to "work[ing] together in good faith to amend and restate the Amended LLC Agreement" to reflect those terms.

F. In mid-February, 2024, Schmidt committed to providing a last infusion of funding ($30M) into SPM.

1. Schmidt told Ritter, "The budget number you have asked for will be approved AFTER you review it with Maria [Seferian.]" Doc. 4 (Feb. 13, 2024 at 4:44PM).

(a) Schmidt also represented, "as I said I'm happy to remain as chairman and be totally helpful to you[.]" Doc. 4 (Feb. 13, 2024 at 4:08PM).

2. Ritter and Seferian spoke about the SPM budget on February 13, 2024. Seferian (and others within Hillspire) signed off on a $30M budget ($27M operating and $3M reserve) on February 29, 2024. *See* Doc. 5.

G. While Chairman of SPM, Schmidt redirected potential opportunities from SPM to other Schmidt-related entities. [***Michelle***: in order to advance this position, substantial detail is required regarding the potentially lost opportunities]

III. **SPM's Potential Claims**

A. Fiduciary Duties

1. *Breach of Duty of Loyalty*: The duty of loyalty "requires an undivided and unselfish loyalty to the corporation and demands that there shall be no conflict between duty and self-interest."[iv]

(a) *Corporate Opportunity Doctrine*: This doctrine is a subspecies of the duty of loyalty that asks "whether or not the fiduciary has appropriated something for himself that, in all fairness, should belong to his company."[v]

2. *Breach of Duty of Care*: The duty of care "requires that fiduciaries inform themselves of material information before making a business decision and act prudently in carrying out their duties."[vi]

3. *Damages Calculation*: The plaintiff bears the burden of proving by a preponderance of the evidence (i.e., more likely than not) that the defendant's breach (i) caused the plaintiff's harm, ***or*** (ii) caused the defendant to wrongfully receive a benefit.[vii]

(a) Courts regularly reject "lost opportunity" or "lost profit" damages - damages that equal "what could have been if everything had gone as planned"- as "too speculative to grant" and "disproportionate and inequitable." This is particularly true in the case of a new business, where "evidence of lost profits [can] be too speculative, uncertain, and remote when there is no history of prior profits."[viii]

(b) Courts will order:

(i) Disgorgement (e.g., salary paid by SPM while Schmidt was in breach, or fees paid by another entity to Schmidt for consulting/services he provided while he was supposed to be working for SPM).

(1) Did Schmidt take an SPM opportunity and receive some side benefit (e.g., payment for exclusivity during diligence phase) even if the transaction never went through?

(ii) Incidental damages (e.g., any expenses SPM incurred in connection with Schmidt taking a corporate opportunity).

(1) Did SPM pay for any of Schmidt's travel to investor meetings where he pitched another business instead of SPM?

(2) Did SPM pay for any research into investors that Schmidt used to pitch non-SPM projects?

(3) Did SPM pay to diligence any technology or asset that Schmidt acquired/attempted to acquire for a non-SPM entity?

4. *Potential Claims Against* ***SPL***: To this point, we have not identified any potential breach of duty claims against SPL.

(a) As an initial matter, it is unsettled under Delaware law whether non-managing members of an LLC owe fiduciary duties to the LLC (or other members).[ix]

(b) Neither the Steel Perlot Amended & Restated LLC Agreement nor the April 2022 email agreement impose any obligations or duties on SPL.

5. *Potential Claims Against* ***Schmidt***: Subject to further fact development, SPM might have breach of loyalty and/or care claims against Schmidt. Set forth below are the factual arguments that could potentially be advanced in support of such a claim. Again, these arguments will not go unrebutted / uncontested and should be fully vetted before any assertions are made.

(a) SPM could argue Schmidt is an SPM fiduciary by virtue of his agreement to serve as SPM's Executive Chairman.

(i) Section 12(c) of Steel Perlot's Amended & Restated LLC Agreement gave Ritter authority to delegate powers and authority to officers of SPM.

(ii) Ritter delegated authority to Schmidt as "Executive Chairman." This delegation was memorialized in the April 2022 email agreement.

(1) The April 2022 email was a binding contract because "all the substantial terms of [the] contract ha[d] been agreed on, and there [wa]s nothing left for future settlement[.]"[x]

(iii) The April 2022 email agreement enumerates Schmidt's responsibilities as Executive Chairman, which SPM would argue demonstrates the type of control over SPM's management necessary to give rise to fiduciary duties.[xi]

(iv) On February 13, 2024, Schmidt represented that he was (and would remain) SPM's chairman.

(b) Given that there is no written agreement laying out Schmidt's fiduciary duties, SPM would argue that "default fiduciary duties play as an equitable gap-filler."[xii]

(i) DUTY OF CARE QUESTIONS:

(1) If available, provide specific examples of Schmidt acting imprudently in connection with performing his duties as Executive Chairman. Focus on times Schmidt's action were an extreme departure from what a typical chairman would do.

a For each example, include detail on the circumstances, how SPM was harmed and an estimate/measure of financial harm to SPM and/or benefit to Schmidt along with the supporting data for that estimate. As above, keep in mind that an estimate of financial harm must be grounded in financial reality to avoid rejection by the court as too speculative in nature.

(2) If available, provide specific examples of Schmidt making an SPM business decision without making himself informed of all material information

available to him. Focus times Schmidt's action were an extreme departure from what a typical chairman would do.

a For each example, include detail on the circumstances, how SPM was harmed, and an estimate/measure of financial harm to SPM and/or benefit to Schmidt, along with the supporting data for that estimate. See above.

(ii) DUTY OF LOYALTY QUESTIONS:

(1) If available, provide specific examples of Schmidt redirecting opportunities from SPM and giving them to his other entities.

a For each example, include detail on the circumstances, how SPM was harmed, and an estimate/measure of financial harm to SPM and/or benefit to Schmidt, along with the supporting data for that estimate. See above.

(2) In 2022, you said that Schmidt "ha[d] systematically given opportunities unrelated to disruptive finance/web3 to other entities, including Evan Spiegel, Ylli, and others." Doc. 2 (June 7, 2022 email from M. Ritter to E. Schmidt). What are the details of these opportunities?

(3) Do you have any documents that reflect Schmidt agreed to spend 50% of his time on SPM? We have one where you reference that and the August 2022 draft Third A&R LLC Agreement includes a provision to that effect.

a What evidence do you have regarding the allocation of Schmidt's time?

B. Tortious Interference with Prospective Business Advantage

1. *Elements*: (1) reasonable probability of a business opportunity (more than "a mere hope or the innate optimism of the salesman");[xiii] (2) defendant's intentional interference with that opportunity; (3) proximate causation; and (4) damages.[xiv]

2. *Damages Calculation*: compensatory damages (the actual loss suffered, e.g., loss in sales/net income).[xv]

3. *Potential Claims Against **Schmidt***: Subject to further fact development, SPM might have tortious interference with prospective business advantage claims against Schmidt.

   (a) The underlying facts for this claim likely will largely overlap with the duty of loyalty corporate opportunity facts (*i.e.*, times Schmidt interfered with SPM's business opportunities).

   (b) For each example: identify (1) the specific prospective business opportunity/partner;[xvi] (2) what Schmidt did that interfered with the opportunity; (3) how Schmidt's actions impacted the opportunity; and (4) quantify the financial impact to SPM.

C. Breach of Contract

1. *Elements*: (1) the existence of a contract, whether express or implied; (2) the breach of an obligation imposed by the contract; and (3) resultant damages to the plaintiff.[xvii]

2. *Damages Calculation*: compensatory damages "are designed to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed," but "should not act as a windfall."[xviii] This measurement focuses primarily on what would have happened absent the breach, not what did happen with the breach.

3. *Potential Claim Against **Schmidt** and/or SPL*: SPM could potentially pursue a breach of contract claim for Schmidt's failure to pay the $30M budget funds that were agreed to in the February 13, 2024 email communications.

   (a) Schmidt told Ritter, acting on behalf of SPM, that the budget "will be approved AFTER you review it with Maria [Seferian.]" Doc. 4 (Feb. 13, 2024 at 4:44PM). Ritter promptly reviewed the budget with Seferian on February 13, 2024.

   (b) Ritter, Seferian and others undertook further reviews (although, SPM would argue, by the plain terms of the deal, SPM was under no obligation to undertake further reviews). Seferian signed off on the $30M budget on February 29, 2024. As we understand it, none of the $30M has been paid.

(c) The implied covenant of good faith and fair dealing can be used to argue that the funds should have been paid on the agreed funding schedule.

(i) QUESTION: On March 8, Laura Wasser told you that there were "pending funding issues" that needed to be resolved and then you scheduled a call. What did Wasser say about the budget during your call?

4. *Related Potential Claim for Tortious Interference Against **Hillspire & Seferian**:* SPM might be able to argue that Hillspire and Seferian knew there was a contract between SPM and Schmidt (for $30M in budget funds) and Seferian's and Hillspire's intentional failure to remit the funds once they were approved was a significant factor in Schmidt/SPL's breach, which was unjustified because SPM was (and is) entitled to the funds, and SPM has materially suffered operationally in the absence of its funding.

IV. **Ritter's Potential Claims** (again, you should fully expect that Schmidt will advance a substantial and unpleasant counter-narrative and should understand that there is no prohibition against his raising unpleasant and even inaccurate characterizations in the legal setting).

A. Outline of Potential Theory of a Case Against **Schmidt**:

1. Schmidt and Ritter met in September 2020. E. Schmidt pursued a romantic relationship with Ritter, but Ritter initially rebuffed Schmidt's efforts.

2. As the year progressed, Schmidt and Ritter spent time together and Ritter (a Columbia JD/MBA student with substantial school responsibilities) assisted Schmidt with his post-Google business ventures. Through this collaboration, Schmidt learned that Ritter is highly intelligent, ambitious, driven and shows alacrity with tech and finance. In approximately November 2020, Schmidt began introducing Ritter to Schmidt's professional contacts. During social and business interactions with notable industry players, Schmidt would complement Ritter's cognitive abilities and work ethic. On one occasion in [year], during an event related to [X], Schmidt said [complimentary thing about Ritter's business ability].

3. In the summer of 2021, Schmidt convinced Ritter to found a business together. Ritter and Schmidt negotiated a framework for the business and with the assistance of Schmidt's legal advisors, created Steel Perlot. Ritter and Schmidt negotiated and collaborated to develop a business structure over the remainder of the year. One of the key preliminary terms was that

Ritter and Schmidt "agree to work together to build a very successful set of businesses." This tenet of the agreement was reflected in the ultimately agreed to non-market 51/49 ownership split. Ritter and Schmidt recommitted to this partnership of equals in April 2022, when they memorialized the operating agreement. In this agreement, Schmidt committed—once again—that "Michelle and Eric agree to work together on Steel Perlot," indeed, Schmidt committed to serving as Steel Perlot's Executive Chairman for an initial term of five years.

4. [Characterize narrative as a broken promise.]

B. Possible Causes of Action for Theory:

1. Equitable Fraud (a/k/a Negligent Misrepresentation)

(a) *Elements*: (1) defendant made a false representation of material fact; (2) defendant intended for plaintiff to rely on the representation; (3) plaintiff justifiably relied on the representation; and (4) damage to plaintiff as a result of such reliance.[xix]

(i) A negligent misrepresentation claim additionally requires showing (i) a special relationship between the parties over which equity takes jurisdiction (like a fiduciary relationship or those in a "special position of confidence and trust"[xx]) or (ii) justification for a remedy that only equity can afford.[xxi]

(ii) The argument would be that the "special relationship" requirement for negligent misrepresentation is satisfied by Ritter's and Schmidt's inextricably intertwined personal and professional relationship.

(b) *Damages Calculation*: the recoverable damages for negligent misrepresentation "are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause," such as the financial loss suffered *as a result* of the misrepresentation and "do not include the benefit of the plaintiff's contract with the defendant."[xxii]

(i) The damages assertion for this cause of action will need to be tailored to the specific pecuniary loss attributable to Schmidt's misrepresentations (i.e., focus on particular deals or opportunities that were impaired) - it cannot be aimed at placing Ritter in the same position she would be in if the relationship with Schmidt had not soured.

2. Promissory Estoppel

(a) *Elements*: (1) a promise was made; (2) promisor's intended to induce promisee to act or not act; (iii) promisee reasonably relied on the promise and took action to her detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise.[xxiii]

(i) Promissory estoppel "is fundamentally a narrow doctrine, designed to protect the legitimate expectations of parties rendered vulnerable by the very processing of attempting to form commercial relationships."[xxiv]

(ii) Accordingly, to fully consider this cause of action, further information would be required concerning what specific commercial agreements, if any, Ritter and Schmidt were working towards but had not reduced to contract.

(b) *Damages Calculation*: recovery in the promissory estoppel context is aimed to ensure "those who are reasonably induced to take injurious action in reliance upon non-contractual promises receive[] recompense for that harm."[xxv] The remedy is case specific, but the "quintessential remedy" is reliance costs reasonably incurred by the plaintiff.[xxvi] Expectation damages are generally disfavored, and only available where there is evidence of bad faith.

(i) Subject to further factual development, the most likely measure of recovery would be compensation for any actions Ritter took in reliance on Schmidt's promise (*e.g.*, personal funds she expended to prepare for a deal that never happened).

C. Slander (spoken defamation)

1. *Elements*: a plaintiff must show (1) the defamatory character of the communication; (2) publication; (3) that the communication refers to the plaintiff; (4) the third party's understanding of the communication's defamatory character; and (5) injury.

(a) A statement is defamatory "if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."[xxvii]

(b) However, statements of opinion generally are not actionable.

2. *Damages*: actual damages (to include loss of reputation and social standing that has a material loss capable of being measured in money with approximate exactness).[xxviii]

3. *Potential Claims Against **Schmidt***: It is unclear whether Ritter has any defamation claims against Schmidt. In the event this is an area that warrants further exploration, FF can help to identify counsel who specialize in this area.

   (a) Ritter noted that a work contact (S.A.) called to discuss other matters, and in the course of the conversation recounted that Schmidt had told the contact (i) Ritter was "on a war path" and (ii) not going anywhere in business."

   (b) The first statement feels unlikely to be viewed as defamatory and the second could be interpreted fairly as a statement of opinion.

---

[i] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004).

[ii] *Id.*

[iii] *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 664 (Del. Ch. 2012) (explaining the "[d]rafters of an LLC agreement must make their intent to eliminate fiduciary duties plain and unambiguous").

[iv] *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1050 (Del. 2021).

[v] *Deane v. Maginn*, No. 2017-0346-LWW, 2022 WL 16557974, at *15 (Del. Ch. Nov. 1, 2022), *reargument denied*, (Del. Ch. 2022), and *appeal dismissed*, 291 A.3d 651 (Del. 2023).

[vi] *United Food*, 262 A.3d at 1049-50.

[vii] *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 859 (Del. Ch.), *judgment entered sub nom. In re Metro Storage Int'l LLC v. Harron* (Del. Ch. 2022).

[viii] *Metro Storage*, 275 A.3d at 860-61.

[ix] *See Feeley*, 62 A.3d at 662-63.

[x] *Loppert v. WindsorTech, Inc.*, 865 A.2d 1282 (Del. Ch. 2004), *aff'd*, 867 A.2d 903 (Del. 2005).

[xi] *See, e.g.*, *In re NSC Wholesale Holdings LLC*, 637 B.R. 71, 86 (Bankr. D. Del. 2022).

[xii] *Feeley*, 62 A.3d at 663.

[xiii] *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *7 (Del. Ch. Jan. 20, 2009).

[xiv] *See Mondero v. Lewes Surgical & Med. Assocs., P.A.*, 2018 WL 1532429, at *4 (D. Del. Mar. 29, 2018) (quoting *DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1153 (Del. 1981).

[xv] *See Beard Rsch., Inc. v. Kates*, 8 A.3d 573 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).

[xvi] *Agilent*, 2009 WL 119865, at *7.

[xvii] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

---

[xviii] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146-47 (Del. 2009).

[xix] *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 115 (Del. 2006).

[xx] *Krahmer v. Christie's* Inc., 903 A.2d 773 (Del. Ch. 2006).

[xxi] *Blueacorn PPP, LLC v. Pay Nerd LLC*, 310 A.3d 590, 594 (Del. Ch. 2024).

[xxii] *Envo, Inc. v. Walters*, 2009 WL 5173807, at *7 (Del. Ch. Dec. 30, 2009) (quoting Restatement Second of Torts § 552(B) (1977)), *aff'd*, 2013 WL 1283533 (Del. Mar. 28, 2013).

[xxiii] *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000) (citing *Keating v. Bd. of Educ. of Appoquinimink Sch. Dist.*, 1993 WL 460527, at *4 (Del. Ch. Nov. 3, 1993), *aff'd*, 650 A.2d 1305 (Del. 1994)).

[xxiv] *Ramone v. Lang*, 2006 WL 905347, at *14 (Del. Ch. Apr. 3, 2006).

[xxv] *Sun Life Assurance Co. of Canada v. U.S. Bank Nat'l Ass'n*, 2019 WL 8353393, at *3 (D. Del. Dec. 30, 2019) (quoting *Ramone v. Lang*, 2006 WL 905347, at *14-15 (Del. Ch. Apr. 3, 2006)).

[xxvi] *Ramone*, 2006 WL 905347, at *16.

[xxvii] *Spence v. Fun*k, 396 A.2d 967, 969 (Del. 1978) (quoting Restatement (First) of Torts § 559 (1938)).

[xxviii] *Danias v. Fakis*, 261 A.2d 529, 532 (Del. Super. Ct. 1969) (quoting Restatement of the Laws of Torts, Ch. 24 cmt. a).

Subject: Fried Frank invoices
From: Ried, Daniel
To: payables@steelperlot.com■
Cc: Tarkan, Adam; Billing Team - Asset Management■
Date: Mon, 1 Apr 2024 13:24:36 -0400

Hello,

Attached are our invoices for matters through February 29, 2024.

Please let us know of any questions or comments.

Dan Ried
Senior Billing Coordinator
Dan.Ried@friedfrank.com | Tel: +1 212 859 4856

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza, New York, NY 10004
friedfrank.com<http://friedfrank.com/>

**Fried, Frank, Harris, Shriver & Jacobson LLP**
One New York Plaza
New York, NY 10004-1980
Tel: +1.212.859.8000
Fax: +1.212.859.4000
www.friedfrank.com

March 31, 2024

**Invoice # 240105675**

Steel Perlot Management, LLC
0 Bond Street
New York, NY 10012
Attn: Michelle Ritter
CEO

**Ref: 007414-00005**

**Re: Hyperion**

**For Professional Services Rendered**

| | |
|---|---|
| through February 29, 2024 | $18,693.00 |
| **Total Current Billing** | **$18,693.00** |

**PLEASE NOTE: Electronic payment (wire or ACH) preferred. If payment by check is the only option, please ensure check is mailed using postal services with tracking capability.**

## Time Summary

| Name | Title | | Hours | Amount |
|---|---|---|---|---|
| Amir R. Ghavi | Partner | | 1.00 | 1,840.00 |
| Lawrence Natke | Partner | | 4.80 | 7,752.00 |
| Adam J. Tarkan | Sr. Spec Counsel | | 1.00 | 1,550.00 |
| Yongsun Kwon | Associate | | 3.60 | 4,446.00 |
| Justin P. Charles | Associate | | 2.70 | 3,105.00 |
| | | **Totals** | **13.10** | **18,693.00** |

## Time Detail

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 02/13/24 | Amir R. Ghavi | Review Hypereon MOU; comments re: same | 1.00 | 1,840.00 |
| 02/13/24 | Adam J. Tarkan | Call re IP matters and Hypereon MOU; review MOU draft | 0.70 | 1,085.00 |
| 02/13/24 | Yongsun Kwon | Telephone conference with L. Natke, A. Ghavi and J. Charles regarding Hypereon MOU; review Hypereon MOU. | 0.80 | 988.00 |
| 02/13/24 | Justin P. Charles | Hypereon - MOU comments | 2.70 | 3,105.00 |
| 02/14/24 | Lawrence Natke | Review Hypereon MOU. | 3.70 | 5,975.50 |
| 02/14/24 | Adam J. Tarkan | Hypereon MOU - review IP comments | 0.10 | 155.00 |
| 02/14/24 | Yongsun Kwon | Revise Hypereon MOU; telephone conference with L. Natke and A. Tarkan regarding Steel Perlot bylaws, director appointments and stock issuances. | 2.70 | 3,334.50 |
| 02/15/24 | Lawrence Natke | Attn to Hypereon term sheet; review potential diligence request list; calls re open issues and planning/next steps. | 1.10 | 1,776.50 |
| 02/15/24 | Adam J. Tarkan | Attn to diligence request document provided by M&A team to client | 0.20 | 310.00 |
| 02/15/24 | Yongsun Kwon | Draft preliminary due diligence request list. | 0.10 | 123.50 |
| | | **Total:** | **13.10** | **18,693.00** |

**Fried, Frank, Harris, Shriver & Jacobson LLP**
One New York Plaza
New York, NY 10004-1980
Tel: +1.212.859.8000
Fax: +1.212.859.4000
www.friedfrank.com

March 31, 2024

**Invoice # 240105675**

Steel Perlot Management, LLC
0 Bond Street
New York, NY 10012
Attn: Michelle Ritter
CEO

**Ref: 007414-00005**

**Re: Hyperion**

## REMITTANCE ADVICE

---

| | |
|---|---|
| **Total Current Invoice** | **$18,693.00** |

**Payment Terms Net 30 Days of Date of Invoice.**

**When making payment please quote Invoice 240105675 and reference 007414-00005**

| | |
|---|---|
| **Bank Name:** | Citibank |
| **Address:** | 153 East 53rd Street, 23rd Floor<br>New York, NY 10022 |
| **Bank Contact:** | Joseph Argento, Citi Private Bank – Law Firm Group |
| **Account Name:** | Fried, Frank, Harris, Shriver & Jacobson LLP |
| **ABA#:** | 021000089 |
| **Account #:** | 6783086396 |
| **Swift Code:** | CITIUS33 |
| **FF Contact:** | Beverly Sands / Victoria Rutman |

Please email details of invoices being paid to receipts@friedfrank.com

**Remittance Address**

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004
Attention: Accounting Department

**Fried, Frank, Harris, Shriver & Jacobson LLP**
One New York Plaza
New York, NY 10004-1980
Tel: +1.212.859.8000
Fax: +1.212.859.4000
www.friedfrank.com

March 31, 2024

**Invoice # 240105676**

Steel Perlot Management, LLC
0 Bond Street
New York, NY 10012
Attn: Michelle Ritter
CEO

**Ref: 007414-00005**

**Re: EST**

**For Professional Services Rendered**

| | |
|---|---|
| through February 29, 2024 | $15,183.00 |
| **Total Current Billing** | **$15,183.00** |

**PLEASE NOTE: Electronic payment (wire or ACH) preferred. If payment by check is the only option, please ensure check is mailed using postal services with tracking capability.**

**Client: 007414 - Steel Perlot Management, LLC**
**Matter: 00005 - EST**

## Time Summary

| Name | Title | | Hours | Amount |
|---|---|---|---|---|
| Colin S. Kelly | Partner | | 0.30 | 573.00 |
| Lawrence Natke | Partner | | 4.80 | 7,752.00 |
| Adam J. Tarkan | Sr. Spec Counsel | | 0.60 | 930.00 |
| Yongsun Kwon | Associate | | 4.80 | 5,928.00 |
| | | **Totals** | **10.50** | **15,183.00** |

## Time Detail

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 02/09/24 | Colin S. Kelly | Reviewed background documents; e-mailed FF team. | 0.30 | 573.00 |
| 02/09/24 | Lawrence Natke | Call with SP re strategic plans and merger with EST; review materials re same. | 2.30 | 3,714.50 |
| 02/09/24 | Adam J. Tarkan | Client call (addressing potential transaction with EST / Jaeson Ma); related matters | 0.30 | 465.00 |
| 02/09/24 | Yongsun Kwon | Draft merger term sheet for EST Media. | 3.90 | 4,816.50 |
| 02/10/24 | Lawrence Natke | Revise EST term sheet. | 2.50 | 4,037.50 |
| 02/10/24 | Adam J. Tarkan | Attn to draft EST media term sheet | 0.20 | 310.00 |
| 02/11/24 | Adam J. Tarkan | Attn to draft EST media term sheet emails | 0.10 | 155.00 |
| 02/12/24 | Yongsun Kwon | Draft preliminary due diligence request list. | 0.90 | 1,111.50 |
| | | **Total:** | **10.50** | **15,183.00** |

**Fried, Frank, Harris, Shriver & Jacobson LLP**
One New York Plaza
New York, NY 10004-1980
Tel: +1.212.859.8000
Fax: +1.212.859.4000
www.friedfrank.com

March 31, 2024

**Invoice # 240105676**

Steel Perlot Management, LLC
0 Bond Street
New York, NY 10012
Attn: Michelle Ritter
CEO

**Ref: 007414-00005**

**Re: EST**

## REMITTANCE ADVICE

---

**Total Current Invoice** **$15,183.00**

**Payment Terms Net 30 Days of Date of Invoice.**

**When making payment please quote Invoice 240105676 and reference 007414-00005**

| | |
|---|---|
| **Bank Name:** | Citibank |
| **Address:** | 153 East 53rd Street, 23rd Floor<br>New York, NY 10022 |
| **Bank Contact:** | Joseph Argento, Citi Private Bank – Law Firm Group |
| **Account Name:** | Fried, Frank, Harris, Shriver & Jacobson LLP |
| **ABA#:** | 021000089 |
| **Account #:** | 6783086396 |
| **Swift Code:** | CITIUS33 |
| **FF Contact:** | Beverly Sands / Victoria Rutman |

Please email details of invoices being paid to receipts@friedfrank.com

**Remittance Address**

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004
Attention: Accounting Department

**Fried, Frank, Harris, Shriver & Jacobson LLP**
One New York Plaza
New York, NY 10004-1980
Tel: +1.212.859.8000
Fax: +1.212.859.4000
www.friedfrank.com

March 31, 2024

**Invoice # 240105677**

Steel Perlot Management, LLC
0 Bond Street
New York, NY 10012
Attn: Michelle Ritter
CEO

**Ref: 007414-00005**

**Re: Future House**

**For Professional Services Rendered**

| | |
|---|---|
| through February 29, 2024 | $5,162.50 |
| **Total Current Billing** | **$5,162.50** |

**PLEASE NOTE: Electronic payment (wire or ACH) preferred. If payment by check is the only option, please ensure check is mailed using postal services with tracking capability.**

**Client: 007414 - Steel Perlot Management, LLC**
**Matter: 00005 - Future House**

## Time Summary

| Name | Title | | Hours | Amount |
|---|---|---|---|---|
| Michael P. Sternheim | Partner | | 3.50 | 5,162.50 |
| | | **Totals** | **3.50** | **5,162.50** |

## Time Detail

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 11/01/23 | Michael P. Sternheim | Comms with client; comms with L. Barshay re: client question; review documents. | 1.00 | 1,475.00 |
| 11/02/23 | Michael P. Sternheim | Review agreements & draft response; call with client re: next steps; draft and revise letter; comms with L. Barshay re: letter. | 2.50 | 3,687.50 |
| | | **Total:** | **3.50** | **5,162.50** |

**Fried, Frank, Harris, Shriver & Jacobson LLP**
One New York Plaza
New York, NY 10004-1980
Tel: +1.212.859.8000
Fax: +1.212.859.4000
www.friedfrank.com

March 31, 2024

**Invoice # 240105677**

Steel Perlot Management, LLC
0 Bond Street
New York, NY 10012
Attn: Michelle Ritter
CEO

**Ref: 007414-00005**

**Re: Future House**

## REMITTANCE ADVICE

---

| | |
|---|---|
| **Total Current Invoice** | **$5,162.50** |

**Payment Terms Net 30 Days of Date of Invoice.**

**When making payment please quote Invoice 240105677 and reference 007414-00005**

| | |
|---|---|
| **Bank Name:** | Citibank |
| **Address:** | 153 East 53rd Street, 23rd Floor<br>New York, NY 10022 |
| **Bank Contact:** | Joseph Argento, Citi Private Bank – Law Firm Group |
| **Account Name:** | Fried, Frank, Harris, Shriver & Jacobson LLP |
| **ABA#:** | 021000089 |
| **Account #:** | 6783086396 |
| **Swift Code:** | CITIUS33 |
| **FF Contact:** | Beverly Sands / Victoria Rutman |

Please email details of invoices being paid to receipts@friedfrank.com

**Remittance Address**

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004
Attention: Accounting Department

**Fried, Frank, Harris, Shriver & Jacobson LLP**
One New York Plaza
New York, NY 10004-1980
Tel: +1.212.859.8000
Fax: +1.212.859.4000
www.friedfrank.com

March 31, 2024

**Invoice # 240105678**

Steel Perlot Management, LLC
0 Bond Street
New York, NY 10012
Attn: Michelle Ritter
CEO

**Ref: 007414-00005**

**Re: Management Company – General Advice**

**For Professional Services Rendered**

| | |
|---|---|
| through February 29, 2024 | $34,115.00 |
| Disbursements | $10.00 |
| **Total Current Billing** | **$34,125.00** |

**PLEASE NOTE: Electronic payment (wire or ACH) preferred. If payment by check is the only option, please ensure check is mailed using postal services with tracking capability.**

**Client: 007414 - Steel Perlot Management, LLC**

**Matter: 00005 - Management Company – General Advice**

## Time Summary

| Name | Title | | Hours | Amount |
|---|---|---|---|---|
| Colin S. Kelly | Partner | | 2.00 | 3,820.00 |
| Jason Ertel | Partner | | 0.50 | 955.00 |
| Michael Gershberg | Partner | | 0.50 | 872.50 |
| Lawrence Natke | Partner | | 4.00 | 6,460.00 |
| Adam J. Tarkan | Sr. Spec Counsel | | 13.80 | 21,390.00 |
| Yongsun Kwon | Associate | | 0.50 | 617.50 |
| | | **Totals** | **21.30** | **34,115.00** |

## Time Detail

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 02/09/24 | Adam J. Tarkan | Client call on new structure; attn to structure chart; follow up call with MR; tc LB re client matters; email CK re tax call | 1.00 | 1,550.00 |
| 02/12/24 | Colin S. Kelly | Conference call with FF team regarding SP restructuring. | 0.50 | 955.00 |
| 02/12/24 | Lawrence Natke | Call with M.Ritter re proposed Sports Media Entertainment (SME) division and potential structure options. | 2.30 | 3,714.50 |
| 02/12/24 | Adam J. Tarkan | Call with CK and LN re proposed structure of various SP entities; work on structure chart and assumptions; email LB re meeting with Pierre and Yves; follow up call with LN | 0.60 | 930.00 |
| 02/13/24 | Michael Gershberg | Research and analysis re export controls on homomorphic encryption. | 0.50 | 872.50 |
| 02/13/24 | Lawrence Natke | Calls re SP holdco and overview of proposed structure; attn to term sheets and MOUs re Sports Media and Entertainment division. | 1.70 | 2,745.50 |
| 02/13/24 | Adam J. Tarkan | Draft and circulate internally proposed SP group structure chart; prepare assumptions re same | 1.30 | 2,015.00 |
| 02/14/24 | Adam J. Tarkan | Review governing documents for SPM; revise structure chart; prepare assumptions for SP restructuring and send internally for review | 1.10 | 1,705.00 |
| 02/19/24 | Jason Ertel | Prepare term sheer (0.3) | 0.30 | 573.00 |

**Client: 007414 - Steel Perlot Management, LLC**

**Matter: 00005 - Management Company – General Advice**

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 02/19/24 | Adam J. Tarkan | Attn to proposal for asset management business; emails with background from client re same; coordinate with LB re same | 0.50 | 775.00 |
| 02/20/24 | Colin S. Kelly | Revised term sheet. | 0.40 | 764.00 |
| 02/20/24 | Adam J. Tarkan | Draft proposal for asset management business; review background materials; send to LB and LN and CK and JE for comments; revise per comments | 6.30 | 9,765.00 |
| 02/21/24 | Jason Ertel | Prepare term sheet (0.2) | 0.20 | 382.00 |
| 02/21/24 | Adam J. Tarkan | Revise term sheet for Asset Management business incorporating internal comments and send to client | 0.70 | 1,085.00 |
| 02/23/24 | Colin S. Kelly | E-mailed FF team regarding buy-out e-mail. | 0.30 | 573.00 |
| 02/23/24 | Adam J. Tarkan | Client email re ES buyout transaction; review option agreement draft; prepare proposed structure and issues list; send internally for comment; attn to CK comments re same | 0.90 | 1,395.00 |
| 02/23/24 | Yongsun Kwon | Review draft structure chart and corresponding summary. | 0.50 | 617.50 |
| 02/25/24 | Colin S. Kelly | Reviewed structure chart, assumptions. | 0.20 | 382.00 |
| 02/26/24 | Colin S. Kelly | Reviewed structure chart; e-mailed FF team. | 0.20 | 382.00 |
| 02/26/24 | Adam J. Tarkan | Follow up on structure chart for new SP structure; incorporate CK comments on assumptions re same | 0.30 | 465.00 |
| 02/27/24 | Colin S. Kelly | Telephone call with A. Tarkan regarding structure. | 0.10 | 191.00 |
| 02/27/24 | Adam J. Tarkan | Revise structure chart; revise assumptions; send both to LB; call with CK on ES buyout question; send structure chart and assumptions to client | 0.50 | 775.00 |
| 02/29/24 | Colin S. Kelly | E-mailed FF team regarding client call. | 0.10 | 191.00 |
| 02/29/24 | Colin S. Kelly | E-mailed A. Tarkan regarding SP Asset Management. | 0.20 | 382.00 |
| 02/29/24 | Adam J. Tarkan | Client email re asset management business and next steps; email re SP structure; set up call and related items | 0.60 | 930.00 |
| | | **Total:** | **21.30** | **34,115.00** |

## Disbursement Summary

| Description | Amount |
|---|---|
| Word Processing | 10.00 |
| Total: | 10.00 |

**Fried, Frank, Harris, Shriver & Jacobson LLP**
One New York Plaza
New York, NY 10004-1980
Tel: +1.212.859.8000
Fax: +1.212.859.4000
www.friedfrank.com

March 31, 2024

**Invoice # 240105678**

Steel Perlot Management, LLC
0 Bond Street
New York, NY 10012
Attn: Michelle Ritter
CEO

**Ref: 007414-00005**

**Re: Management Company – General Advice**

## REMITTANCE ADVICE

| | |
|---|---|
| **Total Current Invoice** | **$34,125.00** |

**Payment Terms Net 30 Days of Date of Invoice.**

**When making payment please quote Invoice 240105678 and reference 007414-00005**

| | |
|---|---|
| **Bank Name:** | Citibank |
| **Address:** | 153 East 53rd Street, 23rd Floor<br>New York, NY 10022 |
| **Bank Contact:** | Joseph Argento, Citi Private Bank – Law Firm Group |
| **Account Name:** | Fried, Frank, Harris, Shriver & Jacobson LLP |
| **ABA#:** | 021000089 |
| **Account #:** | 6783086396 |
| **Swift Code:** | CITIUS33 |
| **FF Contact:** | Beverly Sands / Victoria Rutman |

Please email details of invoices being paid to receipts@friedfrank.com

**Remittance Address**

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004
Attention: Accounting Department

**Fried, Frank, Harris, Shriver & Jacobson LLP**
One New York Plaza
New York, NY 10004-1980
Tel: +1.212.859.8000
Fax: +1.212.859.4000
www.friedfrank.com

March 31, 2024

**Invoice # 240105679**

Steel Perlot Management, LLC
0 Bond Street
New York, NY 10012
Attn: Michelle Ritter
CEO

**Ref: 007414-00002**

**Re: StarX**

---

**For Professional Services Rendered**

| | |
|---|---|
| through February 29, 2024 | $36,028.00 |
| **Total Current Billing** | **$36,028.00** |

**PLEASE NOTE: Electronic payment (wire or ACH) preferred. If payment by check is the only option, please ensure check is mailed using postal services with tracking capability.**

## Time Summary

| Name | Title | | Hours | Amount |
|---|---|---|---|---|
| Colin S. Kelly | Partner | | 1.10 | 2,101.00 |
| Lawrence Natke | Partner | | 4.80 | 7,752.00 |
| Adam J. Tarkan | Sr. Spec Counsel | | 2.60 | 4,030.00 |
| Yongsun Kwon | Associate | | 17.40 | 21,489.00 |
| Madison Eltrich | Associate | | 0.80 | 656.00 |
| | | **Totals** | **26.70** | **36,028.00** |

## Time Detail

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 02/13/24 | Colin S. Kelly | E-mailed FF team regarding 83(b). | 0.10 | 191.00 |
| 02/13/24 | Adam J. Tarkan | Review client email for StarX governing documents and tax matters re same; review prior correspondence re same and additional emails re the foregoing; review documents sent by client | 0.40 | 620.00 |
| 02/14/24 | Colin S. Kelly | E-mailed M. Eltrich regarding background. | 0.10 | 191.00 |
| 02/14/24 | Colin S. Kelly | Conference call with FF team regarding Star X. | 0.50 | 955.00 |
| 02/14/24 | Lawrence Natke | Attn to StarX organizational documents. | 0.60 | 969.00 |
| 02/14/24 | Adam J. Tarkan | Internal call on StarX governing documents and tax elections; review prior correspondence re same | 0.60 | 930.00 |
| 02/14/24 | Madison Eltrich | Discussion of entity formation and process. | 0.50 | 410.00 |
| 02/15/24 | Yongsun Kwon | Research Delaware law re: defective corporate acts; draft bylaws of Star X Networks. | 1.30 | 1,605.50 |
| 02/16/24 | Colin S. Kelly | Reviewed client e-mail regarding Star X. | 0.20 | 382.00 |
| 02/16/24 | Adam J. Tarkan | Prepare proposed email to client outlining plans for preparing various StarX documents (bylaws, director appointment, share issuance, loan agreement, etc); send internally; send to client; internal emails re same | 0.30 | 465.00 |
| 02/16/24 | Yongsun Kwon | Draft bylaws of StarX Networks. | 2.90 | 3,581.50 |
| 02/20/24 | Yongsun Kwon | Draft bylaws; research Delaware law re: defective corporate acts. | 0.80 | 988.00 |
| 02/21/24 | Yongsun Kwon | Draft bylaws and board consent re: defective corporate act and issuance of shares. | 1.70 | 2,099.50 |

**Client: 007414 - Steel Perlot Management, LLC**

**Matter: 00002 - StarX**

| Date | Timekeeper | Description | Hours | Amount |
|---|---|---|---|---|
| 02/22/24 | Lawrence Natke | Attn to StarX corporate documents. | 0.20 | 323.00 |
| 02/22/24 | Yongsun Kwon | Draft board consent re: adoption of by laws, appointment of director and issuance of shares; review SEC filings re: super-voting rights. | 1.80 | 2,223.00 |
| 02/23/24 | Adam J. Tarkan | Client follow up on StarX governance matters; emails re same and related items | 0.30 | 465.00 |
| 02/27/24 | Lawrence Natke | Review and comment on StarX board consent and bylaws; attn to loan agreement. | 1.50 | 2,422.50 |
| 02/27/24 | Adam J. Tarkan | Follow up on StarX governing document update; attn to draft documents sent by AK and related emails | 0.20 | 310.00 |
| 02/27/24 | Yongsun Kwon | Revise board consent and bylaws of StarX. | 1.80 | 2,223.00 |
| 02/28/24 | Colin S. Kelly | Met with M. Eltrich regarding loan agreement. | 0.20 | 382.00 |
| 02/28/24 | Lawrence Natke | Review loan agreement for StarX; attn to corporate documents for StarX. | 1.20 | 1,938.00 |
| 02/28/24 | Adam J. Tarkan | Review draft resolutions and bylaws for StarX; review draft loan agreement | 0.10 | 155.00 |
| 02/28/24 | Yongsun Kwon | Draft loan agreement. | 3.80 | 4,693.00 |
| 02/29/24 | Lawrence Natke | Attn to loan agreement and corporate documents; research re dual-class stock structure. | 1.30 | 2,099.50 |
| 02/29/24 | Adam J. Tarkan | Review loan agreement; tc Adam S; email from client re StarX structure and related items; set up call; client questions on board structure and conflicts | 0.70 | 1,085.00 |
| 02/29/24 | Yongsun Kwon | Draft loan agreement; research Delaware law regarding super voting structure; conference with L. Natke regarding loan agreement and corporate governance documents; draft amendment to certificate of incorporation. | 3.30 | 4,075.50 |
| 02/29/24 | Madison Eltrich | Reviewing draft loan agreement. | 0.30 | 246.00 |
| | | **Total:** | **26.70** | **36,028.00** |

**Fried, Frank, Harris, Shriver & Jacobson LLP**
One New York Plaza
New York, NY 10004-1980
Tel: +1.212.859.8000
Fax: +1.212.859.4000
www.friedfrank.com

Fried Frank

March 31, 2024

**Invoice # 240105679**

Steel Perlot Management, LLC
0 Bond Street
New York, NY 10012
Attn: Michelle Ritter
CEO

**Ref: 007414-00002**

**Re: StarX**

## REMITTANCE ADVICE

---

| | |
|---|---|
| **Total Current Invoice** | **$36,028.00** |

**Payment Terms Net 30 Days of Date of Invoice.**

**When making payment please quote Invoice 240105679 and reference 007414-00002**

| | |
|---|---|
| **Bank Name:** | Citibank |
| **Address:** | 153 East 53rd Street, 23rd Floor<br>New York, NY 10022 |
| **Bank Contact:** | Joseph Argento, Citi Private Bank – Law Firm Group |
| **Account Name:** | Fried, Frank, Harris, Shriver & Jacobson LLP |
| **ABA#:** | 021000089 |
| **Account #:** | 6783086396 |
| **Swift Code:** | CITIUS33 |
| **FF Contact:** | Beverly Sands / Victoria Rutman |

Please email details of invoices being paid to receipts@friedfrank.com

<u>**Remittance Address**</u>

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004
Attention: Accounting Department

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)
First Amended Complaint

# EXHIBIT 50

July 2021 SPM Amended and Restated Limited Liability Company Agreement (95%/5%) and July 1, 2022 Agreement resetting the Percentage Interests to 51% Common Member / 49% Preferred Member (DocuSign A6BCF8E3)

Execution Version

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**STEEL PERLOT MANAGEMENT, LLC**

This **AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** (as may be amended, modified, supplemented or restated from time to time, this "Agreement") of **STEEL PERLOT MANAGEMENT, LLC**, a Delaware limited liability company (the "Company"), is adopted, effective as of September 21, 2021 (the "Formation Date"), by the undersigned, (*a*) Michelle Ritter, an individual (the "Common Member"), and (*b*) Steel Perlot, LLC, a Delaware limited liability company (the "Preferred Member"), in their capacity as the members of the Company (the "Members"). The Common Member shall serve as the initial manager of the Company (the "Manager").

1. Formation. The Company was formed on the Formation Date as a limited liability company under and pursuant to the provisions of the Delaware Limited Liability Company Act, 6 Del. Code § 18-101 et seq., as amended (together with any successor to such statute, the "Act"). The rights, duties and liabilities of the Members and the Manager shall be as provided in the Delaware Act, except as otherwise provided herein. In the event of any inconsistency between any term or condition contained in this Agreement and any nonmandatory provision of the Delaware Act, the terms and conditions contained in this Agreement shall govern.

2. Name. The name of the Company is "**STEEL PERLOT MANAGEMENT, LLC**". The Company may conduct business under this name or any other name determined by the Manager.

3. Purpose. The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in (*a*) such lawful business activities as the Manager may agree, and (*b*) any and all activities necessary, advisable, convenient or incidental to the foregoing.

4. Registered Agent and Office. The Company's registered agent and registered office for the service of process in the State of Delaware pursuant to Section 18-104 of the Delaware Act shall be as set forth from time to time in the certificate of formation of the Company (as may be amended, modified, supplemented or restated from time to time, the "Certificate of Formation").

5. Principal Office. As of the Formation Date, the principal office of the Company is located at such address as the Manager may determine from time to time with notice to the Members. The location of the Company's principal office may be changed by the Manager with notice to the Members, and no amendment to this Agreement shall be necessary in connection with any such change. In addition, the Company may maintain offices and places of business at such other place or places within or outside the State of Delaware as the Manager determines to be necessary, appropriate, advisable or convenient with notice to the Members.

6. Term. The term of the Company shall be perpetual, unless sooner terminated and wound up in accordance with the Delaware Act.

7. Members. Each of the Common Member and the Preferred Member were admitted to the Company as Members on the Formation Date and shall be the sole Members. Additional Members may be admitted to the Company only upon unanimous consent of the Manager and both Members. No Member may assign or otherwise transfer its interest in the Company without the written consent of the other Member.

8. Percentage Interests. The "Percentage Interest" of the Members shall be as follows:

| | |
|---|---|
| Common Member | 95% |
| Preferred Member | 5% |

No change may be made to the Percentage Interest of any Member without the unanimous consent of the Manager and both Members.

9. Capital Contributions. The Members have, as of the date hereof, made capital contributions to the Company as follows:

| | |
|---|---|
| Common Member | $0 |
| Preferred Member | $2,500,000 |

The Members acknowledge and agree that (i) the Preferred Member has, as of the date hereof, funded 100% of the operating expenses and other costs and expenditures of the Company; (ii) such funding was intended by the Members to represent the equity capital of the Company; and (iii) any bridge demand promissory notes or other evidence of such funding that was entered into by the Company and the Preferred Member to document such funding pending the entry into of this Agreement shall be void and of no effect.

The Preferred Member may make additional capital contributions to the Company from time to time, upon unanimous consent of the Manager and both Members. No other capital contributions shall be made to the Company, except with the unanimous consent of the Manager and both Members.

10. Distributions. Distributions of available cash shall be made to the Members in the following order of priority:

(a) first, to the Preferred Member, until such time as the Preferred Member's Unreturned Capital (as defined below) has been reduced to zero;

(b) second, to the Preferred Member, until such time as the Preferred Member's Unpaid Preferred Return (as defined below) has been reduced to zero; and

(c) thereafter, to the Members, pro rata in proportion to their Percentage Interests.

"Unreturned Capital" means, with respect to the Preferred Member, the excess of (*x*) the cumulative capital contributions made by the Preferred Member to the Company over (*y*) the cumulative distributions made by the Company to the Preferred Member pursuant to Section 10(a) above.

"Unpaid Preferred Return" means, with respect to the Preferred Member, the excess of (*x*) a preferred return calculated at a per annum rate, with annual compounding, equal to the mid-term "applicable federal rate" as announced by the Internal Revenue Service and in effect from time to time, on the balance of the Preferred Member's Unreturned Capital from time to time, over (*y*) the cumulative distributions made by the Company to the Preferred Member pursuant to Section 10(b) above.

11. Tax Allocations. Items of income, gain, loss or deduction of the Company (determined in accordance with U.S. tax principles as applied to the maintenance of capital accounts) shall be allocated among the Members with respect to each fiscal year (or other period of the Company), for U.S. federal and state tax purposes, in a manner that as closely as possible gives economic effect to the provisions of Section 10 above and the other relevant provisions of this Agreement, in each case, except to the extent the Manager determines that a deviation therefrom is required by applicable law or to accomplish the economic intent of this Agreement or that special allocations of any such items are appropriate or advisable.

12. Management of the Company.

(a) Except as otherwise expressly provided in this Agreement, including without limitation in Section 12(b) below, all powers to control and manage the business and affairs of the Company shall be exclusively vested in the Manager, who shall be the sole "manager" (within the meaning of Section 18-101(12) of the Delaware Act) of the Company for all purposes of the Delaware Act. The Manager may exercise all powers of the Company and do all such lawful acts, including all actions that the Manager determines necessary, advisable, convenient or incidental for the management and conduct of the Company's business, except for such powers and acts that are expressly required by the Delaware Act, the Certificate of Formation or this Agreement to be exercised or done by the Members. The Manager may be removed and replaced by unanimous consent of the Members. The Preferred Member shall have no voting rights or rights over the management or affairs of the Company except as expressly set forth in this Agreement.

(b) Notwithstanding anything to the contrary in this Agreement, and without limiting any consents or approvals otherwise required by this Agreement, the Manager may not take or cause the Company to commit to any of the following actions or decisions without the prior written consent of the Preferred Member: (i) tax matters, such as making tax elections, preparing or filing any tax returns, and tax contests; (ii) incurrence of debt or making of any guaranty; (ii) fundamental transactions, such as merger, sale of material assets, blanket licenses, bankruptcy, etc; (iii) bringing or settling material litigation; (iv) admitting any new member; and/or (v) conducting any business or activity that would require the Preferred Member to register with the SEC or regulatory body.

(c) The Manager may appoint one or more officers or authorized signatories of the Company and confer upon such officers and authorized signatories such powers and authority

as determined by the Manager; provided that no officer or authorized signatory of the Company shall have greater authority than the Manager or take any action that the Manager is not permitted to take under the Certificate of Formation, this Agreement or the Delaware Act.

13. Limited Liability. Except as otherwise provided by the Delaware Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and neither the Members nor the Manager nor any other person shall be obligated for any such debt, obligation or liability of the Company by reason of being a member or manager of the Company.

14. Indemnification. To the maximum extent permitted by applicable law, the Company shall indemnify, defend and hold harmless each of (*a*) the Manager, (*b*) the Members, (*c*) each affiliate of the Manager or a Member, and (*d*) each officer, director, employee, manager, member, partner, or agent of the Manager, a Member of any such affiliate (collectively, the "Indemnified Parties") from and against any loss, damage, claim or liability incurred by any of them because of any act or omission (other than an act or omission that constitutes gross negligence, fraud or willful misconduct) by such Indemnified Party on the Company's behalf or in furthering the Company's purposes.

15. Amendment. This Agreement may be modified or amended at any time only by a written instrument signed by both Members.

16. Dissolution. The Company shall dissolve, and its affairs shall be wound up upon the first to occur of the following: (*a*) the unanimous determination by Members to dissolve the Company, (*b*) any time there are no Members unless the Company is continued in accordance with the Delaware Act, or (*c*) the entry of a decree of judicial dissolution under Section 18-802 of the Delaware Act. The bankruptcy (within the meaning of the Delaware Act) of any member of the Company shall not cause any of the Members to cease to be a member of the Company and, upon the occurrence of such a bankruptcy, the Company shall continue without dissolution. In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including, without limitation, the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Delaware Act.

17. No Third Party Rights. No person (other than the Members and the Manager) shall have any legal or equitable rights, remedies or claims under or in respect to this Agreement, and no persons other than the Members and the Manager shall be a beneficiary of any provision of this Agreement.

18. Governing Law. This Agreement, including, without limitation, its existence, validity, construction and operating effect, shall be governed by and construed in accordance with the laws of the State of Delaware without regard to otherwise governing principles of conflicts of law.

19. Severability. In the event any provision of this Agreement is adjudged by a court or arbitral panel of competent jurisdiction to be void, unenforceable or inoperative as a matter of law, the same shall in no way affect any other provision in this Agreement, the

application of such provision in any other circumstance or the validity or enforceability of this Agreement as a whole.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

IN WITNESS WHEREOF, the Members have executed this Agreement effective as of the Formation Date.

**COMMON MEMBER:**

**MICHELLE RITTER**

DocuSigned by:
Michelle Ritter
1375348D885F48D...

**PREFERRED MEMBER:**

**STEEL PERLOT, LLC**

By: DocuSigned by:
Maria Seferian
DEF72D5470F6482...
Maria Seferian, General Counsel, Hillspire, LLC,
Manager of Big Hen Group I, LLC, its Member

DocuSign

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 805F7E18D2334C4A88BD2D0EF8BE91AE | | Status: Completed |
| Subject: Please DocuSign: A-R LLC Agreement - Steel Perlot Management (1).docx_Redacted.pdf | | |
| Source Envelope: | | |
| Document Pages: 6 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | Suzin Brockett |
| AutoNav: Enabled | | 555 Bryant Street |
| EnvelopeId Stamping: Enabled | | 347 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | Palo Alto, CA 94301 |
| | | sbrockett@hillspire.com |
| | | IP Address: 98.234.249.38 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>12/30/2021 12:52:19 PM | Holder: Suzin Brockett<br>sbrockett@hillspire.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Maria Seferian<br>mseferian@hillspire.com<br>General counsel<br>Hillspire, LLC<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>Maria Seferian<br>DEF72D5470F6482...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 23.241.241.90 | Sent: 12/30/2021 1:10:45 PM<br>Resent: 12/30/2021 1:39:03 PM<br>Viewed: 12/30/2021 1:12:25 PM<br>Signed: 12/30/2021 1:44:23 PM |

**Electronic Record and Signature Disclosure:**
Accepted: 12/30/2021 1:12:25 PM
ID: 951d272d-07f3-4c6b-bd1b-d313ebf28a52

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Contracts<br>contracts@hillspire.com<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 12/30/2021 1:10:45 PM |

**Electronic Record and Signature Disclosure:**
Not Offered via DocuSign

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 12/30/2021 1:10:45 PM |
| Certified Delivered | Security Checked | 12/30/2021 1:12:25 PM |
| Signing Complete | Security Checked | 12/30/2021 1:44:23 PM |
| Completed | Security Checked | 12/30/2021 1:44:23 PM |

| Payment Events | Status | Timestamps |
| --- | --- | --- |

**Electronic Record and Signature Disclosure**

# AGREEMENT

This agreement, dated as of July 1, 2022 (this "**Agreement**"), between and among Steel Perlot, LLC, a Delaware limited liability company (the "**Preferred Member**"), Michelle Ritter, an individual in her capacity as the Common Member and the Manager (the "**Common Member**") and Steel Perlot Management LLC, a Delaware limited liability company ("**SPM**" or the "**Company**"), is made and entered into in connection with that certain Amended and Restated Limited Liability Company Agreement of SPM adopted effective as of September 21, 2021 (as amended from time to time, the "**Amended LLC Agreement**"). Capitalized terms used herein shall have the meanings set forth in the Amended LLC Agreement.

NOW, THEREFORE, in consideration of the premises and the agreements contained herein, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. Notwithstanding anything to the contrary set forth in the Amended LLC Agreement but subject to Paragraph 2 below, the Percentage Interest of the Members for all purposes of the Amended LLC Agreement (including Section 10 thereof) shall be as follows:

| | |
|---|---|
| Common Member | 51% |
| Preferred Member | 49% |

2. The parties agree that the percentage interests noted in Paragraph 1 above do not apply to certain agreed activities, such as Knox Networks, Inc., StarX, passive investments, and such other investments and activities as the parties may agree in writing from time to time. In furtherance of the foregoing, it is the intent of the parties that the participation in future investment opportunities may vary from the Percentage Interests set forth in Paragraph 1 and such will be agreed from time to time in writing by the parties. For clarity, the parties may also desire to issue equity to employees and others, whether at the Company or subsidiary level, and such issuance may effectively dilute the Common Member and Preferred Member ratably.

3. From and after the date hereof, the parties shall work together in good faith to amend and restate the Amended LLC Agreement to reflect the terms agreed to by the parties hereto in respect of future investment opportunities of SPM and such other terms, conditions and agreements as the parties hereto may hereafter agree in writing from time to time.

No amendment, modification, waiver or discharge of any provision of this Agreement shall in any event be effective unless the same shall be in writing and signed by each party hereto. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

This Agreement shall be interpreted and construed in accordance with the laws of the State of Delaware. If it is determined by a court of competent jurisdiction that any provision of this Agreement is invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this letter agreement.

Except as expressly set forth in and amended by this Agreement, the Amended LLC Agreement shall remain in full force and effect in accordance with its terms.

[*Signature pages follow*]

IN WITNESS WHEREOF, the Members and Manager have executed this Agreement effective as of date first set forth above.

**COMMON MEMBER & MANAGER:**

**MICHELLE RITTER**

DocuSigned by:
Michelle Ritter
9DBCE994A9F3470...

**PREFERRED MEMBER:**

**STEEL PERLOT, LLC**

By: Big Hen Group I, LLC, its Member

By: Hillspire, LLC, its Manager

DocuSigned by:
By: Maria Seferian
DEF72154070C6482...
Name: Maria Seferian
Title: General Counsel

**SPM:**

Steel Perlot Management, LLC

DocuSigned by:
By: Michelle Ritter
9DBCE994A9F3470...
Name: Michelle Ritter
Title: Manager

# EXHIBIT 51

Coit emails of May 23, 2024 ("URGENT REGARDING 2022 TAX RETURNS/AMENDMENTS," 10:26 a.m.; "Re: 2022 Amended return for SPM," 11:29 a.m. and 3:36 p.m.) re the $26.8M FY2022 amendment, "massive tax benefit," and "Michelle will need to amend her 2022 K1, and Big Hen will need to amend their 2022 K1"

Subject: Re: 2022 Amended return for SPM
Date: May 23, 2024 at 3:36:05 PM
To: ssibble@steelperlot.com
Cc: Michelle Ritter mritter@steelperlot.com, Ran Rabinowitch rrabinowitch@steelperlot.com, Mitchell Bajema mbajema@steelperlot.com

Hi Steph -

In follow-up to the below, KPMG is beginning their work on the amended 2022 returns (as MR approved). As a result, Michelle will need to amend her 2022 K1, and Big Hen will need to amend their 2022 K1. Will you or Michelle be informing Big Hen of this request? From my discussions with KPMG, it sounds as though it is the responsibility of the individual partners to amend their K1 returns, but I can clarify if needed.

Please let me know of any questions.

Thank you,

> On Thu, May 23, 2024 at 11:29 AM Connor Coit <ccoit@steelperlot.com> wrote:
> In the prior year, Deloitte capitalized $26.8M from the income statement, which KPMG does not agree with based on the nature of the business that SPM engages in. As a result, the capitalized amount was not able to be recognized as a loss. In the tax/accounting world, when you have net operating losses (iHi S.e. NOLs), you can carry forward these losses to offset gains and/or profit in future years (for up to 5 years). This is what the $26.8M will be intended to be used for, which is a massive tax benefit as you can offset your income to in-turn owe less in taxes. It is a significant tax win and I would recommend proceeding with the amended returns. It appears Michelle has signed off on proceeding with this approach as well.
>
> Please let me know if you have any further questions.
>
> Thank you,
>
> > On Thu, May 23, 2024 at 11:20 AM Stephanie Bousley <sbousley@steelperlot.com> wrote:
> > Hi Connor,
> >
> > Thanks for sending this. Could you please explain to me the significance of the net operating tax loss figure and walk us through your recommendation?
> >
> > Best,

in zero net operating loss (NOL) carryforwards to offset future income. In the current year, KPMG determined that they do not agree with the tax position taken by Deloitte for SPM in FY 2022 and would like to amend the FY 2022 returns. **As a result, KPMG estimates $26.8M of the previously capitalized expenses from a tax perspective can flow through as expenses and be carried forward as an NOL. This is a substantial tax win.**

However, as a result of this FY 2022 amendment, partners will need to amend their respective FY 2022 K1s. Based on discussion with KPMG, we are responsible for informing Big Hen Group I, LLC.

**At this point, the only action needed from Big Hen Group I, LLC is that you confirm you are in agreement and understand the FY 2022 amendment.** Once in agreement, KPMG will proceed with amending the returns, sending you the amended returns, and requiring you to process a Form 1065 to amend your FY 2022 return. SPM will coordinate with your team if there is anything else needed in the meantime.

Please let us know if you have any questions.

Thank you,

On Thu, May 23, 2024 at 10:26 AM Connor Coit <ccoit@steelperlot.com> wrote:
Michelle -

**URGENT REGARDING 2022 TAX RETURNS/AMENDMENTS**

As you are aware, KPMG has been engaged to perform the FY 2023 tax work for SPM and related entities. In FY 2022, Deloitte took a tax position that capitalized all expenses, which was unexpected and resulted in no net operating loss carryforward/benefit from a tax perspective. KPMG does not agree with Deloitte's tax determination in FY 2022 and proposed amending the prior year returns.

As noted below, if FY 2022 returns are amended, the filings mentioned in the email below are required. KPMG estimates the fees for amending these returns of $40K - $45K fee, and after carving our StarX from SPM in FY 2022, the estimated net operating tax loss (i.e. NOL carryforward) will be approx. $26.8M as a result of changing the prior year tax position.

Should we proceed with having KPMG amend the FY 2022 returns, each partner's K1s will also need to be amended (i.e. your K1 along with Big Hen's K1).

Please let me know if you would like KPMG to proceed with amending the FY 2022 returns and if you are comfortable with the associated fee estimate.

Please feel free to reach out with any questions.

Thank you,

# EXHIBIT 52

Coit email of May 29, 2024 ("Re: 2022 Amended return for SPM") transmitting KPMG's $40K–$45K addendum for DocuSign, with draft notice to Big Hen Group I, LLC, and Ritter's forwarding note ("Please share with the appropriate counsel")

partnership re
making
ing sched
an add

Please share with the appropriate counsel to communicate these revisions expeditiously. I ask for your assistance in this communication given the circumstances and extent to which other matters impact the work and employees.

Thanks,

Michelle

—

**Michelle Ritter**
Steel Perlot
mritter@steelperlot.com
(o) +1 917-200-0338

Begin forwarded message:

**From:** Connor Coit <ccoit@steelperlot.com>
**Date:** May 29, 2024 at 4:24:51 PM PDT
**To:** Michelle Ritter <mritter@steelperlot.com>
**Cc:** Stephanie Bousley <ssibble@steelperlot.com>, Stephanie Bousley <sbousley@steelperlot.com>, Ran Rabinowitch <rrabinowitch@steelperlot.com>, Mitchell Bajema <mbajema@steelperlot.com>
**Subject: Re: 2022 Amended return for SPM**

Michelle -

As previously, KPMG intends to amend the 2022 tax returns for SPM as they disagreed with Deloitte's tax position taken in 2022. Attached is the addendum provided by KPMG today, which is in line with the fee proposal you approved ($40-$45K). I sent this addendum to Steph earlier today to facilitate with the docusign process. Please let me know if there are any issues.

However, based on my discussion with KPMG earlier today, we need to reach out to Big Hen Group I, LLC to inform them of this change as their 2022 K1's will require an amendment. **Therefore, I drafted an email below for you to review and send to Big Hen Group I, LLC.**

Please let me know if you have any questions.

Thank you,

---

Hi All -

For FY 2023, Steel Perlot Management, LLC (SPM) engaged KPMG to perform their tax work. When doing so, we asked KPMG to review the tax determination made by our prior year tax partner (Deloitte) in FY 2022.

In FY 2022, Deloitte deemed SPM as a start-up and inevitably capitalized all expenses resulting

in zero net operating loss (NOL) carryforwards to offset future income. In the current year, KPMG determined that they do not agree with the tax position taken by Deloitte for SPM in FY 2022 and would like to amend the FY 2022 returns. **As a result, KPMG estimates $26.8M of the previously capitalized expenses from a tax perspective can flow through as expenses and be carried forward as an NOL. This is a substantial tax win.**

However, as a result of this FY 2022 amendment, partners will need to amend their respective FY 2022 K1s. Based on discussion with KPMG, we are responsible for informing Big Hen Group I, LLC.

**At this point, the only action needed from Big Hen Group I, LLC is that you confirm you are in agreement and understand the FY 2022 amendment.** Once in agreement, KPMG will proceed with amending the returns, sending you the amended returns, and requiring you to process a Form 1065 to amend your FY 2022 return. SPM will coordinate with your team if there is anything else needed in the meantime.

Please let us know if you have any questions.

Thank you,

On Thu, May 23, 2024 at 10:26 AM Connor Coit <ccoit@steelperlot.com> wrote:
Michelle -

**URGENT REGARDING 2022 TAX RETURNS/AMENDMENTS**

As you are aware, KPMG has been engaged to perform the FY 2023 tax work for SPM and related entities. In FY 2022, Deloitte took a tax position that capitalized all expenses, which was unexpected and resulted in no net operating loss carryforward/benefit from a tax perspective. KPMG does not agree with Deloitte's tax determination in FY 2022 and proposed amending the prior year returns.

As noted below, if FY 2022 returns are amended, the filings mentioned in the email below are required. KPMG estimates the fees for amending these returns of $40K - $45K fee, and after carving our StarX from SPM in FY 2022, the estimated net operating tax loss (i.e. NOL carryforward) will be approx. $26.8M as a result of changing the prior year tax position.

Should we proceed with having KPMG amend the FY 2022 returns, each partner's K1s will also need to be amended (i.e. your K1 along with Big Hen's K1).

Please let me know if you would like KPMG to proceed with amending the FY 2022 returns and if you are comfortable with the associated fee estimate.

Please feel free to reach out with any questions.

Thank you,

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)

First Amended Complaint

# EXHIBIT 53

"Meeting w/ KPMG 05.31.2024" minutes (3 pp.): "Discussion Topic: $26.8M amendment to SPM FY2022 Tax Return"; attendees Coit, Bajema, Rabinowitch, Keel, Lennon, Cho, Kierzkowski, Minyong, Quach; "All losses will be allocated to hillspire, MR K1 will not be impacted"

(1) Tax
Trading R within Holdco → basis
investment advisory act for outside clients
+ [money in & out]
(2) ↓ = Startup
investment advisor

Executive to family
spousal equivalent
investment cohabitation

...y owned &
...the sole benefit
...pooled investment vehicle

...re Meeting w/ KPMG 05.31.2024

...tendees: Connor Coit, Mitchell Bajema, Ran Rabinowitch,
Luke Keel, Megan Lennon, Chun Cho, Robert Kierzkowski,
Aum Minyong, Mandy Quach

Did not attend: Anthony Auriemma, Sunil Tahiliani

Discussion Topic: $26.8M amendment to SPM FY2022 Tax Return

(2) control = "unless such power = solely as officer" ← FD Hillspire

↑ $250-500M → startup revenue so these are costs.

investment adv
- Manny
↓
sending deals
- Lauren P.
↓
sending deals
- Todd M. + E

Notes:

- Chun: No reason to capitalize until trader business began. Thoughts when we looked at FY2023 in expansion. Looked at Deloitte's position and didn't realize why they reached this conclusion. When we looked at FY21, EY took a position that is consistent with the approach we had for FY23. We raised a possibility to amend FY22 returns.
- Luke: This has been a saga. We grappled with FY21 but EY was comfortable taking the position but I don't think they have looked at it as closely as hopefully you looked into it. Last year, Deloitte didn't look into it in depth and they did not understand the thought about the trader business. We were scratching our heads if incubating is a trader business.
- Luke: is there revenue
- Ran: Rev from hedging, none for spin out, but we are providing shared service support to the spin out businesses. Its a bundle in the same deal of the investment itself.
- KPMG: Mgmt service agreement for services have been provided. Point from national office - safe agreement is contingent on IPO or realized gain. Revenue is contingent on such.
- Luke: Giving services in exchange for something down the line if it materializes.
- KPMG: National office is more likely than not to sign the return.
- Luke: Wanted to first talk about trader business when that commenced. It commenced in 2021 in their opinion. Second thing, mechanics of how these returns get amended, not amendments for fed purposes, more administrative adjustments.
- Luke: State amendments would not be same as federal. Is KPMG familiar with BBA

finance team flagged + Hillspire initially wanted

- KPMG: BBA regime is how you amend partnership returns is through AAR. Notify the IRS, we are making adjustments to partnership returns, attaching schedules to show what changes on 1065. This will be an additional deduction, so you push out to the partners
- Luke: there is no NOL here. We need to pick it up in future years as returns as favorable adjustment. There are a lot of states here. Most of them would require amendments technically.
- Megan: this is our biggest concern. Picking up the adjustment for federal purposes. Our concern is having to amend all of these state returns.
- Luke: I am with you that I am not concerned about the federal return. I am concerned our principals would have to file amendment returns to the states. But, it would be beneficial, even from the state side.
- KPMG - Robert: We have a large volume of states. Although we are changing the partnership return, there may be no change as to what is sourced out to the partners. If these are zero-portioned states, there may be a zero impact. It comes to a business decision if there needs to be a report up the chain.
- Luke: California is important for us and we need to confirm but it should all be beneficial on the CA side as well. Even from a worldwide income perspective for the individuals.
- Megan: top two concerns:
  - Understand the trader business position.
  - Not ARR.
  - Also NOLs, we don't have corporations up the chain and there are partnerships and individuals.
- Luke: could impact Hillspire as well. All losses will be allocated to hillspire, MR K1 will not be impacted. I want to make sure this is clear and understood.
- Chun: we will keep this in mind.
- Luke: from a timing perspective, you probably want to do this as soon as possible so you have the starting point for FY23.
- Chun: Correct, need to start ASAP.
- Megan: Yes.
- Luke: When you send the bullets, is the amount referenced solid for us to think internally how it would impact us going up the chain?
- Minyong: yes, we are comfortable with the amount provided. It is based on the trial balance provided. There might be slight changes but no material changes expected.

Mandy: The whole thing about changing the position is based on what was done

- Our position is that the business starts when you provide services per the SAFE agreements. We are not looking at when you start businesses. The incubation business started.
- Mandy: if we take the position and file amendment it might trigger an audit. If we get audited, is KPMG standing behind us in this position?
- Chun: We do stand in this position. We are saying this is more likely than not.
- Luke: This is by 50-70%. Possibly not trigger a return the way BBA works.
- Megan: where you get to the individual level, it may raise a red flag. Who knows what else is coming down the pipeline this year and would be needed to report.
- Chun: you have the right position to make sure this is well documented. We will do the same on our end.

**Action Items**:

- Mandy asked if SPM Finance can share the list of 2022 SAFEs that was shared with KPMG. She wants to make sure this decision is not based on FY23 SAFE agreements.
- KPMG can provide authority of their position.
- KPMG can summarize the rationale for everyone's records.

Ⓢ - marked @ Fair value — options purchase — value based on mkt — returns = capital gains / [illegible] in sale

investment —

AFE investments — not quick ~~flips~~ + demonstrate value + [illegible]
(Big Hon I, LLC)

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)
First Amended Complaint

# EXHIBIT 54

Steel Perlot Management, LLC book-to-tax reconciliation, year ended December 31, 2023 (book loss $(20,580,161); taxable income $(15,777,531); "Written off capitalized labour cost" $3,388,013)

**STEEL PERLOT MANAGEMENT, LLC**
**Year Ended December 31, 2023**

| | | (FAV)/UNFAV |
|---|---|---|
| **Book Income/(loss)** | | (20,580,161) |
| **Permanent Differences** | | |
| | Meals and entertainment | 5,818 |
| | Fines and Penalties | 19,000 |
| | Interest | 2,036,685 |
| | **Total Perm Differences** | 2,061,503 |
| **Temporary Differences** | | |
| | Guaranteed Payments | 1,000,000 |
| | State and Local taxes | 50,398 |
| | Accrued Expenses | (315,200) |
| | Accrued Payroll | 101,200 |
| | Accrued Vacation | 244,994 |
| | Book Depreciation | 20,953 |
| | Tax Depreciation | (17,014) |
| | Unrealized gain/loss | (127,256) |
| | Labour cost | |
| | Written off capitalized labour cost | 3,388,013 |
| | Section 174 Deduction Capitalized Labour | (1,604,960) |
| | **Total Temp Differences** | 2,741,128 |
| Taxable Income | | (15,777,531) |

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)
First Amended Complaint

# EXHIBIT 55

SPM capital model dated November 1, 2022 ($MM; FY21–FY23 capital invested $95.3M; "Inhouse Startups" including StarX; "Incremental Investment Needed" $61.2M)

EXHIBIT 85

11/1/22, 1:50 PM

https://mail.google.com/mail/u/0/?tab=cm#inbox/FMfcgzGqRPzfpZZbSHvGnnjzFhFvGcxL?projector=1

| | A | B | C | D | E | F | G | H | I | J | K | L | M |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $MM | External Raise Timing | External Raise Type | FTE- Sep-22 | Non-FTE HC Sep-22 | FTE Until Raise | Non-FTE Until Raise | Capital Invested Life To Date (Sep-22) | Capital Invested FY21 | Capital Invested FY22 | Capital Invested FY23 | Capital Invested (FY21-23) | Incremental Investment Needed |
| 1 | **Internal Cash Engines** | | | | | | | | | | | | |
| 2 | AI Research | Jun-23 | Series A | 6 | 3 | 10 | 0 | 3.4 | 0.6 | 5.1 | 2.9 | 8.5 | 5.2 |
| 3 | Swaps | Sep-23 | Seed | 2 | 0 | 4 | 0 | 0.4 | 0.0 | 1.1 | 2.4 | 3.4 | 3.1 |
| 4 | Liquid Trading | Sep-23 | Seed | 5 | 0 | 5 | 0 | 0.8 | 0.0 | 1.3 | 1.0 | 2.4 | 1.6 |
| 5 | **Total** | | | **13** | **3** | **19** | **0** | **4.5** | **0.6** | **7.5** | **6.3** | **14.3** | **9.8** |
| 6 | **Inhouse Startups** | | | | | | | | | | | | |
| 7 | Knox Networks | Apr-23 | Series A | 15 | 2 | 17 | 0 | 5.9 | 0.4 | 7.4 | 2.6 | 10.4 | 4.6 |
| 8 | Atlas | Apr-23 | Series A | 14 | 4 | 16 | 0 | 2.2 | 0.0 | 4.1 | 1.6 | 5.7 | 3.5 |
| 9 | StarX | Mar-23 | Seed | 1 | 0 | 5 | 0 | 0.6 | 0.0 | 1.0 | 0.5 | 1.5 | 0.9 |
| 10 | Financial Analytics | Sep-23 | Seed | 0 | 0 | 5 | 0 | 0.0 | 0.0 | 0.3 | 1.7 | 1.9 | 1.9 |
| 11 | TikTok Competitor | Sep-23 | Seed | 0 | 0 | 5 | 0 | 0.0 | 0.0 | 0.2 | 1.7 | 1.9 | 1.9 |
| 12 | Zo | Dec-23 | Seed | 3 | 0 | 5 | 0 | 0.4 | 0.0 | 0.6 | 0.9 | 1.6 | 1.2 |
| 13 | SPG | Dec-23 | Seed | 4 | 0 | 4 | 0 | 1.1 | 0.2 | 1.4 | 1.3 | 2.9 | 1.9 |
| 14 | SayF | | | 4 | 0 | 0 | 0 | 0.5 | 0.0 | 0.7 | 0.0 | 0.7 | 0.1 |
| 15 | **Total** | | | **41** | **6** | **57** | **0** | **10.6** | **0.7** | **15.0** | **10.3** | **26.8** | **16.2** |
| 16 | **Other Initiatives** | | | | | | | | | | | | |
| 17 | SP Foundation | | | 0 | 0 | 0 | 0 | 0.2 | 0.0 | 2.8 | 0.0 | 2.8 | 2.6 |
| 18 | Constructivist Fund | | | 0 | 0 | 1 | 0 | 0.0 | 0.0 | 0.0 | 0.7 | 0.7 | 0.7 |
| 19 | Semiconductors | | | 1 | 2 | 1 | 0 | 0.2 | 0.0 | 0.3 | 0.4 | 0.7 | 0.6 |
| 20 | SP Venture | | | 4 | 1 | 5 | 0 | 1.2 | 0.1 | 1.7 | 1.7 | 3.5 | 2.3 |
| 21 | **Total** | | | **5** | **3** | **7** | **0** | **1.5** | **0.1** | **4.8** | **2.8** | **7.7** | **6.2** |
| 22 | **SPM Operations** | | | | | | | | | | | | |
| 23 | **People Expenses** | | | **14** | **2** | **22** | **0** | **5.3** | **0.3** | **8.3** | **13.8** | **22.4** | **17.1** |
| 24 | Leadership | | | 2 | 1 | 7 | 0 | 1.1 | 0.0 | 3.1 | 8.2 | 11.3 | 10.2 |
| 25 | Finance | | | 2 | 1 | 3 | 0 | 0.1 | 0.0 | 0.4 | 0.9 | 1.3 | 1.2 |
| 26 | Legal | | | 2 | 0 | 3 | 0 | 2.7 | 0.2 | 2.8 | 2.0 | 5.1 | 2.3 |
| 27 | Strategic Operations | | | 5 | 0 | 5 | 0 | 0.9 | 0.1 | 1.3 | 1.5 | 2.9 | 2.0 |
| 28 | People Operations | | | 3 | 0 | 4 | 0 | 0.4 | 0.0 | 0.7 | 1.2 | 2.0 | 1.5 |
| 29 | **Non Payroll Expenses** | | | | | | | **9.0** | **1.1** | **11.0** | **8.9** | **21.0** | **12.0** |
| 30 | Leadership | | | | | | | 0.3 | 0.1 | 0.3 | 0.3 | 0.7 | 0.4 |
| 31 | Finance | | | | | | | 0.2 | 0.0 | 0.3 | 0.0 | 0.3 | 0.1 |
| 32 | Legal | | | | | | | 1.5 | 0.3 | 1.6 | 1.5 | 3.4 | 1.9 |
| 33 | Strategic Operations | | | | | | | 2.8 | 0.1 | 3.1 | 1.9 | 5.1 | 2.3 |
| 34 | People Operations | | | | | | | 1.5 | 0.3 | 1.9 | 0.0 | 2.2 | 0.7 |
| 35 | G&A | | | | | | | 2.6 | 0.2 | 3.9 | 5.1 | 9.2 | 6.6 |
| 36 | Prepaid Expenses | | | | | | | 3.0 | 0.0 | 3.0 | 0.0 | 3.0 | 0.0 |
| 37 | **Total** | | | **14** | **2** | **22** | **0** | **17.4** | **1.4** | **22.4** | **22.7** | **46.5** | **29.1** |
| 38 | **Total SPM** | | | **73** | **14** | **105** | **0** | **34.1** | **2.8** | **50.4** | **42.1** | **95.3** | **61.2** |
| [illegible] | **SPM Investments** | | | | | | | | | | | | |

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)

First Amended Complaint

# EXHIBIT 56

Rabinowitch email to "Michelle and Eric" (June 16, 2023) re Knox/SPM/StarX headcount, June budget, and funding request; Quach reply (June 21, 2023) copying Eric Schmidt, Seferian, Hur, and Manuel

EXHIBIT 86

On Fri, Jun 16, 2023 at 4:08 PM Ran Rabinowitch <rrabinowitch@steelperlot.com> wrote:

Michelle and Eric,

Please see below details for Knox/SPM/StarX regarding headcount, June budget, and funding request for the second half of June.

- Knox Employees 14
- StarX Employees 4
- SPM Employees 32

image.png

image.png

- **$745,627** to close the outstanding balance owed from SPM to Steel Perlot.
- Second Half of June Payroll only - **$189K Knox**, **$38K StarX**, and **$775K SPM**.
- Second Half of June Payroll plus Payables (minus Legal) - **$251K Knox**, **$68K StarX**, and **$1,101K SPM**.
- Second Half of June Payroll plus Payables - **$251K Knox**, **$68K StarX**, and **$1,149K SPM**.

Best,

Ran

**Attachments:**

**image001.png** 153k

**image002.png** 198k

---

**mandy@hillspire.com Mandy Quach** Wednesday, June 21, 2023 at 4:17:29 PM Pacific Daylight Time
To: rrabinowitch@steelperlot.com Ran Rabinowitch
Cc: ericschmidt@gmail.com Eric Schmidt, mritter@steelperlot.com Michelle Ritter, dcharnin@steelperlot.com David Charnin, mseferian@hillspire.com Maria Seferian, jhur@hillspire.com Joon Hur, vmanuel@hillspire.com Vince Manuel

# EXHIBIT 57

"Wire scheduled - SPM to StarX for May-2024 Coverage" thread (May 1–6, 2024): Rabinowitch–Quach; Quach's "Eric has no further funding obligation" / "recoupable loan to SPM" / "broader transition" email (May 6, 2024) (Google Vault preservation export by Ritter, July 13, 2024)

I am available to discuss further and support wherever I can. Let me know how best to help.

Best,
Ran

On Mon, May 6, 2024 at 9:16AM Ran Rabinowitch <rrabinowitch@steelperlot.com> wrote:
PRIVILEGED AND CONFIDENTIAL

---------- Forwarded message ---------
From: **Mandy Quach** <mandy@hillspire.com>
Date: Mon, May 6, 2024 at 9:10AM
Subject: RE: Wire scheduled - SPM to StarX for May-2024 Coverage
To: Ran Rabinowitch <rrabinowitch@steelperlot.com>

Hi Ran,

Eric's attorney sent multiple communications to Michelle's attorney regarding SPM funding and Michelle's attorney never responded. Eric's attorney explained th milestones and other criteria relating to the proposed 2024 SPM budget, and because of that and other reasons Eric has no further funding obligation. I hope yo communications. Please let me know if you have a different understanding.

The communications from Eric's attorney to Michelle's attorney also addressed wages for SPM employees and Michelle's attorney never replied. My understand Eric has no further funding obligations, he is willing to fund wages for SPM employees through the end of May pursuant to a recoupable loan to SPM, and he mig severances as part of a broader transition. Please read the communications to Michelle's attorney and let me know your thoughts.

The communications to Michelle's attorney may include more information and I defer to those communications.

Mandy

**From:** Ran Rabinowitch <rrabinowitch@steelperlot.com>
**Sent:** Friday, May 3, 2024 1:26 PM
**To:** Mandy Quach <mandy@hillspire.com>
**Subject:** Re: Wire scheduled - SPM to StarX for May-2024 Coverage

Mandy, I am trying to adhere to my Finance responsibilities and do my job. I need to know where we stand on the SPM budget and the debt line funding for StarX. Er the line, and as I have been always told and per Michelle's first principles, people should always get paid for their work.

You have full visibility to the prior emails and reports sent and should have the relevant information/materials.

Thank you for your help in getting this resolved immediately.

Best,

Ran

On Fri, May 3, 2024 at 10:40AM Mandy Quach <mandy@hillspire.com> wrote:

Hi Ran,

In the SPM Feb Financials, where is the amount spent by StarX reflected?

**From:** Ran Rabinowitch <rrabinowitch@steelperlot.com>
**Sent:** Wednesday, May 1, 2024 2:12 PM
**To:** Mandy Quach <mandy@hillspire.com>
**Subject:** Re: Wire scheduled - SPM to StarX for May-2024 Coverage

# EXHIBIT 58

The Corporation Trust Company "Important Delaware Tax Information" and "2023 State of Delaware 1st Estimated Tax Notice" for StarX Networks, Inc. (DE File No. 7944901), addressed to "Natalya Thakur-COO, Knox Networks Inc., 555 Bryant St PMB 374, Palo Alto, CA" (Apr. 24, 2023); Delaware Division of Corporations status for StarX ("AR Delinquent, Tax Due," as of Mar. 2, 2025); StarX 2023 Delaware Annual Franchise Tax Report filed by Ritter (July 15, 2024)

Wolters Kluwer

CT
28 Liberty Street
New York, NY 10005
855.316.8948 t
212.590.9060 f
ctcorporation.com

April 24, 2023

T13 P19 2997 **************AUTO**ALL FOR AADC 940
NATALYA THAKUR-COO
KNOX NETWORKS INC.
555 BRYANT ST PMB 374
PALO ALTO, CA 94301-1704

## IMPORTANT DELAWARE TAX INFORMATION

**FROM YOUR DELAWARE REGISTERED AGENT: THE CORPORATION TRUST COMPANY**

**RE: STARX NETWORKS, INC.**

**DE FILING NO.: 7944901**

Dear NATALYA THAKUR-COO,

Please find below the 2023 State of Delaware 1st Estimated Tax Notice for the corporation identified above. Payment must be received by the State of Delaware by the date printed below.

Online payment is available at corp.delaware.gov. Acceptable methods of online payment are credit card ($5,000 limit) and ACH debit from a US Checking Account (any amount). If paying by check or money order, the remittance should be submitted by the due date of June 1st, 2023, with the return to:

**MAILING ADDRESS**
Delaware Division of Corporations
P.O. Box 5509
Binghamton, NY 13902-5509

**OVERNIGHT COURIER ADDRESS**
Attn: State of Delaware - Division of Corporations - 5509
JPMorgan Chase
33 Lewis Road
Binghamton, NY 13905

We are here to help! Please feel free to contact:

Your CT Small Business Group
877-467-3525
Thank you for your business.

XXXXXX
SOSCTL

**PAY ONLINE AT: CORP.DELAWARE.GOV**

## 2023 STATE OF DELAWARE 1ST ESTIMATED TAX NOTICE

DO NOT ALTER FILE NUMBER

| FILE NUMBER | NAME | TAX YEAR | PHONE NUMBER |
|---|---|---|---|
| 7944901 | STARX NETWORKS, INC. | 2023 | |

| TAX | PENALTY | INTEREST | FILING FEE | CHECK CHARGE | PREV. BAL. OR CR. | TOTAL BAL. DUE |
|---|---|---|---|---|---|---|
| $68,066.00 | | | | | $174,857.96 | $242,923.96 |

| AMT. DUE IF RECD. BY 1-Jun-23 | AMT. DUE IF RECD. BY 1-Jul-23 | AMT. DUE IF RECD. BY 1-Aug-23 | AMT. DUE IF RECD. BY |
|---|---|---|---|
| $ $245,470.44 | $ $249,037.91 | $ $252,605.38 | $ |

**MAKE CHECK PAYABLE TO: DELAWARE SECRETARY OF STATE**

| CHECK NO. | AMOUNT ENCLOSED |
|---|---|
| | $ |

PLEASE REMIT INVOICE WITH PAYMENT

Registered Agent 9000010
State of Delaware
Division of Corporations
PO Box 5509
Binghamton, NY 13902-5509

1 060123 7944901 024292396 0 5

**Due on or before 1-Jun-23**

# State Of Delaware

****THIS IS NOT AN OFFICAL CERTIFICATE OF STATUS****

Date Retrieved: 10/7/2025 5:12:08PM

File Number: 7944901

Incorporation Date / Formation Date: 5/7/2020

Entity Name: STARX NETWORKS, INC.

Entity Kind: Corporation

Entity Type: General

Residency: Domestic

State: DELAWARE

Status: AR Delinquent, Tax Due

Status as of: 3/2/2025

**Registered Agent Information**

Name: THE CORPORATION TRUST COMPANY

Address: CORPORATION TRUST CENTER 1209 ORANGE ST

City: WILMINGTON

Country:

State: DE

Postal Code: 19801

Phone: 302-658-7581

**Tax Information**

Last AnnualReport Filed: 2023

Tax Due: $ 300224.60

Annual Tax Assessment: $171015

Total Authorized Shares: 20100000

THIS IS NOT AN OFFICAL CERTIFICATE OF STATUS

**Filing History (Last 5 Filings)**

| Seq | Description | No of Pages | Filing Date mm/dd/yyyy | Filing Time | Effective Date mm/dd/yyyy |
|---|---|---|---|---|---|
| 1 | Restated Stock | 7 | 20240315 | 145600 | 20240315 |
| 2 | Stock Corporation | 3 | 20200507 | 184500 | 20200507 |

****THIS IS NOT AN OFFICAL CERTIFICATE OF STATUS****

# State of Delaware

# Annual Franchise Tax Report

| CORPORATION NAME | TAX YR. |
|---|---|
| STARX NETWORKS, INC. | 2023 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE |
|---|---|---|
| 7944901 | 2020/05/07 | |

PRINCIPAL PLACE OF BUSINESS
0 BOND ST., 4TH FL.
NEW YORK, NY 10012

PHONE NUMBER
(510)828-7772

REGISTERED AGENT
THE CORPORATION TRUST COMPANY
CORPORATION TRUST CENTER
1209 ORANGE ST
WILMINGTON DE 19801

AGENT NUMBER
9000010

| AUTHORIZED STOCK BEGIN DATE | END DATE | DESIGNATION/ STOCK CLASS | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| 2020/05/07 | 2024/03/15 | COMMON | 20,000,000 | .0000100000 |

| OFFICER NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|
| MICHELLE RITTER | 269 S. BEVERLY DR., #1315<br>BEVERLY HILLS, CA 90212 | CEO |

| DIRECTORS NAME | STREET/CITY/STATE/ZIP |
|---|---|
| MICHELLE RITTER | 269 S. BEVERLY DR., #1315<br>BEVERLY HILLS, CA 90212 |

*NOTICE: Pursuant to 8 Del. C. 502(b), If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.*

| AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR) | DATE | TITLE |
|---|---|---|
| MICHELLE RITTER<br>269 S. BEVERLY DR., #1315<br>BEVERLY HILLS, CA 90212 US | 2024/07/15 | CEO |

# State of Delaware

# Annual Franchise Tax Report

| CORPORATION NAME | TAX YR. |
|---|---|
| STARX NETWORKS, INC. | 2023 |

| FILE NUMBER | FEDERAL EMPLOYER ID NO. |
|---|---|
| 7944901 | |

ASSETS FOR REGULATED INVESTMENT CORPS

| JAN. 1st. | DEC. 31st. |
|---|---|
| | |

Date(s) of Inactivity

| From | To |
|---|---|
| | |

| TOTAL NUMBER OF SHARES ISSUED | TOTAL GROSS ASSETS | ASSET DATE |
|---|---|---|
| 4,000,000 | $0.00 | 2024/03/15 |

| Franchise Tax | Penalty | 1.5% Monthly Interest | Annual Filing Fee | Prev Credit or Balance |
|---|---|---|---|---|
| $400.00 | $200.00 | $45.00 | $50.00 | $0.00 |

| Prepaid Qrty. Payments | Amount Due | Amount Paid | Check Number |
|---|---|---|---|
| $0.00 | $695.00 | $695.00 | |

Ritter v. Schmidt, et al., No. 2:26-cv-04382-JGB-Ex (C.D. Cal.)
First Amended Complaint

# EXHIBIT 59

StarX (Papapanagiotou)–Auth.Inc (Greene) email thread (May 14, 2024) (Google Vault preservation export by Ritter, July 13, 2024)

7/13/24, 1:

Google Vault - Re: StarX - Auth.Inc

# Re:

ipapapa@steelperlot.com Ioannis Papapanagiotou
To: kieran@auth.inc Kieran Greene
Cc: marios.anapliotis@gmail.com Marios Anapliotis, rrabinowitch@steelperlot.com Ran Rabinowitch

Tuesday, May 14, 2024 at 12:19:58 PM Paci

Hello Kieran,

It was really nice chatting with you today and I learned a lot and I am looking forward to working with you has some great experience in the ad engineering space. I was wondering if you have some time tomorrov to chat with him as well.

Warm regards,
Ioannis

On Tue, May 14, 2024 at 6:32AM Kieran Greene <kieran@auth.inc> wrote:

> Hey Ioannis,
>
> That's actually totally fine and could work better for me.
>
> Thanks,
> Kieran
>
> AUTH
>
> **Kieran Greene**
> CEO
> **E:** kieran@auth.inc
> **M:** +971 52 446 2779
> **Whatsapp:** +353 83 4236 117
>
> AUTH /kierangreene
>
> DISCLAIMER: This email and any files included with it may contain proprietary and/or confidential information that is privileged and confidential and is for the sole use of the intended recipient(s). Any disclosure, copying, distribution, posting, or use of the information contained in or appended to this email is prohibited unless permitted by the sender. If you have received this email in error, please immediately notify the sender via return email or telephone and destroy this original transmission and its included files without reading or saving it in any manner. Auth Consulting. | Building A1, Dubai Digital Park, Dubai Silicon Oasis, Dubai, United Arab Emirates

On Tue 14 May 2024 at
Hello Kieran

# EXHIBIT 60

Still image from video recorded by Ritter at her residence, December 17, 2024, 12:21 p.m., showing Marcus inside the home

EXHIBIT 90



# EXHIBIT 61

WhatsApp messages from Emina (United Kingdom) to Ritter, September 2025, reporting Schmidt's statements ("He told me more than once 'I will bankrupt her' as if it was his vengeance for you not submitting to him")

20 Emina - UK

Yesterday

calling my mum and telling her that I knew the story with you wasn't true 1:45 PM

I am sure everyone around him also knows that the story he sells about you isn't true 1:46 PM

He told me more than once "I will bankrupt her" as if it was his vengeance for you not submitting to him 1:48 PM

I have thoughts on my stuff, obviously. Namely, the stuff I've gone through and that he put my parents through is outrageous. I told him that he could always hop on a plane and find people to tell him what he wants to hear but at night, when he's really alone, he'll realize that the only people who ever cared about him would never be there because he didn't care about himself. 1:49 PM

I hate when people lie. And he knows this. And I hated when he'd use every piece of leverage to hurt my family, my businesses or me. Normal people could break up and just say that I'll never talk to the other person again. Instead, his MO is to own me 1:50 PM

That's why I finally said enough is enough. Because I'm not running from myself at all. I have absolutely nothing to hide. They have said the nastiest